Terry W. Bird – Bar No. 49038
    tbird@birdmarella.com
Dorothy Wolpert – Bar No. 73213
    dwolpert@birdmarella.com
*Naeun Rim – Bar No. 263558
    nrim@birdmarella.com
Shoshana E. Bannett – Bar No. 241977
    sbannett@birdmarella.com
Christopher J. Lee – Bar No. 322140
    clee@birdmarella.com
Jimmy Threatt – Bar No. 325317
    jthreatt@birdmarella.com
BIRD, MARELLA, BOXER,
WOLPERT, NESSIM, DROOKS,
LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Peter J. Eliasberg – Bar No. 189110
    peliasberg@aclusocal.org
Peter Bibring – Bar No. 223981
    pbibring@aclusocal.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 W 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

Donald Specter – Bar No. 83925
    dspecter@prisonlaw.com
Sara Norman – Bar No. 189536
    snorman@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Facsimile: (510) 280-2704

Attorneys for Plaintiff-Petitioners

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| YONNEDIL CARROR TORRES; VINCENT REED; FELIX SAMUEL GARCIA; ANDRE BROWN; SHAWN L. FEARS, individually and on behalf of all others similarly situated,<br><br>                Plaintiff-Petitioners,<br><br>        vs.<br><br>LOUIS MILUSNIC, in his capacity as Warden of Lompoc; and MICHAEL CARVAJAL, in his capacity as Director of the Bureau of Prisons,<br><br>                Defendant-Respondents. | CASE NO.<br><br>**COMPLAINT—CLASS ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF AND PETITION FOR WRIT OF HABEAS CORPUS**<br><br>**Immediate Relief Requested** |

3649388

# I.

# INTRODUCTION

1.      The Federal Bureau of Prisons ("BOP") is mismanaging one of the worst public health catastrophes related to COVID-19 anywhere in the country—and at the epicenter of the outbreak are FCI Lompoc and USP Lompoc (collectively "Lompoc"), where more than 1,000 incarcerated persons have tested positive for COVID.

2.      FCI Lompoc is a low security prison located in Santa Barbara County, California. Just down the road is its sister facility USP Lompoc, which houses medium security individuals and is adjacent to a low security satellite camp. Prisoners are often transferred among these facilities. Lompoc is the site of by far the largest COVID-19 outbreak at a BOP facility. As of the morning of May 15, 2020, BOP reports that 1,023 of the 2,680 individuals collectively incarcerated at Lompoc have tested positive for COVID-19.[1]

3.      The cases at Lompoc account for more than 65 percent of cases in Santa Barbara County and are so staggering that local officials are asking the State of California to allow them to exclude the numbers from Lompoc in their reopening criteria.[2]  Shockingly, these numbers, high as they seem, are still underreported. Only the 963 prisoners at FCI Lompoc have undergone a round of mass testing (which was completed weeks past the point where testing could have helped actually prevent the virus from spreading), with 882 reporting positive—meaning that nearly

---

[1]   Bureau of Prisons, COVID-19 Update, https://www.bop.gov/coronavirus/ (last visited May 15, 2020).

[2]   Delaney Smith, *Santa Barbara County Urges State to Exclude Lompoc Prison Cases from Reopening Criteria*, SANTA BARBARA INDEPENDENT, May 11, 2020, https://www.independent.com/2020/05/11/santa-barbara-county-urges-state-to-exclude-lompoc-prison-cases-from-reopening-criteria/.

*100% now have the virus*.[3] There is no clearer indication of how ineffective BOP's COVID-19 prevention policies have been than their own statistics.

4.       Plaintiff-Petitioners ("Petitioners") are forced to bring this class action seeking court intervention to prevent Lompoc from becoming the site of a national tragedy. Respondents Michael Carvajal, the Director of the BOP, and Louis Milusnic, the Warden of Lompoc, have demonstrated that they will not take the measures necessary to prevent the coronavirus from converting more prison sentences into death sentences without court intervention. Public health experts have been clear—to prevent the disease from spreading and reduce the burden on prison medical resources, Respondents must conduct testing in time for isolation to be effective, provide adequate personal protective equipment ("PPE"), properly treat and monitor those who are sick, and most importantly, ***reduce the prison population to allow for adequate social distancing and sufficient access to medical care***.[4]

5.       As part of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, Congress modified 18 U.S.C. § 3624(c) to enable BOP to do just that—section 12003(b)(2) of the CARES Act gave Respondents and the BOP the broad discretion to allow home confinement and reduce crowding at prisons during the COVID-19 emergency period. Despite this and the guidance of Attorney General William Barr urging the BOP to immediately transfer medically "at-risk" prisoners to home confinement,[5] Respondents are refusing to consider home

---

[3]   Tyler Haden, *Santa Barbara County Urges State to Exclude Lompoc Prison Cases from Reopening Criteria*, SANTA BARBARA INDEPENDENT, May 13, 2020, https://www.independent.com/2020/05/13/lompoc-prison-explodes-with-active-covid-19-cases/ (USP Lompoc, which houses 1717 individuals, has not yet conducted a round of mass testing and is likely to have far more than the 22 cases BOP is currently reporting).

[4]   *See, e.g.*, Exhibit 7 ("Exh. 7", Declaration of Shamsher Samra, M.D.) ¶¶ 20–22; Exhibit 8 ("Exh. 8", Declaration of Marc Stern, M.D.) ¶¶ 18–20.

[5]   Office of the Attorney General, Prioritization of Home Confinement as

confinement for the vast majority of those incarcerated at Lompoc. At the same time, Respondents have failed to conduct timely testing, provide adequate PPE, or effectively isolate those who are infected and those who have had contact with the infected. The recent round of mass testing was helpful only to prove just how ineffective BOP's policies have been. For many, the actions and inactions of Respondents will lead to a death sentence. This deliberate indifference amounts to cruel and unusual punishment prohibited by the Eighth Amendment.

6.     The accounts of the named Petitioners to this action show the inhumane manner in which BOP's COVID-19 policies are being implemented at Lompoc. When Petitioner Yonnedil Carror Torres, who has asthma, reported symptoms consistent with coronavirus, he was ignored for days and denied medical treatment until he went into respiratory shock and had to be put on a ventilator. For Petitioner Vincent Reed, being "quarantined" after testing positive meant being put in solitary confinement for days without medical care. Petitioner Felix Samuel Garcia is scheduled to be released in the fall—but instead of using the power granted to BOP by Congress under the CARES Act to release him early to home confinement, thereby reducing the risk to him and to others, Respondents are arbitrarily forcing him to spend two more months of his sentence at Lompoc in a hastily-converted warehouse, where he is locked in a cell and not even allowed to shower. Due to the burden on Lompoc's medical resources from COVID-19-related care, Petitioner Andre Brown cannot get treatment for his prostate cancer. To make matters worse, Lompoc is one of the few BOP facilities that has made the unusual decision to severely restrict access to phone and email for prisoners under the guise of

Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf; Office of the Attorney General, Increasing Use of Home Confinement as Institutions Most Affected by COVID-19 (Apr. 3, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf.

1    preventing the spread of the virus. Petitioners have barely been able to access

2    phones and internet to ask for help from their lawyers or family members. State jails

3    and most other federal facilities have not implemented similar restrictions on

4    communication with the outside world, and in fact, some state jails are permitting

5    free phone calls due to bans on in-person visiting.[6]

6        7.    Respondents and their ineffectual and unnecessarily cruel policy of

7    isolating positive cases in solitary confinement and unsanitary makeshift living

8    spaces has completely failed to stop or even slow the spread of the virus. Having

9    failed to prevent the outbreak, Respondents cannot now be trusted to provide those

10   who have tested positive with proper medical treatment or to protect those who

11   remain uninfected from infection. Nor are there indications that Respondents are

12   adapting quickly and learning from their mistakes. Somehow, a month and a half

13   since the first BOP prisoner in the country tested positive and a week after the

14   numbers from FCI Lompoc demonstrated how quickly the virus had spread at

15   a nearby facility with shared resources, Lompoc still has not tested the nearly 2000

16   prisoners housed at USP. Moreover, prisoners are still going without basic supplies

17   like soap, hand sanitizer, and face masks.

18       8.    Petitioners cannot afford to wait and see if Respondents will be able to

19   handle the treatment of coronavirus any better than they handled the prevention of

20   its spread. Already, the media is reporting that Respondents are mishandling

21   medical treatment in the same manner in which they mishandled prevention.[7]

22

23   [6]   Sareen Habeshian, *California Inmates Granted Free Calls Following Halted

24   Visitations Amid Coronavirus Fears*, KTLA5, Apr. 1, 2020,
     https://ktla.com/news/california/california-inmates-granted-free-calls-following-

25   halted-visitations-amid-coronavirus-fears/.

26   [7]   Tyler Haden, *Lompoc Prison Explodes with Active COVID-19 Cases*, SANTA

27   BARBARA INDEPENDENT, May 13, 2020,
     https://www.independent.com/2020/05/13/lompoc-prison-explodes-with-active-

28   covid-19-cases/.

Unless immediate action is taken to ensure that Lompoc provides proper medical care to those infected and implements measures to protect those who are not yet infected, including by reducing the size of the incarcerated population, soon, substantially all incarcerated people at Lompoc—many of whom are especially vulnerable due to underlying medical conditions—will be infected with COVID-19. More will die. Dr. Shamsher Samra, a noted physician with ample experience working with incarcerated individuals, delivers an urgent warning: "BOP should take ***immediate steps*** to dramatically downsize the population at Lompoc, with priority given to those at high risk of harm due to their age and health status and thus are likely to require a disproportionate amount of medical resources."[8]

9.      Accordingly, Petitioners Yonnedil Carror Torres, Vincent Reed, Felix Samuel Garcia, Andre Brown, and Shawn L. Fears, on behalf of themselves and a class of all persons incarcerated at Lompoc now and in the future, bring this action for declaratory and injunctive relief, for enlargement of custody to include home confinement, and ultimately, if they cannot be held in custody constitutionally, for release.

## II.

## PARTIES

10.     Plaintiff-Petitioner Yonnedil Carror Torres ("Petitioner Torres") is incarcerated at USP Lompoc. He is 24 years old and has suffered from chronic asthma since he was a child, making him especially vulnerable to complications resulting from COVID-19. On April 24, 2020, Petitioner Torres started feeling seriously ill and developed COVID-19 symptoms including fever, diarrhea, and body aches. For five days, Petitioner Torres asked for medical assistance. For five days, he was ignored. On the sixth day, Petitioner Torres went into acute respiratory shock and collapsed in his cell. Only then was he tested and confirmed to be positive

---

[8]   Exh. 7 ¶ 20 (emphasis added); *accord* Exh. 8 ¶ 17.

1   for COVID-19. Petitioner Torres was put into a medically-induced coma, intubated,

2   and put on a ventilator. As a result of his battle with COVID-19, he has suffered

3   severe lung damage. On their most recent phone call, his sister could no longer

4   recognize his voice. Petitioner Torres's family submitted a submitted a request for

5   compassionate release on his behalf to the Warden of Lompoc on May 11, 2020.

6   They have not received a response.

7        11.    Plaintiff-Petitioner Vincent Reed ("Petitioner Reed") is incarcerated at

8   USP Lompoc. He is 53 years old and has hypertension, making him especially

9   vulnerable to complications resulting from COVID-19. Petitioner Reed's son has

10  juvenile diabetes, is fully blind, and was recently diagnosed with kidney failure at

11  the age of 30. Petitioner Reed may be the only viable candidate to donate a kidney

12  to his son. Around March 27 or 28, 2020, Petitioner Reed began developing

13  symptoms of COVID-19. On March 30, 2020, he was tested and immediately put

14  into solitary confinement. After Petitioner Reed's results came back positive, he was

15  left in solitary confinement for days and then transferred to an old and unsanitary

16  housing unit where—along with others who had tested positive—he languished

17  without treatment. On April 14, 2020, Mr. Reed was returned to the general

18  population. He was not tested again for COVID-19 prior to his return. Petitioner

19  Reed submitted a request for compassionate release/reduction in sentence to the

20  Warden of Lompoc on January 7, 2020. His request was rejected.

21       12.    Plaintiff-Petitioner Andre Brown ("Petitioner Brown") is incarcerated

22  at USP Lompoc. He is 55 years old, illiterate, and has learning disabilities. Because

23  Petitioner Brown is illiterate, the communications blackout at Lompoc which

24  severely restricts access to phone and email for prisoners has functionally cut him

25  off from the outside world. His conviction is currently under appeal with the Ninth

26  Circuit Court of Appeals, with argument expected in late 2020. Petitioner Brown has

27  prostate cancer which must be treated with chemotherapy or surgery. He is also

28  asthmatic, suffers from high blood pressure, and has arthritis in both wrists. Through

1   counsel, Petitioner Brown submitted a request for compassionate release to the

2   Warden of Lompoc on May 13, 2020. He has not received a response.

3       13.    Plaintiff-Petitioner Felix Samuel Garcia ("Petitioner Garcia") is

4   incarcerated at USP Lompoc. He is 36 years old and is set to be transferred to

5   a "halfway house" on July 7, 2020, and released from custody on November 6,

6   2020. Petitioner Garcia was originally housed in a low-security facility at FCI

7   Lompoc. In early May, he tested negative for COVID-19. Afterwards, Petitioner

8   Garcia was abruptly moved to a makeshift cell block set up in a warehouse at USP

9   Lompoc. There, he sits in a small cell with one other prisoner, under total lockdown

10  almost twenty-four hours a day. He is not allowed to shower or change into clean

11  clothes, and has been forced to wet his body with water from his sink in a last resort

12  to maintain personal hygiene. Petitioner Garcia has attempted to submit an

13  application for Compassionate Release and/or Home Confinement to the Warden of

14  Lompoc. However, since the COVID-19 outbreak in Lompoc, those incarcerated

15  have been denied access to the administrative remedy process. Staff have not been

16  accepting the forms required to initiate the process, claiming they cannot do so due

17  to the exigency of the COVID-19 pandemic.

18      14.    Plaintiff-Petitioner Sean L. Fears ("Petitioner Fears") is 50 years old

19  and incarcerated at USP Lompoc. Petitioner Fears lives in a crowded open-plan

20  dormitory with more than a hundred other prisoners, many of whom are sick. He is

21  relying only on a single mask given to him in late April to protect him from

22  infection. Over a month after the outbreak at Lompoc started, he has still not been

23  tested for COVID-19. Petitioner Fears attempted to submit an application for

24  Compassionate Release and/or Home Confinement to the Warden of Lompoc.

25  However, since the COVID-19 outbreak in Lompoc, those incarcerated have been

26  denied access to the administrative remedy process. Staff have not been accepting

27  the forms required to initiate the process, claiming they cannot do so due to the

28  exigency of the COVID-19 pandemic.

15.     Respondent Louis Milusnic ("Respondent Milusnic," "Warden Milusnic," or "Warden") is the Warden at Lompoc. As Warden, Respondent Milusnic is responsible for and oversees all day-to-day activity at Lompoc. He is in charge of all aspects of the operations and functions of Lompoc. His responsibilities include ensuring the safety of all in the institution and ensuring that the institution operates in an orderly fashion. Warden Milusnic is aware of and has adopted and enforced policies that leave Petitioners and all those similarly situated exposed to infection, severe illness, and death due to COVID-19. Warden Milusnic has also declined to release people who qualify under BOP and Department of Justice guidance despite having the authority to do so. Warden Milusnic is the immediate and physical custodian responsible for the detention of the Petitioners. He is sued in her official capacity only.

16.     Respondent Michael Carvajal is the Director of the Federal Bureau of Prisons ("Respondent Carvajal," "Director Carvajal," or "Director"). As Director, Respondent Carvajal is responsible for all BOP policies implemented at Lompoc, including those pertaining to resource distribution and factors that BOP facility leadership should consider in determining an incarcerated individual's eligibility for early release. His responsibilities include ensuring the safety of all in the BOP system and ensuring that institutions operate in an orderly fashion. Director Carvajal is aware of and has adopted and enforced policies that leave Petitioners and all those similarly situated exposed to infection, severe illness, and death due to COVID-19. He is sued in his official capacity only.

## III.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 2241 because Petitioners seek relief from being held in custody in violation of the Eighth Amendment to the U.S. Constitution, and pursuant to 28 U.S.C. § 1331 for relief from conditions of confinement that are in violation of the Eighth

9

1    Amendment.

2       18.    The Court has subject-matter jurisdiction over this Petition pursuant to

3    28 U.S.C. § 1331 (federal question), 5 U.S.C. § 702 of the Administrative Procedure

4    Act, 28 U.S.C. § 2241 (habeas corpus) and Article I, § 9, cl. 2 of the U.S.

5    Constitution (Suspension Clause). In addition, the Court has jurisdiction to grant

6    declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

7       19.    Venue is proper in the Central District of California pursuant to 28

8    U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving

9    rise to these claims occurred and continues to occur in this district.

10      20.    This Court has personal jurisdiction over Warden Milusnic because at

11   all times relevant to this action, she has been employed at Lompoc in Santa Barbara

12   County, California, and all the actions and omissions at issue occurred at Lompoc.

13   This Court has personal jurisdiction over Director Carvajal because at all times

14   relevant to this action, he has set BOP policies and issued guidance that Respondent

15   Milusnic has applied at Lompoc in Santa Barbara County, California.

16                                    **IV.**

17                         **FACTUAL ALLEGATIONS**

18   **A.    The COVID-19 Crisis**

19      21.    The novel coronavirus that causes COVID-19 has led to a global

20   pandemic. As of May 15, 2020, worldwide there are over 4.3 million reported

21   COVID-19 cases and 297,241 confirmed deaths.[9] In the United States, the case

22   count stands at 1,412,121 and the death count at 85,990.[10] In California, there are

23

24   _____

25   [9]   World Health Org., Coronavirus disease (COVID-19) Pandemic (May 11, 2020),
     https://www.who.int/emergencies/diseases/novel-coronavirus-2019.

26   [10]  Ctrs. for Disease Control & Prevention, Coronavirus Disease 2019 (COVID-19),
27   https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last
     visited May 15, 2020).

28

currently 74,936 confirmed cases of coronavirus.[11] There are 5,843 individuals who have been hospitalized with confirmed or suspected cases of coronavirus and 3,108 fatalities.[12] Los Angeles County has been epicenter of the pandemic in California, with 28,644 cases and 1,367 deaths.[13]

22.    The virus is known to spread from person to person through respiratory droplets, close personal contact, and from contact with contaminated surfaces and objects.[14] Infected people can spread the virus to others even if they are asymptomatic, such that simply avoiding people who are coughing or visibly feverish is insufficient.[15]

23.    According to the CDC, people who suffer from certain underlying medical conditions face elevated risk.[16] Such conditions include chronic lung disease, moderate to severe asthma, serious heart conditions, hypertension, high blood pressure, chronic kidney disease, liver disease, diabetes, compromised immune systems (such as from cancer treatment, HIV, autoimmune disease, or use of immunosuppressing medication for other conditions), and severe obesity.[17] One analysis found mortality rates of 13.2% for patients with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and

---

[11]    California Dep't of Public Health, COVID-19, https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx (last visited May 15, 2020).

[12]    *Id.*

[13]    https://covid19.lacounty.gov/

[14]    Exh. 7 ¶ 4.

[15]    Exh. 7 ¶ 5.

[16]    Ctrs. for Disease Control & Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 7, 2020).

[17]    *Id.*

7.6% for cancer.[18]

24.     The risk of illness or death from COVID-19 is increased for older populations. In a February 29, 2020 preliminary report, individuals age 50-59 had an overall mortality rate of 1.3%, those age 60-69 had an overall 3.6% mortality rate, and those age 70-79 had an 8% mortality rate.[19]

25.     In many people, COVID-19 causes fever, cough, and shortness of breath. But for people over the age of fifty or with medical conditions that increase the risk of serious COVID-19 infection, shortness of breath can be severe. Most people in higher-risk categories who develop serious illness will need advanced support. This level of supportive care requires highly specialized equipment that is in limited supply, and an entire team of care providers, including 1:1 or 1:2 nurse-to-patient ratios, respiratory therapists, and intensive-care physicians.[20]

26.     In patients who do not die, COVID-19 can severely damage lung tissue, requiring an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity. COVID-19 may also target the heart muscle, causing a medical condition called "myocarditis," or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise

---

[18]   World Health Org., Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19) at 12 (Feb. 28, 2020), https://www.who.int/docs/default-source/coronaviruse/who- china-joint-mission-on-covid-19-final-report.pdf.

[19]   Worldometer, Age, Sex, Existing Conditions of COVID-19 Cases and Deaths Chart (May 13, 2020), https://cutt.ly/ytEimUQ (data analysis based on WHO China Joint Mission Report).

[20]   *See* Exh. 7 ¶ 7 (noting that treatment for vulnerable people infected by COVID-19 may require "significant advanced support" including ventilator assistance).

1   tolerance and the ability to work.[21]

2       27.    Emerging evidence also suggests that COVID-19 can trigger an

3   over-response of the immune system, further damaging tissues in a cytokine release

4   syndrome that can result in widespread damage to other organs, including

5   permanent injury to the kidneys and neurologic injury. These complications can

6   manifest at an alarming pace. Patients can show the first symptoms of infection in as

7   little as two days after exposure, and their condition can seriously deteriorate in as

8   little as five days.[22]

9       28.    Even some younger and healthier people who contract COVID-19 may

10   require supportive care, which includes supplemental oxygen, positive pressure

11   ventilation, and in extreme cases, extracorporeal mechanical oxygenation.[23]

12       29.    The estimated fatality rate associated with COVID-19 has been

13   estimated to range from 0.1 to 6 percent, meaning COVID-19 may be as much as

14   35 times more fatal than seasonal influenza.[24]  Although many people who contract

15   COVID-19 will exhibit relatively mild symptoms, the virus will manifest in some

16   20 percent of cases as a "more severe disease requiring medical intervention and

17

18   [21]  Cynthia Weiss, How does COVID-19 affect the heart?, Mayo Clinic News

19   Network (Apr. 3, 2020), https://newsnetwork.mayoclinic.org/discussion/how-does-
covid-19-affect-the-heart/.

20   [22]  Lenny Bernstein, et al., *Coronavirus destroys lungs. But doctors are finding its*

21   *damage in kidneys, hearts and elsewhere*, WASH. POST, Apr. 15, 2020,
https://www.washingtonpost.com/health/coronavirus-destroys-lungs-but-doctors-

22   are-finding-its- damage-in-kidneys-hearts-and-elsewhere/2020/04/14/7ff71ee0-

23   7db1-11ea-a3ee- 13e1ae0a3571_story.html; Aria Bendix, *A Day-By-Day*

24   *Breakdown of Coronavirus Symptoms Shows How the Disease COVID-19 Goes
from Bad to Worse*, BUSINESS INSIDER, Mar. 31, 2020,

25   https://www.businessinsider.com/coronavirus-covid19-day-by-day-symptoms-
patients-2020-2.

26

27   [23]  *See* Exh. 7 ¶ 9.

28   [24]  Exh. 7 ¶ 6.

1  support."[25]

2      30.    There is no vaccine against COVID-19 and there is no known

3  medication to prevent or treat infection from COVID-19. Social distancing, or

4  remaining physically separated from known or potentially infected individuals, and

5  vigilant hygiene, including frequently and thoroughly washing hands with soap and

6  water and cleaning and disinfecting high-touch surfaces, are the only known

7  effective measures for protecting people from COVID-19.[26] This is especially

8  significant because the virus can spread through people who appear asymptomatic.[27]

9      31.    State and local officials have been taking aggressive action in

10  California. On March 4, in response to then-emerging coronavirus outbreak,

11  Governor Newsom declared a State of Emergency in California,[28] doing so even

12  before the President had declared a national emergency.[29] That same day, the Los

13  Angeles County Board of Supervisors and Los Angeles County Health Officer

14  declared a local and public health emergency.[30] On March 19, 2020, Governor

15  Newsom issued Executive Order No. N-22-20 requiring all California residents to

16  "stay home or at their place of residence" unless the resident works in critical

---

[25]  *Id.*

[26]  *Id.* ¶¶ 11–12.

[27]  *Id.* ¶ 5.

[28]  Executive Department, State of California, Proclamation of a State of Emergency (Mar. 4, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf

[29]  *See* Charlie Savage, *Trump Declared an Emergency Over Coronavirus. Here's What It Can Do.,* N.Y. TIMES, Mar. 13, 2020, https://www.nytimes.com/2020/03/13/us/politics/coronavirus- national-emergency-html.

[30]  County of Los Angeles Public Health, *County of Los Angeles Declares Local Health Emergency in Response to New Novel Coronavirus Activity* (Mar. 4, 2020),http://www.publichealth.lacounty.gov/phcommon/public/media/mediapubhpdetail.cfm?prid=2248.

infrastructure sectors. [31]

32.     Local officials have also taken extraordinary measures aimed at slowing the virus's spread. For example, on March 19, Los Angeles Mayor issued a "Safer at Home" order ordering residents of the City of Los Angeles to remain in their homes with lawful exceptions for critical tasks such as securing food and health, safety and medical necessities.[32]  Los Angeles County Health Officer Muntu Davis signed a "Safer at Home" order the same day, which prohibited all indoor public and private gatherings and all outdoor public and private events within a confined space where at least 10 people were expected to be in attendance at the same time.[33] The Los Angeles County Order was strengthened on March 21, 2020, to prohibit all gatherings and events, and will be extended through at least August.[34]

**B.     Incarcerated People and Staff Are Particularly Vulnerable.**

33.     People in environments with confined spaces such as correctional

---

[31]  Executive Department, State of California, Order No. N-22-20 (Mar. 19, 2020), https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf.

[32]  Office of Los Angeles Mayor, The "Safer at Home" Emergency Order Has Been Extended (Mar. 19, 2020), https://www.lamayor.org/mayor-garcetti-angelenos-are-%E2%80%98safer-home-new-emergency-order-stops-non-essential-activities-outside.

[33]  County of Los Angeles Public Health, Safer At Home Order for Control of COVID-19 (Mar. 19, 2020), http://file.lacounty.gov/SDSInter/lac/1070029_COVID-19_SaferAtHome_HealthOfficerOrder_20200319_Signed.pdf.

[34]  Colleen Shalby and Sarah Parvini, *L.A. County could keep stay-at-home orders in place well into summer, depending on conditions*, LOS ANGELES TIMES, May 12, 2020, https://www.latimes.com/california/story/2020-05-12/coronavirus-beaches-reopen-los-angeles-county-move-toward-new-normal; County of Los Angeles Public Health, Los Angeles County Announces Two New Deaths (Mar. 23, 2020), http://www.publichealth.lacounty.gov/phcommon/public/media/mediapubhpdetail.cfm?prid=2279.

3649388

facilities, where people live, eat, and sleep in close proximity, face increased danger of contracting COVID-19, as already evidenced by the rapid spread of the virus in cruise ships[35] and nursing homes.[36] The close quarters and limited freedom of movement inherent in correctional facilities makes social distancing and other preventive measures difficult or impossible. Moreover, the ability of incarcerated people to adopt preventative measures is completely subject to the dictates of correctional officials who control the housing, schedules, sanitary supplies, and nearly every other aspect of their lives.[37]

34.    Correctional facilities increase the risk of rapid spread of an infectious disease, like COVID-19, because of the high numbers of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, and no possibility of staying at a distance from others.[38]

---

[35]  *E.g.*, Jason Hanna & Melissa Alonso, CNN, Coral Princess Docks in Miami With 2 Dead and Several Ill of Coronavirus, After Ports Shunned it For Days (Apr. 4, 2020), https://www.cnn.com/2020/04/04/us/coral-princess-cruise-ship-docks-miami-coronavirus/index.html.

[36]  *E.g.*, Stacey Burling, *Assume Coronavirus is Already There, Says a Philly Nursing Home Doctor Who Learned the Hard Way*, PHILA. INQUIRER, Apr. 3, 2020, https://www.inquirer.com/health/coronavirus/coronavirus-renaissance-nursing-home- philadelphia-20200403.html; *see also* Suzy Khimm & Laura Strickler, NBC News, Nursing Homes Overwhelmed By Coronavirus, (Apr. 1, 2020), https://www.nbcnews.com/news/us- news/nursing-homes-overwhelmed-coronavirus-it-impossible-us-stop-spread-n1174171.

[37]  *See* Exh. 8 ¶ 10 ("prisons are congregate enivronments . . . [s]ocial distancing in ways that are recommended by public health officials can be difficult, if not impossible").

[38]  *See generally* I.A. Binswanger et al., *Prevalence of Chronic Medical Conditions Among Jail and Prison Inmates in the USA Compared With the General Population*, 63 J. Epidemiology & Community Health 912 (2009) (concluding that people incarcerated in U.S. jails and prisons had a higher burden of most chronic medical conditions than the general population, even when adjusting for sociodemographic

35.    The CDC has issued guidance urging prison administrators to take action to prevent overcrowding of correctional and detention facilities during a community outbreak.[39] The CDC guidance emphasizes that social distancing is "a cornerstone of reducing transmission of respiratory disease such as COVID-19."[40] It calls not only for social distancing, but also measures for isolating and quarantining detainees and staff who have (or are suspected of having) COVID- 19 from those who do not have (or presumably do not have) the virus.

36.    Many correctional facilities find implementation of these preventive strategies challenging without a significant reduction in prison populations.

37.    As a general matter, correctional facilities frequently lack sufficient medical supplies for the population, and, in times of crisis, medical staff may cease coming to the facilities. Hot water, soap, and paper towels are often in limited supply. Incarcerated people themselves, rather than professional cleaners, are often responsible for cleaning the facilities and often are not given appropriate supplies. This means there are more people who are susceptible to infection all congregated together in a location where fighting the spread of an infection is nearly impossible.[41]

38.    For these reasons, correctional public health experts have recommended the release from custody of people most vulnerable to COVID-19. Exercising authority to enlarge custody to include home confinement or release detainees protects the people with the greatest vulnerability to COVID-19 from

_____

differences and alcohol consumption).

[39]   Ctrs. for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus* Disease *2019 (COVID-19) in* CORRECTIONAL AND DETENTION FACILITIES (CDC GUIDANCE) (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[40]   *Id.*

[41]   *See* Exh. 8 ¶¶ 10–12.

3649388

COMPLAINT—CLASS ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

transmission of the virus, and it also allows for greater risk mitigation for all people held or working in a prison, jail, or detention center. Release of the most vulnerable people from custody also reduces the burden on the region's health-care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time. As Dr. Samra observes: "BOP should take *immediate steps* to dramatically downsize the population at Lompoc, with priority given to those at high risk of harm due to their age and health status and thus are likely to require a disproportionate amount of medical resources."[42]

39.     Courts have responded to this urgent call to reduce incarcerated populations. On March 24, 2020, Presiding Judge Kevin C. Brazile of the Superior Court of California, County of Los Angeles, announced an expedited process for the release of individuals jailed while awaiting trial.[43]  By April 13, 2020, the Los Angeles County jail had released 700 individuals.[44]  On May 1, 2020, Judge Brazile announced that a further 250 individuals had been released on their own recognizance pursuant to the Court's continued efforts "to protect public safety while achieving social distancing inside . . . the jail system."[45] Between the onset of

---

[42]  Exh. 7 ¶ 20.

[43]  Los Angeles Superior Court, Superior Court of Los Angeles County Orders Release of County Jail Inmates Awaiting Trial After Justice Partners Reach Agreement (Mar. 24, 2020), http://www.lacourt.org/newsmedia/uploads/142020324174155NR_Justice_Partners_Request_March_24_2020_FINAL.pdf.

[44]  Los Angeles Superior Court, Superior Court of Los Angeles County Continues to Work With Justice Partners On Jail Release of Adults (Apr. 13, 2020), http://www.lacourt.org/newsmedia/uploads/14202041491026NR_Release_Orders_04_13_20.pdf.

[45]  Los Angeles Superior Court, More Than 250 People Released So Far From L.A. County Jail System Under Statewide Emergency Bail Schedule (May 1, 2020), http://www.lacourt.org/newsmedia/uploads/14202051114247NR_Bail_Order_05_0

COVID-19 and May 13, 2020, Los Angeles lowered its county jail population from 17,076 to 11,813, a reduction of 31%.[46]  High courts in other states have issued similar orders aimed at reducing state prison populations.[47]

40.    Officials in California have echoed the calls to release prisoners and facilitate social distancing. On March 31, 2020, the California Department of Corrections and Rehabilitation announced that it would be transitioning nearly 3,500 non-violent inmates to parole or supervised release in order to "mitigate the spread of COVID-19 . . . [and] increase physical distancing, and assist . . . with isolation and quarantine efforts for suspected or positive COVID-19 cases[.]".[48]  As of April 13, all of these individuals had been released.[49]

_____

1_20(003).pdf.

[46]  Vera Institute of Justice, COVID-19: Criminal Justice Responses to the Coronavirus Pandemic, https://www.vera.org/projects/covid-19-criminal-justice-responses/covid-19-data (last visited May 15, 2020).

[47]  *See*, *e.g.*, *In re: The Petition of the Pennsylvania Prison Society et al.*, No. 70 MM 2020 (Pa. Apr. 3, 2020), https://law.justia.com/cases/pennsylvania/supreme-court/2020/70- mm-2020.html (Pennsylvania Supreme Court ordered the chief judge of all counties to "immediately" engage in a review of the "current capabilities of their county correctional institutions . . . to address the spread of COVID-19," "to ensure that the county correctional institutions in their districts address the threat of COVID-19," as necessary "to identify individuals of incarcerated persons for potential release" and "to undertake efforts to limit the introduction of new inmates into the county prison system."); *Comm. for Pub. Counsel Servs. v. Chief Justice of the Trial Court*, No. SJC-12926 (Mass. Apr. 3, 2020), https://www.mass.gov/files/documents/2020/04/03/12926.pdf (Massachusetts Supreme Court ruled that pre-trial detainees not charged with certain violent offenses, as well as incarcerated individuals held on technical probation and parole violations, is entitled to a rebuttable presumption of release).

[48]  California Department of Corrections and Rehabilitation, CDCR Announces Plan to Further Protect Staff and Inmates from the Spread of COVID-19 in State Prisons (Mar. 31, 2020), https://www.cdcr.ca.gov/news/2020/03/31/cdcr-announces-plan-to-further-protect-staff-and-inmates-from-the-spread-of-covid-19-in-state-prisons/

[49]  California Department of Corrections and Rehabilitation, Frequently Asked

41.     Had Respondents similarly reduced the population at Lompoc as called for by the science, the catastrophe we are faced with today may have been avoided. Because they did not, the outbreak at Lompoc is now out of control. This not only poses an unacceptable risk to the health and safety of the incarcerated, but also burdens local hospitals and thus endangers the broader community. Correctional facilities lack adequate medical facilities to treat serious COVID-19 cases, so an outbreak in a prison could overwhelm local hospitals. And as correctional staff enter and leave the facility, they will carry the virus with them. Like the incarcerated people in the facilities where they work, correctional officers face an increased risk of COVID-19 exposure because they are less able to engage in social distancing and because of the shortage of personal protective equipment, also known as PPE. Indeed, as of May 3, the BOP had reported 498 confirmed past and present infections among its prison staff nationwide.[50]

42.     Given these dangers, on an accelerating basis since mid-March of this year, courts in this Circuit and across the country have ordered the release of prisoners and detainees in response to the COVID-19 crisis.[51]

_____

Questions for Plan on Expedited Release and Increased Physical Space Within State Prisons, https://www.cdcr.ca.gov/covid19/frequently-asked-questions-for-plan-on-expedited-release-and-increased-physical-space-within-state-prisons/ (last visited May 15, 2020).

[50]  *See* Fed. Bureau of Prisons, COVID- 19, https://www.bop.gov/coronavirus/ (last visited May 4, 2020).

[51]  *See, e.g.*, *Arriaga Reyes. v. Decker*, No. 2:20-cv-03600 (D.N.J. Apr. 12, 2020) (ordering five petitions for immediate release of ICE detainees from New Jersey facilities); *Basank v. Decker*, ---F. Supp.3d---, 2020 WL1481503 (S.D.N.Y. Mar. 26, 2020) (ordering release of ten individuals detained by ICE housed in New Jersey county jails because of preexisting medical conditions); *United States v. Rodriguez*, No. 03-CR-271 (E.D. Pa. Apr. 1, 2020) (granting motion for compassionate release where the presence of COVID-19, the inmate's health conditions, the proximity to his release date, and his demonstration of rehabilitation created extraordinary and compelling reasons justifying release); *United States v. Colvin*, No. 3:19-CR-179,

43.   When the dangers of COVID-19 have reached a level where a prison is no longer able to incarcerate its population in constitutional conditions, courts have granted emergency habeas relief for entire classes of prisoners to be evaluated for enlargement of custody on an accelerated basis.[52]

**C.   Lompoc's Failure to Slow the Spread of its COVID-19 Outbreak Has Allowed the Virus to Spread Like Wildfire.**

44.   The numbers speak for themselves: Respondents have lost control of the COVID-19 outbreak at Lompoc entirely. There are over 870 positive COVID-19 cases at the Lompoc among a population of approximately 2,600, almost twice as many cases as the whole of Santa Barbara County—with a population of almost 450,000—combined.

45.   This sad reality is borne out by the information prisoners have relayed to family members and friends despite Lompoc's best efforts to keep them silenced. Since April 16, 2020, the prison has cut off most communications with the outside world, forcing prisoners to communicate with their loved ones only through letters and, since around May 9, sporadic five-minute phone calls.

46.   Counsel for Petitioners have attempted to arrange legal calls with eight

---

2020 WL 1613943 (D. Conn. 2020) (waiving exhaustion requirement and granting motion or compassionate release for vulnerable inmate at FDC Philadelphia where "the risks faced by the Defendant will be minimized by her immediate release to home, where she will quarantine herself"); *Coronel v. Decker*, ---F. Supp. 3d---, 2020 WL 1487274 (S.D.N.Y. Mar. 27, 2020) (granting release of four detainees with medical conditions that render them particularly vulnerable to severe illness or death if infected by COVID-19).

[52]   *Wilson v. Williams*, No. 4:20-CV-00794, 2020 WL 1940882, at *10 (N.D. Ohio Apr. 22, 2020), *appeal filed*, (6th Cir. Apr. 27, 2020) (granting in part emergency motion and ordering FCI Elkton to evaluate all prisoners for enlargement of custody); *Martinez-Brooks v. Easter*, 3-20-cv-00569-MPS, 2020 WL 2405350, at *32 (D. Conn., May 12, 2020) (granting in part temporary restraining order and ordering FCI Danbury to evaluate prisoners with COVID-19 risk factors for home confinement and compassionate release).

3649388

21

COMPLAINT—CLASS ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

prisoners incarcerated at FCI Lompoc and USP Lompoc who had been identified to counsel by their family members and friends as seeking representation in this action.  Counsel have not spoken with any of them.  Although several calls were initially scheduled, they were each abruptly cancelled by the BOP.  As of now, there are no legal calls scheduled with any of the eight prisoners.[53]

47.     Whatever Respondents may say, the facts demonstrate that they had no strategy at all for addressing the virus. As late as late March and early April, when the world outside had already shuttered schools and businesses for weeks, Lompoc simply ignored sick prisoners and left them in place to infect others, or approached isolation by simply hauling infected people into solitary confinement (the Special Housing Unit, or "SHU")—something ordinarily done as punishment—to forget about them entirely. Prisoners displaying symptoms of COVID-19 were left in solitary with no medical attention for days at a time.[54]  This deterred other prisoners from reporting symptoms lest they also be placed into solitary. Afterwards, as the number of positive cases grew, prison authorities began to isolate the infected in a variety of temporary housing units, such as dormitories that had previously been closed due to mold contamination,[55] and hastily-converted warehouses.[56]  Prisoners were also moved from minimum-and-low security facilities with communal dormitories to cells at USP Lompoc's medium-security facility.[57] All of Lompoc's prisoner housing units were placed on total lockdown, confining prisoners to their cells or dormitories for most of the day. This heavy-handed isolation strategy has been a complete failure, for four reasons.

---

[53]   Exhibit 10 ("Declaration of Jimmy Threatt") ¶ 2.

[54]   Exhibit 2 ("Exh. 2", Declaration of Joanna Perales) ¶ 6.

[55]   *Id.* ¶ 7.

[56]   Exhibit 3 ("Exh. 3", Declaration of Graciela Zavala-Garcia) ¶ 4.

[57]   Exh. 2 ¶ 7

1. **Even with Many Prisoners Moved to Temporary Housing, Social Distancing is Impossible in Lompoc's Dormitories and Cells**

48.     Hundreds of people held at the Lompoc USP camps and at several units of FCI are housed in open-plan dormitories for anywhere from 150 to 250 prisoners. In these dormitories, there are no internal walls, and the prisoners sleep on bunk beds that are no more than 2-to-3 feet from each other. There is no air conditioning and ventilation is extremely poor. Everyone shares six toilets, six showers, and one water fountain.[58] Over a hundred prisoners must stand in line outside to pick up their meals, and 25-30 people stand in line outside a tiny five-foot-by-five-foot room to pick up their medication.

49.     Things are not much better for the USP Lompoc prisoners who live in cells. Due to the influx of prisoners from the dormitories, tiny single-occupancy cells are now occupied by two prisoners at a time.[59] Due to the facility-wide lockdown, prisoners are unable to leave their cells to take a shower or change into clean clothes.

2. **Unsanitary Conditions in Temporary Housing Units Offer Fertile Ground for the Other Diseases to Spread.**

50.     The conditions in the temporary housing units are appalling and are putting the lives of those who have tested positive in further danger. Unit H— a dormitory that had been closed three years prior due to mold contamination—was reopened filled with prisoners without proper cleaning, and prisoners were forced to sleep on mattresses which the guards had scattered across the dirty floor.[60] In the warehouses that had been hastily converted into blocks of double-occupancy cells, prisoners were not permitted to leave their cells to shower, and were not given clean

---

[58]  *See* Exhibit 5 ("Exh. 5", Declaration of Nema Zayed Fears) ¶ 4.

[59]  Exhibit 1 ("Exh. 1", Declaration of Kiara Carror) ¶ 5.

[60]  Exh. 3 ¶ 5.

clothes.[61]

### 3.     The Frequent Movement of Prisoners Combined with Lack of Adequate Testing Is Accelerating the Spread of the Virus.

51.     As discussed *supra*, Lompoc's heavy-handed isolation strategy has resulted in a large numbers of prisoners moving from minimum and low security dormitories to temporary housing units and prison cells. In a belated effort to segregate Lompoc's infected population from its healthy and recovered population, Respondents are moving inmates back and forth between housing units, transferring them from one place to another when they are sick, and then either sending them back or transferring them to yet another place when they are deemed "recovered."

52.     Due to Respondents' inadequate testing policies, their isolation strategy has been rendered completely ineffectual. Over a month since its outbreak initially started, Lompoc *still* does not have the capacity to fully test its entire population.[62] Instead, Respondents do not test prisoners at USP Lompoc until they display symptoms,[63] and sometimes not until several days after that, when their health has already deteriorated precipitously.[64] In addition, prisoners are not re-tested and confirmed to be negative before being returned to housing units meant to be populated with non-infected prisoners, a practice Dr. Samra explicitly cites as "problematic."[65] Some prisoners have simply been never tested at all.[66]

---

[61]  *Id.* ¶ 7.

[62]  Taylor Hadsen, *Lompoc Prison Explodes with Active COVID-19 Cases*, SANTA BARBARA INDEPENDENT, May 13, 2020, https://www.independent.com/2020/05/13/lompoc-prison-explodes-with-active-covid-19-cases/.

[63]  Exh. 2 ¶ 6.

[64]  Exh. 1 ¶ 8.

[65]  Exh. 2 ¶ 9; Exh. 7 ¶ 16.

[66]  Exh. 5 ¶ 6.

3649388

COMPLAINT—CLASS ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF AND PETITION FOR WRIT OF HABEAS CORPUS

53.    Infected individuals can spread COVID-19 even when they are completely asymptomatic.[67] As a result, the lack of asymptomatic testing and re-entry testing means that Lompoc is likely allowing infected prisoners to remain with healthy populations and spread the virus, and then allowing prisoners who are not fully recovered but asymptomatic to return to those populations and spread the virus again.

**4.    Lompoc's Inadequate Efforts at Isolation Ignore Other Fundamental Areas of Infection Prevention.**

54.    As Lompoc isolates its prisoners in crowded, unsanitary confines, it has failed to take any of the most basic measures necessary to ensure that the virus does not spread in these confines unabated. Since the outbreak started, Lompoc has distributed only one face mask to prisoners, who have been forced to reuse it indefinitely.[68] Not only do prisoners not have access to hand sanitizer, there are often shortages of soap.[69] Due to the total lockdown, many prisoners are not even able to use the shower.[70] Given that the pervasive lack of testing at USP Lompoc likely means that even "healthy" housing units have at least a few infected prisoners, this lack of baseline protective measures more or less ensures that those few will eventually becoming many—as the alarming rate of growth in positive cases at Lompoc is demonstrating.

**D.    Lompoc Is Incapable of Providing Adequate Medical Care for COVID-19 Patients, Posing an Unconstitutional Threat Both to the Incarcerated and to the Local Community.**

55.    Providing adequate medical care in the face of an outbreak of this size

---

[67] Exh. 7 ¶ 16.

[68] *See* Exh. 5 ¶ 5; Exh. 3 ¶ 6.

[69] Exh. 3 ¶ 6; Exh. 2 ¶¶ 8, 10.

[70] Exh. 3 ¶ 5; Exh. 2 ¶ 8.

3649388

25

would be challenging for any community. For a prison like Lompoc, it is an impossibility. The medical facilities at Lompoc consist of only "a small medical bay capable of caring for a few patients."[71] BOP claims that Lompoc's medical capabilities have been supplemented with a newly-constructed Hospital Care Unit ("HCU"). In reality, the 20-bed HCU—yet another converted warehouse—has been little more than an exercise in public relations: the HCU lacks any ventilators, and is "not properly equipped to handle serious COVID-19 cases."[72] BOP has not yet actually staffed the HCA with doctors and nurses, and local health officials have remarked that as of May 8, it was "unclear whether the [HCU] is in fact operational."[73] In lieu of adequate care —rendered impossible due to a serious lack of medical resources—prison authorities at Lompoc have adopted a chilling indifference towards those affected by COVID-19.

56.     Petitioner Yonnedil Carror Torres shares a tiny, single-occupancy cell with a cellmate at USP Lompoc.[74] Petitioner Torres suffers from chronic asthma, which makes him especially vulnerable to COVID-19.[75] On April 24, 2020, he wrote to his family that he was feeling very sick and was concerned that he may have COVID-19.[76] Six days later, Petitioner Torres's family received a letter from

---

[71]  Taylor Hayden, *Inmates and Families Panic as Lompoc Prison Goes Into Lockdown*, SANTA BARBARA INDEPENDENT, Apr. 22, 2020, https://www.independent.com/2020/04/22/inmates-and-families-panic-as-lompoc-prison-goes-into-lockdown/

[72]  Taylor Hayden, *Lompoc Prison Explodes with Active COVID-19 Cases*, SANTA BARBARA INDEPENDENT, May 13, 2020, https://www.independent.com/2020/05/13/lompoc-prison-explodes-with-active-covid-19-cases/.

[73]  *Id.*

[74]  Exh. 1 ¶ 5.

[75]  *Id.* ¶ 3.

[76]  *Id.* ¶ 6.

his cellmate saying that he had went into acute respiratory failure and collapsed in his cell.[77] Mr. Torres had suffered from fever, diarrhea, and body aches, and had been asking the guards for medical assistance for five days, but was completely ignored.[78] He was only taken to the hospital after every prisoner in his block began to bang on their cell doors in unison to demand that he be taken care of.[79] At the hospital, he was put into a medically-induced coma, intubated, and put on a ventilator.[80] Mr. Torres suffered serious lung damage from COVID-19 which has severely deteriorated his lung capacity.[81]

57.    The story of Mr. Torres is not an isolated incident but part of a larger pattern of deliberate indifference to that shocks the conscience: at Lompoc, medical care is now "limited or nonexistent[,]"[82] and prisoners with COVID-19 are not tested or treated until they hit "rock bottom."[83] Even when they test positive, they are not immediately isolated from other prisoners, sometimes being left in dormitories housing approximately 100 people for as long as 14 days.[84]

58.    Even when Respondents actually identify COVID-19 patients, the treatment they provide resembles prison discipline more than medical care. On March 27 or 28, 2020, Petitioner Reed began exhibiting symptoms of COVID-19.[85] Respondents waited until March 30, 2020 to test him, and immediately placed him in

---

[77] *Id.* ¶ 7.

[78] *Id.*

[79] *Id.* ¶ 8.

[80] *Id.*

[81] *Id.* ¶ 10.

[82] Exhibit 6 ("Exh. 6", Declaration of Darwin P. Roberts) ¶ 7.

[83] *Id.* ¶ 11.

[84] Exh. 6 ¶¶ 7-8.

[85] Exh. 2 ¶ 5.

1  solitary confinement while they awaited results.[86] On March 31, 2020, Petitioner

2  Reed received a temperature and symptom check from a doctor.[87] After that,

3  Respondents left him to languish in solitary confinement, and did not allow him to

4  see a doctor again until April 7, 2020.[88] Respondents' approach of throwing people

5  like Mr. Reed into solitary confinement when they display COVID-19 symptoms

6  has incentivized prisoners at Lompoc to hide symptoms, even when they feel sick.[89]

7        59.    As Dr. Samra notes, "the allegations" "show[] that virtually no effort is

8  being made at Lompoc to monitor or treat prisoners, with staff waiting until the last

9  minute to intervene," and also has significant ripple effects on even regular medical

10 care for prisoners with conditions unrelated to COVID-19.[90] This is precisely what

11 is happening inside Lompoc, as prison staff have stopped accepting requests for

12 medical care from prisoners since the outbreak started.[91] As a result, Petitioner

13 Brown—who requires chemotherapy or surgery to treat his prostate cancer—and

14 others similarly situated have been rendered unable to obtain the care they need to

15 survive.[92]

16       60.    As the outbreak at Lompoc rages on and the prison's medical resources

17 deplete further still, the risk of infection to staff who go home to the community will

18 continue to rise. Every prisoner at a local hospital, in turn, must be guarded 24 hours

19 a day by two correctional officers on eight-hour shifts, meaning each of these

20 officers are returning to their homes and surrounding communities after long-term

21

---

22 [86]  *Id.* ¶ 6.

23 [87]  *Id.*

24 [88]  *Id.*

25 [89]  *Id.* ¶ 6.

26 [90]  Exh. 7 ¶¶ 18, 21.

27 [91]  Exh. 5 ¶ 7.

28 [92]  *See* Exhibit 4 (Declaration of Verna Wefald) ¶ 6

3649388

COMPLAINT—CLASS ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

exposure to coronavirus patients.[93]

61.    The only solution is to reduce the prison population to the point where Lompoc's medical resources become sufficient to provide adequate care for those who remain.

**E.    The Efforts of the Bureau of Prisons Are Inadequate.**

62.    The BOP has failed to respond effectively to the COVID-19 pandemic. The BOP failed to anticipate and prepare for the magnitude of the threat that COVID-19 poses to its own staff and the people it detains; it then failed to respond in any meaningful way to initial signs of uncontrolled outbreaks at several of its facilities across the country, including Lompoc; and it has continued to fail to implement even the baseline measures that would assure the safety of its own staff, of Petitioners and their fellow class members and others incarcerated by the BOP, and of the communities into which staff and others travel on a daily basis.

63.    The BOP's preparations were inadequate from the start. Initial guidance from the BOP was not issued until March 9, and it addressed only the possibility of telework for some employees at an agency where the vast majority of workers must physically appear at facilities to do their jobs, and it mentioned restrictions only for people who had traveled to already-impacted countries.[94]

64.    Moreover, the BOP did not make any changes to protocols that call for prisoners to purchase their own cleaning supplies from commissary—preventing many indigent and poor prisoners from being able to buy those supplies—and for them to maintain responsibility for cleaning and sanitizing their spaces (whether they have supplies or not).[95]

---

[93]  *Id.*

[94]  *See* Federal Bureau of Prisons, Coronavirus Disease 2019 (COVID-19): Screening and Leave Guidance (May 9, 2020), https://cdn.govexec.com/media/gbc/docs/pdfs_edit/031020cb.pdf.

[95]  *See, e.g.*, Federal Bureau of Prisons, Inmate Information Handbook for FCI

65.     In fact, as late as March 26—weeks after many cities and states had closed restaurants and non-essential businesses, restricted travel, and ordered people to shelter in place—the BOP Director announced that the BOP had merely taken an inventory of soap, rather than taken steps to distribute it at no cost or even at a reduced cost.[96]

66.     Among other failures that contributed to spread at BOP facilities, officers reported that even as of late March, they were given only gloves—not masks, face shields, or other PPE—when interacting with prisoners sick enough to require transport to the hospital.[97] Those same officers were ordered back to the job in defiance of CDC guidance that called for self-isolation by correctional staff who had been exposed.[98]

67.     Unicor, an entity that runs prisoner work programs for the BOP, continued operating throughout the pandemic and did not began distributing masks to prisoner workers and correctional officers until about April 2, 2020.[99]

_____

Elton, Ohio (Nov. 10, 2012),
https://www.bop.gov/locations/institutions/elk/ELK_aohandbook.pdf.

[96]   That day the BOP Director issued a statement that "all cleaning, sanitation, and medical supplies have been inventoried. Ample supplies are on hand and ready to be distributed or moved to any facility as deemed necessary."  Federal Bureau of Prisons, Statement from BOP Director (Mar. 26, 2020),
https://www.bop.gov/resources/news/20200326_statement_from_director.jsp.

[97]   Joseph Neff & Keri Blakinger, The Marshall Project, Federal Prisons Agency "Put Staff in Harm's Way" of Coronavirus: Orders at Oakdale in Louisiana Help Explain COVID-19 Spread (Apr. 3, 2020),
https://www.themarshallproject.org/2020/04/03/federal-prisons-agency- put-staff-in-harm-s-way-of-coronavirus.

[98]   Id.

[99]   Cary Aspinwall, Keri Blakinger, & Joseph Neff, The Marshall Project, Federal Prison Factories Kept Running as Coronavirus Spread (Apr. 10, 2020),
https://www.themarshallproject.org/2020/04/10/federal-prison-factories-kept-running-as- coronavirus-spread.

68.     Across facilities, the BOP has been "scrambling" to address staffing and resource needs. Despite this, the BOP has continued to limit the number of contractors who can supply PPE, does not have enough tests, and has been sued by its own staff for requiring them to work in hazardous working conditions.[100]

69.     When the BOP loses control at a facility, dozens of prisoners must go to local hospitals, straining the local healthcare infrastructure, as well.Even those figures are almost certainly an undercount. The BOP has repeatedly understated the scope of the problem and refused to take steps to assess the situation transparently. For example, the BOP has been artificially reducing their number of reported positive cases by classifying individuals who previously tested positive for COVID-19 but no longer showing symptoms as "recovered" and removing them from the count of positive cases, without re-testing them to confirm that the virus is no longer present in their bodies.[101]

70.     BOP's under-reporting of the outbreak at FCI Elkton provides another stark example of their lack of transparency. As of April 6, the BOP had reported eight prisoners and one staff had tested positive at FCI Elkton.[102] Press accounts, however, reported that medical staffing had fallen to fifty percent of capacity, and that three prisoners had already died as of April 6.[103] The full scope of the problem did not become clear until a federal judge ordered the facility to increase testing,

---

[100] Luke Barr, ABC News, Federal Prisons Facing Shortages of Resources Amid Coronavirus Outbreak (Apr. 1, 2020), https://abcnews.go.com/Health/federal-prisons-facing-shortages-resources- amid-coronavirus-outbreak/story?id=69920966.

[101] A "problematic" practice according to Dr. Samra. Exh. 7 ¶ 16.

[102] Id.

[103] WKYC, Ohio Gov. Mike DeWine Authorized Ohio National Guard to Assist Elkton Prison (Apr. 6, 2020), https://www.wkyc.com/article/news/health/coronavirus/ohio-gov-mike-dewine-authorizes-ohio-national-guard-to-assist-elkton-prison/95-d620f3c6-c560-486f-9eac- ebce7c09d4e7.

3649388

31

COMPLAINT—CLASS ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

1  after the BOP admitted that it only had 55 tests on hand for a facility of more than

2  2,400 prisoners.[104]

3      71.   Conditions had already deteriorated so thoroughly that Ohio Governor

4  Mike DeWine called in the state's National Guard to FCI Elkton, a federal prison.[105]

5  At the press conference announcing that decision, Governor DeWine called on the

6  BOP to stop sending new prisoners to Elkton.[106] And the accuracy of the BOP's

7  reporting of COVID-19 cases in Elkton is in doubt.[107]

8      72.   Ultimately, the U.S. District Court for the Northern District of Ohio

9  ordered enlargement of custody for medically vulnerable prisoners at FCI Elkton

10  pending resolution of a class habeas petition on the merits, because of the outbreak

11  already raging at the facility.[108]

12  _____

13  [104] Cleveland.com, Judge grills federal prisons lawyer on lack of coronavirus tests at
Ohio facility in wake of Trump's claim that 'anybody' can get tested (Apr. 18,

14  2020), https://www.cleveland.com/court-justice/2020/04/judge-grills-federal-

15  prisons-lawyer-on-lack-of-coronavirus-tests-at-ohio-facility-in-wake-of-trumps-
claim-that-anybody-can-get-tested.html.

16  [105] WKYC, Ohio Gov. Mike DeWine Authorized Ohio National Guard to Assist

17  Elkton Prison (Apr. 6, 2020),

18  https://www.wkyc.com/article/news/health/coronavirus/ohio-gov-mike-dewine-
authorizes-ohio-national-guard-to-assist-elkton-prison/95-d620f3c6-c560-486f-

19  9eac- ebce7c09d4e7.

20  [106] Cory Shaffer, Cleveland.com, Ohio National Guard Will Assist With Response

21  at Elkton Federal Prison, Cleveland.com (Apr. 6, 2020),
https://www.cleveland.com/coronavirus/2020/04/ohio-national-guard-will-assist-

22  with-coronavirus-response-at-elkton-federal-prison.html; *see also* Brandon Brown,

23  WFMJ, Sen. Portman Urges Prisoners Not to be Transferred to FCI Elkton (Apr. 6,
2020), https://www.wfmj.com/story/41979544/sen-portman-urges-prisoners-not-be-

24  transferred-to-fci-elkton.

25  [107] WKBN, Elkton Union President Reports Different COVID-19 Stats Than
Federal Bureau of Prisons (Apr. 9, 2020),

26  https://www.wkbn.com/news/coronavirus/elkton-union-president-reports-different-

27  covid-19-stats-than-federal-bureau-of-prisons/.

28  [108] *Wilson v. Williams*, No. 4:20-CV-00794, 2020 WL 1940882, at *10 (N.D. Ohio

3649388

32

73.     Such conditions at numerous facilities across the country have led BOP employees, including corrections officers, to file a complaint with the Occupational Safety and Health Administration (OSHA) alleging unsafe conditions at numerous federal prisons nationwide, including Lompoc. Among other things, the officers' OSHA complaint points to the BOP having "directed staff through the Bureau of Prisons who have come in contact with, or been in close proximity to, prisoners who show or have shown symptoms of COVID-19, to report to work and not be self-quarantined for 14 days per the CDC guidelines." It also complains of the BOP having failed to undertake any workplace or administrative controls to address transmission, to require social distancing or other measures in the CDC guidance, or to provide sufficient PPE.[109]

74.     In apparent response, the BOP released a short document titled "Correcting Myths and Misinformation about BOP and COVID-19."[110] In responding to the assertion that staff who had been in contact with prisoners who showed symptoms of COVID-19 still had to come to work, the BOP simply confirmed that such employees *were* required to come to work, with masks.[111]

---

Apr. 22, 2020).

[109] *See* U.S. Dep't of Labor, Notice of Alleged Safety or Health Hazards (March 31, 2020), https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-form-national-complaint.pdf.

[110] *See* Fed. Bureau of Prisons, Correcting Myths and Misinformation About BOP And COVID-19 (Apr. 11, 2020), https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf.

[111] *Id.* at 3 ("In keeping with CDC 'Guidance for Safety Practices for Critical Infrastructure Workers Who May Have Had Exposure to a Person with Suspected or Confirmed COVID-19,' the BOP performs pre-screening of all employees reporting to work and requires exposed workers to wear a mask for 14 days after last exposure. They are also expected to perform regular self-monitoring for symptoms, practice social distancing and to disinfect and clean their work spaces. Anyone who

75.     CARES Act, signed into law on March 27, makes funding available for federal prisons to purchase PPE and test kits for COVID-19 in addition to authorizing the Department of Justice to lengthen the maximum amount of time that a prisoner can be placed in home confinement during the pandemic, as discussed above.[112] Acting under that authority, Attorney General Barr made a finding that emergency conditions are materially affecting the functioning of the BOP, and on April 3 he directed Respondent Carvajal to review prisoners with COVID-19 risk factors to determine their eligibility for home confinement, stating that the BOP's efforts to prevent COVID-19 from entering BOP facilities and infecting prisoners have "not been perfectly successful at all institutions."[113]

76.     Attorney General Barr also released guidance in the form of a series of letters suggesting that some BOP prisoners should be released.[114] Those letters merely encourage the BOP to exercise discretion that it has declined to use, and they do not actually direct the release of categories of prisoners, much less on a scale that would allow for safe social distancing in the facilities or with the speed that the health crisis requires. Of the relatively small number of people released, the BOP has not reported the number who subsequently died.

77.     The BOP's April 22 guidance gave wardens virtually unchecked discretion to deny a request for release and imposes unnecessary and arbitrary barriers on prisoners seeking release. For example, pursuant to the BOP's guidance from April 22: (i) prisoners must have had no disciplinary infractions of any kind for

---

develops signs or symptoms of illness are sent home.").

[112] CARES Act, Pub. L. No. 116-136, § 12003(b), 134 Stat. 281 (2020).

[113] Office of the Attorney General, Increasing Use of Home Confinement at Institutions Most Affected by COVID-10 (Apr. 3, 2020), https://www.justice.gov/file/1266661/download.

[114] *See* US Dep't of Justice, Memoranda For Director of Bureau Prisons from Attorney General Barr (Mar. 26, 2020 & Apr. 3, 2020), https://www.justice.gov/coronavirus.

12 months; (ii) prisoners must provide verification that they would have a lower risk of contracting COVID-19 outside the prison than inside of it, and, (iii) prisoners with any on-going medical care must show their medical needs can be met outside the prison, and that they have a 90-day supply of prescribed medications. After reports of positive cases continued to explode, on May 8, 2020, BOP amended this guidance to relax a few criteria, but it continues to be far more restrictive than the recommendations proposed by Attorney General Barr.

78.    The BOP's April 22 guidance gives wardens virtually unchecked discretion to deny a request for release and imposes unnecessary and impractical barriers on prisoners seeking release. For example, pursuant to the BOP's guidance: (i) prisoners must have had no disciplinary infractions of any kind for 12 months; (ii) prisoners must provide verification that they would have a lower risk of contracting COVID-19 outside the prison than inside of it, and, (iii) prisoners with any on-going medical care must show their medical needs can be met outside the prison, and that they have a 90-day supply of prescribed medications.

79.    The appalling conditions of BOP facilities across the country, and the BOP's failures to address the constitutional rights of prisoners in its care, have forced federal courts to address BOP failures in a large number of individual cases seeking compassionate release[115];  bail pending appeal, trial, or sentencing[116];

---

[115] *E.g.*, *United States v. Smith*, No. 12-cr-133, 2020 WL 1849748 (S.D.N.Y. Apr. 13, 2020) (granting release; finding exhaustion waivable and waived); *United States v. Zukerman*, ---F.Supp.3d ---, 2020 WL1659880 (S.D.N.Y. Apr. 3, 2020) (waiving exhaustion and granting immediate compassionate release in light of COVID-19 to defendant convicted in multi-million dollar fraud scheme); *United States v. Sawicz*, No. 08-cr-287, 2020 WL1815851 (E.D.N.Y. Apr. 10, 2020) (releasing child-pornography offender); *United States v. Oreste*, No. 14-cr-20349 (S.D. Fla. Apr. 6, 2020).

[116] *E.g.*, *United States v. Chavol*, No. 20-50075 (9th Cir. Apr. 2, 2020) (stipulation in a FRAP(9) appeal to release on conditions); *United States v. Hector*, No. 2:18-cr-3-2, ECF 748 (W.D. Va. Mar. 27, 2020).

1   delayed self-surrender[117]; writs of habeas corpus[118]; class-wide relief for groups of

2   prisoners[119]; and furloughs.[120]

3      80.    As noted, the Northern District of Ohio ordered FCI Elkton to release

4   potentially hundreds of medically vulnerable prisoners who face a greater threat

5   from COVID-19. It did this because Elkton had "altogether failed" to follow CDC

6   guidance for correctional settings, and that the measures were "necessary to stop the

7   spread of the virus and save lives."[121] Similarly, the District of Connecticut has

8   ordered FCI Danbury to evaluate and release medically vulnerable inmates on an

9   accelerated basis.[122]

10

11

12

13

---

14   [117] *United States v. Roeder*, No. 20-1682, ___ F. App'x ___, 2020 WL 1545872 (3d

15   Cir. Apr. 1, 2020) (reversing district court's denial of defendant's motion to delay
     execution of his sentence because of the COVID-19 pandemic); *United States v.*

16   *Garlock*, No. 18-CR-418, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020)

17   (observing that "[b]y now it almost goes without saying that we should not be
     adding to the prison population during the COVID-19 pandemic if it can be

18   avoided"); *United States v. Matthaei*, No. 19-CV-243, 2020 WL 1443227, at *1 (D.

19   Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of
     pandemic).

20   [118] *E.g.*, *Xochihua-Jaimes v. Barr*, No. 18-71460, 798 F. App'x 52 (9th Cir. Mar. 23,

21   2020) (Mem) (*sua sponte* releasing detainee from immigration detention "in light of
     the rapidly escalating public health crisis"); *Fraihat v. Wolf*, No. 5:20-CV-590,

22   (C.D. Cal. Mar. 30, 2020).

23   [119] *E.g.*, *In re Request to Commute or Suspend County Jail Sentences*, Docket No.

24   084230 (N.J. Mar. 22, 2020) (releasing large class of defendants serving time in
     county jail "in light of the Public Health Emergency" caused by COVID-19).

25   [120] *E.g.*, *United States v. Stahl*, No. 18-cr-694, 2020 WL 1819986 (S.D.N.Y. Apr.

26   10, 2020).

27   [121] *Wilson*, 2020 WL 1940882, at *8.

28   [122] *Martinez-Brooks*, 2020 WL 2405350, at *32

3649388

36

# V.

## LEGAL GROUNDS FOR PETITION

**A.**   **Respondents' Failure to Take Steps to Mitigate Transmission of COVID-19 Constitutes Deliberate Indifference to the Serious Medical Needs of Petitioner.**

81.    Respondents are violating Petitioners' Eighth Amendment rights by continuing to incarcerate them in conditions that place them at substantial risk of serious harm from transmission of an infectious and deadly disease, especially considering Petitioners' vulnerable conditions.

82.    All individuals held at Lompoc have been convicted and assigned by the BOP to serve time at Lompoc. Therefore, the treatment of all individuals incarcerated at Lompoc, including the treatment of Petitioners, is governed by the Eighth Amendment. *See Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012). The Ninth Circuit employs a two-part test in assessing whether prison officials have violated the Eighth Amendment by way of deliberately indifference to the medical needs of inmates: (1) the plaintiff must have "a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain"; and (2) the defendants' "response to the need" must have been "deliberately indifferent." *Id.*

83.    Government officials act with deliberate indifference when they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year," even when "the complaining inmate shows no serious current symptoms." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). This Court need not "await a tragic event" to find that Respondents are maintaining unconstitutional conditions of confinement. *Id.* at 32-33. This is so not only because a tragedy is ongoing, but because even petitioners and class members who have not yet tested positive have a constitutional right to be free from conditions of confinement that "pose an unreasonable risk of serious

1   damage to [Petitioner's] future health." *Id.* at 35.

2        84.    Indeed, the threat of exposure to a deadly infectious disease such as

3   COVID-19 and subsequent mistreatment due to lack of medical resources

4   constitutes a serious risk to health, particularly for the Petitioners with unique

5   vulnerability to COVID-19. *See Helling*, 509 U.S. at 34 (noting with approval

6   Eighth Amendment claims based on exposure to serious contagious diseases);

7   *Unknown Parties v. Johnson,* No. cv-15-00250, 2016 WL 8188563, at *15 (D. Ariz.

8   Nov. 18, 2016), *aff'd sub nom*, *Doe v. Kelly,* 878 F.3d 710 (finding evidence of

9   medical risks associated with . . .being exposed to communicable diseases" adequate

10   to establish irreparable harm under the Eighth Amendment); *Castillo v. Barr*, --- F.

11   Supp. 3d ---, 2020 WL 1502864, at *5 (C.D. Cal. Mar. 27, 2020) (in civil

12   detainment context, ruling that officials could not "be deliberately indifferent to the

13   potential exposure of civil detainees to a serious, communicable disease on the

14   ground that the complaining detainee shows no serious current symptoms, or ignore

15   a condition of confinement that is more than very likely to cause a serious illness").

16        85.    As such, Petitioners are entitled to be protected from conditions of

17   confinement that create a serious risk to health or safety, including through release

18   from custody when necessary. *Brown v. Plata*, 563 U.S. 493, 531–32 (2011)

19   (upholding lower court's order releasing people from state prison even though

20   release was based on prospect of future harm caused by prison overcrowding); *see*

21   *also Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (correctional official violates

22   Eighth Amendment by consciously failing to prevent "a substantial risk of serious

23   harm").

24        86.    Under Lompoc's current conditions, Respondents have not and cannot

25   protect Petitioners and the class from this well-known risk of serious harm. In these

26   circumstances, enlargement of custody and, if necessary, release, is required to

27   protect Petitioners and other prisoners with high- risk health conditions from

28   unconstitutional custody.

87.     In this case, as established by the facts above, Petitioners face a significant risk of exposure to COVID-19, with the attendant risk of death that follows given their vulnerable conditions. Respondents are well aware of this risk, having been alerted to it by the CDC, the Attorney General, BOP guidance, widespread news reporting, and the ongoing outbreak at various BOP facilities including Lompoc itself. Indeed, the Second Circuit Court of Appeals, unprompted, acknowledged over a month ago the "grave and enduring" risk posed by COVID-19 in the correctional context. *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, No. 19-1778, -- F.3d --, 2020 WL 1320886, at *12 (2d Cir. Mar. 20, 2020).

88.     Finally, as established above, Respondents have not taken steps sufficient to protect Petitioners from the grave risks that are present every moment he is incarcerated at Lompoc. Respondent Milusnic has recklessly failed to follow or implement CDC guidance or directives from Attorney General Barr or the BOP. Respondents are not capable of managing the risk to Petitioners in the facility's current environment. Respondents are holding Petitioners in violation of their Eighth Amendment rights by detaining them in the face of significant threats to their health and safety without taking reasonable steps to prevent or address that harm.

**B.     Overcrowding Ensures That Respondents Cannot Implement Recommended Measures Required to Protect Petitioner's Health, and Violates the Eighth Amendment.**

89.     Respondents are violating Petitioners' Eighth Amendment rights by continuing to incarcerate them in conditions that place them at substantial risk of serious harm from transmission of an infectious and deadly disease.

90.     As alleged above, the BOP has thus far failed to implement effective social distancing across its facilities, including and particularly at Lompoc, with disastrous effects. Part of this failure reflects the nature of correctional confinement; however, a large part here owes to the particular circumstances of Lompoc's design, capacity, and deliberate choices about policies by Respondents.

3649388

39

91.     In the midst of a pandemic, Respondents have chosen to maintain overcrowding at Lompoc at a rate of 130% capacity. The profound and purposeful overcrowding Lompoc ensures that effective social distancing is impossible, and it stymies Respondents' ability to follow and implement the CDC Interim Guidance and other viral-transmission prevention measures.

92.     Courts have long found that facilities' populations may exacerbate existing harms entirely unrelated to the fact of crowding itself, including cases where overcrowding may inhibit a facility's ability to mitigate incarcerated individuals' risk of contracting dangerous diseases. The Supreme Court itself has recognized that correctional defendants such as Respondents can violate the Eighth Amendment when they crowd prisoners into shared spaces with others who have "infectious maladies." *Helling v. McKinney*, 509 U.S. 25, 33 (1993); *see also Hutto v. Finney*, 437 U.S. 678, 682–85 (1978) (recognizing the need for a remedy where prisoners were crowded into cells and some had infectious diseases).

93.     Such decisions make particular sense in light of substantial corroborating evidence that transmission becomes more likely in light of, among other factors, relative crowding of people together. *See, e.g.*, Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007) ("The probability of transmission of potentially pathogenic organisms is increased [in jails and prisons] by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise."), *available at* https://bit.ly/2QZA494.

94.     In this case, Petitioner faces an elevated risk of serious illness both because of particular failures on the part of Respondents as alleged above, and because Respondents have chosen to overcrowd the facility. The current population of Lompoc, both of incarcerated individuals and the staff who come through on a daily basis and work in the same confined space, ensures that any effective measures that would mitigate Petitioner's exposure to and risk of serious illness

1    from COVID-19 are impossible to implement.

2                                            **VI.**

3                        <u>**CLASS ACTION ALLEGATIONS**</u>

4          95.    Petitioners bring this action pursuant to Rule 23(b)(2) of the Federal

5    Rules of Civil Procedure on their own behalf and on behalf of all persons similarly

6    situated.

7          96.    Petitioners seek to represent a class consisting of all current and future

8    people in post-conviction custody at Lompoc (the "Class").

9          97.    The members of both the Class are too numerous to be joined in one

10   action, and their joinder is impracticable. Upon information and belief, the Class

11   exceeds 1,000 individuals.

12         98.    Several common questions of law and fact apply to all Class members.

13   These common questions of fact and law include but are not limited to: (1) whether

14   the conditions of confinement described in this Petition amount to constitutional

15   violations; (2) what measures Respondents have taken and are taking in response to

16   the COVID-19 crisis; (3) whether Respondents have implemented and are

17   implementing an adequate emergency plan during the COVID-19 crisis; (4) whether

18   Respondents' practices during the COVID-19 crisis have exposed and are exposing

19   prisoners at Lompoc to a substantial risk of serious harm; (5) whether the

20   Respondents have known of and disregarded a substantial risk of serious harm to the

21   safety and health of the Class; and (6) what relief should be awarded to redress the

22   harms suffered by members of the Class as a result of the conditions.

23         99.    Absent class certification, individuals incarcerated at Lompoc during

24   the COVID-19 pandemic would face a series of barriers in accessing the relief

25   sought. Lompoc has suspended visitation, and individuals incarcerated there have

26   limited access to communication with the outside world, impeding their ability to

27   obtain legal representation and pursue litigation. Because the Class are all sentenced

28   prisoners, they do not have defense attorneys already working with them on their

1  criminal proceedings. And a large portion of the Class has limited educational

2  backgrounds and financial means.

3      100.  Respondents' practices and the claims alleged in this Petition are

4  common to all members of the Class and members of the Class.

5      101.  The claims of Petitioners are typical of those of the Class. Petitioners,

6  like all others at Lompoc, are currently being held in unconstitutional custody at

7  Lompoc. Petitioners Torres, Reed, and Brown, like many other members of the

8  Class, have underlying conditions that enhance their risk of serious illness or death

9  from COVID-19.

10      102.  The legal theories on which Petitioner relies are the same or similar to

11  those on which all Class members would rely, and the harms suffered by them are

12  typical of those suffered by all the other Class members.

13      103.  Petitioner will fairly and adequately protect the interests of the Class.

14  The interests of the Class representatives are consistent with those of the Class

15  members. In addition, counsel for Petitioner is experienced in class action and civil

16  rights litigation and in criminal law.

17      104.  Counsel for Petitioner knows of no conflicts of interest among Class

18  members or between the attorneys and Class members that would affect this

19  litigation.

20  **VII.**

21  **CLAIMS FOR RELIEF**

22  **FIRST CLAIM FOR RELIEF**

23  **(Eighth Amendment)**

24  **Unconstitutional Conditions of Confinement in Violation of the Eighth

25  Amendment to the U.S. Constitution**

26  28 U.S.C. § 2241/28 U.S.C. § 2243

27  *Class versus All Defendants*

28      105.  Petitioner incorporates by reference each and every allegation

3649388

42

1    contained in the preceding paragraphs as if set forth fully herein.

2         106.   Petitioners bring this claim on their own behalf and on behalf of the

3    Class.

4         107.   The Eighth Amendment guarantees sentenced prisoners custody free of

5    "a condition of confinement that is sure or very likely to cause serious illness and

6    needless suffering the next week or month or year." *Helling*, 509 U.S. at 33; *see also*

7    U.S. Const. Amend VIII. The government's failure to protect the prisoners in its

8    custody from a widespread outbreak of a serious contagious disease that causes

9    potentially permanent damage or death constitutes deliberate indifference in

10   violation of the Eighth Amendment to the United States Constitution.

11        108.   Petitioners and the Class are at severe risk of contracting COVID-19

12   because 60% of prisoners have already tested positive. Petitioners and the sub-class

13   are uniquely vulnerable to serious complications or death from contracting

14   COVID-19 because of their age and/or because they suffer from medical conditions

15   that render them uniquely vulnerable.

16        109.   Because of the conditions at Lompoc, Petitioners and Class members

17   cannot take steps to protect themselves—such as social distancing, hand-washing

18   hygiene, or self-quarantining—and the government has not provided adequate

19   protections. As COVID-19 rapidly spreads inside Lompoc, the already deplorable

20   conditions at the prison will continue to deteriorate, and incarcerated individuals

21   there will continue to contract COVID-19 at staggering rates. Due to inadequate

22   medical care at Lompoc, the health and safety of those who contract COVID-19 will

23   be put in unconstitutional danger.

24        110.   Petitioners contend that the fact of their confinement in prison itself

25   amounts to an Eighth Amendment violation under these circumstances, and nothing

26   short of an order ending their confinement at Lompoc will alleviate that violation.

27        111.   Respondent's failure to adequately protect Petitioners from these

28   unconstitutional conditions, or release them from the conditions altogether,

constitutes deliberate indifference to a substantial risk of serious harm to Petitioners, and all members of the Class, thereby establishing a violation of the Eighth Amendment to the United States Constitution.

112.   Respondents were aware or should have been aware of these conditions, which were and are open and obvious throughout the entire prison

113.   Respondents knew of and disregarded an excessive risk to health and safety.

114.   Respondents failed to act with reasonable care to mitigate these risks, subjecting Petitioners to a grave and serious risk of harm of serious illness, permanent injury, or death.

115.   Because Respondents failed to act to remedy Petitioners' and the Class's degrading and inhumane conditions of confinement in violation of their Eighth Amendment rights, Petitioners seek relief under this Writ of Habeas Corpus Petition and Class Action Complaint.

116.   Because of the unlawful conduct of Respondents, Petitioners and the Class are threatened with imminent physical injury, pain and suffering, emotional distress, humiliation, and death.

## SECOND CLAIM FOR RELIEF

### (Eighth Amendment)

**Unconstitutional Conditions of Confinement in Violation of the Eighth Amendment to the U.S. Constitution**

### Injunctive Relief Only

U.S. Const, Amend. VIII; 28 U.S.C. § 1331; 5 U.S.C. § 702

*Class versus All Defendants in their Official* Capacities

117.   Petitioners incorporate by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

118.   Petitioners bring this claim on their own behalf and on behalf of the Class.

119.   This claim does not seek the release of any members of the Class and accordingly is not maintained pursuant to 28 U.S.C. § 2241. However, it is well-established that individuals may sue to enjoin constitutional violations, either directly under the Constitution or under the Administrative Procedure Act. *See Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019) ("Plaintiffs may bring their challenge through an equitable action to enjoin unconstitutional official conduct, or under the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, as a challenge to a final agency decision that is alleged to violate the Constitution, or both."); *Fazaga v. FBI*, 916 F.3d 1202, 1239–1241 (9th Cir. 2019) (permitting claims against federal officials in their official capacities for injunctive relief directly under the Fourth Amendment, even though Privacy Act provides for other remedies, and contrasting them to direct actions under the Fourth Amendment for money damages, which are *Bivens* claims); *Jones v. Hurwitz*, 324 F. Supp. 3d 97, 100 (D.D.C. 2018) (finding that a *Bivens* claim could not be maintained because allegations were against defendants in their official capacities but that equitable action could have been maintained as a "direct cause of action arising under the Constitution"); *Farmer v. Brennan*, 511 U.S. 825, 846 (1994) ("If the court finds the Eighth Amendment's subjective and objective requirements satisfied" with regard to a federal prisoner, "it may grant appropriate injunctive relief.").

120.   Because of the conditions at Lompoc, Petitioners and Class members cannot take steps to protect themselves—such as social distancing, hand-washing hygiene, or self-quarantining—and the government has not provided adequate protections. As COVID-19 rapidly spreads inside Lompoc, the already deplorable conditions at the prison will continue to deteriorate, and incarcerated individuals there will continue to contract COVID-19 at staggering rates.

121.   Respondent's failure to adequately protect Petitioners from these unconstitutional conditions, or release them from the conditions altogether,

constitutes deliberate indifference to a substantial risk of serious harm to Petitioners, and all members of the Class, thereby establishing a violation of the Eighth Amendment to the United States Constitution.

122.   Because of the unlawful conduct of Respondents, Petitioners and the Class are threatened with imminent physical injury, pain and suffering, emotional distress, humiliation, and death.

## VIII.

## RELIEF REQUESTED

WHEREFORE, Petitioners, and the Class respectfully request that the Court:

1.     Declare that Lompoc's custody of Petitioners and the Class violates the Eighth Amendment right against cruel and unusual punishment with respect to Petitioners and the Class;

2.     Order a highly expedited process—for completion within no more than 48 hours—for Respondents to use procedures available under the law to review members of the Class for enlargement of custody to home confinement (or bail pending habeas corpus) in order to reduce the density of the prison population to a number that allows for the implementation of appropriate measures to prevent the spread of COVID-19, during the pendency of this petition for a writ of habeas corpus;

3.     Order respondents to comply with the Constitution for any Class members who do not receive temporary enlargement and remain at Terminal Island during the pendency of the petition;

4.     Grant a writ of habeas corpus for all members of the class that received temporary enlargement within one day of the Court's order and release all such persons within twenty-four hours;

5.     Enter a temporary restraining order, preliminary injunction and permanent injunction requiring Respondents to immediately adopt mitigation efforts to protect all Class Members not released, including but not limited to:

A.  Providing adequate spacing of six feet or more between incarcerated people so that social distancing can be accomplished in accordance with CDC guidelines;

B.  Ensuring that each incarcerated person receives, free of charge, an individual supply of hand soap and paper towels sufficient to allow frequent hand washing and drying each day; an adequate supply of clean implements for cleaning such as sponges and brushes and disinfectant hand wipes or disinfectant products effective against the virus that causes COVID-19 for daily cleanings;

C.  Ensuring that all incarcerated people have access to hand sanitizer containing at least 60% alcohol;

D.  Providing access to daily showers and daily access to clean laundry, including clean personal towels and washrags after each shower;

E.  Requiring that all Terminal Island staff wear personal protective equipment, consistent with the CDC guidance, including masks and gloves, when interacting with any person or when touching surfaces in cells or common areas;

F.  Requiring that all Terminal Island staff wash their hands, apply hand sanitizer containing at least 60% alcohol, or change their gloves both before and after interacting with any person or touching surfaces in cells or common areas;

G.  Taking the temperature of all class members and screening for symptoms of COVID-19 of all class members, prison staff, and visitors daily (with a functioning and properly operated and sanitized thermometer) to identify potential

1        COVID-19 infections;

2    H.    Assessing (through questioning) each incarcerated person

3        daily to identify potential COVID-19 infections;

4    I.    Ensuring that all class member and prison staff exposed to

5        individuals with known cases of COVID-19 be isolated

6        from individuals who have not tested positive.

7    J.    Immediately providing on a daily basis clean masks for all

8        individuals who display or report potential COVID-19

9        symptoms until they can be evaluated by a qualified

10        medical professional or placed in non-punitive quarantine

11        and ensure the masks are properly laundered with

12        replacements as necessary;

13    K.    Ensuring that individuals identified as having COVID-19

14        or having been exposed to COVID-19 receive adequate

15        medical care and are properly quarantined (without

16        resorting to cohorting, if possible), in a non-punitive

17        setting, with continued access to showers, recreation,

18        mental health services, reading materials, phone and video

19        visitation with loved ones, communications with counsel,

20        and personal property;

21    L.    Cleaning and disinfecting frequently touched surfaces with

22        disinfectant products effective against the virus that causes

23        COVID-19 (at the manufacturer's recommended

24        concentration), as well as surfaces in common areas, every

25        two hours during waking hours, and at least once during

26        the night;

27    M.    Assuring incarcerated people are told they will not be

28        retaliated against for reported COVID-19 symptoms;

3649388

48

1
2
3

N.     Providing necessary medical treatment consistent with
community standards for incarcerated people who are ill
because of COVID-19;

4
5

O.     Responding to all emergency (as defined by the medical
community) requests for medical attention within an hour;

6
7
8
9
10
11
12

P.     Crafting a mechanism to ensure compliance through the
appointment of an independent monitor with medical
expertise to ensure compliance with these conditions, and
provide the monitor with unfettered access to medical
units, confidential communication with detained
individuals in and out of quarantine, and surveillance
video of public areas of the facilities;

13      6.     Certify this petition as a class action, for the reasons stated herein;

14      7.     Award Plaintiffs' attorneys' fees and costs, as provided by statute and
15 law; and

16      8.     Order such other and further relief as this Court deems just, proper and
17 equitable.

18

19      *Local Rule 5-4.3.4(a)(2)(i) Compliance:  Filer attests that all other*
20 *signatories listed concur in the filing's content and have authorized this filing.*

21

22 DATED:  May 16, 2020                 Bird, Marella, Boxer, Wolpert, Nessim,
23                                      Drooks, Lincenberg & Rhow, P.C.

24                                      By:      */s/ Naeun Rim*
                                                 Naeun Rim
25                                      Attorneys for Plaintiff-Petitioners
26
27
28

COMPLAINT—CLASS ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF
AND PETITION FOR WRIT OF HABEAS CORPUS

1    DATED:  May 16, 2020      Peter J. Eliasberg
2                                   Peter Bibring
                                   ACLU Foundation of Southern California

3                                    By: _____ */s/ Peter Bibring*_____

4                                              Peter Bibring
                                   Attorneys for Plaintiff-Petitioners

5

6    DATED:  May 16, 2020      Donald Specter
7                                     Sara Norman
                                   Prison Law Office

8                                    By: _____ */s/ Donald Specter*_____

9                                           Donald Specter
10                                    Attorneys for Plaintiff-Petitioners

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

1     **DECLARATION OF KIARA CARROR**

2         I, Kiara Carror, am over the age of 18 and fully competent to declare as

3     follows:

4         1.      My brother is Yonnedil Carror Torres. He is currently incarcerated at

5     USP Lompoc in Lompoc, California. His BOP Register Number is 41928-069.

6         2.      My brother is 24 years old, and has suffered from chronic asthma since

7     he was a child.

8         3.      I periodically converse with my brother through telephone and letters.

9     From about mid-April until May 9, the prison would not allow any prisoners to use

10    the telephone, and my brother could only reach me through letters. He has not been

11    able to get in direct contact with any lawyers.  He confirmed for me over the phone

12    that he consented to being a party to this lawsuit. Through phones and letters, my

13    brother has described to me how he almost lost his life at Lompoc.

14        4.      My brother currently resides in the medium-security prison at USP

15    Lompoc. He lives in a tiny cell. The cells in his block are normally single

16    occupancy, but currently each cell houses two prisoners. He shares a single toilet in

17    his cell with his cellmate. Many prisoners in his block are visibly sick.

18        5.      On April 24, 2020, we received a letter from my brother telling us that

19    he was extremely sick and was concerned that he may have COVID-19.

20        6.      On April 30, 2020, we received a letter from my brother's cellmate,

21    informing us that my brother had asked the guards for medical assistance for five

22    days, but was completely ignored. He suffered from fever, diarrhea, body aches, and

23    eventually went into acute respiratory failure and collapsed in his cell.

24        7.      Every inmate in his block began to bang their cell doors in unison to

25    demand that my brother receive medical attention. Only then was my brother rushed

26    to a hospital and put into a medically-induced coma. Only then was he tested for

27    COVID-19. He tested positive and was intubated and put on a ventilator.

28        8.      On May 1, 2020, I contacted the prison and was only told that my

3649759.1

brother was no longer at the hospital. They would not give me any other information about his whereabouts. On May 4, 2020, we belatedly received a letter from my brother saying that he had been taken to the hospital and was waiting to be put on a ventilator. We had no way of knowing whether he was even still alive.

9. On May 9, 2020, I finally received a phone call from my brother. His voice sounded hoarse and unfamiliar. He said that a doctor had told him that he suffered acute lung damage from COVID-19 due to his asthma, and his lung capacity was severely deteriorated as a result. After my brother regained consciousness, they briefly placed him in a quarantine unit and then returned him to his original cell.

10. My brother has seen other sick prisoners and their experiences have been similar. He says the prison allows people who are infected with COVID-19 to hit "rock bottom" before any testing or treatment is offered.

11. I submitted a request for compassionate release to the Warden of USP Lompoc on my brother's behalf on May 11, 2020, but have not received a response.

12. If transferred to home confinement, my brother would stay with me at my home in 420 Bay Leaf Dr Kissimmee, FL 34759. He would have access to doctors familiar with his medical history.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 14, 2020, at Kissimmee, FL



Kiara Carror

# EXHIBIT 2

## DECLARATION OF JOANNA MUNSON PERALES

I, Joanna Munson Perales, am over the age of 18 and fully competent to declare as follows:

1.     I am an attorney for the Office of the Federal Public Defender for the District of Columbia. My New York Bar Number is 4591897. I have represented Vincent Reed in connection with a motion for compassionate release before the United States District Court for the District of Columbia.

2.     Mr. Reed is 53 years old and currently incarcerated at USP Lompoc. His BOP Register Number is 27173-016. Mr. Reed has hypertension, and has struggled with mental health issues throughout his incarceration.

3.     Mr. Reed's son, Vincent Reed Jr., has juvenile diabetes, is fully blind, and is experiencing kidney failure at the age of 30; Mr. Reed may be the only viable candidate to donate a kidney to his son; and Vincent Jr.'s elderly grandmother, who is currently his only caregiver, cannot continue his care alone.

4.     During a legal call on May 13, 2020, I spoke to Mr. Reed regarding this class action litigation. Mr. Reed confirmed to me that he wanted to participate as a named plaintiff.

5.     The following is information Mr. Reed conveyed to me over the course of several legal calls. Other than what Mr. Reed told me, I have no independent personal knowledge of this information.

6.     On March 27 or 28, 2020, Mr. Reed began exhibiting symptoms of COVID-19. On March 30, 2020, Mr. Reed was tested for COVID-19. After the test, Mr. Reed was immediately placed in the Special Housing Unit (SHU, or solitary confinement) while he awaited results. On March 31, 2020, Mr. Reed was confirmed to be positive for COVID-19, and saw a doctor for a temperature and symptom check. Afterwards, Mr. Reed was left in the SHU with no medical treatment. Mr. Reed would not see a doctor or any medical staff again until April 7, 2020.

7.     After several days in the SHU, Mr. Reed was moved to dormitory Unit H along with other prisoners who had tested positive for COVID-19. Unit H was one of two dormitories that had been closed over three years ago due to mold contamination. Unit H had not been cleaned before the prisoners arrived, and conditions were extremely unsanitary. The Unit was empty aside from some mattresses that guards brought in.

8.     For days after Mr. Reed's arrival, no treatment or medicine was made available to anyone in Unit H, aside from daily temperature checks. There was no soap, and the prisoners were not allowed to shower.

9.     On April 14, 2020, Mr. Reed was returned to the general population at USP Lompoc prison. The prison is currently on lockdown, with prisoners mostly confined to their cells. Mr. Reed was not tested again for COVID-19, and only received an in-cell evaluation after his return to the general population..

10.     Mr. Reed and others in the general population do not have access to disinfectants or hand sanitizer, and are only given one small bar of soap each week. Once they run out of soap, they cannot purchase any more because the commissary is closed.

11.     Many of the prisoners try to avoid saying anything even when they feel sick, because they have seen others like Mr. Reed being sent to the SHU. They simply stay quietly in their cells until they are obviously too ill to stand, eat, or breathe easily.

12.     Other prisoners just want to leave their cells and do not want to socially distance. They have been under lockdown for a long time and are getting restless.

13.     If transferred to home confinement, Mr. Reed will return to Washington D.C. to self-quarantine at his brother's residence.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

3649386.1                                    2

1    Executed on May 15, 2020, at Cheverly, Maryland.

2

3

4

5

6                                                    _____
                                                     Joanna Munson Perales
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 3

**DECLARATION OF GRACIELA ZAVALA-GARCIA**

I, Graciela Zavala-Garcia, am over the age of 18 and fully competent to declare as follows:

1.      My name is Graciela Zavala-Garcia. I am a practicing attorney, licensed in the State of California for 36 years, with California State Bar No. 113901.

2.      My son's name is Felix Samuel Garcia. He is 36 years old and has been incarcerated since September, 2015.  He is currently in Lompoc, California for the past three years. He was at FCI Lompoc for most of that time, but on May 7, 2020, he was moved to USP Lompoc. My son has a release date of November 6, 2020, and a release date to a "halfway house" for July 7, 2020.  His BOP Register Number is 46693-298.

3.      Sometime in March 2020, FCI Lompoc went into lockdown and beginning on April 17, 2020, my son was denied all access to telephones, email, and commissary. Until May 12, 2020, the only way I could communicate with him was through letters. On May 12, 2020, I received one phone call from my son, and he told me that he wanted to participate in this lawsuit as a named plaintiff. The following information is based on what my son has told me through that call and through his letters.

4.      In early May, my son tested negative for COVID-19. A few days later, on May 7, 2020, he was moved out of Unit J at FCI Lompoc and to a makeshift prisoner housing unit set up in a warehouse at USP Lompoc. The warehouse has multiple small cells that are occupied by two prisoners each. He shares a toilet and sink with his cellmate. The warehouse is on total lockdown, and my son is kept in his cell almost twenty-four hours a day.

5.      The conditions at the warehouse are extremely unsanitary. Since moving to the warehouse, my son has not been able to shower or change into clean

clothes. My son has been forced to wet his body with water from his sink in a desperate attempt to maintain hygiene.

6.   In late April, while still at FCI Lompoc, my son received a single mask. He has had to reuse that mask since then. My son has not been given access to hand sanitizer, and says that there is currently a shortage of soap in the warehouse where he lives.

7.   My son says that other prisoners have been retaliated against for expressing concerns about their safety to the warden. My son also tells me that some prisoners in at FCI Lompoc are being held past their release dates due to the total lockdown.

8.   On May 11, 2020, my son submitted a request for home confinement to the warden at USP Lompoc through his attorney. We have not yet received a response.

8.   My son's current release date is November 6, 2020.  He is scheduled to go to a halfway house in July 2020.  I do not understand why the BOP would continue to place him and others at risk in an overcrowded prison, rather than transfer him to home confinement just two months before he was scheduled for release to a halfway house.

9.    If transferred to home confinement, my son would self-quarantine at my house in Imperial Beach, California, with his father and me. He would have access to doctors who are familiar with his medical history.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on May 14, 2020, at Imperial Beach, California

1

2

3

4

Graciela Zavala-Garcia

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3649384.1

3

# EXHIBIT 4

# DECLARATION OF VERNA WEFALD

I, Verna Wefald, am over the age of 18 and fully competent to declare as follows:

1.     I am an attorney licensed to practice law in the State of California (Bar No. 127104).  I make this declaration on behalf of my client Andre Brown, Reg. No. 54460-097, who is incarcerated at the United States Penitentiary in Lompoc, California.  Mr. Brown, who is 55 years old (DOB 7/13/65) and a United States citizen by birth, is learning disabled and illiterate. He therefore asked that I make this request on his behalf to join a lawsuit to be filed by the ACLU regarding the COVID-19 emergency at various federal correctional institutions, including Lompoc.

2.     I was appointed by the Ninth Circuit Court of Appeals to represent Andre Brown in the appeal of his criminal conviction in the Central District of California. *United States v. Brown*, 19-50025 (13 CR 822). The appeal is fully briefed and may be argued sometime between September and November 2020.

3.     Mr. Brown was sentenced by the Honorable Otis D. Wright on January 28, 2018, to 150 months in prison after being convicted by a jury of two counts of drug trafficking (PCP).  He was convicted of distribution and conspiracy in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iv), and 846.  Mr. Brown has been in custody since his arrest on February 12, 2014, or for more than half of his sentence.  The BOP website indicates his projected release date is 10/06/2024. *See* Exhibit A

4.     Mr. Brown has some minor prior convictions but the last one was 20 years ago.

5.     On Tuesday, May 12, 2020, I spoke to Mr. Brown in a legal call arranged by the Regional Counsel Dennis Wong.  I sent a fax per Lompoc's request to set up a legal call on May 1.  Mr. Wong sent me an email on May 7, to set up the call.  He explained that after each call the office and phone needs to be cleaned so arranging for phone calls is a complicated matter. We arranged for me to be awaiting a call between 9:00 A.M. and noon from Tuesday through Thursday but I was able to speak with Mr. Brown early Tuesday morning. During this call, Mr. Brown confirmed to me that he wanted to

1

1   participate as a named plaintiff in this litigation.

2         6.    I did not have a chance to ask Mr. Brown about the details of his housing.

3   However, he is very concerned for his health given the serious outbreak of COVID-19 at

4   Lompoc. At his sentencing, the Presentence Report (PSR) verified that Mr. Brown has

5   prostate cancer. He will need chemotherapy or surgery in the future.  I do not know how he

6   is being treated for his cancer at this time.

7         7.    Yesterday I sent a request to Lompoc Warden J. Engleman (by email, fax,

8   and certified mail) requesting compassionate release and/or home confinement for

9   Mr. Brown. If the warden does not respond within 30 days I will file a motion in the

10   district court requesting that he be released forthwith.

11         8.    I have communicated with Mr. Brown's daughter Andrea Brown several

12   times. She said that he would be able to live with her as he has in the past.  Mr. Brown also

13   has five other children in the Los Angeles area to whom he is close and who could help to

14   support him as well. He will certainly be eligible for Medicaid and can continue to see his

15   doctors at the Martin Luther King Hospital and the Centinela Medical Center in Lawndale.

16         9.    Mr. Brown is particularly vulnerable at Lompoc given his underlying serious

17   health problems and his inability to communicate with the outside world by mail.  At

18   present there are no phone calls or visits allowed at Lompoc.  Legal calls have to be

19   arranged and this takes some time.

20        I declare under penalty of perjury under the laws of the United States of America

21   that the foregoing is true and correct.

22   Executed on May 14, 2020, at Pasadena, California.

23

24

25

26                            Verna Wefald

27

28

# EXHIBIT 5

**DECLARATION OF NEMA ZAYED FEARS**

I, Nema Zayed Fears, declare as follows:

1. I am over the age of 18, and if called as a witness, I could and would competently testify.

2. My father is Shawn L. Fears. He is 50 years old and currently incarcerated at USP Lompoc in Lompoc, California. His BOP Register Number is 34183-060.

3. Since April 16 2020, the prison has been under lockdown, and my father has not been permitted to use a computer or telephone. I have only been able to converse with him through letters. Through a letter dated May 10, 2020, he told me that he wanted to participate in this lawsuit as a named plaintiff. The following information is based on what my father has told me through his letters.

4. My father currently resides in the South Camp at USP Lompoc. He lives in an open-plan dormitory, where prisoners reside in extremely close quarters with each other and share a bathroom. Many prisoners in my father's dormitory are sick.

5. Since the COVID-19 outbreak started, a single mask is the only piece of protective equipment that my father has received. He has had to re-use that mask for weeks.

6. My father has never been tested for COVID-19. The only testing he has seen in his dormitory is temperature checks.

7. My father says that guards have stopped accepting requests for medical care from prisoners since the outbreak started. He has seen other prisoners being denied regular medical treatment that they would have received prior to the outbreak.

8. If transferred to home confinement, my father would self-quarantine at 10135 Shoreline Pkwy., Villa Rica, GA 30180. He would have access to doctors who are familiar with his medical history.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

3649743.1

1

Executed May 15, 2020, at Villa Rica, Georgia.

2

3

_____

4

Nema Zayed Fears

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 6

## <u>DECLARATION OF DARWIN P. ROBERTS</u>

I, Darwin P. Roberts, declare as follows:

1.      I am an attorney and a member of the Criminal Justice Act panel in the Western District of Washington.  I was appointed counsel for Charles Cheatham in pretrial proceedings in the case *United States v. Charles Cheatham*, U.S. District Court, Western District of Washington, cause number 2:18-CR-00131-RAJ-1. I represent Mr. Cheatham in his currently pending appeal in the Ninth Circuit Court of Appeals, cause number 19-30294.

2.      Mr. Cheatham is in the custody of the United States Bureau of Prisons serving a sentence of incarceration imposed by the U.S. District Court.  His current projected release date is in March of 2031.  His BOP register number is 48768-086.

3.      In early 2020, Mr. Cheatham was transferred from the Federal Detention Center in Seattle, Washington, to Lompoc Federal Correctional Institution in Lompoc, CA.

4.      Since COVID-19 cases began to develop in the Bureau of Prisons, Mr. Cheatham's ability to communicate with me has been limited. Mr. Cheatham has lost most or all of his access to email, and only occasionally can contact me by telephone.

5.      I was able to speak with Mr. Cheatham today, May 14, 2020, for five minutes. Mr. Cheatham stated he could only speak for five minutes at a time and that there were "80 people" waiting their turn to use the telephone for five minutes. I also received information on May 12, 2020, from family members Mr. Cheatham was able to reach by telephone then.

6.      Mr. Cheatham told me that COVID-19 cases at Lompoc FCI have "blown up" in recent weeks. This is consistent with the figures reported on the BOP's website (https://www.bop.gov/coronavirus/), which currently lists 885 cases among inmates at Lompoc FCI, and 13 cases among staff.

7.      Mr. Cheatham told me that medical care offered by the BOP for

COVID-19 has been very limited or nonexistent. He stated that inmates are not tested for COVID-19 unless they are showing obvious symptoms, but even if they are showing symptoms and test positive, they are not isolated from other inmates.

8.     Mr. Cheatham reports that after several days in which he was showing "obvious" symptoms of COVID-19, he was finally given a test for COVID-19 and tested positive. I understand he tested positive within the last 14 days.  Nevertheless, he continues to be held in a dormitory-type situation with approximately 100 other inmates, most of whom, he says, also now have COVID-19.

9.     Mr. Cheatham stated that he and his fellow inmates are not being provided any medication by BOP to treat their COVID-19 symptoms. He stated that they are only being given occasional access to the commissary, meaning they are generally unable to purchase cough drops, cough syrup, or other over-the-counter medications such as aspirin or other painkillers to self-medicate their symptoms.

10.    Mr. Cheatham stated that due to his untreated respiratory illness and severe sore throat, he was unable to consume any food other than broth for a week.

11.    Mr. Cheatham stated the inmates in his area are sleeping under fans that circulate air all night and presumably may be spreading the virus among inmates.

12.    Mr. Cheatham stated that because of BOP's previous efforts to isolate the inmates, he believes the COVID-19 infection must have been introduced into the prison from BOP staff.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I executed this declaration on May 15, 2020, at Seattle, Washington.


_____/s/ Darwin P. Roberts_____
Darwin P. Roberts

2

# EXHIBIT 7

## DECLARATION OF SHAMSHER SAMRA, M.D.

I, Shamsher Samra, declare as follows:

1.     I am an Assistant Professor of Clinical Medicine at University of California, Los Angeles and a faculty member in the Department of Emergency Medicine at Harbor-UCLA.  I work clinically in the LA County jails and participate in jail reentry programs in Los Angeles County.  I am a physician trained in forensic medical evaluations through Physicians for Human Rights.  I am a founding member of both the Harbor-Hospital Based Violence Intervention Program and Trauma Recovery Centers.  I completed by residency in Emergency Medicine at the University of California, Los Angeles.  I received my M.D. from Harvard Medical School.  Attached as Exhibit A is my curriculum vitae.

2.     COVID-19 is a serious disease that has reached pandemic status, and is straining the health care systems around the world. As of May 14, 2020, at least 1.3 million people in the United States had received confirmed diagnoses of COVID 19. At least 83,000 people have died in the United States.  Approximately 71,000 of the confirmed cases were in California, with more than 2,900 having died.[1]  These numbers will continue to increase, perhaps exponentially. Moreover, these figures must be considered in light of nationwide shortages of COVID-19 tests, meaning the actual numbers are likely significantly higher than those reported.

3.     The Lompoc complex is comprised of Federal Correctional Institution Lompoc ("FCI Lompoc") and United States Penitentiary Lompoc ("USP Lompoc"). USP Lompoc itself has two components, a low-security camp and a medium-security prison.  In total, the facilities have a rated design capacity of 2058.[2]

---

[1]   Coronavirus Disease 2019, Centers for Disease Control and Prevention, *available at* https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html

[2]   Prison Rape Elimination Act Audit Report, Federal Bureau of Prisons, at pages 2–3, *available at* https://www.bop.gov/locations/institutions/lof/prea_lof.pdf

However, as of May 14, 2020 they had a total population of 2680, thus exceeding capacity.[3]  As of May 14, 2020, BOP's website reports that there are a total of 924 people at FCI Lompoc who are currently or were recently positive for COVID-19, including 882 residents and 14 staff currently deemed positive, and 25 inmates reported as being "recovered" after previously testing positive.[4]  As of May 14, BOP's website reports that there were a total of 137 people at USP Lompoc who are currently or were recently positive for COVID-19, including 22 staff and 16 residents currently deemed positive, and 93 residents reported as being "recovered" after previously testing positive.[5]  The reported numbers change daily, and the BOP website does not show what criteria it is using to consider someone "recovered."  At least 2 residents have died at FCI Lompoc due to coronavirus.[6]

4.     COVID-19 is a novel respiratory virus. It is spread primarily through droplets generated when an infected person coughs or sneezes, or through droplets of saliva or discharge from the nose. There is no vaccine for COVID-19, and there is no cure for COVID-19. No one has prior immunity. The only way to control the virus is to use preventive strategies, including social distancing.

5.     The time course of the disease can be very rapid. Individuals can show the first symptoms of infection in as few as two days after exposure and their condition can seriously deteriorate in as few as five days (perhaps sooner) after that. It is believed that people can transmit the virus without being symptomatic and,

---

[3]   Inmate Population Breakdown, Federal Bureau of Prisons, *available at* https://www.bop.gov/mobile/about/population_statistics.jsp

[4]   COVID-19, Federal Bureau of Prisons, *available at* https://www.bop.gov/coronavirus/

[5]   COVID-19, Federal Bureau of Prisons, *available at* https://www.bop.gov/coronavirus/

[6]   COVID-19, Federal Bureau of Prisons, *available at* https://www.bop.gov/coronavirus/

1  indeed, that a significant amount of transmission may be from people who are

2  infected but asymptomatic or pre-symptomatic.

3       6.     COVID-19 causes serious illness, with overall case fatality rates in the

4  United States so far estimated at 5.8%. An estimated 20% of those who become

5  infected and develop symptoms require significant medical intervention. While

6  certain medical conditions increase the probability of death from infection,

7  otherwise perfectly healthy people are also vulnerable to COVID-19 and may die as

8  a result.  For example, adults age 20 to 44 account for 20% of all hospitalizations

9  and 12% of ICU admissions.[7]

10       7.     Treatment for serious cases of COVID-19 requires significant advanced

11  support.  In particular, appropriate supportive care often requires ventilator

12  assistance for respiration and prone positioning if a patient's condition worsens

13  despite intubation and ventilation.  Furthermore, hospitals across the country are

14  deploying a variety of drug regimens, including antivirals and imunomodulators, in

15  search of the most effective remedy against COVID-19.  It is essential that patients

16  have immediate access to such advanced supportive care, because the condition of

17  patients who require hospitalization often deteriorates in rapid fashion.  For

18  instance, approximately 50% develop hypoxemia (shortage of oxygen in the blood

19  or shortage of oxygen) by the eighth day.  And as many as 29% develop Acute

20  Respiratory Distress Syndrome (ARDS).[8]  In addition to being a very lethal

21  condition on its own, ARDS has a long and varied list of related complications that

22  are as equally fatal: blood clots, collapsed lung, infections, and scarring of lung

23  _____

24  [7]  Coronavirus, COVID-19, Johns Hopkins Medicine, *available at*

25  hopkinsguides.com/hopkins/view/Johns_Hopkins_ABX_Guide/540747/all/Coronavirus_COVID_19__SARS_CoV_2_#2

26  [8]  Coronavirus, COVID-19, Johns Hopkins Medicine, *available at*

27  hopkinsguides.com/hopkins/view/Johns_Hopkins_ABX_Guide/540747/all/Coronavirus_COVID_19__SARS_CoV_2_#2

28

tissue.[9]  In sum, for those individuals who experience more severe symptoms from COVID-19, immediate and substantial medical intervention is required.

8.    The effects of COVID-19 are especially serious for people who are most vulnerable. Vulnerable people include people over the age of 50, and those of any age with underlying health problems such as—but not limited to—weakened immune systems (which can be caused by a variety of conditions, including but not limited to cancer treatment, smoking, and immune weakening medications), moderate to severe asthma, diabetes, hypertension, serious heart and lung disease, severe obesity,  liver disease, chronic kidney disease, and possibly pregnancy.[10] While the CDC typically classifies only people 65 and older as vulnerable, incarcerated individuals tend to be in poorer health than those in the general population, justifying the use of an earlier cutoff in classifying people deemed vulnerable to COVID-19.

9.    Although individuals in the above-described populations are most vulnerable, even younger and healthier people can suffer severe consequences.  For example, even healthier people who contract COVID-19 are susceptible to severe strokes and may require supportive care, which includes supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.

10.    The full extent of long-term sequela on cardio and cerebrovascular diseases and other organ damage is unknown at this time in light of the novel nature of COVID-19.  However, preliminary evidence suggests COVID-19 may render lasting organ damage in even minimally symptomatic or completely asymptomatic

---

[9]    ARDS, Mayo Clinic, *available at* https://www.mayoclinic.org/diseases-conditions/ards/symptoms-causes/syc-20355576

[10]    Coronavirus Disease 2019, Centers for Disease Control and Prevention, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html

4

DECLARATION OF SHAMSHER SAMRA, M.D.

patients.  For example, COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, can cause a permanent loss of respiratory capacity.  Furthermore, COVID-19 may target the heart muscle, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can affect the heart muscle and electrical system, reducing the heart's ability to pump. This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work.

11.     In light of the above, an outbreak of COVID-19 could put significant pressure on or exceed the capacity of local health infrastructure.  In the absence of a vaccine and a cure, a significant number of people who are infected with the virus will die.  Buttressing these concerns, it is not yet clear whether people who have already been infected with COVID-19 gain immunity against future infection. To the extent that the health care infrastructure is overloaded, people will die unnecessarily because necessary respirators and hospital facilities are unavailable.

12.     Public health authorities recommend a number of preventative steps to help prevent or decrease the spread of COVID-19, with perhaps the most important measure being social distancing.  However, as the CDC and BOP both appear to acknowledge, correctional facilities are inherently limited in their abilities to implement such measures.  For example, the BOP's modified operating directive is inadequate, in part, because it only requires social distancing "as much as practicable."[11]  Indeed, social distancing in ways that are recommended by public health officials can be difficult, if not impossible, in prisons, placing people at risk, especially when a facility is at or above population capacity.  Therefore, even if the conditions at Lompoc were ideal (which they are not) it would require

---

[11]   Modified Operating Directive, Federal Bureau of Prisons, *available at* https://www.bop.gov/coronavirus/covid19_status.jsp

a monumental effort to ensure the safety of prisoners and staff.

13.     I understand the following to be allegations in the Complaint.  If these allegations are confirmed true, the conditions at Lompoc are deeply concerning:

- The Lompoc complex is comprised of Federal Correctional Institution Lompoc and United States Penitentiary Lompoc. USP Lompoc itself has two components, a low-security camp and a medium-security prison.

- In total, the facilities comprising the Lompoc complex have a rated design capacity of 2058.  However, as of May 14, 2020, they had a population of 2680, thus exceeding capacity.

- As of May 13, 2020, more than 1,063 prisoners and staff had tested positive for COVID-19 at FCI Lompoc and USP Lompoc.

- At FCI Lompoc, sick people are being moved to a converted warehouse in USP Lompoc.  The living space there is cell-style (the warehouse is itself a converted SHU), with two prisoners to a cell.  The warehouse is on near-total lockdown, and prisoners are in their cells almost 24 hours a day.  Conditions at the warehouse are very unsanitary.  Nobody can shower or change into clean clothes due to lockdown.

- At the low-security camp at USP, people live in open-plan dormitories with shared bathrooms.  About 140 people live in these dorms and sleep on bunk beds approximately 6 feet apart from each other.  There are no internal walls so everyone and all the bunk beds are in one open space.  All 140 people share six toilets and six showers.  Dorms are crowded and people congregate in common areas.  Other than when they stand in line for meal packets, nobody is allowed to leave the dormitory. Prisoners also have to stand in line to get medication, and there is

1     not enough space for social distancing.

2     &bull;   Initially, the practice appears to have been to transfer sick people
3     to the SHU.  Some prisoners who had tested positive were left
4     there for up to four days with no medical attention.  Eventually,
5     they re-opened two dormitories that had been closed three years
6     ago due to mold contamination in order to house sick people.
7     The re-opened dormitories are extremely unsanitary, and
8     prisoners sleep on mattresses guards have scattered across the
9     ground.  Prisoners here go for up to five days at a time with no
10     treatment for COVID-19.  There is no soap, and people are not
11     being allowed to shower.

12     &bull;   At the medium-security prison at USP, two prisoners each are
13     sharing cells that are normally single occupancy.  It does not
14     appear that they are bothering to pull sick people out of the
15     prison, presumably because they are less infected due to the
16     relative isolation.  Policy seems to be to allow people to hit
17     "rock-bottom" before being treated for COVID-19.

18     &bull;   Inmates were only give one mask in April, and have been reusing
19     that mask since.  Hand sanitizer is non-existent and soap is not
20     plentiful (because commissary is closed, prisoners cannot secure
21     extra soap beyond the one bar per week they are normally
22     issued).

23     &bull;   It does not appear that anyone who tests positive and then
24     "recovers" is tested again before being returned to the general
25     population.

26     &bull;   Prisoners are being denied regular medical treatment they had
27     received prior to the outbreak.  For example, routine procedures
28     scheduled prior to the outbreak have been delayed indefinitely.

14.     These conditions make it virtually impossible to ensure the safety of prisoners who remain housed at the facility if the current course is maintained. Even if the government made best efforts, effective social distancing is out of the question, particularly for those inmates who are effectively forced to be in a communal setting at all times due to their dormitory-style housing.  Indeed, this combination of factors practically ensures that all remaining prisoners will eventually contract COVID-19 unless extraordinary measures are taken now.  As if more evidence were needed of Lompoc's inability to ensure the safety of its prisoners, more than half of them have recently tested positive for COVID-19.

15.     Moreover, it is my understanding that BOP now contends that a substantial number of the prisoners who recently tested positive have "recovered." To the extent these prisoners have actually recovered from the illness, that does not absolve the need for preventive measures.  In particular, it is not yet clear whether people who have been infected develop immunity against future infection by COVID-19.

16.     Furthermore, if it is true that BOP is classifying prisoners as "recovered" without re-testing them, that would be very problematic.  Indeed, the need for continued rigorous preventive measures is only heightened if BOP has not relied on appropriate methods for determining whether prisoners have in fact recovered.  In an ideal scenario, an individual would only be deemed "recovered" after testing negative.  Relying instead, for instance, on patient reports of symptoms may not be sufficient in a correctional setting, where prisoners may be reluctant to share information with staff.  Furthermore, asymptomatic individuals can still be carriers of the disease.  And in a large communal living space, where social distancing cannot be strictly adhered to, individuals should be tested regularly in order to quickly identify and isolate anyone who may contract COVID-19 before it spreads through the population.

17.     I have also reviewed a declaration submitted by Kiarra Carror, the

sister of prisoner Yonnedil Carror Torres who resides at USP Lompoc.  In addition to some of the representations above, the declarant indicates that: (1) Torres has suffered from chronic asthma since he was a child; (2) Torres resides in a cell designed to house only a single person but he shares his cell with another resident, including sharing a toilet; (3) for five straight days, Torres asked correctional officers for medical assistance due to a fever, diarrhea, and body aches, until he eventually collapsed in his cell from acute respiratory failure; (4) after every prisoner on Torres's block began banging their cell doors in unison to attract the attention of correctional officers, Torres was taken to a hospital, where he was placed into a medically-induced coma; (5) at the hospital, he was tested for the first time for COVID-19, with the result coming back positive; (6) Torres was then intubated and put on a ventilator; (7) Torres has been informed by physicians that he suffered acute lung damage from COVID-19 due to his asthma and his lung capacity severely deteriorated as a result; (8) Torres was briefly placed in quarantine upon returning to USP Lompoc before returning to his original cell; and (9) Torres has seen other prisoners similarly struggle to receive medical attention, with their symptoms having to become quite severe to receive treatment.

18.     Assuming these allegations are accurate, the health care delivery system at Lompoc is failing to provide even the minimal level of acceptable care.  In addition to the noted failures to institute an effective regimen of social distancing, these declarations highlight the failure to monitor prisoners and to treat those who have become infected—and even worse, have displayed notable symptoms. Torres's account is alarming, as it shows that virtually no effort is being made at Lompoc to monitor or treat prisoners, with staff instead waiting until the last minute to intervene and send the prisoner to a hospital.  One of the things we have already learned about this disease is the benefit of early and aggressive medical intervention.

19.     Furthermore, given the conditions depicted both in the allegations from the Complaint and the two declarations, it is questionable whether the healthcare

1  system at Lompoc is even capable of adequately responding to the dire situation it

2  now faces.  In the context of a very limited healthcare system at a prison facility

3  (and possible staffing shortages due to COVID-19 outbreak among staff), the

4  inability to swiftly identify those prisoners in need of substantial and proactive

5  medical intervention and either begin an appropriate treatment regimen or transport

6  them to a civilian hospital will only cause needless pain and deaths.

7       20.    In light of the above, in my opinion BOP should take immediate steps

8  to dramatically downsize the population at Lompoc, with priority given to those at

9  high risk of harm due to their age and health status and thus are likely to require a

10  disproportionate amount of medical resources. This will both allow Lompoc to

11  implement more effective preventive and treatment measures while simultaneously

12  granting released or transferred prisoners access to minimally acceptable living

13  conditions.

14       21.    Perhaps most importantly, downsizing will allow for more effective

15  social distancing measures at Lompoc while simultaneously reducing the strain

16  placed on prison staff by the need to monitor and treat prisoners.  Although BOP has

17  attempted to redress the overcrowding by sending certain FCI Lompoc inmates to

18  a converted warehouse, I am informed that the living conditions there are

19  unsanitary, raising questions about the suitability of the environment, especially for

20  a population grappling with a deadly novel disease.  In light of the already high

21  infection rates at Lompoc, any reduction in prisoner population will also allow

22  prison staff to more closely monitor the conditions of infected prisoners for signs

23  that immediate medical intervention is required.  Relatedly, the reduction in

24  population while implementing downsizing measures helps prevent overloading the

25  work of prison staff such that they can continue to ensure the safety of incarcerated

26  people.

27       22.    Furthermore, immediate downsizing that prioritizes prisoners who are

28  elderly and those with underlying health conditions reduces the likelihood they will

1    contract the disease (either for a first or subsequent time) or suffer severe medical

2    consequences as a result of being infected.  Reducing the spread and severity of

3    infection in a prison slows, if not reduces, the number of people who will become ill

4    enough to require hospitalization, which in turn reduces the strain on local

5    community resources and infrastructure.

6        23.    Downsizing from a facility with infection rates as high as Lompoc may

7    be done safely, minimizing the risk of increasing infection rates in the community.

8    In particular, it is imperative that prisoners be tested prior to release.  But even

9    prisoners who receive confirmed diagnoses of COVID-19 may be safely released to

10   the community.  If they are asymptomatic, they must be required to self-quarantine

11   and follow other recommendations of public health officials.  If they are

12   experiencing symptoms, they will likely receive superior healthcare if released from

13   custody due to the present conditions at Lompoc.

14       24.    The above measures, especially if implemented immediately, can slow

15   or stop the spread of infection (or re-infection) and ensure appropriate and proactive

16   treatment of infected prisoners, to the benefit of prisoners and staff and, ultimately,

17   the community at large.

18       25.    In addition to downsizing, and to the extent they are not already being

19   implemented, the following steps should immediately be mandated of the

20   Respondents in order to protect any prisoners who remain in custody:

21           a.    Social Distancing.  The prison must ensure that prisoners are

22   able to maintain adequate social distancing during required or necessary activities,

23   such as collecting food, eating, and receiving medications.

24           b.    Immediate and Continued Testing.  Patients (both staff and

25   prisoners) who require testing, based on public health recommendations and the

26   opinion of a qualified medical professional, should be tested for COVID-19,

27   including to the extent public health recommendations call for continued (or repeat)

28   testing of individuals who have previously been tested.

1          c.     Immediate Screening.  Defendants must be required to screen

2  each employee or other person entering the facility every day to detect fever over

3  100 degrees, cough, shortness of breath, and/or exposure to someone who is

4  symptomatic or under surveillance for COVID-19 or screening as required by public

5  health authorities.  A record should be made of each screening.

6          d.     Quarantine.  The prison must establish non-punitive quarantine

7  for all individuals believed to have been exposed to COVID-19, but not yet

8  symptomatic, and non-punitive isolation for those believed to be infected with

9  COVID-19 and potentially infectious. Any individual who must interact with those

10 potentially or likely inflicted with COVID-19 must utilize protective equipment as

11 directed by public health authorities.  In short, every possible effort must be made to

12 separate infected or potentially infected individuals from the rest of the incarcerated

13 population and each other.

14         e.     Institutional Hygiene.  The prison must be required to provide

15 adequate disinfection of all high-touch areas and cells.

16         f.     Personal Hygiene.  The prison must be required to provide hand

17 soap, disposable paper towels, and access to water to allow prisoners to wash their

18 hands on a regular basis, free of charge and ensure replacement products are

19 available as needed. Further, hand sanitizer with alcohol must be declassified

20 temporarily as contraband.  Correctional staff should be allowed to carry hand

21 sanitizer with alcohol on their person, and prisoners should be allowed to use hand

22 sanitizer with alcohol when they are in locations or activities where hand washing is

23 not available.  Prisoners should also be permitted daily access to showers and clean

24 laundry.  Correctional officers should be required to wear personal protective

25 equipment, consistent with the CDC guidance, including masks and gloves, when

26 interacting with any person or when touching surfaces in cells or common areas.

27 Finally, correctional officers should also wash their hands, use hand sanitizer, or

28 change their gloves both before and after interacting with any person or touching

1  surfaces in cells or common areas.

2         g.   <u>Waive Copays</u>.  There must be a waiving of copays for medical

3  evaluation and care related in any way to COVID-19 and/or its symptoms. A waiver

4  of these types of copays is necessary to avoid disincentivizing patients from

5  requesting medical treatment. Patients with symptoms of possible COVID-19 should

6  be seen quickly.

7         h.   <u>Personal Protective Equipment</u>.  Those prisoners with a cough

8  should be provided masks as soon as they inform staff of this symptom or staff

9  notice this symptom.  Staff should also be required to wear facemasks, gowns or

10  other body coverings, eye protection, and gloves.

11         i.   <u>Supply Chain</u>.  The prison must be required to identify the

12  supplies and other materials upon which the institution is dependent, such as food,

13  medical supplies, certain medicines, cleaning products, etc., and prepare for

14  shortages, delays or disruptions in the supply chain.

15     26.   In sum, reducing the number of individuals imprisoned at Lompoc

16  immediately is necessary for the health and safety of the prisons and our

17  communities. This population reduction should begin with the most medically

18  vulnerable which includes those over age 50 and those with CDC-defined

19  underlying health conditions.

20     I declare under penalty of perjury under the laws of the United States that the

21  foregoing is true and correct.

22     Executed May 15, 2020, at Los Angeles, California

23

24

25                           _____
                         SHAMSHER SAMRA, M.D.

26

27

28

# EXHIBIT A

## Shamsher Samra, MD, MPhil

## CURRICULUM VITAE

**PERSONAL HISTORY:**

Business address:        Harbor-UCLA Medical Center
                         Division of
                         1000 West Carson Street
                         Torrance, California 90509
Work Phone               (310) 269-3923
e-mail:                  ssamra@dhs.lacounty.gov


Home address:            27 Westminster Ave
                         Venice, California 90291
Home Phone:              (559) 269-3923

Date of Birth:           May 5, 1986
Place of Birth:          Los Angeles, California
Citizenship:             U.S. Citizen


EDUCATION and TRAINING:

Stanford University, Stanford, California
     B.S., Biological Sciences                8/04-06/07

Cambridge University, Cambridge, UK
     MPhil, Development Studies
     Gates Cambridge Fellowship               08/07-06/08

Harvard Medical School, Boston, Massachusetts
     MD                                       08/08-06/13

Harvard Kennedy School of Government
     Urban Policy and Human Rights            08/14-12/14

UCLA Medical Center-Olive View Medical Center
     Residency: Emergency Medicine            07/13-06/17

Chief Resident UCLA Medical Center-Olive View Medical Center
     Residency: Emergency Medicine            07/16-06/17

**LICENSURE:**

State of California, A134884                      02/15 -

Shamsher Samra MD, MPhil

Drug Enforcement Agency                                02/15 -

**CERTIFICATION:**

Diplomate, American Board of Emergency Medicine        06/14/18

**PROFESSIONAL EXPERIENCE:**

Assistant Professor Emergency Medicine                 08/17 -
    Harbor-UCLA Medical Center
    Los Angeles, California

Attending Physician Correctional Health Services       08/17-
    Twin Towers Correctional Facility
    Los Angeles, California

Medical Director Whole Person Care Reentry             08/18 –
    Department of Health Services
    Los Angeles, California

Course Director Introduction to Social Medicine        09/18 –
    UCLA David Geffen School of Medicine
    Los Angeles, California

Co-Director Trauma Recovery Center                     12/17-
    Harbor-UCLA Medical Center
    Torrance, California

Co-Director Hospital Based Violence Intervention Program    3/19 -
    Harbor-UCLA Medical Center
    Torrance, California

**PROFESSIONAL ACTIVITIES:**

Committee Services
1. UCLA International and Domestic Health Equity      01/17 -
2. Correctional Health Services Care Transitions     08/17 -
3. Whole Person Care Delivery Systems Integration    01/18 – 06/19
4. Whole Person Care Clinical Innovations            01/18 – 06/19
5. Hospital Based Violence Intervention Consortium   12/18 –
6. DPH Trauma Prevention Initiative                  06/18 –
7. Harbor UCLA Diversity Committee                   06/18 -
8. Harbor Supports Undocumented Patients             06/18 -
9. Los Angeles Office of Violence Prevention         06/19 -
10. Co- Lead Los Angeles Hospital Based Violence
    Intervention Consortium                          06/19 -

Community Service

Shamsher Samra MD, MPhil

1. Strategic Action for a Just Economy Board Member    12/13- 12/18
2. Doctors for Global Health Board Member    08/17 –
3. Tijuana Border Wound Clinic    06/16 –
4. Frontline Wellness Network Founding Member    08/17 –
5. Southern California Physicians for Health Equity    06/18 -


Professional & Scholarly Associations
1. Society for Academic Emergency Medicine    10/14 -
2. American College of Emergency Physicians    10/14 –
3. ACEP Social Emergency Medicine Section    06/17 –
4. SAEM Social Emergency Medicine Interest Group    01/18 -


## HONORS AND SPECIAL AWARDS:
1. Gates- Cambridge Fellowship    06/07 – 06/08

## RESEARCH GRANTS AND FELLOWSHIPS RECEIVED:

Public Health Institute    02/2019-06/2020
California Bridge Program Grant
Goal: Implement and study opiate treatment
Role: Co- PI

California Community Foundation    04/2018-04/2020
Hospital Based Violence Intervention Grant
Goal: Implement a hospital-based violence intervention program
Role: Co-PI

California Victims Compensation Board    04/2019-04/2021
Trauma Recovery Center Grant
Goal: Establish a Trauma Recovery Center
Role: Co-PI

Whole Person Care Los Angeles    06/2019-06/2021
Hospital Based Violence Intervention Grant
Goal: Expand Hospital Based Violence Intervention Programming Regionally
Role: PI

## LECTURES AND PRESENTATIONS:

Local Lectures:

1. "Neurogenic Shock"    08/2015
    Emergency Medicine Residents' Conference, UCLA-Olive View Medical Centers, Los Angeles. California,
2. "Mechanical v. Traditional Chest Compressions"    05/2015
    Emergency Medicine Residents' Conference, UCLA-Olive View Medical Centers, Los Angeles. California
3. ED Based Interventions for At-Risk Drinking"    05/2016

Shamsher Samra MD, MPhil

Emergency Medicine Residents' Conference, UCLA-Olive View Medical Centers, Los Angeles. California, May 2016

4. Introduction to Trauma                                                                06/2016
   Emergency Medicine Residents' Conference, UCLA-Olive View Medical Centers, Los Angeles. California

5. Course Director "Introduction to Social Medicine"                  08/2017
   David Geffen School of Medicine, Los Angeles California

6. Thoracic Trauma                                                                          09/2016
   Emergency Medicine Residents' Conference, UCLA-Olive View Medical Centers, Los Angeles. California

7. Care for the Homeless Patient                                              10/2016
   Emergency Medicine  Residents' Conference, UCLA-Olive View Medical Centers, Los Angeles. California

8. Correctional Health and Primary Care Connections          01/2019
   Department of Health Services Reentry Learning Collaborative, California Endowment. Los Angeles, California

9. Health Equity and Liberation Medicine                              02/2019
   Harbor-UCLA Medical Center Grand Rounds, Carson California

10. Structural Vulnerability                                                      08/2019
    Harbor-UCLA Emergency Medicine Grand Rounds , Carson CA

11. Social Emergency Medicine CPC                                          10/2019
    Harbor-UCLA Emergency Medicine Grand Rounds , Carson CA

12. Hospital Based Violence Intervention                                10/2019
    LAC-USC Emergency Medicine Grand Rounds, Los Angeles California

13. Community Mental Health                                                  11/2019
    Charles Drew Medical School Health Equity Course, Los Angeles California

14. Less Than Lethal Weapons                                                01/2020
    Harbor-UCLA Emergency Medicine Grand Rounds, Carson CA


Regional Lectures:

1. Barriers to the "Right To Health" Amongst Patients of a Public
   Emergency Department Following Implementation of the Affordable Care Act      03/2015
   Western Regional SAEM Conference, Tucson, AZ

2. Structural Vulnerability                                                              05/2017
   Emergency Medicine All-LA Regional Conference, LAC-USC Medical Center, Los Angeles, California

3. Craniofacial Complications                                                      07/2017
   Emergency Medicine Conference, Kaweah-Delta Hospital, Visalia, California

4. Development and Implementation of a Novel Medicaid Enrolment Process
   for Correctional Health Settings.                                                06/2018
   Southern California DII Conference. Los Angeles, California

5. Incarceration and Health                                                          05/2019
   All-LA Regional Conference, Harbor-UCLA, Los Angeles, California

6. Injuries from "Non-Lethal" Weapons                                      08/2019
   Harbor UCLA Regional Trauma and Critical Care Conference, Carson, CA.


National Lectures:

1. Barriers to the "Right To Health" Amongst Patients
   of a Public Emergency Department Following
   Implementation of the Affordable Care Act.                05/2015
   National Society of Academic Emergency Medicine Conference. San Diego
2. A Case of Migrating Chest Pain                            04/2016
   Council of Emergency Medicine Residency Directors National Conference, Annual Lecture, Nashville, TN
3. Craniofacial Complications                                05/2017
   Society of Academic Emergency Medicine Conference, Orlando FL
4. Undocumented Emergency Department Patients: We Can Do Better

                                                             05/2018
   National Society of Academic Emergency Medicine Conference. Indianapolis
5. Migrant Heath and Liberation Medicine                     12/2018
   Second Annual Health of Migrants Conference. Galveston, Texas.
6. Health Equity and Emergency Medicine: A Perfect Fit       05/2019
   Society of Academic Emergency Medicine Conference, Las Vegas NV
7. Leveraging Community Health Workers to Improve Population Health   06/2019
   Americas Essential Hospitals Vitals Conference, Miami FL
8. Breaking the Cycle: Hospital Based Violence Intervention  06/2019
   Americas Essential Hospitals Vitals Conference, Miami FL

International Lectures:

1. Discapacidad: Trauma de Sistema Nervioso Central: Lesiones del Cerebro
   y Medula Espinal                                          02/2017
   Pre-hospital Training Program. Managua, Nicaragua.

**PUBLICATIONS/BIBLIOGRAPHY:**

**RESEARCH PAPERS**

A.  **Research Papers - Peer Reviewed**
1. Hale MB, Krutzik PO, **Samra SS**, Crane JM, Nolan GP, 2009 Stage Dependent Aberrant Regulation of Cytokine-STAT Signaling in Murine Systemic Lupus Erythematosus. PLoS ONE 4(8): e6756. doi:10.1371/journal.pone.000675
2. **Samra SS**, Crowley J, Fawsi M, 2011 The right to water in rural Punjab: Assessing equitable access to water in the context of the ongoing Punjab Rural Water Supply Project. Health and Human Rights Journal. Volume 13, No. 2.
3. **Samra, SS** et al. "Barriers to the Right to Health Among Patients of a Public Emergency Department After Implementation of the Affordable Care Act." Health equity vol. 3,1 186-192. 2 May. 2019, doi:10.1089/heq.2018.0071
4. **Samra, SS**, Taira, B., Pinheiro, E., Trotzky-Sirr, R., & Schneberk, T. (2019). Undocumented Patients in the Emergency Department: Challenges and Opportunities. *Western Journal of Emergency Medicine: Integrating Emergency Care with Population Health*.

B.  **Research Papers - Peer Reviewed (In Press)**
5.  Saadi A, Cheffers ML, Taira B, Trotzky-Sirr R, Parmar P, **Samra SS**, Morrison JL, Shah S, Schneberk TW, "Building Immigration-Informed, Cross-Sector Coalitions: Findings from the Los Angeles County Health Equity for Immigrants Summit," Health Equity

**EDITORIALS**
1.  Maciag K, **Samra SS**, Sorscher SS.                         03/2009
Harvard as Big Pharma. The Harvard Crimson.

**ABSTRACTS**
1.  **Samra SS,** Taira B, Richman, M, McCullough. "Barriers to the "Right To Health" Amongst Patients of a Public Emergency Department Following Implementation of the Affordable Care Act." Western Regional Society of Academic Emergency Medicine Conference, Tucson, AZ, March 2015
2.  **Samra SS,** Taira B, Richman, M, McCullough. "Barriers to the "Right To Health" Amongst Patients of a Public Emergency Department Following Implementation of the Affordable Care Act." National Society of Academic Emergency Medicine Conference. San Diego, May 2015
3.  **Samra SS,** Taira B, Hseih D, Schneberk, T. "Undocumented Emergency Department Patients: We Can Do Better" National Society of Academic Emergency Medicine Conference. Indianapolis, Indiana , May 2018
4.  Taira, B, Torres, J, Nguyen, A, **Samra SS.** "Emergency Department Provider Knowledge of and Preferences for Language Assistance for the Care of Limited English Proficiency Patient" National Society of Academic Emergency Medicine Conference. Indianapolis, Indiana , May 2018
5.  Schneberk T, **Samra SS**. "Creation of a novel medico-legal conduit to assist undocumented individuals presenting to the Emergency Department to address immigration legal needs" National Society of Academic Emergency Medicine Conference. Indianapolis, Indiana , May 2018

Shamsher Samra MD, MPhil

6. Hsieh D, **Samra SS**, "Development and Implementation of a Novel Medicaid Enrolment Process for Correctional Health Settings." Southern California Dissemination, Implementation, and Improvement Conference. Los Angeles, California. June 2018

7. Terao N, Hsieh D, **Samra SS**, Salas A, Murray J, Deane M, Carrillo P. "Implementing an Effective Hospital-Based Violence Intervention Program at a Los Angeles County Trauma Center" Southern California Dissemination, Implementation, and Improvement Conference. Los Angeles, California. June 2018

8. Kiwon Yoo, MPH, **Shamsher Samra, MD**, MPhil, Karen Bernstein, MPH and Dennis Hsieh, MD, JD, Reducing Morbidity, Mortality, and Recidivism for Jail and Prison Re-Entry Patients: The Los Angeles County Whole Person Care Re-Entry Program. American Public Health Association Conference 2019

9. Susie Lee, Dennis Hsieh, MD, JD, **Shamsher Samra, MD, MPhil**, Clemens Hong, MD, MPH, Henna Zaidi, MPP, MPH and Sasha Rumburg. Longitudinal Patient Accompaniment Services by Community Health Workers (CHWs): Improving Coordination of Primary Care Services (PCS) for High-Risk Populations in Los Angeles County. American Public Health Association Conference 2019

10. Natalie Terao, MD, MS, Dennis Hsieh, MD, JD, **Shamsher Samra, MD, MPhil**, Brittney Mull, MD, MPH, Joseph Friedman, MPH, Tony Kuo, MD, MSHS, Noel Barragan, MPH, Molly Deanne, MD, Antoinette Salas, RN, BSN, MICN, Arcelia Tavarez, Paul Carrillo and Jennifer Murray, MSW, LCSW. Implementation and Evaluation of a Hospital-Based Violence Intervention Program at a Los Angeles County Trauma Center. American Public Health Association Conference 2019

11. **Shamsher Samra, MD, MPhil**, Dennis Hsieh, MD, JD, Karen Bernstein, MPH and Kiley Hoffman, MSW. Expansion of a Jail Based Primary Care Reentry Program. American Public Health Association Conference 2019

12. Tony Kuo, MD, MSHS, Noel Barragan, MPH, **Shamsher Samra, MD, MPhil** and Rochelle Dicker, MD. Population Health Perspective on Violence Prevention in the Hospital Setting: Intervening During a "Teachable Moment" in a Victim's Life. American Public Health Association Conference 2019

13. Joseph Friedman, MPH, **Shamsher Samra, MD, MPhil**, Dennis Hsieh, MD, JD, Vincent Chong, MD, MS, Lee Plantmason, MD, Todd Schneberk, MD, MSHPM, MA, Karen Kwaning, Molly Deanne, MD, Brittney Mull, MD, Philippe Bourgois, PhD and Rochelle Dicker, MD. Racial and Geographic Disparities in Violent Injury Rates: A Baseline Assessment for a Los Angeles Hospital-Based Violence Intervention Program. American Public Health Association Conference 2019

14. Dennis Hsieh, MD, JD, **Shamsher Samra, MD, MPhil,** Kiwon Yoo, MPH, Karen Bernstein, MPH and Mark Burstyn, Pharm.D. Providing a 30 Day Supply of Medications upon Discharge from Los Angeles County Jails. American Public Health Association Conference 2019

# EXHIBIT 8

1

### DECLARATION OF MARC STERN, M.D.

2  I, Marc Stern, declare as follows:

3  1.  I am a physician, board-certified in internal medicine, specializing in

4  correctional health care. I most recently served as the Assistant Secretary for Health

5  Care at the Washington State Department of Corrections. I served for four years as

6  a medical subject matter expert for the Officer of Civil Rights and Civil Liberties,

7  U.S. Department of Homeland Security, and as a medical subject matter expert for

8  one year for the California Attorney General's division responsible for monitoring

9  the conditions of confinement in Immigration and Customs Enforcement (ICE)

10  detention facilities. I am a court-appointed medical expert in the class action

11  *Parsons v. Ryan*, CV-12-00601-PHX-ROS. Currently, I am the Medical Advisor for

12  the National Sheriffs' Association on matters related to preventive measures

13  responding to COVID-19. Additionally, in 2009, at the request of the California

14  Receiver Clark Kelso, I toured 10 California state prisons to assess whether or not

15  the Receiver's assignment—to restore the delivery of health services within the

16  California state prisons to constitutionally adequate levels – had been completed.

17  Attached as Exhibit A is a copy of my curriculum vitae.

18  2.  COVID-19 is a serious disease that has reached pandemic status, and is

19  straining the health care systems around the world. As of May 15, 2020, at least

20  1.3 million people in the United States had received confirmed diagnoses of

21  COVID-19. At least 83,000 people have died in the United States. Approximately

22  71,000 of the confirmed cases were in California, with more than 2,900 having died.

23  These numbers will continue to increase, perhaps exponentially. Moreover, these

24  figures must be considered in light of nationwide shortages of COVID-19 tests,

25  meaning the actual numbers are likely significantly higher than those reported.

26  3.  The Lompoc complex ("Lompoc") is comprised of Federal

27  Correctional Institution Lompoc ("FCI Lompoc") and United States Penitentiary

28  Lompoc ("USP Lompoc"). USP Lompoc itself has two components, a low-security

camp and a medium-security prison. In total, the facilities have a rated design capacity of 2058. However, as of May 15, 2020 they had a total population of 2680, thus exceeding capacity. As of May 15, 2020, there are a total of 924 people at FCI Lompoc who are currently or were recently positive for COVID-19, including 870 residents and 14 staff currently deemed positive, and 37 residents reported as being "recovered" after previously testing positive. As of May 15, there are a total of 140 people at USP Lompoc who are currently or were recently positive for COVID-19, including 15 residents and 16 staff currently deemed positive, two resident deaths, and 101 residents reported as being "recovered" after previously testing positive. The BOP website does not show what criteria it is using to consider someone "recovered."

4.      COVID-19 is a novel respiratory virus. It is spread primarily through droplets generated when an infected person coughs or sneezes, or through droplets of saliva or discharge from the nose. There is no vaccine for COVID-19, and there is no cure for COVID-19. No one has prior immunity. The only way to control the virus is to use preventive strategies, including social distancing.

5.      The time course of the disease can be very rapid. Individuals can show the first symptoms of infection in as few as two days after exposure and their condition can seriously deteriorate in as few as five days (perhaps sooner) after that. It is believed that people can transmit the virus without being symptomatic and, indeed, that a significant amount of transmission may be from people who are infected but asymptomatic or pre-symptomatic.

6.      Treatment for serious cases of COVID-19 requires immediate and substantial medical intervention.

7.      The effects of COVID-19 are especially serious for people who are most vulnerable. Vulnerable people include people over the age of 50, and those of any age with underlying health problems such as—but not limited to—weakened immune systems (which can be caused by a variety of conditions, including but not

limited to cancer treatment, smoking, and immune weakening medications), moderate to severe asthma, diabetes, serious heart and lung disease, severe obesity, liver disease, and possibly pregnancy. While the CDC typically classifies only people 65 and older as vulnerable, incarcerated individuals tend to be in poorer health than those in the general population, justifying the use of an earlier cutoff in classifying people deemed vulnerable to COVID-19.

8.     In light of the above, an outbreak of COVID-19 could put significant pressure on or exceed the capacity of local health infrastructure. In the absence of a vaccine and a cure, a significant number of people who are infected with the virus will die. Buttressing these concerns, it is not yet clear whether people who have already been infected with COVID-19 gain immunity against future infection. To the extent that the health care infrastructure is overloaded, people will die unnecessarily because necessary respirators and hospital facilities are unavailable.

9.     Public health authorities recommend a number of preventive steps to help prevent or decrease the spread of COVID-19, with perhaps the most important measure being social distancing.

10.     Prisons are congregate environments, *i.e.*, places where people live and sleep in close proximity. Many people live in dormitory-style units with multiple rows of bunk beds close together or in small multi-person cells that often surround common areas where incarcerated people crowd together during the day. Social distancing in ways that are recommended by public health officials can be difficult, if not impossible, in prisons, even when the population is under design capacity. When prisons are at or above capacity, it becomes even more difficult to implement appropriate social distancing measures.

11.     Infectious diseases that are transmitted via the air or touch (like COVID-19) are more likely to spread, placing people at risk. For these reasons, if—but more likely when—COVID-19 is introduced into a prison, the risks of spread is greatly, if not exponentially, increased as already evidenced by spread of COVID-19

3

1    in two other congregate environments: nursing homes and cruise ships.

2        12.    But prisons actually have an attribute that makes them more dangerous

3    than cruise ships. Unlike cruise ships, prisons are not closed systems. Staff, new

4    detainees, attorneys, and inanimate objects—all potential vectors for virus—are

5    introduced into the system every day. Thus, even if the government makes best

6    efforts to follow preventive guidelines, the introduction of virus into a detention

7    center is almost inevitable. Moreover, because staff and some visitors travel each

8    day from the facilities back to their homes, when infection develops in the facility,

9    there is also significant risk that the infection will be transmitted *outside the facility*,

10   to the family and friends of staff and visitors. In short, the risks that confront

11   individuals at detention facilities such as Lompoc stem from their very nature as

12   congregate environments. Even if the healthcare provided were excellent, there

13   would still be substantial risk; if the healthcare provided were substandard, those

14   substantial risks are only elevated.

15       13.    I understand the following to be allegations in the Complaint. If these

16   allegations are confirmed true, the conditions at Lompoc are deeply concerning:

17       •    In total, the facilities comprising the Lompoc complex have

18           a rated design capacity of 2058. However, as of May 14, 2020,

19           they had a population of 2680, thus exceeding capacity.

20       •    As of May 14, 2020, more than 1,061 residents and staff had

21           tested positive for COVID-19.

22       •    Sick people from FCI Lompoc are being moved to living unit at

23           USP Lompoc. The living space there is double-occupancy cells.

24           The living unit is on near-total lockdown with residents confined

25           to their cells almost 24 hours a day. Conditions are very

26           unsanitary. Nobody can shower or change into clean clothes.

27       •    At the low-security camp at USP Lompoc, people live in open-

28           plan dormitories with shared bathrooms. About 140 people live

in these dormitories and sleep on bunk beds approximately six feet apart from each other. There are no internal walls so everyone and all the bunk beds are in one open space. All 140 people share six toilets and six showers. Dormitories are crowded and people congregate in common areas. Residents also have to stand in line to get medication, and there is not enough space for social distancing.

- Initially, the practice appears to have been to transfer sick people to the solitary confinement unit. Some residents who had tested positive were left there for up to four days with no medical attention. Eventually, prison authorities re-opened two dormitories which had been closed three years ago due to mold contamination in order to house sick people. The re-opened dormitories are extremely unsanitary, and residents sleep on mattresses officers have scattered across the ground. Residents here spend up to five days at a time with no treatment for COVID-19. There is no soap, and people are not being allowed to shower.

- At the medium-security prison at USP, two residents share cells that are normally single-occupancy. Residents who become ill with presumptive COVID-19 are not isolated from the healthy population. The current prison practice seems to be to allow people to hit "rock-bottom" before being treated for COVID-19.

- Residents were only give one mask in April, and have been reusing that mask since. Hand sanitizer is non-existent and soap is not plentiful.

- It does not appear that anyone who tests positive and then "recovers" is tested again before being returned to the general

5

1    population.

2    •    Residents are being denied regular medical treatment they had

3        received prior to the outbreak. For example, medically necessary

4        procedures scheduled prior to the outbreak have been delayed

5        indefinitely.

6    14.    These conditions, if true—a track record of not being able to prevent

7    predictable and widespread infection, continued widespread infection, unsanitary

8    living conditions, inadequate testing, and most importantly overcrowding—make it

9    exceedingly difficult, if not impossible, to ensure the safety of residents who remain

10    housed at the facility. In particular, these conditions mean that social distancing is

11    very difficult, if not impossible, to effectively implement.

12    15.    I have also reviewed a declaration submitted by Kiarra Carror, the

13    sister of Yonnedil Carror Torres, a resident of USP Lompoc. In addition to some of

14    the representations above, the declarant indicates that: (1) Torres resides in a cell

15    designed to house only a single person but he shares his cell with another resident,

16    including sharing a toilet; (2) For five straight days, Torres asked correctional

17    officers for medical assistance due to a fever, diarrhea, and body aches, until he

18    eventually collapsed in his cell from acute respiratory failure; (3) After every

19    resident on Torres's block began banging their cell doors in unison to attract the

20    attention of correctional officers, Torres was taken to a hospital, where he was

21    placed into a medically-induced coma after being placed on a ventilator; (4) At the

22    hospital, he was tested for the first time for COVID-19, with the result coming back

23    positive; (5) Torres has been informed by physicians that he suffered acute lung

24    damage from COVID-19 due to his asthma and his lung capacity severely

25    deteriorated as a result; and (6) Torres has seen other residents similarly struggle to

26    receive medical attention, with their symptoms having to become quite severe to

27    receive treatment.

28    16.    I cannot draw any conclusions from a single second-hand report.

1   However, if these allegations were found to be accurate, and if they were found to

2   be representative of the system of health care delivery operating at USP Lompoc

3   and FCI Lompoc, I would likely draw the following conclusions: (1) Lompoc

4   operators are exposing residents to a significant risk of harm by ensuring that

5   residents cannot socially distance. (2) The health care delivery system at Lompoc is

6   currently unable to provide minimally safe health care, *i.e.*, the current system poses

7   a significant risk of serious harm to residents, a risk that will only increase as more

8   residents become symptomatic from COVID-19 or the condition of symptomatic

9   residents deteriorates as their disease progresses. Indeed, Torres's sister's account is

10   alarming, as she claims that Lompoc staff refused her brother treatment until his

11   condition was at a critical stage, at which point they finally sent him to a hospital for

12   medically necessary treatment.

13        17.    If the second conclusion above were true, I would need more

14   information through discovery to determine the cause(s). However, based on my

15   experience operating, evaluating, and monitoring correctional health care systems, it

16   would likely be the result of one or more of the following factors: insufficient

17   number of staff; inappropriate types of staff (for example, using licensed vocational

18   nurses, performing beyond their licensed scope of practice, to carry out the duties of

19   a registered nurse); insufficient training; and insufficient supervision.

20        18.    For these reasons, I recommend consideration of a concerted effort to

21   downsize the population of Lompoc to the lowest number possible immediately,

22   with priority given to those at high risk of harm due to their age and health status.

23   This will both allow Lompoc to implement more effective preventive and treatment

24   measures while simultaneously granting released or transferred residents access to

25   minimally acceptable living conditions. To maximize their effectiveness in reducing

26   the spread and impact of the virus at Lompoc, these downsizing measures must be

27   implemented now.

28        19.    There are two values to immediate downsizing. First, downsizing will

7

reduce Lompoc's density of congregation. This will allow people in prison to maintain better social distancing. The reduction in population will also make it easier for prison authorities to implement infection prevention measures such as: provision of cleaning supplies to residents; frequent laundering of towels and clothes; provision of soap for handwashing; frequent cleaning of transactional surfaces; etc. Furthermore, downsizing will allow prison health care professionals to devote their attention to a smaller number of residents, potentially improving the quality of care those residents receive. At any prison it is beneficial to conserve medical resources in the face of a pandemic such as the one we presently face. All these steps can slow or stop the spread of infection (or re-infection) and improve treatment outcomes if they are currently inadequate, to the benefit of residents and staff and, ultimately, the community at large.

20.     Second, immediate downsizing that prioritizes residents who are elderly and those with underlying health conditions reduces the likelihood they will contract the disease or suffer severe medical consequences as a result of being infected. Individuals in these groups are at the highest risk of severe complications from COVID-19 and when they develop severe complications they will be transported to community hospitals. Reducing the spread and severity of infection in a prison slows, if not reduces, the number of people who will become ill enough to require hospitalization where they will be using scarce community resources (ER beds, general hospital beds, ICU beds) which also in turn reduces the health and economic burden to the local community at large. Indeed, in light of the new reality in which we operate, decisions to release residents from custody—traditionally concerned primarily with public safety—must also take into account the impact on public health. It is for this reason that release or transfer[1] of at-risk residents not only

---

[1] Transfer is only acceptable if the transfer itself does not pose significant risks and is a transfer to another facility where the quality of health care and COVID-19

1  reduces their risk of death, but also increases public safety when the impact on
2  public health is also considered.

3      21.    Residents who have received confirmed diagnoses of COVID-19 in
4  most cases may be safely released to the community, where they can quarantine or
5  isolate at home. To the extent that the quality of care these residents currently
6  receive is inadequate, release would also ensure that residents have access to better
7  health care.

8      22.    In addition to the downsizing described above, and to the extent they
9  are not already being implemented, the following steps should immediately be
10  mandated of the Respondents in order to protect any residents who remain in
11  custody:

12      a.    <u>Social Distancing</u>. The prison must ensure that residents are able
13  to maintain adequate social distancing during required or necessary activities, such
14  as collecting food, eating, and receiving medications.

15      b.    <u>Immediate and Continued Testing</u>. Patients (both staff and
16  residents) who require testing (or re-testing) based on public health
17  recommendations and the opinion of a qualified medical professional, should be
18  tested for COVID-19.

19      c.    <u>Immediate Screening</u>. Defendants must be required to screen
20  each employee or other person entering the facility every day to detect fever over
21  100 degrees, cough, shortness of breath, other symptoms as currently recommended
22  by CDC, and exposure to someone who is symptomatic or under surveillance for
23  COVID-19, or screening as required by public health authorities. A record should be
24  made of each screening.

25      d.    <u>Quarantine</u>. The prison must establish non-punitive quarantine
26  for all individuals believed to have been exposed to COVID-19, but not yet

27  _____

28  precautions are safe.

9

symptomatic, and non-punitive isolation for those believed to be infected with COVID-19 and potentially infectious. Any individual who must interact with those potentially or likely inflicted with COVID-19 must utilize protective equipment as directed by public health authorities. In short, every possible effort must be made to separate infected or potentially infected individuals from the rest of the incarcerated population and each other.

e.      Post-Isolation or Quarantine. Individuals should only be released from quarantine or isolation in accordance with CDC guidelines as modified by local public health authorities, after which they should be monitored in accordance with those same guidelines.

f.      Institutional Hygiene. The prison must be required to provide adequate disinfection of all high-touch areas and cells.

g.      Personal Hygiene. The prison must be required to provide hand soap, disposable paper towels, and access to water to allow residents to wash their hands on a regular basis, free of charge and ensure replacement products are available as needed. Correctional staff should be allowed to carry hand sanitizer with alcohol on their person, and residents should be allowed to use hand sanitizer with alcohol when they are in locations or activities where hand washing is not available. Correctional officers should be required to wear personal protective equipment and perform hand hygiene when appropriate, consistent with the CDC guidance as modified by local health authorities

h.      Waive Copays. There must be a waiving of copays for medical evaluation and care related in any way to COVID-19 and/or its symptoms. A waiver of these types of copays is necessary to avoid disincentivizing patients from requesting medical treatment. Patients with symptoms of possible COVID-19 should be seen quickly.

i.      Access to Care. All residents should have timely access to an appropriately qualified health care professional.

10

1        j.      <u>Personal Protective Equipment</u>. Those residents with a cough
2   should be provided masks as soon as they inform staff of this symptom or staff
3   notice this symptom.

4        k.      <u>Supply Chain</u>. The prison must be required to identify the
5   supplies and other materials upon which the institution is dependent, such as food,
6   medical supplies, certain medicines, cleaning products, etc., and prepare for
7   shortages, delays or disruptions in the supply chain.

8        23.     Thus, in summary, consideration should be given to immediately
9   reducing the number of individuals imprisoned at Lompoc for the health and safety
10  of the prisons and our communities, taking into account the *totality* of risk posed to
11  the public safety by each individual. This population reduction should begin with
12  the most medically vulnerable which includes those over age 50 and those with
13  CDC-defined underlying health conditions.

14       I declare under penalty of perjury under the laws of the United States that the
15  foregoing is true and correct.

16       Executed May 15, 2020, at Tumwater, Washington.

17

18  _____
19  Marc F. Stern. M.D., M.P.H.

# EXHIBIT A

**MARC F. STERN, M.D., M.P.H., F.A.C.P.**

May, 2020

marcstern@live.com
+1 (360) 701–6520

## SUMMARY OF EXPERIENCE

**CORRECTIONAL HEALTH CARE CONSULTANT**                    **2009 – PRESENT**

Consultant in the design, management, and operation of health services in a correctional setting to assist in evaluating, monitoring, or providing evidence-based, cost-effective care consistent with constitutional mandates of quality.

Current activities include:
- COVID-19 Medical Advisor, National Sheriffs Association (2020 - )
- Advisor to various jails in Washington State on patient safety, health systems, and related health care and custody staff activities and operations, and RFP and contract generation (2014 - )
- Consultant to the US Department of Justice, Civil Rights Division, Special Litigation Section. Providing investigative support and expert medical services pursuant to complaints regarding care delivered in any US jail, prison, or detention facility. (2010 - ) (no current open cases)
- Physician prescriber/trainer for administration of naloxone by law enforcement officers for the Olympia, Tumwater, Lacey, Yelm, and Evergreen College Police Departments (2017 - )
- Consultant to the Civil Rights Enforcement Section, Office of the Attorney General of California, under SB 29, to review the healthcare-related conditions of confinement of detainees confined by Immigration and Customs Enforcement in California facilities (2017 - )
- Rule 706 Expert to the Court, US District Court for the District of Arizona, in the matter of Parsons v. Ryan (2018 - )

Previous activities include:
- Consultant to Human Rights Watch to evaluate medical care of immigrants in Homeland Security detention (2016 - 2018)
- Consultant to Broward County Sheriff to help develop and evaluate responses to a request for proposals (2017 - 2018)
- Member of monitoring team (medical expert) pursuant to Consent Agreement between US Department of Justice and Miami-Dade County (Unites States of America v Miami-Dade County, *et al.*) regarding, *entre outre*, unconstitutional medical care. (2013 - 2016)
- Jointly appointed Consultant to the parties in Flynn v Walker (formerly Flynn v Doyle), a class action lawsuit before the US Federal District Court (Eastern District of Wisconsin) regarding Eighth Amendment violations of the health care provided to women at the Taycheedah Correctional Institute. Responsible for monitoring compliance with the medical component of the settlement. (2010 - 2015)
- Consultant on "Drug-related Death after Prison Release," a research grant continuing work with Dr. Ingrid Binswanger, University of Colorado, Denver, examining the causes of, and methods of reducing deaths after release from prison to the community. National Institutes of Health Grant R21 DA031041-01. (2011 - 2016)
- Consultant to the US Department of Homeland Security, Office for Civil Rights and Civil Liberties. Providing investigative support and expert medical services pursuant to complaints regarding care received by immigration detainees in the custody of U.S. Immigration and Customs Enforcement. (2009 - 2014)
- Special Master for the US Federal District Court (District of Idaho) in Balla v Idaho State Board of Correction, et al., a class action lawsuit alleging Eighth Amendment violations in provision of health care at the Idaho State Correctional Institution. (2011 - 2012)
- Facilitator/Consultant to the US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, providing assistance and input for the development of the first National Survey of Prisoner Health. (2010-2011 )
- Project lead and primary author of National Institute of Corrections' project entitled "Correctional Health Care Executive Curriculum Development," in collaboration with National Commission on Correctional Health Care. NIC commissioned this curriculum for its use to train executive leaders from jails and prisons across the nation to better manage the health care missions of their facilities. Cooperative Agreement 11AD11GK18, US Department of Justice, National Institute of Corrections. (2011 - 2015 )

Marc F. Stern, M.D.                                                                                          Page 2

- Co-teacher, with Jaye Anno, Ph.D., for the National Commission on Correctional Health Care, of the Commission's standing course, *An In-Depth Look at NCCHC's 2008 Standards for Health Services in Prisons and Jails* taught at its national meetings. (2010 - 2013)
- Contributor to 2014 Editions of Standards for Health Services in Jails and Standards for Health Services in Prisons, National Commission on Correctional Health Care. (2013)
- Consultant to the California Department of Corrections and Rehabilitation court-appointed Receiver for medical operations. Projects included:
  - Assessing the Receiver's progress in completing its goal of bringing medical care delivered in the Department to a constitutionally mandated level. (2009)
  - Providing physician leadership to the Telemedicine Program Manager tasked with improving and expanding the statewide use of telemedicine. (2009)
- Conceived, co-designed, led, and instructed in American College of Correctional Physicians and National Commission on Correctional Health Care's Medical Directors Boot Camp (now called Leadership Institute), a national training program for new (Track "101") and more experienced (Track "201") prison and jail medical directors. (2009 - 2012)
- Participated as a member of a nine-person Delphi expert consensus panel convened by Rand Corporation to create a set of correctional health care quality standards. (2009)
- Convened a coalition of jails, Federally Qualified Health Centers, and community mental health centers in ten counties in Washington State to apply for a federal grant to create an electronic network among the participants that will share prescription information for the correctional population as they move among these three venues. (2009 - 2010)
- Participated as a clinical expert in comprehensive assessment of Michigan Department of Corrections as part of a team from the National Commission on Correctional Health Care. (2007)
- Provided consultation to Correctional Medical Services, Inc., St. Louis (now Corizon), on issues related to development of an electronic health record. (2001)
- Reviewed cases of possible professional misconduct for the Office of Professional Medical Conduct of the New York State Department of Health. (1999 – 2001)
- Advised Deputy Commissioner, Indiana State Board of Health, on developing plan to reduce morbidity from chronic diseases using available databases. (1992)
- Provided consultation to Division of General Medicine, University of Nevada at Reno, to help develop a new clinical practice site combining a faculty practice and a supervised resident clinic. (1991)

**OLYMPIA BUPRENORPHINE CLINIC, OLYMPIA, WASHINGTON**                    **2019 - PRESENT**

Volunteer practitioner at a low-barrier clinic to providing Medication Assisted Treatment (buprenorphine) to opioid dependent individuals wishing to begin treatment, until they can transition to a long-term treatment provider

**OLYMPIA FREE CLINIC, OLYMPIA, WASHINGTON**                              **2017 - PRESENT**

Volunteer practitioner providing episodic care at a neighborhood clinic which provides free care to individuals without health insurance until they can find a permanent medical home

**OLYMPIA UNION GOSPEL MISSION CLINIC, OLYMPIA, WASHINGTON**             **2009 – 2014**

Volunteer practitioner providing primary care at a neighborhood clinic which provides free care to individuals without health insurance until they can find a permanent medical home; my own patient panel within the practice focuses on individuals recently released jail and prison.

**WASHINGTON STATE DEPARTMENT OF CORRECTIONS**                           **2002 – 2008**

Assistant Secretary for Health Services/Health Services Director, 2005 – 2008
Associate Deputy Secretary for Health Care, 2002 – 2005

Responsible for the medical, mental health, chemical dependency (transiently), and dental care of 15,000 offenders in total confinement. Oversaw an annual operating budget of $110 million and 700 health care staff.

- As the first incumbent ever in this position, ushered the health services division from an operation of 12 staff in headquarters, providing only consultative services to the Department, to an operation with direct authority and

responsibility for all departmental health care staff and budget. As part of new organizational structure, created and filled statewide positions of Directors of Nursing, Medicine, Dental, Behavioral Health, Mental Health, Psychiatry, Pharmacy, Operations, and Utilization Management.

- Significantly changed the culture of the practice of correctional health care and the morale of staff by a variety of structural and functional changes, including: ensuring that high ethical standards and excellence in clinical practice were of primordial importance during hiring of professional and supervisory staff; supporting disciplining or career counseling of existing staff where appropriate; implementing an organizational structure such that patient care decisions were under the final direct authority of a clinician and were designed to ensure that patient needs were met, while respecting and operating within the confines of a custodial system.

- Improved quality of care by centralizing and standardizing health care operations, including: authoring a new Offender Health Plan defining patient benefits based on the Eighth Amendment, case law, and evidence-based medicine; implementing a novel system of utilization management in medical, dental, and mental health, using the medical staffs as real-time peer reviewers; developing a pharmacy procedures manual and creating a Pharmacy and Therapeutics Committee; achieving initial American Correctional Association accreditation for 13 facilities (all with almost perfect scores on first audit); migrating the eight individual pharmacy databases to a single central database.

- Blunted the growth in health care spending without compromising quality of care by a number of interventions, including: better coordination and centralization of contracting with external vendors, including new statewide contracts for hospitalization, laboratory, drug purchasing, radiology, physician recruitment, and agency nursing; implementing a statewide formulary; issuing quarterly operational reports at the state and facility levels.

- Piloted the following projects: direct issuance of over-the-counter medications on demand through inmates stores (commissary), obviating the need for a practitioner visit and prescription; computerized practitioner order entry (CPOE); pill splitting; ER telemedicine.

- Oversaw the health services team that participated variously in pre-design, design, or build phases of five capital projects to build complete new health units.


**NEW YORK STATE DEPARTMENT OF CORRECTIONAL SERVICES**                              2001 – 2002

Regional Medical Director, Northeast Region, 2001 – 2002

Responsible for clinical oversight of medical services for 14,000 offenders in 14 prisons, including one (already) under court monitoring.

- Oversaw contract with vendor to manage 60-bed regional infirmary and hospice.

- Coordinated activities among the Regional Medical Unit outpatient clinic, the Albany Medical College, and the 13 feeder prisons to provide most of the specialty care for the region.

- Worked with contracting specialists and Emergency Departments to improve access and decrease medical out-trips by increasing the proportion of scheduled and emergency services provided by telemedicine.

- Provided training, advice, and counseling to practitioners and facility health administrators in the region to improve the quality of care delivered.


**CORRECTIONAL MEDICAL SERVICES, INC. (now CORIZON)**                              2000 – 2001

Regional Medical Director, New York Region, 2000 – 2001

Responsible for clinical management of managed care contract with New York State Department of Correctional Services to provide utilization management services for the northeast and northern regions of New York State and supervision of the 60-bed regional infirmary and hospice.

- Migrated the utilization approval function from one of an anonymous rule-based "black box" to a collaborative evidence-based decision making process between the vendor and front-line clinicians.


**MERCY INTERNAL MEDICINE, ALBANY, NEW YORK**                              1999 – 2000

Neighborhood three-physician internal medicine group practice.

Primary Care Physician, 1999 – 2000 (6 months)

Provided direct primary care to a panel of community patients during a period of staff shortage.

**ALBANY COUNTY CORRECTIONAL FACILITY, ALBANY, NEW YORK**                          **1998 – 1999**

Acting Facility Medical Director, 1998 – 1999

Directed the medical staff of an 800 bed jail and provided direct patient care following the sudden loss of the Medical Director, pending hiring of a permanent replacement. Coordinated care of jail patients in local hospitals. Provided consultation to the Superintendent on improvements to operation and staffing of medical unit and need for privatization.

**VETERANS ADMINISTRATION MEDICAL CENTER, ALBANY, NY**                          **1992 – 1998**

Assistant Chief, Medical Service, 1995 – 1998
Chief, Section of General Internal Medicine and Emergency Services, 1992 – 1998
Responsible for operation of the general internal medicine clinics and the Emergency Department.

- Designed and implemented an organizational and physical plant makeover of the general medicine ambulatory care clinic from an episodic-care driven model with practitioners functioning independently supported by minimal nursing involvement, to a continuity-of-care model with integrated physician/mid-level practitioner/registered nurse/licensed practice nurse/practice manager teams.
- Led the design and opening of a new Emergency Department.
- As the VA Section Chief of Albany Medical College's Division of General Internal Medicine, coordinated academic activities of the Division at the VA, including oversight of, and direct teaching in, ambulatory care and inpatient internal medicine rotations for medical students, residents, and fellows. Incorporated medical residents as part of the general internal medicine clinics. Awarded $786,000 Veterans Administration grant ("PRIME I") over four years for development and operation of educational programs for medicine residents and students in allied health professions (management, pharmacy, social work, physician extenders) wishing to study primary care delivery.

**ERIE COUNTY HEALTH DEPARTMENT, BUFFALO, NY**                          **1988 – 1990**

Director of Sexually Transmitted Diseases (STD) Services, 1989 – 1990
Staff Physician, STD Clinic, 1988 – 1989
Staff Physician, Lackawanna Community Health Center, 1988 – 1990
Provided leadership and patient care services in the evaluation and treatment of STDs. Successfully reorganized the county's STD services which were suffering from mismanagement and were under public scrutiny. Provided direct patient care services in primary care clinic for underserved neighborhood.

**UNION OCCUPATIONAL HEALTH CENTER, BUFFALO, NY**                          **1988 – 1990**

Staff Physician, 1988 – 1990
Provided direct patient care for the evaluation of occupationally-related health disorders.

**VETERANS ADMINISTRATION MEDICAL CENTER, BUFFALO, NY**                          **1985 – 1990**

Chief Outpatient Medical Section and Primary Care Clinic, 1986 – 1988
VA Section Head, Division of General Internal Medicine, University of Buffalo, 1986 – 1988
- Developed and implemented a major restructuring of the general medicine ambulatory care clinic to reduce fragmentation of care by introduction of a continuity-of-care model with a physician/nurse team approach.
Medical Director, Anticoagulation Clinic 1986 – 1990
Staff Physician, Emergency Department, 1985 – 1986

## FACULTY APPOINTMENTS

| | |
|---|---|
| 2020 – present | Faculty Associate, Center for Human Rights, University of Washington |
| 2007 – present | Affiliate Assistant Professor, Department of Health Services, School of Public Health, University of Washington |
| 1999 – present | Clinical Professor, Fellowship in Applied Public Health (previously Volunteer Faculty, Preventive Medicine Residency), University at Albany School of Public Health |
| 1996 – 2002 | Volunteer Faculty, Office of the Dean of Students, University at Albany |

Marc F. Stern, M.D.                                                                                         Page 5

| | |
|---|---|
| 1992 – 2002 | Associate Clinical/Associate/Assistant Professor of Medicine, Albany Medical College |
| 1993 – 1997 | Clinical Associate Faculty, Graduate Program in Nursing, Sage Graduate School |
| 1990 – 1992 | Instructor of Medicine, Indiana University |
| 1985 – 1990 | Clinical Assistant Professor of Medicine, University of Buffalo |
| 1982 – 1985 | Clinical Assistant Instructor of Medicine, University of Buffalo |

## OTHER PROFESSIONAL ACTIVITIES

| | |
|---|---|
| 2016 – present | Chair, Education Committee, Academic Consortium on Criminal Justice Health |
| 2016 – present | Washington State Institutional Review Board ("Prisoner Advocate" member) |
| 2016 – 2017 | Mortality Reduction Workgroup, American Jail Association |
| 2013 – present | Conference Planning Committee – Medical/Mental Health Track, American Jail Association |
| 2013 – 2016 | "Health in Prisons" course, Bloomberg School of Public Health, Johns Hopkins University/International Committee of the Red Cross |
| 2013 – present | Institutional Review Board, University of Washington ("Prisoner Advocate" member), |
| 2011 – 2012 | Education Committee, National Commission on Correctional Health Care |
| 2007 – present | National Advisory Committee, COCHS (Community–Oriented Correctional Health Services) |
| 2004 – 2006 | Fellow's Advisory Committee, University of Washington Robert Wood Johnson Clinical Scholar Program |
| 2004 | External Expert Panel to the Surgeon General on the "Call to Action on Correctional Health Care" |
| 2003 – present | Faculty Instructor, Critical Appraisal of the Literature Course, Family Practice Residency Program, Providence St. Peter Hospital, Olympia, Washington |
| 2001 – present | Chair/Co-Chair, Education Committee, American College of Correctional Physicians |
| 1999 – present | Critical Appraisal of the Literature Course, Preventive Medicine Residency Program, New York State Department of Health/University at Albany School of Public Health |
| 1999 | Co–Chairperson, Education Subcommittee, Workshop Submission Review Committee, Annual Meeting, Society of General Internal Medicine |
| 1997 – 1998 | Northeast US Representative, National Association of VA Ambulatory Managers |
| 1996 – 2002 | Faculty Mentor, Journal Club, Internal Medicine Residency Program, Albany Medical College |
| 1996 – 2002 | Faculty Advisor and Medical Control, 5 Quad Volunteer Ambulance Service, University at Albany |
| 1995 – 1998 | Preceptor, MBA Internship, Union College |
| 1995 | Quality Assurance/Patient Satisfaction Subcommittee, VA National Curriculum Development Committee for Implementation of Primary Care Practices, Veterans Administration |
| 1994 – 1998 | Residency Advisory Committee, Preventive Medicine Residency, New York State Department of Health/School of Public Health, University at Albany |
| 1993 | Chairperson, Dean's Task Force on Primary Care, Albany Medical College |
| 1993 | Task Group to develop curriculum for Comprehensive Care Case Study Course for Years 1 through 4, Albany Medical College |
| 1988 – 1989 | Teaching Effectiveness Program for New Housestaff, Graduate Medical Dental Education Consortium of Buffalo |
| 1987 – 1990 | Human Studies Review Committee, School of Allied Health Professions, University of Buffalo |
| 1987 – 1989 | Chairman, Subcommittee on Hospital Management Issues and Member, Subcommittee on Teaching of Ad Hoc Committee to Plan Incoming Residents Training Week, Graduate Medical Dental Education Consortium of Buffalo |
| 1987 – 1988 | Dean's Ad Hoc Committee to Reorganize "Introduction to Clinical Medicine" Course |
| 1987 | Preceptor, Nurse Practitioner Training Program, School of Nursing, University of Buffalo |
| 1986 – 1988 | Course Coordinator, Simulation Models Section of Physical Diagnosis Course, University of Buffalo |
| 1986 – 1988 | Chairman, Service Chiefs' Continuity of Care Task Force, Veterans Administration Medical Center, Buffalo, New York |
| 1979 – 1980 | Laboratory Teaching Assistant in Gross Anatomy, Université Libre de Bruxelles, Brussels, Belgium |

Marc F. Stern, M.D.                                                                                          Page 6

| 1973 – 1975 | Instructor and Instructor Trainer of First Aid, American National Red Cross |
| 1972 – 1975 | Chief of Service or Assistant Chief of Operations, 5 Quad Volunteer Ambulance Service, University at Albany. |
| 1972 – 1975 | Emergency Medical Technician Instructor and Course Coordinator, New York State Department of Health, Bureau of Emergency Medical Services |

## REVIEWER/EDITOR

| 2019 – present | Criminal Justice Review (reviewer) |
| 2015 – present | PLOS ONE (reviewer) |
| 2015 – present | Founding Editorial Board Member and Reviewer, Journal for Evidence-based Practice in Correctional Health, Center for Correctional Health Networks, University of Connecticut |
| 2011 – present | American Journal of Public Health (reviewer) |
| 2010 – present | International Advisory Board Member and Reviewer, International Journal of Prison Health |
| 2010 – present | Langeloth Foundation (grant reviewer) |
| 2001 – present | Reviewer and Editorial Board Member (2009 – present), Journal of Correctional Health Care |
| 2001 – 2004 | Journal of General Internal Medicine (reviewer) |
| 1996 | Abstract Committee, Health Services Research Subcommittee, Annual Meeting, Society of General Internal Medicine (reviewer) |
| 1990 – 1992 | Medical Care (reviewer) |

## EDUCATION

University at Albany, College of Arts and Sciences, Albany; B.S., 1975 (Biology)

University at Albany, School of Education, Albany; AMST (Albany Math and Science Teachers) Teacher Education Program, 1975

Université Libre de Bruxelles, Faculté de Medecine, Brussels, Belgium; Candidature en Sciences Medicales, 1980

University at Buffalo, School of Medicine, Buffalo, M.D., 1982

University at Buffalo Affiliated Hospitals, Buffalo; Residency in Internal Medicine, 1985

Regenstrief Institute of Indiana University, and Richard L. Roudebush Veterans Administration Medical Center; VA/NIH Fellowship in Primary Care Medicine and Health Services Research, 1992

Indiana University, School of Health, Physical Education, and Recreation, Bloomington; M.P.H., 1992

New York Academy of Medicine, New York; Mini-fellowship Teaching Evidence-Based Medicine, 1999

## CERTIFICATION

Provisional Teaching Certification for Biology, Chemistry, Physics, Grades 7–12, New York State Department of Education (expired), 1975

Diplomate, National Board of Medical Examiners, 1983

Diplomate, American Board of Internal Medicine, 1985

Fellow, American College of Physicians, 1991

License: Washington (#MD00041843, active); New York (#158327, inactive); Indiana (#01038490, inactive)

"X" Waiver (buprenorphine), Department of Health & Human Services, 2018

## MEMBERSHIPS

| 2019 – present | Washington Association of Sheriffs and Police Chiefs |
| 2005 – 2016 | American Correctional Association/Washington Correctional Association |
| 2004 – 2006 | American College of Correctional Physicians (Member, Board of Directors, Chair Education Committee) |
| 2000 – present | American College of Correctional Physicians |

Marc F. Stern, M.D.                                                                                                Page 7

## RECOGNITION

B. Jaye Anno Award for Excellence in Communication, National Commission on Correctional Health Care. 2019

Award of Appreciation, Washington Association of Sheriffs and Police Chiefs. 2018

Armond Start Award of Excellence, American College of Correctional Physicians. 2010

(First) Annual Preventive Medicine Faculty Excellence Award, New York State Preventive Medicine Residency Program, University at Albany School of Public Health/New York State Department of Health. 2010

Excellence in Education Award for excellence in clinical teaching, Family Practice Residency Program, Providence St. Peter Hospital, Olympia, Washington. 2004

Special Recognition for High Quality Workshop Presentation at Annual Meeting, Society of General Internal Medicine. 1996

Letter of Commendation, House Staff Teaching, University of Buffalo. 1986

## WORKSHOPS, SEMINARS, PRESENTATIONS, INVITED LECTURES

*It's the 21st Century – Time to Bid Farewell to "Sick Call" and "Chronic Care Clinic".* Annual Conference, National Commission on Correctional Health Care. Fort Lauderdale, Florida. 2019

*HIV and Ethics – Navigating Medical Ethical Dilemmas in Corrections.* Keynote Speech, 14th Annual HIV Care in the Correctional Setting. AIDS Education and Training Program (AETC) Mountain West, Olympia, Washington. 2019

*Honing Nursing Skills to Keep Patients Safe in Jail.* Orange County Jail Special Training Session (including San Bernardino and San Diego Jail Staffs), Theo Lacy Jail, Orange, California. 2019

*What Would You Do? Navigating Medical Ethical Dilemmas.* Leadership Training Academy, National Commission on Correctional Health Care. San Diego, California. 2019

*Preventing Jail Deaths.* Jail Death Review and Investigations: Best Practices Training Program, American Jail Association, Arlington, Virginia. 2018

*How to Investigate Jail Deaths.* Jail Death Review and Investigations: Best Practices Training Program, American Jail Association, Arlington, Virginia. 2018

*Executive Manager Program in Correctional Health.* 4-day training for custody/health care teams from jails and prisons on designing safe and efficient health care systems. National Institute for Corrections Training Facility, Aurora, Colorado, and other venues in Washington State. Periodically. 2014 – present

*Medical Ethics in Corrections.* Criminal Justice 441 – Professionalism and Ethical Issues in Criminal Justice. University of Washington, Tacoma. Recurring seminar. 2012 – present

*Medical Aspects of Deaths in ICE Custody.* Briefing for U.S. Senate staffers, Human Rights Watch. Washington, D.C. 2018

*Jails' Role in Managing the Opioid Epidemic.* Panelist. Washington Association of Sheriffs and Police Chiefs Annual Conference. Spokane, Washington. 2018

*Contract Prisons and Contract Health Care: What Do We Know?* Behind Bars: Ethics and Human Rights in U.S. Prisons Conference. Center for Bioethics – Harvard Medical School/Human Rights Program – Harvard Law School. Boston, Massachusetts. 2017

*Health Care Workers in Prisons.* (With Dr. J. Wesley Boyd) Behind Bars: Ethics and Human Rights in U.S. Prisons Conference. Center for Bioethics – Harvard Medical School/Human Rights Program – Harvard Law School. Boston, Massachusetts. 2017

*Prisons, Jails and Medical Ethics: Rubber, Meet Road.* Grand Rounds. Touro Medical College. New York, New York. 2017

*Jail Medical Doesn't Have to Keep You Up at Night – National Standards, Risks, and Remedies.* Washington Association of Counties. SeaTac, Washington. 2017

*Prison and Jail Health Care: What do you need to know?* Grand Rounds. Providence/St. Peters Medical Center. Olympia, Washington. 2017

*Prison Health Leadership Conference.* 2-Day workshop. International Corrections and Prisons Association/African Correctional Services Association/Namibian Corrections Service. Omaruru, Namibia. 2016; 2018

*What Would YOU Do? Navigating Medical Ethical Dilemmas*. Spring Conference. National Commission on Correctional Health Care. Nashville, Tennessee. 2016

*Improving Patient Safety*. Spring Provider Meeting. Oregon Department of Corrections. Salem, Oregon 2016

*A View from the Inside: The Challenges and Opportunities Conducting Cardiovascular Research in Jails and Prisons.* Workshop on Cardiovascular Diseases in the Inmate and Released Prison Population. The National Heart, Lung, and Blood Institute. Bethesda, Maryland. 2016

*Why it Matters: Advocacy and Policies to Support Health Communities after Incarceration.* At the Nexus of Correctional Health and Public Health: Policies and Practice session. Panelist. American Public Health Association Annual Meeting. Chicago, Illinois. 2015

*Hot Topics in Correctional Health Care.* Presented with Dr. Donald Kern. American Jail Association Annual Meeting. Charlotte, North Carolina. 2015

*Turning Sick Call Upside Down.* Annual Conference. National Commission on Correctional Health Care. Dallas, Texas. 2015.

*Diagnostic Maneuvers You May Have Missed in Nursing School.* Annual Conference. National Commission on Correctional Health Care. Dallas, Texas. 2015

*The Challenges of Hunger Strikes: What Should We Do? What Shouldn't We Do?* Annual Conference. National Commission on Correctional Health Care. Dallas, Texas. 2015

Practical and Ethical Approaches to Managing Hunger Strikes. Annual Practitioners' Conference. Washington Department of Corrections. Tacoma, Washington. 2015

*Contracting for Health Services: Should I, and if so, how?* American Jail Association Annual Meeting. Dallas, Texas. 2014

*Hunger Strikes: What should the Society of Correctional Physician's position be?* With Allen S, May J, Ritter S. American College of Correctional Physicians (Formerly Society of Correctional Physicians) Annual Meeting. Nashville, Tennessee. 2013

*Addressing Conflict between Medical and Security: an Ethics Perspective.* International Corrections and Prison Association Annual Meeting. Colorado Springs, Colorado. 2013

*Patient Safety and 'Right Using' Nurses*. Keynote address. Annual Conference. American Correctional Health Services Association. Philadelphia, Pennsylvania. 2013

*Patient Safety: Overuse, underuse, and misuse…of nurses.* Keynote address. Essentials of Correctional Health Care conference. Salt Lake City, Utah. 2012

*The ethics of providing healthcare to prisoners-An International Perspective.* Global Health Seminar Series. Department of Global Health, University of Washington, Seattle, Washington. 2012

*Recovery, Not Recidivism: Strategies for Helping People Who are Incarcerated.* Panelist. NAMI Annual Meeting, Seattle, Washington, 2012

*Ethics and HIV Workshop*. HIV/AIDS Care in the Correctional Setting Conference, Northwest AIDS Education and Training Center. Salem, Oregon. 2011

*Ethics and HIV Workshop*. HIV/AIDS Care in the Correctional Setting Conference, Northwest AIDS Education and Training Center. Spokane, Washington. 2011

*Patient Safety: Raising the Bar in Correctional Health Care.* With Dr. Sharen Barboza. National Commission on Correctional Health Care Mid-Year Meeting, Nashville, Tennessee. 2010

*Patient Safety: Raising the Bar in Correctional Health Care.* American Correctional Health Services Association, Annual Meeting, Portland, Oregon. 2010

*Achieving Quality Care in a Tough Economy*. National Commission on Correctional Health Care Mid-Year Meeting, Nashville, Tennessee, 2010 (Co-presented with Rick Morse and Helena Kim, PharmD.)

*Involuntary Psychotropic Administration: The Harper Solution*. With Dr. Bruce Gage. American Correctional Health Services Association, Annual Meeting, Portland, Oregon. 2010

*Evidence Based Decision Making for Non-Clinical Correctional Administrators*. American Correctional Association 139th Congress, Nashville, Tennessee. 2009

*Death Penalty Debate*. Panelist. Seattle University School of Law, Seattle, Washington. 2009

Marc F. Stern, M.D.                                                                                                  Page 9

*The Patient Handoff – From Custody to the Community.* Washington Free Clinic Association, Annual Meeting, Olympia, Washington. Lacey, Washington. 2009

*Balancing Patient Advocacy with Fiscal Restraint and Patient Litigation.* National Commission on Correctional Health Care and American College of Correctional Physicians "Medical Directors Boot Camp," Seattle, Washington. 2009

*Staff Management.* National Commission on Correctional Health Care and American College of Correctional Physicians "Medical Directors Boot Camp," Seattle, Washington. 2009

*Management Dilemmas in Corrections: Boots and Bottom Bunks.* Annual Meeting, American College of Correctional Physicians, Chicago, Illinois. 2008

*Public Health and Correctional Health Care.* Masters Program in community–based population focused management – Populations at risk, Washington State University, Spokane, Washington. 2008

*Managing the Geriatric Population.* Panelist. State Medical Directors' Meeting, American Corrections Association, Alexandria, Virginia. 2007

*I Want to do my own Skin Biopsies.* Annual Meeting, American College of Correctional Physicians, New Orleans, Louisiana. 2005

*Corrections Quick Topics.* Annual Meeting, American College of Correctional Physicians. Austin, Texas. 2003

*Evidence Based Medicine in Correctional Health Care.* Annual Meeting, National Commission on Correctional Health Care. Austin, Texas. 2003

*Evidence Based Medicine.* Excellence at Work Conference, Empire State Advantage. Albany, New York. 2002

*Evidence Based Medicine, Outcomes Research, and Health Care Organizations.* National Clinical Advisory Group, Integrail, Inc., Albany, New York. 2002

*Evidence Based Medicine.* With Dr. LK Hohmann. The Empire State Advantage, Annual Excellence at Work Conference: Leading and Managing for Organizational Excellence, Albany, New York. 2002

*Taking the Mystery out of Evidence Based Medicine: Providing Useful Answers for Clinicians and Patients.* Breakfast Series, Institute for the Advancement of Health Care Management, School of Business, University at Albany, Albany, New York. 2001

*Diagnosis and Management of Male Erectile Dysfunction – A Goal–Oriented Approach.* Society of General Internal Medicine National Meeting, San Francisco, California. 1999

*Study Design and Critical Appraisal of the Literature.* Graduate Medical Education Lecture Series for all housestaff, Albany Medical College, Albany, New York. 1999

*Male Impotence: Its Diagnosis and Treatment in the Era of Sildenafil.* 4th Annual CME Day, Alumni Association of the Albany–Hudson Valley Physician Assistant Program, Albany, New York. 1998

*Models For Measuring Physician Productivity.* Panelist. National Association of VA Ambulatory Managers National Meeting, Memphis, Tennessee. 1997

*Introduction to Male Erectile Dysfunction and the Role of Sildenafil in Treatment.* Northeast Regional Meeting Pfizer Sales Representatives, Manchester Center, Vermont. 1997

*Male Erectile Dysfunction.* Topics in Urology, A Seminar for Primary Healthcare Providers, Bassett Healthcare, Cooperstown, New York. 1997

*Evaluation and Treatment of the Patient with Impotence: A Practical Primer for General Internists.* Society of General Internal Medicine National Meeting, Washington D.C. 1996

*Impotence: An Update.* Department of Medicine Grand Rounds, Albany Medical College, Albany, New York. 1996

*Diabetes for the EMT First–Responder.* Five Quad Volunteer Ambulance, University at Albany. Albany, New York. 1996

*Impotence: An Approach for Internists.* Medicine Grand Rounds, St. Mary's Hospital, Rochester, New York. 1994

*Male Impotence.* Common Problems in Primary Care Precourse. American College of Physicians National Meeting, Miami, Florida. 1994

*Patient Motivation: A Key to Success.* Tuberculosis and HIV: A Time for Teamwork. AIDS Program, Bureau of Tuberculosis Control – New York State Department of Health and Albany Medical College, Albany, New York. 1994

Marc F. Stern, M.D. Page 10

*Recognizing and Treating Impotence.* Department of Medicine Grand Rounds, Albany Medical College, Albany, New York. 1992

*Medical Decision Making: A Primer on Decision Analysis.* Faculty Research Seminar, Department of Family Practice, Indiana University, Indianapolis, Indiana. 1992

*Effective Presentation of Public Health Data.* Bureau of Communicable Diseases, Indiana State Board of Health, Indianapolis, Indiana. 1991

*Impotence: An Approach for Internists.* Housestaff Conference, Department of Medicine, Indiana University, Indianapolis, Indiana. 1991

*Using Electronic Databases to Search the Medical Literature.* NIH/VA Fellows Program, Indiana University, Indianapolis, Indiana. 1991

*Study Designs Used in Epidemiology.* Ambulatory Care Block Rotation. Department of Medicine, Indiana University, Indianapolis, Indiana. 1991

*Effective Use of Slides in a Short Scientific Presentation.* Housestaff Conference, Department of Medicine, Indiana University, Indianapolis, Indiana. 1991

*Impotence: A Rational and Practical Approach to Diagnosis and Treatment for the General Internist.* Society of General Internal Medicine National Meeting, Washington D.C. 1991

*Nirvana and Audio–Visual Aids.* With Dr. RM Lubitz. Society of General Internal Medicine, Midwest Regional Meeting, Chicago. 1991

*New Perspectives in the Management of Hypercholesterolemia.* Medical Staff, West Seneca Developmental Center, West Seneca, New York. 1989

*Effective Use of Audio–Visual Aids.* Nurse Educators, American Diabetes Association, Western New York Chapter, Buffalo, New York. 1989

*Management of Diabetics in the Custodial Care Setting.* Medical Staff, West Seneca Developmental Center, West Seneca, New York, 1989

*Effective Use of Audio–Visuals in Diabetes Peer and Patient Education.* American Association of Diabetic Educators, Western New York Chapter, Buffalo, New York. 1989

*Pathophysiology, Diagnosis and Care of Diabetes.* Nurse Practitioner Training Program, School of Nursing, University of Buffalo, Buffalo, New York. 1989

*Techniques of Large Group Presentations to Medical Audiences – Use of Audio–Visuals.* New Housestaff Training Program,  Graduate Medical Dental Education Consortium of Buffalo, Buffalo, New York. 1988

## PUBLICATIONS/ABSTRACTS

Borschmann, R, Tibble, H, Spittal, MJ, … Stern, MF, Viner, KM, Wang, N, Willoughby, M, Zhao, B, and Kinner, SA. *The Mortality After Release from Incarceration Consortium (MARIC): Protocolfor a multi-national, individual participant data meta-analysis.* Int. J of Population Data Science 2019 5(1):6

Binswanger IA, Maruschak LM, Mueller SR, **Stern MF**, Kinner SA**.** *Principles to Guide National Data Collection on the Health of Persons in the Criminal Justice System.* Public Health Reports 2019 134(1):34S-45S

**Stern M.** *Hunger Strike: The Inside Medicine Scoop.* American Jails 2018 32(4):17-21

Grande L, **Stern M.** *Providing Medication to Treat Opioid Use Disorder in Washington State Jails.* Study conducted for Washington State Department of Social and Health Services under Contract 1731-18409. 2018.

**Stern MF**, Newlin N. *Epicenter of the Epidemic: Opioids and Jails.* American Jails 2018 32(2):16-18

**Stern MF**. *A nurse is a nurse is a nurse…NOT!* Guest Editorial, American Jails 2018 32(2):4,68

Wang EA, Redmond N, Dennison Himmelfarb CR, Pettit B, **Stern M**, Chen J, Shero S, Iturriaga E, Sorlie P, Diez Roux AV. *Cardiovascular Disease in Incarcerated Populations*. Journal of the American College of Cardiology 2017 69(24):2967-76

Mitchell A, Reichberg T, Randall J, Aziz-Bose R, Ferguson W, **Stern M**. *Criminal Justice Health Digital Curriculum*. Poster, Annual Academic and Health Policy Conference on Correctional Health, Atlanta, Georgia, March, 2017

**Stern MF**. *Patient Safety (White Paper)*. Guidelines, Management Tools, White Papers, National Commission on Correctional Health Care. http://www.ncchc.org/filebin/Resources/Patient-Safety-2016.pdf. June, 2016

Binswanger IA, **Stern MF**, Yamashita TE, Mueller SR, Baggett TP, Blatchford PJ. *Clinical risk factors for death after release from prison in Washington State: a nested case control study*. Addiction 2015 Oct 17

**Stern MF.** Op-Ed on Lethal Injections. The Guardian 2014 Aug 6

**Stern MF.** *American College of Correctional Physicians Calls for Caution Placing Mentally Ill in Segregation: An Important Band-Aid*. Guest Editorial. Journal of Correctional Health Care 2014 Apr; 20(2):92-94

Binswanger I, Blatchford PJ, Mueller SR, **Stern MF**. *Mortality After Prison Release: Opioid Overdose and Other Causes of Death, Risk Factors, and Time Trends From 1999 to 2009*. Annals of Internal Medicine 2013 Nov; 159(9):592-600

Williams B,  **Stern MF,** Mellow J, Safer M, Greifinger RB. *Aging in Correctional Custody: Setting a policy agenda for older prisoner health care*. American Journal of Public Health 2012 Aug; 102(8):1475-1481

Binswanger I, Blatchford PJ, Yamashita TE, **Stern MF**. *Drug-Related Risk Factors for Death after Release from Prison: A Nested Case Control Study*. Oral Presentation, University of Massachusetts 4th Annual Academic and Health Policy Conference on Correctional Healthcare, Boston, Massachusetts, March, 2011

Binswanger I, Blatchford PJ, Forsyth S, **Stern MF**, Kinner SA. *Death Related to Infectious Disease in Ex-Prisoners: An International Comparative Study*. Oral Presentation, University of Massachusetts 4th Annual Academic and Health Policy Conference on Correctional Healthcare, Boston, Massachusetts, March, 2011

Binswanger I, Lindsay R, **Stern MF**, Blatchford P. *Risk Factors for All-Cause, Overdose and Early Deaths after Release from Prison in Washington State Drug and Alcohol Dependence*. Drug and Alcohol Dependence Aug 1 2011;117(1):1-6

**Stern MF**, Greifinger RB, Mellow J. *Patient Safety: Moving the Bar in Prison Health Care Standards*. American Journal of Public Health November  2010;100(11):2103-2110

Strick LB, Saucerman G, Schlatter C, Newsom L, **Stern MF**. *Implementation of Opt-Out HIV testing in the Washington State Department of Corrections*. Poster Presentation, National Commission on Correctional Health Care Annual Meeting, Orlando, Florida, October, 2009

Binswanger IA, Blatchford P, **Stern MF**. *Risk Factors for Death After Release from Prison*. Society for General Internal Medicine 32nd Annual Meeting; Miami: Journal of General Internal Medicine; April 2009. p. S164-S95

**Stern MF**. Force Feeding for Hunger Strikes – One More Step. CorrDocs Winter 2009;12(1):2

Binswanger I, **Stern MF**, Deyo RA, Heagerty PJ, Cheadle A, Elmore JG, Koepsell TD. *Release from Prison – A High Risk of Death for Former Inmates*. New England Journal of Medicine 2007 Jan 11;356(2):157–165

**Stern MF**, Hilliard T, Kelm C, Anderson E. *Epidemiology of Hepatitis C Infection in the Washington State Department of Corrections*. Poster Presentation, CDC/NIH *ad hoc* Conference on Management of Hepatitis C in Prisons, San Antonio, Texas, January, 2003

Phelps KR, **Stern M**, Slingerland A, Heravi M, Strogatz DS, Haqqie SS. *Metabolic and skeletal effects of low and high doses of calcium acetate in patients with preterminal chronic renal failure*. Am J Nephrol 2002 Sep–Dec;22(5–6):445–54

Goldberg L, **Stern MF,**  Posner DS. *Comparative Epidemiology of Erectile Dysfunction in Gay Men*. Oral Presentation, International Society for Impotence Research Meeting,  Amsterdam, The Netherlands, August 1998. Int J Impot Res. 1998;10(S3):S41 [also presented as oral abstract Annual Meeting, Society for the Study of Impotence, Boston, Massachusetts, October, 1999. Int J Impot Res. 1999;10(S1):S65]

**Stern MF.** *Erectile Dysfunction in Older Men*. Topics in Geriatric Rehab 12(4):40–52, 1997. [republished in Geriatric Patient Education Resource Manual, Supplement. Aspen Reference Group, Eds. Aspen Publishers, Inc., 1998]

**Stern MF**, Wulfert E, Barada J, Mulchahy JJ, Korenman SG. *An Outcomes–Oriented Approach to the Primary Care Evaluation and Management of Erectile Dysfunction*.  J Clin Outcomes Management  5(2):36–56, 1998

Fihn SD, Callahan CM, Martin D, et al.; for the **National Consortium of Anticoagulation Clinics**.* *The Risk for and Severity of Bleeding Complications in Elderly Patients Treated with Warfarin*. Ann Int Med. 1996;124:970–979

Fihn SD, McDonell M, Martin D, et al.; for the **Warfarin Optimized Outpatient Follow–up Study Group**.* *Risk Factors for Complications of Chronic Anticoagulation*. Ann Int Med. 1993;118:511–520. (*While involved in the original proposal development and project execution, I was no longer part of the group at the time of this publication)

**Stern MF**, Dittus RS, Birkhead G, Huber R, Schwartz J, Morse D.  *Cost–Effectiveness of Hepatitis B Immunization Strategies for High Risk People*. Oral Presentation, Society of General Internal Medicine National Meeting, Washington, D.C., May 1992. Clin Res 1992

Marc F. Stern, M.D.                                                                 Page 12

Fihn SD, McDonell MB, Vermes D, Martin D, Kent DL, Henikoff JG, and the **Warfarin Outpatient Follow–up Study Group**. *Optimal Scheduling of Patients Taking Warfarin. A Multicenter Randomized Trial.* Oral Presentation, Society of General Internal Medicine National Meeting, Washington, D.C., May 1992. Clin Res 1992

Fihn SD, McDonnell MB, Vermes D, Kent DL, Henikoff JG, and the **Warfarin Anticoagulation Study Group**. *Risk Factors for Complications During Chronic Anticoagulation.* Poster Presentation, Society of General Internal Medicine National Meeting, Seattle, May 1991

Pristach CA, Donohue GD, Sarkin R, Wargula C, Doerr R, Opila D, **Stern M**, Single G. *A Multidisciplinary Program to Improve the Teaching Skills of Incoming Housestaff.* Acad Med. 1991;66(3):172–174

**Stern MF**. *Diagnosing Chlamydia trachomatis and Neisseria gonorrhea Infections.* (letter) J Gen Intern Med. 1991;6:183

**Stern MF**, Fitzgerald JF, Dittus RS, Tierney WM, Overhage JM. *Office Visits and Outcomes of Care: Does Frequency Matter?* Poster Presentation, Society of General Internal Medicine Annual Meeting, Seattle, May 1991. Clin Res 1991;39:610A

**Stern MF**. *Cobalamin Deficiency and Red Blood Cell Volume Distribution Width.* (letter) Arch Intern Med. 1990;150:910

**Stern M**, Steinbach B. *Hypodermic Needle Embolization to the Heart.* NY State J Med. 1990;90(7):368–371

**Stern MF**, Birkhead G, Huber R, Schwartz J, Morse D. *Feasibility of Hepatitis B Immunization in an STD Clinic.* Oral Presentation,  American Public Health Association Annual Meeting, Atlanta, November 1990

### EXPERT TESTIMONY

Pajas v. County of Monterey, *et al.* US District Court for the Northern District of California, 2019 (trial)

Dockery, *et al.* v. Hall *et al.* US District Court for the Southern District of Mississippi Northern Division, 2018 (trial)

Benton v. Correct Care Solutions, *et al.* US District Court for the District of Maryland, 2018 (deposition)

Pajas v. County of Monterey, *et al.* US District Court Northern District of California, 2018 (deposition)

Walter v. Correctional Healthcare Companies, *et al.* US District Court, District of Colorado, 2017 (deposition)

Winkler v. Madison County, Kentucky, *et al.* US District Court, Eastern District of Kentucky, Central Division at Lexington, 2016 (deposition)

US v. Miami-Dade County, *et al.* US District Court, Southern District of Florida, periodically 2014 - 2016

# EXHIBIT 9

**DECLARATION OF PROFESSOR JUDITH RESNIK REGARDING
ENLARGEMENT AND THE USE OF PROVISIONAL REMEDIES
FOR DETAINED INDIVIDUALS**

        I have been asked to make this declaration to explain my understanding of the remedies, both provisional and permanent, that federal judges can provide to people who are incarcerated and facing the threat of COVID-19. Because I have practiced in the federal courts for decades and represented prisoners in federal court, I have had personal experience with the use of enlargement in habeas corpus cases. Given that this provisional remedy is not regularly discussed in reported decisions or in academic analyses, I believe that my experiences and knowledge can be useful to the Court. This opinion is mine and is not that of the institutions with which I am affiliated. I declare that the following is a true and accurate account of my own work as a lawyer, of the pertinent legal principles as I understand them, and of how these precepts can apply in this unprecedented context.

**My Background**

        1.   I have worked on occasion as a lawyer, including in the clinical programs at Yale Law School and at the University of Southern California Law Center (USC), where I taught for more than a decade before returning to Yale Law School. I have appeared before the United States Supreme Court and in federal district and appellate courts. I have also been appointed by federal judges to assist in issues arising in large-scale litigation. Below, I provide a few aspects of my work particularly relevant to this declaration. I attach my resume as Exhibit A to this Declaration.

        2.   From 1977 until 1980, I was a supervising attorney at Yale Law School's clinical program, which then provided legal services to federal prisoners housed at F.C.I. Danbury. From 1980 to 1996, I taught at USC in both traditional classroom and clinical settings.

        3.   I am now the Arthur Liman Professor of Law at Yale Law School where I teach courses, including on federal and state

courts; procedure; large-scale litigation; federalism; and incarceration.

4.    I have taught law for decades. Much of my focus has been on the role and function of courts, and the relationship of governments to their populations. I regularly teach the class entitled Federal and State Courts in the Federal System. Readings for students include materials on habeas corpus and on civil rights litigation.

5.    In 2018, I was awarded an Andrew Carnegie Fellowship to work on a book, tentatively entitled *Impermissible Punishments*, which explores the impact of the 1960s civil rights revolution on the kinds of punishments that governments can impose on people convicted of crimes. Central to this book is the role that access to courts played for people held in detention.

6.    I am the Founding Director of the Arthur Liman Center for Public Interest Law. The Liman Center teaches classes yearly, convenes colloquia, does research projects, supports graduates of Yale Law School to work for one year in public interest organizations, and is an umbrella for undergraduate fellowships at eight institutions of higher education.

7.    I write about the federal courts; adjudication and alternatives such as arbitration; habeas corpus and incarceration; class actions and multi-district litigation; the judicial role and courts' remedies; gender and equality; and about transnational aspects of these issues. In recent years, I have spent a good deal of time doing research related to prisons. I have helped to develop a series of reports that provide information nation-wide on the use of solitary confinement.

8.    In February of 2019, I testified before the U.S. Commission on Civil Rights at its hearing on women in prison and co-authored a statement related to the isolation of many facilities for women, their needs for education and work training, and the discipline to which they are subjected. *See* Statement submitted for the record, *Women in Prison: Seeking Justice Behind Bars*, before the U.S. Commission on Civil Rights, March 22, 2019. The report, published a few months ago, references this testimony. See U.S. Commission on Civil Rights, *Women in Prison: Seeking Justice Behind Bars* (February 2020), available at https://www.usccr.gov/pubs/2020/02-26-Women-in-Prison.pdf.

**Remedies Available in the Federal Courts:**
**Habeas Corpus, Civil Rights Litigation, and Enlargement**

9.   In light of my knowledge of the federal law of habeas corpus, state and federal court relations, procedure, and remedies, I have been asked by counsel for the petitioners/plaintiffs to address the range of responses available to judges presiding in cases that raise claims related to COVID-19. I have submitted a declaration akin to this one in a few other cases.

10.   As I understand from public materials on the health risks of this disease, COVID-19 poses a deadly threat to the well-being and lives of people who contract this disease. To reduce the risk and spread of this disease, our governments have instructed us to stay distant from others and to take measures that are extraordinary departures from our daily lives and routines.

11.   Applying these urgent medical directives to prisons poses challenges in every jurisdiction. Governing legal principles about prisoners' access to courts were not framed to address COVID-19's reality: that being inside prisons that are densely populated can put large numbers of people (prisoners and staff) at risk of immediate serious illness and potential death.

12.   These unprecedented risks from and harms of COVID-19 in prison raise a new legal question: whether COVID-19 has turned sentences which, when imposed, were (or may have been) constitutional into unconstitutional sentences during the pendency of this crisis.

13.   When sentencing people to a term of years of incarceration, judges had no authority to impose putting a person at grave risk of serious illness and death as part of the punishment for the offense. Now, such grave risks and harms can arise from the fact of incarceration.

14.   A recent Supreme Court case, *Montgomery v. Louisiana*, 136 S.Ct. 718 (2016), provides an analogous situation of sentence that was constitutional at sentencing but unconstitutional now. The Court determined that, in light of new understandings of the limits of brain development in juveniles, sentences of life without parole (LWOP) imposed on individuals who had committed crimes when under the age of eighteen were lawful when issued but became unconstitutional. As a consequence, parole boards or courts had to reconsider whether LWOP remained appropriate. COVID-19 raises a parallel question, as it requires courts to address whether

sentences lawful at imposition can (at least temporarily) no longer be served in prisons because otherwise, the sentence would become an unconstitutional form of punishment. In these abnormal times, the speed at which decisions are made is critical. Therefore, as I discuss below, provisional remedies (enabling enlargement and release for some individuals and de-densifying for others) are necessary.

15.  The classic and longstanding remedy for relief from unconstitutional detention, conviction, and sentences is habeas corpus. The Constitution enshrined the remedy of habeas corpus, which has a substantial common law history and is codified in federal statutes. *See generally* Paul D. Halliday, *Habeas Corpus* (Harvard U. Press, 2012); Amanda L. Tyler, *Habeas Corpus in Wartime* (Oxford U. Press, 2017); Randy Hertz and James Liebman, *Federal Habeas Corpus Practice and Procedure* (2 volumes, 2019); Hart & Wechsler, *The Federal Courts and the Federal System*, Chapter X1, 1193-1164 (Richard H. Fallon, Jr, John F. Manning, Daniel J. Meltzer & David Shapiro, 7th ed., 2015). These citations are the tip of a vast and substantial literature that aims to understand the history and law of habeas corpus.

## The Legal Thicket

16.  As is familiar, in federal courts, federal petitioners file under 28 U.S.C. §2255 (post-conviction motions) and under §2241 (the general habeas statute), both of which are civil actions.

17.  For example, when I worked at Yale Law School in its clinical program in the late 1970s, we filed lawsuits for federal prisoners predicated on 28 U.S.C. §2241 as well as (in appropriate situations) on 28 U.S.C. §1331 (general question jurisdiction) and 28 U.S.C. §1361 (mandamus), and in several instances, we filed cases as class actions. In the mid-1970s, the Supreme Court provided rules and forms for §2254 and §2255 filings. The Federal Rules of Civil Procedure supplement those rules, as recognized in F.R.Civ.Pro. 81(a)(4).

18.  Congress has recognized that federal judges are authorized under the habeas statutes to "summarily hear and determine the facts, and dispose of the matter as law and justice require." *See* 28 U.S.C. §2243. In addition to this statutory authority, federal judicial power is predicated on the constitutional protection of the writ and on the common law.

19.   Congress has channeled and circumscribed some of federal judicial authority through the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) and, relatedly, under the Prison Litigation Reform Act (PLRA) of 1996.

20.   Moreover, the Supreme Court has issued many decisions interpreting the prior habeas statutes, the 1996 revisions in AEDPA, and the intersection of habeas and civil rights claims brought under 42 U.S.C. §1983. The result is a dense arena of law and doctrine that can be daunting for litigants and jurists alike.

21.   Some Supreme Court decisions, written to address claims by state prisoners, have delineated litigation focused on the fact or duration of confinement, for which release is the remedy and habeas is the preferred route, from challenges to conditions of confinement, for which the Court has required use of 42 U.S.C. §1983. *See, e.g., Preiser v. Rodriguez*, 411 U.S. 475 (1978); *Heck v. Humphrey*, 512 U.S. 477 (1994).  Yet that distinction is hard to apply, and many opinions have identified that the overlap, as exemplified by *Mohammad v. Close*, 540 U.S. 744 (2004), *Wilkinson v. Dotson*, 544 U.S. 74 (2005), and by other Supreme Court and lower court decisions.

22.   COVID-19 poses a new and painful context in which to undertake that analysis. Some reported decisions addressing the constitutional right of prisoners that officials not be "deliberately indifferent to serious medical needs" consider those Eighth Amendment claims to be appropriate for §1983 because they relate to conditions. But this deadly disease turns ordinary conditions into potentially lethal threats of illness for which the remedy to consider is release of at least some prisoners because density puts people at medical risk.

23.   Because COVID-19 can end people's lives unexpectedly and abruptly, COVID-19 claims turn the condition of being incarcerated into a practice that affects the fact or duration of confinement. In my view, COVID-19 claims, therefore, collapse the utility and purpose of drawing distinctions between what once could more coherently be distinguished.

24.   Courts need also to consider how COVID-19 fits (or not) with provisions of AEDPA and the parameters of the PLRA. Again, new problems have emerged. For example, in some contexts for state and federal prisoners, a question of exhaustion of remedies arises. Often one issue is the ability of the executive branch to respond

quickly. In the COVID context, day by day, the risk of illness
increases for prisoners and staff, which endanger health care
resources. Exhaustion would be "futile" if other branches of
government are not prompt in response and if people become sick,
risks skyrocket, and deaths occur.

25. "Futility" thus needs to be analyzed in terms not only
of the capacity of institutions but in terms of the likelihood
that the people seeking relief will be well enough to have the
capacity to do so, and that the remedy provided will be effective
given the alleged harm.

26. Other legal issues include when class actions or other
forms of multi-party treatment are appropriate and if so, whether
the criteria such as those of Rule 23 are met; the merits of
arguments about unconstitutional sentences and conditions; and the
range of remedies. Furthermore, circuit case law varies somewhat
on the use and application of the Federal Rules of Civil Procedure
in habeas filings and on the scope and the interpretation of 28
U.S.C. §2241.

## The Availability of Provisional Remedies

27. The reason to flag some of the many issues that
litigation of both habeas petitions and civil rights cases entail
is to underscore the importance of considering provisional
remedies when cases are pending. In general, time is required for
lawyers to brief and for judges to interpret and apply the law.
But waiting days in a world of COVID infections can result in the
loss of life.

28. While courts have not faced COVID before, they have faced
urgent situations, which is why provisional legal remedies exist.
Courts have two ways to preserve the *status quo* – which here means
protecting to the extent possible the health of prisoners, staff,
and providers of medical services. One route is the use of
temporary restraining orders and preliminary injunctions. These
remedies require no explanation because they are familiar
procedures. *See* Fed. R. Civ. Pro. 65.

29. Another option is an aspect of federal judicial power
that is less well known. District courts have authority when habeas
petitions are pending to "enlarge" the custody of petitioners.
"Enlargement" is a term that, as far as I am aware, is used only
in the context of habeas. (More familiar terms for individuals
permitted to leave detention are "release" and "bail," and some

decision that "enlarge" petitioners use those words rather than enlargement).

30.   The distinction is that enlargement is not release. The person remains *in custody* – even as the place of custody is changed and thus "enlarged" from a particular prison to a hospital, half-way house, a person's home, or other setting. Enlargement is a provisional remedy that modifies custody by expanding the site in which it takes place.

31.   Enlargement has special relevance when the PLRA has application. As I understand the PLRA's rules on the "release" of prisoners, enlargement would not apply, as enlargement is not a release order. And, of course, interpreting the many directives of the PLRA in light of COVID entails more elaboration that my comments here.

32.   The need to work through that statute and case law is another reason why the availability of provisional remedies is so important. Enlargement provides an opportunity for increasing the safety of prisoners, staff, and their communities while judges consider a myriad of complex legal questions.

33.   I first encountered the provisional remedy of enlargement in the 1970s, when I represented a prisoner – Robert Drayton – who was confined at F.C.I. Danbury and who filed a habeas petition alleging that the U.S. Parole Commission had unconstitutionally rescinded his parole.

34.   The Honorable T.F. Gilroy Daly, a federal judge sitting in the District of Connecticut, granted Mr. Drayton's request for enlargement while the decision on the merits was pending. Mr. Drayton returned to his home in Philadelphia and came back to Connecticut for the merits hearing. Judge Daly thereafter ruled in his favor; that decision was upheld in part and reversed in part. *See Drayton v. U.S. Parole Commission*, 445 F. Supp. 305 (D. Conn. 1978), *affirmed in part*, *Drayton v. McCall*, 584 F.2d 1208 (2d Cir. 1978).

35.   Judge Daly did not write a decision explaining the enlargement.  Given that I knew that the use of enlargement was not always recorded in published decisions and that enlargement had special relevance here, I decided I should learn more about other courts' discussion of this provisional remedy.

36.   The provisional district court remedy of enlargement is not mentioned directly in in federal rules governing the lower

federal courts. In contrast, at the appellate level, Federal Rule of Appellate Procedure (FRAP) 23 provides in part that:

> While a decision not to release a prisoner is under review, the court or judge rendering the decision, or the court of appeals, or the Supreme Court, or a judge or justice of either court, may order that the prisoner be: (1) detained in the custody from which release is sought; (2) detained in other appropriate custody; or (3) released on personal recognizance, with or without surety. While a decision ordering the release of a prisoner is under review, the prisoner must – unless the court or judge rendering the decision, or the court of appeals, or the Supreme Court, or a judge or justice of either court orders otherwise – be released on personal recognizance, with or without surety.

As that excerpt reflects, the Rule uses language familiar in the context of bail and provides that appellate courts may also determine that a petitioner be detained in "other appropriate custody."

37. Federal courts at all level are authorized by Congress to decide habeas cases "as law and justice requires." 28 U.S.C. §2243. The case law also references that, at the district court level, the authority to release a habeas petitioner pending a ruling on the merits stems from courts' inherent powers. *See, e.g.*, *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001). And, as I noted, in these reported decisions, the terms "bail" or "release" are sometimes used instead of or in addition to "enlargement."

38. In the last weeks, the saliency of enlargement has prompted me to review more of the law surrounding it. To gather materials and opinions on enlargement, I asked two law students, Kelsey Stimson of Yale Law School and Ally Daniels of Stanford Law School, to help me research what judges have said about enlargement and what others have written. Below I detail some of the governing case law. The Hertz & Liebman *Treatise on Habeas* also has a section (§14.2) devoted to this issue.

39. Some of the decisions involve requests for release when habeas petitions were pending from state prisoners, and others from federal prisoners, or from people in immigration detention. Further, several appellate cases address the issue of whether a district court order on enlargement was appealable as of right or subject to mandamus.

40. My central point is that, amidst these various debates about appealability and the test for enlargement/release, most circuits have recognized that district courts have the authority to order release pending final disposition of a habeas petition. *See e.g., Woodcock v. Donnelly*, 470 F.2d 93, 43 (1st Cir. 1972); *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001); *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992); *Calley v. Callaway*, 496 F.2d 701, 702 (5th Cir. 1974); *Dotson v. Clark*, 900 F.2d 77, 79 (6th Cir. 1990); *Cherek v. United States*, 767 F.2d 335, 337 (7th Cir. 1985); *Martin v. Solem*, 801 F.2d 324, 329 (8th Cir. 1986); *Pfaff v. Wells*, 648 F.2d 689, 693 (10th Cir. 1981): *Baker v. Sard*, 420 F.2d 1342, 1342-44 (D.C. Cir. 1969).

41. The Fourth and Eleventh Circuits appear, albeit less directly, to recognize enlargement authority. *See Gomez v. United States*, 899 F.2d 1124, 1125 (11th Cir. 1990); *United States v. Perkins*, 53 F. App'x 667, 669 (4th Cir. 2002). A Ninth Circuit opinion from 1989 likewise appears to recognize the power of district courts to grant release pending a habeas decision where there are "special circumstances or a high probability of success." *See Land v. Deeds*, 878 F.2d 318 (9th Cir. 1989). Thereafter, another decision, *In re Roe*, described the Circuit as not having ruled on the issue in terms of state prisoners. *See* 257 F.3d 1077 (9th Cir. 2001).[1]

42. A discrete question is the standard for enlarging petitioners. To obtain an order for release pending the merits of habeas decision, the petitioner must demonstrate "extraordinary circumstances" and that the underlying claim raises "substantial claims." *See e.g. Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001). Courts have also discussed that release is appropriate when "necessary to make the habeas remedy effective." *Mapp*, 241 F.3d at 226; *see also Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992). As that Third Circuit decision explained, release was "available 'only when the petitioner has raised substantial constitutional claims upon which he has a high probability of success, and also when extraordinary or exceptional circumstances

---

[1] Subsequent lower court cases debated whether district courts do possess such authority. *See, e.g., Hall v. San Francisco Sup. Ct.*, 2010 WL 890044, at *2 (N.D. Cal. Mar. 8, 2010) ("Based on the overwhelming authority [of other circuit courts] in support, the court concludes for purposes of the instant motion that it has the authority to release Hall pending a decision on the merits."); *United States v. Carreira*, 2016 U.S. Dist. LEXIS 31210, at *4, (D. Haw. Mar. 10, 2016) ("[T]his Court declines to address the merits of Petitioner's bail requests in the absence of definitive guidance from the Ninth Circuit regarding the scope of this Court's bail authority.").

exist which make the grant of bail necessary to make the habeas remedy effective.'"

43. Some judges have interpreted the "substantial questions" prong to require the underlying claim to have a "high probability of success." *See Hall v. San Francisco Superior Court*, No. C 09-5299 PJH, 2010 WL 890044, *1 (N.D. Cal. Mar. 8, 2010); *In re Souels*, 688 F. App'x 134, 135 (3d Cir. 2017). That test resembles standards for preliminary injunctive relief and for stays, which include an assessment of the likelihood of success on the merits and of whether the balance of hardships tips in favor of altering the status quo. (And, of course, more can be said about the nuances of these bodies of law as well.)

44. A few cases focus on the health of a petitioner as central to the conclusion that "extraordinary circumstances" exist. For example, in *Johnston v. Marsh*, the petitioner, Alfred Ackerman, brought a habeas claim alleging that he was convicted in Pennsylvania through a trial that lacked "due process." 227 F.2d 528 (3d Cir. 1955). Ackerman asked for release pending a decision on the merits of his habeas petition; he argued that he had advanced diabetes and was "rapidly progressing towards total blindness." *Id.* at 529. The district court authorized Ackerman to be released to a private hospital. The prison warden (Frank Johnston) went to the Third Circuit invoking sought writs of prohibition and mandamus to order the district court (Judge Marsh) to change his ruling. Rejecting the petitions, the Third Circuit affirmed that district courts possessed the authority to order relocation while the habeas petition was pending. *Johnson v. Marsh* has been cited in more recent cases to illustrate that findings of extraordinary circumstances may "be limited to situations involving poor health or the impending completion of the prisoner's sentence." *Landano*, 970 F.2d at 1239.

45. The court in *In re Souels* addressed what showing of health problems constituted extraordinary circumstances. *See* 688 F. App'x at 135-36. Sean Souels, who was serving a 46-month federal prison sentence, petitioned for a writ of mandamus directing the court to rule on his writ of habeas corpus and sought release pending the decision. *Id.* at 134. The court denied Souels bail because "he [did] not describe his medical conditions in any detail or explain how he cannot manage his health issues while he is in prison." *Id.*

46. Health is not the only extraordinary circumstance that has been the basis for enlargement. For example, in *United States v. Josiah*, William Josiah brought a writ of habeas corpus after

the Supreme Court invalidated the residual clause of the Armed Career Criminal Act (ACCA) and altered the method for determining whether prior convictions qualify as violent felonies under the ACCA. 2016 WL 1328101, at *2 (D. Haw. Apr. 5, 2016). Josiah, who was serving a federal prison sentence argued that his prior convictions did not qualify as violent felonies and that he should not be subject to the fifteen-year mandatory minimum. The district court concluded that because the issue of retroactivity was pending before the Supreme Court and Josiah would have served his full sentence if the Court held its prior ruling retroactive, release pending the higher court's ruling was appropriate. *Id.* at *4-6.

47.   In circumstances similar to *Josiah*, a district judge sitting in the Central District of Illinois issued three orders granting release, termed bail, to petitioners pending resolution of their habeas claims. See *Zollicoffer v. United States*, No. 15-03337, 2017 WL 79636 (C.D. Ill. Jan. 9, 2017); *United States v. Jordan*, No. 04-20008, 2016 WL 6634852 (C.D. Ill. Nov. 9, 2016); *Swanson v. United States*, No. 15-03262, 2016 WL 5422048 (C.D. Ill. Sept. 28, 2016).

48.   Another case involved enlargement in the context of the military. *See Gengler v. U.S. through its Dep't of Def. & Navy*, 2006 WL 3210020, at *6 (E.D. Cal. Nov. 3, 2006). As that court explained, a "district court has the inherent power to enlarge a petitioner on bond pending hearing and decision on his petition for writ of habeas corpus." *Id.* at *5. The judge also noted that a "greater showing must be made by a petitioner seeking bail in a criminal conviction habeas 'than would be required in a case where applicant had sought to attack by writ of habeas corpus an incarceration not resulting from a judicial determination of guilt.'" The court used the test of "exceptional circumstances and, at a minimum, substantial questions as to the merits." *Id.* at 13. The court found "exceptional circumstances" based on the fact that the petitioner had been admitted to business school, had been granted permission by his commanding officer to attend, and would be forced to drop out if his custody were not enlarged. The court also ruled that "substantial questions as to the merits" existed because of alleged government errors in drafting the petitioner's service agreement. *Id.* at *6.

49.   As of this writing, a few reported cases discuss COVID-based requests for enlargement while a habeas corpus proceeding is pending. In addition, many decisions address requests for release under federal statutes as well as other remedies.

50.   Given the fast pace of litigation and the many concerns about people's well-being, UCLA has created a website that is regularly updated and compiles materials and decisions related to COVID. See UCLA Law Covid-19 Behind Bars Data Project, *available at* https://docs.google.com/spreadsheets/d/1X6uJkXXS-O6eePLxw2e4JeRtM41uPZ2eRcOA_HkPVTk/edit#gid=708926660.

51.   Below I provide a few illustrations of decisions since April that are related to COVID and enlargement.

52.   On April 7, the Honorable Jesse Furman, sitting in the Southern District of New York, granted on consent a motion styled "for bail" (the term used in the Second Circuit *Mapp* decision). Judge Furman ordered immediate release under specified conditions, pending the adjudication of the Section 2255 Motion. *See United States v. Nkanga,* No. 18-CR-00730 (S.D.N.Y., Apr. 7, 2020).

53.   A second case involves a class action filed by Craig Wilson and others. *See Wilson v. Williams*, No. 4:20-cv-00794-JG, 2020 WL 1940882, at *1 (N.D. Ohio Apr. 22, 2020). Seeking to represent a class of all current and future prisoners of the Elkton Federal Correctional Institution (FCI) and a subclass of the medically vulnerable population, they sought relief because their continued incarceration subjected all FCI prisoners to substantial risk of harm in violation of the Eighth Amendment.

54.   On April 22, 2020, the federal district court granted in part the request by the *Wilson* class for emergency relief, which included enlargement of a subclass of prisoners challenging the manner in which the sentence was served and hence cognizable as a habeas petition. *See Wilson v. Williams*, No. 4:20-cv-00794-JG, 2020 WL 1940882 (N.D. Ohio Apr. 22, 2020).  The Sixth Circuit denied a stay soon thereafter. *See Wilson v. Williams*, No. 4:20-CV-00794, 2020 WL 2308441, at *1 (6th Cir. May 8, 2020).

55.   The *Wilson* case also cited to *Money v. Pritzker*, No. 1-20 CV 02094, 2020 WL 1920660, at *1 (N.D. Ill. April 10, 2020), a class action seeking relief on behalf of state prisoners, and the *Wilson* court referenced that I had also submitted a declaration similar to this one in that action.  In *Money*, I discussed enlargement as well as the interaction between civil rights litigation and habeas corpus. *Id.* at *8-9.  The Honorable Robert M. Dow, Jr. invoked my discussion, and the court determined not to grant the emergency relief sought by the plaintiff class.  *Id.*

56.   On May 12, 2020, the Honorable Michael Shea issued another decision responding to a petition challenging treatment of

prisoners at three facilities that compromise FCI Danbury.  In *Martinez-Brooks v. Easter*, 3-20-cv-00569-MPS, 2020 WL 2405350 (D. Conn., May 12, 2020). Judge Shea granted in part the request for a temporary restraining order and required "the Warden at FCI Danbury to adopt a process for evaluating inmates with COVID-19 risk factors for home confinement and other forms of release that is both far more accelerated and more clearly focused on the critical issues of inmate and public safety than the current process." *Id.* at *1. He also ordered expedited discovery and scheduled a June hearing on the request for a preliminary injunction. *Id.* In that opinion, Judge Shea discussed enlargement as he analyzed the relief sought by the petitioners. *Id.* at *2

57.   Another case has less relevance as it was brought by an unrepresented litigant, Richard Peterson, who had originally sought habeas corpus relief on a claim about education credits and then filed an emergency request for release from a California state prison due to COVID-19. *Peterson v. Diaz*, No. 2:19-CV-01480, 2020 WL 1640008, at *1 (E.D. Cal. Apr. 2, 2020). The district court noted that a class action raising COVID claims was pending in another federal court in California and that, while the court had the authority to release a person while a habeas petition was pending, Mr. Peterson had not provided evidence sufficient to meet the test to do so. *Id.*

## Conclusion

58. In sum, COVID-19 is an unprecedented event that, in my view, raises the legal question of whether, in light of the government mandates for social distancing, sentences (that had been lawful when they were imposed) cannot lawfully be served when the setting puts an individual in a position of untenable risk. Thus, habeas corpus – which addresses the constitutionality of sentences and offers the possibility of release and enlargement – properly provides a jurisdictional basis and remedies for this situation.

59. I need also to note that, in recent years, the Supreme Court has raised questions in many contexts about the remedial powers of federal judges. Whether the topic is nationwide injunctions or commercial contracts, debates have occurred within the Court about the authority of federal judges.

60. Those cases do not address the extraordinary and painful moment in which we are all living. Ordinary life has been up-ended in an effort to keep as many people as possible alive and not

debilitated by serious illness. Moreover, the Supreme Court opinions have not focused on the relevance of those remedial debates to situations were confinement can put entire staffs and detained populations at mortal risk. Therefore, judges have the obligation and the authority to interpret statutes and the Constitution to preserve the lives of people living in and working in prisons. It is my hope that this account of earlier uses of enlargement and the dense account of case law and doctrine will be of service to this Court and to the parties in understanding the meaning and import of American law.


Dated:   May 14, 2020


_____
Judith Resnik

# Judith Resnik

**Address**

| | |
|---|---|
| Yale Law School | Tel:  (203) 432-1447 |
| 127 Wall Street, P.O. Box 208215 | Fax:  (203) 432-1719 |
| New Haven, CT 06520-8215 | Email: judith.resnik@yale.edu |

**Employment**

Arthur Liman Professor of Law, Yale Law School, 1997-present
> Founding Director, Arthur Liman Center for Public Interest Law
> Honorary Visiting Professor, University College London
>> Faculty of Law, 2009-2021
> Visiting Professor, Dauphine Université Paris, March 2016
> Visiting Professor, Université Panthéon-Assas Paris II, May 2015
> Convening Professor, Constituting Federalism, a seminar for the Institute for
>> Constitutional History in conjunction with the New York Historical
>> Society, February 2014
> Scholar in Residence, Columbia Law School, Spring 2011; 2012
> Distinguished Visiting Professor, University of Toronto School of Law, 2005
> Parsons Visitor, Sydney University School of Law, 2004

Visiting Professor, New York University School of Law, 1996-1997
Visiting Professor, Harvard Law School, Fall 1989
Visiting Professor, Yale Law School, Spring 1989
Visiting Professor, University of Chicago Law School, Fall 1988

Orrin B. Evans Professor of Law, University of Southern California, 1989-1997;
> Professor of Law: 1985-1989; Associate Professor: 1982-1985;
> Assistant Professor: 1980-1982
> Member, Faculty, The Salzburg Seminar on U.S. Legal Institutions, July 1988

Acting Director, Daniel and Florence Guggenheim Program in Criminal Justice,
> Yale Law School, 1979-1980

Lecturer in Law and Supervising Attorney, Yale Law School, 1977-1979

Instructor, New York University School of Law, 1976-1977

Law Clerk, Honorable Charles E. Stewart, United States District Court,
> Southern District of New York, 1975-1976

**Selected Professional Activities**

Chair of Fellows Selection Committee and Founding Director, Arthur Liman Center for
> Public Interest Law, Yale Law School, 1997-present

2

Chair, Yale Law School Global Constitutionalism Seminar, A Part of the Gruber Program for Global Justice and Women's Rights, 2012-present
Member, Board of Managerial Trustees, International Association of Women Judges, 2001-present
Chair, Order of the Coif Book Award Committee, 2018-2020
Fellow, Whitney Humanities Center, 2020-2021
Chair, American Association of Law Schools, Section on Law and Humanities, 2020
Chair, American Association of Law Schools, Section on its Sections, 2019-2022
Advisor, American Law Institute, Project on Sexual and Gender-Based Misconduct on Campus, 2015-present
Member, Task Force on Federal Judicial Selection, Project on Government Oversight of The Constitution Project, 2019
Steering Committee, Women Faculty Forum, Yale University, 2001-present
    Co-chair, 2001-2003, 2006-2008
Co-Chair, Judicial-Academic Network, National Association of Women Judges, 2009-2019, 1998-2001
Academic Fellow, Pound Civil Justice Institute, 2016-present
Fellow, Davenport College, Yale University, 2002-present
Former Chair, Section on Civil Procedure, American Association of Law Schools; 2018, 2003, 1991
Member, Executive Committee, Section on Federal Courts, American Association of Law Schools, 1999-2004, 2014-present; chair, 2002
Member, Executive Committee, Section on Law and the Humanities, American Association of Law Schools, 2015-present
Member, Academic & Scientific Council, The Gender Equality Project, Switzerland, 2009-present
Advisor, European Law Institute and International Institute for the Unification of Private Law Project, From Transnational Principles to Rules of European Civil Procedure, 2015-2016
Member, Executive Session, State Courts in the Twenty-First Century, The Kennedy School, Harvard University, 2008-2011
Member, Advisory Group, Principles of the Law of Aggregate Litigation, American Law Institute, 2004-2009
Member, Standing Committee on Federal Judicial Improvements, American Bar Association, 2006-2010 (prior three-year term in the late 1990s);
    Chair, Academic Advisory Committee to the Standing Committee on Federal Judicial Improvements, American Bar Association, 2010-2014
Member, Editorial Board, Yale Journal of Law and Feminism
Member, Editorial Advisory Board, Yale Journal of Law and the Humanities
Member, Advisory Board, Journal of Law and Ethics of Human Rights
Member, Advisory Board, Litigation and Procedure, and Negotiation and Dispute Resolution eJournals (Social Science Research Network, online)
Member, Advisory Board, Women's Studies Quarterly

**Other Activities**

Co-chair of the Board, Fansler Foundation, 2003-2014

Member, National Board of Academic Advisors for the William H. Rehnquist Center on the Constitutional Structures of Government, 2007-2009

Member, Advisory Board of the Science for Judges Project, Brooklyn Law School, 2003-2007

Board Member, Lawyers' Committee for Civil Rights, 2004-2007

Liaison, American Association of Law Schools to the American Bar Association Commission on Women, 2000-2005

Member, Advisory Board of the Center for Judicial Process, Albany Law School, 2000-2004

Member, Editorial Board, Law and Social Inquiry, 1998-2004

Member, Committee on Diversity in Legal Education of the Section of Legal Education and Admissions to the Bar of the American Bar Association, 1996-2002

Consultant, RAND, Institute for Civil Justice, 1980-2002

Member, Editorial Board, The Justice System Journal

Member, Board of Governors, Society of American Law Teachers, 1980-1997

Co-Chair, University of Southern California Feminist Council, 1990-1996

Member, Ninth Circuit Gender Bias Task Force, 1990-1994

Co-Chair, Robert M. Cover Memorial Public Interest Retreat, Society of American Law Teachers, 1988-1992

Member of and a general reporter for the International Association of Procedural Law, 1991 Conference

Member, Planning Committee, ABA-AALS Conference on Women in Legal Education, 1990

Member, Advisory Panel to a Subcommittee of the Federal Courts Study Committee, 1989-1990

Member, Steering Committee for the Center for Feminist Research, University of Southern California, 1990-1994

Member, American Bar Association, Litigation Section, Federal Initiatives Task Force, 1991-1993

Chair, Section on Women in Legal Education, American Association of Law Schools, 1989

Member, Twentieth Century Fund Task Force on Judicial Responsibility, 1988-1989

Member, Board of ACLU of Southern California, 1985

Chair, Bryn Mawr College Centennial Campaign for Southern California, 1983-1985

**Courses taught at Yale Law School, 1997-2020**

Federal and State Courts in the Federal System

Procedure

Equality, Sovereignty and Citizenship (with Prof. Reva Siegel)

Gender: Globally and Locally (with Prof. Vicki Jackson)

Liman Workshops (topics and co-teachers vary yearly)

Rationing Law: Subsidizing Access to Justice in Democracies

Poverty and the Courts: Fines, Fees, Bail, and Collective Redress

Who Pays? Fines, Fees, Bail, and the Cost of Courts
Imprisoned
Human Rights, Incarceration, and Criminal Justice Reform
Moving Criminal Justice: Practices of Reform
Incarceration
Borders
Rationing Law: Constitutional Entitlements to Courts in an
      Era of Fiscal Austerity
Abolition: Slavery, Supermax, and Social Movements
Accessing Justice and Rights – From Streets to Prisons
Community, Confinement, Labor, and Rights
Equality, Punishment, and Incarceration
Imprisoned
Detention
Federalism and Social Movements: Public Interest Lawyering
      in Cities and States
Citizenship
Constitutional Law as Public Interest Law

## Publications

### Books and Monographs

*Fragile Futures and Resiliency: Litigating Climate Change, Judging Under Stress* (co-editor Clare Ryan, Yale Global Constitutionalism Seminar, A Part of the Gruber Program for Global Justice and Women's Rights, 2019)

*Ability to Pay* (co-editors Anna VanCleave, Alexandra Harrington, Jeff Selbin, Lisa Foster, Joanna Weiss, Faith Barksdale, Alexandra Eynon, Stephanie Garlock, and Daniel Phillips, Arthur Liman Center for Public Interest Law Colloquium, 2019), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3387647

*Working to Limit Restrictive Housing: Efforts in Four Jurisdictions to Make Changes* (editor, Arthur Liman Center for Public Interest Law and Association of State Correctional Administrators, 2018).

*Reforming Restrictive Housing: The 2018 ASCA-Liman Nationwide Survey of Time-in-Cell* (co-author, Arthur Liman Center for Public Interest Law and Association of State Correctional Administrators, 2018), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3264350

*Global Reconfigurations, Constitutional Obligations, and Everyday Life* (co-editor Clare Ryan, Yale Global Constitutionalism Seminar, A Part of the Gruber Program for Global Justice and Women's Rights, 2018)

*Who Pays? Fines, Fees, Bail, and the Cost of Courts* (co-editors Anna VanCleave, Kristen Bell, Skylar Albertson, Natalia Friedlander, Illyana Green, and Michael Morse, Arthur Liman Center for Public Interest Law Colloquium, 2018), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3165674

*Reconstituting Constitutional Orders* (co-editor Clare Ryan, Yale Global Constitutionalism Seminar, A Part of the Gruber Program for Global Justice and Women's Rights, 2017)

*Aiming to Reduce Time-In-Cell: Reports from Correctional Systems on the Numbers of Prisoners in Restricted Housing and on the Potential of Policy Changes to Bring About Reforms* (co-author, Yale Law School Arthur Liman Public Interest Program and Association of State Correctional Administrators, 2016)

*Rethinking 'Death Row': Variations in the Housing of Individuals Sentenced to Death* (co-authors Celina Aldape, Ryan Cooper, Katie Haas, April Hu, Jessica Hunter, and Shellie Shimizu, Arthur Liman Public Interest Program, 2016), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2874492

*Acts of State, Acts of God* (editor, Yale Global Constitutionalism Seminar, A Part of the Gruber Program for Global Justice and Women's Rights, 2016)

*Time-in-Cell: The ASCA-Liman 2014 National Survey of Administrative Segregation in Prison* (co-author, Yale Law School Arthur Liman Public Interest Program and Association for State Correctional Administrators, 2015), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2655627

*The Reach of Rights* (editor, Yale Global Constitutionalism Seminar, A Part of the Gruber Program for Global Justice and Women's Rights, 2015)

*The Invention of Courts,* Daedalus: Journal of the American Academy of Arts and Sciences (co-editor Linda Greenhouse, Summer 2014)

*Isolation and Reintegration: Punishment Circa 2014* (co-editors Hope Metcalf and Megan Quattlebaum, Arthur Liman Public Interest Program Colloquium, 2014)

*Sources of Law and of Rights* (editor, Yale Global Constitutionalism Seminar, A Part of the Gruber Program for Global Justice and Women's Rights, 2014)

*Governments' Authority* (editor, Yale Global Constitutionalism Seminar, A Part of the Gruber Program for Global Justice and Women's Rights, 2013)

*Administrative Segregation, Degrees of Isolation, and Incarceration: A National Overview of State and Federal Correctional Policies* (co-authors Hope Metcalf, Jamelia Morgan, Samuel Oliker-Friedland, Julia Spiegel, Haran Tae, Alyssa

Work, and Brian Holbrook , Arthur Liman Public Interest Program, 2013), available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2286861

*Law's Borders* (editor, Yale Global Constitutionalism Seminar, A Part of the Gruber Program for Global Justice and Women's Rights, 2012)

*Representing Justice: Invention, Controversy, and Rights in City-States and Democratic Courtrooms* (with Dennis E. Curtis, Yale University Press, 2011)

*Federal Courts Stories* (co-editor Vicki Jackson, Foundation Press, 2010)

*Migrations and Mobilities: Citizenship, Borders, and Gender* (co-editor Seyla Benhabib, New York University Press, 2009)

*The Processes of the Law: Understanding Courts and Their Alternatives* (Foundation Press, 2004)

*Adjudication and Its Alternatives: An Introduction to Procedure* (with Owen Fiss, Foundation Press, 2003)

*The Effects of Gender: The Final Report of the Ninth Circuit Gender Bias Task Force* (July 1993) (with The Hon. John C. Coughenour, The Hon. Proctor Hug, Jr., The Hon. Marilyn Patel, Terry W. Bird, Deborah R. Hensler, M. Margaret McKeown, and Henry Shields, Jr.), also reprinted in 67 *Southern California Law Review* 745 (1994)

*Procedure* (with Robert Cover and Owen Fiss, Foundation Press, 1988)

*The Federal Procedural System: A Rule and Statutory Source Book* (with Robert Cover and Owen Fiss, Foundation Press, 1988, 1989, 1991)

**Chapters in Books**
Not Isolating Isolation, in *Solitary Confinement: History, Effects, and Pathways to Reform* at 89-114 (Jules Lobel and Peter Scharff-Smith, eds., Oxford University Press, 2020)

Courts *and* Economic and Social Rights/Courts *as* Economic and Social Rights, in *The Future of Economic and Social Rights* at 259-286 (Katharine G. Young, ed., Cambridge University Press, 2019)

The Functions of Publicity and of Privatization in Courts and their Replacements (from Jeremy Bentham to #MeToo and *Google* Spain) in *Open Justice: The Role of Courts in a Democratic Society* at at 177-252 (Burkhard Hess and Ana Koprivica, eds., Max Planck Institute, Luxembourg, Nomos, 2019)

Judicial Methods of Mediating Conflicts: Recognizing and Accommodating Differences in Pluralist Legal Regimes, in *Judicial Power: How Constitutional Courts Affect Political Transformations* at 250-280 (Christine Landfried, ed., Cambridge University Press, 2019)

On Darkness and Light in Legal Imagination and in Practice, in *The Dark Sides of the Law: Perspectives on Law, Literature, and Justice in Common Law Countries* at 13-29 (Geraldine Gadbin-George, Yvonne-Marie Rogez, Armelle Sabatier, and Claire Wrobel, eds., Editions Michel Houdiard, 2019)

Bordering by Law: The Migration of Law, Crimes, Sovereignty, and the Mail, in *Nomos LVII: Immigration, Emigration, and Migration,* at 79-201 (Jack Knight, ed., New York University Press, 2017)

Why Eyes? Cautionary Tales from Law's Blindfolded Justice (with Dennis E. Curtis), in *Blinding as a Solution to Bias in Biomedical Science and the Courts: A Multidisciplinary Approach,* at 227-247 (Aaron Kesselheim and Christopher Robertson, eds., Elsevier Press, 2016)

Constructing the "Foreign:" American Law's Relationship to Non-Domestic Sources, in *Courts and Comparative Law,* at 437-471 (Mads Andrenas and Duncan Fairgrieve, eds., Oxford University Press, 2015)

Epistemological Doubt and Visual Puzzles of Sight, Knowledge, and Judgment: Reflections on Clear-Sighted and Blindfolded Justices (with Dennis E. Curtis), in *Genealogies of Legal Vision*, at 201-242 (Peter Goodrich and Valérie Hayaert, eds., London: Routledge, 2015)

Federalism(s)'s Forms and Norms: Contesting Rights, De-Essentializing Jurisdictional Divides, and Temporizing Accommodations, in *Nomos LV: Federalism and Subsidiarity,* at 363-435 (James E. Fleming and Jacob T. Levy, eds., New York University Press, 2014)

Constructing Courts: Architecture, the Ideology of Judging, and the Public Sphere (with Dennis E. Curtis and Allison Tait), in *Law, Culture & Visual Studies,* at 547-572 (Richard K. Sherwin and Anne Wagner, eds., Springer Publishing Company, 2013)

"Hear the Other Side:" *Miranda,* Guantánamo, and Public Rights to Fairness and Dignity, in *Law and the Quest for Justice,* at 85-109 (Marjorie S. Zatz, Doris Marie Provine, and James P. Walsh, eds., Quid Pro Books, 2013)

Old and New Depictions of Justice: Reflections, Circa 2011, on Hill-Thomas, in *I Still Believe Anita Hill,* at 51-70 (Amy Richards and Cynthia Greenberg, eds., The Feminist Press, 2012)

8

Changing the Climate: The Role of Translocal Organizations of Government Actors
(TOGAs) in American Federalism(s), in *Navigating Climate Change Policy: The
Opportunities of Federalism,* at 120-143 (Edella C. Schlager, Kirsten H. Engel,
and Sally Rider, eds., The University of Arizona Press Tucson, 2011)

Sisterhood, Slavery and Sovereignty: Transnational Women's Rights Movements from
1840 through the Beginning of the Twenty-first Century, in *Women's America:
Seventh Edition*, at 781-790 (Linda Kerber, Cornelia Hughes Dayton, and Jane De
Hart, eds., Oxford University Press, 2010)

New Federalism(s): Translocal Organizations of Government Actors (TOGAs)
Reshaping Boundaries, Policies, and Laws, in *Why the Local Matters:
Federalism, Localism, and Public Interest Advocacy*, at 83-99 (published by the
Liman Public Interest Program at Yale Law School, and the National State
Attorneys General Program at Columbia Law School, 2010)

Managerial Judges, Jeremy Bentham and the Privatization of Adjudication, in *Common
Law, Civil Law and the Future of Categories*, at 205-224 (Janet Walker and Oscar
G. Chase, eds., LexisNexis Canada, 2010), also published in 49 *S.C.L.R.*
(2d) 205 (2010)

What's Federalism For?, in *The Constitution 2020*, at 269-284 (Jack Balkin and
Reva Siegel, eds., Oxford University Press, 2009)

Judicial Independence, in *Global Perspectives on Constitutional Law*, at 15-33 (Vikram
David Amar and Mark V. Tushnet, eds., Oxford University Press, 2008)

From "Rites" To "Rights" of Audience:  The Utilities and Contingencies of the Public's
Role in Court-Based Processes (with Dennis E. Curtis) in *Representation of
Justice*, at 195-236 (Antoine Masson and Kevin O'Connor, eds., P.I.E. - Peter
Lang, 2007)

Sisterhood, Slavery, and Sovereignty: Transnational Antislavery Work and Women's
Rights Movements in the United States During the Twentieth Century, in
*Women's Rights and Transatlantic Antislavery in the Era of Emancipation*, at 19-
54 (Kathryn K. Sklar and James Brewer Stewart, eds., Yale University
Press, 2007)

Gendered Borders and United States' Sovereignty, in *Women and Immigration Law:
New Variations on Classical Feminist Themes*, at 44-63 (S.K. Van Walsum
and T. Spijkerboer, eds., Routledge-Cavendish Press, 2006)

Contracting Civil Procedure, in *Law and Class in America: Trends Since the Cold*

*War*, at 60-86 (Paul Carrington and Trina Jones, eds., New York University Press, 2006)

Democratic Responses to the Breadth of Power of the Chief Justice, in *Reforming the Court: Term Limits for Supreme Court Justices*, at 181-200 (Paul D. Carrington and Roger C. Cramton, eds., Carolina Academic Press, 2006)

Composing a Judiciary:  Reflections on Proposed Reforms in The United Kingdom on How to Change the Voices of and the Constituencies for Judging, in *Constitutional Innovation: The Creating of A Supreme Court for the United Kingdom; Domestic, Comparative and International Reflections*, *A Special Issue of Legal Studies*, at 228-252 (Derek Morgan, ed., LexisNexis, United Kingdom, 2004)

The Story of *Goldberg*: Why This Case Is Our Shorthand, in *Civil Procedures Stories: An In-Depth Look at the Leading Civil Procedure Cases*, at 473-508 (Kevin M. Clermont, ed., Foundation Press, 2004; 2nd ed., 2007)

Federalism(s), Feminism, Families, and the Constitution, in *Women and the United States Constitution: History, Interpretation, and Practice*, at 127-152 (Sybil A. Schwarzenbach and Patricia Smith, eds., Columbia University Press, 2004)

The Rights of Remedies: Collective Accountings for and Insuring Against the Harms of Sexual Harassment in *Directions in Sexual Harassment Law*, at 247-271 (Reva Siegel and Catherine MacKinnon, eds., University Press, 2004)

Civil Processes, in *Oxford Handbook of Legal Studies*, at 478-772 (Peter Cane and Mark Tushnet, eds., Oxford Press, 2003)

Women, Meeting (Again), In and Beyond the United States, Afterword to *The Difference Difference Makes: Women and Leadership*, at 203-216 (Deborah L. Rhode, ed., Stanford University Press, 2003)

Procedure: Legal Aspects (Vol.18), in *International Encyclopedia of the Social & Behavioral Sciences*, at 12136-12141 (Neil J. Smelser and Paul B. Baltes, eds., Elsevier Press, 2001)

Contested Identities: Task Force on Gender, Race, and Ethnic Bias and the Obligations of the Legal Profession (with Deborah Hensler) in *Ethics in Practice, Lawyers' Roles, Responsibilities, and Regulation,* at 240-263 (Deborah L. Rhode, ed., Oxford University Press, 2000)

Federal Judicial Role (Vol. III); Single-Sex Education (Vol. V); Procedural Due Process Civil (Update I, Vol. IV), in *The Encyclopedia of the American Constitution*, 2nd

edition, (Leonard Levy, Kenneth L. Karst, Adam Winkler, Dennis J. Mahoney, and John G. West, Jr., eds., Macmillan, 2000)

Singular and Aggregate Voices: Audiences and Authority in Law & Literature and in Law & Feminism, in *Law and Literature: Current Legal Issues,* Vol. II, at 687-727 (Michael Freeman and Andrew D. E. Lewis, eds., Oxford University Press, 1999)

Foreword (with Carolyn Heilbrun) to *Beyond Portia: Women, Law & Literature in the United States*, at 11-52 (Jacqueline St. Joan and Annette Bennington McElhiney, eds., Northeastern University Press, 1997)

Procedure, in *Looking at Law School*, at 177-195 (Stephen Gillers, ed., Penguin Books, NY, 4th ed., 1997; 3rd ed., 1990)

From the Senate Judiciary Committee to the County Courthouse: The Relevance of Gender, Race, and Ethnicity to Adjudication, in *Race, Gender, and Power in America, The Legacy of the Hill-Thomas Hearings*, at 177-227 (Anita Hill and Emma Jordan, eds., Oxford Press, 1995)

Gender in the Courts: The Task Force Reports, in *The Woman Advocate, Excelling in the 90's*, at 3-38 (Jean Maclean Snyder and Andra Barmash Greene, eds., Prentice Hall Law & Business, 1995)

Finding the Factfinders, in *Verdict: Assessing the Civil Justice System*, at 500-530 (Robert E. Litan, ed., Brookings, May 1993)

Independent and Inter-dependent: The Ninth Circuit and the Federal Judiciary, in *Restructuring Justice,* at 321-330 (Arthur Hellman, ed., Cornell Press, 1990)

The Perception of Justice: Tort Litigants' Views of Trial, Court-Annexed Arbitration, and Judicial Settlement Conferences (with E. Allan Lind, Robert MacCoun, Patricia Ebener, William L.F. Felstiner, Deborah R. Hensler, and Tom R. Tyler), The RAND Corporation, Institute for Civil Justice (1989)

Should Prisoners Be Classified by Sex?, in *Criminal Corrections: Ideals and Realities*, at 109-123 (J. Doig, ed., Mass: Lexington Books, Fall 1982)

Discrimination in Education, Chapter XXVIII in Dorsen, Bender, Neuborne, and Law, in *Political and Civil Rights in the United States*, at 107-173 (Little Brown, 1979, Supplement, 1981)

Prisoners of Their Sex: Health Problems of Incarcerated Women (with Nancy Shaw) in *Prisoners' Rights Sourcebook: Theory, Practice, and Litigation,* Vol. II, at 319-

413 (Ira Robbins, ed., N.Y.: Clark Boardman, 1980, reprinted in 3 *Prison Law Monitor* 57-58, March 1981)

Federal Prisoners' Access to Federal Courts: Jurisdiction and Related Procedural Matters, *Prisoners Rights*, at 85-158 (N.Y.: PLI, 1979)

*Undelivered Care*: The Incapacitated and the Mentally Ill New York City Defendant, A Report to the Mayor's Criminal Justice Coordinating Council (August 1973) (co-authored)

**Articles**

Constituting Security and Fairness: Reflecting on Charles Reich's Imagination and Impact, 129 *Yale Law Journal Forum* 707 (2020)

Inability to Pay: Court Debt Circa 2020 (with David Marcus), 98 *North Carolina Law Review* 361 (2020)

(Un)Constitutional Punishments: Eighth Amendment Silos, Penological Purposes, and People's "Ruin," 129 *Yale Law Journal Forum* 365 (2020)

Book Review: The Challenges of Engaging "The Art of Law: artistic representations and iconography of law and justice in context, from the middle ages to the first world war," in 7 *Comparative Legal History* 239 (2019)

Sentencing Inside Prisons: Efforts to Reduce Isolating Conditions (with Kristen Bell), 87 *University of Missouri Kansas City Law Review* 133 (2018)

A2J/A2K: Access to Justice, Access to Knowledge, Economic Inequalities, and Open Courts and Arbitrations, 96 *North Carolina Law Review* 605 (2018)

Reorienting the Process Due: Using Jurisdiction to Forge Post-Settlement Relationships Among Litigants, Courts, and the Public in Class and Other Aggregate Litigation, 92 *New York University Law Review* 1017 (2017)

"Vital" State Interests: From Representative Actions for Fair Labor Standards to Pooled Trusts, Class Actions, and MDLs in the Federal Courts, 165 *University of Pennsylvania Law Review* 1765 (2017)

Lawyers' Ethics Beyond the Vanishing Trial: Unrepresented Claimants, De Facto Aggregations, Arbitration Mandates, and Privatized Processes, 85 *Fordham Law Review* 1899 (2017)

Accommodations, Discounts, and Displacement: The Variability of Rights as a Norm of Federalism(s), 17 *Jus Politicum* 209 (2017)

"Within Its Jurisdiction": Moving Boundaries, People, and the Law of Migration, 160
*Proceedings of the American Philosophical Society* 117 (2016)

Revising Our "Common Intellectual Heritage": Federal and State Courts in Our Federal
System, 91 *Notre Dame Law Review* 1831 (2016)

Time-In-Cell: Isolation and Incarceration (with Sarah Baumgartel and Johanna Kalb),
125 *Yale Law Journal Forum* (2016);
http://www.yalelawjournal.org/forum/time-in-cell-isolation-and-incarceration

The Contingency of Openness in Courts: Changing the Experiences and Logics of
Publics' Role in Court-Based ADR, 15 *Nevada Law Journal* 1631 (2015)

Diffusing Disputes: The Public in the Private of Arbitration, the Private in Courts, and the
Erasure of Rights, 124 *Yale Law Journal* 2804 (2015); published in Portuguese in
*Grandes Temas do Novo CPC: Justiça Multiportas: Mediação, Conciliação,
Arbitragem e Outros Meios de Solução Adequada Para Conflitos* (DIDIER JR.,
Fredie; ZANETI JR., Hermes; CABRAL, Tricia Xavier Navarro eds., Salvador:
JusPodvim, 2016))

Reinventing Courts as Democratic Institutions, *Daedalus: Journal of the American
Academy of Arts and Sciences* 9 (Summer 2014)

The Privatization of Process: Requiem for and Celebration of the Federal Rules of Civil
Procedure at 75, 162 *University of Pennsylvania Law Review* 1793 (2014)

Inventing Democratic Courts: A New and Iconic Supreme Court (with Dennis E. Curtis),
38 *Journal of Supreme Court History* 207 (2013)

*Gideon* at Guantánamo: Democratic and Despotic Detention (with Hope Metcalf),
122 *Yale Law Journal* 2504 (2013)

Administrative Segregation, Degrees of Isolation, and Incarceration: A National
Overview of State and Federal Correctional Policies (with Hope Metcalf, Jamelia
Morgan, Samuel Oliker-Friedland, Julia Spiegel, Haran Tae, Alyssa Work, and
Brian Holbrook) (2013)

The Democracy in Courts: Jeremy Bentham, 'Publicity', and the Privatization of Process
in the Twenty-First Century, *NoFo* 10 (2013)

Globalization(s), privatization(s), constitutionalization and statization: Icons and
experiences of sovereignty in the 21st century, 11 *International Journal of
Constitutional Law (I·CON)* 162 (2013)

Equality's Frontiers: Courts Opening and Closing, 122 *Yale Law Journal*

*Online* 243 (2013)

Opening the Door: Ruth Bader Ginsburg, Law's Boundaries, and the Gender of Opportunities, 25 *Columbia Journal of Gender and Law* 81 (2013)

Constitutional Entitlements to and in Courts: Remedial Rights in an Age of Egalitarianism: The Childress Lecture, 56 *St. Louis University Law Journal* 916 (2012)

Comparative (In) equalities: CEDAW, the jurisdiction of gender, and the heterogeneity of transnational law production, 10 *International Journal of Constitutional Law (I·CON)* 531 (2012)

Building the Federal Judiciary (Literally and Legally): The Monuments of Chief Justices Taft, Warren, and Rehnquist, 87 *Indiana Law Journal* 823 (2012)

Re-Presenting Justice: Visual Narratives of Judgment and the Invention of Democratic Courts (with Dennis E. Curtis), 24 *Yale Journal of Law and the Humanities* 19 (2012)

Fairness in Numbers: A Comment on *AT&T v. Concepcion*, *Wal-Mart v. Dukes*, and *Turner v. Rogers,* 125 *Harvard Law Review* 78 (2011)

The Production and Reproduction of Constitutional Norms, 35 *New York University Review of Law & Social Change* 226 (2011)

Bring Back Bentham: "Open Courts," "Terror Trials," and Public Sphere(s), 5 *Law & Ethics of Human Rights* 226 (2011)

Compared to What?: ALI Aggregation and the Shifting Contours of Due Process and of Lawyers' Powers, 79 *George Washington Law Review* 628 (2011)

Reading Reinhardt: The Work of Constructing Legal Virtue (*Exempla Iustitiae*), 120 *Yale Law Journal* 539 (2010)

Kyoto at the Local Level: Federalism and Translocal Organizations of Government Actors (TOGAs) (with Joshua Civin and Joseph Frueh), 40 *Environmental Law Reporter* 10768 (2010)

Detention, The War on Terror, and the Federal Courts, 110 *Columbia Law Review* 579 (2010)

The Internationalism of American Federalism: Missouri *and* Holland (Earl F. Nelson Memorial Lecture), 73 *Missouri Law Review* 1105 (2009)

Courts: In and Out of Sight, Site, and Cite, 53 *Villanova Law Rev*iew 771 (2008)

Interdependent Federal Judiciar*ies*: Puzzling about Why and How to Value the
       Independence of Which Judges, *Daedalus* 28 (2008)

Ratifying Kyoto at the Local Level: Sovereigntism, Federalism, and Translocal
       Organizations of Government Actors (TOGAs) (with Joshua Civin and Joseph
       Frueh), 50 *Arizona Law Review* 709 (2008)

Lessons in Federalism from the 1960s Class Action Rule and the 2005 Class Action
       Fairness Act: "The Political Safeguards" of Aggregate Translocal Actions,
       156 *University of Pennsylvania Law Review* 1929 (2008)

Law as Affiliation: "Foreign" Law, Democratic Federalism, and the Sovereigntism of the
       Nation-State, 6 *International Journal of Constitutional Law (I·CON)* 33 (2008)

Foreign as Domestic Affairs: Rethinking Horizontal Federalism and Foreign
       Affairs Preemption in Light of Translocal Internationalism, 57 *Emory Law
       Journal* 31 (2007)

Representing Justice: From Renaissance Iconography to Twenty-First Century
       Courthouses (with Dennis E. Curtis), Henry la Barre Jayne Lecture, 151
       *Proceedings of the American Philosophical Society* 139 (2007)

Roscoe Pound Round-Table Discussion, in Conference of Chief Justices and Council on
       State Court Administrators Symposium, 82 *Indiana Law Journal* 1157 (2007)

No *Daubert* Hearing Necessary: The Extraordinary Expertise of Margaret Berger,
       16 *Journal of Law and Policy* 6 (2007)

Whither and Whether Adjudication?, 86 *Boston University Law Review* 1101 (2006)

Uncovering, Disclosing, and Discovering How the Public Dimensions of Court-
       Based Processes Are at Risk, 81 *Chicago-Kent Law Review* 521 (2006)

Responding to a Democratic Deficit: Limiting the Powers and the Term of the
       Chief Justice of the United States (with Lane Dilg), 154 *University of
       Pennsylvania Law Review* 1575 (2006)

Law's Migration: American Exceptionalism, Silent Dialogues, and Federalism's
       Multiple Ports of Entry, 115 *Yale Law Journal* 1564 (2006)

Living Their Legal Commitments: Paideic Communities, Courts and Robert Cover,
       17 *Yale Journal of Law & the Humanities* 17 (2005)

Procedure as Contract, 80 *Notre Dame Law Review* 593 (2005)

Judicial Selection and Democratic Theory: Demand, Supply, and Life Tenure,
     26 *Cardozo Law Review* 579 (2005)

Procedure's Projects, 23 *Civil Justice Quarterly* 273 (2004)

Migrating, Morphing, *and* Vanishing: The Empirical and Normative Puzzles of
     Declining Trial Rates in Courts, 3 *Journal of Empirical Legal Studies* 783 (2004)

Tribes, Wars, and the Federal Courts: Applying the Myths and the Methods of *Marbury*
     *v. Madison* to Tribal Courts' Criminal Jurisdiction, 36 *Arizona State Law*
     *Journal* 77 (2004)

The Independence of the Federal Judiciary, in Proceedings of the American Academy
     of Arts and Sciences, 17 *Bulletin* 22 (2004)

For Owen M. Fiss: Some Reflections on the Triumph and the Death of Adjudication,
     58 *University of Miami Law Review* 173 (2003)

A Continuous Body: Ongoing Conversations About Women and Legal Education,
     53 *Journal of Legal Education* 564 (2003)

Of Courts, Agencies, and the Court of Federal Claims: Fortunately Outliving One's
     Anomalous Character, 71 *George Washington Law Review* 798 (2003)

Adding Insult to Injury: Questioning the Role of Dignity in Conceptions of Sovereignty
     (with Julie Suk), 55 *Stanford Law Review* 1921 (2003)

Constricting Remedies: The Rehnquist Judiciary, Congress, and Federal Power,
     78 *Indiana Law Journal* 223 (2003)

Reconstructing Equality: Of Justice, Justicia, and the Gender of Jurisdiction,
     14 *Yale Journal of Law and Feminism* 393 (2002)

Mediating Preferences: Litigant Preferences for Process and Judicial Preferences for
     Settlement, 2002 *University of Missouri-Columbia Journal of Dispute*
     *Resolution* 155 (2002)

Teaching Billing: Metrics of Value in Law Firms and Law Schools (with Dennis E.
     Curtis), 54 *Stanford Law Review* 1409 (2002)

"Uncle Sam Modernizes His Justice": Inventing the Federal District Courts of the
     Twentieth Century for the District of Columbia and the Nation, 90 *Georgetown*
     *Law Journal* 607 (2002)

Remarks, Bicentennial Celebration for the Courts of the District of Columbia Circuit,
204 *Federal Rules of Decision* 499 (2002)

Grieving Criminal Defense Lawyers (with Dennis E. Curtis)*,* 70 *Fordham Law Review*
1615 (2002)

Engendering Democracy through Understanding Federal Family Law, 11 *The Good
Society* (A PEGS Journal) 79 (2002)

Tribute to Norman Dorsen, 58 *Annual Survey of American Law* 29 (2001)

Categorical Federalism: Jurisdiction, Gender, and the Globe, 111 *Yale Law
Journal* 619 (2001)

Procedure: Legal Aspects, 18 *International Encyclopedia of the Social & Behavioral
Sciences* (eds. Neil Smelser and Paul Baltes) 12136 (2001)

The Modernity of Judging: Judicial Independence and the 20th Century United States
Federal Courts, presented at The 1701 Conference, Vancouver, British Columbia,
Canada, May 9-11, 2001, on the 300th anniversary of the 1701 Act of Settlement

The Programmatic Judiciary: Lobbying, Judging, and Invalidating the Violence Against
Women Act, 74 *Southern California Law Review* 269 (2000)

Money Matters: Judicial Market Interventions Creating Subsidies and Awarding Fees and
Costs in Individual and Aggregate Litigation, 148 *University of Pennsylvania Law
Review* 2119 (2000)

Trial as Error, Jurisdiction as Injury: Transforming the Meaning of Article III,
113 *Harvard Law Review* 924 (2000)

Judicial Independence and Article III: Too Little and Too Much, 72 *Southern California
Law Review* 657 (1999)

Legal Services: Then and Now (with Emily Bazelon), 17 *Yale Law & Policy Review* 292
(1998)

The Federal Courts and Congress: Additional Sources, Alternative Texts, and Altered
Aspirations, 86 *Georgetown Law Journal* 2589 (1998)

"The Federal Courts": Constituting and Changing the Topic, 32 *University of Richmond
Law Review* 603 (1998)

On the Margin: Humanities and Law, 10 *Yale Journal of Law and the*

*Humanities* 413 (1998)

Contingency Fees in Mass Torts: Access, Risk and the Provision of Legal Services When Layers of Lawyers Work for Individuals and Collectives of Clients (with Dennis E. Curtis), 47 *DePaul Law Review* 425 (1998)

Changing Practices, Changing Rules: Judicial and Congressional Rulemaking in Civil Juries, Civil Justice, and Civil Judging, in a Symposium, Evaluation of the Civil Justice Reform Act, 49 *Alabama Law Review* 133 (1997); also published in Canadian Institute for the Administration of Justice, *The Administration of Justice in Commercial Disputes* 149 (1997)

Litigating and Settling Class Actions: The Prerequisites of Entry and Exit, 30 *U.C. Davis Law Review* 835 (1997)

Afterword: Federalism's Options, *Symposium Issue: Yale Law & Policy Review/Yale Journal on Regulation* 465 (1996)

Changing the Topic, 7 *The Australian Feminist Law Journal* 95 (1996); also published in 8 *Cardozo Studies in Law and Literature* 339 (Fall/Winter 1996)

Asking About Gender in Courts, 21 *Signs: Journal of Women in Culture and Society* 952 (Summer 1996)

Individuals Within the Aggregate: Relationships, Representation, and Fees (with Dennis E. Curtis and Deborah Hensler), 71 *New York University Law Review* 296 (1996)

History, Jurisdiction, and the Federal Courts: Changing Contexts, Selective Memories, and Limited Imagination, 98 *West Virginia Law Review* 171 (1995)

Sentencing Women, 8 *Federal Sentencing Reporter* 134 (1995)

Aggregation, Settlement, and Dismay, 80 *Cornell Law Review* 918 (1995)

Procedural Innovations, Sloshing Over: A Comment on Deborah Hensler, A Glass Half Full, a Glass Half Empty: The Use of Alternative Dispute Resolution in Mass Personal Injury Litigation, 73 *Texas Law Review* 1627 (1995)

Multiple Sovereignties: Indian Tribes, States, and the Federal Government, 79 *Judicature* 118 (1995)

Many Doors? Closing Doors? Alternative Dispute Resolution and Adjudication, 10 *Ohio State Journal on Dispute Resolution* 211 (1995)

Whose Judgment? Vacating Judgments, Preferences for Settlement, and the Role of Adjudication at the Close of the Twentieth Century, 41 *UCLA Law Review* 1471 (1994); also published by RAND, Institute for Civil Justice (1995).

National Courts: Imagining Alternatives to State and Federal Courts, *Southern California Law Review* 2 (Spring 1995)

Rereading "The Federal Courts:" Revising the Domain of Federal Courts Jurisprudence at the End of the Twentieth Century, 47 *Vanderbilt Law Review* 1021 (1994)

The Future of Civil Litigation: A Panel Discussion in Symposium, Reinventing Civil Litigation: Evaluating Proposals for Change, 59 *Brooklyn Law Review* 1199 (1994)

Ambivalence: The Resiliency of Legal Culture in the United States, 45 *Stanford Law Review* 1525 (1993)

Gender Bias: From Classes to Courts, 45 *Stanford Law Review* 2195 (1993)

Revising the Canon: Feminist Help in Teaching Procedure, Introduction to a Symposium, 61 *University of Cincinnati Law Review* 1181 (1993)

Hearing Women, 65 *Southern California Law Review* 1333 (1992)

"Naturally" Without Gender: Women, Jurisdiction, and the Federal Courts, 66 *New York University Law Review* 1682 (1991)

Visible on Women's Issues, 77 *Iowa Law Review* 41 (1991)

From "Cases" to "Litigation," 54 *Law and Contemporary Problems* 5 (1991); also published by RAND, Institute for Civil Justice (1991)

Housekeeping: The Nature and Allocation of Work in the Federal Trial Courts, 24 *Georgia Law Review* 909 (1990)

In the Eye of the Beholder: Tort Litigants' Evaluations of their Experiences in the Civil Justice System (with E. Allan Lind, Robert J. MacCoun, Patricia Ebener, William L.F. Felstiner, Deborah R. Hensler, and Tom R. Tyler), 24 *Law & Society Review* 953 (1990); related monograph, The Perception of Justice; also published by RAND, Institute for Civil Justice (1989)

Feminism and the Language of Judging, 22 *Arizona State Law Journal* 31 (1990)

Changing Criteria for Judging Judges, 84 *Northwestern University Law Review* 889 (1990)

19

Convergences: Law, Literature, and Feminism (with Carolyn Heilbrun), 99 *Yale Law Journal* 1913 (1990)

Constructing the Canon, 2 *Yale Journal of Law and the Humanities* 221 (Winter 1990)

Dependent Sovereigns: Indian Tribes, States, and the Federal Courts, 56 *University of Chicago Law Review* 671 (1989)

Complex Feminist Conversations, *University of Chicago Legal Forum* 1 (1989)

The Domain of Courts, 137 *University of Pennsylvania Law Review* 2219 (1989)

On the Bias: Feminist Reconsiderations of the Aspirations for Our Judges, 61 *Southern California Law Review* 1877 (1988)

The Limits of Parity in Prison, *13 Journal of the National Prison Project* 26 (1987)

Due Process: A Public Dimension, in Conference on Procedural Due Process: Liberty and Justice, 39 *University of Florida Law Review* 405 (1987)

Judging Consent, *University of Chicago Legal Forum* 43 (1987)

Images of Justice (with Dennis E. Curtis), 96 *Yale Law Journal* 1727 (1987)

Failing Faith: Adjudicatory Procedure in Decline, 53 *University of Chicago Law Review* 494 (1986); also published by RAND, Institute for Civil Justice (1986)

The Declining Faith in the Adversary System, 13 *Litigation* 3 (1986)

The Mythic Meaning of Article III Courts, 56 *University of Colorado Law Review* 581 (1985)

Precluding Appeals, 70 *Cornell Law Review* 603 (1985)

Managerial Judges: The Potential Costs, in Symposium, Law and Public Affairs, 45 *Public Administration Review* 686 (Special Issue, November 1985)

Tiers, 57 *Southern California Law Review* 837 (1984)

Commentaries on Prisoner Litigation, 9 *Justice System Journal* 347 (Winter 1984)

The Assumptions Remain, 23 *Judges' Journal* 37 (Fall 1984)

Managerial Judges and Court Delay: The Unproven Assumptions, 23 *Judges' Journal* 8 (Winter 1984)

Book Review of *The Brandeis/Frankfurter Connection*, 71 *California Law Review* 776 (1983)

Managerial Judges, 96 *Harvard Law Review* 374 (1982); also published by RAND, Institute for Civil Justice (1982)

Patients' Rights: Disclosure, Consent, and Capacity (with Nikki Heidepriem), 1973/1974 *Annual Survey of American Law* 87

## Selected Commentary in Newspapers, Magazines, and Journals

Protecting Prisoners in Pandemics Is a Constitutional Must**,** *Bloomberg.com*, March 30, 2020, https://news.bloomberglaw.com/health-law-and-business/insight-protecting-prisoners-in-pandemics-is-a-constitutional-must

Degrading strip search of 200 women prisoners cries out for courts to act, *CNN.com*, October 3, 2019, https://www.cnn.com/2019/10/03/opinions/women-prisoners-have-rights-resnik/index.html

This Question Changed the Face of the Supreme Court, *CNN.com*, September 25, 2018; http://www.cnn.com/2018/09/25/opinions/anita-hill-patsy-mink-changed-how-we-see-kavanaugh-judith-resnik/index.html

The Supreme Court's Arbitration Ruling Undercuts the Court System, *HuffPost,* May 25, 2018; https://www.huffingtonpost.com/entry/opinion-resnik-forced-arbitration_us_5b08395ae4b0802d69caeb47?1s

To Help #MeToo Stick, End Mandatory Arbitration, *HuffPost*, January 23, 2018; https://www.huffingtonpost.com/entry/opinion-resnik-mandatory-arbitration_us_5a65fc39e4b0e5630071c15d?g9r

Arbitration Cuts the Public Out and Limits Redress, *National Law Journal*, August 22, 2016; http://www.nationallawjournal.com/id=1202765654457/Arbitration-Cuts-the-Public-Out-and-Limits-Redress?slreturn=20160914112502

With One Decision, Obama and Lynch Could Reshape the Criminal Justice System (with Robert Ferguson and Margo Schlanger), *The Washington Post* online*,* August 3, 2015; https://www.washingtonpost.com/posteverything/wp/2015/08/03/with-one-decision-obama-could-totally-reform-the-criminal-justice-system/

No Fast Track for Unfair Trade Deals (with Amy Kapczynski), *HuffPost Politics,* June 11, 2015; http://www.huffingtonpost.com/amy-kapczynski/tpp-isds-no-fast-track-for-unfair-trade-deals_b_7562084.html?1434041001

Can Less Confidentiality Mean More Fairness in Campus Sexual Assault Cases? (with
Alexandra Brodsky and Claire Simonich), *The Nation,* February 23, 2015;
http://www.thenation.com/article/198713/can-less-confidentiality-mean-more-
fairness-campus-sexual-assault-investigations

Renting Judges for Secret Rulings, *The New York Times*, February 28, 2014;
http://www.nytimes.com/2014/03/01/opinion/renting-judges-for-secret-
rulings.html?ref=todayspaper

The Return of the Terrible Plan to Ship Female Inmates from the Northeast to Alabama,
*Slate*, October 4, 2013;
http://www.slate.com/blogs/xx_factor/2013/10/04/female_inmates_in_federal_pri
son_must_give_up_their_beds_to_men_and_move.html

Keep Female Prisoners Close to Family (with Nancy Gertner), *The Boston Globe*,
September 3, 2013; http://www.bostonglobe.com/opinion/2013/09/03/keep-
female-prisoners-close-family/eQf4dCawmOGmQ41Ap53GxL/story.html

Harder Time: Why are the federal prison beds for women in the Northeast going to
men—while the women get shipped to Alabama?, *Slate*, July 25, 2013;
http://www.slate.com/articles/news_and_politics/jurisprudence/2013/07/women_i
n_federal_prison_are_being_shipped_from_danbury_to_aliceville.html

How "Robust" is Appellate Review of Courts-Martial? (with Eugene R. Fidell, Elizabeth
L. Hillman, Dwight H. Sullivan, Stephen A. Saltzburg and Kate Stith) (2013),
*Balkinization*; http://balkin.blogspot.com/2013/05/how-robust-is-appellate-
review-of.html

Abolish the Death Penalty and Supermax, Too: Updating the Ban Against Cruel and
Unusual Punishment (with Jonathan Curtis-Resnik), *Slate,* June 18, 2012;
http://www.slate.com/authors.judith_resnik_and_jonathan_curtisresnik.html

War, Terror, and the Federal Courts, Ten Years After 9/11 – Conference (a discussion
with Judge Brett Kavanaugh, Martin Lederman, Sarah Cleveland, Curt Bradley,
and Stephen Vladeck), from the 2012 Annual Meeting of the Association of
American Law Schools, 61 *American University Law Review* 1253 (2012)

A Collective Collage: Women, the Structure of American Legal Education, and
Histories Yet to be Written (with Dennis E. Curtis), 80 *University of Missouri
Kansas City Law Review* 737 (2012)

The Changing Face of Justice: The Visual Vocabulary of Courts is a Transnational
Symbol of Government (with Dennis E. Curtis), *The Guardian*, March 24, 2011;
http://www.guardian.co.uk/law/2011/mar/24/changing-face-justice-judith-resnik

Designing Justice (with Dennis E. Curtis), *Los Angeles Daily Journal,* January 21, 2011.
What Does Justice Look Like? (with Dennis E. Curtis), *Slate*, January 21, 2011;
http://www.slate.com/id/2281277/

From Fool's Blindfold to the Veil of Ignorance (with Dennis E. Curtis), *Yale Law Report*
(Winter 2011)

Object Lesson: On and Off Her Pedestal (with Dennis E. Curtis), *Yale Alumni Magazine*
(November/December 2010)

Citizenship for the 21st Century: A Conversation with Seyla Benhabib and Judith Resnik,
38 *Women Studies Quarterly* 271 (Spring/Summer 2010)

Drafting, Lobbying, and Litigating VAWA: National, Local, and Transnational
Interventions on Behalf of Women's Equality, 11 *Georgetown Journal of Gender
and the Law* 557 (2010)

Open the Door and Turn on the Lights, *Slate*, May 21, 2010;
http://www.slate.com/id/2253500/

Judicial Independence, Panel Discussion, Sandra Day O'Connor, Linda Greenhouse,
Judith Resnik, Bert Brandenburg, and Viet D. Dinh, *Bulletin of the American
Academy* 29 – 56 (Winter 2009)

There's a New Lawyer in Town (with Emily Bazelon), *Slate*, February 9, 2009;
http://www.slate.com/id/2210637/

Revival of Justice, *Slate*, January 6, 2009; http://www.slate.com/id/2208017/

Translocal Transnationalism: Foreign and Domestic Affairs, 102 *American Society of
International Law Proceedings* 214 (2008)

Sitting on Great Judges (with Emily Bazelon), *Slate*, December 19, 2008;
http://www.slate.com/id/2207071/

The Return of Regency (with Allison Tait), *The XX Factor*, September 11, 2008, guest
post; http://www.slate.com/blogs/blogs/xxfactor/archive/2008/09/11/the-return-
of-regency.aspx

Courts and Democracy: The Production and Reproduction of Constitutional Conflict in
The Courts and Social Policy in the United States (Oxford: Foundation for Law,
Justice and Society, 2008);
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1148202

Moving American Mores: From Women's Education to Torture, 36 *Women Studies Quarterly* 339 (Spring/Summer 2008)

When the Justice Department Played Defense, *Slate*, October 27, 2006; http://www.slate.com/id/2152211/

Borders, Law, and Doors – Opening, Bryn Maw College Convocation, May 2006

Opening the Door: Court Stripping: Unconscionable and Unconstitutional? *Slate*, February 1, 2006; http://www.slate.com/articles/news_and_politics/jurisprudence/2006/02/opening_the_door.html

So Long: Changing the Judicial Pension System Could Keep Judges from Staying on the Bench for Too Many Years, July/August *Legal Affairs* 20 (2005)

One Robe, Two Hats (with Theodore Ruger), *New York Times,* Op-Ed, Section 4 at 13, July 17, 2005

Looking Back, Looking Forward: One Hundred Years, Concluding Remarks in Women Faculty Forum, *Gender Matters: Women and Yale in its Third Century* (2004)

The Courts, the Legislature, and the Executive: Separate and Equal? Issues at the Federal Level, 87 *Judicature* 220 (2004)

Judicial Selection, Independent Jurists, and Life-Tenure (2004); http://www.jurist.org/forum/symposium-jc/resnik.php

At Home and Work, Still a Man's World, Commentary (with Emily Bazelon), *Los Angeles Times*, January 2, 2004

Engendering Equality: A View from the United States, 35 *The European Lawyer* 21, (February 2004)

Supermajority Rule, *New York Times*, Op-Ed, Section A at 31, June 11, 2003

**Testimony**

Statement submitted for the record, Women in Prison: Seeking Justice Behind Bars, before the U.S. Commission on Civil Rights, March 22, 2019, U.S. Commission on Civil Rights, *Women in Prison: Seeking Justice Behind Bars* (February 2020), available at https://www.usccr.gov/pubs/2020/02-26-Women-in-Prison.pdf

Comments submitted on Proposed Changes to Code of Conduct for U.S. Judges and Judicial Conduct and Disability Rules (with Abbe R. Gluck), submitted to the

Judicial Conference committees on Codes of Conduct and Judicial Conduct and Disability, November 13, 2018

Comments submitted for the Telephonic Hearing on Proposed Amendments to the Federal Rules of Civil Procedure before the Advisory Committee on Civil Rule of the Judicial Conference of the United States, February 16, 2017

Statement submitted for the record, Women in Detention: The Need for National Reform, Charles Colson Task Force on Federal Corrections Public Hearing, Washington, D.C., March 11, 2015

Statement submitted for the record, Women in Detention: The Need for a National Agenda, Hearing before the Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights, December 9, 2014

The Policies Governing Isolation in U.S. Prisons, Statement submitted for the Hearing before the Senate Judiciary Subcommittee on the Constitution, Civil Rights and Human Rights, Reassessing Solitary Confinement II: The Human Rights, Fiscal and Public Safety Consequences, February 25, 2014; http://www.law.yale.edu/documents/pdf/Liman/Liman_Senate_Statement_Reasse ssing_Solitary_Confinement--_Resnik_Metcalf_--_final_Feb_28_2014.pdf

Statement submitted for the record, Oversight of the Bureau of Prisons and Cost-Effective Strategies for Reducing Recidivism, Hearing before the Senate Judiciary Committee, U.S. Senate, November 13, 2013; http://www.law.yale.edu/documents/pdf/Liman/Senate_Judiciary_Committee_BO P_Oversight_Hearing_Liman_Statement_for_the_Record_

Statement submitted for the record, Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety Consequences, Hearing before the Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights, U.S. Senate, June 19, 2012

Courtroom Use: Access to Justice, Effective Judicial Administration and Courtroom Security, Hearing before the Subcommittee on Courts and Competition Policy of the United States Committee on the Judiciary, U.S. House of Representatives, September 24, 2010

Statement submitted for the record, Recommendations on Courthouse Construction, Courtroom Sharing and Enforcing Congressionally Authorized Limits on Size and Cost, Hearing before the Subcommittee on Economic Development, Public Buildings and Emergency Management Committee on Transportation and Infrastructure, U.S. House of Representatives, May 21, 2010

Statement submitted for the record, Sunshine in Litigation Act: Does Court Secrecy Undermine Public Health and Safety, Hearing before the Subcommittee on Antitrust, Competition Policy and Consumer Rights of the Committee on the Judiciary, 110th Cong. 181, December 11, 2007

Hearings on the Judicial Nomination of John G. Roberts, Jr., to be Chief Justice of the United States, held by the Committee on the Judiciary of the United States Senate, Washington, D.C., September 15, 2005

Hearings on the Judicial Selection before the Standing Committee on Justice, Human Rights, Public Safety and Emergency Preparedness, held by the House of Commons, Ottawa, Canada, April 20, 2004

Hearings on the Proposed Amendments to Federal Rule of Civil Procedure 23, held by the Committee on Rules of Practice and Procedure, Judicial Conference of the United States, January 2002

Hearings on the Senate's Role in the Nomination and Confirmation Process: Whose Burden?, held by the Senate Committee on the Judiciary, Subcommittee on Administrative Oversight and the Courts, 107th Cong. , September 4, 2001, also published in 50 *Drake Law Review* 539 (2001-02)

Hearings on the Proposed Amendment to Federal Rule of Civil Procedure 23, held by the Committee on the Rules of Practice and Procedure, Advisory Committee to the Standing Committee on the Rules of Practice and Procedure of the United States Judicial Conference, November 1996

Hearings on the Proposed Long Range Plan of the Judicial Conference of the United States, held by the Committee on Long Range Planning, December 16, 1994

Hearings on the Proposed Changes in the Federal Rules of Civil Procedure, held by the Standing Committee on Rules of Practice and Procedure of the United States Judicial Conference, November 1991

Hearings on the Tentative Report of the Federal Courts Study Committee, held by members of the Committee, San Diego, California, January 29, 1990

Hearings on the Proposed Amendments to Rule 63 of the Federal Rules of Civil Procedure, held by the Advisory Committee to the Standing Committee on the Rules of Practice and Procedure of the United States Judicial Conference, January 1990

Hearings on the Confirmation of Robert H. Bork to be an Associate Justice of the United States Supreme Court, held by the Committee on the Judiciary, United States Senate, September 25, 1987

Hearings on Proposed Amendments to Rule 52(a) of the Federal Rules of Civil
Procedure, held by the Subcommittee on Criminal Justice of the Judiciary
Committee of the U.S. House of Representatives, June 26, 1985

Hearings on Proposed Amendments to Rule 68 of the Federal Rules of Civil Procedure,
held by the Advisory Committee to the Standing Committee on the Rules of
Practice and Procedure of the United States Judicial Conference, 1985

Hearings on Proposals to Amend the Rules Governing Section 2254 Cases in the United
States District Courts, and Rules Governing Section 2255 Proceedings in the
United States District Courts, held by the Advisory Committee to the Standing
Committee on the Rules of Practice and Procedure of the United States Judicial
Conference, 1984

Female Offender: 1979-80, Part 1: Hearings before the Subcommittee on Courts, Civil
Liberties, and Administration of Justice of the House Committee. on Judiciary,
96th Cong. 59, October 11, 1979

Drug Abuse Treatment: Part 2: Hearings before the Select Committee on Narcotics
Abuse and Control, House of Representatives, 96th Cong., July 25, 1978

**Honors and Awards**

Andrew Carnegie Fellowship, 2018-2020

Honorary Doctorate of Laws, University College London, 2018

Visiting Scholar, Max Planck Institute for Procedural Law, Luxembourg, February 2018

Establishment of the Resnik-Curtis Fellowship in Public Interest Law on the 20th
anniversary of the Liman Program at Yale, 2017

Visiting Scholar, Phi Beta Kappa, 2014-2016

Recipient, Arabella Babb Mansfield Award, National Association of Women Lawyers,
July 2013

*Representing Justice: Invention, Controversy, and Rights in City-States and Democratic
Courtrooms* (with Dennis E. Curtis)
Selected as one of the "Best legal reads of 2011" by The Guardian
Recipient, SCRIBES Award from the American Society of Legal Writers, 2012
Recipient, PROSE Award, Excellence in Social Sciences, 2012
PROSE Award, Excellence in Law & Legal Studies, 2012

Selected as an Outstanding Academic Title of the Year by Choice Magazine, January 2012
Recipient, The Order of the Coif Biennial Book Award, January 2014

New York University Alumna of the Month Award, June 2012, http://www.law.nyu.edu/alumni/almo/pastalmos/2011-12almos/judithresnikjune

Elizabeth Hurlock Beckman Award, Awarded to Outstanding Faculty in Higher Education in the Fields of Psychology or Law, Columbia University, March 2011

*Migrations and Mobilities: Citizenship, Borders, and Gender*, Selected as an Outstanding Academic Title of the Year by Choice Magazine, January 2011

Outstanding Scholar of the Year Award 2008, from the Fellows of the American Bar Foundation

Oral History, 2007, Women Trailblazers in the Law Project, American Bar Association Commission on Women in the Profession, deposited in the Library of Congress, 2009

Convocation Speaker, Bryn Mawr College Commencement, May 2006

Member, American Philosophical Society, elected Spring 2002

Fellow, American Academy of Arts and Sciences, elected Spring 2001

Recipient, Margaret Brent Women Lawyers of Achievement Award, American Bar Association Commission on Women in the Profession, August 1998

Recipient, NYU School of Law, Legal Teaching Award, Spring 1995

Recipient, USC Associates Award for Creativity in Research, Spring 1994

Recipient, Florence K. Murray Award, National Association of Women Judges, Fall 1993

Recipient, "Big Splash Award" from the Program of Women and Men in Society (SWMS), University of Southern California, 1992

Member, Phi Kappa Phi, elected by the USC Chapter, 1991

University Scholar, University of Southern California, 1982-1983

Recipient, Student Bar Association Outstanding Faculty Award, University of Southern California Law Center, 1982-1983

Arthur Garfield Hays Fellow, 1974-1975, New York University

**Education**
    Bryn Mawr College, B.A., cum laude, 1972
    New York University School of Law, J.D., cum laude, 1975

**Bar Memberships**
    Connecticut
        United States District Courts: District of Connecticut, Southern District of New York, Eastern District of New York
        United States Court of Appeals for the First, Second, Third, Fourth, Ninth and Eleventh Circuits
        United States Supreme Court

**Selected Litigation**
    *United States Supreme Court*
        Of counsel on Brief of Amici Curiae, Law Professors in Support of Petitioners (No. 18-622), on Petition for a Writ of Certiorari to the United States Court of Appeals for the Fifth Circuit, Whole Woman's Health, et. al. v. Texas Catholic Conference of Bishops (2018) (on the question of standing)

        Of counsel on Brief of Amici Curiae, Former Judges, Former Prosecutors, Former Government Officials, Law Professors, and Social Scientists in Support of Respondents (No. 17-312), United States of America v. Sanchez-Gomez 138 S.Ct. 1532 (2018) (on the use of shackles for defendants in federal court)

        Of counsel on Brief of Amici Curiae, Professors of Federal Courts Jurisprudence, Constitutional Law, and Immigration Law in Support of Respondents (Nos. 16-1436 and 16-1540), Donald J. Trump, et al. v. International Refugee Assistance Project, et al, Donald J. Trump, et al. v. State of Hawaii, et al. (2017), 138 S.Ct. 2392 (2018) (on travel bans)

        Of counsel on Brief of Amici Curiae, Constitutional Law, Federal Courts, Citizenship, and Remedies Scholars in Support of Respondent Luis Ramon Morales-Santana (No. 15-1191), Lynch v. Morales-Santana, 136 S.Ct. 2545 (2016) (on citizenship and gender)

        Oral Argument and brief presented on behalf of the Respondent Norman Carpenter in Mohawk Industries, Inc. v. Carpenter (No. 08-678, 2009 WL 3169419) (argued October 5), 558 U.S. 100 (2009) (on appealability)

        Of counsel on Brief of Law Professors as Amici Curiae, in Support of Respondent Jacob Denedo (No. 08-267, 2009 WL 418793), United States v. Denedo, 556 U.S. 904 (2009) (on jurisdiction)

Of counsel on Brief of Amici Curiae Professors of Constitutional Law and of Federal
Jurisdiction, in Support of Petitioner Keith Haywood (No. 07-10374), Haywood
v. Drown, 556 U.S. 729 (2009) (on state law and Section 1983)

Of counsel on Brief of Amici Curiae Professors of Constitutional Law and of the
Federal Courts, in Support of the Habeas Petitioners Omar and Munaf (Nos. 07-
394, 06-1666), Munaf v. Geren, 553 U.S. 674 (2008) (on the scope of habeas
corpus)

Of counsel on Brief of Professors of Constitutional Law and of the Federal
Jurisdiction as Amici Curiae, in Support of Petitioners Boumediene et al. (Nos.
06-394, 06-1196), Boumediene v. Bush, 553 U.S. 723 (2008) (on the scope of
habeas corpus)

Brief of Amici Curiae Norman Dorsen, Frank Michelman, Burt Neuborne, Judith Resnik,
and David Shapiro, in Support of Petitioner Salim Ahmed Hamdan (No. 05-184),
Hamdan v. Rumsfeld, 548 U.S. 557 (2006) (on due process)

Brief of Amici Curiae of Law Professors in Support of Petitioner Paula Jones (No. 95-
1853, 1996 WL48092), Clinton v. Jones, 520 U.S. 681 (1997) (on immunity)

Oral Argument presented on behalf of the Rotary Club of Duarte:
Board of Directors of Rotary International v. Rotary Club of Duarte,
481 U.S. 537 (1987) (on California public accommodations law and
associational rights under the First Amendment)

*United States Courts of Appeals*

Brief of Amici Curiae, Scholars of the Law of Prisons, the Constitution, and the Federal
Courts in Support of the Appellants (No. 16-4234), Delores Henry, et al., v. Melody
Hulett, et al. (7th Cir, rehearing en banc pending, 2020) (on constitutional rights in
prison)

Brief of Amici Curiae of Constitutional Law and Procedure Scholars Judith Resnik and
Brian Soucek in Support of Petitioner (No. 16-73801), submitted for the hearing
en banc, C.J.L.G. v. Jefferson B. Sessions III (9th Cir., , 880 F.3d 1122 (2019) (on
due process, right to counsel, and immigrant children)

Of counsel on Brief of Amici Curiae, Professors of Federal Courts Jurisprudence,
Constitutional Law, and Immigration Law in Support of Plaintiffs-Appellees, (No.
17-17168), Ninth Circuit, State of Hawaii, et al., v. Donald Trump (2017) (on
travel bans)

Of counsel on Brief of Amici Curiae, Professors of Federal Courts Jurisprudence,
Constitutional Law, and Immigration Law in Support of Plaintiffs-Appellees, (No.

17-2231 (L), 17-2232, 17-2233, 17-2240 (Consolidated)), Fourth Circuit, International Refugee Assistance Project, et al., Iranian Alliances Across Borders, et al., Eblal Zakzok, et al., v. Donald Trump (2017) (on travel bans)

Of counsel on Brief of Amici Curiae, Constitutional Law Professors in Support of Appellees and Affirmance (No. 17-1351), International Refugee Assistance Project et al. v. Donald J. Trump, et. al. (4th Cir. 2017) (on travel bans)

Appellate Counsel
In re San Juan Dupont Plaza Hotel Fire Litigation, 111 F.3d 220 (1st Cir. 1997) (on awards of fees and costs in a mass tort multi-district litigation)

In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litigation, 56 F.3d 295 (1st Cir.1995)

In re Nineteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litigation, 982 F.2d 603 (1st Cir. 1992)

*United States District Court*
Declaration Regarding Provisional Remedies for Detained Individuals, Money v. Jeffries (N.D. Ill., Eastern Division, No. 20 cv 2-14, filed April 8, 2020)

Of Counsel on Motion for Leave to File Declaration of Correctional Expert Rick Raemisch as Amicus Curiae, Savino et al. v. Hodgson et al. (D. Mass., No. 1:20-cv-10617-WGY, granted March 31, 2020) (to provide the court and parties with expert information)

Of Counsel on Unopposed Motion for Leave to File Amicus Curiae Statement of Correctional Expert Rick Raemisch, Coleman v. Newson (E.D. Cal, No. 2:90-CV-00520-KJM-DB 2020), Plata v. Newsom (No. C01-1351 JST, N.D. Cal., granted April 2, 2020) (to provide the court and parties with expert information)

Court-appointed trustee in re: MDL-926 Global Breast Implant Settlement, 173 F.Supp.2d 1381 (Judicial Panel on Multidistrict Litigation, N.D. Alabama, N.D. Texas, 1994) (overseeing the court-created "common benefit fund")

Expert appointed by the district court to assist the Special Master in McLendon v. Continental Group, Inc., 802 F.Supp. 1216 (D.N.J. 1992) (assisting the court in relationship to a settlement in an ERISA class action)

**Exhibits, Co-Curator**
*The Remarkable Run of a Political Icon: Justice as a Sign of the Law*. Rare Book Exhibition Gallery, Lillian Goldman Law Library, Yale Law School, September–December 2011 (with Dennis E. Curtis, Allison Tait & Michael Widener); http://library.law.yale.edu/justice-sign-law-exhibit

> *Courts: Representing and Contesting Ideologies of the Public Sphere*. Yale Art Gallery, Study Galleries, January – May 2011 (with Dennis E. Curtis)

**Selected Media**

> Interview, Women, Judging, Equality, and Constitutional Law, RAI Storia (Italian television) – *La Corte Costituzionale e le Donne, Pt. 6*, January 2020, https://vimeo.com/377835690

> Interview, WNPR – Connecticut Public Radio's *Where We Live*, presented by John Dankosky, August 5, 2013; http://wnpr.org/post/connecticuts-criminal-justice-system

> Interview, BBC Radio 4's *Law in Action,* presented by Joshua Rozenberg, March 12, 2013; http://www.bbc.co.uk/programmes/b01r5ln5

> Cameo in *Fair Game,* directed by Doug Liman, Fall 2010, and panel moderator, discussion of the film with Valerie Plame, Joseph Wilson, Emily Bazelon and Doug Liman, Paris Theatre, New York City, October 5, 2010

# EXHIBIT 10

## DECLARATION OF JIMMY THREATT

I, Jimmy Threatt, declare as follows:

1.     I am an active member of the Bar of the State of California and an associate with Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, a professional corporation, attorneys of record for Petitioners in this action.  Except for those matters stated on information and belief, I make this declaration based upon personal knowledge and, if called upon to do so, I could and would so testify.

2.     I have attempted to arrange legal calls with eight prisoners incarcerated at FCI Lompoc and USP Lompoc who had been identified to my firm by their family members and friends as seeking our representation in this action.  I have not spoken with any of them.  Although several calls were initially scheduled, they were each abruptly cancelled by the Bureau of Prisons ("BOP").  As of now, there are no legal calls scheduled with any of the eight prisoners.  Attached as **Exhibit A** is a compilation of true and correct copies of my email correspondence with BOP employees.

3.     On May 12, 2020, I called the main desks of FCI Lompoc and USP Lompoc to schedule legal calls with prisoners.  No one answered and I was not granted opportunities to leave voice messages.

4.     On May 12,  2020, I emailed the publicly listed address for FCI Lompoc and USP Lompoc to schedule legal calls with the following four prisoners: (1) Lonnie Ben, No. 69141-051; (2) Yonnedil Carror Torres, No. 41928-69; (3) Andre Brown, No. 54460-097; and (4) Kanagasabai Kanakeswaran, No. 75139-112.  That same day I received responses asking about the urgency of each call.  I immediately responded that each call was urgent, I would abide by any time limits, and I could make myself available at any time for the calls in question.

5.     The next day, May 13, I received email responses indicating that due to "lack of information regarding the urgency" of my request to speak with each prisoner, the matters were being referred to the BOP Legal Department.

3649734.2

1   I immediately responded to indicate that, while I would not divulge privileged

2   information, the calls concerned release options in light of the COVID-19 crisis.

3   That same day, I also submitted requests for legal calls with prisoners (1) Vincent

4   Reed, No. 27173-016, and (2) Vazgen Terpogosyan, No. 77271-112.

5       6.      Later on May 13, I received a call from Jennifer Merkle, an attorney

6   with the BOP Legal Department, informing me that a call had been approved with

7   Lonnie Ben.

8       7.      At 12:18 A.M. on May 14, I emailed the address for Lompoc to request

9   a legal call with Felix Samuel Garcia, No 46693-298.  I have not received

10  a response.

11      8.      At 12:21 A.M. on May 14, I emailed the address for Lompoc to request

12  a legal call with Shawn Fears, No 34183-060.  I have not received a response.

13      9.      Later on May 14, I received email responses indicating that requests for

14  calls with the following prisoners had been approved: (1) Lonnie Ben, (2) Yonnedil

15  Carror Torres, (3) Andre Brown, (4) Kanagasabai Kanakeswaran, (5) Vincent Reed,

16  and (6) Vazgen Terpogosyan.  I have not heard anything regarding prisoners Brown

17  or Reed since.

18      10.     Shortly thereafter, I received an additional email scheduling a legal call

19  with Yonnedil Carror Torres for 9:00 A.M. on May 19.  As to my other outstanding

20  requests for legal calls, the officer could not "tell me when they [the prisoners] will

21  be afforded the legal call."  Later that afternoon, the officer cancelled the call with

22  Torres that had been scheduled just hours earlier:  "Per our legal department, I am

23  going to cancel the scheduled legal call [with] the above client [Torres]."

24      11.     Also on May 14, an officer called to schedule my call with prisoner

25  Lonnie Ben for 1:00 P.M. later that same day.  When I called FCI Lompoc at

26  1:00 P.M., I was told that the call had been cancelled and that it would be

27  rescheduled but was not given any other details.

28      12.     I received another call on May 14 scheduling calls for the following

3649734.2

2

DECLARATION OF JIMMY THREATT

morning, May 15, with prisoners (1) Kanagasabai Kanakeswaran and (2) Vazgen Terpogosyan.  But shortly later, the same officer called to cancel both because "something came up."

13.     At 1:04 P.M. on May 14, I received  an email from Jennifer Merkle, an attorney with BOP, informing me that she had been referred thirteen of my requests to speak with prisoners, which would include all of my requests to speak with prisoners at FCI Lompoc, USP Lompoc, and FCI Terminal Island.  She stated she would need to assess every request individually and would be in touch as to each separately.

14.     As I was finalizing this declaration on May 15, I received a second email from Ms. Merkle, asking me to call her so that she and I could "identify [my] specific needs."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I executed this declaration on May 15, 2020, at Los Angeles, California.

_____
Jimmy Threatt

# EXHIBIT A

| **From:** | Jimmy Threatt |
|---|---|
| **Sent:** | Tuesday, May 12, 2020 12:16 PM |
| **To:** | LOX/ExecAssistant@bop.gov |
| **Cc:** | Christopher J. Lee; Naeun Rim |
| **Subject:** | Legal Call with Inmate at FCI Lompoc |

| **Importance:** | High |
|---|---|

My firm is counsel for Lonnie Ben (Inmate No. 69141-051).  We are trying to schedule a call to discuss an urgent legal matter with him.  We called the facility this morning, but no one is answering the phone.

We would appreciate any assistance you can provide.  You can reach me at this email address or on my cell phone, 650-384-5319.  If I am unavailable, you can also reach my colleagues (copied here): Christopher Lee at 617-631-2122 and Naeun Rim at 678-492-6707.

Thank you.


**Jimmy Threatt**
*Associate*
T: 310.201.2100
F: 310.201.2110
E: jthreatt@birdmarella.com
**Bird, Marella, Boxer, Wolpert, Nessim,**
**Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
**www.BirdMarella.com**

| | |
|---|---|
| **From:** | Jimmy Threatt |
| **Sent:** | Thursday, May 14, 2020 12:19 AM |
| **To:** | LOX/ExecAssistant@bop.gov |
| **Cc:** | Christopher J. Lee; Naeun Rim |
| **Subject:** | Legal Call with Inmate at USP Lompoc |

I am writing to schedule a legal call with Felix Samuel Garcia (Inmate No. 46693-298).  This is a legal call regarding release options given the COVID crisis, and is urgent given that crisis.

We would appreciate any assistance you can provide.  You can reach me at this email address or on my cell phone, 650-384-5319.  If I am unavailable, you can also reach my colleagues (copied here): Christopher Lee at 617-631-2122 and Naeun Rim at 678-492-6707.

Thank you.


**Jimmy Threatt**
*Associate*
T: 310.201.2100
F: 310.201.2110
E: jthreatt@birdmarella.com
**Bird, Marella, Boxer, Wolpert, Nessim,**
**Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
**www.BirdMarella.com**

**From:**          Jimmy Threatt
**Sent:**          Thursday, May 14, 2020 12:21 AM
**To:**            'LOX/ExecAssistant@bop.gov'
**Cc:**            Christopher J. Lee; Naeun Rim
**Subject:**       Legal Call with Inmate at USP Lompoc


I am writing to schedule a legal call with Shawn Fears (Inmate No. 34183-060).  This is a legal call regarding release options given the COVID crisis, and is urgent given that crisis.

We would appreciate any assistance you can provide.  You can reach me at this email address or on my cell phone, 650-384-5319.  If I am unavailable, you can also reach my colleagues (copied here): Christopher Lee at 617-631-2122 and Naeun Rim at 678-492-6707.

Thank you.


**Jimmy Threatt**
*Associate*
T: 310.201.2100
F: 310.201.2110
E: jthreatt@birdmarella.com
**Bird, Marella, Boxer, Wolpert, Nessim,**
**Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
**www.BirdMarella.com**

| | |
|---|---|
| **From:** | LOX/Legal Svcs~ <LOX/LegalSvcs~@bop.gov> |
| **Sent:** | Thursday, May 14, 2020 7:58 AM |
| **To:** | Jimmy Threatt |
| **Subject:** | RE: Request Legal Call with BEN #69141-051 (LOF) |

After speaking with our BOP Attorney, a 15 minute legal call has been
approved for you and your client.

A Unit Team member will be contacting you in the near future to set up a
legal call.

Thank you for your patience and understanding during this challenging
time.

Ms. Morales

>>> On 5/13/2020 at 1:30 PM, Jimmy Threatt <jthreatt@birdmarella.com> wrote:

This is a legal call regarding release options given the COVID crisis, and is urgent given that crisis.

**Jimmy Threatt**
*Associate*
T: 310.201.2100
F: 310.201.2110
E: jthreatt@birdmarella.com
**Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
**www.BirdMarella.com**

**From:** LOX/Legal Svcs~ <LOX/LegalSvcs~@bop.gov>
**Sent:** Wednesday, May 13, 2020 12:57 PM
**To:** Jimmy Threatt <jthreatt@birdmarella.com>
**Subject:** RE: Request Legal Call with BEN #69141-051 (LOF)

Due to lack of information regarding the urgency of your request, your request is being sent to the BOP Legal Office
for further review and approval.  Please be advised this may delay your request for a Legal Call.

>>> On 5/12/2020 at 2:15 PM, Jimmy Threatt <jthreatt@birdmarella.com> wrote:

Thank you, Ms. Morales.  To respond to your questions:

1

1) The matter is urgent and we need to speak with Lonnie Ben as soon as possible.  It cannot wait until the facility comes off the enhanced mitigation measures.

2) We do have wide windows of availability; we can make any time work.

3) We understand and will respect the 15 minute time limit.

As a reminder, I can be reached at 650-384-5319, and my colleagues can also be reached on their cell phones (Christopher Lee at 617-631-2122 and Naeun Rim at 678-492-6707).

**Jimmy Threatt**
*Associate*
T: 310.201.2100
F: 310.201.2110
E: jthreatt@birdmarella.com
**Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
**www.BirdMarella.com**

---

**From:** LOX/Legal Svcs~ <LOX/LegalSvcs~@bop.gov>
**Sent:** Tuesday, May 12, 2020 1:42 PM
**To:** Jimmy Threatt <jthreatt@birdmarella.com>
**Cc:** Christopher J. Lee <clee@birdmarella.com>; Naeun Rim <nrim@birdmarella.com>
**Subject:** Re: Request Legal Call with BEN #69141-051 (LOF)

Good Morning,

I have been asked to evaluate your request for a legal call with the above-referenced inmate/your client.

Inmate legal calls usually go through the Unit Team, but our COVID-19 situation has prompted enhanced mitigation measures which has staff focusing on inmate management and enhanced sanitation.  In short, FCC Lompoc is not under normal operation, and with matters like these, we want to facilitate legal access while balancing public health safety issues.

As FCC Lompoc is currently in the midst of enhanced mitigation measures to address our COVID-19 situation, such as restricting inmate movement, I need to weigh the necessity of the request/call against the goals of our current measures.  Also, inmates at FCC Lompoc currently have access to TRULINCS (Email) and phone calls.  The inmate can place you on his phone list and email account.  Additionally, they receive legal mail daily.

We provide an occasional inmate attorney call when the inmate
demonstrates that communication with attorneys by correspondence,
visiting, or normal telephone use is not adequate, and when the
inmate or inmate's attorney can demonstrate an imminent court
deadline.  Thus, we'd like to ask you the following questions:

1. Urgency - can this call wait until we can come off of our enhanced
mitigation measures?  Is there an imminent court deadline?  Are
communication by other means not adequate? While I am likely to defer
to a fellow officer of the court's representation of urgency, I need
to ask as FCC Lompoc staff are currently focused on active inmate
management and enhanced sanitation, and minimizing movement and
maintaining maximum separation is critical during this time;

2. Assuming urgency, do you have wide windows of date and time when
you are willing to receive a call?  For example, Wed - Friday from 8-
12 noon?  As arranging a call during this time will require moving an
inmate from a quarantined or isolation area/cell to a staff office
with a phone, there is much coordination that needs to happen to
ensure the safety of all concerned.  Thus, staff need maximum
flexibility on when they can actually make the call;

3. Can the call be of limited duration, like 15 minutes?  As there
are other urgent calls that need to be accommodated, keeping the
calls short is important to facilitating those are deemed
necessary.  Keep in mind there is extensive disinfecting that needs
to happen of the office and phone after each is made.

Thank you for your patience and understanding during this challenging
time.

Ms. Morales

>>> On 5/12/2020 at 12:16 PM, Jimmy Threatt <jthreatt@birdmarella.com> wrote:
My firm is counsel for Lonnie Ben (Inmate No. 69141-051).  We are trying to schedule a call to
discuss an urgent legal matter with him.  We called the facility this morning, but no one is answering
the phone.

We would appreciate any assistance you can provide.  You can reach me at this email address or on
my cell phone, 650-384-5319.  If I am unavailable, you can also reach my colleagues (copied here):
Christopher Lee at 617-631-2122 and Naeun Rim at 678-492-6707.

Thank you.


**Jimmy Threatt**
*Associate*
T: 310.201.2100
F: 310.201.2110
E: jthreatt@birdmarella.com

**Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
**www.BirdMarella.com**

| **From:** | LOX/Legal Svcs~ <LOX/LegalSvcs~@bop.gov> |
|---|---|
| **Sent:** | Thursday, May 14, 2020 7:59 AM |
| **To:** | Jimmy Threatt |
| **Subject:** | RE: Request Legal Call with BROWN #54460-097 |

After speaking with our BOP Attorney, a 15 minute legal call has been approved for you and your client.

A Unit Team member will be contacting you in the near future to set up a legal call.

Thank you for your patience and understanding during this challenging time.

Ms. Morales

>>> On 5/13/2020 at 1:31 PM, Jimmy Threatt <jthreatt@birdmarella.com> wrote:

This is a legal call regarding release options given the COVID crisis, and is urgent given that crisis.

**Jimmy Threatt**
*Associate*
T: 310.201.2100
F: 310.201.2110
E: jthreatt@birdmarella.com
**Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
**www.BirdMarella.com**

**From:** LOX/Legal Svcs~ <LOX/LegalSvcs~@bop.gov>
**Sent:** Wednesday, May 13, 2020 12:56 PM
**To:** Jimmy Threatt <jthreatt@birdmarella.com>
**Subject:** RE: Request Legal Call with BROWN #54460-097

Due to lack of information regarding the urgency of your request, your request is being sent to the BOP Legal Office for further review and approval.  Please be advised this may delay your request for a Legal Call.

>>> On 5/12/2020 at 2:14 PM, Jimmy Threatt <jthreatt@birdmarella.com> wrote:

Thank you, Ms. Morales.  To respond to your questions:

1) The matter is urgent and we need to speak with Andre Brown as soon as possible.  It cannot wait until the facility comes off the enhanced mitigation measures.

2) We do have wide windows of availability; we can make any time work.

3) We understand and will respect the 15 minute time limit.

As a reminder, I can be reached at 650-384-5319, and my colleagues can also be reached on their cell phones (Christopher Lee at 617-631-2122 and Naeun Rim at 678-492-6707).

**Jimmy Threatt**
*Associate*
T: 310.201.2100
F: 310.201.2110
E: jthreatt@birdmarella.com
**Bird, Marella, Boxer, Wolpert, Nessim,**
**Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
**www.BirdMarella.com**

---

**From:** LOX/Legal Svcs~ <LOX/LegalSvcs~@bop.gov>
**Sent:** Tuesday, May 12, 2020 1:41 PM
**To:** Jimmy Threatt <jthreatt@birdmarella.com>
**Cc:** Christopher J. Lee <clee@birdmarella.com>; Naeun Rim <nrim@birdmarella.com>
**Subject:** Re: Request Legal Call with BROWN #54460-097

Good Morning,

I have been asked to evaluate your request for a legal call with the above-referenced inmate/your client.

Inmate legal calls usually go through the Unit Team, but our COVID-19 situation has prompted enhanced mitigation measures which has staff focusing on inmate management and enhanced sanitation.  In short, FCC Lompoc is not under normal operation, and with matters like these, we want to facilitate legal access while balancing public health safety issues.

As FCC Lompoc is currently in the midst of enhanced mitigation measures to address our COVID-19 situation, such as restricting inmate movement, I need to weigh the necessity of the request/call against the goals of our current measures.  Also, inmates at FCC Lompoc currently have access to TRULINCS (Email) and phone calls.  The inmate can place you on his phone list and email account.  Additionally, they receive legal mail daily.

We provide an occasional inmate attorney call when the inmate
demonstrates that communication with attorneys by correspondence,
visiting, or normal telephone use is not adequate, and when the
inmate or inmate's attorney can demonstrate an imminent court
deadline.  Thus, we'd like to ask you the following questions:

1. Urgency - can this call wait until we can come off of our enhanced
mitigation measures?  Is there an imminent court deadline?  Are
communication by other means not adequate? While I am likely to defer
to a fellow officer of the court's representation of urgency, I need
to ask as FCC Lompoc staff are currently focused on active inmate
management and enhanced sanitation, and minimizing movement and
maintaining maximum separation is critical during this time;

2. Assuming urgency, do you have wide windows of date and time when
you are willing to receive a call?  For example, Wed - Friday from 8-
12 noon?  As arranging a call during this time will require moving an
inmate from a quarantine or isolation area/cell to a staff office
with a phone, there is much coordination that needs to happen to
ensure the safety of all concerned.  Thus, staff need maximum
flexibility on when they can actually make the call;

3. Can the call be of limited duration, like 15 minutes?  As there
are other urgent calls that need to be accommodated, keeping the
calls short is important to facilitating those are deemed
necessary.  Keep in mind there is extensive disinfecting that needs
to happen of the office and phone after each is made.

Thank you for your patience and understanding during this challenging
time.

Ms. Morales


>>> On 5/12/2020 at 12:11 PM, Jimmy Threatt <jthreatt@birdmarella.com> wrote:
   My firm is counsel for Andre Brown (Inmate No. 54460-097).  We are trying to schedule a call to
   discuss an urgent legal matter with him.  We called the facility this morning, but no one is answering
   the phone.

   We would appreciate any assistance you can provide.  You can reach me at this email address or on
   my cell phone, 650-384-5319.  If I am unavailable, you can also reach my colleagues (copied here):
   Christopher Lee at 617-631-2122 and Naeun Rim at 678-492-6707.

   Thank you.


   **Jimmy Threatt**
   *Associate*
   T: 310.201.2100
   F: 310.201.2110

E: jthreatt@birdmarella.com
**Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
**www.BirdMarella.com**

| | |
|---|---|
| **From:** | LOX/Legal Svcs~ <LOX/LegalSvcs~@bop.gov> |
| **Sent:** | Thursday, May 14, 2020 10:51 AM |
| **To:** | Jimmy Threatt |
| **Subject:** | Re: Request Legal Call with TERPOGOSYAN #77271-112 (LOM) |

A 15 minute legal call has been approved for you and your client.

A Unit Team member will be contacting you in the near future to set up a legal call.

Thank you for your patience and understanding during this challenging time.

Ms. Morales

>>> On 5/13/2020 at 4:03 PM, Jimmy Threatt <jthreatt@birdmarella.com> wrote:

I am writing to schedule a legal call with Vazgen Terpogosyan (Inmate No. 77271-112).  This is a legal call regarding release options given the COVID crisis, and is urgent given that crisis.

We would appreciate any assistance you can provide.  You can reach me at this email address or on my cell phone, 650-384-5319.  If I am unavailable, you can also reach my colleagues (copied here): Christopher Lee at 617-631-2122 and Naeun Rim at 678-492-6707.

Thank you.

**Jimmy Threatt**
*Associate*
T: 310.201.2100
F: 310.201.2110
E: jthreatt@birdmarella.com
**Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
**www.BirdMarella.com**

| | |
|---|---|
| **From:** | LOX/Legal Svcs~ <LOX/LegalSvcs~@bop.gov> |
| **Sent:** | Thursday, May 14, 2020 10:53 AM |
| **To:** | Jimmy Threatt |
| **Subject:** | Re: Request Legal Call with REED #27173-016 (LOM) |

A 15 minute legal call has been approved for you and your client.

A Unit Team member will be contacting you in the near future to set up a legal call.

Thank you for your patience and understanding during this challenging time.

Ms. Morales

>>> On 5/13/2020 at 4:07 PM, Jimmy Threatt <jthreatt@birdmarella.com> wrote:

I am writing to schedule a legal call with Vincent Reed (Inmate No. 27173-016).  This is a legal call regarding release options given the COVID crisis, and is urgent given that crisis.

We would appreciate any assistance you can provide.  You can reach me at this email address or on my cell phone, 650-384-5319.  If I am unavailable, you can also reach my colleagues (copied here): Christopher Lee at 617-631-2122 and Naeun Rim at 678-492-6707.

Thank you.

**Jimmy Threatt**
*Associate*
T: 310.201.2100
F: 310.201.2110
E: jthreatt@birdmarella.com
**Bird, Marella, Boxer, Wolpert, Nessim,**
**Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
**www.BirdMarella.com**

1

| | |
|---|---|
| **From:** | Jennifer Merkle <jmmerkle@bop.gov> |
| **Sent:** | Thursday, May 14, 2020 1:04 PM |
| **To:** | Jimmy Threatt |
| **Subject:** | Requests for Legal Calls with Clients / Prospective Clients at FCC Lompoc |

Good afternoon,

I think you may recall we spoke on the phone about a legal call for inmate Ben the other day.  I have now been assigned 13 of your requests to review.  It has become apparent that some of the individuals that you seek to have a legal call with are represented by other counsel as to their release options; therefore, I will be assessing each of these requests individually.

In the meantime, please feel free to send any additional request to me directly for review.

I will be in touch as to each request separately.

Thank you,
Jennifer

Jennifer M. Merkle
Senior Attorney
FCC Victorville
PO Box  5400
Adelanto, CA 92301
Phone:  760-530-5440
Fax:  760-530-5103
jennifer.merkle@usdoj.gov
jmmerkle@bop.gov

SENSITIVE/PRIVILEGED COMMUNICATION
The information contained in this electronic message and any and all accompanying documents constitutes sensitive information.  This information is the property of the U.S. Department of Justice.  If you are not the intended recipient of this information, any disclosure, copying, distribution, or the taking of any action in reliance on this information is strictly prohibited.  If you received this message in error, please notify us immediately at the above number to make arrangements for its return to us.

| | |
|---|---|
| **From:** | Jorge A. Garcia <jagarcia@bop.gov> |
| **Sent:** | Thursday, May 14, 2020 2:36 PM |
| **To:** | Jimmy Threatt |
| **Subject:** | RE: Request Legal Call with CARROR-TORRES #41928-069 (LOM) |

Per our legal department, I am going to cancel the scheduled legal call the above client.

>>> Jimmy Threatt <jthreatt@birdmarella.com> 5/14/2020 10:00 AM >>>

Mr. Garcia,

Thank you for your email.  Tuesday, May 19, at 9 am works.  Please note that I should be called at 650-384-5319.  Let me know if I need to do anything else prior to the call.

I have also submitted requests for calls with the inmates listed below, who are also housed at USP Lompoc.  Those calls have not been scheduled yet, though the requests pertaining to Brown and Keswaran have also been approved.

1) Andre Brown, 54460-097

2) Kanagasabai Kana Keswaran, 75139-112

3) Vincent Reed, 27173-016

4) Vazgen Terpogosyan, 77271-112

5) Felix Samuel Garcia, 46693-298

6) Shawn Fears, 34182-060

**Jimmy Threatt**
*Associate*
T: 310.201.2100
F: 310.201.2110
E: jthreatt@birdmarella.com
**Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
**www.BirdMarella.com**

---

**From:** Jorge A. Garcia <jagarcia@bop.gov>
**Sent:** Thursday, May 14, 2020 8:43 AM
**To:** Jimmy Threatt <jthreatt@birdmarella.com>
**Subject:** RE: Request Legal Call with CARROR-TORRES #41928-069 (LOM)

Good morning Sir or Mam,

1

```
I've been tasked to set up a legal call with your client.  Due to the high
volume of requested legal calls, I'm currently scheduling calls for next
week 05/18/20 to 05/22/20.  The earliest slot I have available would
be Tuesday 9 am.  If that would work, please advise.  If not, please
provide 3 dates and times next week you would like the call to take place.
Thank You.
```

```
After speaking with our BOP Attorney, a 15 minute legal call has been
approved for you and your client.

A Unit Team member will be contacting you in the near future to set up a
legal call.

Thank you for your patience and understanding during this challenging
time.

Ms. Morales
```

>>> On 5/13/2020 at 1:32 PM, Jimmy Threatt <> wrote:

This is a legal call regarding release options given the COVID crisis, and is urgent given that crisis.

**Jimmy Threatt**
*Associate*
T: 310.201.2100
F: 310.201.2110
E: jthreatt@birdmarella.com
**Bird, Marella, Boxer, Wolpert, Nessim,**
**Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
**www.BirdMarella.com**

**From:** LOX/Legal Svcs~ <LOX/LegalSvcs~@bop.gov>
**Sent:** Wednesday, May 13, 2020 12:56 PM
**To:** Jimmy Threatt <jthreatt@birdmarella.com>
**Subject:** RE: Request Legal Call with CARROR-TORRES #41928-069 (LOM)

Due to lack of information regarding the urgency of your request, your request is being sent to the BOP Legal Office for further review and approval.  Please be advised this may delay your request for a Legal Call.

>>> On 5/12/2020 at 2:12 PM, Jimmy Threatt <jthreatt@birdmarella.com> wrote:

Thank you, Ms. Morales.  To respond to your questions:

1) The matter is urgent and we need to speak with Yonnedil Carror Torres as soon as possible.  It cannot wait until the facility comes off the enhanced mitigation measures.

2) We do have wide windows of availability; we can make any time work.

3) We understand and will respect the 15 minute time limit.

As a reminder, I can be reached at 650-384-5319, and my colleagues can also be reached on their cell phones (Christopher Lee at 617-631-2122 and Naeun Rim at 678-492-6707).

**Jimmy Threatt**
*Associate*
T: 310.201.2100
F: 310.201.2110
E: jthreatt@birdmarella.com
**Bird, Marella, Boxer, Wolpert, Nessim,**
**Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
**www.BirdMarella.com**

---

**From:** LOX/Legal Svcs~ <LOX/LegalSvcs~@bop.gov>
**Sent:** Tuesday, May 12, 2020 1:40 PM
**To:** Christopher J. Lee <clee@birdmarella.com>; Jimmy Threatt <jthreatt@birdmarella.com>; Naeun Rim <nrim@birdmarella.com>
**Subject:** Re: Request Legal Call with CARROR-TORRES #41928-069 (LOM)

Good Morning,

I have been asked to evaluate your request for a legal call with the above-referenced inmate/your client.

Inmate legal calls usually go through the Unit Team, but our COVID-19 situation has prompted enhanced mitigation measures which has staff focusing on inmate management and enhanced sanitation.  In short, FCC Lompoc is not under normal operation, and with matters like these, we want to facilitate legal access while balancing public health safety issues.

As FCC Lompoc is currently in the midst of enhanced mitigation measures to address our COVID-19 situation, such as restricting inmate movement, I need to weigh the necessity of the request/call against the goals of our current measures.  Also, inmates at FCC Lompoc currently have access to TRULINCS (Email) and phone

calls.  The inmate can place you on his phone list and email
account.  Additionally, they receive legal mail daily.

We provide an occasional inmate attorney call when the inmate
demonstrates that communication with attorneys by correspondence,
visiting, or normal telephone use is not adequate, and when the
inmate or inmate's attorney can demonstrate an imminent court
deadline.  Thus, we'd like to ask you the following questions:

1. Urgency - can this call wait until we can come off of our enhanced
mitigation measures?  Is there an imminent court deadline?  Are
communication by other means not adequate?  While I am likely to defer
to a fellow officer of the court's representation of urgency, I need
to ask as FCC Lompoc staff are currently focused on active inmate
management and enhanced sanitation, and minimizing movement and
maintaining maximum separation is critical during this time;

2. Assuming urgency, do you have wide windows of date and time when
you are willing to receive a call?  For example, Wed - Friday from 8-
12 noon?  As arranging a call during this time will require moving an
inmate from a quarantined or isolation area/cell to a staff office
with a phone, there is much coordination that needs to happen to
ensure the safety of all concerned.  Thus, staff need maximum
flexibility on when they can actually make the call;

3. Can the call be of limited duration, like 15 minutes?  As there
are other urgent calls that need to be accommodated, keeping the
calls short is important to facilitating those are deemed
necessary.  Keep in mind there is extensive disinfecting that needs
to happen of the office and phone after each is made.

Thank you for your patience and understanding during this challenging
time.

Ms. Morales


>>> On 5/12/2020 at 12:09 PM, Jimmy Threatt <jthreatt@birdmarella.com> wrote:
My firm is counsel for Yonnedil Carror Torres (Inmate No. 41928-69).  We are trying to schedule a
call to discuss an urgent legal matter with him.  We called the facility this morning, but no one is
answering the phone.

We would appreciate any assistance you can provide.  You can reach me at this email address or on
my cell phone, 650-384-5319.  If I am unavailable, you can also reach my colleagues (copied here):
Christopher Lee at 617-631-2122 and Naeun Rim at 678-492-6707.

Thank you.


**Jimmy Threatt**

*Associate*
T: 310.201.2100
F: 310.201.2110
E: jthreatt@birdmarella.com
**Bird, Marella, Boxer, Wolpert, Nessim,**
**Drooks, Lincenberg & Rhow, P.C.**
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
**www.BirdMarella.com**

| | |
|---|---|
| **From:** | Jennifer Merkle <jmmerkle@bop.gov> |
| **Sent:** | Friday, May 15, 2020 1:51 PM |
| **To:** | Jimmy Threatt |
| **Subject:** | Re: Requests for Legal Calls with Clients / Prospective Clients at FCC Lompoc |

Good afternoon,

I have had a chance to go through all of the emails and research the cases for each of the individuals you are seeking to speak with.  Please call me at your convenience so we can over these and identify your specific needs.

Jennifer

Jennifer M. Merkle
Senior Attorney
FCC Victorville
PO Box  5400
Adelanto, CA 92301
Phone:  760-530-5440
Fax:  760-530-5103
jennifer.merkle@usdoj.gov
jmmerkle@bop.gov

SENSITIVE/PRIVILEGED COMMUNICATION
The information contained in this electronic message and any and all accompanying documents constitutes sensitive information.  This information is the property of the U.S. Department of Justice.  If you are not the intended recipient of this information, any disclosure, copying, distribution, or the taking of any action in reliance on this information is strictly prohibited.  If you received this message in error, please notify us immediately at the above number to make arrangements for its return to us.


>>> Jennifer Merkle 5/14/2020 1:03 PM >>>
Good afternoon,

I think you may recall we spoke on the phone about a legal call for inmate Ben the other day.  I have now been assigned 13 of your requests to review.  It has become apparent that some of the individuals that you seek to have a legal call with are represented by other counsel as to their release options; therefore, I will be assessing each of these requests individually.

In the meantime, please feel free to send any additional request to me directly for review.

I will be in touch as to each request separately.

Thank you,
Jennifer

Jennifer M. Merkle
Senior Attorney
FCC Victorville
PO Box  5400
Adelanto, CA 92301

Phone:  760-530-5440
Fax:  760-530-5103
jennifer.merkle@usdoj.gov
jmmerkle@bop.gov

SENSITIVE/PRIVILEGED COMMUNICATION

The information contained in this electronic message and any and all accompanying documents constitutes sensitive information.  This information is the property of the U.S. Department of Justice.  If you are not the intended recipient of this information, any disclosure, copying, distribution, or the taking of any action in reliance on this information is strictly prohibited.  If you received this message in error, please notify us immediately at the above number to make arrangements for its return to us.