# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Torres *et al*.,<br><br>          Plaintiff-Petitioners,<br>v.<br><br>Milusnic *et al*.,<br><br>          Defendant-Respondents. | Case No.:  CV 20-4450-CBM-PVC(x)<br><br>**ORDER RE: PLAINTIFF-PETITIONERS' MOTION FOR PRELIMINARY INJUNCTION, AND *EX PARTE* APPLICATION FOR PROVISIONAL CLASS CERTIFICATION** |

The matters before the Court are:  (1) Plaintiff-Petitioners' *Ex Parte* Application for Temporary Restraining Order and Order to Show Cause re: Preliminary Injunction (Dkt. No. 18 ("TRO Application")); and (2) Plaintiff-Petitioners' *Ex Parte* Application for Provisional Class Certification (Dkt. No. 22 ("Application for Class Certification")).  The matters are fully briefed.[1]

After the July 7, 2020 hearing, the parties each filed a notice of non-opposition stating they did not object to converting the TRO Application to an expedited motion for preliminary injunction.  (Dkt. Nos. 41, 42.)  Accordingly, the TRO Application was converted to an expedited motion for preliminary

---

[1] The parties stipulated to a briefing schedule re the TRO Application and Application for Class Certification.

1   injunction.[2]

2   ## I.     BACKGROUND

3          Petitioners Yonnedil Carror Torres, Vincent Reed, Felix Samuel Garcia,

4   Andre Brown, and Shawn Fears are federal inmates incarcerated at FCI Lompoc

5   and USP Lompoc (collectively, "Lompoc") located in Santa Barbara, California.

6   This action brought on behalf of "all current and future people in post-conviction

7   custody at Lompoc" (Compl. ¶ 96), challenges the Director of the Bureau of

8   Prisons ("BOP") and Warden of Lompoc's response during the COVID-19

9   pandemic.  The Complaint asserts two causes of action:  (1) Unconstitutional

10  Conditions of Confinement in Violation of the Eighth Amendment to the U.S.

11  Constitution pursuant to 28 U.S.C. §§ 2241, 2243; (2) and Unconstitutional

12  Conditions of Confinement in Violation of the Eighth Amendment to the U.S.

13  Constitution pursuant to U.S. Const, Amend. VIII; 28 U.S.C. § 1331; 5 U.S.C. §

14  702, "Injunctive Relief Only."

15         Petitioners apply for a preliminary injunction requesting the Court to

16  require (1) Respondents to expedite review and determination of eligibility of

17  Lompoc inmates for home confinement and compassionate release, and (2)

18  improved conditions for inmates remaining at Lompoc in light of COVID-19.[3]

19  ## II.    STATEMENT OF THE LAW

20  **A.     Preliminary Injunction**

21         The standard for issuing a preliminary injunction requires the parties

22  seeking relief to show (1) they are likely to succeed on the merits, (2) they are

23  likely to suffer irreparable harm in the absence of injunctive relief, (3) the balance

24  of equities is in their favor, and (4) injunctive relief is in the public interest.  *See*

25

26  [2] The Court has reviewed and considered the supplemental filings by the parties
    and evidentiary objections thereto.  (Dkt. Nos. 39, 40.)

27  [3] While Petitioners' proposed order includes a list of 26 items sought, the essential
    relief requested by Petitioners re: the motion for preliminary injunction is
28  summarized above.

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  Under this standard, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotations omitted).

**B.     Class Certification**

Federal Rule of Civil Procedure 23(a) requires that a proposed class satisfy the following four requirements for class certification:  (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a).  "A class action may be maintained if Rule 23(a) is satisfied and if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

### III.     DISCUSSION

**A.     <u>COVID-19</u>**

COVID-19 is a novel, highly contagious, and deadly virus.  On March 4, 2020, California declared a state of emergency in response to COVID-19.  On March 11, 2020, COVID-19 was declared a global pandemic by the World Health Organization.  On March 13, 2020, the President of the United States declared a national emergency in response to COVID-19.  Millions of confirmed cases of COVID-19 and hundreds of thousands of related deaths have been reported worldwide.  The United States Center for Disease and Control Prevention ("CDC") reports that as of July 7, 2020, there have been 2,932,596 confirmed cases of COVID-19 and 130,133 related deaths in the United States, and 271,684 confirmed cases of COVID-19 and 6,337 related deaths have occurred in California.[4]

--------

[4] CDC, *Cases and Deaths in the U.S.,* available at

1    According to the CDC, COVID-19 spreads mainly among people who are

2    in close contact (i.e., within approximately 6 feet) and therefore limiting close

3    contact with others is the best way to reduce the spread of COVID-19.[5]  COVID-

4    19 spreads when an infected person coughs, sneezes, or talks, and droplets from

5    their mouth or nose are launched into the air and land in the mouths or noses of

6    people nearby, or are inhaled into the lungs.  A person may contract COVID-19 by

7    touching a surface or object that has the virus on it and then touching their own

8    mouth, nose, or eyes.[6]  COVID-19 spreads very easily and sustainably between

9    people and is spreading more efficiently than influenza.[7]  Anyone can contract

10   COVID-19 and spread it to others.[8]  Recent studies indicate people who are

11   infected with the novel coronavirus but do not have symptoms likely also play a

12   role in the spread of COVID-19.[9]

13        The more closely a person interacts with others and the longer that

14   interaction, the higher the risk of COVID-19 spread.[10]  Therefore, the CDC

15   advises that maintaining social distance of approximately 6 feet "is very important

16   in preventing the spread of COVID-19,"[11] and "is one of the best tools we have to

17

18

---

https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/us-cases-deaths.html (last accessed July 7, 2020); CDC, Cases & Deaths by Jurisdiction, available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last accessed July 7, 2020).

[5] CDC, *Prevent Getting Sick, Social Distancing*, available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (hereinafter, "CDC Social Distancing Guidelines") (last accessed July 7, 2020).

[6] *Id.*

[7] CDC, *Prevent Getting Sick, How COVID-19 Spreads*, available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last accessed July 7, 2020).

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

avoid being exposed to this virus and slowing its spread."[12]  Per the CDC, "[s]ocial distancing is especially important for people who are at higher risk of severe illness from COVID-19."[13]  Among adults, the risk of severe illness or death from COVID-19 increases with age.[14]  Additionally, individuals of any age who have serious underlying medical conditions, including individuals with chronic obstructive pulmonary disease, serious heart conditions such as heart failure, coronary artery disease, or cardiomyopathies, Type 2 diabetes, chronic kidney disease, sickle cell disease, immunocompromised state from a solid organ transplant, and obesity (body mass index of 30 or higher) are at increased risk for severe illness or death from COVID-19.[15]  Individuals at any age might be at increased risk of severe illness from COVID-19 if they have the following conditions: asthma, cerebrovascular diseases, cystic fibrosis, hypertension or high blood pressure, immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines, neurologic conditions such as dementia, liver diseases, pregnancy, pulmonary fibrosis, thalassemia, Type 1 diabetes, or individuals who are smokers.[16]

**B.** **Lompoc**

FCI Lompoc is a low security prison.  (Compl. ¶ 2; Engleman Decl. ¶ 5.) USP Lompoc is a medium security prison, with a separate minimum-security satellite camp.  (Compl. ¶ 2; Engleman Decl. ¶ 5.)  USP Lompoc has units

---

[12] CDC Social Distancing Guidelines.

[13] *Id.*

[14] CDC, *Who is at Increased Risk for Severe Illness? Older Adults*, available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last accessed July 7, 2020).

[15] CDC, *Who is at Increased Risk for Severe Illness? People with Certain Medical Conditions,* available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last accessed July 7, 2020).

[16] *Id.*

physically divided into 2-man cells with walls and cell doors, some units have grills for doors, and each cell has a sink/water fountain and toilet.  (Engleman Decl. ¶¶ 5-6.)  FCI Lompoc and USP's satellite camp are structured as dormitories with community restrooms which include sinks, toilets and showers.  (Cross Decl. ¶ 6.)  Some areas of USP's satellite camp and FCI Lompoc have open configurations while other areas have 8-10 person rooms.  (*Id*.)

As of July 7, 2020, 859 inmates at FCI Lompoc and 170 inmates at USP Lompoc have tested positive for COVID-19 or have been deemed "recovered."[17] Four inmates at Lompoc have died from COVID-19.[18]  The designated capacity for Lompoc is 2,058,[19] but as of June 3, 2020, there were 2,599 inmates at Lompoc.  (Engleman Decl. ¶ 7.)[20]

## C. **Petitioners**

### (1) **Petitioner Carror-Torres**

Petitioner Carror-Torres is 24 years old and resides at USP Lompoc. (Carror Decl. ¶ 4.)  He was convicted for carjacking with serious bodily injury (sexual assault) and aiding and abetting a violent crime by carrying a firearm, sentenced to 20 years imprisonment, and projected to be released on August 7, 2023.  (Engleman Decl. ¶¶ 8, 9, Ex. A.)  Carror-Torres has suffered from chronic

---

[17] *See* Federal Bureau of Prisons, *COVID-19 Coronavirus*, https://www.bop.gov/coronavirus/ (last accessed July 7, 2020).

[18] *Id*.

[19] *See* Federal Bureau of Prisons, *Prison Rape Elimination Act (PREA) Audit Report* at 2, 6, available at https://www.bop.gov/locations/institutions/lof/prea_lof.pdf (last accessed July 7, 2020).

[20] At the July 7, 2020 hearing, Respondents represented there are 1,759 "empty beds" at Lompoc but acknowledged new inmates are being placed at Lompoc. Moreover, as of July 9, 2020, there are 1,521 inmates at USP Lompoc (*see* Federal Bureau of Prisons, *USP Lompoc*, available at https://www.bop.gov/locations/institutions/lom/ (last accessed July 9, 2020)), and 964 inmates at FCI Lompoc (*see* Federal Bureau of Prisons, *FCI Lompoc*, available at https://www.bop.gov/locations/institutions/lof/ (last accessed July 9, 2020)).  Therefore, as of July 9, 2020, there are 2,485 inmates at Lompoc.

asthma since he was a child.  (Kiara Carror (hereinafter, "Carror") Decl. ¶ 2.)[21]

Carror-Torres's sister submitted a request for compassionate release on behalf of her brother to the Warden of Lompoc on May 11, 2020, but as of May 14, 2020 had not received a response.  (*Id*. ¶ 11.)[22]  Carror-Torres's sister declares he would stay with her at her home in Kissimmee, Florida, if he is transferred to home confinement.  (*Id*. ¶ 12.)  Respondents contend Carror-Torres was not considered for priority placement on home confinement because of his underlying violent crime and sex offense conviction.

### (2)    Petitioner Brown

Petitioner Brown is 55 years old and incarcerated at USP Lompoc.  (Wefald Decl. ¶ 1.)  Brown has had a history of asthma since childhood, is learning disabled and illiterate, has prostate cancer and will need chemotherapy or surgery in the future.  (*Id*. ¶¶ 1, 6; Cross Decl. ¶ 12.)  Brown was convicted of conspiracy to manufacture, distribute, and possess with intent to distribute phencyclidine (PCP), and illegally possess a listed chemical and distribution and possession with

[21] Carror-Torres's sister Kiara Carror submitted a declaration in support of Petitioners' TRO Application.  At the hearing Respondents noted Petitioners did not file declarations signed by the named Petitioners, and instead submitted declarations from Petitioners' counsel and family members which include hearsay evidence.  Respondents also object to the declaration of Jimmy Threatt filed by Petitioners after the July 7, 2020 hearing, on the ground it "consists of statements with no foundation and hearsay inadmissible under Federal Rules of Evidence 602 and 802."  (*See* Dkt. No. 40.)  The Court, however, may consider inadmissible evidence, including hearsay evidence, in determining whether to issue a temporary restraining order or preliminary injunction.  *See Houdini Inc. v. Goody Baskets LLC,* 166 F. App'x 946, 947 (9th Cir. 2006) ("[T]he district court did not abuse its discretion in considering hearsay and biased evidence of actual confusion because the rules of evidence do not strictly apply to preliminary injunction proceedings."); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (In deciding whether to issue a temporary restraining order, the district court "may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.").  Accordingly, Respondents' objections re: hearsay and lack of foundation are overruled.

