Terry W. Bird – Bar No. 49038
 tbird@birdmarella.com
Dorothy Wolpert – Bar No. 73213
 dwolpert@birdmarella.com
*Naeun Rim – Bar No. 263558
 nrim@birdmarella.com
Shoshana E. Bannett – Bar No. 241977
 sbannett@birdmarella.com
Kate S. Shin – Bar No. 279867
 kshin@birdmarella.com
Oliver Rocos – Bar No. 319059
 orocos@birdmarella.com
Christopher J. Lee – Bar No. 322140
 clee@birdmarella.com
Jimmy Threatt – Bar No. 325317
 jthreatt@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG &
RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Donald Specter – Bar No. 83925
 dspecter@prisonlaw.com
Sara Norman – Bar No. 189536
 snorman@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Facsimile: (510) 280-2704

Peter J. Eliasberg – Bar No. 189110
 peliasberg@aclusocal.org
Peter Bibring – Bar No. 223981
 pbibring@aclusocal.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

Attorneys for Plaintiff-Petitioners Yonnedil
Carror Torres, Vincent Reed, Felix Samuel
Garcia, Andre Brown, and Shawn L. Fears

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| YONNEDIL CARROR TORRES, et al., <br><br> Plaintiff-Petitioners, <br><br> vs. <br><br> LOUIS MILUSNIC, in his capacity as Warden of Lompoc, et al., <br><br> Defendant-Respondents. | CASE NO. 2:20-cv-04450-CBM-PVCx <br><br> **NOTICE OF MOTION AND MOTION TO ENFORCE COMPLIANCE WITH PRELIMINARY INJUNCTION AND FOR ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT; DECLARATION OF NAEUN RIM** <br><br> *[Filed concurrently with Application to Shorten Time]* <br><br> Date:   October 6, 2020 <br> Time:   10:00 A.M. <br> Crtrm.:  8B <br><br> Assigned to Hon. Consuelo B. Marshall |

3669727

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on October 6, 2020, at 10:00 A.M., or as soon thereafter as the matter may be heard in the courtroom of the Honorable Consuelo B. Marshall, United States District Court Judge, located at 350 W. 1st Street, Los Angeles, California 90012, Courtroom 8B, Plaintiff-Petitioners Yonnedil Carror Torres, Vincent Reed, Felix Samuel Garcia, Andre Brown, and Shawn L. Fears ("Petitioners"), will, and hereby do, move the Court to enforce compliance with preliminary injunction and for an order to show cause.

This motion is made pursuant to the Court's inherent authority to enforce compliance with the Court's orders. *See U.S. v. Yacoubian*, 24 F.3d 1, 6 (9th Cir. 1994). This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place by email on September 3, 2020, and by telephone conference on September 8, 2020. (Decl. Rim ¶ 2.) In consideration of the Respondents' objection to Petitioners submitting an *ex parte* application, Petitioners have filed a regularly noticed motion and concurrently an application to shorten time.

This motion is based on this Notice of Motion, the Memorandum of Points and Authorities, Declaration of Naeun Rim, and such other and further argument and evidence as may be presented to the Court at the hearing on this matter.


DATED:  September 10, 2020          Respectfully submitted,

Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.

By:  */s/ Naeun Rim*
Naeun Rim
Attorneys for Plaintiff-Petitioners

3669727

# <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

I.      INTRODUCTION .............................................................................................. 1

II.     ARGUMENT ..................................................................................................... 3

      A.      Respondents' Failure to Promptly Release Approved Class
          Members Violates the Court's Preliminary Injunction .......................... 4

      B.      Respondents' Denial of Home Confinement to RRC Class
          Members Violates the Court's Preliminary Injunction .......................... 7

III.    CONCLUSION ............................................................................................... 11

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Armstrong v. Brown*
   939 F.Supp.2d 1012 (N.D. Cal. 2013)....................................................3

*Chiquita Fresh, N.A., LLC v. Pandol Associates Marketing, Inc.*
   2008 WL 324009 (E.D. Cal. Feb. 5, 2008) ...........................................3

*Farmer v. Brennan*
   511 U.S. 825 ..........................................................................................10

*In re Crystal Palace Gambling Hall, Inc.*
   817 F.2d 1361 (9th Cir. 1987) ...............................................................3

*In re Dual-Deck Video Cassette Recorder Antitrust Litigation*
   10 F.3d 695 (9th Cir. 1993) ...................................................................3

*International Union, UMWA v. Bagwell*
   512 U.S. 821 (1994) ...............................................................................3

