Venters-BOP Lompoc

COVID-19 Inspection of BOP Lompoc by Dr. Homer Venters

**A. Table of Contents**

Introduction                                    Page 1
Methodology                                    Page 2
Inspection                                      Page 4
Findings                                        Page 18
Summary                                        Page 28
Appendix 1. Information reviewed          Page 31

**B. Introduction**

1. This report is submitted to The Honorable Consuelo B. Marshall, United States District Court Judge, Central District of California in response to an order to perform a COVID-19 inspection of the Federal Bureau of Prisons facility Lompoc. This order relates to case CV 20-4450-CBM-(PVCx) *Torres et al. v. Milusnic et al.*

2. This facility inspection was ordered by The Court on August 12th, 2020.

3. The COVID-19 pandemic has caused over 100,000 documented cases of infection in U.S. prisons, including facilities of the U.S. Bureau of Prisons (BOP), since March 2020. The pace of this pandemic in U.S. prisons has increased in recent weeks after a slowing in June.  In the BOP, over 13,000 cases were reported by September 1, 2020, with a case rate of 849 per 100,000 prisoners across all BOP facilities.[1] The rate and pace of infection has varied widely across the BOP system's 122 correctional facilities, with confirmed cases in 112 and a total number of infections of 1,752 federal inmates and 643 BOP staff, resulting in 118 prisoner and 2 staff deaths.[2]

---

[1] https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons, accessed 9/7/20.
[2] US BOP COVID Data. https://www.bop.gov/coronavirus/ accessed 9/5/20.

Venters-BOP Lompoc

4.  The COVID-19 outbreak at BOP Lompoc has been one of the nation's most overwhelming. BOP
    data on September 1, 2020, identified 953 detained people as 'recovered' from COVID-19 and
    three as actively infected. Four people were reported to have died from COVID-19 related illness.
    The census of the BOP Lompoc facility was approximately 2,200 at the time.

5.  In July 2020, the Office of the Inspector General of the U.S. Department of Justice released a
    report on the COVID-19 response at BOP Lompoc.[3] This remote inspection identified several
    areas of deficiency in the response, including inadequate staffing of health and correctional staff,
    lack of adequate testing and screening of detained people, inadequate leadership, shortage of
    personal protective equipment and extremely limited use of home confinement as an alternative
    for high-risk people.

**C.  Methodology**

6.  The goal of my inspection of BOP Lompoc was to assess the adequacy of the facility response to
    COVID-19. In order to achieve this goal, I relied on three basic questions;

    a.  Does the facility adequately identify and respond to individual cases of COVID-19?

    b.  Does the facility adequately implement infection control, social distancing and other
        measures to slow the spread of the virus?

    c.  Does the facility adequately identify and protect high-risk patients?

    These questions are interrelated in that all three domains are essential to an adequate COVID-19

    response and they rely on each other to be effective. Adequacy is determined using guidelines of

    the Centers for Disease Control and Prevention (CDC) relating to COVID-19 in detention settings

---

[3] DEPARTMENT OF JUSTICE | OFFICE OF THE INSPECTOR GENERAL PANDEMIC RESPONSE REPORT 20-086 JULY
2020. https://oig.justice.gov/sites/default/files/reports/20-086.pdf?_ga=2.124398604.740363991.1599381764-
829252430.1596389882 accessed 9/13/20.

Venters-BOP Lompoc

as well as basic correctional health standards.[4] Policies reported or produced by the Bureau of Prisons have also been utilized to assess adequacy, and many of the questions I posed to detained people and staff during the inspection were framed to elicit their understanding of the policies in place and whether/how they were being implemented. The adequacy of the BOP Lompoc response to COVID-19 is presented below in 'Findings' which includes strengths, deficiencies and recommendations.

7. Communication regarding the information I required to conduct this inspection, as well as the timing and logistics of the inspection included attorneys from both respondents and plaintiffs. My actual inspection occurred on September 1st and 2nd 2020. During the inspection, I posed multiple questions about information that the BOP/PHS team indicated they would best be able to respond to in writing. I submitted a list of these questions after my inspection and the information was produced to me between September 7th and September 24th 2020. The list of information I reviewed for this report is contained below in Appendix 1.

8. Physical inspection of BOP Lompoc was conducted with facility leadership and staff and without attorneys for either the respondents or plaintiffs. Facility staff took photographs of areas I requested and produced them afterwards on a secure platform, along with responses to questions that arose during the inspection that required verification, and supplemental communication from detained people who I was unable to speak with due to time constraints.

9. During the inspection, BOP Lompoc staff did not block or impede my access to any part of the facility and were extremely helpful in orienting me to the overall layout and operations of the facility, the various measures taken in response to COVID-19 and the current status of COVID-19 mitigation efforts.

---

[4] Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities. Updated July 22, 2020. https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/index.html, accessed 9/13/20.

**D. Inspection**

10. The Lompoc inspection was conducted over two days, September 1st and 2nd. The BOP Lompoc complex is comprised of three administrative areas, FCI Lompoc, also referred to as 'the Low' because of its low security status, USP Lompoc, also referred to as 'the Medium', for the same reason, and two camp areas, North and South Camps. The first day of inspection focused on FCI Lompoc (the Low) and the second on USP Lompoc (the Medium) and the two camp areas. During this time, I spoke with 52 detained people and approximately 25 staff members. In most housing areas, there were many more people seeking to speak about their COVID-19 experiences than time allowed for. BOP staff and I agreed that people who I did not have time to speak with could submit written information that would be provided to me. I received four such written communications. In each facility, I was accompanied by a BOP/PHS team that included one or more leadership and staff from the specific facility as well as a Public Health Service Officer who provided information on the overall COVID-19 response and how each facility implemented BOP COVID-19 policies and a BOP who took photos and notes. The facility Warden and Heath Service Administrator were present intermittently during the inspection.

11. The first area of inspection was the staff screening process, located at the facility training center. The BOP/PHS team indicated that every staff member was screened daily at this site before starting work. The screening area was a large lobby and followed a L-shaped path that was approximately 40 feet on each side, with two primary stops, one for temperature screening and one for symptom screening. A final check with security occurred with a wrist band being given for anyone who cleared screening, and the wrist bands were different colors for the two days of my inspection. Written record of each individual screening was created.

