1  SAMUEL A. KEESAL, JR., CASB No. 38014
   skip.keesal@kyl.com
2  STEFAN PEROVICH, CASB No. 245580
   stefan.perovich@kyl.com
3  BRYCE CULLINANE, CASB No. 307079
   bryce.cullinane@kyl.com
4  KEESAL, YOUNG & LOGAN
   A Professional Corporation
5  400 Oceangate, Suite 1400
   Long Beach, California 90802
6  Telephone:    (562) 436-2000
   Facsimile:    (562) 436-7416
7
8  GEORGE B. NEWHOUSE, JR., CASB No. 107036
   george@richardscarrington.com
9  Richards Carrington, LLC
   545 S. Figueroa, 7th Floor
10 Los Angeles, CA 90071
   Telephone:  (303) 962-2690
11 Facsimile:  (888) 888-5280
12

13 Attorneys for Plaintiff Intervenor
   FAUSTINO BERNADETT
14

15                    **UNITED STATES DISTRICT COURT**

16   **CENTRAL DISTRICT OF CALIFORNIA – FIRST STREET COURTHOUSE**

17 Torres et al.,                    ) Case No. CV 20-4450-CBM-PVC(x)
                                      )
18                    Plaintiffs,     ) **MEMORANDUM OF POINTS &**
                                      ) **AUTHORITIES IN SUPPORT OF**
19         vs.                        ) **PLAINTIFF INTERVENOR**
                                      ) **FAUSTINO BERNADETT'S MOTION**
20 Milusnic et al.,                   ) **FOR ORDER GRANTING LEAVE TO**
                                      ) **INTERVENE AS PLAINTIFF AND**
21                    Defendants.     ) **FOR IMMEDIATE EVALUATION**
                                      ) **PURSUANT TO THE COURT'S**
22                                    ) **ORDER OF JULY 14, 2020**
                                      )
23                                    )
                                      ) **DATE:     DECEMBER 29, 2020**
24                                    ) **TIME:     10:00 A.M.**
                                      ) **PLACE:    350 W. 1ST STREET,**
25                                    )          **COURTROOM # 8B,**
                                      )          **8TH FLOOR**
26 _____)
27
28 ///

                              - 1 -

KYL4826-8159-8405.16

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ...................................................................5

I.  INTRODUCTION .......................................................................7

II.  STATEMENT OF FACTS ..........................................................11

  A.  DR. BERNADETT IS SCHEDULED TO SELF-SURRENDER
      TO LOMPOC ON FEBRUARY 19, 2021 .............................11

  B.  EVALUATIONS BY THREE SEPARATE DOCTORS
      CONFIRM THAT DR. BERNADETT'S UNDERLYING
      HEALTH CONDITIONS PUT HIM AT HIGH RISK FROM
      THE VIRUS. .......................................................................11

  C.  PROCEDURAL BACKGROUND. .......................................13

III.  ARGUMENT ............................................................................17

  A.  LEGAL STANDARD. .........................................................17

  B.  DR. BERNADETT IS ENTITLED TO MANDATORY
      INTERVENTION UNDER FRCP 24(A). ...............................18

    1.  Dr. Bernadett's Motion is timely (Factor One). ...........19

      a.  This case is in its infancy, and Dr. Bernadett is
          intervening quickly. ............................................20

      b.  No Parties Will Be Prejudiced By
          Dr. Bernadett's Intervention. ...............................20

    2.  Dr. Bernadett has a significantly protectable interest in
        this action  because he is scheduled to report to
        Lompoc on February 19, 2021  (Factor Two). ...............21

    3.  The disposition of the action may impair or impede
        Dr. Bernadett's ability to protect his interest (Factor
        Three). ..................................................................22

    4.  Dr. Bernadett's interest is not adequately represented
        because he is scheduled to report on February 19,
        2021, and Respondents refuse to evaluate him for
        home confinement despite the July 14, 2020 Order
        (Factor Four).........................................................23

  C.  ALTERNATIVELY, THE COURT SHOULD GRANT
      PERMISSIVE INTERVENTION UNDER FRCP 24(B) OR
      SHOULD RULE ON DR. BERNADETT'S REQUEST
      UNDER FRCP 71.................................................................24

KYL4826-8159-8405.16

D.    RESPONDENTS SHOULD BE ORDERED TO IMMEDIATELY EVALUATE DR. BERNADETT FOR HOME CONFINEMENT PURSUANT TO THE COURT'S JULY 14, 2020 ORDER. ....................25

IV.    CONCLUSION.................................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### FEDERAL CASES

*Arakaki v. Cayetano*,
   324 F.3d 1078 (9th Cir. 2003) ...........................................................21, 23

*Banneck v. Fed. Nat'l Mortg. Ass'n*,
   No. 3:17-CV-04657-WHO
   2018 WL 3417477 (N.D. Cal. July 13, 2018) ..........................................21

*Buono v. Kempthorne*,
   502 F. 3d 1069 (9th Cir. 2007) ......................................................18, 26

*Citizens for Balanced Use v. Montana Wilderness Ass'n*,
   647 F.3d 893 (9th Cir. 2011) ................................................................21

*Emma C. v. Eastin*,
   2007 U.S. Dist. LEXIS 95437 (N.D. Cal. 2007) ............................18, 26

*Freeman v. Delta Air Lines, Inc.*,
   No. C 13-04179 JSW
   2014 WL 5830246 (N.D. Cal. Nov. 10, 2014) .......................................22

*Habeas Corpus Res. Ctr. v. United States Dep't of Justice*,
   No. C 13-4517 CW
   2013 WL 6157321 (N.D. Cal. Nov. 22, 2013) ........................................21

*Hazel Green Ranch, LLC v. U.S. Dep't of Interior*,
   No. 1:07-CV-00414-OWW-SMS
   2007 WL 2580570 (E.D. Cal. Sept. 5, 2007) .........................................22

*Hensley v. Municipal Court*,
   411 U.S. 345 (1973) ...............................................................................15

*Jones v. Cunningham*,
   371 U.S. 236 (1963) ...............................................................................15

*Maleng v. Cook*,
   490 U.S. 488 (1989) ...............................................................................15

KYL4826-8159-8405.16

*Perry v. Proposition 8 Official Proponents*,
   587 F.3d 947 (9th Cir. 2009) .................................................................................... 24

*Prete v. Bradbury*,
   438 F.3d 949 (9th Cir. 2006) .................................................................................... 23

*Reebok Int'l Ltd. v. McLaughlin*,
   49 F.3d 1387 (9th Cir. 1995) .......................................................................... 18, 26

*Smith v. L.A. Unified Sch. Dist.*,
   830 F.3d 843 (9th Cir. 2016) .................................................................................... 20

*Smith v. Marsh*,
   194 F.3d 1045 (9th Cir. 1999) .................................................................................. 20

*Sw. Ctr. for Biological Diversity v. Berg*,
   268 F.3d 810 (9th Cir. 2001) .......................................................................... 18, 19

*U.S. v. Payne*,
   2017 U.S. Dist. LEXIS 20046 (D. Nev. 2017) .................................................. 18, 26

*United States v. Alisal Water Corp.*,
   370 F.3d 915 (9th Cir. 2004) .......................................................................... 19, 20

*United States v. California*,
   538 F. App'x 759 (9th Cir. 2013) .............................................................................. 19

*United States v. City of Los Angeles*,
   Cal., 288 F.3d 391 (9th Cir. 2002) ............................................................................ 19

*United States v. State of Or.*,
   745 F.2d 550 (9th Cir. 1984) .................................................................... 19, 20, 21

*Wash. State Bldg. & Const. Trades Council, AFL-CIO v. Spellman*,
   684 F.2d 627 (9th Cir. 1982) .................................................................................... 19

*Wilderness Soc. v. U.S. Forest Serv.*,
   630 F.3d 1173 (9th Cir. 2011) .......................................................................... 19, 21

KYL4826-8159-8405.16

## FEDERAL STATUTES AND RULES

18 U.S.C.
   § 4 .................................................................................................. 8, 27

Fed. R. Civ. P. Rule 24 ................................................................... 19, 21

Fed. R. Civ. P.
   Rule 24(a) ................................................................................... 18, 19
   Rule 24(a)(2) ....................................................................................... 17
   Rule 24(a)(2) ....................................................................................... 18
   Rule 24(b) ........................................................................................... 24
   Rule 24(b)(1)(B) ................................................................................. 18
   Rule 71 ........................................................................... 18, 24, 25, 26

Fed. R. Evid.
   Rule 706 .......................................................................................... 9, 16

I

KYL4826-8159-8405.16

Plaintiff Intervenor FAUSTINO BERNADETT ("Dr. Bernadett"), respectfully submits this Memorandum of Points and Authorities in Support of his Motion to Intervene and Request that Respondents LOUIS MILUSNIC (the warden of the Federal Correctional Complex at Lompoc, CA) and MICHAEL CARVAJAL (the director of the Bureau of Prisons) (collectively, "Respondents") be ordered to comply with the Court's July 14, 2020 Order by immediately evaluating Dr. Bernadett for home confinement.

## I. **INTRODUCTION**

Respondents must be required to comply with this Court's July 14, 2020 Order and cannot be allowed to disregard portions of that Order. This is especially true here, where Dr. Bernadett's life and long-term health are at stake.

On July 14, 2020, this Court provisionally certified a class of "all current *and future people* in post-conviction custody at FCI Lompoc and USP Lompoc [who are] over the age of 50" or who have "Underlying Health Conditions." *See* Doc. 45, p. 10-21 (emphasis added).

The July 14, 2020 Order requires that "each" class member be fully and speedily reviewed for home confinement and compassionate release by Respondents by July 28, 2020, and that Respondents give "substantial weight to the inmate's factors for severe illness or death from COVID-19 based on age (over 50) or Underlying Health Conditions." *See* Doc. 45, p. 49. The Court specifically ordered Respondents to file with the Court a declaration identifying all class members by July 22, 2020 and a second declaration by July 29, 2020 "setting forth a list of class members who Respondents have determined are eligible for home confinement and an explanation for each denial… including an explanation of the factual basis for any factors determined to outweigh the danger to the inmate from COVID-19." *Id.*

///

KYL4826-8159-8405.16

Respondents concede that they know the names of 261 future Lompoc inmates (like Dr. Bernadett) who are members of the class. *See* Doc. 56, p. 1.[1] Nevertheless, Respondents refuse to comply with the July 14, 2020 Order and refuse to evaluate any future inmates for home confinement, or to include their names and status in the declarations required by the Court. *Id.* at p. 1.[2]

Dr. Bernadett is a 66-year-old retired physician. He was sentenced to 15 months imprisonment,[3] after pleading guilty to one count of misprision of felony under 18 U.S.C. § 4.[4] Dr. Bernadett is a first time offender who has no history of violence, sex offense, or terrorism. He has zero risk of recidivism. He is scheduled to self-surrender on February 19, 2021 to the camp at Lompoc. Dr. Bernadett suffers from, amongst other ailments, a chronic intermittent cough, hypertension (high blood pressure), high cholesterol, and high triglycerides.[5] As a result of his age, medical complications, and lack of good health, Dr. Bernadett is at high risk of contracting the virus and suffering lethal or permanent, devastating, and life-compromising consequences. [6]

On May 18, 2020 (five months ago), Dr. Bernadett petitioned Respondent L.J. Milsunic (as Acting Complex Warden at USP Lompoc) to be evaluated for home confinement and compassionate release in accordance with the CARES Act and Attorney General Barr's April 3, 2020 order instructing that the bureau immediately

---

[1] *See* Doc. 56 (". . . rosters reveal there are 261 prospective new inmates (including 144 inmates currently in other BOP facilities) who are anticipated to be transferred to FCI or USP Lompoc . . .").

[2] *See* Doc. 56 (". . . I need to explain that no 'future' inmates were included in the lists that have been produced.").

[3] Dr. Bernadett was sentenced on January 17, 2020 to 15 months of incarceration by the Hon. Josephine Staton in the matter of *U.S. v. Faustino Bernadett* (SACR 19-00121-JLS).

[4] 18 U.S.C. § 4, provides that, "Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both."

[5] *See* Declaration of Robert Lugliani ("Lugliani Decl."), attached hereto as Exhibit A; Declaration of Dr. Michael Del Vicario ("Del Vicario Decl.") attached hereto as Exhibit B; Declaration of Dr. Christopher Traughber ("Traughber Decl."), attached hereto as Exhibit C.

[6] *See* Declaration of Marc Stern, M.D., M.P.H., attached hereto as Exhibit D ("Stern Decl."), ¶ 8.

KYL4826-8159-8405.16

1　begin transferring vulnerable and elderly inmates (like Dr. Bernadett) at impacted

2　facilities to home confinement.  No response to that petition was received.

3　　　　　　On July 16, 2020 (two days after the Court's July 14, 2020 Order),

4　Dr. Bernadett notified Respondents (through counsel) that he was a class member and

5　requested to be evaluated for home confinement pursuant the Order.  Dr. Bernadett's

6　notification included his prior May 18, 2020 Petition to Respondent Milsunic, along

7　with his medical information, his Presentence Investigation Report, and his plan for

8　home confinement.  Dr. Bernadett also offered to provide any additional information

9　Respondents needed.

10　　　　　Despite having access to the information, Respondents argue that they are

11　incapable of reviewing future inmates (like Dr. Bernadett) for home confinement.  *See*

12　Doc. 56, p. 2.[7]  This is unconvincing and confirms that Respondents simply have not

13　even tried to comply with the full scope of the July 14, 2020 Order.

14　　　　　Respondents have made clear that they will not even consider a request for

15　home confinement until *after* Dr. Bernadett reports to Lompoc.  Respondent's position

16　requires elderly and vulnerable class members to be exposed to a facility:

17　　　　　　　(1)  where more than 1,000 inmates have contracted COVID-19;

18　　　　　　　(2)  where the Court found that "meaningful social distancing is not

19　possible [] absent a reduction in the inmate population, thereby placing medically

20　vulnerable inmates at Lompoc at significant risk of contracting COVID-19."  (*See*

21　Doc. 45, p. 32.);

22　　　　　　　(3)  where Dr. Venters (the Court-appointed Rule 706 expert) recently

23　"….raise[d] concerns regarding the safety of Lompoc inmates and measures that should

24　be implemented to prevent [the] spread of COVID-19…"  (*See* Court's October 8, 2020

25　Order, Doc. 105, p. 4, n.2.); and

---

[7] "The Warden at FCC Lompoc does not have any authority over, nor does she play any role in the home confinement considerations or RIS processing of inmates not entrusted to her care."

(4)  where the Office of the Inspector General recently issued a critical report stating that Lompoc "will again face a shortage of medical and correctional staff when [temporary] staff return to their home institutions."[8]

The BOP has apparently taken the initiative by requiring that a prisoner serve at least 25% of their sentence and thereafter a request for review would be put at the "back of the line."  Unfortunately, without action by this Court Dr. Bernadett would have to be in prison a minimum of three to four months, plus processing time, before being considered regardless of how entitled he may be to immediate review and designation to home confinement.  Respondents' order of operations defies logic because the surest way to simultaneously prevent the spread of the virus and to reduce the inmate population is to evaluate inmates *before* they report.

Respondents' position contradicts the intent of Congress in passing the CARES Act, Attorney General Barr's directive and this Court's July 14, 2020 Order. Evaluating Dr. Bernadett and other elderly and vulnerable future Lompoc inmates immediately is not only the directive of this Court, but doing so is in the best interest of the inmate population and staff at Lompoc, the local community surrounding Lompoc, and all vulnerable inmates.

Dr. Bernadett, has a pressing, material, and significant interest in this case because he is entitled to be immediately evaluated for home confinement *before* reporting to Lompoc, but Respondents refuse to do so.  Dr. Bernadett hereby respect-fully seeks to intervene so that his concerns may be heard and adjudicated.  The Petitioners do not object to Dr. Bernadett's intervention.

Dr. Bernadett had hoped to avoid this motion and has met and conferred with Respondents on several occasions.  While Respondents' counsel has been gracious and helpful, unfortunately, no agreement could be reached.  In light of the current state

---

[8] *See Pandemic Response Report: Remote Inspection of Federal Correctional Complex Lompoc,* Department of Justice, Office of the Inspector General, July 2020, P. 3

KYL4826-8159-8405.16

of the pandemic, Dr. Bernadett's vulnerabilities, and his fast approaching February 19, 2021 self-surrender date, Dr. Bernadett's intervention and immediate evaluation for home confinement are now both urgent and necessary.

## II. STATEMENT OF FACTS

### A. Dr. Bernadett is scheduled to self-surrender to Lompoc on February 19, 2021.

Dr. Bernadett is a retired physician. He is a white-collar non-violent first-time offender. On January 17, 2020, Dr. Bernadett was sentenced to 15 months incarceration by the Honorable Josephine L. Staton ("Judge Staton").[9] Judge Staton ordered Dr. Bernadett to self-surrender to the custody of the Bureau of Prisons[10] and Dr. Bernadett was designated to the camp at Lompoc. As of the January 17, 2020 sentencing, the impact of COVID-19 on elderly and vulnerable inmates like Dr. Bernadett (especially at BOP facilities like Lompoc) could not be foreseen.

Dr. Bernadett's surrender date is currently scheduled for February 19, 2021.[11]

### B. Evaluations by three separate doctors confirm that Dr. Bernadett's underlying health conditions put him at high risk from the virus.

Dr. Bernadett is 66 years of age. He was recently evaluated by three separate medical doctors. All three confirmed that Dr. Bernadett suffers from multiple ailments that make him susceptible to, and easily compromised by the virus.

The August 25, 2020 evaluation prepared Dr. Michele Del Vicario, M.D. (the former head of the Cardio Vascular department at Providence Little Company of

///

---

[9] *See U.S. v. Faustino Bernadett* (SACR 19-00121-JLS), Doc. 50.

[10] *Id.*

[11] Dr. Bernadett's original self-surrender date was continued due to the COVID-19 pandemic.

KYL4826-8159-8405.16

Mary Medical Center and the former Chief of Staff at Little Company of Mary Hospital), provides in relevant part:

> It is my understanding that the patient in the future may be incarcerated. It is my strong recommendation that the patient should not be put him in harm's way, that he is in an environment where COVID-19 may be prevalent and would expose him to significant health risk with the possibility of even death if he should contract the viral infection. Specifically, he has multiple risk factors that would make him substantially more vulnerable than the general population; these include age, hypertension which presently is inadequately controlled, asthma and potentially underlying significant pulmonary dysfunction as to be determined by his pulmonologist. Additionally, he is somewhat overweight, adding an extra risk factor. All this in addition to the possibility that the patient has underlying coronary artery disease which will be assessed in the near future with a stress echo. *See* Del Vicario Decl., Notes p. 4.

Similarly, the August 27, 2020 letter from Dr. Christopher Traughber (who is in charge of urgent care at the Palos Verdes Family and Immediate Medical Care Center), provides:

> I am writing this letter on behalf of my patient Faustino, Bernadett DOB: 05/29/1954 in effort to avoid any unnecessary exposure to the Covid-19 virus during his upcoming incarceration, due to his risk factors that increase his risk of harmful Covid-19 infection outcome.
> 1. Age > 65 years old
> 2. Overweight (BMI 27)
> 3. Hypertension, under treatment
> 4. Hyperlipidemia, under treatment
> 5. History: of respiratory disease with chronic cough and asthma
> 6. Elevated PSA with prostatic hypertrophy and significant family history of aggressive prostate cancer in brother.
> These risk factors increase his risk of poor outcome including death, to Covid-19 infection. *See* Dr. Traughber Decl.

- 12 -

In addition, Dr. Robert Lugliani, a pulmonologist and Dr. Bernadett's primary-care physician, also previously examined and evaluated Dr. Bernadett.  His report states: "COVID-19 is currently in pandemic with a resurgence of cases in Los Angeles County . . . Patient is advised of his high risk status due to age, hypertension, heart disease risk, weight, pulmonary risk and potentially immunocompromised position due to his elevated prostate specific antigen, which may indicate early prostate cancer, especially due to his youngest brother just completing treatment for an aggressive form of same.  Patient advised to stay home as much as possible . . ."  *See* Dr. Lugliani Decl., Letter, p. 5.

In addition to his advanced age, each of these conditions contributes to Dr. Bernadett's increased susceptibility to contracting COVID-19, and increases his likelihood of suffering either fatal or life-long impairments from the disease.  *See* Stern Decl. ¶¶ 14 & 15.

## C. **Procedural Background.**

On April 3, 2020, in response to the COVID-19 pandemic and calls to reduce the federal inmate population, Attorney General Barr invoked the CARES Act and ordered the Bureau of Prisons to "immediately maximize appropriate transfers to home confinement of all appropriate inmates held at FCI Oakdale, FCI Danbury, FCI Elkton, and at other similarly situated BOP facilities where covid-19 is materially affecting operations."[12]

On May 16, 2020, Petitioners Yonnedil Carror Torres, Vincent Reed, Felix Samuel Garcia, Andre Brown, and Shawn Fears (the "Petitioners"), inmates incarcerated at FCC Lompoc, filed the instant case on behalf of "all current and future people in post-conviction custody at Lompoc."  *See* Doc. 1, ¶ 96.

///

---

[12] Attorney General William Barr, *Increasing Use of Home Confinement at Institutions Most Affected by COVID-19*, (April 3, 2020) https://www.justice.gov/file/1266661/download.

