1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10

11

YONNEDIL CARROR TORRES, et al.,

Case No. CV 20-4450 CBM (PVCx)

12

Plaintiffs-Petitioners,

13

v.

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE  (Dkt. No. 169)**

14

LOUIS MILUSNIC, Warden, et al.,

15

Defendants-
Respondents.

16

17

    This Report and Recommendation is submitted to the Honorable Consuelo B.

18

Marshall, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 05-

19

07 of the United States District Court for the Central District of California.

20

21

**I.**

22

**INTRODUCTION**

23

24

    Pending before the Court is a dispute regarding the enforcement of this Court's July

25

14, 2020 order granting Petitioners' motion for a preliminary injunction[1] between

26

Plaintiffs-Petitioners Yonnedil Carror Torres, Vincent Reed, Felix Samuel Garcia, Andre

27

────────────────

28

[1] The parties agreed to convert Petitioners' *Ex Parte* Application for a Temporary Restraining Order into an expedited motion for a preliminary injunction.  (Dkt. Nos. 41, 42).

Brown, and Shawn L. Fears, in their individual capacities and on behalf of the class (collectively, "Petitioners"), and Defendants-Respondents Louis Milusnic, in his capacity as Warden of Lompoc, and Michael Carvajal, in his capacity as Director of the Bureau of Prisons (collectively, "Respondents").  (*See* "Preliminary Injunction Order," Dkt. No. 45). Many of the disputes were presented to the Court in a Status Report on November 17, 2020.  ("November 17 Status Report," Dkt. No. 120).  On December 29, 2020, the District Judge referred six matters raised in the Status Report to the Magistrate Judge with instructions "to meet with the parties and assist them in resolving the issues."[2]  ("Referral," Dkt. No. 151).  On January 19, 2021, Petitioners submitted a "Summary of Disputed Issues" noting that the parties had "made progress" regarding certain matters while identifying disputes that were still unresolved.  ("Summary," Dkt. No. 160).  The Magistrate Judge held a video conference with the parties on January 21, 2021 to discuss any outstanding issues.  (Dkt. No. 163).  While the parties addressed the matters in good faith, they were unable to reach an agreement and concluded that further briefing would be the most efficient method to resolve them.  (*Id*. at 1).

Accordingly, pursuant to the briefing schedule set by the Court, on January 29, 2021, Petitioners filed the instant Motion to Enforce Compliance with Preliminary Injunction, ("Motion"), supported by the declaration of Oliver Rocos ("Rocos Decl."). (Dkt. No. 169).  Respondents filed an Opposition on February 5, 2021 ("Opp."), supported by the declarations of Jason Christopher ("Christopher Decl."), David Dwyer ("Dwyer Decl."), Asma Tekbali ("Tekbali Decl."), and Chung Han ("Han Decl.").  (Dkt. No. 174).

---

[2] The matters were:

1. Identification and notice to the class
2. Future Class Members and Periodic updates
3. Review and Reconsideration for Factual Errors
4. Protective order for review worksheets
5. Home confinement evaluation process
6. Delayed Transfer to Home Confinement

(Referral at 1).

Respondents also filed under seal the declarations of Todd Javernick ("Javernick Decl. I," Dkt. No. 172), and of Melissa Arnold ("Arnold Decl. I," Dkt. No. 173). Petitioners filed a Reply on February 12, 2021. ("Reply," Dkt. No. 180). After the close of briefing, the parties participated in a mediation. Because the mediation had the potential to render Petitioners' Motion moot, the Court deferred ruling on the Motion or conducting any further proceedings until the conclusion of the mediation.

The mediation did not result in a settlement. Accordingly, the Court held a hearing on the Motion on March 19, 2021. During the hearing, Petitioners requested authorization to submit certain prisoner data that they contended would support their contention that Respondents impermissibly imposed categorical bars on prisoners' eligibility for home confinement, which the Court granted. (Dkt. No. 188). Pursuant to the Court's Order authorizing post-hearing filings, on March 26, 2021, Petitioners filed under seal a Supplemental Data Submission in support of their Motion. ("Supp. Data," Dkt. No. 202). The submission consisted of a brief memorandum ("Supp. Data Memo," Dkt. No. 201) and several exhibits, including a comprehensive Excel spreadsheet identifying 285 class members who were denied home confinement despite having characteristics that would seemingly support a grant of home confinement, ("Supp. Data Exh. A," Dkt. No. 202-1), and additional spreadsheets grouping the inmates identified in Exhibit A by the ostensible reason for the denial of home confinement. ("Supp. Data Exhs. B-F," Dkt. No. 202-2 through Dkt. No. 202-6).

On April 2, 2021, Respondents filed a Response to Petitioners' Supplemental Data Submission, ("Supp. Data Response, Dkt. No. 205), supported by the declarations of Patricia Bradley ("Bradley Decl.," Dkt. No. 206 at 3-65) and David Brewer ("Brewer Decl.," Dkt. No. 206 at 66-119),[3] and the declaration of Todd Javernick. ("Javernick

---

[3] Although the Bradley and Brewer declarations are separately paginated, they were docketed together as a single document, which was not consecutively paginated. Accordingly, for ease of reference, the Court will cite to the pages of the Bradley and

Decl. II," Dkt. No. 207).  Bradley explains in her declaration the home confinement decisions that she made for each of the individual inmates identified in Petitioners' Supp. Data Exhibits B-F, and the decision-making process she engaged in generally in response to Exhibit A.  (Bradley Declaration at 1 ¶ 4).  Brewer describes in his declaration "the home confinement decisions specifically for each of those inmates who are identified by Petitions in Exhibits B-F, who remain at FCC Lompoc, and who were considered for home confinement by the Home Confinement Committee."  (Brewer Decl. at 68 ¶ 7).  Javernick attaches exhibits listing inmates at FCI Lompoc (Exh. J) and USP Lompoc (Exh. K) who were over age 50 with underlying medical conditions and explains the process by which the inmates were identified.  (Javernick Decl. II at 2-4 ¶¶ 4-8 & Exhs. J & K).

