TRACY L. WILKISON
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section
KEITH M. STAUB (Cal. Bar No. 137909)
PAUL B. LA SCALA (Cal Bar No. 186939)
CHUNG H. HAN (Cal. Bar No. 191757)
DANIEL A. BECK (Cal. Bar No. 204496)
JASMIN YANG (Cal. Bar No. 255254)
PAUL B. GREEN (Cal. Bar No. 300847)
Assistant United States Attorney
        Federal Building, Suite 7516
        300 North Los Angeles Street
        Los Angeles, California 90012
        Telephone: (213) 894-7423
        Facsimile: (213) 894-7819
        E-mail: Keith.Staub@usdoj.gov
                Chung.Han@usdoj.gov
                Paul.LaScala@usdoj.gov
                Daniel.Beck@usdoj.gov
                Jasmin.Yang@usdoj.gov
                Paul.Green@usdoj.gov

Attorneys for Respondents
Louis Milusnic and Michael Carvajal

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| YONNEDIL CARROR TORRES, *et al.*,<br><br>        Plaintiff-Petitioners,<br><br>                v.<br><br>LOUIS MILUSNIC, *et al.*,<br><br>        Defendant-Respondents. | No. CV 20-4450-CBM-PVCx<br><br>**RESPONDENTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Supporting declarations, statement of uncontroverted facts and conclusions of law, and proposed judgment filed concurrently]<br><br>Hearing Date: June 29, 2021<br>Time:          10:00 a.m.<br>Courtroom:    8B<br><br>Honorable Consuelo B. Marshall<br>United States District Judge |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **TABLE OF CONTENTS**

**Page(s)**

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................1

I.    INTRODUCTION ................................................................................................1

II.   FACTUAL BACKGROUND...............................................................................2

    A.    The BOP's Pandemic Response Plan..........................................................2

    B.    Testing ........................................................................................................4

        1.    Inmate Testing..................................................................................4

        2.    Staff Testing .....................................................................................6

    C.    Vaccinations ...............................................................................................7

    D.    Population Reduction and Transfers to Home Confinement .......................9

    E.    Site Visits and Expert Testimony.............................................................10

        1.    Court Ordered Inspection and Rule 706 Report by Dr. Homer Venters .............................................................................................10

        2.    Site Visit and Report of Dr. Jeffrey Beard.....................................11

        3.    Report of Asma Tekbali ..................................................................12

III.  ARGUMENT......................................................................................................14

    A.    Petitioners Cannot Establish and Eighth Amendment Violation...............14

        1.    Petitioners Cannot Satisfy the Objective Requirement of the Eighth Amendment Standard...............................................................16

        2.    There is No Dispute that Petitioners Cannot Satisfy the Subjective Requirement of the Eighth Amendment Standard..........19

    B.    Petitioners Have Failed To Timely Move For And Obtain Class Certification Prior To The Motion Cutoff...................................................23

    C.    Petitioners Have Failed to Exhaust Administrative Remedies ..................24

IV.   CONCLUSION...................................................................................................24

i

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Battista v. Clarke,*
645 F.3d 449 (1st Cir. 2011) ........................................................14

*Calvary Chapel Dayton Valley v. Sisolak,*
140 S. Ct. 2603 (2020) .................................................................15

*Cameron v. Bouchard,*
815 Fed. Appx. 978 (6th Cir. 2020) .............................................15

*Chunn v. Edge,*
465 F. Supp. 3d 168 (E.D.N.Y. 2020)..........................................11

*Farmer v. Brennan,*
511 U.S. 825 (1994) ...............................................................passim

*Gen. Tel. Co. of the Southwest v. Falcon,*
457 U.S. 160- (1982).....................................................................24

*Grinis v. Spaulding,*
2020 WL 2300313 .........................................................................21

*Helling v. McKinney,*
509 U.S. 25 (1993) ...............................................14, 16, 17, 19

*Hines v. Youssef,*
2015 WL 164215 (E.D. Cal. Jan. 13, 2015)................................17

*Lucero-Gonzalez v. Kline,*
464 F. Supp. 3d 1078 (D. Ariz. 2020)..........................................23

*Marlowe v. LeBlanc,*
2020 WL 2043425 (5th Cir. Apr. 27, 2020).................................21

*Maronyan v. Toyota Motor Sales, USA, Inc.,*
658 F.3d 1038 (9th Cir. 2011) ......................................................24

ii

*Money v. Pritzker*,
  453 F.Supp.3d....................................................................................22

*Nellson v. Barnhart*,
  2020 WL 3000961..............................................................................21

*Perez v. Oakland County*,
  466 F.3d 416 (6th Cir. 2006)............................................................14

*South Bay United Pentecostal Church v. Newsom*,
  140 S.Ct. 1613 (May 29, 2020).........................................................15

*Swain v. Junior*,
  961 F.3d 1276 (11th Cir. 2020)................................................15, 20, 21

*Toguchi v. Chung*,
  391 F.3d 1051 (9th Cir. 2004)......................................................15, 21

*United States v. Austin*,
  2021 WL 1137897 (E.D. Mich. Mar. 25, 2021) ...............................18

*United States of America v. Poupart*,
  2021 WL 917067 (D. Conn. Mar. 10, 2021).....................................19

*United States v. Jackson*,
  2021 WL 806366 (D. Minn. Mar. 3, 2021).......................................18

*United States v. Miller*,
  2021 WL 1115863 (E.D. Mich. Mar. 24, 2021) ...............................18

*Valentine v. Collier*,
  956 F.3d 797 (5th Cir. 2020)............................................................15

*Valentine v. Collier*,
  993 F.3d 270 (5th Cir. 2021)............................................................20

*Wilson v. Ponce*,
  2021 WL 880397 (C.D. Cal. Feb. 25, 2021).....................................21

*Wilson v. Seiter*,
  501 U.S. 294 (1991) ........................................................................23

iii

*Wilson v. Williams*,
   961 F.3d 829 (6th Cir. 2020)..................................................................15, 21

*Wragg v. Ortiz*,
   2020 WL 2745247.........................................................................................21, 22

**Statutes**

42 U.S.C. § 1997e(a)...............................................................................................24

iv

<u>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**</u>

PLEASE TAKE NOTICE that, on June 29, 2021, at 10:00 a.m., or as soon thereafter as they may be heard, Defendants-Respondents Louis Milusnic and Michael Carvajal ("Respondents"), will, and hereby do, bring a Motion for Summary Judgment before the Honorable Consuelo B. Marshall, United States District Judge, located at Courtroom 8B of the First Street Courthouse, 350 West 1st Street, Los Angeles, California 90012.