[22] While no evidence is before the Court regarding a determination by the BOP as to Carror-Torres' request, Respondents represented at the July 7, 2020 hearing that the BOP denied Carror-Torres's request for compassionate release on May 26, 2020.  No evidence was provided to the Court as to whether Carror-Torres' medical condition was considered by the BOP prior to denying the request or whether Carror-Torres was notified of the denial of the request.

1  intent to distribute PCP,[23] sentenced to 12.5 years imprisonment, and has a

2  projected release date of October 6, 2024.  (Engleman Decl. ¶¶ 29, 31, Ex. J;

3  Wefald Decl. ¶ 3.)  According to his attorney, Brown had "minor prior convictions

4  but the last [prior conviction] was 20 years ago.  (Wefald Decl. ¶ 4.)

5  On May 13, 2020, Brown's attorney sent a request to the Lompoc Warden

6  requesting compassionate release and/or home confinement for Brown.  (*Id.* ¶ 7.)

7  There is no evidence before the Court that the warden has notified Brown

8  regarding a determination of his request.[24]

9  Brown's daughter has stated Brown would be able to live with her if he is

10  released or placed on home confinement.  (*Id.* ¶ 8.)  The Associate Warden of

11  Lompoc, however, declares Brown does not qualify for priority placement on

12  home confinement under the Attorney General's memoranda because of his low

13  risk of recidivism PATTERN score.  (Engleman Decl. ¶¶ 35, 49.a.)  The Associate

14  Warden of Lompoc further declares a decision was made to transfer Brown to a

15  different facility which was scheduled for March 5, 2020, but the transfer did not

16  take place because the BOP stopped all routine movement in March.  (Engleman

17  Decl. ¶ 30.)  The Associate Warden declares it is anticipated Brown will be

18  transferred "once BOP resumes inmate movement."  (*Id.*)[25]

19

—————————————

20  [23] Brown's conviction is on appeal before the Ninth Circuit, has been fully briefed,
    and may be argued some time between September-November 2020.  (Wefald
21  Decl. ¶ 2.)

22  [24] At the July 7, 2020 hearing, Respondents represented Brown's request was
    denied on June 23, 2020.  There is no evidence before the Court that any risk
23  factors for severe illness or death from COVID-19 were considered prior to the
    denial of Brown's request.  Respondents also represented at the hearing Brown is
24  being considered by BOP staff as an "exception" for home confinement, but were
    unable to provide information regarding the type of "exception" for which Brown
25  is being considered.

26  [25] At the July 7, 2020 hearing, Respondents represented Brown has not been
    transferred and that it was unknown when the BOP would resume inmate
27  movement.  Petitioners' counsel declares that as of July 7, 2020, the BOP's inmate
    locator website, https://www.bop.gov/inmateloc/, "indicated that . . . Andre Brown
28  (Register No. 54460-097) . . . remain[s] in BOP custody at USP Lompoc."
    (Threatt Decl. ¶ 5.)

**(3)    Petitioner Reed**

Petitioner Reed is 53 years old and currently incarcerated at USP Lompoc. (Perales Decl. ¶ 2.)  Reed has hypertension and mental health issues.  (*Id*.)  Reed may be the only viable candidate to donate a kidney to 30-year-old son Vincent who is suffering from kidney failure, is fully blind, and has diabetes.  (*Id*. ¶ 3.)  Vincent's grandmother is his only caregiver and cannot continue to care for him alone.  (*Id*.)  Reed was convicted of armed bank robbery, armed carjacking, and destroying property, sentenced to 25 years imprisonment, and projected to be released August 5, 2025.  (Engleman Decl. ¶¶ 14, 16.)

Reed's attorney declares he would return to Washington D.C. to self-quarantine at his brother's resident if transferred to home confinement.  (Perales Decl. ¶ 13.)  The Associate Warden of Lompoc declares Reed is "unsuitable for CARES Act home confinement" of his violent crime conviction.  (Engleman Decl. ¶ 49.a.)[26]

**(4)    Petitioner Fears**

Petitioner Fears is 50 years old and is currently incarcerated at USP Lompoc.  (Zayed Fears Decl. ¶ 2.)[27]  Fears was convicted of conspiracy to possess with intent to distribute 15 kilograms of cocaine and, after violating the terms of his supervised release, was sentenced to 32 months, and has a projected release date of August 19, 2021.  (Engleman Decl. ¶¶ 36, 38, Ex. M.)

Fears' daughter declares if Fears is transferred to home confinement, he would self-quarantine in Villa Rica, Georgia.  (Zayed Fears Decl. ¶ 8.)

---

[26] At the July 7, 2020 hearing, Respondents represented Reed's request for compassionate release was denied by the BOP, and his motion for compassionate release filed with the sentencing court was denied on June 11, 2020.  After the hearing, Respondents filed a copy of a one-page order dated June 11, 2020 issued by the United States District Court for the District of Columbia denying Reed's Emergency Motion to Reduce Sentence Pursuant to the Compassionate Release Statute 18 U.S.C. § 3582(c)(1)(A)(i) in *United States v. Vincent E. Reed*, No. 1:03-cr-00560-RBW (D.D.C.).

[27] No evidence was submitted regarding Fears' medical history.

1   Respondents state Fears does not qualify for priority placement on home

2   confinement under the Attorney General's memoranda because of his risk of

3   recidivism, but the BOP has decided to transfer Fears to a different facility which

4   was supposed to occur on March 3, 2020 but "did not take place because all

5   movement stopped in the Agency." (Engleman Decl. ¶¶ 37, 50.)  The Lompoc

6   Associate Warden declares it is "anticipated" that Fears' transfer "will occur once

7   BOP resumes inmate movement." (*Id.* ¶ 37.)[28]

8       **(5)  Petitioner Garcia**[29]

9       Petitioner Garcia is 36 years old, has been incarcerated since September

10   2015. (Zavala-Garcia Decl. ¶ 2.)  Garcia was convicted of possession of

11   methamphetamine with intent to distribute, was sentenced to seven years

12   imprisonment, has a projected release date of November 6, 2020, and a release

13   date to a halfway house/residential reentry center currently scheduled for July 28,

14   2020. (*See* Dkt. Nos. 39, 42.)[30]  Garcia was incarcerated at FCI Lompoc for most

15   of the last three years but was moved to USP Lompoc on May 7, 2020. (Zavala-

16   Garcia Decl. ¶ 2.)

17       Garcia's attorney submitted a request for home confinement to the Warden

18

19   [28] At the July 7, 2020 hearing, Respondents represented Fears had not been
    transferred and that it was unknown when the BOP would resume inmate
20   movement. Petitioners' counsel declares that as of July 7, 2020, the BOP's inmate
    locator website, https://www.bop.gov/inmateloc/, "indicated that . . . Shawn Fears
21   (Register No. 34183-060) remain[s] in BOP custody at USP Lompoc." (Threatt
    Decl. ¶ 5.)
22
    [29] After the hearing, Petitioners filed a handwritten letter from Petitioner Garcia
23   dated June 21, 2020. (Dkt. No. 39, Ex. A.)  The letter appears to be written in
    Spanish and Petitioners filed an English translation of the letter. (*Id.*)  However,
24   the translation was not certified and therefore the Court has no manner of
    determining the accuracy of the translation.  Accordingly, the Court does not
25   consider Garcia's June 21, 2020 letter or the non-certified translation thereof.

26   [30] The evidence submitted by the parties prior to the July 7, 2020 hearing indicated
    Garcia's release date to a "halfway house" or residential reentry center ("RCC")
27   was scheduled for July 7 or July 9, 2020. (*See* Zavala-Garcia Decl. ¶ 2; Engleman
    Decl. ¶¶ 21, 23, Ex. G.).  The supplemental filings by the parties demonstrate
28   Garcia's release date to the halfway house/RCC is now scheduled for July 28,
    2020. (Dkt. Nos. 39, 42.)

at USP Lompoc on May 11, 2020, but has not received a response.  (Zavala-Garcia Decl. ¶ 8.)[31]  If Garcia is transferred to home confinement, his mother states he would self-quarantine at her home in Imperial Beach, California with his parents.  (*Id.* ¶ 9.)  Lompoc's Associate Warden declares Garcia is not "suitable for home confinement at this time" because he "must participate in and complete the transitional component of the drug treatment program at the RRC," and "[i]f he fails to do so, his projected release date will be modified to reflect he did not earn a reduction in sentence and he will be required to serve a longer sentence." (Engleman Decl. ¶ 49.b.)  Respondents also contend Garcia "does not qualify for priority placement on home confinement under the Attorney General's memoranda because he has a low risk of recidivism PATTERN score."  (*Id.* ¶ 28.)[32]

**D.     Habeas Claim**

Petitioners' first cause of action is a habeas claim pursuant to 28 U.S.C. § 2241 for alleged violation of the Eighth Amendment.  As a preliminary issue, the parties disagree as to whether Petitioners properly bring a habeas claim.

28 U.S.C. § 2241 provides a writ of habeas corpus shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States."  Habeas claims pursuant to Section 2241 are the proper procedural vehicle for prisoners to challenge the fact or duration of confinement.  *See Preiser v. Rodriguez*, 411 U.S. 475, 489 (1973) (sole federal remedy for a prisoner challenging the "fact or duration" of imprisonment and seeking immediate release or a speedier release from imprisonment is a writ of habeas corpus); *Crawford v. Bell*, 599 F.2d 890, 891 (9th Cir. 1979) ("the writ of habeas corpus is limited to attacks upon the legality or duration of confinement").

---

[31] At the July 7, 2020 hearing, Respondents represented Garcia's request was still being reviewed by the BOP as of July 6, 2020.

[32] No evidence was submitted regarding Garcia's medical history.

"A civil rights action . . . is the proper method of challenging 'conditions of confinement.'"  *Badea v. Cox*, 931 F.2d 573, 574 (9th Cir. 1991) (quoting *Preiser*, 411 U.S. at 498-99).[33]

Courts are split as to whether claims by prisoners in light of the COVID-19 pandemic are challenges to the fact or duration of confinement properly brought as a habeas claim under Section 2241, or challenges to the conditions of confinement which fall outside the core of habeas corpus.  *Compare Wilson v. Ponce*, 2020 WL 3053375, at *11 (C.D. Cal. June 8, 2020) (writ of habeas corpus does not encompass Eighth Amendment claim for expedited review for enlargement of custody of prisoners at FCI Terminal Island based on conditions during COVID-19 pandemic); *Alvarez v. Larose*, 2020 WL 2315807, at *3 (S.D. Cal. May 9, 2020) (habeas petition brought by prisoners at Otay Mesa Detention Center was not properly brought pursuant to 28 U.S.C. § 2241 because the petitioners' claims "[were] based solely on the current conditions inside OMDC given the COVID-19 pandemic"); *Wragg v. Ortiz*, 2020 WL 2745247, at *18 (D.N.J. May 27, 2020) (habeas petition brought by prisoners in FCI Fort Dix were not properly brought as a habeas claim because the petitioners were not contesting "the validity of their convictions or sentences" or the "duration of their confinement," but instead seeking "injunctive relief based on unconstitutional conditions of confinement, a type of challenge that neither the Supreme Court nor the Third Circuit has yet recognized as a cognizable habeas claim."), *with Wilson v. Williams*, 2020 WL 3056217, at *5 (6th Cir. June 9, 2020) (petitioners' claims "are properly brought

---

[33] *See also Nelson v. Campbell*, 541 U.S. 637, 643 (2004) ("[C]onstitutional claims that merely challenge the conditions of a prisoner's confinement, whether the inmate seeks monetary or injunctive relief, fall outside of that core [of habeas corpus] and may be brought pursuant to § 1983 in the first instance."); *Muhammad v. Close*, 540 U.S. 749, 750 (2004) ("Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus . . .; requests for relief turning on circumstances of confinement may be presented in a § 1983 action."); *Nettles*, 830 F.3d at 927 ("[R]equests for relief turning on circumstances of confinement may be presented in a § 1983 action.").

under § 2241 because they challenge the fact or extent of their confinement by seeking release from custody" and claiming "no set of conditions would be constitutionally sufficient"); *Martinez-Brooks v. Easter*, 2020 WL 2405350, at *16 (D. Conn. May 12, 2020) (FCI Danbury prisoners properly brought habeas claim where they contended "the fact of their confinement in prison itself amounts to an Eighth Amendment violation under . . . circumstances" arising during the COVID-19 pandemic and claimed "nothing short of an order ending their confinement at FCI Danbury will alleviate that violation"); *Cameron v. Bouchard*, 2020 WL 2569868, at *27 (E.D. Mich. May 21, 2020) (habeas petition pursuant to 2241 was "proper avenue" for plaintiffs' claims which "seek release for medically-vulnerable inmates not because the conditions of their confinement fail to prevent irreparable constitutional injury, but based on the fact of their confinement" in light of the COVID-19 pandemic); *Malam v. Adducci*, 2020 WL 1672662, at *3 (E.D. Mich. Apr. 5, 2020), *as amended* (Apr. 6, 2020) (holding petitioner asserted a cognizable habeas claim regarding confinement in Calhoun County Correctional Facility amidst COVID-19 pandemic where she "has not conceded the existence of acceptable alternative conditions of her confinement" and "her Fifth Amendment claim, if successful, would render her continued detention invalid").