*Martinez-Brooks v. Easter*
   3:20-CV-569 MPS, Dkt. 70 (D. Conn. May 29, 2020) .....................7, 8

*Shillitani v. United States*
   384 U.S. 364 (1966) ...............................................................................3

*Stone v. City & Cnty. of San Francisco*
   968 F.2d 850 (9th Cir. 1992) ..................................................................3

*U.S. v. Yacoubian*
   24 F.3d 1 (9th Cir. 1994) ........................................................................3

**Other Authorities**

H.R. 748, CARES Act .................................................................................*passim*

U.S. Const. amend. VIII ......................................................................4, 7, 10

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiff-Petitioners Yonnedil Carror Torres, Vincent Reed, Felix Samuel Garcia, Andre Brown, and Shawn L. Fears ("Petitioners") move this Court for an order seeking enforcement of the Court's preliminary injunction of July 14, 2020. The preliminary injunction requires Respondents, among other things, to make "***full and speedy use*** of their authority under the CARES Act and evaluate each class member's eligibility for home confinement which gives substantial weight to the inmate's risk factors for severe illness or death from COVID-19 based on age (over 50) or Underlying Health Conditions." (Dkt. 45 at 49 (emphasis added).) Respondents have failed to comply with this requirement for at least two subcategories of class members: (1) those who have already been approved for home confinement but have not yet been released ("Approved Class Members") and (2) those who were denied home confinement and designated instead to a Residential Re-entry Center ("RRC" or "halfway house"), even though they have no history of violence, sex offense, or terrorism and do not have "High" PATTERN scores ("RRC Class Members").

With respect to the Approved Class Members, it appears from the BOP's inmate locator website[1] that the vast majority of class members who have been granted home confinement are still in custody at Lompoc—even those who were identified as having been approved by Respondents as far back as August 20, 2020—*three weeks ago*. (Decl. Rim ¶ 4.) Respondents have ignored Petitioners' requests for information about which Approved Class Members have actually been released, whether they are being required to quarantine in the Special Housing Unit prior to release for a certain period even though they have a release plan where they can self-isolate, and specifics about why it is taking so long. (Decl. Rim ¶ 3.) Every

---

[1]   https://www.bop.gov/inmateloc/

3669727

MOTION TO ENFORCE COMPLIANCE WITH
PRELIMINARY INJUNCTION AND FOR ORDER TO SHOW CAUSE

day that these medically vulnerable class members remain in custody puts their health and the health of those around them at unnecessary risk.  Unless the Court intervenes, Respondents could continue delaying for weeks before actually releasing those who have already been approved.  The Court must issue an order enforcing compliance with the requirement that Respondents make *speedy* use of their CARES Act authority.

With respect to the RRC Class Members, Petitioners seek swift relief because many have imminent transfer dates, and once they leave the custody of Lompoc, they may no longer qualify as members of the provisional class.  Respondents have inexplicably denied home confinement to nearly 100 medically vulnerable class members who were deemed suitable enough for community placement at a halfway house, even those who have no history of violence, sex offenses, or terrorism.  Many of the RRC Class Members meet the home confinement criteria Respondents were using *before* the Court issued its preliminary injunction and are in fact the very people who would be most eligible for home confinement.  If these RRC Class Members have a viable release plan and are not otherwise a danger to public safety, Respondents' refusal to grant them home confinement reflects a continued failure to make full use of their CARES Act authority and to put substantial weight on class members' risk factors for severe illness or death from COVID-19, as was ordered by the Court.

While Petitioners dispute Respondents' compliance with many other parts of the Court's preliminary injunction order, Petitioners intend to address the remaining issues with the Special Master or Rule 706 Expert appointed by the Court, as indicated in the concurrently-filed Proposal Regarding a Special Master.  Because the issues pertaining to the Approved Class Members and the RRC Class Members are time-sensitive, however, and because Respondents have tried to delay the matter further by refusing to provide information that might have obviated the need to for litigation, Petitioners have raised the narrow issues in this specific motion directly

1  with the Court, along with an application to shorten time.