12. The first facility with detained people that I inspected was FCI Lompoc also referred to as 'the Low'. The BOP/PHS team indicated that 1020 people were detained at the time of my inspection, and that no medical isolation or medical quarantine was being conducted in this facility. The BOP/PHS team stated that three detained people were in medical isolation for COVID-19 and

Venters-BOP Lompoc

that two or three staff were currently diagnosed with COVID-19. I was also told that new admissions to the overall complex had restarted, and that the new admission quarantine process, like other quarantine and medical isolation, occurred at USP Lompoc/the Medium. Before starting the inspection, I went through the fit testing process for N95 mask use. The officer who performed the fit testing closely followed the written prompts and script in his possession and the equipment and supplies he utilized were clean and it only took a few minutes for him to bring them to a room in the facility to perform the test. His supervisor indicated that all staff, security and health, were fit tested for N95 mask use.

13. Prior to inspecting housing areas, I asked the BOP/PHS team how many high-risk patients were in this facility and the overall complex and they stated that this information was tracked on a COVID-19 spreadsheet that would be provided to me but that they were not certain about exact numbers or proportions. I then asked how many people who had been diagnosed with COVID-19 had ongoing or lingering symptoms after their medical isolation was complete. The staff stated that no patients had any symptoms that persisted from COVID-19 infection. When I clarified that I was asking about symptoms that persist for weeks or months after the initial infection, the staff again stated that no patients have any such symptoms. I asked whether there is a standard assessment conducted in the week or two after medical isolation release to look for ongoing symptoms, disability or other medical problems and was told that no such process exists but that existing sick call would allow for anyone to be seen within one day for any such concerns. The BOP/PHS team also indicated that all officers wear masks and ensure social distancing, but they also stated that no tracking or documentation of these tasks exists in unit logbooks or supervisor records. I was told that both mask wearing by officers and social distancing are ensured through periodic rounding by supervisors. Data supplied by the BOP/PHS team after my inspection indicates that 525 of the 1020 people detained in the Low (51.6%) meet CDC criteria for being high-risk for serious illness to death from COVID-19 infection.

Venters-BOP Lompoc

14. I asked about the use of daily COVID-19 screenings similar to what was done for staff, and the BOP/PHS team indicated that housing area screenings were only conducted in quarantine and medical isolation settings, not for housing areas without either designation. They stated that in the Low, this meant that no housing areas, including the one dorm area for people who have never tested positive for COVID-19 (J dorm), have daily screening for COVID-19. I was also told by the BOP/PHS team that any detained person who works outside their cohort or housing area is screened on daily basis by being asked questions about current symptoms of COVID-19. This process of screening every detained person who works across the various Lompoc sites, including the farm and other work areas, was repeatedly presented to me as a process that occurs without fail, and that security staff ask these questions before any detainee starts their work on a daily basis. I asked about training materials for this process and was told that none exist. I asked about logbook entries or other documentation that these screenings occur and was told that none exist.

15. I inspected the education area which did not have any detained people present, and was informed by the BOP/PHS team that if any person was suspected of having COVID-19 while in this or any other area, a 'Strike team' would be called to conduct high level cleaning and disinfection. This included BOP staff who work in the safety department and detained people who have additional training for responding to suspected COVID-19 cases as well as additional PPE, although they indicated that while staff have access to N95 masks, the detained people on the strike team would not have N95 masks.

16. I next inspected building B which includes several housing areas (Photos DSC 1-12). I first inspected housing area E, which the BOP/PHS team reported as housing 164 people with a capacity for 234. The BOP/PHS team explained that people in this housing area utilize a central dining hall that is cleaned by the aforementioned Strike team in between uses. They also explained that no sick call encounters occur in or on the unit and that people would submit paper requests for sick call and be seen at the medical clinic. They also confirmed that everyone in this housing area and the other housing areas, except for J dorm, had tested positive for COVID-19. I

then inspected housing area D. Both housing areas are comprised of open bunks are present with bathrooms situated in between bunk areas. At the time of my inspection, most detained people and staff were wearing masks. The bunks in the sleeping areas were situated close together, approximately 5-6 feet apart, with both top and bottom bunks in use intermittently. Some bunks were arranged head to toe, either for adjacent bunks or top/bottom bunks, and some were not Floors of all areas were clean, without trash or debris. Fewer than half of bathrooms had paper towels available at the time of my inspection. All bathrooms had soap available.

17. The next area I inspected was the food service area (photos DSC 13-15). The tables in this area had tape on every other seat to indicate where people should not sit. The BOP/PHS team presented these seating arrangements as part of their efforts to promote social distancing. The tape appeared to be freshly applied.

18. I subsequently inspected the Gym area of the Low (photos DSC 0017-0028), which the BOP/PHS team explained served as a housing area for approximately 25 high-risk patients in August. The sequence of events that led to placing high-risk patients into the gym involved testing in early May which identified most people as COVID-19 positive, and the small number of COVID-19 negative people were placed into building M and then building J. At some point in August, several of the people in building J building developed COVID-19 symptoms and part of the response included placing 20-25 high-risk people into the gym to keep them separate from other detained people for approximately 25 days. The gym was not in use at the time of my inspection. The shower in the gym is located inside a mop or utility closet, which is not clear from the photos.

19. The next area I inspected in the Low was J dorm, which was at approximately 2/3 capacity. This dorm was similar to the E building in terms of the bunk placement as well as the intermittent use of both top and bottom bunks and the lack of any consistency to the head to toe arrangement of adjacent or top/bottom bunks. As with E building, one of two bathrooms I inspected in J building

Venters-BOP Lompoc

had paper towels in the dispenser. Most detained people and staff were wearing masks as the time of my inspection and the floors in sleeping areas and bathrooms were clean and free of debris.