KYL4826-8159-8405.16

On May 18, 2020 (five months ago), Dr. Bernadett independently petitioned Respondent L.J. Milsunic (as Acting Complex Warden at USP Lompoc) to be evaluated for home confinement and compassionate release in accordance with the CARES Act and Attorney General Barr's April 3, 2020 order instructing that the BOP immediately begin transferring vulnerable and elderly inmates (like Dr. Bernadett) to home confinement.[13]  Respondent did not respond to Dr. Bernadett's May 18, 2020 petition.

On June 1, 2020, Petitioners applied to this Court for a preliminary injunction requesting that Respondents (1) put in place a process-based remedy that requires Respondents to evaluate prisoners for home confinement on an accelerated basis and to eliminate eligibility barriers that categorically exclude most prisoners from consideration, and (2) to institute social distancing, sanitation, and medical treatment policies that would bring prison conditions in compliance with the Eighth Amendment. *See* Doc. 18.

On June 4, 2020, Petitioners moved the Court to certify a class of current and future Lompoc prisoners over the age of 50 and with pre-existing medical conditions, all of whom would be profoundly affected by the outcome of this litigation. *See* Doc. 22.

In July 2020, the Department of Justice Office of Inspector General issued its Pandemic Response Report 20-086 (Remote Inspection of Federal Correctional Complex Lompoc), which was critical of the facilities response to the Pandemic.

This Court's July 14, 2020 Order granted Petitioners' request for issuance of a preliminary injunction, finding:  "Petitioners show they are at substantial risk of exposure to COVID-19, which is inconsistent with contemporary standards of human decency." *See* Doc. 45, p. 18.  The Court found that "meaningful social distancing is

---

[13] *See* Request for Home Confinement Evaluation Before August 18, 2020 Self-Surrender to FCC Lompoc, attached hereto as Exhibit E.

1   not possible at Lompoc absent a reduction in the inmate population, thereby placing

2   medically vulnerable inmates at Lompoc at significant risk of contracting COVID-19."

3   *See* Doc. 45, p. 32.

4           The Court also found that "there is no evidence Respondents are priori-

5   tizing their use of statutory authority under the CARES Act to grant home confinement

6   to Lompoc inmates in light of the pandemic, or giving due consideration to inmates'

7   age or medical conditions in evaluating eligibility of home confinement." *See* Doc. 45,

8   p. 32.  In light of these findings, the Court certified a class of inmates defined, in-part,

9   as: "all current and future people in post-conviction custody[14] at FCI Lompoc and

10  USP Lompoc over the age of 50, and all current and future people in post-conviction

11  custody at FCI Lompoc and USP Lompoc of any age with underlying health

12  conditions . . ." *See* Doc. 45, p. 48.

13          The Court instructed that by "no later than July 20, 2020" the BOP should

14  file a "list with the Court which . . . identifies all members of the class defined in this

15  Order . . ." *See* Doc. 45, p. 48.  The Court also ordered that the Government "make full

16  and speedy use of [its] authority under the CARES Act and evaluate each class

17  member's eligibility for home confinement which gives substantial weight to the

18  inmate's risk factors for severe illness or death from COVID-19 based on age (over 50)

19  or Underlying Health Conditions." *See* Doc. 45, p. 49.

20          On July 16, 2020 (two days after the Court's July 14, 2020 Order was

21  issued), Dr. Bernadett notified Respondents (through counsel) that he is a class member

22  and requested to be evaluated for home confinement.  Dr. Bernadett's notification

23  included his prior May 18, 2020 Petition to Respondent Milsunic, along with his

---

[14] Dr. Bernadett is a future person in post-conviction *custody* under the Court's July 14, 2020 Order.  *See Maleng v. Cook,* 490 U.S. 488, 491 (1989) ("Our interpretation of the 'in custody' language has not required that a prisoner be physically confined in order to challenge his sentence on habeas corpus."); *Hensley v. Municipal Court,* 411 U.S. 345, 351 (1973) (Supreme Court finding for an inmate released on his own recognizance pending execution of sentence, "we can only conclude that petitioner is in custody for purposes of the habeas corpus statute."); *Jones v. Cunningham,* 371 U.S. 236, 239-40 (1963) (an individual is in custody even if not presently incarcerated if there is a significant restraint on the individual's liberty "not shared by the public generally.")

KYL4826-8159-8405.16

1   medical information, his Presentence Investigation Report, and his plan for home
2   confinement.  Dr. Bernadett also offered to provide any additional information that
3   Respondents may require.[15]

4           On July 20, 2020, the BOP filed, under seal, a list that purported to contain
5   the names and information of class members.  *See* Doc. 49.  On July 22, 2020, the BOP
6   filed the declaration of Todd Javernick, an assistant warden at Lompoc, which stated:
7   ***"I need to explain that no 'future' inmates were included in the lists that have been***
8   ***produced…"***  *See* Doc. 56, p. 1 (emphasis added).[16]

9           Despite the Court's July 14, 2020 Order, Dr. Bernadett is informed and
10  believes that Respondents have not evaluated him for home confinement and that his
11  name was not included on the lists that Respondents provided to the Court.

12          On September 1 and 2, 2020, a site inspection of Lompoc was conducted
13  by Dr. Venters, the Court-appointed Rule 706 expert.

14          On September 10, 2020, Petitioners filed their *Motion to Enforce*
15  *Compliance with Preliminary Injunction and for Order to Show Cause.  See* Doc. 93.
16  That Motion did not address Respondents' refusal to review for home confinement
17  class members who had not yet reported to Lompoc.

18          On September 25, 2020, Dr. Venters' report regarding his Lompoc site
19  visit was filed.  *See* Doc. 101.  "Dr. Venters' Expert Report raises concerns regarding
20  the safety of Lompoc inmates and measures that should be implemented to prevent
21  Spread of COVID-19 at Lompoc."  *See* Court's October 8, 2020 Order, Doc. 105, p. 4,
22  n.2.

23          On October 2, 2020, Senators Richard "Dick" Durbin (of the Senate
24  Judiciary Committee) and Elizabeth Warren sent a joint letter to Attorney General Barr

25

26  [15] *See* Notice of Defendant Faustino Bernadett's Status as a Member of the Provisional Class Established by the Honorable Consuelo Marshall's July 14, 2020 Order, attached hereto as Exhibit F.

27  [16] Of note, Respondents have not disputed that future inmates are members of the class.

28

KYL4826-8159-8405.16

and Michael Carvajal (Director of the BOP) that is critical of the BOP's response to the pandemic and demands that more be done to reduce inmate populations, stating in part:

> Based on BOP statistics, the rate of infection within BOP remains nearly four and a half times higher than in the general population.  This is mounting evidence that efforts to contain the virus within BOP facilities are failing.  As Director Carvajal recognized when he testified in June, the best way to reduce the spread of the virus is through social distancing, but "prisons by design are not made for social distancing."  In fact, social distancing is virtually impossible to maintain inside prison facilities absent substantial population reductions, but DOJ and BOP continue to make only minimal use of its authority to release inmates to home confinement.  While decisions to release inmates are no doubt complex, you must do more to release inmates.  *See* October 2, 2020 Letter, attached hereto as Exhibit G.

On October 8, 2020, the Court entered the *Order Granting Motion to Enforce Compliance with Preliminary Injunction and Order to Show Cause.  See* Doc. 105.

No future Lompoc inmates are Petitioners in this case and counsel for Petitioners have indicated they are not aware of any other future Lompoc inmates (other than Dr. Bernadett) who intend to intervene.

### III.  **ARGUMENT**

### A.    **Legal Standard.**

Courts "must permit" intervention when the intervenor "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." *See* Fed. R. Civ. P. 24(a)(2).  The Court also "may permit" permissive intervention for an intervenor who "has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).  In assessing either type of

- 17 -

KYL4826-8159-8405.16

intervention, "[c]ourts are to take all well-pleaded, nonconclusory allegations in the motion to intervene, the proposed complaint or answer in intervention, and declarations supporting the motion as true absent sham, frivolity or other objections." *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 820 (9th Cir. 2001).  Under these standards, Dr. Bernadett respectfully submits that he is entitled to mandatory intervention or, in the alternative, permissive intervention.  Alternatively, this Court may grant Dr. Bernadett's request pursuant to Fed. R. Civ. P. 71 which states, "[w]hen an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party."

Furthermore this Court has the inherent authority to enforce its own orders and to compel Respondents to comply with the July 14, 2020 Order, by ordering that Dr. Bernadett be immediately evaluated for home confinement.  *See* Court's October 8, 2020 *Order Granting Motion to Enforce Compliance with Preliminary Injunction and Order to Show Cause,* and cases cited therein, Doc. 105; *see also, Buono v. Kempthorne,* 502 F. 3d 1069, 1081 n.11 (9th Cir. 2007); *Reebok Int'l Ltd. v. McLaughlin,* 49 F.3d 1387, 1390 (9th Cir. 1995); *Emma C. v. Eastin,* 2007 U.S. Dist. LEXIS 95437, *5 (N.D. Cal. 2007); *U.S. v. Payne,* 2017 U.S. Dist. LEXIS 20046, *8 (D. Nev. 2017).

## B. Dr. Bernadett is entitled to mandatory intervention under FRCP 24(a).

"When analyzing a motion to intervene of right under FRCP Rule 24(a)(2), [courts in the Ninth Circuit] apply a four-part test:  (1) the motion must be timely; (2) the applicant must claim a 'significantly protectable' interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the parties to the action." *Wilderness Soc. v. U.S. Forest Serv.*, 630 F.3d 1173, 1177 (9th Cir. 2011).

- 18 -

The four-part test is construed "liberally in favor of potential intervenors." *Sw. Ctr. for Biological Diversity*, 268 F.3d at 818; *Wash. State Bldg. & Const. Trades Council, AFL-CIO v. Spellman*, 684 F.2d 627, 630 (9th Cir. 1982) ("Rule 24 traditionally has received a liberal construction in favor of applicants for intervention."); *United States v. State of Or.*, 745 F.2d 550, 552 (9th Cir. 1984) (noting that the "factors of Rule 24(a) should be construed favorably to intervenor"); *United States v. Alisal Water Corp.*, 370 F.3d 915, 919 (9th Cir. 2004) (noting that "the requirements for intervention are broadly interpreted in favor of intervention"). "A liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts." *United States v. City of Los Angeles*, Cal., 288 F.3d 391, 397–98 (9th Cir. 2002) (quotation omitted). Each factor supports Dr. Bernadett's intervention here.

### 1. **Dr. Bernadett's Motion is timely (Factor One).**

Dr. Bernadett's intervention request is timely because this case is still in its infancy, because Dr. Bernadett's February 19, 2021 surrender date is quickly approaching and because the request is made soon after it became clear that Respondents would not comply with the July 14, 2020 Order. "Timeliness is a flexible concept; its determination is left to the district court's discretion." *Alisal*, 370 F.3d at 921. Courts in the Ninth Circuit consider three factors in evaluating timeliness of a motion to intervene: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Cal. Dep't of Toxic Substances Control v. Commercial Realty Projects*, Inc., 309 F.3d 1113, 1119 (9th Cir. 2002) (citation and internal quotation marks omitted); *see also United States v. California*, 538 F. App'x 759, 760 (9th Cir. 2013). "[T]he mere lapse of time, without more, is not necessarily a bar to intervention." *Alisal*, 370 F.3d at 921; *see also Oregon*, 745 F.2d at 552 ("Mere lapse of time alone is not determinative."). Indeed, the Ninth Circuit has allowed intervention as long as seventeen years after the adoption of a consent decree. *See Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 854 (9th Cir. 2016). "[T]he timeliness requirement for intervention as of right should be treated more

- 19 -

1    leniently than for permissive intervention because of the likelihood of more serious

2    harm." *Oregon*, 745 F.2d at 552.

3        **a.    This case is in its infancy, and Dr. Bernadett is intervening**

4            **quickly.**

5            The relevant date for determining how fast an intervenor should act to

6    intervene is when the intervenor developed an interest in the lawsuit and realized that

7    that interest was not adequately protected. *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th

8    Cir. 1999) ("The crucial date for assessing the timeliness of a motion to intervene is

9    when proposed intervenors should have been aware that their interests would not be

10   adequately protected by the existing parties."). "[A] party's interest in a specific phase

11   of a proceeding may support intervention at that particular stage of the lawsuit." *Alisal*,

12   370 F.3d at 921.

13           Here, not only is Dr. Bernadett intervening within four months of the filing

14   of this case (May 16, 2020), but he is intervening a mere three months after the Court

15   issued its July 14, 2020 Order, and just days after it became clear that Respondents

16   would not comply with the Order.  As such, Dr. Bernadett is promptly and without

17   delay moving to intervene in this case.

18       **b.    No Parties Will Be Prejudiced by Dr. Bernadett's**

19           **Intervention.**

20           Prejudice to the existing parties is "the most important consideration in

21   deciding whether a motion for intervention is untimely." *Oregon*, 745 F.2d at 552

22   (quoting 7A C. Wright & A. Miller, Federal Practice and Procedure § 1916, at 575

23   (1972)).  As the Ninth Circuit has made clear, "the only 'prejudice' that is relevant

24   under this factor is that which flows from a prospective intervenor's failure to intervene

25   after he knew, or reasonably should have known, that his interests were not being

26   adequately represented." *L.A. Unified Sch. Dist.*, 830 F.3d at 857.  Parties opposing

27   intervention must show that "their problems are materially different now than they

28   would have been had" the intervenor moved in a more timely fashion.  *Oregon*, 745

- 20 -

F.2d at 553.  Any prejudice must be "because of the passage of time."  *Id.* (emphasis added); *see also Banneck v. Fed. Nat'l Mortg. Ass'n*, No. 3:17-CV-04657-WHO, 2018 WL 3417477, at *3 (N.D. Cal. July 13, 2018) (granting motion to intervene because any "potential prejudice is not attributable to the timing of [intervenor's] motion, which is the only prejudice that's pertinent to the analysis").

The existing parties will not be prejudiced by Dr. Bernadett's intervention.  This case has just begun and no significant discovery has taken place.  Petitioners do not oppose Dr. Bernadett's intervention.  As such, Dr. Bernadett's Motion is timely.

## 2. Dr. Bernadett has a significantly protectable interest in this action  because he is scheduled to report to Lompoc on February 19, 2021  (Factor Two).

Dr. Bernadett has a significant protectable interest in this action because it directly impacts his life, liberty, health, and safety.  "[I]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene."  Fed. R. Civ. P. 24, Advisory Committee Notes, 1966 Amendments; *see also Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003) (relying on the above comment in the advisory notes).  The key question is whether the intervenor will "suffer a practical impairment of its interests as a result of the pending litigation."  *Wilderness Soc.*, 630 F.3d at 1179 (quoting *California ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006)).  "To demonstrate a significant protectable interest, an applicant must establish that the interest is protectable under some law and that there is a relationship between the legally protected interest and the claims at issue."  *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011).  A "constitutional interest" clearly qualifies as such a legally protectable interest.  *See, e.g., Habeas Corpus Res. Ctr. v. United States Dep't of Justice*, No. C 13-4517 CW, 2013 WL 6157321, at *1 (N.D. Cal. Nov. 22, 2013); *Freeman v. Delta Air Lines, Inc.*, No. C 13-04179 JSW, 2014 WL 5830246, at *2 (N.D. Cal. Nov. 10, 2014); *Hazel Green Ranch,*

- 21 -

1    *LLC v. U.S. Dep't of Interior*, No. 1:07-CV-00414-OWW-SMS, 2007 WL 2580570, at
2    *8 (E.D. Cal. Sept. 5, 2007).

3              As a member of the provisional class, the July 14, 2020 Order requires
4    Respondents to evaluate Dr. Bernadett for home confinement.  However, Respondents
5    failed to do so and did not submit Dr. Bernadett's name (or the names of any other
6    future Lompoc inmates) to the Court.  Whether respondents are required to comply with
7    the July 14, 2020 Order, and the extent to which this litigation affects the conditions of
8    confinement at Lompoc, have direct bearing on Dr. Bernadett's life, liberty, health, and
9    safety, all of which are significantly protectable interests that will be impacted by the
10   outcome of this case.

11            **3.    The disposition of the action may impair or impede**
12                   **Dr. Bernadett's ability to protect his interest (Factor Three).**

13            Dr. Bernadett will self-report to Lompoc on February 19, 2021.  Despite
14   the Court's July 14, 2020 Order, Respondents are refusing to evaluate Dr. Bernadett for
15   home confinement before he reports.  Dr. Bernadett's intervention is necessary to
16   enforce his rights under the Order.  Furthermore, the outcome of this case, and whether
17   future inmates are evaluated for home confinement, will mean the difference between
18   Dr. Bernadett (and those like him) serving his sentence in a safe location or at Lompoc
19   where more than 1,000 prisoners have contracted the virus, where the Court has found
20   that the conditions do not comport with modern human decency, where testing and
21   staffing are in woefully short supply, where adequate social distancing is impossible,
22   and where the OIG has concluded that a resurgence of the virus may occur when
23   temporary staff are sent back to their home institutions.  As such, intervention is
24   necessary because disposition of the action may impair or impede Dr. Bernadett's
25   interests.
26   ///
27
28

**4.  Dr. Bernadett's interest is not adequately represented because he is scheduled to report on February 19, 2021, and Respondents refuse to evaluate him for home confinement despite the July 14, 2020 Order (Factor Four).**

Despite the clear language of the July 14, 2020 Order, Respondents still refuse to immediately evaluate Dr. Bernadett for home confinement.  Dr. Bernadett's February 19, 2021 self-surrender date is quickly approaching, which makes this Motion necessary to protect his interests.

Petitioners consent to Dr. Bernadett's intervention in this matter.  Petitioners and their counsel have heroically undertaken a herculean task on behalf of the provisional class.  However, Dr. Bernadett's specific circumstances (including his medical background) and fast approaching surrender date confirm that intervention is necessary to adequately represent his interests.  "In determining whether a party will adequately represent an intervenor's interest, the Court considers several factors, such as whether an existing party will make all of the intervenor's arguments, whether an existing party is capable of and willing to make such arguments, and whether the intervenor offers any necessary element to the proceedings that would be neglected." *Prete v. Bradbury*, 438 F.3d 949, 956 (9th Cir. 2006).  "The burden on proposed intervenors in showing inadequate representation is minimal, and would be satisfied if they could demonstrate that representation of their interests 'may be' inadequate." *Arakaki*, 324 F.3d at 1086 (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)).

Here, all of the Petitioners are incarcerated.  *See* Doc. 45, p. 6–10.  They are not *future* Lompoc inmates, like Dr. Bernadett.  Petitioners are understandably working hard on behalf of the entire class to (among other things) require Respondents to establish and adhere to a process whereby incarcerated inmates are properly

///

- 23 -

reviewed for home confinement.  However, there is currently no process for evaluating *future* Lompoc inmates.[17]  Intervention is necessary here due to Dr. Bernadett's specific circumstances, his fast approaching surrender date and Respondent's refusal to comply with the July 14, 2020 Order.

Dr. Bernadett's request for home confinement, made directly to the BOP, has fallen on deaf ears.  As a member of the class, Dr. Bernadett has a material interest in the outcome of the litigation (which lacks a future inmate as a plaintiff) and he should be permitted to intervene so that the Court may rule on his request to be evaluated pursuant to the Court's July 14, 2020 Order.

C. **Alternatively, the Court should grant permissive intervention under FRCP 24(b) or should rule on Dr. Bernadett's request under FRCP 71.**

An applicant for permissive intervention must show "(1) independent grounds for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or defense, and the main action, have a question of law or a question of fact in common." *Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 955 (9th Cir. 2009) (quotation omitted).

These requirements are clearly met here.  There are independent grounds for jurisdiction over Dr. Bernadett's claims under the CARES Act.  Dr. Bernadett's motion is timely, as discussed above, and Dr. Bernadett's claim has factual and legal overlap with this action, insofar as he is a member of the provisional class certified by this Court in the July 14, 2020 Order.  The Court's enforcement of the Order and its future orders relating to the class will have direct bearing on Dr. Bernadett's future life and liberty.  As such, permissive intervention should be permitted.

///

---

[17] For example, Petitioners have not yet raised an objection to the Respondents' position on excluding future inmates from the class roster.

KYL4826-8159-8405.16

Alternatively, this Court may grant Dr. Bernadett's request pursuant to Fed. R. Civ. P. 71 which states, "[w]hen an order grants relief for a nonparty or may be enforced against a nonparty, the procedure for enforcing the order is the same as for a party." As such, irrespective of whether or not Dr. Bernadett may intervene in this matter, the Court may still rule on his request because the July 14, 2020 grants him relief.

> **D.** **Respondents should be ordered to immediately evaluate Dr. Bernadett for home confinement pursuant to the Court's July 14, 2020 Order.**

Respondents must be required to comply with this Court's July 14, 2020 Order. Dr. Bernadett's life and long-term health are at stake.

On July 14, 2020, this Court held that "The evidence before the Court demonstrates meaningful social distancing is not possible at Lompoc absent a reduction in the inmate population, thereby placing medically vulnerable inmates at Lompoc at significant risk of contracting COVID-19." *See* Doc. 45, p. 32, *ll.* 1–4. The Court provisionally certified a class of "all current *and future people* in post-conviction custody at FCI Lompoc and USP Lompoc [who are] over the age of 50" or who have "Underlying Health Conditions." *See* Doc. 45, *ll.* 10–21 (emphasis added). The July 14, 2020 Order provides that:

> No later than July 28, 2020, Respondents shall make *full and speedy* use of their authority under the CARES ACT and evaluate each class member's eligibility for home confinement *which gives substantial weight* [18] to the inmate's factors for sever illness or death from COVID-19 based on age (over 50) or Underlying Health Conditions. *See* Doc. 45, p. 49, *ll.* 11-14 (emphasis added).