## II.
## BACKGROUND

The Preliminary Injunction Order summarizes the BOP's authority under the CARES Act to grant home confinement to inmates in light of the COVID-19 pandemic:

> 18 U.S.C. § 3624 authorizes the BOP to place certain prisoners on home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months.  On March 26, 2020, Attorney General William Barr issued a memorandum directing the BOP to prioritize the use of "various statutory authorities to grant home confinement for prisoners seeking transfer in connection with the COVID-19 pandemic."  The Attorney General's March 26 memorandum provided a list of discretionary factors for evaluating inmates for confinement, which included: (1) "[t]he age and vulnerability of the inmate to COVID-19, in accordance with the

---

Brewer declarations by the CM/ECF-generated page numbers on the Court's docket at Dkt. No. 206.

Centers for Disease Control and Prevention (CDC) guidelines"; (2) "[t]he security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities"; "[t]he inmate's conduct in prison"; (3) "[t]he inmate's score under PATTERN,[4] with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum"; (4) "[w]hether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety"; and (5) "[t]he inmate's crime of conviction, and assessment of the danger posed by the inmate to the community."[FN 43]

[FN 43] Attorney General Barr noted in the March 26 memorandum that "[s]ome offenses, such as sex offenses, will render an inmate ineligible for home detention."

Section 12003(b)(2) of the CARES Act, enacted on March 27, 2020, authorizes the Attorney General to expand the BOP to lengthen the maximum amount of time a prisoner may be placed on home confinement pursuant to § 3624(c)(2) upon finding "emergency conditions will material affect the functioning of the [BOP]." CARES Act, Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, Attorney General Barr issued a memorandum to the Director of the BOP, wherein Barr found emergency conditions are materially affecting the functioning of the BOP as a result of the pandemic. The April 3 memorandum instructed the BOP to continue processing inmates eligible for home confinement under pre-CARES Act standards, and directed the BOP to "expand the cohort of inmates who can

---

[4] "[T]he BOP's 'PATTERN' risk assessment tool . . . is aimed at predicting whether an inmate will reoffend based on several characteristics or 'risk factors.' The tool assigns each inmate to one of four categories for risk of recidivism: minimum, low, medium, or high. A 'Low' PATTERN score is supposed to indicate a higher risk of recidivism than a 'minimum' score." *Whitted v. Easter*, 2021 WL 165015, at *7 (D. Conn. Jan. 19, 2021).

be considered for home release . . . to the most vulnerable inmates at the most affected facilities" and "immediately review all inmates who have COVID-19 risk factors, as established by the CDC."[FN 44]

> [FN 44] In the April 3 memorandum, Attorney General Barr also wrote "we cannot simply release prison populations en masse onto the streets" because of risks to the public of criminal activity from released prisoners, and thus directed the BOP to "continue making the careful, individualized determinations BOP makes in the typical case."

(Preliminary Injunction Order at 30-31; *see also* Rocos Decl., Exh.2 ("March 26 Memorandum"); *id.*, Exh. 3 ("April 3 Memorandum")).

On April 22, 2020 and May 8, 2020, following the issuance of former Attorney General William Barr's memoranda, the BOP issued two nearly-identical memoranda with the subject "Home Confinement."  (*See* Rocos Decl., Exh. 4 ("April 22 Memorandum"); *id.*, Exh. 5 ("May 8 Memorandum").[5]  The April 22 Memorandum provided that home confinement review should be prioritized for inmates:  in low and minimum security facilities, with PATTERN scores of minimum, and those who have served over 50% of their sentence or who have 18 months or less remaining on their sentence and have served more than 25% of it.  (April 22 Memorandum at 1-2).  It also identified factors that the BOP considered to "ensure inmates are suitable for home confinement," which included "the inmate's institutional history for the last twelve months," the existence of a "verifiable release plan," and verification that the "inmate's primary or prior offense history does not

---

[5]  The BOP also issued a memorandum on November 16, 2020 containing updated home confinement review criteria.  (*See* Rocos Decl., Exh. 6 ("November 16 Memorandum")). The parties agree that the November 16 BOP Memorandum does not apply to class members at FCC Lompoc.  (*See* Motion at 11) (citing November 17 Status Report at 12 n.8).

include violence, a sex offense, or terrorism related." (*Id*. at 1).  The May 8 Memorandum
contained the same prioritization guidance as the April 22 Memorandum, but provided that
eligibility determinations should include verifying that the inmate's primary offense (not
the inmate's primary or prior offense history) is not violent, a sex offense, or terrorism
related, and clarified that inmates with incident violations in the 300 or 400 series (*i.e.*, less
severe violations) would still be eligible for home confinement.  (May 8 Memorandum at
1).