Respondents hereby move for entry of summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the grounds that there are no genuine triable issues of material fact which exist as to Petitioners' claims of Eighth Amendment violations arising from Respondents' response to the COVID-19 pandemic at the Federal Corrections Complex in Lompoc, California, and that, as a matter of law, Respondents are entitled to summary judgment. This Motion is based upon this Notice, the pleadings on file herein, the attached Memorandum of Points and Authorities, the declarations and exhibits attached hereto, and upon such other and further arguments, documents and grounds as may be presented to the Court in the future.

This motion is made following the conference of counsel pursuant to Local Rule 7-3 which was held on March 16, 2021.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

2    Dated:  May 25, 2021                    TRACY L. WILKISON
                                             Acting United States Attorney
3                                            DAVID M. HARRIS
                                             Assistant United States Attorney
4                                            Chief, Civil Division
                                             JOANNE S. OSINOFF
5                                            Assistant United States Attorney
                                             Chief, General Civil Section
6
                                             _/s/ Jasmin Yang_____
7                                            Jasmin Yang
                                             Assistant United States Attorney
8
                                             Attorneys for Respondents
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          vi

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The Federal Correctional Complex, Lompoc ("FCC Lompoc") experienced a serious outbreak of COVID-19 in March-May of 2020. But that was over a year ago. The Federal Bureau of Prisons ("BOP") has taken extensive steps to mitigate COVID-19 risk at FCC Lompoc, in compliance with the BOP's COVID-19 Pandemic Response Plan and the guidance for correctional facilities from the Centers for Disease Control ("CDC"). The BOP's Pandemic Response Plan has proven extremely successful at infection control for FCC Lompoc, along with other BOP facilities. This was demonstrated during the huge wave of COVID-19 cases that swept through Southern California over the past winter. Although COVID-19 spread throughout California, by contrast, few cases emerged inside FCC Lompoc over that same period. And those few cases were quickly identified and treated, with no larger outbreak emerging. Currently, there are *zero* COVID-positive inmates at FCC Lompoc. There have been no cases in FCC Lompoc's general population for months.

On top of the BOP's extraordinary efforts to protect inmates through its Pandemic Response Plan, FCC Lompoc has offered the COVID-19 vaccine to all existing inmates and has a system in place to continue offering it to newly arriving inmates. mRNA vaccines have proven to be extraordinarily effective, with a 95% efficacy rate in preventing symptomatic COVID-19.[1] Starting in December 2020, inmates at FCC Lompoc were some of the first people in this country to be offered these COVID-19 vaccines. Far from "deliberate indifference," the BOP made COVID-19 risk reduction an absolute priority.

At this juncture, Petitioners cannot meet their burden to produce evidence sufficient to support their claim for permanent injunctive relief based on their Eighth Amendment claim. This case is about the current conditions at FCC Lompoc, not what they were in March 2020. Petitioners cannot reset the clock back to March of 2020.

---

[1] *See e.g.* https://www.nih.gov/news-events/news-releases/peer-reviewed-report-moderna-covid-19-vaccine-publishes

1

Notably, Petitioners did not move this Court for additional preliminary injunctive relief on the basis of Dr. Homer Venters' September 2020 report—because there was no significant constitutional risk raised and established therein—and they have retained no other experts in this case. The BOP has since controlled COVID-19 risk at the facility, with remarkable success, by implementing its rigorous plan. This point is reinforced by the BOP's intensive vaccination campaign. Since the BOP has been providing COVID-19 vaccination for months now, Petitioners can prove neither the objective nor the subjective prongs of their Eighth Amendment claim against the BOP.

Summary judgment should be granted for the Respondents accordingly.

## II.   FACTUAL BACKGROUND

### A.   The BOP's Pandemic Response Plan

The initial COVID-19 outbreak at FCC Lompoc posed an unprecedented challenge. Little was known about the disease or its prevention at the pandemic's start. Vaccines were not available. Since then, however, the BOP has followed guidance and directives from the CDC, World Health Organization (WHO), the Office of Personnel Management (OPM), the Department of Justice (DOJ), and the White House. Statement of Uncontroverted Facts filed concurrently herewith ("UF") 1. On August 31, 2020, the BOP released a COVID-19 Pandemic Response Plan that compiles previous guidance, including all phases of its Action Plan, and provides a comprehensive document with specific guidance for limiting the spread of COVID-19 at BOP institutions. UF 2. The Plan contains eleven modules that are updated as needed, based on guidance from key stakeholders including the CDC, WHO, and DOJ. UF 3.

FCC Lompoc has been operating in compliance with the CDC's guidance and with the BOP's COVID-19 Pandemic Response Plan. UF 4. Through implementing a host of measures, including broad-based testing and adherence to evolving CDC guidelines for infection prevention and control (such as cohorting and isolation procedures enacted after testing every inmate), the institution has managed to prevent further COVID-19 outbreaks. UF 5. The efficacy of the BOP's campaign to mitigate risk

2

at the facility was harshly tested over the winter wave period, as COVID-19 infection
rates exploded throughout California. The graph shown below, which was recently taken
from the New York Times' COVID-19 webpage, shows the rise and fall of this winter
wave of Californian COVID-19 infections, which crested on December 21, 2020.



https://www.nytimes.com/interactive/2021/us/california-covid-cases.html.  UF 7.

    In contrast, the graph below shows the number of COVID-19 cases at FCC
Lompoc over the same time period.  Declaration of Jessica Figlenski, ¶ 16.



Following this winter surge, Los Angeles County has seen over 1.2 million confirmed COVID-19 cases—over ten percent of the county population. UF 8. A similar rate of infection extended throughout California, which has over 3.6 million total confirmed positives. UF 9.

In stark contrast to that uncontrolled winter spread of COVID-19 in California, COVID-19 cases were well-controlled over this same period within FCC Lompoc. UF 6, 11. No major outbreak emerged, and certainly nothing comparable to the rates of infection that were experienced by the general populace outside the facility over that period. UF 11. Currently, there are 0 inmate COVID-19 cases at FCC Lompoc, and 0 staff cases.[2] UF 12. Even over the most difficult risk period, right before the first vaccinations began, FCC Lompoc performed remarkably well at infection control. While new COVID-19 cases were not completely eliminated, they were few, and were quickly identified and contained through adherence to the BOP's COVID-19 Pandemic Response Plan. UF 13. FCC Lompoc has not had an inmate-related COVID-19 hospitalization since August 20, 2020 (UF 31) whereas California had over 21,000 COVID-19 hospitalizations on January 7, 2021.[3]

**B.    Testing**

1.    <u>Inmate Testing</u>

The first confirmed case of COVID-19 at FCC Lompoc was an inmate from USP Lompoc who was swabbed at the local hospital on March 26, 2020 and the positive results were reported to FCC Lompoc on March 30, 2020. UF 14. FCC Lompoc took immediate action and began conducting a contact investigation and screening and testing positively identified contacts. UF 15. Inmates found to test positive were isolated and exposed inmates were quarantined and monitored for symptoms. UF 16. Mass testing at FCI Lompoc took place on May 5, 2020. UF 17. COVID-19 negative inmates were

---

[2]    https://www.bop.gov/coronavirus/index.jsp

[3]    https://calmatters.org/health/coronavirus/2020/04/california-coronavirus-covid-patient-hospitalization-data-icu/

4

cohorted in a dedicated unit at the USP (which has cells instead of open-bay dormitories) to prevent further transmission of the disease among those testing negative. UF 18. Since the mass testing in May of 2020, inmate testing at FCC Lompoc has been conducted in accordance with the BOP's COVID-19 Pandemic Response Plan Module 3, Screening and Testing. UF 19.