Here, Petitioners state they are not asking the Court to release inmates or transfer them to home confinement. Rather, Petitioners request that "the Court grant them and all similarly situated individuals habeas relief by ordering 'a highly expedited process—for completion within no more than 48 hours—for [BOP] to use procedures available under the law to review members of the Class for enlargement of custody . . . in order to reduce the density of the prison population to a number that allows for the implementation of appropriate measures to prevent the spread of COVID-19.'"

Because Petitioners' habeas claim would not necessarily lead to immediate

or earlier release, Ninth Circuit and Supreme Court authority suggest their claim does not fall within "the core of habeas corpus."  *See Nettles v. Grounds*, 830 F.3d 922, 935 (9th Cir. 2016) (If a petitioner's claim "would not necessarily lead to his immediate or earlier release from confinement," that claim "does not fall within 'the core of habeas corpus.'") (citing *Skinner v. Switzer*, 562 U.S. 521, 535 n.13 (2012)); *Wilkinson v. Dotson*, 544 U.S. 74, 74-75 (2005) (finding prisoner's claims did not "lie[] at the core of habeas corpus" because success on his claims "means at most a new parole hearing at which parole authorities may, in their discretion, decline to shorten his prison term" and therefore his claims would not "necessarily spell speedier release," and noting "Section 1983 remains available for procedural challenges where success *would not necessarily* spell immediate or speedier release for the prisoner").

However, here Petitioners also argue they "are challenging through their Section 2241 petition the fact and duration of their confinement on the basis that no set of conditions of confinement under the present circumstances could be constitutional."  Because Petitioners contend there are no set of conditions of confinement that could be constitutional, the Court finds Petitioners challenge the fact of their confinement.  *See* 28 U.S.C. § 2241 (a writ of habeas corpus extends to a "in custody in violation of the Constitution or laws or treaties of the United States"); *Wilson v. Williams*, 2020 WL 3056217, at *5 (petitioners' claims were properly brought under § 2241 where they alleged there are no conditions of confinement sufficient to prevent irreparable constitutional); *Martinez-Brooks*, 2020 WL 2405350, at *16 (petitioners' claim was a proper habeas claim because they "contend[ed] that the fact of their confinement in prison itself amounts to an Eighth Amendment violation under these circumstances, and nothing short of an order ending their confinement at FCI Danbury will alleviate that violation."); *Cameron*, 2020 WL 2569868, at *27 (holding "§ 2241 is the proper vehicle for Plaintiffs to challenge the continued confinement of medically-vulnerable Jail

inmates during the COVID-19 pandemic" because "Plaintiffs seek release for medically-vulnerable inmates not because the conditions of their confinement fail to prevent irreparable constitutional injury, but based on the fact of their confinement" by claiming "no set of conditions would be constitutionally sufficient"); *Malam*, 2020 WL 1672662, at *3 (noting "where a petitioner claims no set of conditions would be sufficient to protect her constitutional rights, her claim should be construed as challenging the fact, not conditions, of her confinement and is therefore cognizable in habeas," and finding because petitioner claimed "no matter what steps are taken, due to her underlying serious health conditions, there is no communal holding facility where she could be incarcerated during the Covid-19 pandemic that would be constitutional[,] Petitioner's claim must therefore be considered as a challenge to the continued validity of confinement itself").[34]

Accordingly, the Court concludes Petitioners properly assert a habeas claim pursuant to § 2241 challenging the fact of their confinement.

**E.     Eighth Amendment**

The Court must analyze whether Petitioners meet their burden of demonstrating they are entitled to preliminary injunctive relief on their claims. Petitioners' habeas claim is based on Respondents' alleged violation of their Eighth Amendment rights.[35]  As part of their habeas claim and direct Eighth Amendment claim, Petitioners seek an order requiring Respondents "to fully utilize their authority to transfer non-violent prisoners with viable release plans to

---

[34] *Cf. Alvarez*, 2020 WL 2315807, at *3 (finding plaintiffs did not challenge the fact or duration of their confinement because unlike the inmates in *Wilson v. Williams*, plaintiffs failed to allege in the complaint or argue in their application for a temporary restraining order that "there are no set of conditions of confinement that would be constitutionally sufficient").

[35] Because the petitioners in *Wilson v. Ponce* sought a TRO only as to their habeas claim and did not seek immediate relief on their Eighth Amendment claim, the district court did not address the Eighth Amendment claim in denying the application for a temporary restraining order in that case.  *See Wilson v. Ponce*, 2020 WL 3053375, at *8.

1    home confinement and to evaluate quickly compassionate release requests so that

2    they may be escalated to the courts as appropriate."  Petitioners also assert an

3    Eighth Amendment claim challenging the conditions of confinement at Lompoc

4    and requests declaratory and injunctive relief under the Eighth Amendment to

5    order improved conditions for all prisoners who *remain* at Lompoc, in the form of

6    social distancing, provision of sanitary products and personal protective

7    equipment, improved sanitary practices, adequate testing, contact tracing, and

8    isolation measures.

9            **(1)    Likelihood of Success on the Merits**

10           "[T]he Eighth Amendment applies to conditions of confinement that are not

11   formally imposed as a sentence for a crime."  *Helling v. McKinney*, 509 U.S. 25,

12   29 (1993).  The Supreme Court has recognized that the Eighth Amendment

13   "requires that inmates be furnished with the basic human needs, one of which is

14   'reasonable safety,'" and "[i]t is "cruel and unusual punishment to hold convicted

15   criminals in unsafe conditions."  *Id*. at 33 (citations omitted).  Such Eighth

16   Amendment claims are analyzed through a two-pronged inquiry.  *Id.* at 35-37.

17   Under the objective prong, the prisoner must establish "society considers the risk

18   that the prisoner complains of to be so grave that it violates contemporary

19   standards of decency to expose *anyone* unwillingly to such a risk.  In other words,

20   the prisoner must show that the risk of which he complains is not one that today's

21   society chooses to tolerate."  *Id*. at 36.  The subjective prong "requires an inquiry

22   into the prison officials' state of mind" based on the "deliberate indifference"

23   standard.  *Id*. at 32.  A prison official is deliberately indifferent if he "knows of

24   and disregards an excessive risk to inmate health or safety; the official must both

25   be aware of facts from which the inference could be drawn that a substantial risk

26   of serious harm exists, and he must also draw the inference."  *Farmer v. Brennan*,

27   511 U.S. 825, 837 (1994).

28           Here, Petitioners show a likelihood of success as to the objective prong.

COVID-19 is a novel, highly infectious virus that has been declared a global pandemic, and resulted in lockdowns of entire countries around the globe to stop the spread of the virus.  There are over 2 million confirmed cases of COVID-19 and over 130,000 related deaths in the United States, and over 271,00 confirmed cases and over 6,300 reported deaths in California.[36]  The medically vulnerable are at higher-risk of suffering severe illness or death from COVID-19.  Per the CDC, COVID-19 is thought to be transmitted from person to person mainly through respiratory droplets, and social distancing "is a cornerstone of reducing transmission of respiratory diseases such as COVID-19" but "is challenging to practice in correctional and detention environments."  (Rim Decl. Ex. B at 13.) The virus has spread among inmates at Lompoc—859 inmates at FCI Lompoc and 170 inmates at USP Lompoc have tested positive for COVID-19 or have been deemed "recovered" by the BOP[37] and four inmates at Lompoc have died.  The physical configuration of the facilities at Lompoc—i.e., dormitories, multi-person cells, open configurations, community restrooms, and units/rooms shared by 8-10 person rooms (*see* Engleman Decl. ¶¶ 5-6; Cross Decl. ¶ 6)—precludes meaningful social distancing.  Petitioners' medical expert declares "incarcerated individuals tend to be in poorer health than those in the general population," inmates over the age of 50 and inmates of any age with underlying health conditions are at higher risk for severe illness from COVID-19, and the conditions at Lompoc which preclude effective social distancing measures place inmates at risk for contracting COVID-19.  (Samra Decl. ¶¶ 8, 12-14.)  Based on one former inmate's account, during daily count he had to stand shoulder to shoulder with other cellmates, and social distancing was impossible visiting medical for sick call, when picking up daily meals, and within dormitories.  (Lumpkin Decl. ¶¶ 12-

---

[36] CDC, *Cases and Deaths in the U.S.*, available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/us-cases-deaths.html (last accessed July 7, 2020).

[37] It is unclear as to how the BOP determines whether an inmate is "recovered."

16.)

Accordingly, Petitioners show they are at substantial risk of exposure to COVID-19, which is inconsistent with contemporary standards of human decency. *See Helling*, 509 U.S. at 32-35 (noting prison conditions where inmates "in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease . . . was one of the prison conditions for which the Eighth Amendment required a remedy," and that inmates could state a claim under the Eighth Amendment regarding exposure of inmates to a serious, communicable disease); *Wilson v. Williams*, 2020 WL 3056217, at *7 (petitioners demonstrated they are "incarcerated under conditions posing a substantial risk of serious harm" to satisfy objective prong of Eighth Amendment claim, finding "[t]he transmissibility of the COVID-19 virus in conjunction with Elkton's dormitory-style housing—which places inmates within feet of each other—and the medically-vulnerable subclass's health risks, presents a substantial risk that petitioners at Elkton will be infected with COVID-19 and have serious health effects as a result, including, and up to, death").

However, it is not enough to show Lompoc inmates are at risk of contracting COVID-19 or that Respondents were aware of that risk.[38]  Under the second subjective prong, "[a] prison official may be held liable under the Eighth Amendment for acting with 'deliberate indifference' to inmate health or safety only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it."  *Farmer*,

---

[38] The parties do not dispute Respondents are aware of the risk of spread of COVID-19 among Lompoc inmates.  Nor could they, given that the BOP implemented a multi-phased plan and certain measures were implemented at Lompoc in response to the COVID-19 pandemic.  Moreover, Respondents' knowledge of the risk may be inferred based on the fact 1,065 inmates at Lompoc have tested positive for COVID-19, and four inmates at Lompoc have died.  *See Wilson v. Williams*, 2020 WL 3056217, at *8 (inferring respondents were aware of the risk of COVID-19 to inmates where fifty-nine inmates and forty-six staff members tested positive for COVID-19, and six inmates had died).

511 U.S. at 825.  Under this standard, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."  *Id.* at 844.  To be deliberately indifferent, Respondents must have a subjective "state of mind more blameworthy than negligence," akin to criminal recklessness.  *Id.* at 835, 839–40.