2  **II.   <u>ARGUMENT</u>**

3       "There [is] no question that courts have inherent power to enforce compliance

4  with their lawful orders."  *U.S. v. Yacoubian*, 24 F.3d 1, 5 (9th Cir. 1994) (citing

5  *Shillitani v. United States*, 384 U.S. 364, 370 (1966)); *see also Armstrong v. Brown*,

6  939 F.Supp.2d 1012, 1018 (N.D. Cal. 2013) ("A district court has the authority to

7  make an enforcement order to secure compliance with its earlier orders and

8  governing law.") (citing *International Union, UMWA v. Bagwell*, 512 U.S. 821,

9  827–28 (1994)).  Moreover, "[f]ailure to obey the terms of preliminary

10  injunction constitutes a contempt of court."  *Chiquita Fresh, N.A., LLC v. Pandol*

11  *Associates Marketing, Inc.*, 2008 WL 324009, at *1 (E.D. Cal. Feb. 5, 2008) (citing

12  *Int'l Union v. Bagwell*, 512 U.S. at 828-32); *see also In re Crystal Palace Gambling*

13  *Hall, Inc.*, 817 F.2d 1361, 1365 (9th Cir. 1987) ("If a person disobeys a specific and

14  definite court order, he may properly be adjudged in contempt.").

15       Although enforcement orders typically follow findings of a party being in

16  contempt, a finding of contempt is not necessary in order for an enforcement order

17  to be issued.  *See, e.g.*, *Armstrong*, 939 F.Supp.2d at 1022 (granting motion for order

18  to enforce compliance with earlier orders while denying motion for

19  contempt).  Nevertheless, a court may issue an order of contempt where it finds that

20  "(1) (the respondent) violated (a) court order, (2) beyond substantial compliance,

21  (3) not based on a good faith and reasonable interpretation of the order, (4) by clear

22  and convincing evidence."  *In re Dual-Deck Video Cassette Recorder Antitrust*

23  *Litigation*, 10 F.3d 695 (9th Cir. 1993).  Once the moving party meets its burden, the

24  burden "shifts to the contemnors to demonstrate why they were unable to comply"

25  with the court order.  *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 865 n.9

26  (9th Cir. 1992).

27       Petitioners do not seek a finding of contempt at this stage.  Rather, Petitioners

28  seek an order enforcing compliance with the preliminary injunction by a date certain

3669727                                     3

1   and requiring Respondents to demonstrate compliance by that date or otherwise
2   show cause why they should not be held in contempt.  Such court action is necessary
3   because the Review Worksheets filed by Respondents make clear that Respondents
4   are refusing to comply with the Court's preliminary injunction with respect to the
5   Approved Class Members and the RRC Class Members.  Moreover, Respondents
6   have demonstrated time and time again that they will not act expeditiously or
7   provide the information necessary for Petitioners to determine the sufficiency of
8   their compliance unless there is a Court order that expressly requires Respondents to
9   do so.

10              **A.**    **Respondents' Failure to Promptly Release Approved Class**
11                     **Members Violates the Court's Preliminary Injunction.**

12          In the order granting preliminary injunction, the Court found Petitioners were
13   likely to succeed on their habeas claim for violation of the Eighth Amendment due
14   to "the Lompoc Warden's failure to take reasonable measures to reduce risk of
15   serious harm to inmates by failing to make meaningful use of his home confinement
16   authority as expanded by the CARES Act."  (Dkt. 45 at 35.)  The Court went on to
17   state that it "expects such determinations by Respondents to include consideration of
18   public safety and the nature of Petitioners' convictions, but due consideration should
19   be given to an inmate's age and medical conditions in evaluating eligibility for
20   home confinement and compassionate release."  (*Id*. at 39.)  Accordingly, in Item 4
21   of the preliminary injunction, the Court ordered, "Respondents shall make ***full and***
22   ***speedy use*** *of their authority under the CARES Act* and evaluate each class
23   member's eligibility for home confinement which gives ***substantial weight to the***
24   ***inmate's risk factors*** for severe illness or death from COVID-19 based on age (over
25   50) or Underlying Health Conditions."  (*Id*. at 49 (emphasis added).)  The Court
26   further ordered Respondents to identify the "factors determined to outweigh the
27   danger to the inmate from COVID-19" and to allow class members to provide "a
28   plan for release to home confinement, which includes any information about their

3669727                                    4

1  ability to quarantine for 14 days upon release." (*Id*.)

2      Since the Court's order, Respondents have made three separate filings in

3  which they identified class members who were approved for home confinement:

4      • On August 20, 2020, Respondents filed the Declaration of Melissa

5          Arnold and listed **14 class members** who had actually been released to

6          home confinement, along with corresponding release dates.[2] (Dkt. 78

7          at  3-4 (Decl. Arnold ¶ 5.)  Respondents also listed **37 class members**

8          who had been "approved for placement on home confinement or have

9          already transferred to home confinement." (*Id*. at 6-7 (Decl. Arnold

10          ¶ 8.)