20. I spoke with 20 detained people in the Low and received written communication from another two. The following are COVID-19 concerns or observations that were relayed by at least two of the people I spoke with.

   a. People who receive daily medications reported that they line up in very close fashion, often touching the person in front of and behind them. They explained that because they do not control the movement of others, and because they don't want to miss their medication, they are unable to get others to space out. Nobody had ever seen a correctional officer ask or tell detained people to spread out or mention social distancing while waiting for medications.

   b. People I spoke with reported that sick call requests often go unanswered and when they are seen, it is most often more than a week after reporting a medical problem. Many people also reported submitting multiple sick call requests over several weeks without being seen for the same ongoing health problem.

   c. People who were held in 'the hospital' for medical isolation reported being seen and assessed on a daily basis, but many of those who held in other medical isolation settings reported going days in between clinical assessments. Multiple people also reported that daily COVID-19 screenings in quarantine units were often limited to temperature checks without being asked about their symptoms.

   d. All of the people I spoke with in the Low had COVID-19 in the weeks or months before my visit. Approximately 1/4 of them were still experiencing symptoms of COVID-19, including shortness of breath, pain with breathing, daily headaches, ringing in the ears and weakness. None of them reported being seen after leaving medical isolation to be asked about ongoing COVID-19 symptoms or disability. Most of those who reported ongoing symptoms of COVID-19 stated that they had submitted multiple sick call

Venters-BOP Lompoc

requests without eliciting any response. As one person stated "I stopped putting in cop-outs because they told me it was just part of the COVID."

e.  In units that had paper towels, detained people stated that the paper towels were made available in the days before my inspection. Posting of new COVID-19 signage and general cleaning was also reportedly done just before the inspection.

f.  Many of the people who reported having COVID-19 symptoms as the reason for being tested (as opposed to being tested in response to another case) reported being initially rebuffed by medical staff, being told that they had a cold, the flu or that they needed to 'wait and see' before being evaluated by a physician or tested. These people reported writing their COVID-19 symptoms on sick call slips and sometimes reporting to nursing staff during medication administration. They often reported receiving Tylenol and being returned to their housing area if they reported multiple COVID-19 symptoms but did not have a fever.

g.  Many people who told me that they were not ill at the time of their COVID-19 test reported that they had actually been sick weeks earlier. They expressed concerns that their medical records document them as asymptomatic and/or recovered, but that they had been very ill before their tests and either faced barriers to accessing testing and care or were reluctant to report being sick because they didn't want to go into a solitary confinement setting.

h.  Many patients with chronic health problems, including hypertension, diabetes and asthma reported that they went many months, often more than 6, without being seen in the chronic care clinic. They stated that their medications would be renewed many times and even when having worsening symptoms of their disease, they could not be seen for chronic care issues. People with hypertension stated that their blood pressure was generally not checked in between chronic care visits, so that they went many months without knowing their blood pressure, and people with asthma reported that their peak

Venters-BOP Lompoc

flow measurement was not checked, either during chronic care visits or during asthma attacks. Most of the people with chronic care issues I spoke with reported that they had not had a chronic care encounter since contracting COVID-19. Most of the people I spoke with about chronic care stated that they believed that insufficient staffing caused delays in their chronic care.

i.   I spoke with three people who used canes or walkers and each of them expressed difficulty in the COVID-19 response, including the inability to use the shower in the gym, when housed there, as well as the need to navigate stairs to receive medications and go to meals.

j.   Many of the people I spoke with who were in medical isolation during the months of April, May and June reported that they were not examined regularly and that they went days in between a health professional physically examining their lungs or doing any assessment other than a temperature check. One man who reported that his COVID-19 symptoms included elevated heart rate, palpitations and shortness of breath reported that nobody ever listened to his lungs with a stethoscope while in medical isolation and that he was never given an EKG despite his heart rate being very elevated on the day he entered medical isolation. People who experienced medical isolation in the 'hospital' reported more regular daily assessments and access to care, while those who experienced medical isolation in various prison housing units more consistently reported barriers to assessment and care.

k.   Several of the people I spoke with reported that officer wearing of masks is inconsistent, with less compliance on night and weekend shifts.

21. The next area I inspected was the North and South Camp (photos DSC 29-38). I was told by the BOP/PHS team that most of the workers for the farm, transportation, safety, food service and Air Force base were housed in the Camps. The BOP/PHS team repeated their explanation from the prior day that every detained worker was screened for COVID-19 symptoms on a daily basis

10

Venters-BOP Lompoc

before starting work. I was told that some of these work assignments had been suspended during earlier COVID-19 response, but that most had restarted and that all would be functioning soon.  I asked about documentation that the worker screening process occurred, as is the case in the staff screening area, and was told that the screenings happen without fail, but that there was no documentation. I asked about high heat days (housing area temperatures greater than 87'f) and heat sensitivity for people with chronic health problems, and the potential interaction between heat stress/stroke and COVID-19 in these groups of people, and was told that BOP Lompoc does not experience any high heat days. The North Camp was reported to have one dorm, with 101 people currently housed, and the South Camp, two dorms with a total of 185 people, and both camps at approximately 50% overall capacity.

22. These dorms were large open areas, each with capacity for 160-190 people. In the middle of the North Camp dorm, a computer/phone area was present with a bottle of cleaning or disinfecting spray present at every terminal or phone. The living spaces and bathrooms were clean of debris on the floor and the individual some bunks were arranged head to toe to the closest bunk and others were not. Every bunk in the North Camp had a bottle of cleaning solution hanging from the frame.

23. After the North Camp dorm, I inspected the programs area, which was not being utilized at the time. After inspecting the South Camp dorms, I inspected the dining hall. This area was utilized for housing of detained people and multiple detained people reported to me that this dining hall had been closed prior to COVID-19 due to mold or other health issues. The BOP/PHS team stated that the dining hall had been closed for renovations and in the response to my request for any documentation of mold or other health risks in this dining hall, the BOP stated that they had no records of any such concern.