///

---

[18] The Court's Order requiring that "substantial weight" be given to each class member's risk factors, does not permit Respondents to deny home confinement to future inmates simply for not yet serving an arbitrary percentage of their sentence.

KYL4826-8159-8405.16

1  The Court specifically ordered Respondents to file with the Court a declaration

2  identifying all class members by July 22, 2020 and a second declaration by July 29,

3  2020 "setting forth a list of class members who Respondents have determined are

4  eligible for home confinement and an explanation for each denial… including an

5  explanation of the factual basis for any factors determined to outweigh the danger to the

6  inmate from COVID-19." *Id.*

7         Respondents concede that they know the names of 261 future Lompoc

8  inmates (like Dr. Bernadett) who are members of the class. *See* Doc. 56, p. 1.[19]

9  Nevertheless, Respondents refuse to comply with the July 14, 2020 Order and refuse to

10  evaluate any future inmates for home confinement, or to include their names and status

11  in the declarations required by the Court. *Id.* at p. 2 [20]

12         This Court has the inherent authority to enforce its own orders and to

13  compel Respondents to comply with the July 14, 2020 Order, by ordering that

14  Dr. Bernadett be immediately evaluated for home confinement. *See Buono v.*

15  *Kempthorne,* 502 F. 3d 1069, 1081 n.11 (9th Cir. 2007); *Reebok Int'l Ltd. v.*

16  *McLaughlin,* 49 F.3d 1387, 1390 (9th Cir. 1995); *Emma C. v. Eastin,* 2007 U.S. Dist.

17  LEXIS 95437, *5 (N.D. Cal. 2007); *U.S. v. Payne,* 2017 U.S. Dist. LEXIS 20046, *8

18  (D. Nev. 2017); *see also* Fed. R. Civ. P. 71 ("[w]hen an order grants relief for a

19  nonparty or may be enforced against a nonparty, the procedure for enforcing the order

20  is the same as for a party.").

21         Dr. Bernadett is a 66 year old non-violent first time offender who was

22  sentenced to 15 months imprisonment on January 17, 2020,[21] after pleading guilty to

23  ///

24  _____

25  [19] See Doc. 56 (". . . rosters reveal there are 261 prospective new inmates (including 144 inmates currently in other BOP facilities) who are anticipated to be transferred to FCI or USP Lompoc . . .").

26  [20] See Doc. 56 (". . . I need to explain that no 'future' inmates were included in the lists that have been produced.").

27  [21] Dr. Bernadett was sentenced on January 17, 2020 to 15 months of incarceration by the Hon. Josephine Staton in the matter of *U.S. v. Faustino Bernadett* (SACR 19-00121-JLS).

28

one count of misprision of felony under 18 U.S.C. § 4.[22]  For more than 14-months (since his August 15, 2019 change of plea hearing), Dr. Bernadett has successfully and positively functioned in the community while under supervised release, with no incidents or violations.  Dr. Bernadett has complied with all post-conviction reporting and supervision requirements.

Dr. Bernadett is scheduled to self-surrender on February 19, 2021 to the low security camp at Lompoc.  As discussed above and as shown by the accompanying declarations from his doctors, Dr. Bernadett suffers from serious compromising ailments.[23]  As a result of his age, medical complications, and lack of good health, Dr. Bernadett is at high risk of contracting the virus and suffering lethal or permanent, devastating, and life-compromising consequences.[24]

Respondents have possessed sufficient information to evaluate Dr. Bernadett for months.  On May 18, 2020 (five months ago), Dr. Bernadett petitioned the Respondent L.J. Milsunic (as Acting Complex Warden at USP Lompoc) to be evaluated for home confinement in accordance with the CARES Act and Attorney General Barr's April 3, 2020 order instructing that the bureau immediately begin transferring vulnerable and elderly inmates (like Dr. Bernadett) to home confinement. No response to that petition was ever provided.

On July 16, 2020 (two days after the Court's July 14, 2020 Order was issued), Dr. Bernadett notified Respondents (through counsel) that he was a class member and requested to be evaluated for home confinement.  Dr. Bernadett's notification included his prior May 18, 2020 Petition to Respondent Milsunic, along with medical information, his Presentence Investigation Report, and his plan for home

---

[22] 18 U.S.C. § 4, provides that, "Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both."

[23] *See* Lugliani Decl.

[24] *See Declaration of Marc Stern, M.D., M.P.H.*, attached hereto as Exhibit D ("Stern Decl."), ¶ 8.

KYL4826-8159-8405.16

confinement.  Dr. Bernadett also offered to provide any additional information that Respondents may require.  In addition, Respondents independently possess a comprehensive Pre-Sentence Investigation Report created by the United States Probation Office containing Dr. Bernadett's underlying health conditions, medical information, home life details, recidivism factors, underlying crime details, age, work history, and much more.[25]

Therefore, respondents have all the information they need to evaluate Dr. Bernadett (and other future Lompoc prisoners) for home confinement.  However, despite possessing this information, Respondents unconvincingly argue that they are incapable of evaluating future inmates (like Dr. Bernadett).  *Id.* at p. 2.[26]  This confirms that Respondents simply have not even tried to comply with the full scope of the July 14, 2020 Order.

Respondents have made clear that they will not consider a request for home confinement until *after* Dr. Bernadett reports to Lompoc.  The BOP has apparently taken the initiative by requiring that a prisoner serve at least 25% of their sentence and thereafter a request for review would be put at the "back of the line." Unfortunately, without action by this Court Dr. Bernadett would have to be in prison a minimum of three to four months, plus processing time, before being considered regardless of how entitled he may be to immediate review and designation to home confinement.  Respondent's position requires elderly and vulnerable class members to be exposed to the facility, putting them and the facility at risk.  Respondents' order of operations defies logic, as the best way to simultaneously prevent the spread of the virus and to reduce the inmate population (as ordered by this Court) is to evaluate

---

[25] There no known requirement for an in-person face to face meeting or evaluation for someone to be evaluated for home confinement, and Dr. Bernadett is informed and believes that the evaluation is customarily performed through a review of the inmate's file.

[26] See Doc. 56 ("The Warden at FCC Lompoc does not have any authority over, nor does she play any role in the home confinement considerations or RIS processing of inmates not entrusted to her care.")

KYL4826-8159-8405.16

inmates *before* they report.  Respondent's position contradicts the intent of Congress in passing the CARES Act, Attorney General Barr's directive and this Court's July 14, 2020 Order.  Evaluating Dr. Bernadett and other elderly and vulnerable future Lompoc inmates immediately, is not only the directive of this Court, but doing so is in the best interest of the inmate population, the staff at Lompoc, the local community surrounding Lompoc, and all vulnerable inmates.

## IV.  CONCLUSION

For these reasons, Dr. Bernadett respectfully requests that the Court permit him to intervene as a plaintiff in this case, and that the Court order Respondents to immediately evaluate Dr. Bernadett for home confinement pursuant to the Court's July 14, 2020 Order.

DATED:  December 1, 2020

_____
SAMUEL A. KEESAL, JR.
STEFAN PEROVICH
BRYCE CULLINANE
KEESAL, YOUNG & LOGAN
Attorneys for Plaintiff Intervenor
FAUSTINO BERNADETT

- 29 -

# EXHIBIT A

1  SAMUEL A. KEESAL, JR., CASB No. 38014
   skip.keesal@kyl.com
2  STEFAN PEROVICH, CASB No. 245580
   stefan.perovich@kyl.com
3  BRYCE CULLINANE, CASB No. 307079
   bryce.cullinane@kyl.com
4  Keesal, Young & Logan
   A Professional Corporation
5  400 Oceangate, Suite 1400
   Long Beach, California 90802
6  Telephone:    (562) 436-2000
7  Facsimile:    (562) 436-7416

8  GEORGE B. NEWHOUSE, JR., CASB No. 107036
   george@richardscarrington.com
9  Richards Carrington, LLC
10 545 S. Figueroa, 7th Floor
   Los Angeles, CA 90071
11 Telephone:   (303) 962-2690
12 Facsimile:    (888) 888-5280

13

14 Attorneys for Defendant
   FAUSTINO BERNADETT

15

16                **UNITED STATES DISTRICT COURT**

17        **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

18

19 UNITED STATES OF AMERICA,          )  Case No. SACR 19-00121-JLS
                                      )
20                       Plaintiff,   )  **DECLARATION OF ROBERT
                                      )  LUGLIANI, M.D.**
21            vs.                     )
                                      )
22 FAUSTINO BERNADETT,                )
                                      )
23                      Defendant.    )
                                      )
24                                    )
                                      )
25                                    )
                                      )
26 _____    )

27

28 *///*

I, Robert Lugliani, M.D. declare as follows:

1. I am a board licensed physician in the state of California and I earned my medical degree from Tufts University School of Medicine in Boston, Mass. I am an internal and general medicine doctor with specialized training in pulmonary medicine. I completed my internship, residency, and fellowship at Harbor-UCLA Medical Center. I have been practicing medicine in the Long Beach area for more than 25 years. I currently practice medicine with the American Pacific Medical Group.

2. I am Dr. Fuastino Bernadett's personal physician and I typically examine him and his health on an annual basis. I am qualified to testify regarding his health and ailments.

3. I recently examined him on July 1, 2020 and July 9, 2020. After these examinations, I produced a report of my examination. A true and correct copy of my report is attached hereto as Exhibit "A."

4. I have personal knowledge of the facts set forth in Exhibit "A" and herein, and if called upon as a witness, I could testify competently thereto.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 9, 2020, at _____, California.

ROBERT LUGLIANI, M.D.

KVLA811-3021-1778.1

# EXHIBIT A



**AMERICAN PACIFIC**
**MEDICAL GROUP**
Committed to your Health

Robert Lugliani, M.D.
Respiratory Disease, Internal Medicine
President, ProHealth Partners, Argus Medical Management

Name: Faustino Bernadett
DOB: 05/29/1954
Age: 66
Date of Report: July 09, 2020
Date of Service: July 01, 2020. Follow-up: July 09, 2020

History of present illness:

This is a 66 year old male who is well known to this examiner, returns primarily for annual exam. Patient complains of wife's noticing that he coughs intermittently throughout the day and especially at night and early morning. He checks temperature daily because of COVID-19 and has not noted any increase. Cough is dry, more prominent with cold dry air exposure and productive in morning of clear sputum. Denies dyspnea, hemoptysis, night sweats, fever, chills or weight loss. History of asthma as child. History of anterior bulging disk C5/C6. History of dysphasia. Patient reports taste and smell are intact. No extreme fatigue noted recently. No known COVID-19 exposure. Wears mask when outside the home and maintains social distance.

Continues to have pain in cervical spine, with weakness, tingling and numbness in bilateral upper extremities including hands and fingers. Also continues to have pain in low back, hip/buttock, and numbness in right big toe. Occasional radiation of pain bilaterally in lower extremities.

Patient complains of right forefoot pain for several months status post trauma and persistent left ankle pain.

Allergies:
No Known Allergies.

DEPRESSION SCREENING:
Not at all the patient reports little interest or pleasure in doing things.
Not at all the patient reports feeling down, depressed or hopeless.

Falls Prevention:
Discussed Fall Prevention
No falls or 1 fall without injury in last year.
Patient assessed for falls.

REVIEW OF SYSTEMS
HEENT: Denies pharyngitis, rhinitis or sinusitis. Dry eyes with history of eye surgeries for vision. Chronic keratoconjunctivitis, uses eyedrops several times per day.
RESPIRATORY: AS PER HISTORY OF PRESENT ILLNESS

1045 Atlantic Avenue, Suite 902 · Long Beach, California 90813
Tel (562) 437-0996 · Fax (562) 495-4631

CARDIOVASCULAR: Denies any history of chest pains, palpitations, paroxysmal nocturnal dyspnea, dyspnea on exertion or orthopnea. Denies ankle edema. Denies increasing and progressive chest pressure or palpitations. Family history: Mother with congestive heart failure, s/p myocardial infarction, and stroke.

GASTROINTESTINAL: History of hemorrhoids managed with Preparation-H pads and cream as necessary. Denies anorexia, nausea, vomiting, hematemesis, melena or diarrhea.

GENITOURINARY: Patient reports frequency, urgency of urination, and nocturia. No dysuria. Brother with prostate cancer.

NEUROLOGIC: Denies dizziness, lightheadedness, syncope or seizures. Denies tremors. Occasional left eye pain/cephalgia managed with over-the-counter analgesics. Weakness as reported on previous orthopedic exam.

MUSCULOSKELETAL: AS PER HISTORY OF PRESENT ILLNESS AND PREVIOUS ORTHOPEDIC EXAM.

DERMATOLOGIC: Denies rashes, pruritic areas, easy bruisability or bleeding.

PSYCHIATRIC: Denies severe anxiety or depression. Insomnia due to chronic pain. Managed with medication along with sleep routine and lumbar and knee pillows.

VITAL SIGNS:
Recorded By Lugliani MD, Robert on 07/01/2020
Weight 190
Pulse Rate 75; Blood Pressure 171/108 Pain level: 5/10
Pulse Oximetry: 97%

Vital signs on 07/09/2020 at follow-up visit to review labs and x-rays:
Subjective: Started Ramipril. No worsening of cough or fever, no other COVID-19 symptoms.
Temperature: 96.6; Pulse: 73; Blood Pressure: 154/89 Pain level: 5/10
Pulse Oximetry: 97%

Physical Examination

HEENT: The head is normocephalic. The pupils are equal, round, and react to light and accommodation. Slight conjunctival injection noted both eyes. Residue of eyedrops noted at outer canthus, both eyes. Tympanic membranes are clear. Throat is free of any exudates or erythema.

NECK: No cervical adenopathy appreciated, supple, no jugular venous distension below at 35 degrees. Thyroid is not palpable or enlarged. The carotid arteries upstrokes are normal, equal bilaterally.

CHEST: Normal AP diameter

LUNGS: Lungs are clear.

HEART: Regular sinus rhythm. No significant heaves, rubs, or gallops are appreciated.

ABDOMEN: Soft. Good bowel sounds. Liver, kidneys, spleen are nonpalpable. No abdominal masses, abdominal bruits, or pulsatile masses noted.

RECTAL/GENITALIA: Not performed by this examiner.

EXTREMITIES: No clubbing cyanosis, or edema. Good peripheral pulses are appreciated throughout. Tenderness to palpation, left plantar forefoot in the area of the first and second

metatarsal phalangeal joint. Spine: Some limitation of twisting, stooping, lifting, flexing and extending. Detailed exam deferred to ortho.

LYMPHATIC: No significant lymphadenopathy appreciated and auxiliary, inguinal, supraclavicular posterior and anterior cervical areas.

NEUROLOGIC: Cranial nerves are grossly intact. Asymmetric grip strength noted with right grip less than left, though right dominant. Numbness of right great toe noted. Detailed exam deferred to ortho.

BACK: Detailed exam deferred to ortho.

SKIN: No rashes or bruising noted at this time. Lumbar healed surgical scar noted.


Additional reports reviewed:
Orthopedic report by Dr. Harry Marinow, July 29, 2019.


Summary and discussion:

Chronic cervical neck pain:
1. Multiple levels of severe foraminal stenosis with 8 degrees of kyphosis at C4-C5
2. Anterior disc bulging of 7mm C4-C5 associated with occasional dysphasia

Chronic upper back pain with radicular symptoms (numbness, tingling and weakness) in arms, legs and toe numbness
1. Compression fracture of thoracic vertebrae T-12

Chronic low back pain and limitation of flexion, extension, stooping, twisting and lifting due to:
1. Lumbar spondylosis
2. Fusion of lumbar spine levels L4-L5, L5-S1
3. Bilateral L3-L4, L4-L5 severe facet arthropathy
4. Listhesis with hypertrophic changes and neuroforaminal narrowing at L5-S1

Chronic intermittent hip pain:
1. Right hip degenerative osteoarthritis
2. Post-traumatic retrosacral fluid collection between gluteus maximus and subcutaneous fat requiring pad when seated

Chronic pain in left knee, ankle and foot:
1. History of left knee torn medial collateral ligament, requiring knee support
2. Laxity of left anterior cruciate ligament, requiring knee support

Assessment/Problem List

1. Hypertension
2. Hypercholesterolemia
3. Hypertriglyceridemia
4. Chronic intermittent cough with history of asthma and bulging cervical disc.
5. Significant family history of heart failure and stroke

6. Overweight BMI 27
7. Elevated Prostate Specific Antigen (PSA) with prostatic hypertrophy with significant family history of prostate cancer
8. Chronic pain, numbness, tingling, and decreased strength due to traumatic musculoskeletal injuries, including but not limited to bulging discs in the spine at numerous levels, back surgery and compression fracture of spine, as well as severe narrowing of spinal cord opening at several places in the spinal column.
9. Left forefoot traumatic arthritis
10. Left ankle pain due to knee and foot injuries leading to irregular gait, requiring ankle support
11. Chronic pain in hip, knee, ankle and foot due to sequelae of traumatic injuries
12. Tension headache
13. Chronic keratoconjunctivitis of both eyes due to history of eye surgeries requiring frequent eye drops throughout the day
14. Hemorrhoids
15. Insomnia due to chronic pain

## Discussion and Plan

Hypertension, hypercholesterolemia, hypertriglyceridemia, overweight BMI and a family history of heart attack, stroke and congestive heart failure indicate early heart disease and high risk for heart attack and stroke. While there is no current indication of acute disease, patient should alter lifestyle and take prescribed medications to lower blood pressure and cholesterol to slow the progression. Diet modification (low fat, low salt, low calorie) to lose weight and daily exercise 60 minutes per day along with Ramipril 2.5mg once daily and Atorvastatin 10mg daily.

The patient's cough indicates reactive airways with which may be due to chronic microaspiration due to the bulging cervical spine disc or longstanding subclinical asthma that has worsened with the added insult of microaspiration. Will follow closely and conduct a full workup if worsens.

Prostatic hypertrophy with elevated PSA and significant family history of prostate cancer (brother). Symptoms managed medically. Continue tadalafil 5mg once daily. At elevated risk of prostate cancer due to continued elevated PSA, hypertrophic prostate and brother treated for aggressive prostate cancer recently. Repeat PSA in 4-6 months and consider referral to Urologist at that time.

The patient experiences chronic pain from his neck to his lower back due to traumatic musculoskeletal injuries, fractures and spine surgery, as well as foraminal narrowing and bulging discs. He has limitations in twisting, stooping, flexing and extending and should not lift heavy items. Left forefoot traumatic arthritis – orthotic support should be continued. Left ankle pain should be managed with support worn during the daytime and at night as necessary. Knee support should be worn during the day and at night as needed to aid in pain relief. The patient has been managed well on current medical regimen and orthotic supports. Continue ibuprofen 600-800mg every 6-8 hours as needed for pain, along with acetaminophen 1000mg every 12

hours as needed for pain and orthotic supports. Repeat MRI should be ordered after COVID-19 is better controlled.

Tension headaches should continue to be managed with over-the-counter analgesics.

Chronic keratoconjunctivitis followed by optometrist annually and eyedrops used several times per day as needed to maintain moisture. Patient advised that with increased mask wearing eyes will be prone to dry out more, so increased use of eye drops will be necessary and chalazion prevention by cleaning eyes nightly with warm washcloth and baby shampoo is recommended.

Hemorrhoids should continue to be managed with Preparation-H pads and creams. After COVID-19 subsides, will refer for evaluation by gastroenterologist to evaluate and schedule screening colonoscopy.

Patient's insomnia is due to chronic pain. Insomnia, in turn, worsens chronic pain, so sleep is very important. Patient should continue to use eszopiclone 2mg nightly as needed and zolpidem tartrate 3.5mg SL nightly as needed along with lumbar and knee pillows and sleep regimen, trying to get to sleep and awaken at same times each night and day.

COVID-19 is currently in pandemic with a resurgence of cases in Los Angeles County and many other places around the state. Patient is advised of his high risk status due to age, hypertension, heart disease risk, weight, pulmonary risk and potentially immunocompromised position due to his elevated prostate specific antigen, which may indicate early prostate cancer, especially due to his youngest brother just completing treatment for an aggressive form of same. Patient advised to stay home as much as possible, but when out of the house, avoid gatherings of more than 10 people, maintain six feet from others and wear an N-95 mask when in public or within 6 feet of others. Maintain diligent hand hygiene with soap and water and hand sanitizer and avoid touching face and eyes.

7/9/2020.

Robert Lugliani, M.D.

# EXHIBIT B

SAMUEL A. KEESAL, JR., CASB No. 38014
skip.keesal@kyl.com
STEFAN PEROVICH, CASB No. 245580
stefan.perovich@kyl.com
BRYCE CULLINANE, CASB No. 307079
bryce.cullinane@kyl.com
Keesal, Young & Logan
A Professional Corporation
400 Oceangate, Suite 1400
Long Beach, California 90802
Telephone: (562) 436-2000
Facsimile: (562) 436-7416

GEORGE B. NEWHOUSE, JR., CASB No. 107036
george@richardscarrington.com
Richards Carrington, LLC
545 S. Figueroa, 7th Floor
Los Angeles, CA 90071
Telephone: (303) 962-2690
Facsimile: (888) 888-5280

Attorneys for Defendant
FAUSTINO BERNADETT

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>vs.<br><br>FAUSTINO BERNADETT,<br><br>                Defendant. | Case No. SACR 19-00121-JLS<br><br>**DECLARATION OF MICHELE DEL VICARIO, M.D.** |

///

KYL4838-6194-6315.1

I, Michele Del Vicario, M.D., declare as follows:

I am a board licensed medical doctor in the state of California and the former head of the Cardiovascular Department at Providence Little Company of Mary Medical Center in Torrance, California. I also am the former Chief of Staff of Little Company of Mary Hospital. I have personal knowledge of the facts set forth below, and if called upon as a witness, I could testify competently thereto.