This action, filed on May 16, 2020, is brought on behalf of inmates at FCI Lompoc
and USP Lompoc (collectively, "Lompoc") challenging the response of the Director of the
Bureau of Prisons ("BOP") and Warden of Lompoc to the COVID-19 pandemic.  The
Complaint asserts two causes of action:  (1) Unconstitutional Conditions of Confinement in
Violation of the Eighth Amendment to the U.S. Constitution pursuant to 28 U.S.C.
§§ 2241, 2243; (2) and Unconstitutional Conditions of Confinement in Violation of the
Eighth Amendment to the U.S. Constitution pursuant to U.S. Const, Amend. VIII; 28
U.S.C. § 1331; 5 U.S.C. § 702.  On July 14, 2020, the Court granted Petitioners' motion
for a preliminary injunction and required Respondents to make "full and speedy use of
their authority under the CARES Act and evaluate each class member's eligibility for
home confinement which gives substantial weight to the inmate's risk factors for severe
illness and death from COVID-19 based on age (over 50) or Underlying Health
Conditions."  (Preliminary Injunction Order at 49).  The Preliminary Injunction Order also
provisionally certified a class of individuals comprising "all current and future people in
post-conviction custody at FCI Lompoc and USP Lompoc over the age of 50, and all
current and future people in post-conviction custody at FCI Lompoc and USP Lompoc of
any age" with certain underlying health conditions (the "Underlying Health Conditions").[6]
(*Id.* at 44).

---

[6] The underlying health conditions included "chronic obstructive pulmonary disease;
serious heart conditions such as heart failure, coronary artery disease, or cardiomyopathies;
Type 2 diabetes; chronic kidney disease; sickle cell disease; immunocompromised state

1    Since the Preliminary Injunction Order issued, Respondents have evaluated

2    approximately 2,066 class members' eligibility for home confinement.  (Declaration of

3    Melissa Arnold, Dkt. No. 212 ("Arnold Decl. II"), ¶ 6).  Home confinement was

4    preliminarily granted to 128 of those class members by the Warden or Home Confinement

5    Committee and 38 class members were approved for transfer to a Residential Reentry

6    Center ("RRC").  (*Id.*).  As of April 5, 2021, 136 class members have been placed in home

7    confinement, 197 have been transferred to a RRC, 79 have been granted compassionate

8    release, and 113 have been released for other reasons. (*Id.* ¶ 7).  An additional 73 class

9    members have been transferred to other institutions.  (*Id.*).

10

11                                        **III.**

12                        **THE PARTIES' CONTENTIONS**

13

14    The parties dispute whether Respondents are complying with this Court's

15   Preliminary Injunction Order to make "full and speedy use of their authority under the

16   CARES Act and evaluate each class member's eligibility for home confinement which

17   gives substantial weight to the inmate's risk factors for severe illness and death from

18   COVID-19 based on age (over 50) or Underlying Health Conditions."  Petitioners state that

19   they are not seeking an order that any particular inmate be granted home confinement, but

20   are seeking only to enforce the Court's ruling that Respondents "'make full' use of 'their

21   authority' by following the applicable guidance."  (Reply at 3).

22

23    In particular, Petitioners contend that Respondents, in contravention of the

24   Preliminary Injunction Order, categorically disqualify from home confinement class

25   _____

26   from a solid organ transplant; obesity (body mass index of 30 or higher); asthma; cerebrovascular diseases; cystic fibrosis; hypertension or high blood pressure; immunocompromised state from blood or bone marrow transplant; immune deficiencies,

27   HIV, or those who use corticosteroids, or use other immune weakening medicines; neurologic conditions such as dementia; liver diseases; pulmonary fibrosis; thalassemia;

28   Type 1 diabetes; and smokers."  (Preliminary Injunction Order at 44).

members who (1) have not yet served a particular amount of their sentence, (Motion at 17-20; Reply at 5-7); (2) have a prior offense that is a crime of violence, a sex crime, or was related to terrorism, (Motion at 20-21; Reply at 8-9); or (3) have a disciplinary infraction/s or a PATTERN score other than minimum.  (Motion at 21-22; Reply at 9-10).  Respondents counter that they are complying with BOP's May 8 Memorandum and that, in any event, this Court is prohibited from reviewing any decision regarding where to house an inmate and so cannot grant the relief requested.  (Opp. at 12-18).  Petitioners further contend that even after an inmate is determined to be eligible for home confinement, Respondents' administrative processes and practices improperly delay the transfer, including by quarantining inmates for up to 28 days before the transfer is completed.  (Motion at 22-24; Reply at 10-15).  Respondents contend, however, that they are moving as quickly as they can, and that any delays in the transfer to home confinement are not a violation of the preliminary injunction, but are rather the result of BOP policies, quarantine periods, or delays attributed to approval and supervision of inmates by the United States Probation Office.  (Opp. at 18-23).

Petitioners contend that the Preliminary Injunction Order's definition of the provisional class to include "future people in post-conviction custody" encompasses individuals who are designated to serve a custodial sentence in Lompoc, even if they are not yet physically present in Lompoc.  As such, Petitioners maintain that Respondents must review those individuals for home confinement.  (Motion at 24-25; Reply at 16-18).  Respondents disagree, and contend that only individuals who are physically in custody at Lompoc can be class members subject to review for home confinement.  (Opp. at 23-25).

In their brief in support of the Supplemental Data Submission, Petitioners contend that there are 285 inmates who were denied home detention despite having "no demerits in the majority of categories of information identified in the Review Worksheets."  (Supp. Data Memo at 1).  For a large majority of these inmates -- 74% -- "time served" was a

reason given for denying home confinement.  (*Id*.).  Petitioners assert that the data shows that Respondents used other factors, such as old violent and terrorism convictions, and PATTERN scores, as categorical barriers to bar home detention.  (*Id.* at 2-3).  Petitioners further contend that the data shows that other improper factors, such as age, no COVID risk factors, and underlying conditions, were used to deny home detention.  Finally, Petitioners argue that Respondents misuse criminal history, seriousness of current offense, and gang affiliation to preclude home detention.  (*Id.* at 3-5).