The Pandemic Response Plan requires that symptomatic inmates be isolated and tested expeditiously and asymptomatic inmates with known or suspected contact with a COVID-19 case be quarantined and tested expeditiously. UF 20. This section also provides that expanded testing of all inmates in an entire open bay housing unit should be considered as part of a robust contact tracing. UF 21.

FCC Lompoc continues to conduct testing in accordance with the BOP's testing protocols, which include testing all incoming and outgoing inmates in accordance with BOP Pandemic Response Plan Module 4, Inmate Isolation and Quarantine. UF 22. This mandatory testing of all inmates entering or leaving the institution is in addition to the protocols used to determine when to test inmates within the institution's general population because of contact investigation. UF 23, 25. The testing of all inmates releasing or transferring out of FCC Lompoc serves as random surveillance testing of the institution's general population. UF 24. As part of intake procedures, all inmates who entered FCC Lompoc after the initial outbreak in May 2020 entered quarantine units and were tested as determined by existing BOP testing protocols. UF 25. No later than August 10, 2020, FCC Lompoc tested all incoming inmates, isolated positive inmates, quarantined negative inmates, and re-tested quarantined inmates on or after the 14th day of their quarantine period. UF 26. These inmates were transferred into the institution's general population only if they either had cleared quarantine by having a repeated negative test result or, if positive, after completing the isolation period and being cleared by medical staff. UF 27. Incoming inmates have no contact with inmates in the institution's general population until they clear quarantine or isolation. UF 28.

As of May 19, 2021, FCC Lompoc has conducted over 5,479 COVID-19 tests on 1,722 inmates. UF 29. As of this date, there are zero confirmed inmate COVID-19 case

at FCC Lompoc. UF 12. All five of the FCC Lompoc inmates who died of COVID-related illness contacted the disease during the March-May 2020 outbreak at FCC Lompoc. UF 30. FCC Lompoc has not had an inmate hospitalized for COVID-related illness since August 20, 2020. UF 31. FCI Lompoc has not had a COVID-19 case in its general population since September 25, 2020. UF 32. USP Lompoc has not had a COVID-19 case in its general population since December 31, 2020. UF 33. The last lab-confirmed case of COVID-19 at FCC Lompoc occurred in FCC Lompoc's intake quarantine with a newly arriving inmate on March 26, 2021 and was detected as part of the BOP's intake quarantine process. UF 34.

      2.   <u>Staff Testing</u>

The BOP's COVID-19 Pandemic Response Plan, Module 11, Employee Management, provides guidance for staff testing, including the identification of testing sites in the local community, requiring staff who test positive to report their diagnosis to the BOP, and indications and priorities for testing. UF 35. The BOP's Pandemic Response Plan requires staff to report positive test results, requires asymptomatic staff who test positive to wait at least 10 days before reporting to work, and sets forth an algorithm for when symptomatic staff may return to work (with staff who have been hospitalized being required to wait at least 20 days since the appearance of symptoms before they return to work). UF 36. The BOP's procedures do not permit staff with positive test results to report to work until the appropriate CDC time-based guidance permits them to return. UF 37.

The BOP has established a nationwide contract with Quest Diagnostics to facilitate COVID-19 testing for all BOP employees, including those at FCC Lompoc, at no charge to staff. UF 38. Staff members can obtain a collection kit from the institution, complete the test, and return it for processing. UF 39. Quest Diagnostics provides immediate notification to the staff member in the event of a positive test. UF 41. Employees are obligated to report positive test results and are directed not to report to work. UF 42.

6

During the initial outbreak at FCC Lompoc in April/May 2020, the BOP's Infection Prevention staff coordinated a staff testing clinic with the local health department at a nearby local health clinic. UF 45. Furthermore, as individuals working in a correctional facility, all FCC Lompoc staff have access to COVID-19 testing free of charge from dozens of other locations in the community. UF 46.

## C.   Vaccinations

FCC Lompoc administered its first doses of the Pfizer COVID-19 vaccine to inmates from December 28, 2020, through December 31, 2020. UF. 47. Vaccinations were offered to FCC Lompoc staff first to decrease the possible introduction of COVID-19 into the institution, and any remaining vaccinations were offered to FCC Lompoc inmates. UF 48. As there were not enough remaining doses to vaccinate all of the facility's inmates at that time, the institution's medical staff offered vaccinations to inmates as set forth in the BOP's national guidance. UF 49. Priority for vaccination is based upon the nature of the housing (prioritizing open bay over celled housing) and the inmate's individual priority levels (1 – 4) which take into account whether inmates are health service unit workers, their age, and whether they meet the CDC criteria for being at increased risk for severe illness from COVID-19.  UF 50. The BOP allocated the limited number of vaccine doses it received in December 2020 to protect as many inmates as possible in open-bay dorms (UF 51), while using other methods (such as cohorting) to protect inmates in the USP who live in two-person cells separated by solid walls.

FCC Lompoc first offered vaccines to inmates at the USP Camp and FCI as those living spaces consist of open-bay dorms. UF 51. At that time, all inmates at USP North Camp and South Camp were offered the vaccine and inmates at the FCI in J Dorm and K Dorm were offered the vaccine. UF 52. From December 28 through 31, 2020, medical staff at FCC Lompoc administered 429 doses of the Pfizer-BioNTech COVID-19 Vaccine ("Pfizer vaccine"). UF 53.

On March 1, 2021, FCC Lompoc received 600 doses of the Moderna vaccine. UF 54. On April 23, 2021 FCC Lompoc received an additional 110 doses of the Pfizer

vaccine. UF 55. As of April 26, 2021, FCC Lompoc had offered the vaccine to all inmates at FCC Lompoc, with the exception of two inmates who were in pre-release quarantine who were not scheduled to be at FCC Lompoc for the administration of the second dose of vaccine. UF 56.