### a.    Improved Conditions

As discussed above, Petitioners' Eighth Amendment claim seeks improved conditions at Lompoc in light of the pandemic.  According to Respondents, the BOP implemented a multiphase approach in response to the COVID-19 pandemic and protective measures have been implemented at Lompoc as follows:

During Phase I in January 2020, the BOP established a task force who worked with experts from the WHO and CDC to develop screening protocols for staff, visitors, and inmates.   (Engleman Decl. ¶ 54.)  The BOP distributed information regarding COVID-19 to inmates February 5, 2020, issued guidance to Lompoc staff on March 10, 2020 explaining the BOP's screening and leave procedures, and posted CDC posters for inmates on how to stop the spread of respiratory diseases on March 12, 2020.  (*Id.*)

Phase II was implemented on March 13, 2020, during which the BOP required each facility to assess its inventories and supplies, update their pandemic plans, and establish quarantine areas in their facilities.  The BOP suspended for a period of 30 days social visits, legal visits, inmate facility transfers, official staff travel, staff training, contractor access, volunteer visits, and tours, and required screening of staff and inmates for known COVID-19 symptoms.  (*Id.* ¶ 55.a.)  On March 13, 2020, the Acting Warden sent a notice to the inmate population concerning the BOP's COVID-19 protective measures.  (*Id.*)  On March 16, 2020, a staff screening site was established at Lompoc for all staff, essential contractors, and volunteers to be screened before entering the facility.  (*Id.* ¶ 56.)  Staff were

instructed not to come to work if they are sick, notified personal protective equipment ("PPE") was available for their use, given screening and leave guidance, and provided information about COVID-19, the importance of handwashing, and stopping the spread of germs. (*Id.*)  CDC posters regarding how to stop the spread of germs were posted for Lompoc inmates on March 25, 2020. (*Id.* ¶ 58.)  Lompoc created a Quarantine Unit and sent guidance to staff on its operation, made efforts to keep inmates within their housing units, emphasized extra sanitation of phones and keyboards, mask-wearing and social distancing, and increased personal and area cleanliness. (*Id.* ¶ 55.b.)  On March 27, 2020, Lompoc modified commissary schedules to help limit inmate group contact. *Id.*

Phase III guidance with issued on March 18, 2020 regarding maximizing telework and taking inventory of sanitation and medical supplies. (Engleman Decl. ¶ 57.)

On March 26, 2020, the BOP implemented Phase IV which added preventative measures for quarantine and isolation and the use of PPE by screening staff at all institutions, and the measures were updated on March 28, 2020. (*Id.* ¶ 59, Ex. BB.)  At USP Lompoc, each housing unit was permitted to go outside to the yard or to education for one hour every other day, and each unit (including quarantined units) were provided showers and phone/computer access every other day. (*Id.* ¶ 60.)

During Phase V, which took effect April 1, 2020, Lompoc implemented the following measures:

> (1)  For a 14-day period, inmates in every institution would be *secured in their assigned cells/quarters* to decrease the spread of the virus.

> (2)  To the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.

> (3)  The BOP would coordinate with the United States Marshals Service ("USMS") to significantly decrease incoming movement.

(4)     After 14 days, this decision would be reevaluated and a decision made as to whether or not to return to modified operations.

(5)     Limited group gathering would be afforded to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Computer System (TRULINCS) access.

(*Id*. ¶ 61.)  All Lompoc inmates were confined to their cells for the majority of the day, meals and a limited number of commissary items were delivered to inmates' cells, inmates were permitted to leave their cells in small groups on a rotating basis at designated times for approximately 2.5-3 hours a day depending on the day of the week and with appropriate physical distancing for activities such as telephone use, TRULINCS, showers, and exercise.  (*Id*.)  On April 6, 2020, the BOP issued guidance to all CEO's directing them to immediately implement CDC guidelines and to issue masks to inmates, surgical masks were issued to all inmates and staff, and three washable cloth masks for each inmate were later distributed.  (*Id*.)  On April 7, 2020, staff were emailed a reminder regarding daily sanitation and the continued need for social distancing, using PPE as instructed, and keeping frequently touched areas clean and disinfected, and sanitation efforts increased at BOP facilities.  (*Id*. ¶ 65.)  On April 8, 2020, the BOP Director posted a memorandum to the inmate population notifying them of the first positive confirmed COVID-19 case of an inmate on March 21, 2020 and the first positive staff case on March 22, 2020.  (*Id*. ¶ 67, Ex. X at 7.)  Lompoc staff was sent information on COVID-19 and steps to take to stay healthy and to stop the spread of the virus, information on the proper use of face coverings was posted for the inmate population on April 13, 2020, and signs and guidance were posted in Housing Unit areas.  (*Id*. ¶¶ 67, 68, Ex. EE at 13.)

Phase VI, which was in effect from April 13, 2020 to May 18, 2020, included efforts to mitigate the spread of COVID-19, limited movement of staff and inmates, outlined criteria for quarantine and isolation of inmates, minimized outside contacts, and addressed continued use of PPE.  (Engleman Decl. ¶ 69.)

Assistant Directors ordered inmates be secured in their assigned cells/quarters, limited group gatherings were provided to the extent practical to facilitate telephone, TRULINCS, commissary, laundry and showers.  (*Id*.)  On April 16, 2020, Lompoc cancelled all staff scheduled leave and posted notices to inmates regarding handwashing and information regarding COVID-19.  (*Id*. ¶ 70, Ex. X at 14-16.)  On April 17, 2020, Lompoc mandated use of masks, began restricting inmates to their housing units, and restricted inmate use of phone and TRULINCS. (*Id*.)  All Lompoc inmates were issued surgical and cloth masks, and required to wear a mask at all times.  (*Id*. ¶¶ 71, 71.a, 71.b, Ex. NN at 63, 71.c.)  Replacement masks were available upon request.  (*Id*. ¶ 71.a, 71.b, Ex. NN at 63, 71.c.)  Each inmate received disinfectant and paper towels.  (*Id*. ¶ 71.a, 71.b, Ex. NN at 63, 71.c.)  Inmates could send and receive mail and legal calls were made available as needed.  (*Id*. ¶¶ 71.a, 71.b.)  At FCI Lompoc, movement was limited to use of restrooms or communicating with staff.  (*Id*. ¶ 71.c.)  Hygiene items were issued weekly, and laundry exchange occurred weekly at USP Lompoc and FCI Lompoc. (*Id*. ¶¶ 71.a, 71.c.)  Commissary, food services, medical services, and laundry services were not affected for Camp inmates during Phase VI.  (*Id*. ¶ 71.b, Ex. NN at 63.)  Commissary was suspended, but food services, medical services and laundry services were not affected at FCI Lompoc.  (*Id*. ¶ 71.c.)

On April 17, 2020, Lompoc implemented 14 days of enhanced mitigation measures including suspending all phone and computer access due to concerns regarding spread of COVID-19 through surfaces, limiting movements at USP Lompoc to cells so there was no access to showers, but weekly laundry exchange continued.  USP Lompoc inmates were allowed to have commissary for up to $50, commissary services were suspended at FCI Lompoc, and usually commissary services were permitted for Camp inmates.  (*Id*. ¶ 72.)  On April 20, 2020 Lompoc issued a press release and staff were advised Lompoc was negotiating a contract for an on-side mobile hospital equipped with hospital beds and medical personnel,

and the Lompoc Warden asked staff to wear masks even when in the community. *Id*. ¶ 73.)  On April 29, 2020 a document regarding Frequently Asked Questions was distributed to Lompoc inmates.  (*Id*. ¶ 74, Ex. II.)

On May 4, 2020, modified operations went into effect at USP Lompoc and the Camp, which included allowing inmates to use showers one at a time with the area being disinfected after each use, allowing brief phone and email access with sanitation and disinfection standards, and requiring wearing surgical masks at all times.  (*Id*. ¶ 75.)  On May 4, 2020, Lompoc announced completed construction of a hospital care unit (HCU) inside Lompoc with ten (10) double-occupancy, acute care treatment rooms with negative pressure, Patient Intake Room, Nurses Station, Pharmacy, Linen Exchange Room, Biohazard Room, and Medical Supply & Storage, and that a contract for medical personnel had been negotiated.  (*Id*. ¶ 76, Ex. JJ.)  On May 5, 2020, Lompoc announced it was testing 100% of inmates for COVID-19, starting at FCI Lompoc and additional information was posted in inmate housing units such as information identifying symptoms and changes in CDC guidance regarding symptoms.  (*Id*. ¶ 76, Ex. EE.)  Staff were reminded by the acting warden of Lompoc on May 8, 2020, that they were "continuously reviewing inmates for Residential Reentry Centers, Home Confinement placements, furlough eligibility prior to placement in RRC/HC's, to further allow us to create the environment needed in a correctional setting to counter COVID-19."  (*Id*. ¶ 79.)  Lompoc staff were emailed regarding following guidance re: social distancing, wearing masks in public, and donning PPE.  (*Id*.)  On May 12, 2020, Lompoc announced the activation of the Hospital Care Unit and that inmates with less severe COVID-19 symptoms would be returned to the facility, and announced impending installation of a BLU-Med Hospital Tent at FCI Lompoc.  (*Id*. ¶ 80.)  On May 14, 2020, Lompoc issued additional guidance for certain units at USP Lompoc, effective May 18, 2020, which required social distancing, use of masks, and sanitation standards but permitted inmates of groups

of no more than 10 at a time to use common areas for one-hour periods to use phones, computers and to shower.  (*Id.* ¶ 81.)

Phase VII, which took effect on May 18, 2020, extended the Phase VI action plan through June 30, 2020.  (Engleman Decl. ¶ 82, Ex. KK.)  All inmates were continued to their cells for the majority of the day but inmates are allowed to leave their cells in small groups on a rotating basis at designated times for certain activities such as phone use, TRULINCS, showers and exercise; and meals are delivered directly to housing units.  (*Id.* ¶ 83.)

Phase VIII, effective July 1, 2020, extends Phase VII through July 31, 2020, and includes procedures regarding inmate "Court trips"; intake procedures regarding symptom and temperature screening, testing, isolation, and quarantine; and movement of inmates between BOP institutions.  (Dkt. No. 40, Ex. D.)

Respondents also state additional measures were taken at Lompoc. Respondents provided COVID-19 testing for FCC Lompoc staff.  (Engleman Decl. ¶ 67.)  According to evidence submitted by Respondents, FCC Lompoc medical staff "regularly" screens inmates through temperature and symptom checks, and all staff, contractors and essential volunteers must undergo a health screening before they are allowed to enter the facility.  (Cross Decl. ¶¶ 15, 19.c, 24, 30, 33.)

With respect to USP Lompoc, inmates in the general population at USP Lompoc are issued soap on a weekly basis, and soap may be purchased at the commissary.  (Engleman Decl. ¶ 65.a.)  Chemical sanitizer is available on a daily basis, but hand sanitizer is not available to inmates.  (*Id.*)  Cleaning supplies are distributed to all units on a weekly basis and available to inmates daily.  (*Id.*) Inmates in SHU are distributed seven packs of multi-soap shampoo on Tuesdays and Thursday.  (*Id.*)  The SHU Law Library is disinfected after each inmate use. (*Id.*)  At the North and South Camps of USP Lompoc, there are two antibacterial foam hand wash dispensers, computer keyboards are covered with plastic bags for

individual use, inmates are issued soap each Friday, cleaning supplies are distributed to all units on a weekly basis and are available to inmates daily.  (*Id.* ¶ 65.b.)

As to FCI Lompoc, the Lompoc Assistant Warden declares staff administer sanitizer before and after inmates use computer keyboards or phones, saran wrap is placed on keyboards prior to each inmates' use, and phones are disinfected between each use.  (*Id.* ¶ 65.b.)  Liquid antibacterial soap is dispensed in unit bathrooms.  (*Id.*)  Cleaning supplies are distributed to all units on a weekly basis and are available to inmates daily.  (*Id.*)  Indigent inmates are issued soap on a weekly basis.  (*Id.*)  Inmates are not provided hand sanitizer for their personal possessions.  (*Id.* ¶ 65.c.)  Every inmate at FCI Lompoc has been tested for COVID-19.  (Cross Decl. ¶ 15; Engleman Decl. ¶ 54.)