11      • On August 27, 2020, Respondents filed the Declaration of Theresa

12          Leyvas and listed **48 class members** who had been "approved for

13          placement on home confinement or already placed on home

14          confinement." (Dkt. 82 at 5-7 (Decl. Leyvas ¶ 6).)

15      • On September 4, 2020, Respondents filed a second Declaration of

16          Theresa Leyvas and listed **28 class members** who had been "approved

17          for placement on home confinement or have already been placed on

18          home confinement." (Dkt. 87 at 3-4 (Decl. Leyvas ¶ 4).)

19      In total, Respondents appear to have approved 127 class members for home

20  confinement.  While that is welcome progress, it is meaningless if few have actually

21  been released.  Apart from the 14 class members who were identified with their

22  actual release dates, 113 class members are listed with the vague description as

23  having been "approved for placement on home confinement or . . . already

24  transferred to home confinement," making it impossible to understand who has been

25

26  ---

[2]   It is not clear from the declaration whether these 14 class members were released
27  pursuant to the Court's preliminary injunction or had been granted home
    confinement before that.
28

released.  A week ago, Petitioners asked Respondents to provide a list identifying which of the Approved Class Members had been released since the filings, and for those who had not yet been released, the expected dates of release and an explanation for the delay.  (Dkt. 89-1 at 4 (Decl. Beck, Ex. A).)  To date, Respondents have not yet provided that information (or provided a definitive response to any of the other topics in that email).  (Decl. Rim ¶ 3.)  Counsel for Petitioners had to resort to checking the status of every Approved Class Member on the BOP's inmate locator website.  (Decl. Rim ¶ 4.)  As of September 9, 2020, only 16 out of the 113 Approved Class Members identified in the filings without release dates are shown as being out of the custody of Lompoc.  (*Id.*)

The Court has made clear time and time again that Respondent must make ***speedy use*** of their CARES Act authority.  While the filings do not show the date the class members were approved for home confinement, some were identified to the Court as far back as three weeks ago.  This delay is unacceptable when there is a Court order finding that Respondent's *failure to take swift action* under the CARES Act has put the lives of those incarcerated at serious risk in the midst of a global pandemic.  It is important to note that Lompoc is *still* overcrowded.  As of September 10, 2020, there were 2218 people incarcerated at Lompoc,[3] despite its designated capacity of 2058.[4]  While Respondents boasted to the Court at the last status conference that the number of people incarcerated at Lompoc has been reduced since the filing of this lawsuit, almost none of that reduction appears to be pursuant to Respondents' compliance with the Court's preliminary injunction but rather due to people reaching the end of their sentence or being granted

---

[3]   *See* https://www.bop.gov/locations/institutions/lof/ (reflecting 1000 inmates as of September 10, 2020) and https://www.bop.gov/locations/institutions/lom/ (reflecting 1218 inmates as of September 10, 2020).

[4]   https://www.bop.gov/locations/institutions/lof/prea_lof.pdf at 6.

compassionate release by courts.  Petitioners have also been told by Respondents that Lompoc has stopped receiving incoming prisoners but expects to resume sometime in October.  Thus, any artificial reduction in the total number of incarcerated people at Lompoc is bound to come to an end when Lompoc resumes intake.

Respondents have refused to provide specific reasons for the delay, to commit to a date on which all Approved Class Members will be released, or even to confirm who has been released on a periodic basis.  In doing so, Respondents ignore the heart of the Court's ruling—that their failure to make full and speedy use of their CARES Act authority and their knowing confinement of medically vulnerable class members in an overcrowded, understaffed prison places lives at risk and amounts to deliberate indifference in violation of the Eighth Amendment.  Respondents' failure to expeditiously release the Approved Class Members violates the Court's order and requires enforcement of compliance.