24. I then inspected the medical clinic where sick call and chronic care encounters for both Camps occur. The clinic included several examination rooms and a pharmacy window that was presented as the spot where people que to receive their medications. The Health Services Administrator

Venters-BOP Lompoc

(HSA) explained that both Camps were transitioning to a sick call box system that would not require people to physically come to the clinic to submit their sick call requests. I asked about what level of staffing was dedicated to this facility, for MD, mid-level (PA or NP) and nursing staff and was told that no set staffing level existed but that staff spent whatever time was needed to see patients. I asked of there was an average number of hours per day that nurses and other health staff were in the clinic and was told that this varies and could not be estimated. I asked about expectations for sick call response time and the HSA stated that if anyone reported a new injury or pain or any medical problem relating to a chronic care exacerbation, that they would be seen within 24 hours, not only in the Camps but throughout BOP Lompoc. I asked how sick call timeliness was monitored, including the subset of sick call requests that involve COVID-19 symptoms and was told that this is not a metric that is tracked.

25. I spoke with 22 detained people in the North and South Camps. The following are COVID-19 concerns or observations that were relayed by at least two of the people I spoke with.

   a. As in the Low, most people I spoke with in the North and South Camps reported that sick call requests take more than a week for response and most of the chronic care patients I spoke with expressed frustration that they were not seen regularly. Many of the chronic care patients stated that it had been more than six months since they had been seen and that they were unable to get a response via sick call or chronic care when their disease symptoms worsened. I spoke with three people who had been injured in their work or in the housing area and who reported more than two weeks in response to sick call encounters for their injuries.

   b. People I spoke with in the Camps reported having COVID-19 in the weeks or months before my visit and approximately ¼ of them reported still experiencing symptoms of COVID-19, including pain with breathing, headaches, loss of taste and smell, joint stiffness and weakness. None of them reported being seen after leaving medical isolation

to be asked about ongoing COVID-19 symptoms or disability and several reported that they had submitted multiple sick call requests for these symptoms without being seen.

c.  Other reports from people in the Camps that echoed what people reported in the Low included the difficult initially accessing care when they became ill with COVID-19, as well as concerns about having been labelled asymptomatic when they tested positive despite actually being ill with COVID-19 weeks earlier. Multiple people also reported that daily COVID-19 screenings in quarantine units were often limited to temperature checks without being asked about their symptoms.

d.  Several people also expressed feeling reluctance to report their COVID-19 symptoms when they first became ill because the unit they would be transferred to was operated like solitary confinement.

e.  I asked people in the Camps about their work detail and whether they are screened on a daily basis for COVID-19 symptoms. Nobody reported ever having been screened as part of their work detail.

f.  Many of the people I spoke with in the Camps reported that officers regularly do not wear masks, including the count officers who rotate between units. None of the people I asked about medication lines reported any efforts to implement or promote social distancing while in the medication or clinic ques.

g.  Several people in the Camps reported intimidation from correctional officers before my inspection, including outright threats to not speak with me as well as threats of solitary confinement if masks were specifically not worn during the inspection. As with the Low, in areas with paper towels, detained people stated that the paper towels and soap were made available in the days before my inspection.

26. The next area of my BOP Lompoc inspection was the USP (United States Penitentiary) also known as 'the Medium'. I spoke with 10 people detained in this facility and toured housing areas as well as the dedicated COVID-19 inpatient unit referred to by detained people as 'the hospital'.

The BOP/PHS team included facility and complex leadership and I was able to speak with the lead physician (Clinical Director) as well as the HSA during parts of this inspection. The Medium was presented as two administrative areas, the general population area, which housed 702 people at the time of my inspection and the special housing unit, or 'SHU' which housed 205 people. The first area of my inspection was the inpatient unit also referred by detained people as 'the hospital'. This structure was created by completely renovating an existing space to fashion a new 12 room medical care unit with a central nursing station and surrounding rooms for patient care. This unit provided patient care between May 15 and August 31, according to the BOP/PHS team. The team stated that COVID-19 patients who required some combination of elevated medical monitoring, intravenous fluids and oxygen therapy were treated in this unit. The staff who provided this care were from a contract with an outside vendor, Unicor. At the time I inspected this unit, the staff were decommissioning the unit because no patients were housed there. The BOP/PHS team presented to me that there was no plan to utilize this unit in the coming weeks and that additional staffing resources would be required to do so.

27. The next area I inspected was the J unit, which was reported by the BOP/PHS team to have 119 people, and a capacity of 242 (photos DSC 39-45). The B range of the J unit was comprised of individual cells and a dedicated shower area. The common areas of the floors were clean of debris as were the shower areas. The BOP/PHS team indicated that most of the people on this unit were in single cells, and that anyone designated as 'high-risk' based on CDC criteria was in a single cell.

28. The next area I inspected was the facility intake unit (photos DSC 49-60). The BOP/PHS team explained that new admissions to anywhere in the BOP Lompoc facility would be processed in this unit and then proceed to new admission quarantine, also in the Medium, before going to their eventual housing area. The team stated that every cell would be cleaned in between intakes, so that each group of new admissions would be processed through and the cells they had been in cleaned, before another group was processed. The cleaning of these cells was done by detained

people. When I asked whether people doing this cleaning were screened for symptoms of
COVID-19 at the start of their shift, the housing area officers did not appear to be familiar with
this process and the leadership interjected to say that this screening was done without fail. I asked
whether the cleaning of the cells or the screening of the cleaning workers was documented in a
logbook or elsewhere and was told that neither task was recorded.

29. The next area I inspected was the SHU, comprised of 6 tiers (photos DSC 61-64). Three of the
tiers were in use as quarantine, presented by the team as housing quarantined people who were
awaiting transfer to another facility or who were in a 'special population'. These tiers were all
comprised of cells with solid doors and the BOP/PHS team stated that whenever a food slot or
doon on a cell is opened, staff don PPE. The team stated that all quarantine patients are in single
cells and that none of them has access to recreation or telephone. The team also stated that at least
daily, a temperature check and COVID-19 symptom screening is conducted for all detainees,
usually by opening the food slot.