1. On August 25, 2020, I personally evaluated the health of Dr. Faustino Bernadett, during an in-person consultation.

2. I am qualified to testify regarding Faustino Bernadett's health and ailments.

3. Attached hereto is a true and correct copy of my "Evaluation Progress Notes of Faustino Bernadett" which I prepared on August 25, 2020 regarding my evaluation of Faustino Bernadett.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 15, 2020 at Torrance, California.


MICHELE DEL VICARIO, M.D.
BOARD CERTIFIED IN
INTERVENTIONAL CARDIOLOGY,
INTERNAL MEDICINE, AND
CARDIOVASCULAR DISEASE;
SPECIALIZING IN THE PRACTICE OF
CARDIOLOGY

KYL4838-6194-6315.1

# Bernadett, Faustino

MRN: 20014183019

**Office Visit** 8/25/2020
PMI - SB Heart and Vascular

Provider: Michele Del Vicario, MD (Cardiology)
Primary diagnosis: Chest pain, unspecified type
Reason for Visit: Hypertension

## Progress Notes

Michele Del Vicario, MD (Physician) • Cardiology

**PMI - SB Heart and Vascular**
3475 TORRANCE BLVD STE A
TORRANCE CA 90503-5800
Phone: 310-370-3568
Fax: 310-540-0676

### Progress Notes

**Date:** 8/25/2020

**Patient Information**
Patient Name: Faustino Bernadett
Date of Birth: 5/29/1954     Age: 66 y.o.
Medical Record #: 20014183019

**Reason for visit:**
Chief Complaint
Patient presents with
 • Hypertension
   *New patient evaluation*

**HPI:** Patient seen here for general cardiovascular consult today.
The patient has longstanding history of hypertension, hypercholesterolemia and
hypertriglyceridemia none of which apparently have been under reasonable control.

Additionally he has some dyspnea on exertion and a chronic intermittent cough which is
attributed to his childhood asthma. Probably has an element of lung disease for
which he is under the care of his primary physician who is also a pulmonary specialist.

In addition he has cervical spine degenerative disc disease as well as lumbosacral spine
disease and this   produces abundance of discomfort which has aggravated his overall
health status and wellbeing.

He does have a weight issue that is he is overweight.

Of note is that when the patient does exert himself particularly if he goes up a slight
incline there is increased shortness of breath and associated with this is also mild left
anterior chest discomfort or pressure-like feeling.

No radiation of the discomfort.

None of these episodes have lasted more than 10 minutes, rest alleviates both the
shortness of breath and  chest tightness.

**Of note is that the patient has been under a great deal of stress due to work situation over the last 4 to 5 years and this has particularly been severe yet over the last year.**

There has been no lightheadedness palpitations or syncope.

**PMI - SB Heart and Vascular**
3475 TORRANCE BLVD STE A
TORRANCE CA 90503-5800
Phone: 310-370-3568
Fax: 310-540-0676

## Problem List:

Patient Active Problem List
Diagnosis
- Essential hypertension
- Hypertriglyceridemia
- Hypercholesterolemia
- Mild intermittent asthma without complication
- Lumbar disc disease
- Cervical disc disease

## Medications:

Current Outpatient Medications

| Medication | Sig | Dispense | Refill |
|---|---|---|---|
| • atorvaSTATin (LIPITOR) 10 mg tablet | Take 10 mg by mouth. | | |
| • Coenzyme Q10 (CO Q 10 PO) | Take by mouth. | | |
| • eszopiclone (LUNESTA) 2 MG TABS | TAKE 1 TABLET BY MOUTH AT BEDTIME AS NEEDED | | |
| • ramipril (ALTACE) 2.5 mg capsule | Take 2.5 mg by mouth Daily. | | |
| • tadalafil (CIALIS) 5 MG tablet | Take 5 mg by mouth Daily. | | |
| • Zolpidem Tartrate 3.5 MG SUBL | 1 TABLET SUBLINGUALLY AT BEDTIME | | |

No current facility-administered medications for this visit.

## Family and Social History:

Family History

| Problem | Relation | Age of Onset |
|---|---|---|
| • Stroke | Mother | |
| • Heart attack | Mother | |
| • Cardiomyopathy | Mother | |
| • Heart failure | Mother | |
| • Other (see comment) AIRPLANE ACCIDENT | Father | |
| • Prostate cancer | Brother | |
| • Breast cancer | Sister | |
| • Other (see comment) ELEVATED LIVER ENZYMES | Daughter | |

Social History

Socioeconomic History
- **Marital status:** Married
  - Spouse name: Not on file
- **Number of children:** Not on file
- **Years of education:** Not on file
- **Highest education level:** Not on file

Tobacco Use
- **Smoking status:** Never Smoker
- **Smokeless tobacco:** Never Used

Substance and Sexual Activity
- **Alcohol use:** Yes
  - *Comment: SOCIAL*

## Allergies:

No Known Allergies

## Review of Systems:

All systems were reviewed, and negative apart from the history of present illness and also his multiple discomfort related to radiculopathy

**Physical Findings: (Explain Abnormal)**    repeat blood pressure 174/102

| Vitals with Orthostatic BP with comments | 8/25/2020 |
|---|---|
| **SYSTOLIC** | 194 |
| **DIASTOLIC** | 113 |
| **Pulse** | 86 |
| **Temp** | 97.8 |
| **Weight** | 199 lbs |
| **Height** | 5' 11" |
| **SPO2** | 93 |
| **BMI** | 27.8 kg/m2 |
| **Pain Score** | 0 |

General appearance: alert and oriented x3, appears stated age and cooperative
Neck: no adenopathy, no carotid bruit, no JVD and thyroid not enlarged, symmetric, no tenderness/mass/nodules
Lungs: clear to auscultation bilaterally
Heart: regular rate and rhythm, S1, S2 normal, S4
Abdomen: soft, non-tender; bowel sounds normal; no masses,  no organomegaly
Extremities: extremities normal, atraumatic, no cyanosis or edema
Pulses: 2+ and symmetric
Skin: Skin color, texture, turgor normal. No rashes or lesions
**Neurological examination: Grossly intact**
**Data Reviewed**: Some outside records brought in by the patient
(see tracing and/or report for full interpretation)

## Assessment and Plan:
### 1. Chest pain, unspecified type
We will need to exclude underlying coronary disease particularly in view of his family history of relatively premature coronary disease and myocardial infarctions, specifically his mother has

had 3 myocardial infarctions and has had congestive heart failure as well as a cerebrovascular vascular accident.

His grandfather died at the age of 60 with a myocardial infarction.

- ECHO Stress w Cont ECG Monitoring; Future

## 2. Essential hypertension
Not well controlled, patient been admonished about low-salt diet use and to increase activity level and reduce his weight.

ramipril will be doubled to 5 mg daily he is to monitor his blood pressure on a twice daily basis and to call within a week. The goal of his systolic blood pressure is to be less than 130 mmHg. Obviously if his stress level could be reduced this would also contribute to better control of his hypertension.

I do not feel at this point in time there are any further investigation for other causes of this hypertension are indicated.

## 3. Hypertriglyceridemia
Not well controlled

## 4. Hypercholesterolemia
Not well controlled will increase his Lipitor to 20 mg daily
And again has been counseled about weight reduction and dietary restrictions as far as low-cholesterol diet. The aim will be to bring the cholesterol well under 200 mg/dL

As well as LDL cholesterol which is now 138 certainly below 100 mg/dL

As well as to decrease the triglycerides slightly from 155 mg/dL

Should have repeat lipid panel within the next 4 to 6 weeks and subsequent adjustment should be made.

## 5. Mild intermittent asthma without complication
This will be further addressed by his pulmonologist.

## 6. Lumbar disc disease
Under the care of orthopedics.

## 7. Cervical disc disease
Under the care of orthopedics.

## Further consideration on Dr. Bernadett:

It is my understanding that the patient in the future may be incarcerated.

It is my strong recommendation that the patient should not be put in harm's way, that he is in an environment where COVID-19 may be prevalent and would expose him to significant health risk with the possibility of even death if he should contract the viral infection.

Specifically he has multiple risk factors that would make him substantially more vulnerable than the general population; these include age, hypertension which presently is inadequately controlled, asthma and potentially underlying significant pulmonary dysfunction as to be determined by his pulmonologist.
Additionally he is somewhat overweight adding an extra risk factor.

All of this is in addition to the possibility that the patient has underlying coronary artery disease which will be assessed in the near future with a stress echo.

**Return Appointment**: No follow-ups on file.

Electronically signed by: Michele Del Vicario, MD, 8/25/2020 1:15 PM PDT

*Patient Name: Faustino Bernadett/DOB: 5/29/1954/Medical Record #: 20014183019*

**"We retain the right to modify this information in the event of errors without notice. This report was generated by a voice dictation system. Errors in punctuation, grammar and content occur. The patient has been advised to follow up with appointments. Patient has been informed that non-compliance with this recommendation could result in serious consequences because of delays of diagnosis and treatment. It also has been disclosed to the patient that we expect patients to take an active role in their healthcare."**

## Instructions

After Visit Summary (Printed 8/26/2020)

## Additional Documentation

| | |
|---|---|
| Vitals: | BP 194/113 ❗ (Abnormal) Pulse 86 Temp 36.6 °C (97.8 °F) (Infrared Device) |
| | Ht 1.803 m (5' 11") Wt 90.3 kg (199 lb) SpO2 93% BMI 27.75 kg/m² BSA 2.13 m² |
| | Pain Sc  0 - No pain    More Vitals |
| Flowsheets: | Epidemic Risk, Vitals, Anthropometrics, Epidemic Risk Screen, ED qSOFA Calculation |
| Encounter Info: | Billing Info, History, Allergies, Detailed Report |

## 🗋 Encounter-Level Documents:

There are no encounter-level documents.

## 🗋 Order-Level Documents:

There are no order-level documents.

## Encounter Status

Closed by Michele Del Vicario, MD on 8/26/20 at 13:25

## Orders Placed

ECHO Stress w Cont ECG Monitoring (Resulted 9/3/2020)

## Medication Changes

As of 8/25/2020 12:31 PM

None

## Visit Diagnoses

Chest pain, unspecified type R07.9
Essential hypertension I10
Hypertriglyceridemia E78.1
Hypercholesterolemia E78.00
Mild intermittent asthma without complication J45.20
Lumbar disc disease M51.9
Cervical disc disease M50.90

Case 2:20-cv-04450-CBM-PVC  Document 132-1  Filed 12/01/20  Page 48 of 168  Page ID
Case 2:20-cv-04450-CBM-PVC  Document 143-2  Filed 12/16/20  Page 48 of 168  Page ID
#:5766
#:5732

## Curriculum Vitae

### Michele Del Vicario, M.D.

**Demographic**

| | |
|---|---|
| Place of Birth | Panni, Italy |
| Citizenship | Canada and United States of America |
| Contact Info | 3475 Torrance Blvd., Suite A |
| | Torrance, CA 90503 |
| | (310) 370-3568 – Phone |
| | (310) 540-0676 – Fax |

**Education**

| | |
|---|---|
| 1967 | University of British Columbia, Vancouver, Canada, B.S. |
| 1970 | University of British Columbia, Vancouver, Canada, M.D. |

**Postgraduate Training**

| | |
|---|---|
| 1970-1971 | Internship: Memorial Hospital, Long Beach, California – Rotation O |
| 1971-1974 | Internal Medicine Residency: University of California, Irvine, Long Beach Veterans Administration Hospital, Long Beach, California |
| 1974-1976 | Cardiology Fellowship: University of California, Irvine, Long Beach Veterans Administration Hospital, Long Beach, California |

**Licensure/Certification**

| | |
|---|---|
| 1970 | LMCC (Canada) |
| 1971 | California FLEX |
| 1971 | Medical Licensure, State of California (#A24434 – Active) |
| 1974 | American Board of Internal Medicine |
| 1974 | Canadian Board of Internal Medicine (Written) |
| | Fellowship of Royal College of Physicians (C) |
| 1975 | Canadian Board of Internal Medicine (Orals) |
| | Fellowship of Royal College of Physicians (C) |
| 1977 | American Board of Internal Medicine Cardiovascular Disease (Diplomate) |
| 1979 | Fellowship of American College of Cardiology |
| 1999 | Fellowship of American College of Interventional Cardiology (Diplomate) |
| 2009 | American Board of Internal Medicine Interventional Cardiology (Diplomate) |

**Professional Societies and Memberships**

American College of Physicians
California Medical Association
Los Angeles County Medical Association
American Echocardiology Society
Los Angeles American Heart Association

Case 2:20-cv-04450-CBM-PVC  Document 132-1  Filed 12/01/20  Page 49 of 168  Page ID
Case 2:20-cv-04450-CBM-PVC  Document 143-3  Filed 12/16/20  Page 49 of 168  Page ID
#:5767

**Staff Positions**

2014-2015     President, Professional Staff, Providence Little Company of Mary Medical Center
              Torrance, California
              Board of Directors, Little Company of Mary Hospital, Torrance, California
              Medical Director, Heart Cath Lab, Little Company of Mary Hospital, Torrance, CA
              Chairman, Cardiology Subcommittee, Little Company of Mary Hospital, Torrance, CA
              Chairman, Endovascular Taskforce, Torrance Memorial Medical Center, Torrance, CA

**Research**     Participation Investigator:
              TIMI 16
              Second Symphony
              CHARISMA
              PROVE IT
              ARISE
              TIMI 36 MERLIN
              TENACITY
              OCTAVE
              OVERTURE

**Bibliographies of Publications**

Ferlinz, J., Del Vicario, M., Herman, M.V., Gorlin, R. Incidence of right ventricular asynergy in patients with coronary artery disease. *Circulation* October 1975; 52:11-81. (Abstract)

Ferlinz, J., Del Vicario, M., Gorlin, R. Right ventricular contraction abnormalities in chronic artery disease: incidence and relationship to prior myocardial infarction. *Chest* 176; 70:426. (Abstract)

Aronow, W.S., Del Vicario, M., Moorthy, K., King, J., Vawter, M., Papageorge's, N.P. Long-term efficacy of halofenate on serum triglyceride levels, *Current Therapeutic Research* 1976; 18:855.

Aronow, W.S., Ferlinz, J., Del Vicario, M., Moorthy, K., King, J., Cassidy, J. Effect of timolol versus propranolol on hypertension and hemodynamics, *Circulation* 1976; 54:47.

Ferlinz, J., Del Vicario, M., Gorlin, R. Incidence of right ventricular asynergy in patient with coronary artery disease. *The American Journal of Cardiology* 1976; 38:557.

Prakash, R., Moorthy, K., Del Vicario, M., Aronow, W.S. Reliability of echocardiography in quantitating pericardial effusion-a prospective study. *Journal of Clinical Ultrasound.*

Ferlinz, J., Del Vicario, M., Cassidy, J., Aronow, W.S. Effects of rapid digitalization on left ventricular volumes and asynergy in patient with coronary artery disease. Accepted for presentation at the American College of Cardiology Meeting in Las Vegas, March 1977. (Abstract)

Orlando, J., Del Vicrio, M., Cassidy, J., Aronow, W.S. Correlation of mean pulmonary artery wedge pressure, left atrial dimension, and PTF-V in patients with acute myocardial infarction. *Circulation* May 1977.
Ferlinz, J., Del Vicario, M., Aronow, W.S. Effects of rapid digitalization on total and regional myocardial performed in patient with coronary artery disease. *The American Heart Journal* 1978; 96.

Grollman, J., Del Vicario, M., Mittal, A.K. Percutaneous transluminal abdominal aortic angioplasty. *American Journal of Radiology* May 1980; 134:1053-1054.

# EXHIBIT C

SAMUEL A. KEESAL, JR., CASB No. 38014
skip.keesal@kyl.com
STEFAN PEROVICH, CASB No. 245580
stefan.perovich@kyl.com
BRYCE CULLINANE, CASB No. 307079
bryce.cullinane@kyl.com
Keesal, Young & Logan
A Professional Corporation
400 Oceangate, Suite 1400
Long Beach, California 90802
Telephone: (562) 436-2000
Facsimile: (562) 436-7416

GEORGE B. NEWHOUSE, JR., CASB No. 107036
george@richardscarrington.com
Richards Carrington, LLC
545 S. Figueroa, 7th Floor
Los Angeles, CA 90071
Telephone: (303) 962-2690
Facsimile: (888) 888-5280


Attorneys for Defendant
FAUSTINO BERNADETT

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. SACR 19-00121-JLS |
| Plaintiff, | **DECLARATION OF CHRISTOPHER TRAUGHBER, M.D.** |
| vs. | |
| FAUSTINO BERNADETT, | |
| Defendant. | |

///

- 1 -

I, Christopher Traughber, M.D., declare as follows:

I am a board licensed medical doctor in the state of California and currently in charge of the Urgent Care Unit at the Palos Verdes Family and Immediate Medical Care Center. I have personal knowledge of the facts set forth below, and if called upon as a witness, I could testify competently thereto.

1.      On or about August 25, 2020, I personally evaluated the health of Dr. Faustino Bernadett, during an in-person consultation.

2.      I am qualified to testify regarding Faustino Bernadett's health and ailments.

3.      Attached hereto is a true and correct copy of my letter regarding my evaluation of the health and ailments of Faustino Bernadett, which I prepared on August 27, 2020.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 15, 2020 at Palos Verdes, California.


CHRISTOPHER TRAUGHBER, M.D.



PV FAMILY AND
IMMEDIATE MEDICAL
CARE CENTER

08/27/2020

Re: Faustino, Bernadett
DOB: 05/29/1954

To Whom It May Concern:

I am writing this letter on behalf of my patient Faustino, Bernadett DOB: 05/29/1954 in effort to avoid any unnecessary exposure to the Covid-19 virus during his upcoming incarceration,  due to his risk factors that increase his risk of harmful Covid-19 infection

1. Age > 65 years old
2. Overweight (BMI 27)
3. Hypertension, under treatment
4. Hyperlipidemia, under treatment
5. History of respiratory disease with chronic cough and asthma
6. Elevated PSA with prostatic hypertrophy and significant family history of aggressive prostate cancer in brother

These risk factors increase his risk of poor outcome including death, to Covid-19 infection.

Please consider a home sentencing option for the elderly man.

Sincerely,

*CTraghber M.D*

Christopher Traughber, M.D.

26516 Crenshaw Boulevard • Palos Verdes Peninsula, CA 90274
Tel 310.541.7911 • Fax 310.541.2953

# EXHIBIT D

1  SAMUEL A. KEESAL, JR., CASB No. 38014
   skip.keesal@kyl.com
2  STEFAN PEROVICH, CASB No. 245580
   stefan.perovich@kyl.com
3  BRYCE CULLINANE, CASB No. 307079
   bryce.cullinane@kyl.com
4  Keesal, Young & Logan
   A Professional Corporation
5  400 Oceangate, Suite 1400
   Long Beach, California 90802
6  Telephone: (562) 436-2000
   Facsimile: (562) 436-7416
7
   GEORGE B. NEWHOUSE, JR., CASB No. 107036
8  george@richardscarrington.com
   Richards Carrington, LLC
9  545 S. Figueroa, 7th Floor
   Los Angeles, CA 90071
10 Telephone: (303) 962-2690
   Facsimile: (888) 888-5280
11
   Attorneys for Defendant
12 FAUSTINO BERNADETT

13              UNITED STATES DISTRICT COURT

14      CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

15

16
        ,                           CASE NO. SACR 19-00121-JLS
17
   UNITED STATES OF AMERICA,        **DECLARATION OF MARC F.
18                                  STERN, M.D., M.P.H.**
                       Plaintiff,
19
20            vs.

21 FAUSTINO BERNADETT,

22                     Defendant.

23

24

25

26

27

28

3649598.1

                        DECLARATION OF MARC STERN, M.D.
KYL4828-7404-3074.1

# DECLARATION OF MARC STERN, M.D.

I, Marc Stern, declare as follows:

1.     I am a physician, board-certified in internal medicine, specializing in correctional health care. I most recently served as the Assistant Secretary for Health Care at the Washington State Department of Corrections. I served for four years as a medical subject matter expert for the Officer of Civil Rights and Civil Liberties, U.S. Department of Homeland Security, and as a medical subject matter expert for one year for the California Attorney General's division responsible for monitoring the conditions of confinement in Immigration and Customs Enforcement (ICE) detention facilities. I am a court-appointed medical expert in the class action *Parsons v. Ryan*, CV-12-00601-PHX-ROS. Currently, I am the Medical Advisor for the National Sheriffs' Association on matters related to preventive measures responding to COVID-19. Additionally, in 2009, at the request of the California Receiver Clark Kelso, I toured 10 California state prisons to assess whether or not the Receiver's assignment—to restore the delivery of health services within the California state prisons to constitutionally adequate levels – had been completed. Attached as Exhibit A is a copy of my curriculum vitae.

2.     COVID-19 is a serious disease that has reached pandemic status, and is straining the health care systems around the world. As of July 7, 2020, at least 2.9 million people in the United States had received confirmed diagnoses of COVID 19. At least 130,000 people have died in the United States. Approximately 271,000 of the confirmed cases were in California, with more than 6,300 having died. California is now seeing a dramatic spike in COVID cases. These numbers will continue to increase, perhaps exponentially. Moreover, these figures must be considered in light of nationwide shortages of COVID-19 tests, meaning the actual numbers are likely significantly higher than those reported.