In turn, Respondents argue that Petitioner's data submission "does nothing to carry Petitioner's burden to submit evidence showing that Respondents have violated the preliminary injunction."  (Supp. Data Response, at 1).  In creating the spreadsheet which contains denials for 285 inmates, Respondents assert that the spreadsheet's central code category -- W -- reason for denial on worksheet -- reflects Petitioners' counsel's subjective attempt to simplify the underlying worksheet data, which makes the data suspect.  (*Id*. at 1-2).  Respondents maintain that Petitioner's counsel is not competent or qualified to make and offer such simplified assertions regarding the alleged meaning of the BOP worksheets, which [Petitioners'] counsel did not prepare and do not understand.  (*Id.* at 2).  Further, Respondents cite to the attached Declaration of Warden Patricia V. Bradley, which shows that she did not make broad or sweeping decisions based on any particular factor, but instead considered all of the factors and used her best correctional judgment to make a decision.  (*Id.*).  Respondents argue that Petitioners' "data" demonstrates that amongst the inmates not approved for home confinement, there was a wide range of time served (from none to 94.2%), a wide range of ages, and a wide range of PATTERN scores, demonstrating that Respondents conducted a holistic review for each inmate.  (*Id.*).  Finally, Respondents assert that the BOP properly exercised its discretion, and Petitioner's challenge of approximately 10% of the home confinement decisions does not demonstrate a violation of the preliminary injunction. (*Id.* at 4).  Respondents request that the motion be denied.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# IV.

# DISCUSSION

A.    <u>**Consideration of Time Served**</u> (Motion at 17-20; Reply at 5-7; Opp. at 12-18)

While Petitioners do not argue that Respondents may not consider the amount of time served at all in determining the priority with which class members are evaluated for home confinement, Petitioners contend that Respondents are impermissibly "doing more than *considering* the amount of time served -- they are generally treating those who have served less than 65% of their sentence as ineligible for home confinement (and indeed, at times are denying home confinement to those who *have* served more than 65%)." (Motion at 18) (emphasis in original). Furthermore, while the amount of time served may be considered a factor in determining the *priority* with which a class member should be evaluated, Petitioners insist that it is not a permissible factor in determining *suitability*. (*Id*.) (citing May 8 Memorandum at 1; *see also* Reply at 5). Petitioners note that the CARES Act eliminated the 6-month/10% time-served requirement for home confinement approvals under 18 U.S.C. § 3624(c)(2). (*Id.* at 19). Petitioners argue that by purportedly using amount of time served as a "categorical" bar, Respondents are "necessarily" "giving no weight at all to those class members' risk factors," contrary to the imperative in the Preliminary Injunction Order. (*Id.*). Furthermore, the "controlling guidance" in the Attorney General's April 3 Memorandum instructs that "inmates with a suitable confinement plan will generally be appropriate candidates for home confinement," (April 3 Memorandum at 2), which means that time served "should not be treated as even a significant consideration when completing home confinement evaluations, let alone a categorical bar." (Motion at 20). Petitioners expressly note that "while both the March 26 Memo and the May 8 Memo list out factors to be considered when determining suitability for home confinement, neither include time served." (Reply at 6) (emphasis omitted).

1        Respondents insist that "FCC Lompoc . . . continues to consider inmates for home

2   confinement pursuant to the Preliminary Injunction, its statutory obligations, the Attorney

3   General memoranda and BOP directives."  (Opp. at 13).  According to Respondents, the

4   "only restraint the Preliminary Injunction [Order] placed on the BOP's exercise of

5   discretion was to require the Warden to give substantial weight to the factors which cause

6   or could cause increased risk from severe disease from COVID-19 . . . ."  (Opp. at 12).

7   Beyond that requirement, which did not dictate an outcome, Respondents emphasize that

8   "district courts do not have jurisdiction to review challenges to places of imprisonment,"

9   (*id*.) (citing *Reeb v. Thomas*, 636 F.3d 1124, 1126-28 (9th Cir. 2011), and insist that the

10  "BOP may exercise the discretion afforded it under 18 U.S.C. § 3621 categorically . . . ."

11  (Opp. at 13).  Respondents also note that in light of the significant number of daily COVID

12  infections and deaths reported in Los Angeles County, "FCC Lompoc's measures provide[]

13  increased protection from the coronavirus."  (*Id*.).  According to the declaration of Jason S.

14  Christopher, submitted with the Opposition, as of February 5, 2021, "there is one inmate

15  with a current COVID-19 case at USP Lompoc and zero inmate COVID-19 cases at FCI

16  Lompoc.  The COVID-19 positive inmate at USP Lompoc is asymptomatic and has been

17  quarantined and isolated . . . ."  (Christopher Decl. ¶ 18).  Furthermore, Christopher states

18  that "[o]f the 2,046 inmates currently at FCC Lompoc, 1,133 inmates . . . (*i.e.*, 55%) have

19  either recovered from COVID-19 per CDC Guidelines (891) or have been fully vaccinated

20  (242) and 984 inmates have either not tested positive for COVID-19 or have not been

21  vaccinated."[7]  (*Id*. ¶ 17).