Petitioner Vincent Reed received the first dose of the Moderna vaccine on March 4, 2021 and his second dose on March 31, 2021. UF 57. Mr. Reed has tested negative as recently as November 16, 2020, though he previously had a positive lab result on a specimen collected on March 30, 2020.  UF 57. Petitioner Yonnedil Carror-Torres was offered the vaccine on April 9, 2021, educated and given the opportunity to ask questions of the infection control nurse at FCC Lompoc and elected to refuse the vaccine. UF 58. He has not had a laboratory test confirming he has COVID-19, though he has been tested multiple times, most recently on January 25, 2021, with negative findings each time. UF 59.

As of May 19, 2021, FCC Lompoc medical staff administered the vaccine as follows:

    a.    241 out of 438 staff members have been fully vaccinated through the BOP.  This number does not account for staff members who have received vaccinations through community sources. UF 60.

    b.    1,091 out of 1,862 inmates have been fully vaccinated. UF 61.

    c.    729 inmates have refused the vaccine. UF 62.[4]

    d.    There are no inmates at FCC Lompoc who have not yet been offered the vaccine. UF 63.

FCC Lompoc is offering the vaccine to newly arrived inmates at their intake into the facility upon their arrival. UF 64. The inmates are then placed in BEMR scheduling and the vaccination is ordered from the BOP's Central Fill and Distribution Center in Pollack, Louisiana. UF 65. The BOP has shifted from a spoke and wheel allocation system to a system in which FCC Lompoc can order the specific number of vaccine

---

[4] Because of inmate movement in and out of FCC Lompoc, the number of refusals and vaccinated inmates does not equal the current population.

doses needed for newly arrived staff and inmates and any inmates or staff who change
their mind and indicate they now wish to receive the vaccine. UF 65.

In summary, 1,091 out of 1,862 inmates at FCC Lompoc have been fully
vaccinated (58.6%) and 729 inmates have refused the vaccine. UF 61-62. 72.82% of the
inmates at FCC Lompoc have either recovered from COVID-19 or are previously
COVID-19 naïve inmates who have been vaccinated. UF 66. As of April 26, 2021, all
eligible inmates had been offered the vaccine. UF 56. Vaccinations will continue to be
offered to newly arrived inmates and those who previously refused and wish to receive
the vaccine. UF 64-65.

When inmates at FCC Lompoc are offered the COVID-19 vaccine, they are
provided a form by a medical provider in the event they refuse vaccination and have the
opportunity to ask questions about the vaccine. UF 67. There is abundant signage about
the vaccine throughout the institution and educational materials on the TRULINCS
system in both Spanish and English to educate inmates about the vaccine. UF 68. FCC
Lompoc has the ability to translate vaccine information into any language that is needed.
UF 68. Additional staff was sent to FCC Lompoc to assist with vaccine administration
and vaccine education. UF 69. FCC Lompoc is continuing to engage with inmates who
previously refused the vaccine to provide education and information about the vaccine.
UF 70. To date, between 30 to 40 inmates who initially refused the vaccine changed their
minds when it was re-offered. UF 71. Those inmates who refused the vaccine have
received and will continue to receive additional opportunities to be vaccinated. UF 72.
The BOP is evaluating the reasons inmates are hesitant to accept the vaccine. UF 72.
Inmates have the ability to submit a request to medical staff for more information or to
ask questions about the vaccine and those in chronic care are being counseled at their
chronic care appointments. UF 72.

### D.    Population Reduction and Transfers to Home Confinement

FCC Lompoc has conducted 2,083 home confinement reviews pursuant to the
Court's Preliminary Injunction, with more reviews being conducted regularly. UF 73. In
other words, the BOP has done home confinement reviews of nearly all the inmates at

9

FCC Lompoc in compliance with the Court's Preliminary Injunction. From these reviews, 141 inmates were preliminarily approved for home confinement and 215 were approved for transfer to a Residential Reentry Center. UF 74. As of May 4, 2021, 141 class members had been placed in home confinement, 215 were transferred to an RRC, 82 were granted compassionate release, 124 were released, and 153 were transferred. UF 75.

Across the United States, the BOP has increased the home confinement population by approximately 200% from March 2020 through December 2020 and has transferred approximately 25,790 inmates to home confinement. UF 76. In addition, the BOP set temporary population caps for low and minimum-security institutions with open bay housing. UF 77. FCC Lompoc's current population of 1,891 is a 29% population reduction from the population of 2,680 alleged in the Complaint and is below the number of available beds. UF 78.

### E.    Site Visits and Expert Testimony

1.    <u>Court Ordered Inspection and Rule 706 Report by Dr. Homer Venters</u>

At the Petitioners' request, the Court appointed Dr. Homer Venters pursuant to Federal Rule of Evidence 706 to conduct a site visit of FCC Lompoc and prepare a report. UF 79. Dr. Venters was directly adverse to the federal government, as an opposing party-retained expert, in prior COVID-19 cases, including *Chunn et al. v. Edge*, 1:20-cv-01590 (E.D.N.Y.); *Martinez-Brooks et al. v. Easter*, 3:20-cv-00569 (D. Conn.); and *Fraihat v. ICE*, 19-cv-1546-JGB (SHKx) (C.D. Cal.). In the *Chunn* case, the District Court made strong criticisms of Dr. Venters' opinions, while citing and relying upon the opposing testimony by Dr. Beard and Asma Tekbali (who Respondents have retained as experts again here, as discussed below). Dr. Venters first visited FCC Lompoc on September 1-2, 2020. UF 80. Dr. Venters' first report, filed on September 25, 2020, made recommendations about what else he thought should be done at FCC Lompoc. UF 81-82. But, as explained below, to the extent they were not already being

10

done by FCC Lompoc, those recommendations were either (a) inconsistent with CDC guidance; or (b) based entirely on claims made by unidentified inmates about problems they were allegedly experiencing. UF 86.

In fact, Dr. Venters had received heavy criticism because of those same methodological deficiencies in the order denying a preliminary injunction in the *Chunn* case. *See Chunn v. Edge*, 465 F. Supp. 3d 168, 181 (E.D.N.Y. 2020) (noting that Dr. Venters' claim that MDC Brooklyn was failing to conduct COVID screening based on inmates' out of court statements to Dr. Venters "does not appear to be supported by the evidence"). There, the district court noted that Dr. Venters made idiosyncratic suggestions without a reliable scientific basis for imposing them; in some cases, his unsupported suggestions were affirmatively misguided and contrary to the governing scientific guidance. *See id.* at 186 (noting that the steps Dr. Venters recommended are "not called for by the CDC's guidance").