The accounts offered by Petitioners, however, paint a different picture. Petitioner Carror-Torres sent a letter to his sister which she received on April 24, 2020, wherein he wrote he was extremely sick and concerned he might have COVID-19.  (Carror Decl. ¶ 5.)[39]  She received another letter on April 30, 2020 from his cellmate who informed her Carror-Torres had asked guards for medical assistance for five days but was ignored, suffered from fever, diarrhea, body aches, went into acute respiratory failure and collapsed in his cell, and was taken to a hospital and put into a medically-induced coma after inmates in his block banged their cell doors demanding he receive medical attention, where he later tested positive for COVID-19, was intubated and put on a ventilator.  (*Id.* ¶¶ 6-7.)

---

[39] The Court may consider inadmissible evidence, including hearsay evidence, in determining whether to issue a temporary restraining order or  preliminary injunction.  *See Houdini Inc. v. Goody Baskets LLC*, 166 F. App'x 946, 947 (9th Cir. 2006) ("[T]he district court did not abuse its discretion in considering hearsay and biased evidence of actual confusion because the rules of evidence do not strictly apply to preliminary injunction proceedings."); *Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (In deciding whether to issue a temporary restraining order, the district court "may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial.").

Carror-Torres telephoned his sister on May 9, 2020 stating his doctor told him he suffered acute lung damage from COVID-19 due to his asthma and his lung capacity was severely deteriorated as a result and was briefly placed in a quarantine unit then placed back in his original cell.  (*Id*. ¶ 9.)

On March 27 or 28, 2020, Petitioner Reed began exhibiting symptoms of COVID-19, was tested on March 30, 2020 and immediately placed in a Special Housing Unit ("SHU") after being tested, was confirmed to be positive for COVID-19 on March 31, 2020, saw a doctor for a temperature and symptom check, and then left in SHU with no medical treatment and did not see a doctor or medical staff again until April 7, 2020.  (Perales Decl. ¶ 6.)  After several days in the SHU, Reed was moved to dormitory Unit 2 H with other prisoners who had tested positive for COVID-19.  (*Id*. ¶ 7.)  For days after Reed arrived at Unit 2 H, no treatment or medicine was made available to anyone in the unit other than daily temperature checks, there was no soap, the prisoners were not allowed to shower, and conditions at the unit were extremely unsanitary.  (*Id*. ¶ 8.)  On April 14, 2020, Reed was returned to the general population at USP Lompoc, but he was not tested again for COVID-19 and only received an in-cell evaluation after his return to the general population.  (*Id*. ¶ 9.)  Reed and others in the general population at USP Lompoc do not have access to disinfectants or hand sanitizer, are only given one small bar of soap each week and cannot purchase any more soap once they run out because the commissary is closed.  (*Id*. ¶ 10.)

Petitioner Fears has received one mask since the COVID-19 pandemic began, has had to reuse that mask, and has not been tested for COVID-19.  (Zayed Fears Decl. ¶¶ 5-6.)  The only testing Fears has seen in his dormitory is temperature checks, and Fears states guards have stopped accepting requests for medical care from prisoners since the COVID-19 outbreak started.  (*Id*.)

In early May 2020, Petitioner Garcia tested negative for COVID-19, and was then moved to a makeshift prisoner housing unit set up in a warehouse at USP

Lompoc on May 7, 2020, where he was placed in a small cell with one cellmate with whom he has to share a toilet and sink. (Zavala-Garcia Decl. ¶ 4.) The warehouse is on total lockdown and Garcia is kept in his cell almost 24-hours a day. (*Id*.) The warehouse is extremely unsanitary, Garcia has not been able to shower or change into clean clothes since May 7, 2020, and Garcia has to wash his body with water from his sink. (*Id*.) Garcia received one mask in late April while he was at FCI Lompoc and has had to reuse that mask since then, has not been given access to hand sanitizer, and states there is a shortage of soap in the warehouse.

According to a former inmate who was incarcerated FCI Lompoc, inmates have to wait in a waiting room with approximately 10 seats with up to 40 people when they "went to medical for sick call" and "social distancing was impossible." (Lumpkin Decl. ¶ 13.) Inmates also had to line up "less than six feet apart in their housing units for pill call." (*Id*.) Dorms have long rows of two-man bunks spaced closed together where social distancing is impossible, and inmates had to go up and down narrow stairwells shoulder to shoulder with other inmates twice a day to pick up meals and bring them back to their housing unit. (*Id*. ¶¶ 14-16.) Inmates were not removed from the housing units and isolated even if they had symptoms like severe coughing unless their temperature was 100.4 degrees or higher. (*Id*. ¶¶ 27-28.) When inmates asked for a replacement for their mask which had been damaged, they were told by correctional staff that they did have any more masks. (*Id*. ¶ 33.) Inmates did not have adequate supplies of soap, if they showered and washed your hands regularly it would run out in a few days, liquid dispensers at sink would be empty by lunch time, and they were not provided with hand sanitizer. (*Id*. ¶ 37.) Inmates were not provided with enough cleaning supplies to clean shared bathrooms and housing units, were given water downed cleaning solution, and were not given paper towels. (*Id*. ¶ 38.) The former inmate recalls once guards brought 36 rags to be used by all 140 prisoners on his floor to clean

their bunks, bathroom faucets, and toilet handles.  (*Id*.)

The disputed facts as to the safety measures implemented at Lompoc precludes the Court from issuing a temporary restraining order at this stage requiring Respondents to implement the specific safety measures to combat COVID-19 requested by Petitioners.[40]  *See Mayview Corp. v. Rodstein*, 480 F.2d 714, 719 (9th Cir. 1973) (holding "[b]ecause of the disputed facts, the matter should proceed to trial on the merits" and preliminary injunction was improper).[41]

Moreover, the fact that COVID-19 has spread among Lompoc inmates does not establish Respondents have the necessary state of mind to satisfy the subjective deliberate indifference prong for Petitioners' Eighth Amendment claim as to the safety measures implemented to protect inmates from COVID-19.  *See Farmer*, 511 U.S. at 844 (the fact that "the harm ultimately was not averted" does not demonstrate deliberate indifference); *Wilson v. Williams*, 2020 WL 3056217, at *8 (finding "while the harm imposed by COVID-19 on inmates at Elton ultimately [is] not averted, the BOP has responded reasonably to the risk and therefore has not been deliberately indifferent to the inmates' Eighth Amendment rights," noting evidence that the BOP took preventative measures, including screening for symptoms, educating staff and inmates about COVID-19, cancelling visitation, quarantining new inmates, implementing regular cleaning, providing disinfectant supplies, providing mask, and engaging in efforts to expand testing "demonstrate the opposite of a disregard of a serious health risk") (internal quotations and citations omitted); *Valentine v. Collier*, 956 F.3d 797, 802-03 (5th

---

[40] At the July 7, 2020 hearing, Petitioners acknowledged there are facts in dispute as to the conditions at Lompoc.

[41] *See also Martinez-Brooks*, 2020 WL 2405350, at *29 ("[F]actual disputes preclude me from concluding at this stage that the Warden's implementation of measures to protect against the spread of COVID-19 exhibits deliberate indifference to the serious risks posed by the virus, and thus that the Petitioners are likely to succeed on the merits of this portion of their claim," and " I thus deny the Petitioner's request for a temporary restraining order to the extent that it asks the Court to direct the Warden to implement safety measures and report to the Court on the status of those measures.").

Cir. 2020) (prison officials showed likelihood of success on appeal of preliminary injunction issued by district court required the officials to immediately implement more preventive measures to combat COVID-19 in Texas state prison, reasoning the plaintiffs lacked evidence of the defendants' "subjective deliberate indifference" to the substantial risk of serious harm of COVID-19 and noting "[t]o the contrary, the evidence shows that [Texas Department of Criminal Justice] has taken and continues to take measures—informed by guidance from the CDC and medical professionals—to abate and control the spread of the virus"); *Swain v. Junior*, 958 F.3d 1081, 1089 (11th Cir. 2020) (noting the district court incorrectly collapsed the subjective and objective components of the deliberate indifference inquiry for plaintiffs' Eighth Amendment claim and likely erred because (1) resultant harm does not establish a liable state of mind for deliberate indifference but the district court "treated the increase in COVID-19 infections as proof that the defendants deliberately disregarded an intolerable risk"; and (2) "the inability to take a positive action likely does not constitute 'a state of mind more blameworthy than negligence'" required for deliberate indifference but the district court treated defendants' inability to "achieve meaningful social distancing" as evincing a reckless state of mind for the subjective component of plaintiffs' claim despite acknowledging social distancing was "impossible" and "cannot be achieved absent an additional reduction in Metro West's population or some other measure to achieve meaningful social distancing").[42]

_____

[42] *Cf. Cameron*, 2020 WL 1929876, at *2 (preliminarily finding deliberate indifference in violation of the Eighth Amendment when jail "has not imposed even the most basic safety measures recommended by health experts, the Centers for Disease Control and Prevention, and Michigan's Governor to reduce the spread of COVID-19 in detention facilities"); *Banks v. Booth*, 2020 WL 1914896, at *10-*11 (D.D.C. Apr. 19, 2020) (finding plaintiffs established a likelihood of success in showing deliberate indifference where plaintiffs provided evidence the defendants "are aware of the risk that COVID-19 poses to Plaintiffs' health and have disregarded those risks by failing to take comprehensive, timely, and proper steps to stem the spread of the virus," including evidence "inmates who have requested medical aid for COVID-19 symptoms report long waits for medical care, testing, or separation from the general population").

1

**b.**     **Requests for Home Confinement and Compassionate**

2

**Release**

3       Aside from the safety measures implemented to prevent the spread of

4 COVID-19 at Lompoc, Petitioners also contend Respondents are violating the

5 Eighth Amendment by failing and/or misusing their statutory authority pursuant to

6 the CARES Act to maximize transfers to home confinement during the pandemic.

7       18 U.S.C. § 3624 authorizes the BOP to place certain prisoners on home

8 confinement for the shorter of 10 percent of the term of imprisonment of that

9 prisoner or 6 months.  On March 26, 2020, Attorney General William Barr issued

10 a memorandum directing the BOP to prioritize the use of "various statutory

11 authorities to grant home confinement for prisoners seeking transfer in connection

12 with the COVID-19 pandemic."  The Attorney General's March 26 memorandum

13 provided a list of discretionary factors for evaluating inmates for confinement,

14 which included: (1) "[t]he age and vulnerability of the inmate to COVID-19, in

15 accordance with the Centers for Disease Control and Prevention (CDC)

16 guidelines"; (2) "[t]he security level of the facility currently holding the inmate,

17 with priority given to inmates residing in low and minimum security facilities";

18 "[t]he inmate's conduct in prison"; (3) "[t]he inmate's score under PATTERN,

19 with inmates who have anything above a minimum score not receiving priority

20 treatment under this Memorandum"; (4) "[w]hether the inmate has a demonstrated

21 and verifiable re-entry plan that will prevent recidivism and maximize public

22 safety"; and (5) "[t]he inmate's crime of conviction, and assessment of the danger

23 posed by the inmate to the community."[43]

24       Section 12003(b)(2) of the CARES Act, enacted on March 27, 2020,

25 authorizes the Attorney General to expand the BOP to lengthen the maximum

26

27 _____

[43] Attorney General Barr noted in the March 26 memorandum that "[s]ome
28 offenses, such as sex offenses, will render an inmate ineligible for home
detention."

amount of time a prisoner may be placed on home confinement pursuant to §
3624(c)(2) upon finding "emergency conditions will material affect the
functioning of the [BOP]."  CARES Act, Pub. L. No. 116-136, § 12003(b)(2).  On
April 3, 2020, Attorney General Barr issued a memorandum to the Director of the
BOP, wherein Barr found emergency conditions are materially affecting the
functioning of the BOP as a result of the pandemic.  The April 3 memorandum
instructed the BOP to continue processing inmates eligible for home confinement
under pre-CARES Act standards, and directed the BOP to "expand the cohort of
inmates who can be considered for home release . . . to the most vulnerable
inmates at the most affected facilities" and "immediately review all inmates who
have COVID-19 risk factors, as established by the CDC."[44]

Respondents contend the BOP's multiphase plan included consultation with
experts from the CDC.  The CDC's own guidelines, however, provide that social
distancing is "a cornerstone of reducing transmission of respiratory disease."[45]
The BOP's multiphase plan does not include measures for meaningful social
distancing.[46]  Moreover, the number of inmates incarcerated at Lompoc is over the
designated capacity.[47]  Four inmates at Lompoc have died and over 1,000 Lompoc

---

[44] In the April 3 memorandum, Attorney General Barr also wrote "we cannot
simply release prison populations en masse onto the streets" because of risks to
the public of criminal activity from released prisoners, and thus directed the BOP
to "continue making the careful, individualized determinations BOP makes in the
typical case."