**B.**   **Respondents' Denial of Home Confinement to RRC Class Members Violates the Court's Preliminary Injunction.**

By designating medically vulnerable class members to RRCs when they are otherwise suitable for home confinement, Respondents are failing to make *full* use of their CARES Act authority and shirking the requirement to put substantial weight to the inmate's risk factors, both of which were required by the Court's preliminary injunction.  Under similar facts in the case involving FCI Danbury, the court ordered the respondent in that case to release to home confinement those medically vulnerable class members who had been designated to RRCs so long as they did not have "a violent offense of conviction, a sexually-related offense of conviction, or a 'High' PATTERN score."  *Martinez-Brooks v. Easter*, 3:20-CV-569 MPS, Dkt. 70 at 6 (D. Conn. May 29, 2020).[5]  The court reached this conclusion after finding that

---

[5]   A copy of the decision is attached as Exhibit A to the Declaration of Naeun Rim.

it was "unlikely that social distancing can be adequately observed at a half-way house, where communal living is, again, the norm," and thus, "the extent to which RRCs actually present a safer environment for medically vulnerable inmates is unclear." *Id*. at 4.  The court also noted, "Importantly, with respect to the medically vulnerable inmates that are the subject of this order, the Respondent has *already* determined that these inmates—who have generally served the vast majority of their sentences—are appropriate for some form of community placement, *i.e.*, that they are suitable to leave the prison environment in the coming months." *Id*.

The same reasons stated by the court in *Martinez-Brooks* justify an order enforcing compliance with the Court's preliminary injunction in this case.  Like the respondent in *Martinez-Brooks*, the Lompoc Respondents have "already conducted these individualized determinations in approving these inmates for community placement, presumably taking into account both public safety and penological objectives." *See id*. at 4-5.  Despite confirming that the class members are appropriate to return to the community, Respondents have designated these class members to an RRC instead of approving them for home confinement, even if they do not have "a violent offense of conviction, a sexually-related offense of conviction, or a 'High' PATTERN score." *See id*. at 6.  Perversely, the Review Worksheets show that the RRC Class Members include many who are likely the *most* eligible for home confinement out of all of the class members—that is why they were approved for RRC in the first place.  Examples include:

- A.G., who is HIV positive, age 52, in on a white collar offense, listed as no history of violence, sex offense, or terrorism, set to be released on 5/18/2021 (less than a year from now), is minimum security, and has a minimum PATTERN score.  (Dkt. 78-1 at ECF p. 17 (Ex. A Bates 24).)
- A.B., who has diabetes, age 63, conviction unspecified, listed as no history of

(Decl. Rim ¶ 5.)

violence, sex offense, or terrorism, is set to be released on 11/17/2020, and has a minimum PATTERN score. (Dkt. 78-1 at ECF p. 7 (Ex. A Bates 14).)

- M.G., who is obese, age 28, convicted of a drug offense and possession of a firearm, listed as no history of violence, sex offense, or terrorism, set to be released on 3/2/2021, has a low PATTERN score, and is noted as being "Eligible for HC," but then designated to an RRC. (Dkt. 78-1 at ECF p. 20, (Ex. A Bates 27).)

- R.L., who has diabetes, age 55, convicted of a drug offense, listed as no history of violence, sex offense, or terrorism, set to be released on 8/6/2021, and has a low PATTERN score. (Dkt. 78-1 at ECF p. 26 (Ex. A Bates 33).)

- E.V., who has chronic kidney disease, age 43, convicted of a drug offense, listed as no history of violence, sex offense, or terrorism, set to be released on 4/16/2021, and has a medium PATTERN score. (Dkt. 78-1 at ECF p. 49, (Ex. A Bates 56).)

- S.V., who has hypertension, age 52, convicted of a white collar offense, listed as no history of violence, sex offense, or terrorism, set to be released on 7/28/2021, and has a medium PATTERN score.  (Dkt. 78-1 at ECF p. 48, (Ex. A Bates 55).)

Respondents have already determined that these class members are suitable for community placement.  Therefore, if they do not have a history of violence, sex offense, or terrorism and do not have "High" PATTERN scores, but they are still being denied home confinement, Respondents are failing to place substantial weight on the class member's risk factors or making full and speedy use of their authority under the CARES Act.  Moreover, the explanation on the Review Worksheets suggests that Respondents *are not even evaluating some RRC Class Members for home confinement if they have been approved for RRC placement.*  Instead of listing the factors that outweigh the medical risk to the class member, as required by the

Court's order, many of the explanations for RRC members state as follows:

> **Home Confinement Committee Review:**
> The above case has been reviewed and the committee has APPROVED placement in a Residential Re-Entry Center (RRC). The Unit Team should complete the RRC referral immediately and forward to the RRM's office for processing. It is imperative the Unit Team include all information listed on the memo dated May 8, 2020.