30. The next two areas I inspected were housing areas utilized for pre-release quarantine and medical
isolation. Both areas were comprised of open bar-stock units. The BOP/PHS team described the
current approach to movement in and out of the facility as a 'test in, test out' model in which any
newly admitted person, or person set to be released would be tested twice and proceed on their
path with two negative test results. People with positive tests would be transferred to medical
isolation for further assessments. In the pre-release unit, the donning and doffing of PPE was set
up inside the unit, near the entrance (photo DSC 0064). In the nearby housing area utilized for
medical isolation, three patients were being housed as a result of active COVID-19 concerns.
A purpose-built enclosure was set up outside this unit for doffing of PPE.

31. I also inspected the medical clinic area, and was able to see the examination rooms and speak to
the Clinical Director and Health Service Administrator. During this discussion I asked both
leaders as well as the rest of the BOP/PHS team whether the facility has a quality assurance
metric that tracks timeliness with sick call requests and reports to the quarterly or monthly quality

meetings what this tracking reveals. I asked the same question in relation to the percentage of

chronic care visits that occur within prescribed timelines. I was told that there was no such

tracking or reporting of either chronic care or sick call timeliness. The Clinical Director stated

that he was certain that 100% of chronic care encounters occur within the prescribed timeframe

based on BOP guidelines because there is a roster of chronic care encounters and he has access to

this information. I then asked how the impact of staffing shortages is assessed in relation to the

ability to perform sick call and chronic care encounters. The team was either unable or unwilling

to identify any relationship between staffing levels and lack of timely response to sick call or

chronic care. I inquired how the need for staffing was tracked in relation to the availability of

staffing hours for nurses and physicians and the HSA indicated that staff were used when needed,

but that there was no set matrix or number of staff hours in any of the various clinics because the

needs would change from day to day. I further inquired whether an average or median number of

hours needed was tracked and received the same reply, that staffing was allotted as needed but

that neither the HSA nor the Clinical Director would offer an opinion about how currently

unfilled lines relate to access to care.

32. During my time in USP/the Medium, I spoke with ten detained people across the housing areas

that I inspected. The following represent COVID-19 related issues or concerns that at least two

people reported to me;

   a.  At with the prior facilities, detained people reported that sick call requests regarding

       medical problems often go unanswered or that more than a week passes between

       submitting and being seen.

   b.  Multiple people in the USP reported that they do not have access to paper towels and

       must use personal towels for drying their hands after washing and that these towels are

       generally wet much of the time because they are used for cleaning their cells as well as

       personal hygiene.

Venters-BOP Lompoc

    c.   Patients I spoke with in the chronic care services reported that they go many months in between encounters, some reporting more than six months since being seen. Several people reported that even when their chronic health problems worsen, they may not be able to be seen. Some chronic care patients reported that filing a grievance may prompt being seen for either sick call or chronic care, but that this also brings the risk of retaliation by security staff.

    d.   Two people reported that their medical isolation time had been extended by approximately one week when their test results were lost.

    e.   Several people reported that officers in their units do not wear masks, especially on night and weekend shifts.

    f.   Among patients who had tested positive for COVID-19, several reported ongoing symptoms of COVID-19 including weakness and headaches. Some also reported that they had been ill months before being tested and that they were concerned that their medical records document them as asymptomatic, even though they were ill with symptoms when originally infected.

    g.   Threats from officers for speaking candidly with me were also reported in these discussions.

33. Across the three facilities I inspected, several people reported that cleaning of common areas is not conducted regularly and that when a potential COVID-19 case is identified, no special measures are taken in cleaning/disinfecting of the personal effects and living space of that person. These reports included either observing no cleaning/disinfecting at all, or having detained people without masks engage in cleaning/disinfecting when a potential COVID-19 case has been identified.

34. My review individual patient medical records, chronic care rosters and BOP mortality reviews reveals several concerns;

Venters-BOP Lompoc

    a.   Multiple patients who died from COVID-19 appear not to have received regular or timely medical assessment *after* being identified as ill with COVID-19. This concern includes lack of a daily health assessment while a patient has active COVID-19 symptoms so that more than 24 hours passed between documentation of worsening clinical status and the next encounter, resulting in the terminal hospitalization.

    b.   Access to chronic care encounters appears to occur at less frequent intervals than described by facility leadership, and reference is made to 'annual' chronic care encounters, including attempting to address up to six chronic diseases in such an encounter with very limited physical assessment.

    c.   All four of the internal mortality reviews note multiple strengths in the clinical care received by patients who died from COVID-19 and zero suggestions or recommendations for any improvement. Each of these reviews is accompanied by a one-page external consultant review that also notes no recommendations or suggestions to improve care for any of these cases.

**E.  Findings**

35. My findings are divided into three areas; strengths deficiencies and recommendations. My framework for evaluation is based on how the facility has responded to three areas of COVID-19 response;

    a.   Does the facility adequately identify and respond to individual cases of COVID-19? This area of response includes screening for new cases, response to sick call requests relating to COVID-19, as well as the practices in medical isolation once cases are identified and identification and treatment of persisting COVID-19 symptoms.

    b.   Does the facility adequately slow the spread of the COVID-19 virus? This area of response includes basic infection control including hand washing and drying, cleaning of common areas, social distancing and mask wearing.

    c.  Does the facility adequately identify and protect high-risk patients? This area of response includes the use of the chronic care program and enhanced screening and infection control measures to identify, educate and care for patients before, during and after COVID-19 infection based on their increased risk of death and serious illness. This also includes efforts to secure release for high-risk patients from detention.