3.     The Lompoc complex ("Lompoc") is comprised of Federal Correctional Institution Lompoc ("FCI Lompoc") and United States Penitentiary

Lompoc ("USP Lompoc"). USP Lompoc itself has two components, a low-security camp and a medium-security prison. In total, the three Lompoc facilities have a rated design capacity of 2058. However, as of July 7, 2020 they had a total population of 2,473, thus exceeding capacity. As of July 7, 2020 there are a total of 172 people at USP Lompoc who are currently or were positive for COVID-19, including 8 residents currently deemed positive, two resident deaths, and 162 residents reported as being "recovered" after previously testing positive. The BOP website does not show what criteria it is using to consider someone "recovered."

4.      COVID-19 is a novel respiratory virus. It is spread primarily through droplets generated when an infected person coughs or sneezes, or through droplets of saliva or discharge from the nose. There is no vaccine for COVID-19, and there is no cure for COVID-19. No one has prior immunity. The only way to control the virus is to use preventive strategies, including social distancing.

5.      The time course of the disease can be very rapid. Individuals can show the first symptoms of infection in as few as two days after exposure and their condition can seriously deteriorate in as few as five days (perhaps sooner) after that. It is believed that people can transmit the virus without being symptomatic and, indeed, that a significant amount of transmission may be from people who are infected but asymptomatic or pre-symptomatic.

6.      Treatment for serious cases of COVID-19 requires immediate and substantial medical intervention.

7.      The effects of COVID-19 are especially serious for people who are most vulnerable. Vulnerable people include people over the age of 50, and those of any age with underlying health problems such as—but not limited to—weakened immune systems (which can be caused by a variety of conditions, including but not limited to cancer treatment, hypertension, smoking, and immune weakening medications), moderate to severe asthma, diabetes, serious heart and lung disease, severe obesity,  liver disease, and possibly pregnancy. While the CDC typically

classifies only people 65 and older as vulnerable, incarcerated individuals tend to be in poorer health than those in the general population, justifying the use of an earlier cutoff in classifying people deemed vulnerable to COVID-19.

8. The full extent of long-term sequela from COVID-19 infection is unknown at this time. It is possible that it may result in permanent damage to lung, heart, brain, and other tissues.

9. In light of the above, an outbreak of COVID-19 could put significant pressure on or exceed the capacity of local health infrastructure. In the absence of a vaccine and a cure, a significant number of people who are infected with the virus will die. Buttressing these concerns, it is not yet clear whether people who have already been infected with COVID-19 gain immunity against future infection. To the extent that the health care infrastructure is overloaded, people will die unnecessarily because necessary respirators and hospital facilities are unavailable.

10. Public health authorities recommend a number of preventive steps to help prevent or decrease the spread of COVID-19, with perhaps the most important measure being social distancing.

11. Prisons are congregate environments, *i.e.*, places where people live and sleep in close proximity. Many people live in dormitory-style units with multiple rows of bunk beds close together or in small multi-person cells that often surround common areas where incarcerated people crowd together during the day. Social distancing in ways that are recommended by public health officials can be difficult, if not impossible, in prisons, even when the population is under design capacity. When prisons are at or above capacity, it becomes even more difficult to implement appropriate social distancing measures.

12. Infectious diseases that are transmitted via the air or touch (like COVID-19) are more likely to spread, placing people at risk. For these reasons, if—but more likely when—COVID-19 is introduced into a prison, the risks of spread is greatly, if not exponentially, increased as already evidenced by spread of COVID-19

in two other congregate environments: nursing homes and cruise ships.

13.     But prisons actually have an attribute that makes them more dangerous than cruise ships. Unlike cruise ships, prisons are not closed systems. Staff, new detainees, attorneys, and inanimate objects—all potential vectors for virus—are introduced into the system every day. Thus, even if the government makes best efforts to follow preventive guidelines, the introduction of virus into a detention center is almost inevitable. Moreover, because staff and some visitors travel each day from the facilities back to their homes, when infection develops in the facility, there is also significant risk that the infection will be transmitted *outside the facility*, to the family and friends of staff and visitors. In short, the risks that confront individuals at detention facilities such as Lompoc stem from their very nature as congregate environments. Even if the healthcare provided were excellent, there would still be substantial risk; if the healthcare provided were substandard, those substantial risks are only elevated.

14.     Faustino Bernadett is a 66 year old man set to be incarcerated at the camp at Lompoc on August 18, 2020.  My review of a declaration from his treating physician shows that Dr. Bernadett suffers from hypertension and a chronic intermittent cough. His age and history of hypertension are two factors that increase the likelihood of his suffering severe effects, including death, if he contracts COVID-19. As such, he is much safer at home, than in a prison environment. Subjecting Dr. Bernadett to a prison environment greatly increases the likelihood that he will contract COVID-19 and suffer serious consequences.

15.     The effects of COVID-19 are very serious, especially for people who are most vulnerable.  As demonstrated in the first table below, the risk of severe complications (requiring hospitalization) rises dramatically between the 18 to 49-year-old age group and the 50 to 64-year-old age group. As demonstrated in the second table below, the number of deaths rises dramatically between the 25 to 34-year-old age group to the 35 to 44-year-old age group and again to the 45 to 54-

year-old age group.

Rates of Laboratory-Confirmed COVID-19-Associated Hospitalizations
(per 100,000 population as of week ending June 13, 2020, source CDC:
    www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html

| Age Group | |
| --- | --- |
| 0-4 years | 7.4 |
| 5-17 years | 3.5 |
| 18-49 years | 56.5 |
| 50-64 years | 143.0 |
| +65 years | 286.9 |

Number of Deaths from COVID-19, by Age
(as of June 17, 2020, source CDC: https://data.cdc.gov/NCHS/Provisional-
    COVID-19-Death-Counts-by-Sex-Age-and-S/9bhg-hcku)

| Age Group | |
| --- | --- |
| Under 1 year | 8 |
| 1–4 years | 5 |
| 5–14 years | 13 |
| 15–24 years | 125 |
| 25–34 years | 699 |
| 35–44 years | 1,780 |
| 45–54 years | 4,976 |
| 55–64 years | 12,307 |
| 65–74 years | 21,462 |
| 75–84 years | 27,529 |
| +85 years | 34,435 |

16.     The aforementioned elevated risk poses a risk not only to the health of the individuals who contract COVID-19, but to the community at large. It does so, in at least one way related to patients such as Dr. Bernadett, because when such individuals do become infected, they are more likely to utilize scarce community resources, such as emergency departments, hospital beds, and ventilators.

17.     Decisions regarding incarceration and release from incarceration normally take into account their impact on public safety. In the face of the COVID-19 epidemic, the calculus of public safety must now also take into account the

impact on public health. The release of CDC-defined at-risk prison residents not only reduces the risk of death to the resident, but also increases public safety via the public health mechanisms described above. For this reason, decisions regarding release of a COVID-19 at-risk patient should factor in this risk in assessing the totality of public safety risk.

18.    I have been made aware of the following allegations, as contained in a recently-filed class action lawsuit and declarations filed therein, against the BOP facility at Lompoc.[1]  Relying on those representations and assuming them to be confirmed true, the conditions at Lompoc are deeply concerning:

- At the low-security camp at USP Lompoc, people live in open-plan dormitories with shared bathrooms. More than 100 inmates live in these dormitories and sleep on bunk beds with no more than two to three feet between the bunks. There are no internal walls so everyone and all the bunk beds are in one open space. All of these inmates  share six toilets and six showers. Dormitories are crowded and people congregate in common areas. Residents also have to stand in line to get medication, and there is not enough space for social distancing.

- Initially, the practice appears to have been to transfer sick people to the solitary confinement unit. Some residents who had tested positive were left there for up to four days with no medical attention. Eventually, prison authorities re-opened two dormitories which had been closed three years ago due to mold contamination in order to house sick people. The re-opened dormitories are extremely unsanitary, and residents sleep on mattresses officers have scattered across the ground. Residents here spend up to five days at a time with no treatment for COVID-19. There is no soap, and people are not being allowed to shower.

---

[1] *Torres et. al. v. MILUSNIC et. al.* (Case No. 2:20-cv-04450) (CD CA).

- Residents were only give one mask in April, and have been reusing that mask since. Hand sanitizer is non-existent and soap is not plentiful.
- It does not appear that anyone who tests positive and then "recovers" is tested again before being returned to the general population.
- Residents are being denied regular medical treatment they had received prior to the outbreak. For example, medically necessary procedures scheduled prior to the outbreak have been delayed indefinitely.

19. These conditions, if true—a track record of not being able to prevent predictable and widespread infection, continued widespread infection, unsanitary living conditions, inadequate testing, not providing enough masks, and most importantly overcrowding—make it exceedingly difficult, if not impossible, to ensure the safety of residents who remain housed at the facility. In particular, these conditions mean that social distancing is very difficult, if not impossible, to effectively implement.

20. For the above reasons, I recommend consideration of a concerted effort to downsize the population of Lompoc to the lowest number possible immediately, with priority given to those at high risk of harm due to their age and health status. This will both allow Lompoc to implement more effective preventive and treatment measures while simultaneously granting released or transferred residents access to minimally acceptable living conditions. To maximize their effectiveness in reducing the spread and impact of the virus at Lompoc, these downsizing measures must be implemented now.

21. There are two values to immediate downsizing. First, downsizing will reduce Lompoc's density of congregation. This will allow people in prison to maintain better social distancing. The reduction in population will also make it easier for prison authorities to implement infection prevention measures such as: provision of cleaning supplies to residents; frequent laundering of towels and clothes; provision of soap for handwashing; frequent cleaning of transactional

surfaces; etc. Furthermore, downsizing will allow prison health care professionals to devote their attention to a smaller number of residents, potentially improving the quality of care those residents receive. At any prison it is beneficial to conserve medical resources in the face of a pandemic such as the one we presently face. All these steps can slow or stop the spread of infection (or re-infection) and improve treatment outcomes if they are currently inadequate, to the benefit of residents and staff and, ultimately, the community at large.

22.     Second, immediate downsizing that prioritizes residents who are elderly and those with underlying health conditions reduces the likelihood they will contract the disease or suffer severe medical consequences as a result of being infected. Individuals in these groups are at the highest risk of severe complications from COVID-19 and when they develop severe complications they will be transported to community hospitals. Reducing the spread and severity of infection in a prison slows, if not reduces, the number of people who will become ill enough to require hospitalization where they will be using scarce community resources (ER beds, general hospital beds, ICU beds) which also in turn reduces the health and economic burden to the local community at large. Indeed, in light of the new reality in which we operate, decisions to release residents from custody—traditionally concerned primarily with public safety—must also take into account the impact on public health. It is for this reason that release or transfer[2] of at-risk residents not only reduces their risk of death, but also increases public safety when the impact on public health is also considered.

23.     Residents who have received confirmed diagnoses of COVID-19 in most cases may be safely released to the community, where they can quarantine or isolate at home. To the extent that the quality of care these residents currently

---

[2] Transfer is only acceptable if the transfer itself does not pose significant risks and is a transfer to another facility where the quality of health care and COVID-19 precautions are safe.

1  receive is inadequate, release would also ensure that residents have access to better
2  health care.

3      24.    In addition to the downsizing described above, and to the extent they
4  are not already being implemented, the following steps should immediately be
5  mandated of the Respondents in order to protect any residents who remain in
6  custody:

7          a.    Social Distancing. The prison must ensure that residents are able
8  to maintain adequate social distancing during required or necessary activities, such
9  as collecting food, eating, and receiving medications.

10          b.    Immediate and Continued Testing. Patients (both staff and
11 residents) who require testing (or re-testing) based on public health
12 recommendations and the opinion of a qualified medical professional, should be
13 tested for COVID-19.

14          c.    Immediate Screening. Defendants must be required to screen
15 each employee or other person entering the facility every day to detect fever over
16 100 degrees, cough, shortness of breath, other symptoms as currently recommended
17 by CDC, and exposure to someone who is symptomatic or under surveillance for
18 COVID-19, or screening as required by public health authorities. A record should be
19 made of each screening.

20          d.    Quarantine. The prison must establish non-punitive quarantine
21 for all individuals believed to have been exposed to COVID-19, but not yet
22 symptomatic, and non-punitive isolation for those believed to be infected with
23 COVID-19 and potentially infectious. Any individual who must interact with those
24 potentially or likely inflicted with COVID-19 must utilize protective equipment as
25 directed by public health authorities. In short, every possible effort must be made to
26 separate infected or potentially infected individuals from the rest of the incarcerated
27 population and each other.

28          e.    Post-Isolation or Quarantine. Individuals should only be released

from quarantine or isolation in accordance with CDC guidelines as modified by local public health authorities, after which they should be monitored in accordance with those same guidelines.

        f.     Institutional Hygiene. The prison must be required to provide adequate disinfection of all high-touch areas and cells.

        g.     Personal Hygiene. The prison must be required to provide hand soap, disposable paper towels, and access to water to allow residents to wash their hands on a regular basis, free of charge and ensure replacement products are available as needed. Correctional staff should be allowed to carry hand sanitizer with alcohol on their person, and residents should be allowed to use hand sanitizer with alcohol when they are in locations or activities where hand washing is not available. Correctional officers should be required to wear personal protective equipment and perform hand hygiene when appropriate, consistent with the CDC guidance as modified by local health authorities

        h.     Waive Copays. There must be a waiving of copays for medical evaluation and care related in any way to COVID-19 and/or its symptoms. A waiver of these types of copays is necessary to avoid dis-incentivizing patients from requesting medical treatment. Patients with symptoms of possible COVID-19 should be seen quickly.

        i.     Access to Care. All residents should have timely access to an appropriately qualified health care professional.

        j.     Personal Protective Equipment. Those residents with a cough should be provided masks as soon as they inform staff of this symptom or staff notice this symptom.

        k.     Supply Chain. The prison must be required to identify the supplies and other materials upon which the institution is dependent, such as food, medical supplies, certain medicines, cleaning products, etc., and prepare for shortages, delays or disruptions in the supply chain.

25.     Thus, in summary, consideration should be given to immediately reducing the number of individuals imprisoned at Lompoc for the health and safety of the prisons and our communities, taking into account the *totality* of risk posed to the public safety by each individual. This population reduction should begin with the most medically vulnerable which includes those over age 50 and those with CDC-defined underlying health conditions.

26.     Considering Dr. Bernadett's age and medical condition, I recommend that this increased risk to his health and the public's health due to COVID-19 if he is incarcerated, be considered when calculating the totality of risk he poses to the community if he is confined at a prison facility.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 10th day of July, 2020, at Tumwater, Washington.

MARC F. STERN, MD, MPH

# EXHIBIT E

LAW OFFICES
## KEESAL, YOUNG & LOGAN
A PROFESSIONAL CORPORATION
400 OCEANGATE, SUITE 1400
LONG BEACH, CA 90802
(562) 436-2000
FACSIMILE:
(562) 436-7416
www.kyl.com

SAMUEL A. KEESAL, JR.
STEPHEN YOUNG
MICHAEL M. GLESS
PETER R. BOUTIN
TERRY ROSS
JOHN D. GIFFIN
PHILIP A. McLEOD
NEAL SCOTT ROBB
BEN SUTER
ROBERT J. STEMLER
MICHELE R. UNDERWOOD

ELIZABETH P. BEAZLEY
JODI S. COHEN
JULIE L. TAYLOR‡
STACEY MYERS GARRETT
JON W. ZINKE†
ELIZABETH H. LINDH
DAVID D. PIPER‡
SANDOR X. MAYUGA
CHRISTOPHER A. STECHER‡
ESTHER E. CHO
MELANIE L. RONEN‡

BENTLEY P. STANSBURY III‡
STEFAN PEROVICH
RYAN S. LEAN
KRISTY H. SAMBOR
AILAN LIU
JOSHUA NORTON
VALERIE I. HOLDER†·
IGOR V. STADNIK†
SIMON M. LEVY
BRYCE CULLINANE

ASHLEY E. IMPELLITTERI
CHERYL S. CHANG
KATHERINE L. HANDY
CASSIDY A. WALLACE
JAMES L. KRITENBRINK
SAMANTHA D. PARRISH
NATALIE M. LAGUNAS
GEORGE A. CROTON
CONNOR M. TRAFTON
TERESA J. THONG

OF COUNSEL
ROBERT H. LOGAN
SCOTT T. PRATT
RICHARD A. APPELBAUM+
REAR ADMIRAL  U S C G  (RET )

ELIZABETH A. KENDRICK
WILLIAM McC. MONTGOMERY
YALE H. METZGER·

·  ADMITTED IN ALASKA
†  ADMITTED IN WASHINGTON
‡  ADMITTED IN WASHINGTON & CALIFORNIA
§  ADMITTED IN ALASKA & CALIFORNIA
·  ADMITTED IN DISTRICT OF COLUMBIA & FLORIDA
·  REGISTERED FOREIGN LAWYER WITH THE LAW SOCIETY
    OF HONG KONG & ADMITTED IN NEW YORK

ALL OTHERS ADMITTED IN CALIFORNIA

May 18, 2020

_**Via UPS Overnight**_

L.J. Milusnic
Acting Complex Warden
USP Lompoc
3901 KLEIN BLVD
Lompoc, CA 93436

Re:  Faustino Bernadett: Request for Home Confinement Evaluation Before August 18, 2020 Self-Surrender to FCC Lompoc (Register No. 78386-112)
Our File No.:  6213-2

Dear Warden Milusnic:

We write on behalf of our client, Dr. Faustino Bernadett ("Tino") who is scheduled to self-report to FCC Lompoc on August 18, 2020 to begin serving a 15-month sentence.  Tino, age 65, is a retired doctor and non-violent offender who has no criminal history beyond his guilty plea to a single count of misprision of a felony.  As you know, the current outbreak of COVID-19 in this country has seriously impacted prison populations, especially the BOP's facilities at Lompoc.  Thank you for your extraordinary efforts combatting the virus at Lompoc.  Despite those efforts, Lompoc has a high infection rate and the virus is running rampant.  People like Tino over the age of 65 are especially vulnerable to contracting the virus and suffering fatal or life-altering consequences.  Understandably, Tino is shaken by the notion of reporting into BOP custody while the virus is raging.  We have already entered into two 60-day extensions of Tino's self-surrender date with the United States Attorney's Office.  However, an end to the threat posed by the virus to vulnerable seniors is nowhere in sight.

We write to you today to respectfully request that you evaluate Tino for home confinement under the Attorney General's April 3, 2020 memo and the BOP's Acting Senior Deputy Assistant Director David Brewer's April 20, 2020 memo instructing that vulnerable inmates at impacted facilities be released to home confinement for the remainder of their prison terms.  Both of those memos are attached hereto as Exhibits "A" and "B."  We respectfully request that you make this evaluation and designate Tino to home confinement before his surrender date on August 18, 2020.  Tino has no prior criminal history, did not engage in a sex or terrorism crime, poses no risk to the community, and has a viable release plan.  Tino has several health conditions and risk factors that make him even more susceptible.  Attached hereto as Exhibit "C" is the Presentence Investigation Report issued in Tino's case, which confirms that he has met all the prerequisites for release to home confinement under the instructions established

SAN FRANCISCO OFFICE
450 PACIFIC AVENUE
SAN FRANCISCO, CA 94133
(415) 398-6000
FACSIMILE:
(415) 981-0136 • (415) 981-7729

ANCHORAGE OFFICE
SUITE 7A
101 E. 9TH AVENUE
ANCHORAGE, AK 99501-3651
(907) 279-9696
FACSIMILE: (562) 436-7416

SEATTLE OFFICE
SUITE 3100
1301 FIFTH AVENUE
SEATTLE, WA 98101
(206) 622-3790
FACSIMILE: (206) 343-9529

HONG KONG OFFICE
SUITE 1603
299 QUEEN'S ROAD CENTRAL
HONG KONG
(852) 2854-1718
FACSIMILE: (852) 2541-6189

L.J. Milusnic
Acting Complex Warden
May 18, 2020
Page 2

      Re:   Faustino Bernadett: Request for Home Confinement Evaluation Before
              August 18, 2020 Self-Surrender to FCC Lompoc (Register No. 78386-112)
              Our File No.:  6213-2

by David Brewer's April 20, 2020 memo.  Dr. Bernadett has paid the fine, restitution, and
special assessment that were ordered by the Court.  Dr. Bernadett has a health insurance plan and
is willing to pay for any costs associated with monitoring during home confinement.  Rather than
having Dr. Bernadett report to your facility on August 18, 2020, almost certainly exposing him to
the virus or him exposing the staff and inmate population to the virus, we urge that the only
procedurally correct and humane solution is to confirm the information above and direct
Dr. Bernadett to serve his sentence at home.  An alternative would be to conduct any
investigation necessary by correspondence, telephone communications, Skype and/or Zoom, or
any other mechanism (including simply reviewing the Presentence Investigation Report prepared
by the Probation Department) to avoid Dr. Bernadett's attendance in-person at Lompoc.  We are
not asking for a shorter sentence or for him to simply be released.