22

23

---

24  [7] In their Reply, Petitioners argue that the purportedly high level of naturally immune and
    immunized inmates at Lompoc is a consequence of the fact that "most of the Lompoc
25  population was infected already due to Respondents' failed policies" and shows an
    "unconstitutional callousness towards those inmates in their care."  (Reply at 3-4)
26  (emphasis omitted).  According to Petitioners, the infection rate among inmates at Lompoc
    is 56%, which is "seven times more than the infection rate in the United States as a whole."
27  (*Id*. at 4).  Petitioners further contend that even that rate likely underestimates the true
    number of infections, as Respondents "continue to refuse to conduct mass-testing of the
28  inmates at USP Lompoc."  (*Id*.).  As such, Petitioners assert that the "threat COVID-19
    poses to inmates is still very real and inmates are continuing to die."  (*Id*.).

1    Respondents contend that the "thousands of worksheets filed" in this case contradict

2    Petitioners' unsupported assertion that they are "giving no weight at all" to class members'

3    risk factors, and instead show that individualized decisions are made for each inmate

4    within "the totality of the circumstances . . . with substantial weight given to the

5    Preliminary Injunction factors."[8]  (Opp. at 17).  Specifically, Respondents contend that

6    Petitioners' accusation that consideration of the amount of time served violates the

7    Preliminary Injunction Order is "baseless."  (Opp. at 15).  The CARES Act does not

8    provide that "an individual sentenced to a term of imprisonment by a federal court does not

9    have to serve any time in a federal institution, or that the BOP must disregard the amount

10   of time served."  (*Id*. at 16).  According to Respondents, the "CARES Act merely

11   suspended 18 U.S.C. § 3624(c)(2)'s requirement that home confinement" was limited to

12   only those prisoners who had less than 10% or 6 months of their term left to serve,

13   whichever was less, and allowed "the BOP to 'lengthen the maximum amount of time' the

14   BOP may place a prisoner in home confinement."  (*Id.*).  Respondents state that if an

15   individual were allowed to be transferred to home confinement before developing any sort

16   of prison record, the requirements that the BOP must review the "inmate's institutional

17   discipline history for the last twelve months" and the "inmate's conduct in prison" would

18   be a nullity.  (*Id.*) (quoting March 26 Memorandum at 2; April 22 Memorandum at 1).

19

20   The Court finds that time served is an appropriate factor for Respondents to weigh

21   in determining whether an inmate is suitable for home confinement.  However, to the

22   extent that Respondents have denied class members home confinement on the basis that

23   they have not served a sufficient amount of time, or have only served a certain percentage

24   of time, or any other variation of a time component[9] -- who appear to meet all of the other

25

26   [8] Petitioners counter that the worksheets do not "actually explain *why*" the factors
     purportedly considered by Respondents outweigh each class member's risk factors.  (Reply
27   at 7) (emphasis in original).

28   [9] For example, some of the worksheets use the language of "percentage of time served,"
     "time remaining to serve," "time remaining on sentence," "amount of time remaining on

1   requirements for home confinement -- those denials are improper.  The March 26

2   Memorandum was silent as to whether an inmate was required to serve a certain portion of

3   his sentence before being released to home confinement.  Likewise, neither the April 22

4   nor May 8 Memoranda include time served as a factor in determining suitability for home

5   confinement.  The Court finds that Petitioner's supplemental data, which demonstrates that

6   of the 285 inmates listed on the spreadsheet, 210 (74%) were denied home detention based,

7   in part, on "time served," and that 66 of those 210 were denied home detention based

8   solely on "time served,'' is a sufficient basis to find that Petitioners have met their burden

9   for re-evaluation of certain inmates.   As such, the Court recommends that the District

10  Judge order re-evaluation of denial of home detention to any class member who was

11  denied such where the *only* reason given for the denial was the amount of time served or

12  percentage of time served, or some other variation of a time component.  On such a re-

13  evaluation, Respondents shall assign substantial weight to the class member's risk factors

14  for severe illness and death from Covid-19 based on age (over 50) or Underlying Health

15  Conditions, and eliminate all requirements that the class member have served some portion

16  of his sentence in order to be eligible for home confinement, so long as the class member

17  has served at least one year of his sentence.[10]  This requirement shall also apply to future

18  class members and those who have yet to be evaluated for home confinement.

19

20

21

22

23

24

25  sentence," "time remaining on current sentence," "amount of time left to serve," or other
    variations of a time component as a reason to deny home confinement.

26

27  [10] The Court elects this one year requirement because it relates to the BOP's guidance
    memorandum which allows certain inmates who have received disciplinary incident
    reports in the past 12 months consideration may be referred for placement in home
28  confinement, if in the Warden's judgment such placement does not create an undue risk to
    the community. (Dkt. No. 169-1 at 26).

14

**B.** **Consideration of Prior Convictions** (Motion at 20-21; Reply at 8-9; Opp. at 12-18)

Petitioners also contend that Respondents are "routinely denying inmates home confinement on the basis that a *prior*, rather than a current, offense was violent, sexual, or terrorism related . . . ."  (Motion at 20).  According to Petitioners, "Respondents' use of prior offenses to categorically deny home confinement, without regard to how recent or serious they are, thus conflicts with their obligation to 'make full and speedy use of their authority' in conducting home confinement reviews for class members."  (*Id.* at 21).  Petitioners acknowledge that the April 22 Memorandum stated that an inmate's prior offenses were relevant to suitability for home confinement, (*id.*) (citing April 22 Memorandum at 1), but emphasize that the May 8 Memorandum specifically required "verifying the inmate's primary offense is not violent, a sex offense, or terrorism related," but did not refer to prior offenses at all.  (Motion at 20) (quoting May 8 Memorandum at 1; *see also* Reply at 8 (May 8 Memorandum "*withdrew* the prior guidance that [Respondents] should also consider prior offenses" (emphasis in original)).  As such, Petitioners maintain that the nature of a prior offense is "not relevant to a determination of an inmate's suitability for home confinement," and is certainly not a bar to eligibility.  (Motion at 20).