Dr. Venters conducted a second visit of FCC Lompoc on April 20-21, 2021. UF 83. His second report was filed with the Court at Dkt. 239-1. UF 84. Dr. Venters second report again makes recommendations that are not called for by CDC guidance and glaringly omits relevant information, such as the fact that as of the time of his visit, there had been zero COVID-19 inmate cases for some time.

### 2. Site Visit and Report of Dr. Jeffrey Beard

Respondents' expert Dr. Jeffrey Beard visited FCC Lompoc on September 8, 2020 and April 20-21, 2021. UF 87. He reviewed Plaintiff's complaint, the actions taken by the BOP and FCC Lompoc in response to COVID-19, and has reviewed Dr. Venters' two reports regarding FCC Lompoc. UF 88. Dr. Beard determined and opined that:

- FCC Lompoc is currently managed by a knowledgeable, effective Warden and management team, and the facility is clean and well maintained. UF 89.
- At the time of his visit, the management team was complying with both BOP direction and CDC guidance relative to managing COVID-19 in a correctional

11

facility. UF 90.

- FCC Lompoc has released/transferred 25% of its inmate population from the time of Attorney General Barr's memo on March 26, 2020 to September 4, 2020, which is more than many other state and federal facilities around the country. UF 91.
- The vaccination program at FCC Lompoc is going very well. UF 92.
- Dr. Venters relies on unidentified inmates in reaching his conclusions and often makes recommendations not grounded in CDC guidance. He also does not offer scientific standards upon which the recommendations are based. UF 93.
- Dr. Venters' methodology for surveying inmates is not a credible or sound source of unbiased or reliable information. A random sample of inmates would have been a better source of information. UF 94.
- The BOP continues to update its COVID-19 policies and procedures to follow CDC guidelines. UF 95.

Respondents incorporate by reference Dr. Beard's rebuttal of Dr. Venters' opinions as set forth in Dr. Beard's report filed at (Dkt. No. 113 at Exhibit 1) as well as Dr. Beard's declaration filed concurrently herewith.

### 3.   Report of Asma Tekbali

Respondents also retained epidemiologist Asma Tekbali to opine as an expert on FCC Lompoc's infection control and testing procedures. UF 96. Ms. Tekbali bore the lead responsibility as an Infection Preventionist at Lenox Hill Hospital-Northwell Health. UF 97. Her hospital was at the center of dealing with New York's COVID-19 crisis and is believed to have admitted and cared for the most COVID-19 patients in the world. UF 98. To prepare her opinion on FCC Lompoc, Ms. Tekbali reviewed the inspection reports by Dr. Venters and Dr. Beard, as well as underlying documentation. She spoke with FCC Lompoc prison governance and infection control officers. UF 99.

Ms. Tekbali explains that the efficacy rate of the Pfizer and Moderna vaccines is 94-95%. UF 100. The Pfizer vaccine was also shown in clinical trials to be 100%

12

effective at preventing severe disease.  UF 100. Data from Israel show that the Pfizer and Moderna vaccines are highly effective across all age groups at preventing symptomatic and asymptomatic COVID-19 infections, hospitalizations, severe illness and death, including the B.1.1.7 variant. UF 100.[5] UF 100. Ms. Tekbali concludes that "FCC Lompoc has effectively responded to a significant COVID-19 outbreak by collaborating with local health departments, adapting to and implementing pandemic response guidance from the CDC and BOP, constructing a COVID-19 hospital unit, providing masks and materials for hand hygiene to inmates, and offering vaccination to essentially all of the inmates and staff." UF 101. She explained that "In their complaint, petitioners request adequate testing and isolation, PPE, and proper treatment and monitoring of inmates ill with the virus. Based on the materials I have been provided, I have determined that FCC Lompoc has met these requests …" UF 102. Ms. Tekbali observes that "Another indication of the facility's successful effort to stop transmission of the virus is the fact that there are no positive inmates at FCC Lompoc, in contrast to the COVID-19 rates prevailing in California. While positive tests have occurred, they have not led to large new outbreaks at the facility, which provides further proof that the infection control measures have been effective and proper." UF 103.

Ms. Tekbali states that "The steps the BOP took to respond to and control FCC Lompoc's outbreak went beyond CDC and BOP guidance, and the effectiveness of these actions are reflected today in the lack of any further major outbreaks at the facility. Particularly given the recent vaccination efforts, I believe it is very unlikely the facility will see a repeat of the spring 2020 outbreak." UF 104. Ms. Tekbali notes that "The near halt of COVID-19 infections within FCC Lompoc after vaccinations began is proof that vaccinations are effective…." UF 105.

---

[5] *See also* https://www.latimes.com/california/story/2021-05-21/breakthrough-coronavirus-infections-of-vaccinated-people-exceedingly-rare-in-l-a-county (stating that of the 3.3 million LA County residents fully vaccinated as of May 7, 2021, 0.03% tested positive for COVID-19, 0.002% were hospitalized, and 0.00036% died).

1    III.    **ARGUMENT**

2        A.    **Petitioners Cannot Establish and Eighth Amendment Violation.**

3        To succeed on their Eighth Amendment claim, petitioners must satisfy two

4    requirements. *First*, they must show that they suffer a deprivation that is "objectively,

5    'sufficiently serious,'" "result[ing] in the denial of the 'minimal civilized measure of

6    life's necessities.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). That "requires more

7    than a scientific and statistical inquiry into the seriousness of the potential harm and the

8    likelihood that such injury to health will actually be caused"; it requires a showing that

9    "society considers the risk that the prisoner complains of to be so grave that it violates

10   contemporary standards of decency to expose *anyone* unwillingly to such a risk." *Helling*

11   *v. McKinney*, 509 U.S. 25, 36 (1993). *Second*, petitioners must show that BOP is acting

12   with "'deliberate indifference' to inmate health or safety," "know[ing] of and

13   disregard[ing] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 834,

14   837. "[T]he Eighth Amendment prohibits mistreatment only if it is tantamount to

15   'punishment,' and thus courts have imposed liability upon prison officials only where

16   they are so deliberately indifferent to the serious medical needs of prisoners as to

17   unnecessarily and wantonly inflict pain." *Perez v. Oakland County*, 466 F.3d 416, 423

18   (6th Cir. 2006) (quotation marks omitted).