[45] CDC, *Interim Guidance on Management of Coronavirus Disease 2019
(COVID-19) in Correctional and Detention Facilities* at 4 (Mar. 23, 2020),
available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-
correctional-detention.pdf.

[46] *Accord Wilson v. Williams*, 2020 WL 3056217, at *13 (Cole, dissenting).

[47] *See* Federal Bureau of Prisons, *Prison Rape Elimination Act (PREA) Audit
Report* at 2, 6, available at
https://www.bop.gov/locations/institutions/lof/prea_lof.pdf (last accessed July 7,
2020); Federal Bureau of Prisons, *USP Lompoc*, available at
https://www.bop.gov/locations/institutions/lom/ (last accessed July 9, 2020);
Federal Bureau of Prisons, *FCI Lompoc*, available at
https://www.bop.gov/locations/institutions/lof/ (last accessed July 9, 2020); *see
also* Engleman Decl. ¶ 7.

have tested positive for COVID-19.  The evidence before the Court demonstrates
meaningful social distancing is not possible at Lompoc absent a reduction in the
inmate population, thereby placing medically vulnerable inmates at Lompoc at
significant risk of contracting COVID-19.  Congress recognized the serious threat
to the health and safety of inmates in light of COVID-19 and the urgent need for
reduction of the inmate population in certain institutions in passing the CARES
Act.

Despite passage of the CARES Act, and despite the Attorney General's
Memorandum emphasizing the existence of emergency conditions facing the BOP
as the result of the pandemic and the need for "immediate[]" review of inmates
with COVID-19 risk factors for home confinement, there is no evidence
Respondents are prioritizing their use of statutory authority under the CARES Act
to grant home confinement to Lompoc inmates in light of the pandemic, or giving
due consideration to inmates' age or medical conditions in evaluating eligibility of
home confinement.  As of April 20, 2020, only 59 Lompoc inmates had been
considered for home confinement and 24 inmates were scheduled to be released to
home confinement or a Residential Reentry Center.  (Rim Decl. Ex. Q.)  There is
no evidence before the Court regarding how many inmates have actually been
released to home confinement in light of the pandemic.[48]

A request for home confinement on behalf of Petitioner Garcia was sent to
the Lompoc Warden on May 11, 2020, but no response has been received.
(Zavala-Garcia Decl. ¶ 8.)  According to Lompoc's Reduction in Sentence
Coordinator, Garcia's request is being reviewed by staff to determine whether he
qualifies.  (Arnold Decl. ¶ 6.c.)  The Associate Warden, however, declares

---

[48] At the July 7, 2020 hearing, Respondents represented that since April 2, 2020,
840 Lompoc inmates have been considered for home confinement.  Respondents,
however, did not have information regarding how many of the 840 inmates have
actually been placed on home confinement, and there is no evidence before the
Court as to what criteria was applied by Respondents in determining those
inmates' eligibility for home confinement.

Petitioner Garcia is not "suitable for home confinement at this time" because he has a prior conviction for engaging in an act of unlawful sexual intercourse with a minor and must participate in and complete the transitional component of the drug treatment program at the RCC to earn a reduction in sentence under 18 U.S.C. § 3621.  (*Id.* ¶ 49 b.)

Petitioner Carror-Torres suffers from chronic asthma (Carror Decl. ¶ 2), and therefore is at higher risk for severe illness or death from COVID-19.[49]  The Associate Warden of Lompoc, however, declares Carror-Torres is "unsuitable for CARES Act home confinement" because he was convicted of a violent offense and because sexual assault was an element of the offense for which Carror-Torres was convicted.  (*Id.* ¶¶ 49.a, 49.b.)

Petitioner Brown is 55 years old, has prostate cancer and will need future treatment (chemotherapy or surgery), and therefore may be at higher risk for contracting COVID-19.  (Wefald Decl. ¶¶ 1, 6.)  However, the Associate Warden declares Brown has not been "prioritized for home confinement at this time due to [his] low (rather than minimum) risk for recidivism."  (Engleman Decl. ¶ 50.)[50]

Petitioner Reed is 53 years old and has hypertension.  (Perales Decl. ¶ 2.) The Associate Warden, however, declares Reed is "unsuitable for CARES Act home confinement" of his violent crime conviction.  (Engleman Decl. ¶ 49.a.) Petitioner Fears is 50 years old (Zayed Fears Decl. ¶ 2), but Respondents state Fears does not qualify for priority placement on home confinement because of his

---

[49] While Carror-Torres has already tested positive for COVID-19 and has been released from the hospital after receiving treatment, he was informed he suffered acute lung damage from COVID-19 due to his asthma and his lung capacity was severely deteriorated as a result.  (Carror Decl. ¶¶ 6-7, 9.)  Moreover, it is unknown at this time whether persons who contract COVID-19 are immune from the virus or how long any such immunity would last.

[50] As to the remaining named Petitioners, the Associate Warden of Lompoc declares Petitioner Reed is "unsuitable for CARES Act home confinement" because he has been convicted of a violent offense (Engleman Decl. ¶ 49.a), and Petitioner Fears has not been "prioritized for home confinement at this time due to [his] low (rather than minimum) risk for recidivism" (*id.* ¶ 50).

1  risk of recidivism.

2       After the July 7, 2020 hearing, Respondents filed a declaration from Todd

3  Javernick, the Regional Correctional Programs Administrator for the Western

4  Region of the BOP, who declared a May 8, 2020 memorandum from the Acting

5  Assistant Director over Correctional Programs Division and the Assistant Director

6  over Reentry Services Division was issued which "provided that a Warden may

7  refer for further review any inmate that does not meet the current suitability

8  criteria but does have COVID-19 risk factors for severe disease to the Correctional

9  Programs Division in Central Office." (Javernick Decl. ¶ 20.)  However, there is

10  no evidence that the Warden at Lompoc has referred any inmate for home

11  confinement based only on his COVID-19 risk factors for severe illness following

12  the May 8, 2020 memorandum.  Javernick also declares a "roster" of inmates to

13  review for home confinement was sent out by the BOP on May 12, 2020, which

14  was generated solely based on an inmate's age being 65 or older, "home

15  confinement consideration was emphasized and it was suggested that inmates be

16  sent up for further review by the Correctional Programs Division for review as an

17  exception if they don't meet the criteria for home confinement placement for any

18  reason." (*Id*. ¶ 21.)  However, there is no evidence any Lompoc inmates were

19  identified in the May 12, 2020 roster or considered for home confinement based

20  on their age being 65 or older.

21       Accordingly, the evidence demonstrates Respondents have ignored, and

22  therefore have likely been deliberately indifferent, to the known urgency to

23  consider inmates for home confinement, particularly those most vulnerable to

24  severe illness or death if they contract COVID-19, in failing to make prompt and

25  meaningful use of home confinement and disregarding inmates' age and medical

26  conditions in determining eligibility for home confinement.[51]  Petitioners therefore

27

28  [51] At the July 7, 2020 hearing, Respondents represented the BOP has identified
Lompoc inmates who are "medically vulnerable" consistent with CDC guidelines
as part of the home confinement process, but no evidence in support of this

1  demonstrate a likelihood of success on their Eighth Amendment claim based on

2  the Lompoc Warden's failure to take reasonable measures to reduce risk of serious

3  harm to inmates by failing to make meaningful use of his home confinement

4  authority as expanded by the CARES Act.  *See Wilson v. Williams*, 2020 WL

5  3056217, at \*14 (Cole, Dissenting) (The BOP's failure to make use of its home

6  confinement authority at Elkton, "constitutes sufficient evidence for the district

7  court to have found that petitioners were likely to succeed on their Eighth

8  Amendment claim"); *Martinez-Brooks*, 2020 WL 2405350, at \*23, \*26 (noting the

9  "Eighth Amendment requires that [the determination of whether to place an

10  inmate on home confinement] be made promptly," and finding petitioners showed

11  a likelihood of success on the merits on their Eighth Amendment claim with

12  respect to the medically vulnerable subclass because the Danbury Warden "has

13  disregarded a 'substantial risk of serious harm' by 'failing to take reasonable

14  measures to abate it'" by "failing to make meaningful use of her home

15  confinement authority") (quoting *Farmer*, 511 U.S. at 847).

16      Petitioners also argue Respondents are violating the Eighth Amendment by

17  not granting compassionate release of Lompoc inmates.  Under 18 U.S.C. §

18  3582(c)(1)(A), a sentencing court may reduce a defendant's term of imprisonment

19  upon a motion by the Director of the BOP or the defendant, if it finds that

20  "extraordinary and compelling reasons warrant such a reduction."  For the BOP to

21  bring a motion for compassionate release on behalf of a defendant, the warden

22  must determine that the request warrants approval, and then the request must be

23  reviewed by the General Counsel and either the Medical Director or the Assistant

24  Director, Correctional Programs Division, before the Director of the BOP brings a

25  motion for compassionate release under 18 U.S.C. § 3582(c).  28 C.F.R. § 571.62.

26

27  representation has been provided to the Court.  At the hearing, Respondents were
    unable to identify for the Court how many Lompoc inmates are considered
28  "medically vulnerable" consistent with CDC guidelines.

A defendant may bring a motion for compassionate release after "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

There is no evidence demonstrating consideration of Lompoc inmates' risk factors for severe illness or death from COVID-19 in evaluating requests for compassionate release, and Petitioners' evidence suggests requests for compassionate release are discouraged/not being accepted at Lompoc.  Petitioners state Petitioner Garcia submitted a request for compassionate release to the Lompoc Warden on April 12, 2020 but has not yet been granted release.[52]  Melissa Arnold, the Reduction in Sentence Coordinator at FCC Lompoc, declares Garcia's request is being reviewed by staff to determine whether he qualifies for release.  (Arnold Decl. ¶ 6.)  However, Respondents do not submit evidence regarding what has been done so far by staff in reviewing the requests, what remains to be done, how long the staff review will take, when staff recommendations will be presented to the Lompoc Warden, or when the ultimate determination will be made on Petitioners Garcia's request.[53]  Richard Lumpkin, a former Lompoc inmate who was released on May 8, 2020 after a court granted his motion for compassionate release, declares on or about April 13, 2020 a prison official announced, "do not submit any request for compassionate release, or grievances because staff is not accepting them because we are understaffed."

---

[52] Respondents represented at the July 7, 2020 hearing that Garcia's request is still being reviewed.

[53] Arnold declares after staff completes their review of Petitioner Carror-Torres, Garcia, and Brown's requests, they "will submit a recommendation as to the disposition of the application," and "[t]he Warden will then consider that recommendation and will either forward the application to the BOP's Office of General Counsel for further processing or will deny the application and inform the inmate of that denial in writing."  (Arnold Decl. ¶ 7.)

(Lumpkin Decl. ¶ 46.)[54]  Lumpkin also declares another inmate, Anthony Samuels, had submitted a request for compassionate release to his unit case manager and asked that it be forwarded to the warden for consideration but was told "I'll forward it to my shredder," and has not received a written response from the case manager or warden regarding his request for compassionate release.  (*Id.* ¶ 47.)[55]

Respondents do not submit evidence regarding how many Lompoc inmates have been considered for compassionate release by the Warden since the pandemic began, how many requests for compassionate release (if any) have been brought by the BOP on behalf of Lompoc inmates, or how many Lompoc inmates have actually been released under 18 U.S.C. § 3582(c).[56]  Respondents' failure to make reasonable and prompt use of compassionate release to reduce the inmate population is buttressed by the fact that the evidence before the Court demonstrates the number of inmates at Lompoc is over the designated capacity for inmates.