(*e.g.*, Dkt 78-1 at 29.)  Given that class members must meet safety standards to be approved for a halfway house placement, suitability for RRC placement should be a factor that weights *in favor* of home confinement.  Instead, Respondents appear to be *disqualifying* people from consideration on the basis that they've already been approved for a halfway house.  That does not comply with the preliminary injunction in this case and is a continuation of the constitutional violation that gave rise to the Court's order in the first place.

During the parties' meet and confer correspondence, Respondents repeated their argument that prison designation decisions are not subject to court review. Again, Respondents mistake a statutory limitation on a sentencing court's ability to dictate BOP designations with a license to violate the constitution.  The case law is clear that courts can—and *must*—review a BOP designation if the designation itself violates the Eighth Amendment.  Indeed, the seminal case on the standard for Eighth Amendment deliberate indifference, *Farmer v. Brennan*, 511 U.S. 825, 830-31(1994), involved a transgender prisoner's challenge to being designated to a United States Penitentiary, where she was more likely to be subject to violence and rape. Far from holding that courts could not review prison designation decisions, the Court instead reversed the appellate court's decision affirming the district court's granting of summary judgment in favor of prison officials and remanded the case for further proceedings, clearly signaling that it was possible for the designation to amount to an Eighth Amendment violation. *Id*. at 848-49.  Respondents' argument should be rejected.

1

**III.    <u>CONCLUSION</u>**

2

For the above reasons, the Court should grant Petitioners' motion and grant

3

the relief submitted in the accompanying proposed order.

4

5

DATED:  September 10, 2020          Respectfully submitted,

6

Terry W. Bird

7

Dorothy Wolpert

8

Naeun Rim
Shoshana E. Bannett

9

Kate S. Shin

10

Oliver Rocos
Christopher J. Lee

11

Jimmy Threatt

12

Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.

13

14

By:       */s/ Naeun Rim*

15

Naeun Rim
Attorneys for Plaintiff-Petitioners

16

17

18

19

20

21

22

23

24

25

26

27

28

3669727

11

# DECLARATION OF NAEUN RIM

I, Naeun Rim, declare as follows:

1.      I am an active member of the Bar of the State of California and a principal with Bird, Marella, Boxer, Wolpert, Nessim, Drooks, Lincenberg & Rhow, a professional corporation, attorneys of record for Plaintiff-Petitioners Yonnedil Carror Torres, Vincent Reed, Felix Samuel Garcia, Andre Brown, and Shawn L. Fears in this action.  I make this declaration in support of Motion to Enforce Compliance with Preliminary Injunction and for Order to Show Cause. Except for those matters stated on information and belief, I make this declaration based upon personal knowledge and, if called upon to do so, I could and would so testify.

2.      On September 3, 2020, I sent a meet-and-confer email to Respondents laying out the substance of this motion. The email has already been filed by Respondents as Exhibit A to the Declaration of Daniel Beck, filed as Dkt. 89-1.  The parties further met and conferred by telephone conference on September 8, 2020.

3.      As of September 10, 2020, I have not received from Respondents a response to my requests for more information regarding class members who have been approved for home confinement or designated to a halfway house.

4.      On September 9, 2020, I looked up the registration numbers of the 113 class members described in Dkts. 78, 82, and 87 as having been "approved for placement on home confinement or have already transferred to home confinement" on the BOP's inmate locater website, available at https://www.bop.gov/inmateloc/. As of that date, only 16 were listed as being out of the custody of Lompoc.

/ / /

/ / /

/ / /

/ / /

/ / /

3669727

5.     Attached as **Exhibit A** is a true and correct copy of the decision filed as Docket 70 in *Martinez-Brooks v. Easter*, 3:20-CV-569 MPS (D. Conn. May 29, 2020), that I downloaded off of PACER.

I declare under penalty of perjury that the foregoing is true and correct, and that I executed this declaration on September 10, 2020, at Los Angeles, California.

*/s/ Naeun Rim*
Naeun Rim

3669727

MOTION TO ENFORCE COMPLIANCE WITH
PRELIMINARY INJUNCTION AND FOR ORDER TO SHOW CAUSE

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DIANTHE MARTINEZ-BROOKS ET AL

*Plaintiffs*,

v.

D. EASTER & MICHAEL CARVAJAL,

*Defendants*.