36.  Strengths of the BOP/Lompoc COVID-19 response.

    a.  Staff screening. The staff intake screening process located in the training center is very well-organized and includes adequate space so that staff do not bunch up during screenings, as well as paper records of each screening. Use of a single, non-custodial site allows the facility to ensure that anyone who has an elevated temperature or who has positive responses to screening questions will not proceed into a facility.

    b.  Hospital unit. One very clear strength of the BOP Lompoc response was the creation of a dedicated unit to care for COVID-19 patients. This unit is superior to any other effort I have seen in my 12 facility COVID-19 inspections and clearly provided a higher level of care to the relatively small number of patients who were treated there. Because this unit was designed with health care delivery as the main priority, the physical plant and systems of information and care utilized ensured that patients were regularly assessed, and that when patients showed clinical worsening, staff were quickly aware and followed clear protocols concerning additional care and hospital transfer. This unit lies fallow now, reportedly because of a lack of dedicated staff and also because of an unclear clinical need.

    c.  Screening database. The BOP/PHS team stated that they originally created a spreadsheet or tracking document to include symptoms of COVID-19 that were detected either through daily screenings in quarantine units or through sick call reports. This approach is very important because it gives the facility the ability to track the occurrence of new COVID-19 symptoms across time and location. This approach is particularly critical as a

management tool in the coming months because of the impending influenza season, the restarting of new admissions and the fact that many of those originally infected are passing their 90-day mark, potentially vulnerable to a second infection.

d. Testing. BOP Lompoc has significantly expanded COVID-19 testing in coordination with national BOP protocols. Key elements of this approach include testing of all potential close contacts when a new case of COVDI-19 is detected as well as a 'test-in, test-out' approach which is now relatively standard in prison systems. This approach involves housing newly detained people in a quarantine unit where they are offered two COVID-19 tests, one near the start and a second near the end of their 14-day quarantine. A similar process is utilized for people awaiting transfer out of the facility.

e. Quarterly quality meetings. I reviewed the quarterly quality report entitled '"Improving Organizational Performance Meeting" and find that many crucial principles of quality assurance and improvement are being utilized in BOP Lompoc. A quality improvement project on promoting adequate hand hygiene involved clear outline of goals, metrics and outcomes in the analysis of 15 health staff per month and tracked the percentage that performed proper hand hygiene. Other strengths of this report include data reporting in medication errors, dental and cancer screenings.

f. PHS involvement. The PHS Officer who accompanied me during the inspection was extremely knowledgeable about every aspect of the facility COVID-19 policies and responses despite having a role that oversees multiple BOP facilities. Gaps in the implementation of those policies (below) reflect a lack of staffing and information systems, but the presence of a highly trained and engaged PHS Officer is a tremendous asset to the facility and COVID-19 patients alike.

g. Housing area cleanliness and cleaning solutions. The housing areas were generally clean and free of debris during my inspection, in both living quarters and bathrooms. Cleaning solution for personal spaces also appeared abundant during the time of my inspection.

Venters-BOP Lompoc

37. Deficiencies in the BOP/Lompoc COVID-19 response.

    a. COVID-19 screening. Several deficiencies exist in the BOP Lompoc approach to COVID-19 screening among detained people. Taken together, these screening deficiencies increase the risk that patients will become seriously ill or die from COVID-19 and also increase the potential spread of the virus.

        i. The most obvious screening issue is that the facility is not conducting daily COVID-19 screenings among the people who have not yet had COVID-19. The current approach of only utilizing daily screenings among staff and detainees in quarantine units leave the facility vulnerable to development of COVID-19 among people who are naïve to COVID-19. The problems with sick call (below) increase the consequences that may flow this lack of screening.

        ii. A second deficiency in the screening process involves detained people in work details. During both days of my inspection, the entire BOP/PHS team stated that every detained person who works outside their housing area is screened daily for COVID-19 symptoms before they start work. I asked whether any record of these screenings occurring exists, either in logbooks utilized by staff or elsewhere. I was told that there was no such documentation that these daily screenings occur, but that the leadership of the facility, including the PHS officer, were certain that these screenings occur. I spoke with numerous detained people who work outside their housing area, many of them in the North or South Camps, and none of them reported having ever been screened before work. In addition, when I asked individual officers about how this process occurs, in housing areas as well as in various areas of the facility where work might occur, none of them seemed familiar with the process. This is a critical deficiency because aside from staff, the work details are the primary potential vector for spread of COVID-19 from one part of the facility to another.

iii. A third screening concern is that many of the medical records I examined show inconsistent screening activities, meaning that some of the people who became ill with COVID-19 and even died from COVID-19 had screenings documented less than daily while in a quarantine or medical isolation units. I reviewed 140 pages of screening records and it is clear that despite the stated policies of BOP/PHS to screen for both temperature and symptoms, only temperatures are being recorded much of the time, which was also reported as the practice by many detained people. This reliance on elevated temperature alone is an unreliable approach to detecting COVID-19.[5]

b. Lack of timely access to sick call and chronic care. Among the 52 people I spoke with, the most common COVID-19 related concern was a lack of access to health care, namely sick call and chronic care encounters. These encounters and care are central to the facility COVID-19 response. Detained people overwhelmingly attributed these concerns to a lack of staffing in the health service.

i. Sick call timeliness was reported by almost every person to exceed stated expectations. The BOP/PHS team indicated that a sick call requests concerning a new health problem that included a symptom such as pain should result in a face to face encounter within 24 hours. This is consistent with correctional standards of care.[6] People I spoke with consistently reported that reports of new pain, injury and other new medical problems routinely took more than a week to result in being seen, and often that multiple sick call requests and even grievances were

---

[5] Voytco L. Fauci Says Coronavirus Temperature Checks 'Notoriously Inaccurate'. Forbes Online. Aug 13, 2020. https://www.forbes.com/sites/lisettevoytko/2020/08/13/fauci-says-coronavirus-temperature-checks-notoriously-inaccurate/#4324213e33f0, accessed 9/15/20.
[6] National Commission on Correctional Health Care https://www.ncchc.org/cnp-screening-sickcall-triage, accessed 9/17/20.