      We understand that the BOP is prioritizing inmates for home confinement
consideration based on the amount of time they have already served.  However, this policy does
not consider the fact that soon-to-arrive inmates such as Tino are in a very different category.
These people should not be made to report, sit in solitary confinement for 15 days, likely contract
the virus, sit in solitary confinement for another 15 days, and then be released to home
confinement.  This order of operations does not achieve the goals laid out by the Attorney
General in his April 3, 2020 memo.  Those inmates who qualify for release under the Attorney
General's directive should be able to achieve this end-result before reporting to their BOP
facility.  More fundamentally, vulnerable elderly inmates with health conditions like Tino should
not be required to report to their designated BOP facility before even being evaluated for home
confinement under the Attorney General's and David Brewer's instructions.  At the very least,
these incoming inmates should be evaluated for home confinement before reporting to their
BOP-designated facility.

      Dr. Bernadett is also in the unique position of actively aiding, supporting, and
advising medical professionals, NGO's, community organizations, and governmental entities
who are working on the front lines of the covid-19 containment effort.  For example, to
encourage a Southern California garment maker to begin producing masks, he placed their first
10,000-mask order.  Those masks are now on their way to, amongst other places, clinics, nursing
homes, and grocery stores.  He is largely responsible for helping a local Boyle Heights school
stay open for the summer, he is critical in advising a ventilator company produce much-needed
health care equipment, he is sponsoring the creation of TikTok videos to help encourage young
people to wear masks, he is working with a federally qualified health plan to devise ways for
expectant mothers to see their doctors without visiting a hospital, he is assisting the City of Long
Beach with capacity planning, he is spearheading an effort to house the homeless in Long Beach
in modified "shipping container" homes, and he is helping to provide internet and learning
materials to children who lack access to both.  He is doing all of this work, including signing up

L.J. Milusnic
Acting Complex Warden
May 18, 2020
Page 3

Re:   Faustino Bernadett: Request for Home Confinement Evaluation Before
       August 18, 2020 Self-Surrender to FCC Lompoc (Register No. 78386-112)
       Our File No.:  6213-2

for the California Health Corps, on a voluntary basis.  If he is committed to home confinement, he can continue this important work.

        We respectfully request that Tino be immediately evaluated for home detention under the Attorney General and David Brewer's memos.  Please also consider this as Tino's request for compassionate release under 18 U.S.C. § 3582.  Tino is happy to submit himself to a Zoom, Skype, or telephone interview if that would be helpful.

        Thank you for your time and consideration of our request.  Please let us know if you would like additional information regarding Tino.

                        Warm regards,

                        Samuel A. Keesal, Jr.
                        *skip.keesal@kyl.com*

SAK:bc (KYL4823-2149-8043 1)
Enclosures.

# EXHIBIT A



**U.S. Department of Justice**
**Memorandum**
Federal Bureau of Prisons

*Correctional Programs Branch*

*Central Office*
*320 First Street, N.W.*
*Washington, DC 20534*


MEMORANDUM FOR CORRECTIONAL PROGRAM ADMINISTRATORS

FROM:              David Brewer, Acting Senior Deputy Assistant
                   Director

SUBJECT:           Furlough and Home Confinement Additional Guidance


The following guidance is provided from information contained in
the CARES Act, memoranda from Attorney General Barr, and the
Bureau of Prisons.  This memorandum rescinds guidance previously
provided.

**Furlough**
The current pandemic is considered an urgent situation that may
warrant an emergency furlough under 570.32(b)(1) and 570.33(b).
These regulations authorize a non-transfer emergency furlough if
the inmate is otherwise deemed appropriate, even if he/she has
been submitted for Home Confinement (HC).  Effective April 16,
2020, all inmates referred for an emergency furlough due to the
Covid-19 pandemic should be submitted and keyed as FURL CRI.

Inmates who have been referred for a release planning furlough
based on guidance issued prior to April 16, 2020, do not require
a new application.  These inmates should be keyed out of the
facility as FURL REL. Furlough applications completed on or
after April 16, 2020, should follow the updated guidance.
Inmates within 12 months of his/her Projected Release Date
(PRD), or those who have received Home Confinement placement and
have a PRD exceeding one year, should be reviewed for furlough.

**Home Confinement**
In an effort to alleviate concerns and questions, the following
criteria should be met when reviewing and referring inmates for
HC:

  • Primary or prior offense is not violent

- Primary or prior offense is not a sex offense
- Primary or prior offense is not terrorism
- No detainer
- Mental Health Care Level is less than CARE-MH 4
- PATTERN risk score is Minimum (R-MIN)
- No incident reports in the past 12 months (regardless of severity level)
- U.S. Citizen
- Viable Release Plan

If the inmate meets the criteria above, the following factors should be noted, but are not a reason for denial:
- Age
- Projected Release Date
- Percentage of time served
- Medical Care Level
- Victim Witness Program
- Arrival dated (ARSD)

Any concerns regarding an inmate's suitability for HC placement should be noted in Section 11 of the BP-210, *Institutional Referral for CCC Placement.* It is strongly encouraged to refer inmates currently housed in a facility with active Covid-19 cases.

For inmates requesting relocation, a release plan must be submitted to the USPO prior to HC referral submission. The USPO approval letter must be forwarded to the RRM, once received. Institution staff should contact the Health Service Specialist in the RRM's office with questions regarding HC placement for inmates with medical concerns.

If you have any questions, please contact David Brewer, Acting Senior Deputy Assistant Director, Correctional Programs Division, at (202)353-3638.

# EXHIBIT B



Office of the Attorney General
Washington, D. C. 20530

April 3, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU OF PRISONS

FROM:      THE ATTORNEY GENERAL

SUBJECT:   Increasing Use of Home Confinement at Institutions Most Affected by
           COVID-19

The mission of BOP is to administer the lawful punishments that our justice system
imposes. Executing that mission imposes on us a profound obligation to protect the health and
safety of all inmates.

Last week, I directed the Bureau of Prisons to prioritize the use of home confinement as a
tool for combatting the dangers that COVID-19 poses to our vulnerable inmates, while ensuring
we successfully discharge our duty to protect the public. I applaud the substantial steps you have
already taken on that front with respect to the vulnerable inmates who qualified for home
confinement under the pre-CARES Act standards.

As you know, we are experiencing significant levels of infection at several of our facilities,
including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using
home confinement, where appropriate, to move vulnerable inmates out of these institutions. I
would like you to give priority to these institutions, and others similarly affected, as you continue
to process the remaining inmates who are eligible for home confinement under pre-CARES Act
standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who
can be considered for home release upon my finding that emergency conditions are materially
affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as
detailed below, you give priority in implementing these new standards to the most vulnerable
inmates at the most affected facilities, consistent with the guidance below.

**I.     IMMEDIATELY MAXIMIZE APPROPRIATE TRANSFERS TO HOME
       CONFINEMENT OF ALL APPROPRIATE INMATES HELD AT FCI OAKDALE,
       FCI DANBURY, FCI ELKTON, AND AT OTHER SIMILARLY SITUATED BOP
       FACILITIES WHERE COVID-19 IS MATERIALLY AFFECTING OPERATIONS**

Case 2:20-cv-04450-CBM-PVC Document 343 Filed 12/16/20 Page 76 of 168 Page ID #:5894

While BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions. I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations. You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems. And now that I have exercised my authority under the CARES Act, your review should include all at-risk inmates—not only those who were previously eligible for transfer.

For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred. It is vital that we not inadvertently contribute to the spread of COVID-19 by transferring inmates from our facilities. Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations.

I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community. I therefore authorize BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety.

Given the speed with which this disease has spread through the general public, it is clear that time is of the essence. Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress.

## II.    **PROTECTING THE PUBLIC**

While we have a solemn obligation to protect the people in BOP custody, we also have an obligation to protect the public. That means we cannot simply release prison populations en masse onto the streets. Doing so would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses.

That risk is particularly acute as we combat the current pandemic. Police forces are facing the same daunting challenges in protecting the public that we face in protecting our inmates. It is impossible to engage in social distancing, hand washing, and other recommend steps in the middle of arresting a violent criminal. It is thus no surprise that many of our police officers have fallen ill with COVID-19, with some even dying in the line of duty from the disease. This pandemic has dramatically increased the already substantial risks facing the men and women who keep us safe, at the same time that it has winnowed their ranks while officers recover from getting sick, or self-quarantine to avoid possibly spreading the disease.

Memorandum from the Attorney General                                                    Page 3
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

      The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates. Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context.

      I believe strongly that we should do everything we can to protect the inmates in our care, but that we must do so in a careful and individualized way that remains faithful to our duty to protect the public and the law enforcement officers who protect us all.

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA )
)
           vs.           )   **PRESENTENCE INVESTIGATION REPORT**
)
                      )   **Docket No.: 0973 8:19CR00121-1**
    **Faustino Bernadett**   )
)

**Prepared for:**     The Honorable Josephine L. Staton
                   United States District Judge

**Prepared by:**      Natalie Nelson
                   USPO
                   Santa Ana, CA
                   714-338-4558
                   natalie_nelson@cacp.uscourts.gov



















14



15

16





Respectfully Submitted,

MICHELLE A. CAREY
Chief Probation & Pretrial Services Officer

Natalie Nelson
U.S. Probation Officer
714-338-4558

Approved:

Joseph Abrams
Supervisor
714-338-2909

T51\BERNADETT_FAUSTINO_6105321_JLS_PSR

# EXHIBIT F

LAW OFFICES
## KEESAL, YOUNG & LOGAN
A PROFESSIONAL CORPORATION
400 OCEANGATE, SUITE 1400
LONG BEACH, CA 90802
(562) 436-2000
FACSIMILE:
(562) 436-7416
www.kyl.com

SAMUEL A. KEESAL, JR.
STEPHEN YOUNG
MICHAEL M. GLESS
PETER R. BOUTIN
TERRY ROSS
JOHN D. GIFFIN
PHILIP A. McLEOD
NEAL SCOTT ROBB
BEN SUTER
ROBERT J. STEMLER
MICHELE R. UNDERWOOD

ELIZABETH P. BEAZLEY
JODI S. COHEN
JULIE L. TAYLOR‡
STACEY MYERS GARRETT
JON W. ZINKE·
ELIZABETH H. LINDH
DAVID D. PIPER‡
SANDOR X. MAYUGA
CHRISTOPHER A. STECHER‡
ESTHER E. CHO
MELANIE L. RONEN‡

BENTLEY P. STANSBURY III‡
STEFAN PEROVICH
RYAN S. LEAN
KRISTY H. SAMBOR
AILAN LIU
JOSHUA NORTON
VALERIE I. HOLDER‡·
IGOR V. STADNIK‡
SIMON M. LEVY
BRYCE CULLINANE

ASHLEY E. IMPELLITTERI
CHERYL S. CHANG
KATHERINE L. HANDY
CASSIDY A. WALLACE
JAMES L. KRITENBRINK
SAMANTHA D. PARRISH
NATALIE M. LAGUNAS
GEORGE A. CROTON
CONNOR M. TRAFTON
TERESA J. THONG

·   ADMITTED IN ALASKA
‡   ADMITTED IN WASHINGTON
‡   ADMITTED IN WASHINGTON & CALIFORNIA
§   ADMITTED IN ALASKA & CALIFORNIA
+   ADMITTED IN DISTRICT OF COLUMBIA & FLORIDA
*   REGISTERED FOREIGN LAWYER WITH THE LAW SOCIETY
    OF HONG KONG & ADMITTED IN NEW YORK

ALL OTHERS ADMITTED IN CALIFORNIA

OF COUNSEL
ROBERT H. LOGAN
SCOTT T. PRATT
RICHARD A. APPELBAUM+
REAR ADMIRAL U S C G (RET )

ELIZABETH A. KENDRICK
WILLIAM McC. MONTGOMERY
YALE H. METZGER·

July 16, 2020

*Via Email*

Chung Hae Han (*chung.han@usdoj.gov*)
AUSA – Office of U.S. Attorney
300 North Los Angeles Street, Suite 7516
Los Angeles, CA  90012

Damon A Thayer (*damon.thayer@usdoj.gov*)
AUSA – Office of the U.S. Attorney
300 North Los Angeles Street, Suite 7516
Los Angeles, CA  90012

Keith M Staub (*keith.staub@usdoj.gov*)
AUSA – Office of U.S. Attorney
300 North Los Angeles, Street Room 7516
Los Angeles, CA  90012

Paul Bartholomew Green (*Paul.Green@usdoj.gov*)
AUSA – Office of U.S. Attorney
300 North Los Angeles Street, Suite 7516
Los Angeles, CA  90012

Re:   *Torres, et al., v. Milusnic, et al.*
        Case No. 20-CV-04450
        Our File No.:  6213-2

## NOTICE OF DEFENDANT FAUSTINO BERNADETT'S STATUS AS A MEMBER OF THE PROVISIONAL CLASS ESTABLISHED BY THE HONORABLE CONSUELO MARSHALL'S JULY 14, 2020 ORDER

Dear Messrs. Han, Thayer, Staub, and Green:

We write on behalf of Dr. Faustino Bernadett ("Dr. Bernadett"), a 66-year old non-violent, white-collar, first-time offender with multiple underlying health conditions, who on January 17, 2020 was sentenced by Judge Josephine Staton of the Federal District Court for the Central District of California (Case No. 8:19-cr-00121-JLS) to 15 months' incarceration in Bureau of Prisons ("BOP") custody.[1]  Currently, Dr. Bernadett is designated to report to the camp at Lompoc on August 18, 2020.[2]

We reviewed the order of Judge Consuelo Marshall issued on July 14, 2020 in the case entitled *Torres, et al. v. Milusnic, et al.*, currently pending in the United States District Court for the Central District of California (Case No. 20-CV-04450).  Dr. Bernadett is a member of the provisional class certified by the July 14, 2020 Order because he is a "post-conviction," "future" inmate of the Lompoc facility who is over the age of 50.  He also suffers from serious underlying medical conditions that make him vulnerable to the COVID-19 virus.  Therefore, we

---

[1] *See U.S. v. Bernadett,* Case No. 8:19-cr-00121-JLS, Doc. 50.  All docket references made in this letter refer to the docket entries in matter number 8:19-cr-00121-JLS.

[2] As of the writing of this letter, Judge Staton is considering our pending *ex parte* motion to continue the surrender date for an additional 60 days.

SAN FRANCISCO OFFICE
450 PACIFIC AVENUE
SAN FRANCISCO, CA 94133
(415) 398-6000
FACSIMILE:
(415) 981-0136 · (415) 981-7729

ANCHORAGE OFFICE
SUITE 7A
101 E. 9TH AVENUE
ANCHORAGE, AK 99501-3651
(907) 279-9696
FACSIMILE: (562) 436-7416

SEATTLE OFFICE
SUITE 7A
1301 FIFTH AVENUE
SEATTLE, WA 98101
(206) 622-3790
FACSIMILE: (206) 343-9529

HONG KONG OFFICE
SUITE 1603
299 QUEEN'S ROAD CENTRAL
HONG KONG
(852) 2854-1718
FACSIMILE: (852) 2541-6189

Office of the U.S. Attorney
July 16, 2020
Page 2

      Re:  *Torres, et al., v. Milusnic, et al.*
           Case No. 20-CV-04450
           Our File No.:  6213-2

respectfully request that he be included on your list of class members that is required to be submitted to Judge Marshall by July 20, 2020.  *See* July 14, 2020 Order 48:22-27.

On May 18, 2020, we wrote to the warden at Lompoc, requesting: (1) that Dr. Bernadett be evaluated, pre-surrender, for his eligibility to serve his 15-month imprisonment in home detention, pursuant the Attorney General's April 3, 2020 memo (instructing that vulnerable inmates at impacted facilities be released to home confinement for the remainder of their prison terms), and (2) that Dr. Bernadett be considered for compassionate release under 18 U.S.C. § 3582.  A copy of that letter is attached hereto as Exhibit "A."  The warden did not respond.

Attached hereto as Exhibit "B" is a recent letter from Dr. Bernadett's treating physician, Dr. Robert Lugliani.  Dr. Lugliani concludes that: "COVID-19 is currently in pandemic with a resurgence of cases in Los Angeles County . . . Patient [Dr. Bernadett] is advised of his high risk status due to age, hypertension, heart disease risk, weight, pulmonary risk and potentially immunocompromised position due to his elevated prostate specific antigen, which may indicate early prostate cancer, especially due to his youngest brother just completing treatment for an aggressive form of same.  Patient advised to stay home as much as possible . . ."

As stated in the Presentence Investigation Report issued by the United States Probation Office, (attached hereto as Exhibit "C"), Dr. Bernadett is a first-time white-collar offender who poses no danger to the community and will certainly not reoffend.  Dr. Bernadett paid the fine and forfeiture order imposed by Judge Staton, and he is not a flight risk (he has complied with all requirements imposed by the Pretrial Services Office and is being allowed to self-surrender).

Dr. Bernadett has a viable release plan (attached as Exhibit "D"), which includes numerous important efforts to combat the COVID-19 virus and its economic impacts in Southern California.

Please consider this letter as Dr. Bernadett's formal request to be included in the provisional class of future Lompoc inmates who should be evaluated for home confinement or compassionate release under Judge Marshall's July 14, 2020 Order.  If we can provide any additional information, please let us know.  Please confirm that Dr. Bernadett's information will be included in your submission to Judge Marshall.

           Best regards,

           Samuel A. Keesal Jr.
           *skip.keesal@kyl.com*

SAK/GBH:pjl (KYL4837-0451-9363 2)
Attachments.

# EXHIBIT A

LAW OFFICES

# KEESAL, YOUNG & LOGAN

A PROFESSIONAL CORPORATION
400 OCEANGATE, SUITE 1400
LONG BEACH, CA 90802
(562) 436-2000
FACSIMILE:
(562) 436-7416
www.kyl.com

SAMUEL A. KEESAL, JR.
STEPHEN YOUNG
MICHAEL M. GLESS
PETER R. BOUTIN
TERRY ROSS
JOHN D. GIFFIN
PHILIP A. McLEOD
NEAL SCOTT ROBB
BEN SUTER
ROBERT J. STEMLER
MICHELE R. UNDERWOOD

ELIZABETH P. BEAZLEY
JODI S. COHEN
JULIE L. TAYLOR‡
STACEY MYERS GARRETT
JON W. ZINKE'
ELIZABETH H. LINDH
DAVID D. PIPER‡
SANDOR X. MAYUGA
CHRISTOPHER A. STECHER‡
ESTHER E. CHO
MELANIE L. RONEN‡

BENTLEY P. STANSBURY III‡
STEFAN PEROVICH
RYAN S. LEAN
KRISTY H. SAMBOR
AILAN LIU
JOSHUA NORTON
VALERIE I. HOLDER‡'
IGOR V. STADNIK†
SIMON M. LEVY
BRYCE CULLINANE

ASHLEY E. IMPELLITTERI
CHERYL S. CHANG
KATHERINE L. HANDY
CASSIDY A. WALLACE
JAMES L. KRITENBRINK
SAMANTHA D. PARRISH
NATALIE M. LAGUNAS
GEORGE A. CROTON
CONNOR M. TRAFTON
TERESA J. THONG

OF COUNSEL

ROBERT H. LOGAN
SCOTT T. PRATT
RICHARD A. APPELBAUM+
REAR ADMIRAL U S C G (RET )

ELIZABETH A. KENDRICK
WILLIAM McC. MONTGOMERY
YALE H. METZGER'

•   ADMITTED IN ALASKA
‡   ADMITTED IN WASHINGTON
+   ADMITTED IN WASHINGTON & CALIFORNIA
§   ADMITTED IN ALASKA & CALIFORNIA
•   ADMITTED IN DISTRICT OF COLUMBIA & FLORIDA
'   REGISTERED FOREIGN LAWYER WITH THE LAW SOCIETY
    OF HONG KONG & ADMITTED IN NEW YORK

ALL OTHERS ADMITTED IN CALIFORNIA

May 18, 2020

*Via UPS Overnight*

L.J. Milusnic
Acting Complex Warden
USP Lompoc
3901 KLEIN BLVD
Lompoc, CA  93436

> Re:   Faustino Bernadett: Request for Home Confinement Evaluation Before
>       August 18, 2020 Self-Surrender to FCC Lompoc (Register No. 78386-112)
>       Our File No.:  6213-2

Dear Warden Milusnic:

We write on behalf of our client, Dr. Faustino Bernadett ("Tino") who is scheduled to self-report to FCC Lompoc on August 18, 2020 to begin serving a 15-month sentence.  Tino, age 65, is a retired doctor and non-violent offender who has no criminal history beyond his guilty plea to a single count of misprision of a felony.  As you know, the current outbreak of COVID-19 in this country has seriously impacted prison populations, especially the BOP's facilities at Lompoc.  Thank you for your extraordinary efforts combatting the virus at Lompoc.  Despite those efforts, Lompoc has a high infection rate and the virus is running rampant.  People like Tino over the age of 65 are especially vulnerable to contracting the virus and suffering fatal or life-altering consequences.  Understandably, Tino is shaken by the notion of reporting into BOP custody while the virus is raging.  We have already entered into two 60-day extensions of Tino's self-surrender date with the United States Attorney's Office.  However, an end to the threat posed by the virus to vulnerable seniors is nowhere in sight.