As discussed above, Respondents maintain that the Court lacks jurisdiction to review specific housing decisions and that the Preliminary Injunction Order required only that the BOP give substantial weight to class members' risk factors in making home confinement decisions, which Respondents assert they have done.  Specifically with respect to the BOP's consideration of prior offenses, Respondents emphasize that the March 26 Memorandum "provided that 'sex offenses' and other 'serious offenses' would make inmates '*ineligible*' for home confinement," and "did not distinguish between 'current' and 'prior' offenses in determining eligibility."  (Opp. at 14) (emphasis in original).  Instead, the March 26 Memorandum directed the BOP "to perform an

'assessment of the danger posed by the inmate to the community.'" (*Id.*) (quoting March 26 Memorandum at 15).  Respondents further contend that the April 3 Memorandum directed the BOP to "'continue making the careful, individualized determinations BOP makes in the typical case.'" (Opp. at 14) (quoting April 3 Memorandum at 2). Respondents insist that their decisions to deny home confinement to certain class members based on their "long criminal history" or "discharge of a firearm" during a prior offense were "within the BOP's discretion to deny home confinement as potential risks to public safety." (Opp. at 14).

Here, the Court finds that Respondents have properly identified a legitimate goal -- public safety -- in screening an inmate's prior offenses to determine if they are violent, sex, or terrorism-related in determining suitability for home detention.  However, the Court is concerned with the propriety of making this an absolute disqualifier, especially when the prior offense is stale.  For this reason, the Court finds that denial on the basis of a prior offense which is a crime of violence, a sex offense, or is terrorism related, which is more than 15 years old, is improper.  The Court recommends that the District Judge order re-evaluation of any inmate who was denied home confinement where the *only* stated reason was a prior offense which is older than 15 years, and prohibit consideration of any such prior offense which is older than 15 years old.  On such a re-evaluation, Respondents shall assign substantial weight to the class member's risk factors for severe illness and death from Covid-19 based on age (over 50) or Underlying Health Conditions.

## C.   <u>Consideration of Incident Reports and PATTERN Scores</u> (Motion at 21-22; Reply at 9-10; Opp. at 12-18)

Petitioners claim that Respondents are improperly denying home confinement to class members who have had any incident reports in the last twelve months, even though the May 8 Memorandum stated that inmates with less serious infractions in the 300 or 400

16

series are eligible for home confinement if the warden determined that the placement did not create an undue community risk.  (Motion at 21) (citing May 8 Memorandum at 1).  With respect to PATTERN scores, Petitioners maintain that even though the May 8 Memorandum provided that inmates who had anything above a "Minimum" score would not receive *priority* treatment, it did not indicate that such scores would make an inmate *ineligible* for home confinement.  (Motion at 21; Reply at 9-10).  As such, Petitioners argue that "Respondents' use of disciplinary incidents and PATTERN scores above minimum as barriers to home confinement, even though the class member does not currently pose a threat to public safety, is thus a violation of the Preliminary Injunction."  (Motion at 22).

Respondents assert that they are statutorily required to consider "the history and characteristics of the prisoner" in making home confinement determinations.  Opp. at 15) (quoting 18 U.S.C. § 3621(b)(3)).  This is reflected in March 26 Memorandum's direction that "inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year" will not receive priority treatment for home confinement.  (Opp. at 15) (quoting March 26 Memorandum at 2).  Respondents maintain that the examples cited by Petitioners do not show a violation of the Preliminary Injunction Order because they do not show a failure to give weight to the inmates' COVID risk factors, and because the inmates' records provided bases for disqualification that properly fell "within the BOP's discretion to deny home confinement."  (Opp. at 15).

The Court finds Respondents' arguments persuasive.  The March 26 Memorandum provided that inmates who engaged in violence or gang-related activity while in prison or who were disciplined in the past year would not receive priority treatment for home confinement.  While the March 26 Memorandum did not treat an inmate's history of violence and gang activity while in prison as a categorical disqualifier for home confinement, but only for priority treatment for home confinement, Respondents'

17

1    consideration of class members' PATTERN scores and disciplinary actions is rationally

2    related to the goal of promoting public safety, and can be properly be weighed to the

3    degree Respondents consider necessary in making home confinement decisions.

4

5       **D.**     **Post-Decision Transfer Delays** (Motion at  22-24; Reply at 10-15; Opp. at

6          18-23)

7

8       Petitioners contend that Respondents are failing to make meaningful use of the

9    home confinement authority afforded them by the CARES Act "by routinely keeping in

10   custody class members granted home confinement for many months based on

11   impermissibly slow administrative processes and unwarranted lengthy quarantines."

12   (Motion at 22).  While Petitioners acknowledge that "a certain amount of administrative

13   processing to transfer class members is understandable" and that pre-release quarantining

14   is required, there is no requirement that processing be complete before quarantining can

15   begin.  (*Id.* at 22-23).  Furthermore, Petitioners reject Respondents' contention that they

16   must obtain the approval of the U.S. Probation Office to approve class members' home

17   confinement outside of their sentencing districts.  (*Id.* at 23).  Petitioners argue that the

18   BOP could hire independent contractors to monitor inmates granted home confinement

19   outside of their sentencing districts, and emphasize that the April 3 Memorandum

20   expressly recognized that transfer to home confinement may be authorized even if

21   electronic monitoring is not available, so long as the BOP determines that the transfer is

22   appropriate and will not endanger the public.  (*Id.*) (citing April 3 Memorandum at 2).