19       The Supreme Court has repeatedly affirmed that the Eighth Amendment does not

20   authorize courts to superintend prison officials' decisions about how to balance

21   competing interests within the constraints of the prison setting. Prison officials act with

22   deliberate indifference in violation of the Eighth Amendment only if they "know[] of and

23   disregard[] an excessive risk to inmate health or safety," a standard that "incorporates

24   due regard for [officials'] unenviable task of keeping dangerous men in safe custody

25   under humane conditions." *Farmer*, 511 U.S. at 837, 845 (quotation marks omitted); *see*

26   *also Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011) (noting that the Eighth

27   Amendment "leav[es] ample room for professional judgment, constraints presented by

28                                              14

the institutional setting, and the need to give latitude to administrators who have to make difficult trade-offs as to risks and resources"). The Supreme Court has accordingly emphasized that courts must use "caution" in issuing injunctions in the prison context and may not "enmesh[]" themselves "in the minutiae of prison operations." *Farmer*, 511 U.S. at 846-47. Moreover, to obtain injunctive relief, Petitioners must demonstrate that "prison authorities' *current* attitudes and conduct" meet the "high legal standard" of deliberate indifference, and will continue to do so in the future. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004) (emphasis added); *Farmer v. Brennan*, 511 U.S. 825, 845 (1994).

Nearly all federal courts have held that reasonable efforts taken by prison officials to reduce COVID-19 risk cannot rise to an Eighth Amendment violation even where those efforts were imperfect and the harm imposed by COVID-19 was "ultimately not averted." *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (quoting *Farmer*, 511 U.S. at 844); *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020); *Swain v. Junior*, 961 F.3d 1276, 1286 (11th Cir. 2020); *Cameron v. Bouchard*, 815 Fed. Appx. 978, 986 (6th Cir. 2020) (rejecting plaintiffs' attempts to distinguish *Williams* because their "argument at most shows that defendants' response was imperfect"). Here, the BOP has taken, and continues to take, the necessary steps to eliminate the COVID-19 crisis at FCC Lompoc and to avert any future crisis.

The Supreme Court has twice rejected calls to enjoin local officials' measures taken to protect the health and safety of their citizens during the pandemic. *See South Bay United Pentecostal Church v. Newsom*, 140 S.Ct. 1613, 1613-14 (May 29, 2020) (Roberts, C.J., concurring in the denial of application for injunctive relief) ("especially broad" latitude should be given to officials entrusted with protecting health and safety during this pandemic whose decisions "should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people"); *see also Calvary Chapel*

15

*Dayton Valley v. Sisolak*, 140 S. Ct. 2603 (denying request to enjoin local COVID-19 restrictions).

        1.      Petitioners Cannot Satisfy the Objective Requirement of the Eighth Amendment Standard

The "objective prong" of the Eighth Amendment requires a showing that an inmate has been deprived "of the minimal civilized measure of life's necessities.'" *Farmer*, 511 U.S. at 834. When this deprivation involves a risk of harm, this prong requires the inmate to show that "society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

Petitioners cannot show that the BOP is depriving them of the "minimal civilized measure of life's necessities" or "violating contemporary standards of decency" in addressing the risk of harm to inmates that COVID-19 presents. "A prison official's duty under the Eighth Amendment is to ensure reasonable safety." *Farmer*, 511 U.S. at 844. FCC Lompoc's response is aligned with official guidance from leading world health authorities for mitigating the risks associated with the pandemic. FCC Lompoc has vastly decreased any risk of outbreak by adhering to the CDC guidelines. As explained, there are currently *no* cases of COVID-19 at FCC Lompoc, there have been no COVID-19 cases in FCC Lompoc's general population since December, 2020, there have been no hospitalizations for COVID-19 since August 2020, every inmate has been offered the vaccine, and over 70% of inmates are either recovered from COVID-19, fully vaccinated, or both.

Importantly, the BOP drafted and FCC Lompoc implemented a detailed plan that built on the CDC's guidelines to address the COVID-19 pandemic on multiple fronts. UF 1-4. That plan, which continues to evolve as data and science on the pandemic advances, addresses virtually every aspect of operating these facilities in the midst of the pandemic. UF 3. Measures including staff screening, mask wearing, and testing and

quarantine procedures for newly arriving inmates have kept new COVID-19 cases at bay. UF 5-6. Over the winter, COVID-19 risk proved much more difficult to control within the homes that Petitioners have been asking to be released to. FCC Lompoc's inmates were some of the first people in the United States to be offered the vaccine in December 2020 and FCC Lompoc has now offered the vaccine to all inmates and has infrastructure in place to offer it to new arrivals and inmates who previously refused and now wish to receive it. UF 47, 63-65.

The COVID-19 pandemic exposed everyone – particularly before vaccines had been approved – to the risk of falling ill. FCC Lompoc's response to COVID-19 is aligned with official guidance from leading world health authorities for mitigating the risks associated with the pandemic. *See* Dkt. No. 25-2 ¶¶ 15-16, 23-25, 29; UF 83; Dkt. No. 113 at Exhibit 1 at 3. This Court should reject Petitioners' position that Respondents did not take reasonable steps to protect prisoners at FCC Lompoc from the harm of COVID-19. As an initial matter, even assuming that were true year ago (and it was not), the question before the Court is whether it should enter permanent injunctive relief to address conditions as they exist *now* at FCC Lompoc. In any event, this argument ignores the evidence of the numerous steps the BOP has taken in response to COVID-19 and ignores that FCC Lompoc has offered the vaccine to all inmates. UF 62-63. FCC Lompoc has implemented the same risk-reduction practices among the inmates and staff that are recommended for the community at-large: physical distancing, limited movement, screening mechanisms, providing soap for hand washing, frequently disinfecting high-touch areas, mask-wearing, and quarantining or isolating individuals as appropriate. *See* Dkt. No. 25-2 ¶¶ 54-83; UF 4-6. These practices are the same measures that society deems capable of reducing the risk of COVID-19 transmission, and thus reflect the manner in which "today's society chooses to tolerate" that risk. *Helling*, 509 U.S. at 36.