Therefore, Respondents' failure to take reasonable measures to promptly review and grant requests for compassionate release or move for compassionate

---

[54] *See also United States v. Pippin*, 2020 WL 2602140, at *2 (W.D. Wash. May 20, 2020) (The Court "implore[ed] FCI-Lompoc to respond to" the petitioner's request for compassionate release request and petitioner's counsel sent the court's order to FCI-Lompoc in an email but "FCI-Lompoc never responded").

[55] Requests for compassionate release were also submitted to the Lompoc Warden on behalf of Petitioner Carror-Torres on May 11, 2020 and behalf of Petitioner Brown on May 13, 2020.  (Carror Decl. ¶ 11; Wefald Decl. ¶ 7.)  There is no evidence before the Court that a response has been received, but Respondents represented at the July 7, 2020 hearing that the BOP has denied Carror-Torres and Brown's requests.  However, no evidence has been submitted regarding the reasons for the purported denials of Carror-Torres and Brown's requests for compassionate release.  Respondents represented at the hearing Brown is being considered as an "exception" for home confinement but no information was provided as to the type of exception for which he is being considered or when a determination will be made as to whether he will be placed on home confinement under such an "exception."

[56] Respondents were unable to provide such information in response to the Court's inquiries at the July 7, 2020 hearing.

release on behalf of Lompoc inmates to reduce the inmate population at Lompoc further demonstrates Respondents' deliberate indifference to inmates' risk of severe illness or death from COVID-19. *See Martinez-Brooks*, 2020 WL 2405350, at *24 (finding petitioners showed a likelihood of success on the merits on their claim that the Respondents are displaying deliberate indifference in violation of the Eighth Amendment based on evidence demonstrating FCI Danbury staff's failure to grant a single request for compassionate releasee, respondents' failure to adjust the standards for compassionate release to take into account "new 'extraordinary and compelling' circumstances presented by COVID-19 in the prison setting," and evidence the warden "is processing request for compassionate release based on COVID-19 at a pace that disregards the seriousness of the risk faced by medically vulnerable inmates").

Accordingly, the Court finds Petitioners demonstrate a likelihood of success on their Eighth Amendment claims based on Respondents' failure to make meaningful use of the home confinement authority as expanded by the CARES Act or compassionate release which takes into account Lompoc inmates' risk for severe illness or death from COVID-19.  Alternatively, the Court finds there are serious questions going to the merits of Petitioners' Eighth Amendment claims based on Respondents' failure to promptly consider home confinement or compassionate release of Lompoc inmates which takes into account inmates' age and medical conditions which place them at high risk for severe illness or death from COVID-19.[57]  *All. for the Wild Rockies*, 632 F.3d at 1131.

**(6)     Irreparable Harm, Balance of Equities, and the Public Interest**

Here, Petitioners face risk of irreparable harm to their health in light of

---

[57] The balance of hardships tips sharply in Petitioners' favor because Petitioners face significant risk of irreparable harm to their health and violation of their constitutional rights if a TRO is not issued requiring an expedited process for considering home confinement or compassionate release of medically vulnerable inmates in light of COVID-19.  (*See* infra.)

1   COVID-19 and the public interest is served to prevent violation of Petitioners'

2   Eighth Amendment rights.  *See Am. Beverage Ass'n v. City & Cty. of San*

3   *Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) ("[I]t is always in the public interest

4   to prevent the violation of a party's constitutional rights."); *Wilson v. Williams*,

5   2020 WL 3056217, at \*11 ("district court correctly noted that inmates at Elkton

6   face a risk of irreparable injury if they are infected by COVID-19"); *Castillo v.*

7   *Barr*, 2020 WL 1502864, at \*6 (C.D. Cal. Mar. 27, 2020) (finding the balance of

8   the equities tipped "sharply in favor of the Petitioners" because the civil detainee

9   petitioners face "irreparable harm to their constitutional rights and health" in light

10  of COVID-19 pandemic, and noting "there is no harm to the Government when a

11  court prevents the Government from engaging in unlawful practices") (citing

12  *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); *Martinez-Brooks*,

13  2020 WL 2405350, at \*28 (noting in granting TRO "aimed at accelerating the

14  process for evaluating inmates [at Danbury Federal Correctional Institution] for

15  home confinement and compassionate release, that "Petitioners' interest in

16  avoiding serious illness or death must weigh heavily" and "the public interest is

17  best served by ensuring the constitutional rights of persons within the United

18  States are upheld").

19      The Court is mindful of public safety concerns if inmates are released or

20  placed on home confinement, including concerns regarding increased criminal

21  activity.  The Court does not order release of Petitioners here.  Instead, the Court

22  orders Respondents to make a prompt determination of the eligibility of home

23  confinement and compassionate release as to Lompoc inmates who are at higher

24  risk for severe illness or death from COVID-19.  The Court expects such

25  determinations by Respondents to include consideration of public safety and the

26  nature of Petitioners' convictions, but due consideration should be given to an

27  inmate's age and medical conditions in evaluating eligibility for home

28  confinement and compassionate release.  *See Martinez-Brooks*, 2020 WL

2405350, at *28 (noting "an assessment of the public interest also requires individualized consideration of an inmate's suitability for release, taking into account the safety of the inmate, his or her family, and the public" and that the injunction ordered "mandates such individualized consideration, albeit on a basis more accelerated and more focused on the critical factors of inmate and public safety than the current home confinement review process at FCI Danbury").

Respondents also argue Petitioners have access to healthcare while incarcerated but have not proven they will have access to medical care if released, where Petitioners would reside, and whether Petitioners will have access to medical care if placed on home confinement or released. Petitioners, however, submit evidence of where each Petitioner would reside if placed on home confinement (Carror Decl. ¶ 12; Perales Decl. ¶ 13; Zavala-Garcia Decl. ¶ 9; Wefald Decl. ¶ 8; Zayed Fears Decl. ¶ 8), and submit evidence Carror-Torres, Garcia, Brown, and Fears would have access to medical doctors familiar with their medical history (Carror Decl. ¶ 12; Zavala-Garcia Decl. ¶ 9; Wefald Decl. ¶ 8; Zayed Fears Decl. ¶ 8).[58] Moreover, the Court's order here does not prohibit Respondents from taking into account the safety of inmates, their family, and the public in determining the suitability for release, but rather orders Respondents to prioritize inmates at high risk of severe illness or death from COVID-19 for consideration of home confinement and compassionate release. *See, e.g.,* *Martinez-Brooks*, 2020 WL 2405350, at *28 ("Respondents argue that an assessment of the public interest also requires individualized consideration of an inmate's suitability for release, taking into account the safety of the inmate, his or her family, and the public. I agree, and the order I issue today mandates such individualized consideration, albeit on a basis more accelerated and more focused on the critical factors of inmate and public safety than the current home

---

[58] No information regarding Petitioner Reed's access to medical care if he is placed on home confinement was provided.

1    confinement review process at FCI Danbury.").

2    Accordingly, the Court finds the balance of equities and public interest tip

3    sharply in Petitioners' favor for issuance of an order expediting the process for

4    determining inmates' eligibility for home confinement or compassionate release

5    which takes into account inmates' age and medical condition in light of COVID-

6    19. *Alliance for the Wild Rockies*, 632 F.3d at 1131.

7    **F.    Other Purported Grounds Barring Relief**

8    **(1)    The PLRA's Limitations To Court Prison Release Orders**

9    Respondents argue judicial review of Petitioners' claims are barred by the

10   PLRA.

11   18 U.S.C. § 3626(a)(3)(A) of the PLRA provides:  "In any civil action with

12   respect to prison conditions, no court shall enter a prisoner release order unless ...

13   (i) a court has previously entered an order for less intrusive relief that has failed to

14   remedy the deprivation of the Federal right sought to be remedied... ; and (ii) the

15   defendant has had a reasonable amount of time to comply with the previous court

16   orders." *Id.*  It precludes prisoner release orders unless "entered [ ] by a three-

17   judge court." *Id.* § 3626(a)(3)(B).  Before entering such an order, the three-judge

18   panel must first find, by clear and convincing evidence, "(i) crowding is the

19   primary cause of the violation of a Federal right; and (ii) no other relief will

20   remedy the violation of the Federal right." *Id.* § 3626(a)(3)(E).  The PLRA

21   defines "prisoner release order" in expansive terms to include "any order ... that

22   has the purpose or effect of reducing or limiting the prison population, or that

23   directs the release from ... a prison." *Id.* § 3626(g)(4).  The PLRA's limitations

24   "ensure that the 'last resort remedy' of a population limit is not imposed 'as a first

25   step.'" *Brown v. Plata*, 563 U.S. 493, 514 (2011) (citation omitted).

26   A "civil action with respect to prison conditions" for purposes of the PLRA

27   means "any civil proceeding arising under Federal law with respect to the

28   conditions of confinement or the effects of actions by government officials on the

1   lives of persons confined in prison, but does not include habeas corpus
2   proceedings challenging the fact or duration of confinement in prison." 8 U.S.C. §
3   3626(g)(2). Therefore, the PLRA's limitations regarding prison release orders do
4   not apply to habeas proceedings "challenging the fact or duration of confinement
5   in prison." *Id*.; *see also Nettles*, 830 F.3d at 934 (prisoners must comply with the
6   PLRA if their claim challenges any "aspect of prison life" other than the "fact or
7   duration of the conviction or sentence"). Having found Petitioners assert a proper
8   habeas claim pursuant to § 2241 challenging the fact of their confinement, the
9   PLRA's limitations regarding prison release orders do not apply here. *See Wilson
10  v. Williams*, 2020 WL 3056217, at *6 ("Because petitioners' claims are properly
11  brought under § 2241, the BOP's argument that the claims are foreclosed by the
12  PLRA fails. The PLRA does not apply in habeas proceedings.") (citing 18 U.S.C.
13  § 3626(g)(2)).

14         **(2)    Exhaustion of Administrative Remedies**

15         "The PLRA requires a prisoner to exhaust 'available administrative
16  remedies'" before bringing an action with respect to prison conditions." *Williams
17  v. Paramo*, 775 F.3d 1182, 1190-91 (9th Cir. 2015) (citing 42 U.S.C. § 1997e(a)).
18  A defendant may raise failure to exhaust administrative remedies as an affirmative
19  defense. *Id.* at 1191. A defendant "must first prove that there was an available
20  administrative remedy and that the prisoner did not exhaust that available remedy.
21  Then, the burden shifts to the plaintiff, who must show that there is something
22  particular in his case that made the existing and generally available administrative
23  remedies effectively unavailable to him by 'showing that the local remedies were
24  ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.'" *Id.*

25         Respondents argue Petitioners have not exhausted their administrative
26  remedies such as through the traditional grievance process, and that Petitioners
27  can move for immediate release under 18 U.S.C. § 3582(c)(1)(A), request
28  compassionate release or a reduction in sentence under 18 U.S.C. §§ 3582 and

4205(g), or request that the Warden respond to an emergency request within three calendar days under 28 C.F.R. § 542.18.  While the PLRA requires a prisoner to exhaust "'available administrative remedies' before bringing an action with respect to prison condition," an administrative remedy is not available if "prison officials inform the prisoner that he cannot file a grievance."  *Id*.  Here, Petitioners submit evidence Lompoc inmates were instructed by prison officials not to submit grievances and requests for compassionate release because such grievances and requests were not being accepted due to understaffing.  (Lumpkin Decl. ¶ 46.)  Moreover, Petitioner Garcia has not received a response to his request for compassionate release.  Therefore, the Court finds Petitioners meet their burden of showing exhaustion is excused because administrative remedies are not available.  *See Paramo*, 775 F.3d at 1191-92 (petitioner met her burden of production in showing that administrative remedies were not available to her where she alleged she first tried informing an officer about her claim but "he did not help her" and told her it was "not [his] problem," and she "attempted to file a grievance and an appeal" with an officer "who rejected the grievance and refused to file the appeal"); *Martinez-Brooks*, 2020 WL 2405350, at *19 (finding petitioners were excused from exhaustion of their administrative remedies based on undue prejudice from delay where the warden had considered only 159 inmates for home confinement to date and had not addressed 44% of the compassionate release requests, and petitioners "have shown that that they would likely suffer irreparable harm if they were required to exhaust the administrative remedy process before seeking relief in court" "[g]iven the rapid spread of COVID-19 at FCI Danbury, as evidenced by the number of positive tests among inmates and staff to date").[59]

**(3)   Mootness**

Respondents also argue Plaintiffs' motion for preliminary injunction is

---

[59] *See also Wilson v. Ponce*, 2020 WL 3053375, at *11 ("The Court is satisfied that exhaustion is met or excused here, for the reasons argued by Petitioners.").

moot as to Petitioners Brown and Fears because the BOP has considered their
place of confinement and they will be transferred to a different facility.  The Court
finds Brown and Fears' claims are not moot because they have not yet been
transferred and Respondents have not made a determination regarding home
confinement or compassionate release which takes into account Brown and Fears'
age and medical conditions in light of COVID-19.