No. 3:20-cv-00569 (MPS)

## <u>ORDER</u>

On May 12, I issued a temporary restraining order directing the Respondent to review, on an expedited basis, all medically vulnerable inmates for home confinement eligibility under the Warden's expanded authority under the CARES Act. ECF No. 30 at 69-73. The Respondent has taken substantial steps toward complying with this order. Nonetheless, more than two weeks after the Temporary Restraining Order was entered, it appears that not one inmate has actually been released to home confinement pursuant to the Order (*i.e.*, excluding those who were released as a result of the process that was occurring before the order was issued). Consequently, with respect to those inmates that the Respondent has already determined to be eligible for home confinement, yesterday I ordered the Respondent, by June 4, either to (a) release each inmate to home confinement or (b) demonstrate that public safety or medical considerations or the absence of any home in which to place the inmate would make it unsafe to move the inmate immediately to home confinement. ECF No. 68 at 4. This order was intended to bring the Respondent into

compliance with the Court's May 12 TRO, which required the Warden to eliminate the
categorical 14-day quarantine requirement to allow for immediate release where possible. ECF
No. 30 at 71. The Petitioners urge the Court to take similar action with respect to those inmates
that the Respondent has already determined to be appropriate for placement in a Residential
Reentry Center ("RRC"). For the reasons that follow, I grant the Petitioners' request in part—as
to those inmates the Warden has deemed appropriate for placement in a RRC who do not have
either (a) a violent[1] or sexually related offense of conviction[2] or (b) a PATTERN score of
"High." This ruling assumes familiarity with the procedural history of this case as well as the
Court's prior rulings.

In *Mapp v. Reno*, the Second Circuit held that district courts have inherent authority to
grant bail to habeas petitioners. *Mapp v. Reno*, 241F.3d 221, 226 (2d Cir. 2001) ("Today we
reaffirm these cases and hold, once again, that the federal courts have inherent authority to admit
to bail individuals properly within their jurisdiction."). The standard for bail pending habeas
litigation, however, is "a difficult one to meet." *Id.* "The petitioner must demonstrate that the
habeas petition raise[s] substantial claims and that extraordinary circumstances exist[ ] that make
the grant of bail necessary to make the habeas remedy effective." *Id.* During the course of the
ongoing COVID-19 pandemic, district courts within this Circuit have relied on the authority of
*Mapp* to issue bail or temporary release orders to medically vulnerable Section 2241 petitioners
claiming that their continued confinement violates the Constitution. *See, e.g.*, *Basank v. Decker*,

---

[1] For purposes of this order only, I do not consider mere possession of a firearm or ammunition –
whether as a convicted felon, in connection with a drug trafficking offense, or based on some
other unlawful capacity – to be a violent offense.
[2] By "offense of conviction," I mean the offense for which the inmate is currently incarcerated.
An inmate who has a violent or sexually-related past offense is not excluded by this order unless
his or her PATTERN score is "High."

2020 WL 1953847, at *13 (S.D.N.Y Apr. 23, 2020) ("Even if [ICE detainees petitioning under Section 2241] had not met the requirements for a preliminary injunction, the Court would release them on bail pending final resolution of their habeas claims under the Second Circuit's decision in *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001)."); *Ferreyra v. Decker*, 2020 WL 1989417, at *12 (same); *Coronel v. Decker*, 2020 WL 1487274, at *8-9 (S.D.N.Y. March 27, 2020) (finding that "Petitioners have raised substantial claims" and that "[r]elease is . . . necessary to make the habeas remedy effective" because "[i]f Petitioners were to remain detained, they would face a significant risk that they would contract COVID-19—the very outcome they seek to avoid.").

Here, I have already found that the Petitioners have shown a likelihood of success on their claim that the Respondent has run afoul of the Eighth Amendment by failing to make meaningful use of her home confinement and compassionate release authority. *See* ECF No. 30 at 42-56. For those same reasons, Petitioners have also shown that they have raised "substantial claims" under *Mapp*.

I now further find that, with respect to those medically vulnerable inmates who have already been approved for community placement, who do not have violent or sexually-related offenses of conviction, and who do not have a "High" PATTERN score, there are "extraordinary circumstances . . . that make the grant of bail necessary to make the habeas remedy effective." It is undisputed that the medically vulnerable inmates face a grave risk of serious illness or death if they were to contract COVID-19. ECF No. 30 at 6-7. It is also undisputed that true social distancing—the most effective measure for preventing the spread of COVID-19—simply cannot be implemented at a facility, like FCI Danbury, where inmates live communally and sleep in large dormitory halls that house as many as 140 inmates. *Id.* at 6-7, 44. FCI Danbury was specifically identified as one of three federal prisons exhibiting "significant levels of infection"

by the Attorney General. ECF No. 24-2 at 48. Thus far, one inmate at FCI Danbury has died as a result of contracting COVID-19, and multiple inmates have been hospitalized. *Id.* at 7.