Venters-BOP Lompoc

required to elicit a response. Several people reported that they initially reported
COVID-19 symptoms via sick call and that they were not seen for days or longer.

ii.  Chronic care encounters were also reported by almost all people in the chronic
care service to take far longer than the 3-6-month window referenced by BOP
staff. These delays were also clear when I reviewed the chronic care roster
referenced by the Clinical Director, but this information is not part of regular
quality assurance. These delays in chronic care can significantly increase the risk
of serious illness or death from COVID-19 since poorly controlled health
problems are associated with worse COVID-19 outcomes. For example, several
patients with asthma stated to me that despite reporting asthma exacerbations via
sick call, they continued to receive the same medications and no chronic care
encounters for many months. I also reviewed utilization data which showed that
184 chronic care encounters occurred in the month of August 2020. The facility
separately reported that a total of 1134 detained people qualify as being high risk
for serious illness or death from COVID-19, 50.8 % of the total population.
Based on assumptions shared by staff, that most of those people are on the
chronic care service and that there is a range of time intervals between 1 and 6
months for chronic care encounters, this monthly pace of chronic care encounters
falls far below what is needed.[7]

iii.  A separate access to care issue is the lack of assessment for ongoing COVID-19
symptoms among people who have survived the infection. I spoke with many
people who reported ongoing shortness of breath, pain, headaches, weakness and
ringing in the ears weeks after their initial infection. The presence of these

---

[7] Assuming 1000 of the high-risk people are on the chronic care service, with a 50/30/20 % split for 6/3/1-month
intervals, a monthly pace of 383 chronic care encounters is needed. This need is even greater if there are ever
interruptions in services or if patients have more than one chronic care problem and not all problems are
addressed at each visit, which medical records show to be the case at least some of the time.

ongoing symptoms and even disability among a group of people who are
classified by BOP as 'recovered' reveals a lack of any system to look for these
problems after a person leaves medical isolation. BOP has an obligation to assess
COVID-19 patients and care for those who require physical therapy, specialty
referral and other types of care during recovery.

c.  Lack of infection control in housing areas. Throughout the facilities I inspected, it was
clear that people either had no access to paper towels or that access had been provided in
the days before my inspection. The CDC has clearly identified the ability to dry one's
hands with a single use paper towel or air dryer as critical to COVID-19 response.[8] In one
housing area I was told by BOP leadership that paper towels were not needed because of
the presence of a hand dryer. I tested the hand dryer and it was broken. Staff and detained
people in the unit confirmed that it had not worked for over one year. I have inspected
numerous facilities that manage to secure paper towels for people in both dorm and cell
housing areas.

Throughout my inspection, the BOP/PHS team stated that common surfaces are cleaned
and disinfected at least two times per day and the BOP supplied a COVID-19 cleaning
policy which affirms the same. I reviewed data from the Truintel system, which serves as
an electronic logbook, and where BOP staff stated that every round of
cleaning/disinfecting is recorded. In the four 24-hour periods I reviewed (2 each for
North and South Camp), only one was cleaned twice, the others only once. This is
consistent with reports from detained people that cleaning/disinfecting does not occur
according to facility policies.

Despite BOP/PHS assurances that enhanced cleaning occurs in any response to a
suspected COVID-19 case via a 'Strike team', multiple detained people reported that

---

[8] COVID-19: Handwashing. https://www.cdc.gov/coronavirus/2019-ncov/global-covid-19/handwashing.html,
accessed on 9/21/20.

Venters-BOP Lompoc

after identification of a potential COVID-19 case, personal effects and spaces were either

left exposed without any cleaning/disinfecting or that detained people without masks

were used to conduct this high-risk work.

    d.   Punitive approach to quarantine. The SHU unit I inspected is a 6-tier housing area

designed for punitive segregation. The housing of people for 22-24 hours per day in cells,

without access to basic privileges including phone and out of cell time is not appropriate

and runs counter to CDC guidelines on making COVID-19 responses in detention

settings non-punitive.[9]  While not directly related to quarantine, the intimidation and

threatening of detained people to behave in a manner prescribed by correctional staff

during the inspection is another very concerning example of a punitive response to the

COVID-19 outbreak in the facility.

38. Recommendations to mitigate morbidity and mortality from COVID-19 at BOP Lompoc.

Recommendation 1. All detained people in BOP Lompoc should be screened for both elevated

temperature and COVID-19 symptoms on a daily basis, prioritizing rollout among people in work

crews, those who are COVID-19 negative and those who are >90 days post-infection.[10] Results of

screenings should be entered into patient records and health leadership should review an adequate

sample of screenings on a monthly basis to know that they occur and are recorded. BOP/PHS

should also restart their daily tracking of COVID-19 symptoms reported either through sick call

or screenings, both as an outbreak management tool and quality assurance intervention. All

screening results and sick call requests should be entered into patient records.

Recommendation 2. BOP Lompoc should identify the number of additional health staff required

to meet their sick call and chronic care obligations and hire those staff within 30 days. BOP

---

[9] Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities Updated July 22, 2020. https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html, accessed 9/19/20.
[10] The CDC has reported immunity from COVID-19 reinfection as potentially limited to 90 days. https://www.cdc.gov/media/releases/2020/s0814-updated-isolation-guidance.html, accessed 9/15/20.

documents indicate that among its roster of 35 health staff, there are ten staffing vacancies,
including one medical officer, two nurse practitioners, one nurse, one pharmacist and two
paramedics. The PHS roster of four lines includes two vacancies, a quality improvement
coordinator and a physician assistant. In addition to regular staffing channels, the facility may
need to consider short term per diem staff to help with screening and post-COVID-19 symptom
assessments. The facility health leadership should be trained and supported to track and report on
the link between patient care needs and staffing resources so that gaps in access to care from
inadequate staffing are transparent. BOP/PHS leadership at Lompoc should also devise a staffing
plan and threshold for use of the hospital unit with a predetermined number of active COVID-19
infections.

Recommendation 3. Every person with a recorded positive COVID-19 test should have a health
encounter with a mid-level or physician provider within 7-10 days of their release from medical
isolation to identify a) their original symptoms, b) the presence of any lingering or ongoing
symptoms and c) the need for repeat encounters, specialty referral or physical or occupational
therapy. It is important for these encounters to identify whether each patient was ill with COVID-
19 symptoms and when they were tested in relation to their symptoms. Because most patients in
Lompoc BOP tested positive weeks or months ago, these encounters should start with those who
are on the chronic care service. This assessment can easily be added as a template or feature of
chronic care encounters.

Recommendation 4. BOP Lompoc should utilize basic quality assurance tools to measure and
report in their quality meeting the percentage of sick call requests that are seen in a timely
manner, as well as the percentage of chronic care encounters that occur in a timely manner. The
quarterly quality meeting displays this approach in some areas but sick call and chronic care
encounters are reported only in terms of number of visits without any assessment of what
percentage of the total encounters occur in a timely manner.