We write to you today to respectfully request that you evaluate Tino for home confinement under the Attorney General's April 3, 2020 memo and the BOP's Acting Senior Deputy Assistant Director David Brewer's April 20, 2020 memo instructing that vulnerable inmates at impacted facilities be released to home confinement for the remainder of their prison terms.  Both of those memos are attached hereto as Exhibits "A" and "B."  We respectfully request that you make this evaluation and designate Tino to home confinement before his surrender date on August 18, 2020.  Tino has no prior criminal history, did not engage in a sex or terrorism crime, poses no risk to the community, and has a viable release plan.  Tino has several health conditions and risk factors that make him even more susceptible.  Attached hereto as Exhibit "C" is the Presentence Investigation Report issued in Tino's case, which confirms that he has met all the prerequisites for release to home confinement under the instructions established

SAN FRANCISCO OFFICE
450 PACIFIC AVENUE
SAN FRANCISCO, CA 94133
(415) 398-6000
FACSIMILE:
(415) 981-0136 • (415) 981-7729

ANCHORAGE OFFICE
SUITE 7A
101 E. 9TH AVENUE
ANCHORAGE, AK 99501-3651
(907) 279-9696
FACSIMILE: (562) 436-7416

SEATTLE OFFICE
SUITE 3100
1301 FIFTH AVENUE
SEATTLE, WA 98101
(206) 622-3790
FACSIMILE: (206) 343-9529

HONG KONG OFFICE
SUITE 1603
299 QUEEN'S ROAD CENTRAL
HONG KONG
(852) 2854-1718
FACSIMILE: (852) 2541-6189

L.J. Milusnic
Acting Complex Warden
May 18, 2020
Page 2

        Re:   Faustino Bernadett: Request for Home Confinement Evaluation Before
                  August 18, 2020 Self-Surrender to FCC Lompoc (Register No. 78386-112)
                  Our File No.:  6213-2

by David Brewer's April 20, 2020 memo.  Dr. Bernadett has paid the fine, restitution, and special assessment that were ordered by the Court.  Dr. Bernadett has a health insurance plan and is willing to pay for any costs associated with monitoring during home confinement.  Rather than having Dr. Bernadett report to your facility on August 18, 2020, almost certainly exposing him to the virus or him exposing the staff and inmate population to the virus, we urge that the only procedurally correct and humane solution is to confirm the information above and direct Dr. Bernadett to serve his sentence at home.  An alternative would be to conduct any investigation necessary by correspondence, telephone communications, Skype and/or Zoom, or any other mechanism (including simply reviewing the Presentence Investigation Report prepared by the Probation Department) to avoid Dr. Bernadett's attendance in-person at Lompoc.  We are not asking for a shorter sentence or for him to simply be released.

        We understand that the BOP is prioritizing inmates for home confinement consideration based on the amount of time they have already served.  However, this policy does not consider the fact that soon-to-arrive inmates such as Tino are in a very different category.  These people should not be made to report, sit in solitary confinement for 15 days, likely contract the virus, sit in solitary confinement for another 15 days, and then be released to home confinement.  This order of operations does not achieve the goals laid out by the Attorney General in his April 3, 2020 memo.  Those inmates who qualify for release under the Attorney General's directive should be able to achieve this end-result before reporting to their BOP facility.  More fundamentally, vulnerable elderly inmates with health conditions like Tino should not be required to report to their designated BOP facility before even being evaluated for home confinement under the Attorney General's and David Brewer's instructions.  At the very least, these incoming inmates should be evaluated for home confinement before reporting to their BOP-designated facility.

        Dr. Bernadett is also in the unique position of actively aiding, supporting, and advising medical professionals, NGO's, community organizations, and governmental entities who are working on the front lines of the covid-19 containment effort.  For example, to encourage a Southern California garment maker to begin producing masks, he placed their first 10,000-mask order.  Those masks are now on their way to, amongst other places, clinics, nursing homes, and grocery stores.  He is largely responsible for helping a local Boyle Heights school stay open for the summer, he is critical in advising a ventilator company produce much-needed health care equipment, he is sponsoring the creation of TikTok videos to help encourage young people to wear masks, he is working with a federally qualified health plan to devise ways for expectant mothers to see their doctors without visiting a hospital, he is assisting the City of Long Beach with capacity planning, he is spearheading an effort to house the homeless in Long Beach in modified "shipping container" homes, and he is helping to provide internet and learning materials to children who lack access to both.  He is doing all of this work, including signing up

L.J. Milusnic
Acting Complex Warden
May 18, 2020
Page 3

Re:  Faustino Bernadett: Request for Home Confinement Evaluation Before
August 18, 2020 Self-Surrender to FCC Lompoc (Register No. 78386-112)
Our File No.:  6213-2

for the California Health Corps, on a voluntary basis.  If he is committed to home confinement, he can continue this important work.

We respectfully request that Tino be immediately evaluated for home detention under the Attorney General and David Brewer's memos.  Please also consider this as Tino's request for compassionate release under 18 U.S.C. § 3582.  Tino is happy to submit himself to a Zoom, Skype, or telephone interview if that would be helpful.

Thank you for your time and consideration of our request.  Please let us know if you would like additional information regarding Tino.

Warm regards,

Samuel A. Keesal, Jr.
*skip.keesal@kyl.com*

SAK:bc (KYL4823-2149-8043 1)
Enclosures.

# EXHIBIT A



**U.S. Department of Justice**
**Memorandum**
Federal Bureau of Prisons

*Correctional Programs Branch*

*Central Office*
*320 First Street, N.W.*
*Washington, DC 20534*


MEMORANDUM FOR CORRECTIONAL PROGRAM ADMINISTRATORS

FROM:          David Brewer, Acting Senior Deputy Assistant
               Director

SUBJECT:       Furlough and Home Confinement Additional Guidance


The following guidance is provided from information contained in
the CARES Act, memoranda from Attorney General Barr, and the
Bureau of Prisons.  This memorandum rescinds guidance previously
provided.

**Furlough**
The current pandemic is considered an urgent situation that may
warrant an emergency furlough under 570.32(b)(1) and 570.33(b).
These regulations authorize a non-transfer emergency furlough if
the inmate is otherwise deemed appropriate, even if he/she has
been submitted for Home Confinement (HC).  Effective April 16,
2020, all inmates referred for an emergency furlough due to the
Covid-19 pandemic should be submitted and keyed as FURL CRI.

Inmates who have been referred for a release planning furlough
based on guidance issued prior to April 16, 2020, do not require
a new application.  These inmates should be keyed out of the
facility as FURL REL. Furlough applications completed on or
after April 16, 2020, should follow the updated guidance.
Inmates within 12 months of his/her Projected Release Date
(PRD), or those who have received Home Confinement placement and
have a PRD exceeding one year, should be reviewed for furlough.

**Home Confinement**
In an effort to alleviate concerns and questions, the following
criteria should be met when reviewing and referring inmates for
HC:

  • Primary or prior offense is not violent

- Primary or prior offense is not a sex offense
- Primary or prior offense is not terrorism
- No detainer
- Mental Health Care Level is less than CARE-MH 4
- PATTERN risk score is Minimum (R-MIN)
- No incident reports in the past 12 months (regardless of severity level)
- U.S. Citizen
- Viable Release Plan

If the inmate meets the criteria above, the following factors should be noted, but are not a reason for denial:

- Age
- Projected Release Date
- Percentage of time served
- Medical Care Level
- Victim Witness Program
- Arrival dated (ARSD)

Any concerns regarding an inmate's suitability for HC placement should be noted in Section 11 of the BP-210, *Institutional Referral for CCC Placement.* It is strongly encouraged to refer inmates currently housed in a facility with active Covid-19 cases.

For inmates requesting relocation, a release plan must be submitted to the USPO prior to HC referral submission. The USPO approval letter must be forwarded to the RRM, once received. Institution staff should contact the Health Service Specialist in the RRM's office with questions regarding HC placement for inmates with medical concerns.

If you have any questions, please contact David Brewer, Acting Senior Deputy Assistant Director, Correctional Programs Division, at (202)353-3638.

# EXHIBIT B



Office of the Attorney General
Washington. D. C. 20530

April 3, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU OF PRISONS

FROM:      THE ATTORNEY GENERAL

SUBJECT:   Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

The mission of BOP is to administer the lawful punishments that our justice system imposes. Executing that mission imposes on us a profound obligation to protect the health and safety of all inmates.

Last week, I directed the Bureau of Prisons to prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses to our vulnerable inmates, while ensuring we successfully discharge our duty to protect the public. I applaud the substantial steps you have already taken on that front with respect to the vulnerable inmates who qualified for home confinement under the pre-CARES Act standards.

As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below.

I.   **IMMEDIATELY MAXIMIZE APPROPRIATE TRANSFERS TO HOME CONFINEMENT OF ALL APPROPRIATE INMATES HELD AT FCI OAKDALE, FCI DANBURY, FCI ELKTON, AND AT OTHER SIMILARLY SITUATED BOP FACILITIES WHERE COVID-19 IS MATERIALLY AFFECTING OPERATIONS**

Case 2:20-cv-04450-CBM-PVC    Document 143    Filed 12/16/20    Page 110 of 168    Page ID #:5828

Memorandum from the Attorney General                                                    Page 2
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

While BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions. I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations. You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems. And now that I have exercised my authority under the CARES Act, your review should include all at-risk inmates—not only those who were previously eligible for transfer.

For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred. It is vital that we not inadvertently contribute to the spread of COVID-19 by transferring inmates from our facilities. Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations.

I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community. I therefore authorize BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety.

Given the speed with which this disease has spread through the general public, it is clear that time is of the essence. Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress.

## II.   **PROTECTING THE PUBLIC**

While we have a solemn obligation to protect the people in BOP custody, we also have an obligation to protect the public. That means we cannot simply release prison populations en masse onto the streets. Doing so would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses.

That risk is particularly acute as we combat the current pandemic. Police forces are facing the same daunting challenges in protecting the public that we face in protecting our inmates. It is impossible to engage in social distancing, hand washing, and other recommend steps in the middle of arresting a violent criminal. It is thus no surprise that many of our police officers have fallen ill with COVID-19, with some even dying in the line of duty from the disease. This pandemic has dramatically increased the already substantial risks facing the men and women who keep us safe, at the same time that it has winnowed their ranks while officers recover from getting sick, or self-quarantine to avoid possibly spreading the disease.

Memorandum from the Attorney General                                                Page 3
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates. Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context.

I believe strongly that we should do everything we can to protect the inmates in our care, but that we must do so in a careful and individualized way that remains faithful to our duty to protect the public and the law enforcement officers who protect us all.

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| | ) | **Docket No.:** 0973 8:19CR00121-1 |
| **Faustino Bernadett** | ) | |
| | ) | |

**Prepared for:**   The Honorable Josephine L. Staton
United States District Judge

**Prepared by:**   Natalie Nelson
USPO
Santa Ana, CA
714-338-4558
natalie_nelson@cacp.uscourts.gov























Respectfully Submitted,

MICHELLE A. CAREY
Chief Probation & Pretrial Services Officer

Natalie Nelson
U.S. Probation Officer
714-338-4558

Approved:

Joseph Abrams
Supervisor
714-338-2909

T51\BERNADETT_FAUSTINO_6105321_JLS_PSR

# EXHIBIT B



**AMERICAN PACIFIC**
MEDICAL GROUP
Committed to your Health

**Robert Lugliani, M.D.**
Respiratory Disease, Internal Medicine
President, ProHealth Partners, Argus Medical Management

Name: Faustino Bernadett
DOB: 05/29/1954
Age: 66
Date of Report: July 09, 2020
Date of Service: July 01, 2020. Follow-up: July 09, 2020

History of present illness:

This is a 66 year old male who is well known to this examiner, returns primarily for annual exam. Patient complains of wife's noticing that he coughs intermittently throughout the day and especially at night and early morning. He checks temperature daily because of COVID-19 and has not noted any increase. Cough is dry, more prominent with cold dry air exposure and productive in morning of clear sputum. Denies dyspnea, hemoptysis, night sweats, fever, chills or weight loss. History of asthma as child. History of anterior bulging disk C5/C6. History of dysphasia. Patient reports taste and smell are intact. No extreme fatigue noted recently. No known COVID-19 exposure. Wears mask when outside the home and maintains social distance.

Continues to have pain in cervical spine, with weakness, tingling and numbness in bilateral upper extremities including hands and fingers. Also continues to have pain in low back, hip/buttock, and numbness in right big toe. Occasional radiation of pain bilaterally in lower extremities.

Patient complains of right forefoot pain for several months status post trauma and persistent left ankle pain.

Allergies:
No Known Allergies.

DEPRESSION SCREENING:
Not at all the patient reports little interest or pleasure in doing things.
Not at all the patient reports feeling down, depressed or hopeless.

Falls Prevention:
Discussed Fall Prevention
No falls or 1 fall without injury in last year.
Patient assessed for falls.

REVIEW OF SYSTEMS
HEENT: Denies pharyngitis, rhinitis or sinusitis. Dry eyes with history of eye surgeries for vision. Chronic keratoconjunctivitis, uses eyedrops several times per day.
RESPIRATORY: AS PER HISTORY OF PRESENT ILLNESS

1045 Atlantic Avenue, Suite 902 · Long Beach, California 90813
Tel (562) 437-0996 · Fax (562) 495-4631

CARDIOVASCULAR: Denies any history of chest pains, palpitations, paroxysmal nocturnal dyspnea, dyspnea on exertion or orthopnea. Denies ankle edema. Denies increasing and progressive chest pressure or palpitations. Family history: Mother with congestive heart failure, s/p myocardial infarction, and stroke.

GASTROINTESTINAL: History of hemorrhoids managed with Preparation-H pads and cream as necessary. Denies anorexia, nausea, vomiting, hematemesis, melena or diarrhea.

GENITOURINARY: Patient reports frequency, urgency of urination, and nocturia. No dysuria. Brother with prostate cancer.

NEUROLOGIC: Denies dizziness, lightheadedness, syncope or seizures. Denies tremors. Occasional left eye pain/cephalgia managed with over-the-counter analgesics. Weakness as reported on previous orthopedic exam.

MUSCULOSKELETAL: AS PER HISTORY OF PRESENT ILLNESS AND PREVIOUS ORTHOPEDIC EXAM.

DERMATOLOGIC: Denies rashes, pruritic areas, easy bruisability or bleeding.

PSYCHIATRIC: Denies severe anxiety or depression. Insomnia due to chronic pain. Managed with medication along with sleep routine and lumbar and knee pillows.

VITAL SIGNS:
Recorded By Lugliani MD, Robert on 07/01/2020
Weight 190
Pulse Rate 75; Blood Pressure 171/108 Pain level: 5/10
Pulse Oximetry: 97%

Vital signs on 07/09/2020 at follow-up visit to review labs and x-rays:
Subjective: Started Ramipril. No worsening of cough or fever, no other COVID-19 symptoms.
Temperature: 96.6; Pulse: 73; Blood Pressure: 154/89 Pain level: 5/10
Pulse Oximetry: 97%

Physical Examination

HEENT: The head is normocephalic. The pupils are equal, round, and react to light and accommodation. Slight conjunctival injection noted both eyes. Residue of eyedrops noted at outer canthus, both eyes. Tympanic membranes are clear. Throat is free of any exudates or erythema.

NECK: No cervical adenopathy appreciated, supple, no jugular venous distension below at 35 degrees. Thyroid is not palpable or enlarged. The carotid arteries upstrokes are normal, equal bilaterally.

CHEST: Normal AP diameter

LUNGS: Lungs are clear.

HEART: Regular sinus rhythm. No significant heaves, rubs, or gallops are appreciated.

ABDOMEN: Soft. Good bowel sounds. Liver, kidneys, spleen are nonpalpable. No abdominal masses, abdominal bruits, or pulsatile masses noted.

RECTAL/GENITALIA: Not performed by this examiner.

EXTREMITIES: No clubbing cyanosis, or edema. Good peripheral pulses are appreciated throughout. Tenderness to palpation, left plantar forefoot in the area of the first and second

metatarsal phalangeal joint. Spine: Some limitation of twisting, stooping, lifting, flexing and extending. Detailed exam deferred to ortho.

LYMPHATIC: No significant lymphadenopathy appreciated and auxiliary, inguinal, supraclavicular posterior and anterior cervical areas.

NEUROLOGIC: Cranial nerves are grossly intact. Asymmetric grip strength noted with right grip less than left, though right dominant. Numbness of right great toe noted.  Detailed exam deferred to ortho.

BACK: Detailed exam deferred to ortho.

SKIN: No rashes or bruising noted at this time. Lumbar healed surgical scar noted.


Additional reports reviewed:

Orthopedic report by Dr. Harry Marinow,  July 29, 2019.


Summary and discussion:


Chronic cervical neck pain:
1. Multiple levels of severe foraminal stenosis with 8 degrees of kyphosis at C4-C5
2. Anterior disc bulging of 7mm C4-C5 associated with occasional dysphasia


Chronic upper back pain with radicular symptoms (numbness, tingling and weakness) in arms, legs and toe numbness
1. Compression fracture of thoracic vertebrae T-12


Chronic low back pain and limitation of flexion, extension, stooping, twisting and lifting due to:
1. Lumbar spondylosis
2. Fusion of lumbar spine levels L4-L5, L5-S1
3. Bilateral L3-L4, L4-L5 severe facet arthropathy
4. Listhesis with hypertrophic changes and neuroforaminal narrowing at L5-S1


Chronic intermittent hip pain:
1. Right hip degenerative osteoarthritis
2. Post-traumatic retrosacral fluid collection between gluteus maximus and subcutaneous fat requiring pad when seated


Chronic pain in left knee, ankle and foot:
1. History of left knee torn medial collateral ligament, requiring knee support
2. Laxity of left anterior cruciate ligament, requiring knee support


Assessment/Problem List

1. Hypertension
2. Hypercholesterolemia
3. Hypertriglyceridemia
4. Chronic intermittent cough with history of asthma and bulging cervical disc.
5. Significant family history of heart failure and stroke

6. Overweight BMI 27
7. Elevated Prostate Specific Antigen (PSA) with prostatic hypertrophy with significant family history of prostate cancer
8. Chronic pain, numbness, tingling, and decreased strength due to traumatic musculoskeletal injuries, including but not limited to bulging discs in the spine at numerous levels, back surgery and compression fracture of spine, as well as severe narrowing of spinal cord opening at several places in the spinal column.
9. Left forefoot traumatic arthritis
10. Left ankle pain due to knee and foot injuries leading to irregular gait, requiring ankle support
11. Chronic pain in hip, knee, ankle and foot due to sequelae of traumatic injuries
12. Tension headache
13. Chronic keratoconjunctivitis of both eyes due to history of eye surgeries requiring frequent eye drops throughout the day
14. Hemorrhoids
15. Insomnia due to chronic pain

Discussion and Plan

Hypertension, hypercholesterolemia, hypertriglyceridemia, overweight BMI and a family history of heart attack, stroke and congestive heart failure indicate early heart disease and high risk for heart attack and stroke. While there is no current indication of acute disease, patient should alter lifestyle and take prescribed medications to lower blood pressure and cholesterol to slow the progression. Diet modification (low fat, low salt, low calorie) to lose weight and daily exercise 60 minutes per day along with Ramipril 2.5mg once daily and Atorvastatin 10mg daily.

The patient's cough indicates reactive airways with which may be due to chronic microaspiration due to the bulging cervical spine disc or longstanding subclinical asthma that has worsened with the added insult of microaspiration. Will follow closely and conduct a full workup if worsens.

Prostatic hypertrophy with elevated PSA and significant family history of prostate cancer (brother). Symptoms managed medically. Continue tadalafil 5mg once daily. At elevated risk of prostate cancer due to continued elevated PSA, hypertrophic prostate and brother treated for aggressive prostate cancer recently. Repeat PSA in 4-6 months and consider referral to Urologist at that time.

The patient experiences chronic pain from his neck to his lower back due to traumatic musculoskeletal injuries, fractures and spine surgery, as well as foraminal narrowing and bulging discs. He has limitations in twisting, stooping, flexing and extending and should not lift heavy items. Left forefoot traumatic arthritis – orthotic support should be continued. Left ankle pain should be managed with support worn during the daytime and at night as necessary. Knee support should be worn during the day and at night as needed to aid in pain relief. The patient has been managed well on current medical regimen and orthotic supports. Continue ibuprofen 600-800mg every 6-8 hours as needed for pain, along with acetaminophen 1000mg every 12

hours as needed for pain and orthotic supports. Repeat MRI should be ordered after COVID-19 is better controlled.

Tension headaches should continue to be managed with over-the-counter analgesics.

Chronic keratoconjunctivitis followed by optometrist annually and eyedrops used several times per day as needed to maintain moisture. Patient advised that with increased mask wearing eyes will be prone to dry out more, so increased use of eye drops will be necessary and chalazion prevention by cleaning eyes nightly with warm washcloth and baby shampoo is recommended.

Hemorrhoids should continue to be managed with Preparation-H pads and creams. After COVID-19 subsides, will refer for evaluation by gastroenterologist to evaluate and schedule screening colonoscopy.

Patient's insomnia is due to chronic pain. Insomnia, in turn, worsens chronic pain, so sleep is very important. Patient should continue to use eszopiclone 2mg nightly as needed and zolpidem tartrate 3.5mg SL nightly as needed along with lumbar and knee pillows and sleep regimen, trying to get to sleep and awaken at same times each night and day.

COVID-19 is currently in pandemic with a resurgence of cases in Los Angeles County and many other places around the state. Patient is advised of his high risk status due to age, hypertension, heart disease risk, weight, pulmonary risk and potentially immunocompromised position due to his elevated prostate specific antigen, which may indicate early prostate cancer, especially due to his youngest brother just completing treatment for an aggressive form of same. Patient advised to stay home as much as possible, but when out of the house, avoid gatherings of more than 10 people, maintain six feet from others and wear an N-95 mask when in public or within 6 feet of others. Maintain diligent hand hygiene with soap and water and hand sanitizer and avoid touching face and eyes.

7/9/2020.

Robert Lugliani, M.D.