23   Finally, Petitioners contend that Respondents' 28-day quarantine policy lacks any support

24   "in law or fact," as even the CDC recommends testing and "a 14-day quarantine for

25   individuals preparing for release or transfer to another facility."[11]  (Motion at 24).

26   _____

27 [11] In their Reply, Petitioners also note that in the October 8, 2020 Order Granting Motion to Enforce Compliance, the District Judge rejected Respondents' contention that the time associated with home confinement processing is not a violation of the Preliminary

28 Injunction Order, stating:  "Respondents also contend the Court's Preliminary Injunction Order does not require immediate transfer of inmates to home confinement, the transfer of

Respondents contend that Petitioners are ignoring the "logistical hurdles" that must be overcome before the BOP can transfer an inmate "to the supervision of an RRC or the USPO" and the reality that "the BOP cannot simply release inmates en masse outside FCC Lompoc without appropriate supervision." (Opp. at 18). Respondents note that by statute, inmates transferred to home confinement are subject to supervision, and that, with rare exceptions, that includes electronic monitoring. (*Id*.). Respondents assert that the exemption from the electronic monitoring requirement raised in the April 3 Memorandum was prompted by the shortage of electronic equipment, but "[e]quipment availability is not an issue at this time," so the exception no longer applies.[12] (*Id.* at 19). Furthermore, even when electronic monitoring is infeasible, the statute requires alternate means of monitoring, not a complete lack of accountability of supervision. (*Id.*) (citing 18 U.S.C. § 3624(b)(2)(A)(ii). Respondents also state that Petitioners' demand for immediate transfer ignores that when there is no RRC available, "the USPO must approve relocation requests for inmates who seek . . . release to a jurisdiction other than their sentencing district," and insist that the BOP cannot control the pace at which the USPO makes those decisions. (Opp. at 19) (citing 18 U.S.C. §§ 3624(c) & 3563(b)(14)). Furthermore, Respondents claim that the BOP cannot require the USPO to accept an inmate's transfer request.[13] (Opp. at 21). The relocation approval requirement is repeated in numerous BOP

---

a specific number of inmates, or transfer by a stated time. However, . . . [b]y failing to expeditiously release Approved Class Members to home confinement, Respondents are not making full and speedy use of their CARES Act authority in violation of the Preliminary Injunction." (*See* Reply at 10-11 (quoting Dkt. No. 105 at 3-4; emphasis omitted)).

[12] Petitioners counter that the April 3 Memorandum "makes no reference to equipment at all" and contend that the reason electronic monitoring was "technically infeasible" was "due to the volume and speed with which inmates had to be transferred to home confinement -- considerations that remain relevant today." (Reply at 12).

[13] Petitioners maintain that 18 U.S.C. § 3603, which identifies the duties of probation officers, "prohibits the U.S. Probation Office from refusing to supervise an inmate if the BOP requests them to," and "does not mean BOP must be held hostage to the Probation Office if it refuses to comply." (Reply at 13).

program statements.[14]  (*Id*. at 20).  Furthermore, the laws governing service contracts mean, as a practical matter, that "the BOP cannot simply hire a contractor to provide home confinement monitoring services."[15]  (*Id*. at 21).  Furthermore, in light of the low infection rate at Lompoc compared to the high rate of infection in the community and the "slow rollout of the vaccination in California," such hiring is unnecessary.  (*Id*. at 21-22).  Finally, Respondents maintain that "the quarantine period is not delaying an inmate's transfer date -- once the RRC or USPO provide the inmate's transfer date, the institution places the inmate in pre-transfer quarantine to allow for sufficient time to ensure all testing and quarantine is completed so that the inmate can make his transfer date."  (*Id*. at 22).

        The Court is concerned with the amount of time it is taking for inmates granted home detention to be released.  While it is true that a process needs to occur, and that a quarantine period, securing a release plan for the inmate, and the cooperation of the Probation Office are necessary, there is no reason why those granted home detention should languish for five or six months.  For this reason, the Court recommends that the District Judge order Respondents to complete all the steps necessary to finalize the transfer of class members granted home confinement within one month of such a grant, and further recommends that the District Judge order Respondents to not quarantine class members granted home confinement for a period longer than fourteen days.  If Respondents are unable to meet these deadlines for any class member, they shall submit a declaration showing good cause why they are unable to do so no later than one month and one week after the grant of home detention.

---

[14] Petitioners contend that "[s]ince all of the statutes and policies Respondents cite relate to prerelease or release of inmates, not the temporary use of home confinement to address the COVID-19, none of them provide cover for Respondents' failure to comply with the Preliminary Injunction by immediately transferring class members granted home confinement."  (Reply at 14).

[15] Petitioners challenge Respondents' argument that budgetary and regulatory constraints prevent them from engaging outside contractors, and assert that "the number of class members who may require location monitoring by an independent contractor is less than a dozen and so the cost would be minimal."  (Reply at 14).