Notably, Petitioners have not shown that FCC Lompoc's practices raise the risk of death or hospitalization from COVID-19 at Lompoc substantially over the risk in the

17

community at large. *See Hines v. Youssef*, 2015 WL 164215, at *4 (E.D. Cal. Jan. 13, 2015) ("Unless there is something about a prisoner's conditions of confinement that raises the risk of exposure substantially above the risk experienced by the surrounding communities, it cannot be reasoned that the prisoner is involuntarily exposed to a risk the society would not tolerate."). The death rate among infected individuals at FCC Lompoc is drastically lower than the death rate with Los Angeles County, as of May 24, 2021.[6] FCC Lompoc has had no inmate-related COVID-hospitalizations since August 2020, compared to the 21,936 COVID-19 hospitalizations in California in January 2021.[7]

Now that the BOP has offered the vaccine to all FCC Lompoc inmates, the risks have been significantly reduced. Courts have acknowledged the scientific data showing the effectiveness of the COVID-19 vaccine. *See. e.g., United States v. Miller*, 2021 WL 1115863 at *2 (E.D. Mich. Mar. 24, 2021) ("The court is aware of no scientifically derived evidence showing that severe complications or death from COVID-19 is likely, or even possible, after an individual has received a full vaccination regimen.") Any objective risk of serious illness from COVID-19 is now within inmates' control. Numerous courts have recognized that an inmate cannot move for compassionate release based on COVID concerns but also refuse the vaccine. *United States v. Jackson*, 2021 WL 806366 at *1-2 (D. Minn. Mar. 3, 2021) (an inmate "cannot simultaneously claim that he must be released because of the risk of complications while refusing a vaccine that could virtually eliminate that risk."); *United States v. Austin*, 2021 WL 1137897 at *2 (E.D. Mich. Mar. 25, 2021) ("A prisoner cannot on the one hand point to the risk of severe illness, while on the other hand refuse to participate in basic precautionary measures such as vaccination."). As one court noted in the context of an inmate's request for compassionate release from FCI Danbury:

---

[6] The death rate among inmates at FCC Lompoc was 0.41% (5 deaths for 1,210 cases), compared with the Los Angeles County death rate of 1.95% (24,175 deaths for 1,238,919 cases), as of March 17, 2021. *Cf.* BOP website (https://www.bop.gov/coronavirus/index.jsp) with L.A. County website (http://publichealth.lacounty.gov/media/coronavirus/data/index.htm).

[7] https://calmatters.org/health/coronavirus/2020/04/california-coronavirus-covid-patient-hospitalization-data-icu/

> The opportunity for individually-identifiable inmates to opt to receive the COVID-19 vaccine represents a sea change from their previous COVID-19 infection vulnerability and inability to protect themselves against the virus, even with comorbidities. . . . Mr. Poupart's argument that his significant medical needs warrant his release lacks persuasive force since the vaccine has empowered Mr. Poupart to reduce these risks.

*United States of America v. Poupart*, 2021 WL 917067, at *1 (D. Conn. Mar. 10, 2021). An inmate whom the BOP offers "the ability and opportunity to take measures to markedly reduce [their] risk of severe illness or death from COVID-19 while incarcerated," but who rejects such measures, cannot reasonably continue to accuse the BOP of inflicting cruel and unusual punishment on them by being indifferent to their COVID-19 risk.

The risks currently faced by those inside FCC Lompoc are lower than the general risks faced by the public outside, due to the facility's superior ability to control its population, its operations, and its risk factors relative to what has been done over the same period in general Californian communities. Moreover, given that FCC Lompoc has offered all inmates the ability to protect themselves from COVID-19 through vaccines, Petitioners cannot meet their burden to show that the BOP has placed them in conditions of confinement subjecting them to an objectively "unreasonable risk" of harm under the Eighth Amendment. *Helling*, 509 U.S. at 36. UF 55-56.

2.     There is No Dispute that Petitioners Cannot Satisfy the Subjective Requirement of the Eighth Amendment Standard

Petitioners also fail to satisfy the subjective prong of their Eighth Amendment claim, which requires them to show that Respondents "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. This test is subjective, meaning "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. The Eighth Amendment does not require perfect results. *See id. at* 844 ("prison officials who actually knew of a substantial risk to inmate health or safety may

be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted").

To establish an entitlement to injunctive relief, Petitioners must show that BOP officials *currently* are acting with deliberate indifference. Where a prisoner "seeks injunctive relief to prevent a substantial risk of serious injury from ripening into actual harm, the subjective factor . . . should be determined in light of the prison authorities' current attitudes and conduct[.]" *Id.* at 845 (internal quotation marks omitted). Thus, Petitioners must show that today, Respondents are recklessly disregarding an excessive risk to Petitioners' safety, and that they will continue to do so "into the future." *Id.*

The Fifth, Sixth and Eleventh Circuits found no Eighth Amendment violations even in facilities with significant active COVID-19 outbreaks (which is not the case here) and reversed district court decisions granting injunctive relief. In *Valentine v. Collier*, 993 F.3d 270, 277 (5th Cir. 2021), the Fifth Circuit reversed the district court's entry of a permanent injunction over a geriatric state prison. The Fifth Circuit found that the prison's response to COVID-19 and its implementation of public health guidance regarding testing, social distancing, mask use, handwashing, and sanitation and cleaning did not meet the subjective test of deliberate indifference and concluded that permanent injunctive relief was not warranted. *Id.* at 289.

In *Swain v. Junior*, 961 F.3d 1276, 1287 (11th Cir. 2020), the district court issued an injunction finding that prison officials were deliberately indifferent because it was not possible for inmates to be at least six feet apart at all times and because the rate of COVID-19 infections had increased. The Eleventh Circuit reversed, concluding that where prison officials "took numerous *other* measures – besides social distancing – to mitigate the spread of the virus," including requiring the use of face masks, screening of staff into the facility, daily temperature screening, suspending outside visitation, and providing disinfecting and hygiene supplies to all inmates, prison officials could not be found liable because they could not meet the subjective component under the Eighth Amendment. *Id.* at 1289 (emphasis in original). The Eleventh Circuit noted that, although inmates at the facility had contracted COVID-19, resulting harm alone cannot

20

establish a culpable state of mind. *Id.* It found no Eighth Amendment liability if prison officials respond reasonable to a risk to inmate health, "*even if the harm ultimately was not averted.*" (quoting *Farmer*, 511 U.S. at 844) (emphasis in original).

In *Williams*, the Sixth Circuit also vacated the district court's injunction and held that petitioners could not satisfy the subjective prong of an Eighth Amendment violation where the BOP had responded reasonably to the risk of COVID-19 at FCI Elkton by implementing screening, testing, isolation, and hygiene measures, limiting inmate movement, and providing inmates and staff with masks and PPE. 961 F.3d at 841. *Williams* noted that the Fifth and Eleventh Circuits had already found similar measures to constitute a reasonable response to COVID-19 such that there was no tenable Eighth Amendment claim. *Id.* at 841-42 (citing *Swain* (per curiam); *Valentine* (per curiam); *Marlowe v. LeBlanc*, 2020 WL 2043425 (5th Cir. Apr. 27, 2020) (per curiam)). *See also Grinis*, 2020 WL 2300313, at *3 ("These affirmative steps may or may not be the best possible response to the threat of COVID-19 within the institution, but they undermine an argument that the respondents have been actionably deliberately indifferent to the health risks of inmates."); *Nellson*, 2020 WL 3000961, at *8 (finding no likelihood of success on merits of Eighth Amendment conditions-of-confinement claim due to COVID-19 and noting that "[c]ompliance with CDC protocols does not demonstrate that defendants are disregarding a substantial risk to inmate health or failing to respond reasonably to the risks of COVID-19"). Moreover, as Judge Fitzgerald noted in *Wilson v. Ponce*, CV 20-4451-MWF, a COVID-19 conditions of confinement case at FCI Terminal Island, "a mere difference of medical opinion is insufficient, as a matter of law, to establish deliberate indifference." *Wilson v. Ponce*, 2021 WL 880397, at *4 (C.D. Cal. Feb. 25, 2021) (citing *Toguchi*, 391 F.3d at 1058 (internal quotations marks and citation omitted)).