**G.    Class Certification**

Also pending before the Court is Petitioners' *Ex Parte* Application for
Provisional Class Certification.  (Dkt. No. 22.)  Petitioners move for provisional
class certification in connection with their motion for a preliminary injunction
pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2).  Petitioners seek
provisional certification of the following class:  "All current and future people in
post-conviction custody at FCI Lompoc and USP Lompoc."  However, Petitioners
state if the Court disagrees with the proposed class definition, Petitioners move for
the Court to redefine or modify the class definition.

The Court finds the proposed class definition is overly broad.  The Court
therefore redefines the class as "all current and future people in post-conviction
custody at FCI Lompoc and USP Lompoc over the age of 50,[60] and all current and
future people in post-conviction custody at FCI Lompoc and USP Lompoc of any
age with underlying health conditions including chronic obstructive pulmonary
disease; serious heart conditions such as heart failure, coronary artery disease, or
cardiomyopathies; Type 2 diabetes; chronic kidney disease; sickle cell disease;
immunocompromised state from a solid organ transplant; obesity (body mass
index of 30 or higher); asthma; cerebrovascular diseases; cystic fibrosis;
hypertension or high blood pressure; immunocompromised state from blood or

---

[60] Petitioners' medical expert declares inmates are generally in poorer health than
the general population and inmates over the age of 50 and inmates of any age with
underlying health conditions are at higher risk for severe illness from COVID-19.
(Samra Decl. ¶ 8.)

1   bone marrow transplant; immune deficiencies, HIV, or those who use

2   corticosteroids, or use other immune weakening medicines; neurologic conditions

3   such as dementia; liver diseases; pulmonary fibrosis; thalassemia; Type 1 diabetes;

4   and smokers."[61]  *See Wang v. Chinese Daily News, Inc.,* 737 F.3d 538, 546 (9th

5   Cir. 2013) ("Rule 23 provides district courts with broad authority … to redefine …

6   classes as appropriate.").  The Court now addresses the requirements for class

7   certification as to the redefined class.

8   **(1)   Rule 23(a)**

9   For provision certification, Petitioners must satisfy the requirements of

10   Federal Rule of Civil Procedure 23(a):  (1) numerosity; (2) commonality; (3)

11   typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a).

12   Rule 23(a)'s numerosity requirement for class certification requires the

13   class to be "so numerous that joinder of all members is impracticable."  Fed. R.

14   Civ. Proc. 23(a).  There are over 2,000 inmates currently incarcerated at Lompoc.

15   While there is no specific information regarding the number of Lompoc inmates in

16   the redefined class, Respondents state they do not contest the numerosity

17   requirement is met.[62]  Accordingly, the Court finds the class is so numerous that

18   joinder is impracticable, and therefore the numerosity requirement is met.

19   To satisfy the commonality requirement, there must be questions of law

20   and/or fact common to the class. Fed. R. Civ. P. 23(a)(2). To establish

21   commonality, Plaintiff need only point to a single common question to the class.

22   *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2556 (2011).  The Court finds all

23   class members have been subjected to significant risk of exposure to COVID-19.

24   Common facts include the process by Respondents in considering Lompoc

25   _____

26   [61] *See, e.g., Martinez-Brooks*, 2020 WL 2405350, at *30-*31 (provisionally
    certifying class of "medically vulnerable" prisoners with COVID-19 risk factors at
    FCI Danbury).

27   [62] Although Respondents state that Petitioners' class definition is overbroad, they
28   do not contend that the numerosity requirement is not met, even as to a smaller
    subset of Lompoc inmates.

inmates for home confinement and compassionate release are common to the entire putative class, and common questions exist as to whether Respondents' failure to make prompt and meaningful use of home confinement and compassionate release in light of the pandemic, and disregard of inmates' age and medical conditions in determining eligibility for home confinement and compassionate release violate the Eighth Amendment. *See, e.g., Martinez-Brooks*, 2020 WL 2405350, at *30 ("I find that, as in *Preiser*, the claim as to which I now grant preliminary relief—that the Warden's implementation of her home confinement and compassionate release authority violates the constitutional rights of medically vulnerable inmates—is plainly "applicable on behalf of the entire [subclass]" and "uncluttered by subsidiary issues."). Accordingly, the Court finds the commonality requirement is satisfied.[63]

"Claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). The Court finds Petitioners' Carror-Torres, Brown, Reed, and Fears' claims are typical of the class because Petitioners are currently incarcerated at Lompoc, have been subject to substantial risk of exposure to COVID-19, have higher risk of severe illness or death from COVID-19 based on their age and/or underlying medical conditions,[64] and challenge the

---

[63] Respondents argue that individualized issues preclude certification because "there is no way to decide which inmates should stay and which inmates should go, without diving into an inmate specific inquiry." However, the inquiry is whether Respondents' existing process with respect to home confinement and compassionate release, as applied to medically vulnerable inmates, "amounts to deliberate indifference." *Martinez-Brooks*, 2020 WL 2405350, at *30. Respondents also argue each inmate "presents a different risk profile for COVID-19 based on age and preexisting conditions," which precludes class certification. However, "while members of the putative class [as redefined by the Court] may vary in terms of the severity of their COVID-19 risk factors, all are recognized as falling in the high-risk group as to which heightened precautions are justified." *Martinez-Brooks*, 2020 WL 2405350, at *30-*31. Accordingly, the Court finds individualized inquiries do not preclude provisional certification at this stage.

[64] The record before the Court does not demonstrate Petitioner Garcia has an underlying health condition placing him at higher risk for severe illness or death from COVID-19.

46

same process regarding Respondents' failure to make prompt and meaningful use of home confinement and compassionate release.  *See, e.g., Martinez-Brooks*, 2020 WL 2405350, at *30-*31 (finding typicality requirement was similarly satisfied because "the process at issue is applicable to all inmates" and  "each member's claim arises from the same course of events—the establishment and operation of this process [regarding home confinement and compassionate release]— and each class member makes similar legal arguments to prove the defendant's liability.") (internal quotations and citation omitted).  Accordingly, the Court finds that with the exception of Petitioner Garcia, the typicality requirement is satisfied.

To satisfy the adequacy of representation requirement, Petitioners must show (1) that the putative named plaintiffs have the ability and the incentive to represent the claims of the class vigorously; (2) that the named plaintiffs have obtained adequate counsel, and (3) that there is no conflict between the named plaintiffs' claims and those asserted on behalf of the class.  *Lerwill v. Inflight Motion Pictures, Inc*., 582 F.2d 507, 512 (9th Cir. 1978).  Petitioners submit evidence of their counsel's experience litigating class actions and complex cases, including cases on behalf of prisoners.  Respondents do not challenge the adequacy of Petitioners' counsel.  Moreover, there is no conflict between Petitioners and members of the class.  Petitioners have confirmed their willingness to be a named plaintiff in this action.  (*See* Carror Decl. ¶ 3; Perales Decl. ¶ 4; Zavala-Garcia Decl. ¶ 3; Wefald Decl. ¶ 1; Zayed Fears Decl. ¶ 3.)  Therefore, the Court finds the adequacy requirement is met.

### (2)     Rule 23(b)(2)

Federal Rule of Civil Procedure 23(b)(2) provides that a class action may be maintained if Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements are met, and if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole."

Here, Respondents' failure to make prompt and reasonable use of home confinement and compassionate release in light of the pandemic which takes into account inmates' age and medical conditions is applicable to each member of the class so that injunctive relief is appropriate as to the class as a whole  Accordingly, the Court finds Rule 23(b)(2) is satisfied.

## IV.   CONCLUSION

Accordingly, the Court **GRANTS** Petitioners' Motion for Preliminary Injunction and *Ex Parte* Application for Provisional Class Certification as follows:

1.   The Court certifies, on a provisional basis, a class defined as "all current and future people in post-conviction custody at FCI Lompoc and USP Lompoc over the age of 50, and all current and future people in post-conviction custody at FCI Lompoc and USP Lompoc of any age with underlying health conditions, including chronic obstructive pulmonary disease; serious heart conditions such as heart failure, coronary artery disease, or cardiomyopathies; Type 2 diabetes; chronic kidney disease; sickle cell disease; immunocompromised state from a solid organ transplant; obesity (body mass index of 30 or higher); asthma; cerebrovascular diseases; cystic fibrosis; hypertension or high blood pressure; immunocompromised state from blood or bone marrow transplant; immune deficiencies, HIV, or those who use corticosteroids, or use other immune weakening medicines; neurologic conditions such as dementia; liver diseases; pulmonary fibrosis; thalassemia; Type 1 diabetes; and smokers (hereinafter, "Underlying Health Conditions")";

2.   **No later than July 20, 2020**, Respondents shall file under seal a list with the Court which:  (a) identifies all members of the class defined in this Order; (b) identifies each class member's sentencing court and the criminal case number; and (c) identifies whether the class member has (i) submitted a request for compassionate release, and if so whether a decision has been made as to the request, and (ii) been reviewed for home confinement since March 26, 2020, and if so, whether the inmate has been designated for home confinement;

3.   **No later than July 22, 2020**, Respondents shall file a declaration

setting forth the process used to identify the class members in the list filed;

4.     **No later than July 22, 2020**, notify inmates that they are being considered for home confinement and institute a process, including free telephone calls or emails to their families so that inmates can provide Respondents with a plan for release to home confinement, which includes any information about their ability to quarantine for 14 days upon release;

5.     **No later than July 28, 2020**, Respondents shall make full and speedy use of their authority under the CARES Act and evaluate each class member's eligibility for home confinement which gives substantial weight to the inmate's risk factors for severe illness or death from COVID-19 based on age (over 50) or Underlying Health Conditions;

6.     **No later than July 29, 2020**, Respondents shall file under seal a declaration setting forth a list of class members whom Respondents have determined are eligible for home confinement, and an explanation for each denial of home confinement of any class member, including an explanation of the factual basis for any factors determined to outweigh the danger to the inmate from COVID-19;

7.     **No later than July 22, 2020,** file a declaration setting forth criteria for compassionate release which takes into account COVID-19, and an explanation if no such criteria for compassionate release exists which takes into account COVID-19 as to Lompoc inmates; and

8.     **No later than August 3, 2020**, for any Lompoc inmate who has made a written request for compassionate release based on COVID-19 but has not received a decision, Respondents shall provide written notice of either (a) a referral of the matter in writing with recommendation of approval of the request pursuant to 28 C.F.R. § 571.62, or (b) a denial of the request and copy of the applicable appeal form pursuant to 28 C.F.R. §§ 571.63, 542.15.

/ / /

/ / /

/ / /

/ / /

/ / /

1        The Court further orders the parties to meet and confer **no later than July**

2   **17, 2020** regarding arrangements for a site visit of Lompoc and a process in which

3   Petitioners' counsel can confidentially communicate with Petitioners and class

4   members, and file a joint status report re same **no later than July 20, 2020.**

5

6        **IT IS SO ORDERED.**

7

8   DATED:  July 14, 2020.

          _____

9             CONSUELO B. MARSHALL
          UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28