The habeas remedy the Petitioners seek is for the Warden to pursue all reasonable measures, including the use of her expanded home confinement authority under the CARES Act, to remove them from FCI Danbury and thereby protect them from contracting COVID-19—a potentially fatal illness. The effectiveness of this remedy depends upon these inmates remaining infection-free. Yet every day that these medically vulnerable inmates spend incarcerated at FCI Danbury increases their chances of contracting COVID-19. This is the very outcome that Petitioners seek to avoid, and one that would render their requested relief entirely ineffective.

The Respondent has designated the inmates in question for placement in an RRC. Many of these placements, however, are not scheduled to occur for several months. *See* ECF No. 66 (listing RRC dates ranging from June 2020 through April 2021). Counsel for the Respondent indicated during the May 28 conference that Respondent is attempting to accelerate some of these placements, but it remains unclear when placement will actually occur. Furthermore, it seems unlikely that social distancing can be adequately observed at a half-way house, where communal living is, again, the norm. As a result, the extent to which RRCs actually present a safer environment for medically vulnerable inmates is unclear. Thus, the inmates' pending placement at an RRC does not render bail unnecessary to make the habeas remedy effective.

Importantly, with respect to the medically vulnerable inmates that are the subject of this order, the Respondent has *already* determined that these inmates—who have generally served the vast majority of their sentences—are appropriate for some form of community placement, *i.e.*, that they are suitable to leave the prison environment in the coming months. The fact that the Respondent has already conducted these individualized determinations in approving these

inmates for community placement, presumably taking into account both public safety and penological objectives, addresses any concern that the need for individualized consideration makes granting bail under *Mapp* on a multi-party basis inappropriate under *U.S. ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125 (2d Cir. 1974). *See generally* ECF No. 30 at 62-66 (discussing the application of *Preiser* to the present action).

The Respondent chiefly argues that release to home confinement is inappropriate because it does not allow for the level of supervision that an inmate would receive at a half-way house. I address this concern in part by excluding from this order those inmates designated for RRC placement who are the most in need of close supervision to protect the public, *i.e.*, those who are currently incarcerated for violent or sexually-related offenses and those who have PATTERN scores of "High," which reportedly reflects a high likelihood of recidivism.[3] This order thus only applies to those inmates listed on the spreadsheet filed as ECF No. 66—and any others designated for RRC placement since the spreadsheet was filed on May 27, 2020—who have been designated for RRC placement but do not have violent or sexually-related offenses of conviction and do not have PATTERN scores of "High."

I also note that inmates on home confinement are not without supervision. They remain in the custody of the BOP and can be supervised by either an RRC or the United States Probation System. *See, e.g.*, 18 U.S.C. § 3624(c)(2) (classifying home confinement as "prelease custody"); *id.* § 3624(c)(3) (directing Probation to provide assistance to prisoners in "prerelease custody"). Inmates on home confinement can also be placed on electronic monitoring. *See*

---

[3] Of course, as to those inmates, I encourage the Respondent to continue to make efforts to accelerate their assignments to RRCs—in the hope that the particular RRC to which they might be assigned would present a somewhat lower risk of infection than does the environment of FCI Danbury.

https://www.bop.gov/about/statistics/docs/program_fact_sheet_201907.pdf (last visited on May 29, 2020). While there is some degree of additional supervision at an RRC, I cannot conclude that this factor outweighs the medical considerations that make release to home confinement necessary to make the habeas remedy effective for those inmates to whom this order applies.

I thus find that, as to the inmates to whom this order applies, extraordinary circumstances, including the substantial risk to the health of these medically vulnerable inmates and the prevalence of COVID-19 at FCI Danbury (described in my earlier ruling, ECF No. 30 at 7, 13), make bail necessary to make the habeas remedy effective. Accordingly, I order as follows: By **June 9**, with respect to each medically vulnerable inmate who has been approved for community placement at an RRC and who does not have a violent offense of conviction, a sexually-related offense of conviction, or a "High" PATTERN score, the Warden shall either (a) release the inmate to home confinement or (b) demonstrate that public safety or medical considerations or the absence of any home in which to place the inmate would make it unsafe to move the inmate immediately to home confinement. The fact that a greater degree of supervision will be available at an RRC will not, by itself, be deemed sufficient to demonstrate that it is unsafe to move the inmate to home confinement, as the Court has already addressed this argument.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                May 29, 2020