Venters-BOP Lompoc

Recommendation 5. BOP Lompoc should implement measures to promote social distancing, institutional cleaning/disinfecting and mask wearing including consideration of;

-Use of camp program area for recreation with socially distanced seating.

-Training of officers on how to promote/encourage social distancing.

-Implementing social distancing in medication, food and other lines.

-Regular COVID-19 town halls in each housing area with health and security leadership.

-Use of enhanced cleaning/disinfecting for responding to suspected COVID-19 cases. This should include specialized training and the same level of PPE for both staff and detainees engaged in this work.

-Development of monitoring tools for staff mask wearing, implementation of cleaning/disinfecting and other infection control measures by security staff. These tools should provide documentation that compliance is assessed and that deficiencies are addressed.

Recommendation 6. Paper towels and soap should be made available to all detained people in any location where they wash their hands.

Recommendation 7. BOP Lompoc should provide basic services and freedoms to people in quarantine and medical isolation, including access to phone calls, recreation, reading material and time out of cell. Medical isolation should also follow CDC guidelines for being non-punitive.[11]

Recommendation 8. BOP Lompoc and BOP generally should investigate the occurrence of retaliation and threats against detained people who report medical or health related concerns.

Recommendation 9. BOP Lompoc and BOP headquarters should expedite the applications and reviews of high-risk patients who meet criteria for home confinement and report on the number and timing of pending and approved applications.

---

[11] Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities. Updated July 22, 2020. https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#Medicalisolation, accessed 9/17/20.

Venters-BOP Lompoc

Recommendation 10. I recommend that BOP Lompoc coordinate with PHS and BOP headquarters to undertake a review of all COVID-19 related deaths throughout BOP facilities with specific attention to the following areas;

-Gaps in daily screenings and medical isolation assessments.

-Late or missed chronic care, delays in response to sick call.[12]

-Whether patients who died had been reviewed or expedited for potential release.

-Whether mortality reviews routinely fail to identify findings or recommendations for improvements in care.

The six 'COVID-19 Mortality Review Guidance Questions' that each of the current death reviews mandate do not inquire whether a patient experienced delays or denials of sick call or chronic care and also do not ask whether chronic health problems were well or poorly controlled. There is also no question as to whether the patient received daily screenings while in quarantine or daily clinical assessments while in medical isolation. Without answering these questions for each mortality review, it is unlikely that inadequacies in care will ever be linked to the outcomes of serious illness or death from COVID-19, despite the reality that they are intimately connected.

## F. Summary

39. The COVID-19 outbreak at BOP Lompoc has been one of the prison system's most expansive, in terms of the percentage of detained people who were infected as well as those who died. The response of the BOP and PHS to this unprecedented challenge at Lompoc exhibits both significant strengths and serious deficiencies. Overall, the COVID-19 response at BOP Lompoc is characterized by some evidence-based strategies being superimposed on a grossly inadequate system of health care. As a result, the policies and procedures developed to find and respond to

---

[12] For almost 2 decades, the U.S. Department of Health and Human Services has identified the link between poorly controlled chronic health problems and hospitalizations. See https://www.ahrq.gov/downloads/pub/ahrqqi/pqiguide.pdf, accessed 9/19/20.  This lens should be applied to a review of all COVID-19 deaths in BOP custody.

Venters-BOP Lompoc

COVID-19 cases, slow the spread of the virus and protect high risk patients have been

incompletely implemented. Many of the deficiencies in health access flow directly from chronic,

unaddressed understaffing. This problem has been previously identified but I am very concerned

by facility leadership's inability to discuss or quantify how these shortages relate to the COVID-

19 response.

40. A common thread that I observed throughout my inspection was a lack of data tracking or basic

quality assurance in the approach that leadership takes, not only for staffing, but in access to sick

call, chronic care and cleaning/disinfecting. The BOP/PHS team offered numerous assurances

that these and other critical COVID-19 tasks, such as screening of detained work crews, occur

without fail-despite contrary reports by detained people and ample evidence to the contrary in

documents I have reviewed, including the records of people who died from COVID-19. Based on

my review of the quarterly quality meeting report and other records, I believe that implementing

these quality assurance tools is feasible and would be extremely helpful in providing regular,

objective data critical to the COVID-19 response.

41. The BOP COVID-19 response at Lompoc can be vastly improved by building on existing

strengths and addressing longstanding weaknesses, especial in the health service. By applying the

same rigorous approach that is utilized for staff COVID-19 screening to detained people,

addressing the punitive nature of quarantine settings and ensuring regular assessments of people

in medical isolation, I am confident that cases will be more quickly identified and cared for.

Unless the chronic staffing shortages are addressed, however, people with acute complaints

relating to COVID-19, influenza and other health problems will likely be missed, and similarly,

without adequate staffing for chronic care and post-COVID-19 care, the patients who do become

ill with COVID-19 and influenza will face higher risks of serious illness and death. A much more

thorough review of deaths from COVID-19 is required by BOP/PHS.

42. Addressing these concerns in the health system will take time, as will the implementation of

better social distancing and other infection control efforts. The current census of many housing

Venters-BOP Lompoc

areas, and the considerable number of high-risk people inside Lompoc create a strong mandate

for more vigorous consideration and processing of compassionate release applications.

Executed this 25th day of September, 2020 in Jackson MS

Signed,

Homer Venters MD, MS

**G. Appendix 1. Materials Reviewed for Venters BOP Lompoc Inspection Report**

- Protective Order.
- BOP home confinement memo.
- BOP Lompoc COVID-19 memos.
- BOP COVID-19 Cleaning materials, K unit cleaning detail roster.
- Written inmate communications.
- COVID Case data.
- Camp cleaning logs.
- Chronic care roster.
- Staffing vacancies.
- Medical isolation log.
- COVID-19 Screening logs.
- Grievances.
- Medical records for deceased inmates.
- Medical records of petitioners.
- Mortality reviews (internal and external consultant) for deceased inmates.