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | |
| | ) | **Docket No.:   0973 8:19CR00121-1** |
| **Faustino Bernadett** | ) | |
| | ) | |

**Prepared for:**   The Honorable Josephine L. Staton
United States District Judge

**Prepared by:**   Natalie Nelson
USPO
Santa Ana, CA
714-338-4558
natalie_nelson@cacp.uscourts.gov





Case 8:19-cr-50121-MLS Document 40 Filed 01/10/20 Page 138 of 174 Page ID #:854



















17





Respectfully Submitted,

MICHELLE A. CAREY
Chief Probation & Pretrial Services Officer

Natalie Nelson
U.S. Probation Officer
714-338-4558

Approved:

Joseph Abrams
Supervisor
714-338-2909

T51\BERNADETT_FAUSTINO_6105321_JLS_PSR

# EXHIBIT D

## Faustino Bernadett's Plan for Home Confinement

Faustino Bernadett ("Dr. Bernadett") has been on supervised release since July 15, 2020. He has been living at his home in Palos Verdes, CA and will continue to reside there with his wife. Due to Dr. Bernadett's age and underlying health conditions, he and his wife are quarantining in place at their home. He will continue to do so while under home confinement.

Dr. Bernadett has private healthcare coverage. As such, he is able to obtain medical treatment if necessary.

While under home confinement, Dr. Bernadett will continue his important work in the community. Here is a comprehensive list of his incredible works:

- **California Health Corps:** The first action Dr. Bernadett took was to register with the California Health Corps. This corps was established when California called for retired physicians to come out of retirement and assist during the COVID-19 pandemic. He is a retired anesthesiologist and pain management doctor with expertise in chronic pain management in people of all ages, including the elderly, and preventing opioid addiction. He also signed-up as a volunteer with the Medical Reserve Corps of Los Angeles.

- **Mask Donations:** Dr. Bernadett and his wife contacted a local garment manufacturer and asked whether they had the ability to begin making masks. They committed to purchasing their first set of masks, if they needed a commitment to proceed. The manufacturer took up the challenge, and has since converted to producing masks as part of the Los Angeles LA Protect initiative. While the Bernadett order was amongst the first, the very first masks went to healthcare providers through LA Protect. The manufacturer now produces 10,000 or more masks a week, and now produces masks for children as well as adults. Ten thousand masks purchased, and then donated by Dr. Bernadett and his wife, are now used at, amongst other places, a US Post Office branch, the Hawthorne Police Department, clinics, nursing homes, and grocery stores.

- **Encouraging Mask Wearing Amongst Youth:** Dr. Bernadett anticipated early that youth would be reticent to wear masks. He also anticipated the need to wear masks in public for months to come. As such, he reached out to teens and young adults about how to best influence young people to wear masks in public. He then contacted social media influencers who will post pictures and clever videos of themselves wearing masks online to create enthusiasm among youth to wear masks. This includes a TikTok video challenge to show young people wearing masks.

- **Ventilator Production:** As a volunteer, Dr. Bernadett is advising a company that manufactures ventilators. It currently produces pediatric ventilators and is planning to shift production to adult ventilators, applying a design that relies upon already approved FDA parts. He has no financial interest in the company and is receiving no compensation.

- **Protecting Expectant Mothers from COVID-19:** Dr. Bernadett has been advising on the design of access to care for pregnant women, without exposure to COVID-19.

He has done this after being approached by a large federally qualified health center (aka "free clinic") requesting help with the challenge of caring for pregnant women without the usual number of office visits during the pregnancy, to avoid potential exposure to COVID-19. He is advising the health center on how to conduct pre-natal programs using home monitoring and reporting to minimize office visits and potential exposure to COVID-19. They have requested ongoing help as other program design challenges arise during the crisis.

- **Capacity Planning with the City of Long Beach:** Dr. Bernadett is advising the City of Long Beach and the hospital and healthcare system in Long Beach on capacity planning, including use of hotel and motel rooms and event space for purposes of quarantine, temporary housing for first responders, health workers, recuperating patients and the homeless. Calls, meetings, and written reports are ongoing, and will need to continue beyond the peak of the virus, and for months to come. In this effort, Dr. Bernadett served as an advisor in the re-opening of Long Beach Community Hospital for the purpose of expanding hospital bed capacity in Long Beach. He is also continuing to participate on the board of St. Mary Hospital Foundation and he met with the foundation to discuss their current plan for COVID-19 response. He recently termed out of the St. Mary Hospital Foundation board and was recognized for his decades of service.

- **Protecting the Homeless:** The problems and challenges faced by the City of Long Beach to address disease transmission among the homeless in Long Beach has also been on Dr. Bernadett's mind. He and his wife helped the city to identify hotel rooms in the city that could be used for housing and they assisted in developing guidance for a discussion around how to address longer-term needs in this area. In the course of this research, the governor announced Project Roomkey, a joint program of the state, county, and Federal Emergency Management Agency, seeking to place homeless in hotels during the crisis to isolate them and allow for quarantine. He and his wife also identified a source of longer-term housing options that would provide low cost housing for the homeless: modified shipping containers that include a bathroom, kitchen, and living room/bedroom in each unit. They went to the lengths of identifying contractors and skilled labor for improvements, and are in the process of assessing the supply chain to construct 100 such tiny homes within 14 days. The homes could be built concurrently, if supplies are available. Further, they have procured donated space, including several large parking lots, which could be used to create a community. These tiny homes are made in and around the Port of Los Angeles and Port of Long Beach and would create work for those in construction. It requires five people 14 days to build one of these homes. An estimated 400 people would be employed to build these homes. Dr. Bernadett and his wife have gone to the lengths of identifying a second builder, and are awaiting specifics on the potential small self-contained dwelling (e.g. has bathroom and shower in the unit). Subsequently, the city was informed that it could purchase hotels for purposes of longer-term housing for the homeless, and chose to take that approach first. Still, Dr. Bernadett continues to maintain the relationships to construct the container tiny home housing, as he anticipates that the hotel purchases might fall through or not be sufficient to house the numbers of homeless locally.

KYL4821-8087-3923.1

- **Providing Internet Access and Learning Materials to Children:** In an effort to counteract the long-term detrimental economic impacts of the virus on struggling families, Dr. Bernadett is focused on reaching children without access to the internet or to educational resources during this difficult time away from school.  He wants to make sure they do not fall behind.  As such, since the arrival of COVID-19 in this country, Dr. Bernadett and his wife made the lead donation ($1,000,000) to the National 4-H Council's Fourward campaign to use toward COVID-19 impacted youth in areas where no broadband exists (primarily in rural areas).  In this program, the 4-H is working to connect as many kids as possible to the internet and provide resources like 4-H at Home.  Where internet connection is not possible, books and educational resources are being sent.  In addition to the $1,000,000 donation, Dr. Bernadett and his wife are donating 100,000 books, as a start.  This project also included a Harris Poll survey that identified mental health challenges encountered by youth in the wake of COVID-19 isolation.  The survey results are currently being distributed nationally through the Land Grant Universities, Historically Black Colleges and Universities, Tribal Colleges and Hispanic Serving Universities via Cooperative Extension.  Dr. Bernadett and his wife recently provided a grant to expand a counselling center in East San Jose to provide mental health services to youth and their families (at a school site) who cannot afford counselling.

- **Supporting Santa Teresita Catholic School in Boyle Heights:** In an effort to ensure that the virus does not close important educational facilities in impacted communities, Dr. Bernadett and his wife reached out to Santa Teresita Catholic School in Boyle Heights shortly after schools started sending their students home.  They know this Catholic K-8 school because several years ago they refilled all of the books in their library, because they had none.  They knew that the school served a population that was at risk for significant backslide if the school closed.  Of the 197 students that normally attend the school, only eight had an employed parent as of the beginning of April.  Most students had no access to broadband, or a computer or a tablet even if they did.  Now, almost all of them have computers and all but five have access to the internet.  These children are in grave danger of missing educational and developmental milestones as well as at high risk for domestic violence in their homes.  Dr. Bernadett approached the principal of the school to find out if there would be summer school for these kids.  She said that they did not have the funds for that.  She agreed that individual learning plans for each child would help them very much, especially in this stressful time, as many of the children were behind academically even before the COVID-19 crisis.  Dr. Bernadett and his wife offered to pay for the costs of operating the summer school.  The next day the assistant superintendent told the principal that they would be allowed to offer summer school.  In addition to keeping the school open, Dr. Bernadett and his wife are covering the purchase of new textbooks that will also be available electronically, as well as laptops for teachers so they can teach remotely, as necessary.

Dr. Bernadett has not been performing any function that requires a medical license.

KYL4821-8087-3923.1

# EXHIBIT G

# United States Senate

WASHINGTON, DC 20510

October 2, 2020

The Honorable William P. Barr
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Michael Carvajal
Director
Federal Bureau of Prisons
U.S. Department of Justice
320 First Street NW
Washington, D.C. 20534

Dear Attorney General Barr and Director Carvajal:

You must do more to protect Bureau of Prisons (BOP) staff and vulnerable inmates from infection due to the coronavirus (COVID-19). Too many have died, and too many are suffering needlessly.

On March 23, 2020 – when there were just three inmates and three staff members who had tested positive – a bipartisan group of 14 senators wrote to you, expressing serious concern for the health and wellbeing of federal prison staff and inmates and urging you to take necessary steps to protect them, particularly by using existing authorities under the First Step Act of 2018 to release or transfer to home confinement the most vulnerable inmates.[1] On June 2, 2020, Director Carvajal testified before the Senate Judiciary Committee to explain the BOP's response to the pandemic. By that time, 68 inmates had died, more than 5,200 inmates and 600 staff had tested positive, and the rate of infection within BOP was more than six times higher than in the general population, yet you had transferred just two percent of inmates to home confinement. At the hearing, many Senators expressed concern that the Department of Justice (DOJ) and BOP were not doing enough to contain the virus and protect those most vulnerable to infection. Nonetheless, Director Carvajal assured the Committee that BOP had a "robust pandemic plan in place" and the "plan evolves as information about the nation's COVID response measures are updated."[2] Director Carvajal said that BOP had "positive cases in less than half of [its] prisons,

---

[1] https://www.durbin.senate.gov/imo/media/doc/Letter.%20to%20DOJ%20and%20BOP%20on%20COVID-19%20and%20FSA%20provisions%20-%20final%20bipartisan%20text%20with%20signature%20blocks.pdf.
[2] https://www.judiciary.senate.gov/meetings/examining-best-practices-for-incarceration-and-detention-during-covid-19.

with less than 20 facilities having a significant presence of COVID" and "in fact, two-thirds of [BOP's] positive cases are located in just seven of 122 BOP institutions."[3]

Since the date of Director Carvajal's testimony, the virus has spread to almost every BOP institution and dozens of federal halfway houses. At least 133 inmates and two staff members have died due to the coronavirus, and these deaths have occurred in more than 40 facilities.[4] Almost 17,000 inmates and staff have tested positive since the pandemic began and currently there are active cases at more than 150 BOP institutions and halfway houses. More than 50 facilities currently have more than five active inmate or staff cases, which is undoubtedly a "significant presence," given the ease with which this disease spreads. Based on BOP statistics, the rate of infection within BOP remains nearly four and a half times higher than in the general population.[5]

This is mounting evidence that efforts to contain the virus within BOP facilities are failing. As Director Carvajal recognized when he testified in June, the best way to reduce the spread of the virus is through social distancing, but "prisons by design are not made for social distancing."[6] In fact, social distancing is virtually impossible to maintain inside prison facilities absent substantial population reductions, but DOJ and BOP continue to make only minimal use of its authority to release inmates to home confinement. While decisions to release inmates are no doubt complex, you must do more to release inmates.

BOP became aware of the dangers of the pandemic nine months ago. As Director Carvajal testified in June, "BOP's response to COVID-19 began in January."[7] At that time, BOP had the authority to release vulnerable inmates under the compassionate release and elderly home confinement provisions of the First Step Act. Six months ago, under the CARES Act, Congress expanded BOP's authority to transfer incarcerated individuals to home confinement during the pandemic, which was a bipartisan recognition of the need to reduce prison populations to reduce the spread of the virus. On March 26, 2020, Attorney General Barr issued a memo, directing BOP to prioritize the use of statutory authorities to grant home confinement for inmates during the pandemic.[8] Notwithstanding this broad statutory authority and the Attorney General's direction, BOP has transferred only about four percent of the prison population to home confinement, while thousands more eligible inmates could safely be released. In a report of an inspection of the pandemic response at the Federal Correctional Complex Lompoc, the DOJ Office of Inspector General (OIG) found that BOP "did not fully leverage" its authority to transfer inmates to home confinement, and the use of home confinement as a mechanism to

---

[3] Director Carvajal provided no information about positive cases at BOP halfway houses.
[4] https://www.bop.gov/coronavirus/index.jsp.
[5] These statistics likely significantly underestimate the extent of the virus in BOP facilities, given the limited testing and BOP's decision to report cases and deaths only when there is a positive test.
[6] https://www.judiciary.senate.gov/meetings/examining-best-practices-for-incarceration-and-detention-during-covid-19.
[7] https://www.judiciary.senate.gov/meetings/examining-best-practices-for-incarceration-and-detention-during-covid-19.
[8] https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf.

reduce inmate population was "extremely limited."[9] The same appears to be true at many other facilities.

The failure to release more inmates has cost lives, including the life of Andrea High Bear, who tragically died after giving birth while on a ventilator. At the time of her death, she was the only known positive case at the Federal Medical Center (FMC) Carswell. Since then, five more women have died at FMC Carswell and more than 500 have been infected.[10] Others have died at BOP facilities within months of their full term release date for nonviolent offenses, while BOP failed to respond to their requests for compassionate release.[11] While some of the 133 who have died may garner less sympathy because of the nature of their offenses, none of these men and women were sentenced to die in prison. Nearly all of those who have died in custody had long term pre-existing conditions that put them at risk, and thus BOP was on notice that they were vulnerable.[12]

In addition, there are disturbing reports that BOP has invested in unproven and potentially dangerous treatments, including spending almost three million dollars on ultraviolet sanitizing devices, which the World Health Organization says should not be used on humans,[13] and sixty thousand dollars on hydroxychloroquine, which the Food and Drug Administration has cautioned against using for the treatment of COVID-19.[14] In contrast, BOP reportedly has not consistently maintained proven preventative measures, such as social distance and the use of hand sanitizer.[15]

In June, Director Carvajal testified that testing resources were "extremely limited at the beginning of this pandemic," but claimed that "as testing resources have become more widely available," BOP was "expanding testing to [the] inmate population which [was] helping [BOP] to quickly identify and isolate positive cases to flatten the curve when an outbreak occurs."[16] In response to questioning at the hearing, BOP added testing numbers to its website. These numbers show that BOP is not making widespread use of testing to control the spread of the virus, but rather has tested only 40 percent of the inmate population.[17] BOP also reportedly does not test

---

[9] https://oig.justice.gov/reports/remote-inspection-federal-correctional-complex-lompoc.

[10] https://www.bop.gov/coronavirus/index.jsp.

[11] https://www.washingtonpost.com/local/public-safety/frail-inmates-could-be-sent-home-to-prevent-the-spread-of-covid-19-instead-some-are-dying-in-federal-prisons/2020/08/02/992fd484-b636-11ea-9b0f-c797548c1154_story.html.

[12] https://www.bop.gov/resources/press_releases.jsp.

[13] https://abcnews.go.com/Politics/bureau-prisons-spends-million-uv-sanitizing-gates-contracts/story?id=72234824.

[14] https://www.forbes.com/sites/walterpavlo/2020/04/07/bureau-of-prisons-recently-purchased-hydroxychloroquine-controversial-covid-19-treatment/#29cec4942839.

[15] https://www.washingtonpost.com/nation/2020/08/24/prisoners-guards-agree-about-federal-coronavirus-response-we-do-not-feel-safe/.

[16] https://www.judiciary.senate.gov/meetings/examining-best-practices-for-incarceration-and-detention-during-covid-19.

[17] https://www.bop.gov/coronavirus/index.jsp.

staff, but requires staff to find testing resources in the community.[18] Thus, BOP is not always aware, and does not always report, when staff test positive. Without BOP testing staff and more widespread testing of inmates, asymptomatic employees and staff are almost certainly spreading the virus within BOP facilities.

Staffing shortages also are contributing to the insufficient response to the pandemic. The OIG inspection of Lompoc found that both a preexisting shortage of medical staff and insufficient correctional staffing interfered with the pandemic response at the facility, where nearly 1,000 inmates have been infected and several inmates have died as a result of exposure to COVID-19.[19] Similar staffing shortages at other facilities, including the United States Penitentiary Thomson, could have similarly devastating outcomes.

During this crisis, transparency is critical to maintaining public confidence. Tracking the number of inmates and staff who test positive on the public website is useful, but BOP does not publicize the number of those who are symptomatic and presumptive positives. BOP also reports deaths of inmates who tested positive, but may not be reporting the deaths of presumptive positive inmates who did not test positive.

The transfer of inmates from sites with outbreaks, to sites with no outbreaks, without first testing inmates and limiting transfers to inmates who test negative, also raises serious concerns because asymptomatic inmates can carry the virus and these transfers could spread the disease to facilities and communities that may otherwise be unaffected. A recent report indicated that BOP is permitting the U.S. Marshals Service to transfer inmates between BOP facilities, and from private facilities to BOP facilities, without first testing these inmates and assuring they are not carrying the virus, once again raising concerns about spreading the virus to otherwise unaffected communities.[20]

At the June hearing, Senators raised concerns about BOP's use of the PATTERN risk assessment tool to make home confinement decisions. This tool was developed pursuant to the First Step Act, but to this day, the tool itself has not been posted to the BOP website, as required by the First Step Act, leading to widespread confusion and leaving offenders and their families in the dark as to the scoring system. Moreover, this tool was not developed to make assessments regarding medical vulnerability or suitability for transfer to home confinement, and the accuracy of PATTERN has not yet been studied or tested, making it particularly inappropriate for use in making these life-or-death decisions.

Equally concerning is the DOJ data suggesting that the tool would produce racially disparate results.[21] Although some changes were made to the tool in response to these concerns,

---

[18] https://www.federaltimes.com/management/2020/06/05/bop-pushes-staff-covid-testing-responsibility-onto-outside-programs/.

[19] https://oig.justice.gov/reports/remote-inspection-federal-correctional-complex-lompoc.

[20] https://www.themarshallproject.org/2020/08/13/con-air-is-spreading-covid-19-all-over-the-federal-prison-system.

[21] https://www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system.pdf at 62.

no evidence was produced to demonstrate that these changes would reduce racial disparities, and thus far DOJ has not released demographic data from the implementation of PATTERN.

At the June hearing, Director Carvajal testified that the racial breakdown of transfers to home confinement "mirror[s]" the racial breakdown within the prison population.[22] Following the hearing, BOP provided Congressional staff with demographic data for all inmates on home confinement, purporting to support the assertion that there has been no racial disparities created by the use of PATTERN for home confinement decisions. The data provided, however, is based on everyone on home detention, not just those who were placed on home detention based on PATTERN during the pandemic, as was requested at the hearing.

At the hearing in June, Director Carvajal asked that Congress come directly to BOP for answers regarding BOP's response to the pandemic, rather than relying on news reports, which he described as "misunderstandings" of BOP operations.[23] To ensure an accurate understanding of BOP's pandemic response, please provide answers to the following:

- Why has BOP not transferred more inmates to home confinement under the CARES Act?

- Why is BOP not placing more inmates in home confinement under the Elderly Home Confinement program?

- Why is BOP opposing nearly every request for compassionate release under the First Step Act?

- Has BOP exposed any inmates or staff to ultraviolet light, and if so, how many? Please provide details.

- Has BOP given hydroxychloroquine to inmates or staff for the treatment of COVID-19 and if so how many? Please provide details.

- Why is BOP not making broader use of testing as a tool to contain the virus?

- Is BOP making testing available to staff, and if not, why not?

- What is BOP doing to address the staffing shortages that are interfering with BOP's ability to respond to the pandemic?

- Will BOP commit to publicly reporting the number of inmates who are symptomatic and presumptive positives, and the deaths of any of these inmates?

---

[22] https://www.judiciary.senate.gov/meetings/examining-best-practices-for-incarceration-and-detention-during-covid-19.
[23] https://www.judiciary.senate.gov/meetings/examining-best-practices-for-incarceration-and-detention-during-covid-19.

- Why has BOP not required the testing of inmates before or when the United States Marshals Service transfers them to BOP facilities and permitted the transfer of only those who test negative for COVID-19?

- Why is DOJ using PATTERN to deny home confinement placement, when the tool is not tested, may produce racially disparate results, and is not designed for such assessments?

- Please provide a copy of the current Program Statement regarding the use of PATTERN and the version of the assessment tool currently in use at BOP facilities.

- Please provide demographic data for all of the risk assessments conducted using PATTERN, including race and gender for each risk category.

- Please provide demographic data for inmates who have been placed on home confinement based on criteria that include PATTERN, or alternatively, the demographic data for inmates placed on home confinement after March 26, 2020.

- The First Step Act requires BOP to provide programing opportunities to inmates and to award inmates earned time credits for program completion. Is BOP providing these opportunities and awarding credits during the pandemic?

You have the discretion to significantly reduce the risk the pandemic poses to BOP staff, inmates, and the surrounding communities, by reducing prison populations. Every day that you fail to do so, more people are at risk. We look forward to your prompt response.

Sincerely,

Richard J. Durbin
United States Senator

Elizabeth Warren
United States Senator