1    **E.**    **Consideration of Future Lompoc Inmates Prior to Physical Custody**

2         (Motion at 24-25; Reply at 16-18; Opp. at 23-25)

3

4         Petitioners note that the provisional class certified by the Court in the Preliminary

5    Injunction Order included both "'present and future people in post-conviction custody at

6    FCI Lompoc and USP Lompoc . . . .'"  (Motion at 24) (quoting Preliminary Injunction

7    Order at 48).  Petitioners maintain that "[d]enying consideration of home confinement to

8    the hundreds of Lompoc Designees runs contrary" to the goal of protecting inmates at risk

9    of severe illness or death from COVID-19.  (Motion at 24).  According to Petitioners, it is

10   "absurd" to require an individual like Dr. Bernadett -- "a 66-year-old man with several

11   underlying conditions including at least hypertension, asthma, heart disease, and possible

12   cancer" -- to enter Lompoc before he can be considered. (*Id.* at 25).  Petitioners contend

13   that for Lompoc Designees already incarcerated at other BOP institutions, Respondents can

14   access their SENTRY and other records, while Lompoc Designees not already in other

15   institutions can be invited to submit documentation of their eligibility to be a class

16   member.  (*Id.*).  Alternatively, Petitioners request that "at a minimum, Respondents should

17   be required to determine whether a newly arriving prisoner is a class member within 14

18   days from arrival and evaluated for home confinement within 14 days of being identified

19   as a class member."  (*Id.*).

20

21        Respondents note that this is a habeas proceeding, and state that here, "the FCC

22   Warden is the only individual who can exercise habeas jurisdiction."  (Opp. at 23) (citing,

23   *inter alia*, *Rumsfeld v. Padilla*, 542 U.S. 426, 427 (2004)).  However, "[t]he Warden and

24   FCC Lompoc staff have no responsibility for, nor control over, inmates who are not

25   physically at FCC Lompoc."  (Opp. at 24).  Respondents represent that not only does the

26   Warden not have custody over inmates at other BOP institutions, but also FCC staff do not

27

28

21

even have access to the records necessary to conduct a home confinement assessment.[16] (*Id.*).  For individuals who have not yet self-surrendered, they are not in BOP custody, and the CARES Act, which applies only to "prisoners," is inapplicable.  (*Id.*).  Furthermore, the March 26 Memorandum mandates that the BOP medical director, or someone he designates, must make an assessment of an inmate's risk factors, which requires the inmate to be in BOP custody.  (*Id.*).  Furthermore, there is no guarantee that individuals who have not yet self-surrendered will actually be incarcerated at FCC Lompoc, as the example of Bernadett, who received a presidential pardon before his self-surrender deadline expired, illustrates.  (*Id.* at 25).  Finally, to the extent that there are presently no "future" inmates waiting to self-surrender, Petitioners may be seeking an impermissible advisory opinion.[17] (*Id.*).

        For those inmates who are already in custody at another BOP institution, and who have been designated to transfer to FCC Lompoc, the Court recommends that the District Judge order Respondents to: provide those individuals with a notice of the class definition, inform them that they are entitled to submit documentation showing their eligibility to be a class member, immediately add eligible inmates to the class list, and initiate a review of the inmates for home confinement within fourteen days after the inmate arrives at FCC Lompoc, and complete that review fourteen days after the date that the review is initiated. For those individuals who are to surrender but are not in custody at FCC Lompoc, this process is to occur once they physically arrive at the institution within the same deadlines.

---

[16] Petitioners concede that Respondents may not have access to Lompoc Designees' "full medical records," but note that they do have access to the "'Judgment, Presentence Report, and some central inmate monitoring information,'" which could be supplemented by information from the Lompoc Designee himself.  (Reply at 16) (quoting Dkt. No. 172 ¶ 13).

[17] Petitioners refute Respondents' suggestion that they are seeking an "advisory opinion" because Respondents' own witnesses have testified that as of "'February 5, 2021, there [we]re 295 inmates designated to transfer [to] FCC Lompoc from another facility.'" (Reply at 17) (quoting Dkt. No. 172 at ¶ 11).

# V.

# RECOMMENDATIONS

For the reasons stated above, it is recommended that the District Judge issue an Order: (1) accepting this Report and Recommendation; and (2) requiring Respondents to take the following actions:

1.     Within 28 days, Respondents shall re-evaluate any class member who was denied home confinement where the only reason given for the denial was the amount of time served or percentage of time served, or some other variation of a time component.  On such a re-evaluation, Respondents shall:

     (a)     assign substantial weight to the class member's risk factors for severe illness and death from Covid-19 based on age (over 50) or Underlying Health Conditions, and

     (b)     eliminate all requirements that the class member have served some portion of his sentence in order to be eligible for home confinement, so long as the class member has served at least one year of his sentence.

This requirement shall also apply to future class members and those who have yet to be evaluated for home confinement.

2.     Within 28 days, Respondents shall re-evaluate any class member who was denied home confinement where the only stated reason was a prior offense than is more than 15 years old.  On such a re-evaluation, Respondents shall:

     (a)     assign substantial weight to the class member's risk factors for severe illness and death from Covid-19 based on age (over 50) or Underlying Health Conditions.

     (b)     disregard prior offenses that are more than 15 years old.

This requirement shall also apply to future class members and those who have yet to be evaluated for home confinement.

3.      Respondents shall complete all steps necessary to finalize the transfer of class members granted home confinement within one month of each grant.  Respondents shall not quarantine any class member granted home detention for longer than fourteen days.  If Respondents are unable to meet these deadlines for any particular class member, they shall submit a declaration show good cause to this Court as to why they are unable to do so no later than one month and one week after the grant of home detention.

4.      For all individuals who have been designated to be in custody at Lompoc in the future, Respondents shall:

(a)     provide those individuals with a notice of the class definition,

(b)     inform them that they are entitled to submit documentation showing their eligibility to be a class member,

(c)     immediately add eligible inmates to the class list, and

(d)     initiate a review of the inmates for home confinement within fourteen days after the inmate arrives at FCC Lompoc, and complete the review fourteen days after the review is initiated.

For those individuals who are to surrender but are not in custody at FCC Lompoc, this process is to occur once they physically arrive at the institution within the same deadlines.

DATED:  April 30, 2021

_____
PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE

24