To the extent that Petitioners' deliberate indifference argument is premised on the assumption that the inability to remain six feet apart at all times is *per se* deliberate indifference, that argument has been squarely rejected by other courts. *See Wragg*, 2020

21

WL 2745247, at *21 (no Eighth Amendment violation because there is "no evidence of Respondents' liable state of mind" and noting "physical distancing is not possible in a prison setting, as Petitioners urge, does not an Eighth Amendment claim make and, as such, Petitioners are not likely to succeed on the merits").

Similarly, Petitioners here cannot satisfy the subjective requirement of an Eighth Amendment conditions-of-confinement claim. BOP officials have not acted with deliberate indifference to the risk that COVID-19 poses to inmate populations; rather, they have taken aggressive, appropriate, and successful measures to abate that risk at FCC Lompoc. Although Petitioners and Respondents have minor disputes over the implementation about these measures, even if Petitioners' allegations are true, it does not rise to the level of deliberate indifference. *See Wragg*, 2020 WL 2745247, at *21 (no Eighth Amendment violation because there is "no evidence of Respondents' liable state of mind"); *Money v. Pritzker*, 453 F.Supp.3d at 1131 (prisoner petitioners have "no chance of success" as to deliberate indifference because of the measures taken by the Illinois Department of Corrections). Petitioners cannot succeed on their Eighth Amendment claim given the actions taken by the BOP at FCC Lompoc. *See Farmer*, 511 U.S. at 845. Respondents acted with a high degree of care, and certainly were not acting with deliberate indifference that would transform conditions at FCC Lompoc into an Eighth Amendment "punishment." Indeed, starting in December 2020, inmates at FCC Lompoc were some of the first people in this country to be offered these COVID-19 vaccines. UF 47. All Lompoc inmates have now been offered the vaccine. UF 63. Furthermore, the BOP created and implemented its Pandemic Response Plan, which is continually revised to reflect new scientific developments. UF 1-3. The Pandemic Response plan addresses nearly every aspect of operating the BOP's institutions and reflects that the BOP has used every tool in its arsenal (such as masking, testing of inmates and staff, cohorting, quarantine protocol, and vaccination). UF 1-3.

In fact, Petitioners' own pleadings recount the numerous steps FCC Lompoc has taken to combat COVID-19: conducted testing of hundreds of inmates (*see* ECF No. 16 at ¶¶ 2-3,); issued masks (ECF No. 16 at ¶ 54, ECF No. 18 at 29:8-12, 49:2-4); locked

22

down the facility (ECF No. 16 at ¶¶ 47, 49, ); and isolated individuals with positive test results for COVID-19 (ECF No. 16 at ¶¶ 47, 51). The existence of these facts, which Petitioners acknowledge were taken, undercuts their bald assertions that FCC Lompoc showed deliberate indifference to the threat to inmate health posed by COVID-19.

As the pandemic has progressed, FCC Lompoc adhered to the BOP's Pandemic Response Plan and has conducted over 5,479 COVID-19 tests, continues to provide masks and soap to inmates, and has offered the vaccine to all inmates. UF 29, 63, 101. These steps in the face of this global pandemic, demonstrate an extremely high degree of care. Petitioners thus cannot show that BOP officials are acting with deliberate indifference, and cannot succeed on their Eighth Amendment claim. *See Farmer*, 511 U.S. at 845 ("[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause."); *Lucero-Gonzalez v. Kline*, 464 F. Supp. 3d 1078, 1090 (D. Ariz. 2020) ("The very fact that Defendants have enacted [] policies [in response to the risks posed by COVID-19] supports that they have not been subjectively indifferent to the risks posed by COVID-19."), *order clarified on reconsideration*, 2020 WL 8258212 (D. Ariz. July 17, 2020). In total, the evidence demonstrates that Respondents acted with an extremely high degree of care, and certainly were not acting with deliberate indifference that would transform conditions at FCC Lompoc into an Eighth Amendment "punishment." *See Wilson v. Seiter*, 501 U.S. 294, 298, 300 (1991).

## B. Petitioners Have Failed To Timely Move For And Obtain Class Certification Prior To The Motion Cutoff

Petitioners have not moved for class certification. They only filed an *ex parte* application for *provisional* class certification. Dkt. No. 22. Following the Court's initial issuance of the preliminary injunction and grant of such provisional certification (Dkt. No. 45), Petitioners have treated this case as if it were essentially over, with the pressing COVID-19 risk having been resolved, and no urgent risk to the inmates remaining beyond what the preliminary injunction had already addressed. Petitioners thus do not have a class action to proceed with. Because "actual, not presumed," compliance with

23

Rule 23 remains the touchstone for class certification, a class may be certified only after the court has conducted a "rigorous analysis" to determine if class certification is appropriate in light of the particular facts underlying the plaintiff's claim. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 160-61 (1982). Here, Petitioners never moved for such a determination. While the Court certified a *provisional* class in connection with issuing the preliminary injunction, the scope of such provisional certification is limited to facilitating such preliminary relief. It is not a substitute for an actual Rule 23 class certification.

### C.    Petitioners Have Failed to Exhaust Administrative Remedies

The PLRA mandates that "[n]o action shall be brought with respect to prison conditions under . . . any . . . Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *Maronyan v. Toyota Motor Sales, USA, Inc.*, 658 F.3d 1038, 1041-42 (9th Cir. 2011) (PLRA exhaustion "requirement"). To the extent that Petitioners seek further relief concerning FCC Lompoc's response to COVID-19, they may not raise those claims in this lawsuit until they have fulfilled the PLRA's administrative exhaustion requirements.  Respondents incorporate by reference their administrative exhaustion argument at Dkt. No. 25 at 55:4-59:3.

## IV.    CONCLUSION

For the foregoing reasons, Respondents respectfully request that this Court grant summary judgment in favor of Respondents and against Petitioners as a matter of law.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Dated: May 25, 2021

Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
JOANNE S. OSINOFF
Assistant United States Attorney
Chief, General Civil Section


_/s/ Jasmin Yang_
JASMIN YANG
Assistant United States Attorney
Attorneys for Respondents

25