Terry W. Bird – Bar No. 49038
    tbird@birdmarella.com
Dorothy Wolpert – Bar No. 73213
    dwolpert@birdmarella.com
Shoshana E. Bannett – Bar No. 241977
    sbannett@birdmarella.com
Kate S. Shin – Bar No. 279867
    kshin@birdmarella.com
Oliver Rocos – Bar No. 319059
    orocos@birdmarella.com
Christopher J. Lee – Bar No. 322140
    clee@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT,
NESSIM, DROOKS, LINCENBERG &
RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Naeun Rim
    nrim@manatt.com
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 312-4380
Facsimile: (310) 312-4224

Attorneys for Plaintiff-Petitioners Yonnedil
Carror Torres, Vincent Reed, Felix Samuel
Garcia, Andre Brown, and Shawn L. Fears

Donald Specter – Bar No. 83925
    dspecter@prisonlaw.com
Sara Norman – Bar No. 189536
    snorman@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Facsimile: (510) 280-2704

Peter J. Eliasberg – Bar No. 189110
    peliasberg@aclusocal.org
Peter Bibring – Bar No. 223981
    pbibring@aclusocal.org
ACLU FOUNDATION OF
SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-9500
Facsimile: (213) 977-5297

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| YONNEDIL CARROR TORRES, et al., | CASE NO. 2:20-cv-04450-CBM-PVCx |
| Plaintiff-Petitioners, | **PLAINTIFF-PETIONERS' RESPONSE TO DEFENDANTS-RESPONDENTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| LOUIS MILUSNIC, in his capacity as Warden of Lompoc, et al., | Assigned to Hon. Consuelo B. Marshall |
| Defendant-Respondents. | Date:     June 29, 2021<br>Time:     10:00am<br>Crtrm.:   8B |

3723164.1

1

Pursuant to Central District of California Local Rule 56-1, Plaintiffs-Petitioners Yonnedil Carror Torres, Vincent Reed, Felix Samuel Garcia, Andre Brown, and Shawn L. Fears ("Petitioners") submit this Response to Defendant-Respondents Louis Milusnic and Michael L. Carvajal's ("Respondents") Statement of Uncontroverted Facts and Conclusions of Law in support of their Motion for Summary Judgment.

## I.

## PETITIONERS' RESPONSE TO RESPONDENTS' STATEMENT OF UNCONTROVERTED FACTS

## STATEMENT OF GENUINE DISPUTES OF MATERIAL FACT ("DF")

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| 1.   Jessica Figlenski, the Central Office Quality Improvement/Infection Prevention & Control Consultant responsible for the Western Region within the Federal Bureau of Prisons (BOP), Lawrence Cross, the Health Services Administrator at the Federal Correctional Complex in Lompoc, California ("FCC Lompoc"), and James Engleman, the Associate Warden at FCC Lompoc, believe that the BOP has followed guidance and directives from the CDC, World Health Organization (WHO), the Office of Personnel Management (OPM), the Department of Justice (DOJ), and the White House in responding to the COVID- 19 pandemic. | **DISPUTED.** Respondents have proposed an opinion, not a fact. Moreover, Petitioners dispute the facts upon which Ms. Figlenski's, Mr. Cross's, and Mr. Engleman's belief is based. Respondents have violated, and continue to violate, CDC recommendations for correctional facilities in a number of ways, including by failing to conduct screening/surveillance testing of staff, *see infra* Petitioners' Additional Uncontroverted Facts ("AUF") 7-9, 65-66, 74, failing to require staff exposed to COVID-19 to quarantine or undergo testing for COVID-19, *see infra* AUF 10, 67-71, failing to regularly test incarcerated workers, *see infra* AUF 13-14, 72, failing to ensure social distancing, *see infra* AUF 29, 31, 73, failing to provide soap to incarcerated |

3723164.1

2

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| | people, *see infra* AUF 29, 75; DF 89, and failing to ensure conditions in quarantine/isolation units are non-punitive, *see infra* AUF 36, 37. Respondents have also failed to implement the many recommendations from the CDC to encourage those living and working at Lompoc to get vaccinated against COVID-19. *See infra* AUF 38-47, 49-54, 77-85. |
| 2. On August 31, 2020, the BOP released a COVID-19 Pandemic Response Plan that compiles previous guidance, including all phases of its Action Plan, and provides a comprehensive document with specific guidance for limiting the spread of COVID- 19 at BOP institutions. | **NOT DISPUTED.** |
| 3. The COVID-19 Pandemic Response Plan contains eleven modules incorporating guidance from the Centers for Disease Control (CDC), World Health Organization (WHO), and the Department of Justice (DOJ). | **DISPUTED.** The BOP's COVID-19 Pandemic Response Plan is not consistent with CDC guidance regarding testing of staff and incarcerated workers. *See DF 1.* |
| 4. Jessica Figlenski, the Central Office Quality Improvement/Infection Prevention & Control Consultant responsible for the Western Region within the BOP, believes that FCC Lompoc has been operating in compliance with the CDC's guidance and with the BOP's COVID-19 | **DISPUTED.** Respondents have proposed an opinion, not a fact. Moreover, Petitioners dispute the facts upon which Ms. Figlenski's belief is based. *See DF 1.* |

3723164.1

3

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE
DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| Pandemic Response Plan. | |
| 5. Jessica Figlenski, the Central Office Quality Improvement/Infection Prevention & Control Consultant responsible for the Western Region within the BOP, believes that FCC Lompoc has prevented further COVID-19 outbreaks, like the one that occurred in the spring of 2020, and COVID- 19 related deaths by implementing a host of measures, including broad-based testing and adherence to evolving CDC guidelines for infection prevention and control (such as cohorting and isolation procedures enacted after testing every inmate). | **DISPUTED.** Respondents have proposed an opinion, not a fact. Moreover, Petitioners dispute the facts upon which Ms. Figlenski's belief is based. *See* DF 1. |
| 6. Epidemiologist Asma Tekbali believes that FCC Lompoc effectively slowed the spread of COVID-19 through its infection control measures by collaborating with local health departments, adapting to and implementing pandemic guidance from the CDC and the BOP, constructing a COVID-19 hospital unit, and providing masks and materials for hand hygiene to inmates, and offering vaccination to essentially all of the inmates and staff. | **DISPUTED.** Respondents have proposed an opinion, not a fact. Moreover, Petitioners dispute the facts upon which Ms. Tekbali's belief is based, *see* DF 1, and dispute that Ms. Tekbali is qualified to opine as an expert on Lompoc's infection control practices.<br><br>Ms. Tekbali has no firsthand knowledge of Lompoc's COVID-19 response practices. She took few, if any, steps to corroborate the information that she included in either of her two reports, information which she received from the BOP's other expert, Dr. Beard, or from just three members of prison leadership. She did not speak with anyone incarcerated at |

3723164.1

4

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| | Lompoc, did not interview staff assigned to work in the housing units, and did not review anyone's individual healthcare records.

Additionally, Ms. Tekbali has never held a position in a correctional facility, Declaration of Asma Tekbali ("Tekbali Decl.") ¶ 1 & Ex. A (Dkt. No. 251-3), has no experience in correctional healthcare delivery, *id.*, and has never been past the administrative area in any federal, state, county, or municipal correctional institution, Declaration of Sara Norman ("Norman Decl."), filed herewith, ¶ 4 & Ex. 3 (Deposition of Asma Tekbali ("Tekbali Dep.") at 21:22-22:18). She is also not a medical doctor. Tekbali Decl. ¶ 1, Ex. A. She graduated from her Masters Program in 2019 and has since only had one position in the field of infection prevention, which she began in August 2019. *Id.*

*See, e.g.*, Tekbali Dep. at 26:10-13 (testifying that she did not interview anyone incarcerated at Lompoc before submitting either of her reports), 31:21-32:6, 13-15; 47:18-25; 48:8-14 (admitting she only spoke with two members of prison leadership before drafting her first report and one other member of prison leadership before drafting her second report), 38:2-5 ("I did not take any steps to corroborate" officers are compliant with mask policies), 46:15-21 ("I didn't speak |

3723164.1

5

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| | with anybody specifically about soap."), 46:22-47:1 ("I could not physically be there to visualize any soap dispensers") 54:17-24 (testifying that she "did not take steps to corroborate" that an incarcerated person with COVID-19 at Lompoc was asymptomatic before including it her report), 56:14-17 ("I did not" "review any contact tracing worksheets to verify" contract tracing occurred before concluding it did), 101:8-15 (conceding that she does not know how incarcerated people can ask health providers about vaccine-related questions), 103:9-14; 104:1-4 (admitting that she did not review any documentation about people who refused the vaccine and later accepted it, despite including information in her report about it). |
| 7.   COVID-19 infection rates increased throughout California from November 2020 through February 2021. | **NOT DISPUTED.** |
| 8.   Los Angeles County experienced over 1.2 million confirmed COVID-19 cases to date. | **NOT DISPUTED.** |
| 9.   California has had over 3.6 million total confirmed positives to date. | **NOT DISPUTED.** |
| 10. Epidemiologist Asma Tekbali believes that the presence of 0 positive | **DISPUTED.** Respondents have proposed an opinion, not a fact. |

3723164.1

6

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| inmate cases at FCC Lompoc as of March 20, 2021 in contrast to the state of the COVID-19 pandemic in California is proof that FCC Lompoc has effectively slowed the spread of COVID-19 and evidence that the BOP's infection control measures have been successful at FCC Lompoc. | Moreover, Petitioners dispute the facts upon which Ms. Tekbali's belief is based and dispute that Ms. Tekbali is qualified to opine as an expert on Lompoc's infection control practices. *See* DF 6, 12. |
| 11. Epidemiologist Asma Tekbali believes that no major outbreak emerged within FCC Lompoc in early 2021, and nothing comparable to the rates of infection that were experienced by the general populace outside the facility over that period. | **DISPUTED.** Respondents have proposed an opinion, not a fact. Moreover, Petitioners dispute the facts upon which Ms. Tekbali's belief is based and dispute that Ms. Tekbali is qualified to opine as an expert on Lompoc's infection control practices. *See* DF 6. |
| 12. As of May 25, 2021, there are 0 inmate or staff COVID-19 cases at FCC Lompoc. | **DISPUTED.** Petitioners do not dispute that Respondents had not identified any active COVID-19 infections at Lompoc as of May 25, 2021.  However, Petitioners dispute Respondents' ability to identify all COVID-19 cases at Lompoc on any given day, as Respondents are not conducting regular surveillance testing of all staff and incarcerated people. *See* Declaration of Jessica Figlenski ("Figlenski Decl.") ¶ 5 & Ex. 1 (Dkt. No. 251-2 at 12-24), ¶ 9 & Ex. 2 (Dkt. No. 251-2 at 33) (BOP policy does not require surveillance testing of staff or incarcerated people); AUF 7, 9, 10. |
| 13. Epidemiologist Asma Tekbali | **DISPUTED.** Respondents have |

3723164.1

7

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| believes that while positive tests occurred at FCC Lompoc earlier in 2021, they were limited to the intake of new inmates, and so did not lead to any new outbreaks in the general population at the facility, despite the large surge in COVID-19 rates during the same period outside the facility, which provides further proof that the infection control measures FCC Lompoc implemented have been effective and proper. | proposed an opinion, not a fact. Moreover, Petitioners dispute the facts upon which Ms. Tekbali's belief is based and dispute that Ms. Tekbali is qualified to opine as an expert on Lompoc's infection control practices. *See* DF 6. |
| 14. The first confirmed case of COVID-19 at FCC Lompoc was an inmate from USP Lompoc who was swabbed at the local hospital on March 26, 2020 and the positive results were reported to FCC Lompoc on March 30, 2020. | **NOT DISPUTED.** |
| 15. After confirmation of the first case of COVID-19 at USP Lompoc, FCC Lompoc took immediate action and began conducting a contact investigation and screening and testing positively identified contacts. | **DISPUTED.** Respondents have not consistently conducted contact investigations, isolated patients, or screened and tested positive contacts. A report published by the Office of the Inspector General (OIG) in July 2020 detailed the failures of Lompoc's early pandemic response. In one case, medical staff did not test or isolate an incarcerated person who, for days, reported to medical staff that he had symptoms consistent with COVID-19. Before his admission to the community hospital, he had exposed other people in his housing unit to COVID-19 for |

3723164.1

8

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| | nearly a week. In another case, institution leadership failed to notify a staff member that he had been a close contact of another COVID-positive staff member. *See* Norman Decl. ¶ 15 & Ex. 14 (OIG Report at 5-6, 9). The OIG report also indicates that staffing shortages limited Lompoc's ability to conduct regular COVID-19 symptom screenings. *See id*. (OIG Report at i). |
| 16. Inmates found to test positive were isolated and exposed inmates were quarantined and monitored for symptoms. | **DISPUTED.** Lompoc has not consistently monitored people in isolation or quarantine units for symptoms of COVID-19. During his September 2020 site visit, the Court Expert determined that people in quarantine or isolation units often only had their temperatures checked, but they were not monitored for any other symptoms of COVID-19. Court Expert Init. Report ¶¶ 20(d), 25(c), 37(a)(iii) (Dkt. No. 101-1). Similarly, he observed that some people in medical isolation did not even receive daily temperature checks, at times "going days in between clinical assessments." *Id*. at ¶ 20(c). |
| 17. Mass testing at FCI Lompoc took place on May 5, 2020. | **NOT DISPUTED.** |
| 18. COVID-19 negative inmates were cohorted in a dedicated unit at the USP (which has cells instead of open-bay dormitories) to prevent further | **NOT DISPUTED.** |

3723164.1

9

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
| --- | --- |
| transmission of the disease among those testing negative. | |
| 19. Since the mass testing in May of 2020, inmate testing at FCC Lompoc has been conducted in accordance with the BOP's COVID-19 Pandemic Response Plan Module 3, Screening and Testing. | **DISPUTED**.  Lompoc has not consistently administered COVID-19 tests to incarcerated people in accordance with the BOP's COVID-19 Pandemic Response Plan Module 3, Screening and Testing.  The Court Expert detailed in his first report that many symptomatic people were "not isolated and tested expeditiously," as required by the BOP's COVID-19 Pandemic Response Plan Module 3.  Instead, he reported that, upon relaying to medical staff that they were symptomatic, many people were "initially rebuffed by medical staff, being told that they had a cold, the flu or that they needed to 'wait and see' before being evaluated by a physician or tested." Court Expert Init. Report ¶ 20(f) (Dkt. No. 101-1). |
| 20. Section 2 of Module 3 of the COVID-19 Pandemic Response Plan requires that symptomatic inmates be isolated and tested expeditiously and asymptomatic inmates with known or suspected contact with a COVID-19 case be quarantined and tested expeditiously. | **NOT DISPUTED.** |
| 21. Section 2 of Module 3 of the COVID-19 Pandemic Response Plan provides that expanded testing of all | **NOT DISPUTED.** |

3723164.1

10

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| inmates in an entire open bay housing unit should be considered as part of a robust contact tracing. | |
| 22. FCC Lompoc continues to conduct testing in accordance with the BOP's testing protocols, which include testing all incoming and outgoing inmates in accordance with BOP Pandemic Response Plan Module 4, Inmate Isolation and Quarantine. | **NOT DISPUTED** that Lompoc tests incoming and outgoing inmates**.** |
| 23. FCC Lompoc also has protocols to determine when to test inmates within the institution's general population because of contact investigation. | **NOT DISPUTED.** |
| 24. The testing of all inmates releasing or transferring out of FCC Lompoc serves as random surveillance testing of the institution's general population. | **DISPUTED.** Lompoc does not conduct surveillance testing, which the BOP defines as "testing all inmates at an institution without any known COVID-19 cases." Figlenski Decl., Ex. 2 (Dkt. No. 251-2) (BOP's COVID-19 Pandemic Response Plan Module 3, Screening and Testing). *See also* Norman Decl. ¶ 5 & Ex. 4 (Deposition of Dr. Homer Venters ("Venters Dep.") at 266:6-13) (Court Expert opining that surveillance testing is not being done at Lompoc). |
| 25. As part of intake procedures, all inmates who entered FCC Lompoc after the initial outbreak entered quarantine units and were tested as | **NOT DISPUTED.** |

3723164.1

11

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| determined by existing BOP testing protocols. | |
| 26. No later than August 10, 2020, FCC Lompoc tested all incoming inmates, isolated positive inmates, quarantined negative inmates, and re-tested quarantined inmates on or after the 14th day of their quarantine period. | **NOT DISPUTED.** |
| 27. These inmates were transferred into the institution's general population only if they either had cleared quarantine by having a repeated negative test result or, if positive, after completing the isolation period and being cleared by medical staff. | **NOT DISPUTED.** |
| 28. Incoming inmates have no contact with inmates in the institution's general population until they clear quarantine or isolation. | **NOT DISPUTED.** |
| 29. As of May 19, 2021, FCC Lompoc has conducted over 5,479 COVID-19 tests on 1,722 inmates. | **NOT DISPUTED.** |
| 30. All five of the FCC Lompoc inmates who died of COVID-related illness contracted the disease during the March-May 2020 outbreak at FCC Lompoc. | **NOT DISPUTED.** |
| 31. FCC Lompoc has not had an inmate | **NOT DISPUTED.** |

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| hospitalized for COVID-related illness since August 20, 2020. | |
| 32. FCI Lompoc has not had a COVID-19 case in its general population since September 25, 2020. | **DISPUTED.** *See* DF 12. |
| 33. USP Lompoc has not had a COVID-19 case in its general population since December 31, 2020. | **DISPUTED.** *See* DF 12. |
| 34. The last lab-confirmed case of COVID-19 at FCC Lompoc occurred in FCC Lompoc's intake quarantine with a newly arriving inmate on March 26, 2021 and was detected as part of the BOP's intake quarantine process. | **NOT DISPUTED.** |
| 35. The BOP's COVID-19 Pandemic Response Plan, Module 11, Employee Management, provides guidance for staff testing, including the identification of testing sites in the local community, requiring staff who test positive to report their diagnosis to the BOP, and indications and priorities for testing. | **NOT DISPUTED.** |
| 36. The BOP's Pandemic Response Plan requires staff to report positive test results, requires asymptomatic staff who test positive to wait at least 10 days before reporting to work, and sets forth an algorithm for when symptomatic staff may return to work | **NOT DISPUTED.** |

3723164.1

13

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| (with staff who have been hospitalized being required to wait at least 20 days since the appearance of symptoms before they return to work. | |
| 37. The BOP's procedures do not permit staff with positive test results to report to work until the appropriate CDC time-based guidance permits them to return. | **NOT DISPUTED.** |
| 38. As set forth in Section E of Module 11 of the Pandemic Response Plan, the BOP has established a nationwide contract with Quest Diagnostics to facilitate COVID-19 testing for all BOP employees, including those at FCC Lompoc, via self-swab collection kits. | **NOT DISPUTED.** |
| 39. Staff members that meet indications for testing specified in Module 11 can obtain a collection kit from the institution, complete the test, and return it via Federal Express to the Quest Diagnostics labs for processing. | **DISPUTED.**  The extent to which Respondents makes COVID-19 tests available to such staff on a voluntary basis is unclear.  Respondents' person most knowledgeable on this fact was unable to confirm whether "they've had staff that have taken advantage of the opportunity or not."  Norman Decl. ¶ 2 & Ex. 1 (Deposition of Bryan Birkholz, Respondents' designee pursuant to Federal Rule of Civil Procedure 30(b)(6) ("Respondents' PMK Dep.") at 64:4-11.  In an email dated December 11, 2020 and produced by Respondents, Lompoc's Health Services Administrator stated "the |

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| | process is meant to be a last resort, or another avenue, for staff to obtain COVID-19 testing if they are unsuccessful in the community. We will not have test kits on hand to distribute to staff."  Norman Decl. ¶ 10 & Ex. 9 (LOX 1473). |
| 40. Staff at FCC Lompoc have access to their test results through a secure online portal provided by Quest Diagnostics. | **NOT DISPUTED.** |
| 41. Quest Diagnostics provides immediate notification to the staff member in the event of a positive test via a telephone call and overnight mail. | **NOT DISPUTED.** |
| 42. FCC Lompoc employees are obligated to report positive test results and are directed not to report to work. | **NOT DISPUTED.** |
| 43. Quest Diagnostics also provides a nightly aggregate report of staff results to the BOP. | **NOT DISPUTED.** |
| 44. COVID-19 testing provided by Quest Diagnostics is available at no charge to BOP staff. | **NOT DISPUTED.** |
| 45. During the initial outbreak at FCC Lompoc in the spring of 2020, the BOP's Infection Prevention staff coordinated a staff testing clinic with | **NOT DISPUTED** |

3723164.1

15

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| the local health department at a nearby local health clinic. | |
| 46. Furthermore, as individuals working in a prison, all FCC Lompoc staff have access to COVID-19 testing free of charge from dozens of other locations in the community, including Rite-Aid and CVS pharmacies. | **NOT DISPUTED.** |
| 47. FCC Lompoc administered its first doses of the Pfizer COVID-19 vaccine to inmates from December 28, 2020, through December 31, 2020. | **NOT DISPUTED.** |
| 48. Pursuant to the BOP's COVID-19 Vaccine Guidance dated December 28, 2020, vaccinations were offered to FCC Lompoc staff first to decrease the possible introduction of COVID-19 into the institution, and any remaining vaccinations were offered to FCC Lompoc inmates. | **NOT DISPUTED.** |
| 49. As there were not enough remaining doses to vaccinate all of the facility's inmates, the institution's medical staff offered vaccinations to inmates as set forth in the BOP's national guidance. | **NOT DISPUTED.** |
| 50. Priority for vaccination is based upon the nature of the housing (prioritizing open bay over celled housing) and the inmate's individual | **NOT DISPUTED.** |

3723164.1

16

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| priority levels (1 – 4) which take into account whether inmates are health service unit workers, their age, and whether they meet the CDC criteria for being at increased risk for severe illness from COVID-19. | |
| 51. In offering vaccines to inmates in December 2020, FCC Lompoc started offering vaccines to inmates at the USP Camp and FCI as those living spaces consist of open- bay dorms. | **NOT DISPUTED.** |
| 52. In December 2020, all inmates at USP North Camp and South Camp were offered the vaccine and inmates at the FCI in J Dorm and K Dorm were offered the vaccine. | **NOT DISPUTED.** |
| 53. From December 28 through 31, 2020, medical staff at FCC Lompoc administered 429 doses of the Pfizer-BioNTech COVID- 19 Vaccine ("Pfizer vaccine"). | **NOT DISPUTED.** |
| 54. On March 1, 2021, FCC Lompoc received a second batch of vaccine. This batch of vaccine was the Moderna vaccine. FCC Lompoc received 600 doses. | **NOT DISPUTED.** |
| 55. On April 23, 2021, FCC Lompoc received another batch of the Pfizer vaccine. FCC Lompoc received 110 | **NOT DISPUTED.** |

3723164.1

17

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE
DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| doses. | |
| 56. As of April 26, 2021, FCC Lompoc had offered the vaccine to all inmates at FCC Lompoc, with the exception of two inmates who were in pre-release quarantine who were not scheduled to be at FCC Lompoc for the administration of the second dose of vaccine. | **NOT DISPUTED.** |
| 57. Petitioner Vincent Reed received the first dose of the Moderna vaccine on March 4, 2021, and has tested negative as recently as November 16, 2020, though he previously had a positive lab result on a specimen collected March 30, 2020. | **NOT DISPUTED.** |
| 58. Petitioner Yonnedil Carror-Torres was offered the vaccine on April 9, 2021, educated and given the opportunity to ask questions of the infection control nurse at FCC Lompoc and elected to refuse the vaccine. | **DISPUTED.** Mr. Torres was not educated about the vaccine and was not given the opportunity to ask questions. *See* Declaration of Yonnedil Carror Torres ("Torres Decl."), filed herewith, ¶¶ 2-4. |
| 59. Mr. Carror-Torres has not had a laboratory test confirming he has COVID-19, though he has been tested multiple times, most recently on January 25, 2021, with negative findings each time. | **NOT DISPUTED.** |
| 60. As of May 19, 2021, 241 out of 438 staff members have been fully | **DISPUTED.** Petitioners dispute this proposed fact to the extent that |

3723164.1

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| vaccinated through the BOP. This number does not account for staff members who have received vaccinations through community sources. | Respondents claim that members of Lompoc staff have, in fact, received vaccinations through community sources. That fact is not supported by evidence. Lompoc does not currently track staff vaccination rates unless the vaccination occurred via the BOP. Court Expert Supp. Report ¶ 11 (Dkt. No. 239-1); Respondents' PMK Dep. at 50:19-51:1. |
| 61. As of May 19, 2021, 1091 out of 1,862 inmates have been fully vaccinated. | **NOT DISPUTED.** |
| 62. As of May 19, 2021, 729 inmates have refused the vaccine. | **NOT DISPUTED.** |
| 63. As of May 19, 2021, there are no inmates at FCC Lompoc who have not yet been offered the vaccine. | **NOT DISPUTED.** |
| 64. FCC Lompoc is offering the vaccine to newly arrived inmates at their intake into the facility upon their arrival. | **NOT DISPUTED.** |
| 65. The inmates are then placed in BEMR scheduling and the vaccination is ordered from the BOP's Central Fill and Distribution Center in Pollack, Louisiana. The BOP has shifted from a spoke and wheel allocation system to a system in which FCC Lompoc can order the specific number of vaccine | **NOT DISPUTED.** |

3723164.1

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| doses needed for newly arrived staff and inmates and any inmates or staff who change their mind and indicate they now wish to receive the vaccine. | |
| 66. 72.82% of the inmates at FCC Lompoc have either recovered from COVID-19 or are previously COVID-19 naïve inmates who have been fully vaccinated. | **DISPUTED.** Respondents' failure to track chronic or long-term COVID-19 symptoms makes it impossible to determine the number of incarcerated people who tested positive from COVID-19 and have "recovered." Court Expert Supp. Report ¶ 11 (Dkt. No. 239-1). There is no evidence in the record demonstrating Respondents' knowledge of whether COVID-19 patients have recovered. Respondents' only support for this proposed fact is a conclusory assertion by Ms. Figlenski, which cites a collection of data from an unidentified source. Figlenski Decl. ¶ 25, Ex. 6 (Dkt. No. 251-2). |
| 67. When inmates at FCC Lompoc are offered the COVID-19 vaccine, they are provided a form by a medical provider in the event they refuse vaccination and have the opportunity to ask questions about the vaccine. | **DISPUTED.** Incarcerated people at Lompoc do not have an opportunity to ask questions about the vaccine when they are offered it. Rather, as the Court Expert found, incarcerated people at Lompoc report that "when they tried to ask questions about the safety of the vaccine, or posed questions about their own health or medication issues in relation to the vaccine, they were told to either take the vaccine or sign a refusal form." Court Expert Supp. Report ¶ 19(a), 9 (Table 1) (Dkt. No. 239-1). *See also* Torres Decl. ¶¶ 2-4; |

3723164.1

20

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE
DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| | Declaration of Albert Lee Mitchell ("Mitchell Decl."), filed herewith, ¶¶ 3-4. |
| 68. There is abundant signage about the vaccine throughout the institution and educational materials on the TRULINCS system in both Spanish and English to educate inmates about the vaccine. FCC Lompoc has the ability to translate vaccine information into any language that is needed. | **DISPUTED.** Petitioners dispute the assertion that signage about the vaccine is "abundant." *See* Norman Decl. ¶ 3 & Ex. 2 (Deposition of Jeffery Beard ("Beard Dep.") at 149:25, 150:1-3) (Respondents' expert's unawareness of prevalence of signage throughout Lompoc). Petitioners dispute the second sentence of UF 68 to the extent it asserts that Lompoc has translated any vaccine information into a language other than English or Spanish. *See* Respondents' PMK Dep. at 36:24-25, 37:1-8. |
| 69. Additional staff was sent to FCC Lompoc to assist with vaccine administration and vaccine education. | **DISPUTED.** Documents produced by Respondents demonstrate the presence of staff to assist with vaccine administration, not with vaccine education. *See* Norman Decl. ¶ 9 & Ex. 8 (LOX 1265) (internal correspondence between Regional Health Services Administrator and Lompoc's Health Services Administrator regarding "available staff trained to conduct COVID-19 vaccinations" and "assume clinical duties"; no reference to specific duties around vaccine education). Respondents cite only Ms. Figlenski's assertion in support of the proposed fact. DF 69, citing Figlenski Decl. ¶ 26 (Dkt. No. 251-2). As the Court Expert |

3723164.1

21

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| | found, "there appears little effort focused on engaging staff and incarcerated people about their questions or concerns regarding the vaccine." Court Expert Supp. Report ¶ 28(a) (Dkt. No. 239-1). |
| 70. FCC Lompoc is continuing to engage with inmates who previously refused the vaccine to provide education and information about the vaccine. | **DISPUTED.** The Court Expert's conversations with both staff and incarcerated people confirmed that Lompoc is not engaging with incarcerated people who have refused the vaccine to provide education and information about the vaccine. The Court Expert found that staff "reported no efforts to identify and follow up with high-risk patients who refused vaccination," Court Expert Supp. Report ¶ 28(a) (Dkt. No. 239-1), and that "[n]one of the people who refused the vaccine reported being subsequently contacted by health staff to discuss their reasons for refusal and none of them reported that their refusal or vaccine questions had been addressed in their subsequent health encounters." *Id.* ¶ 19(a). *See also* Torres Decl. ¶¶ 2-4; Mitchell Decl. ¶¶ 3-4. |
| 71. To date, between 30 to 40 inmates who initially refused the vaccine changed their minds when it was re-offered. | **NOT DISPUTED.** |
| 72. Those inmates who refused the | **DISPUTED.** Petitioners dispute |

3723164.1

22

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE
DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| vaccine have received and will continue to receive additional opportunities to be vaccinated. The BOP is evaluating the reasons inmates are hesitant to accept the vaccine. Inmates have the ability to submit a request to medical staff for more information or to ask questions about the vaccine and those in chronic care are being counseled at their chronic care appointments. | assertions made in the second and third sentences of this proposed fact. As to the second sentence, as the Court Expert found in his supplemental tour, "[n]o surveys of staff or incarcerated people had been conducted to date regarding COVID-19 vaccination per the team." Court Expert Supp. Report ¶ 11 (Dkt. No. 239-1). Contrary to Respondents' claim that the BOP is evaluating the reasons that incarcerated people are hesitant to accept the vaccine, the Court Expert found that Lompoc, a BOP institution, is not engaging with incarcerated people to determine why they are refusing the vaccine. As to the third sentence, Petitioners dispute the assertion that incarcerated people in chronic care are being counseled about the COVID-19 vaccines at their chronic care appointments. According to the Court Expert, "[n]one of the people who refused the vaccine . . . reported that their refusal or vaccine questions had been addressed in their subsequent health encounters," *id.* ¶ 19(a), and Lompoc should "[i]mmediately incorporate vaccine engagement into all chronic care encounters with patients who have refused vaccination," *id.* ¶ 29(b). Furthermore, the Court Expert noted the concerns of incarcerated people "that their chronic care levels had been 'downgraded' . . . to lessen the frequency of medical encounters for their chronic health issues." *Id.* ¶ 19(e). This factual |

3723164.1

23

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE
DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| | contention related to chronic care encounters creates a dispute regarding whether these individuals are, in fact, being seen and counseled about the vaccine at such encounters. *See also* Torres Decl. ¶¶ 2-4. |
| 73. FCC Lompoc has conducted 2,083 home confinement reviews pursuant to the Court's Preliminary Injunction, with more reviews being conducted as FCC Lompoc runs monthly updates to the class list. | **NOT DISPUTED.** |
| 74. From these reviews, 129 inmates were preliminarily approved for home confinement and 39 were approved for transfer to a Residential Reentry Center. | **NOT DISPUTED.** |
| 75. As of May 4, 2021, 141 class members had been placed in home confinement, 215 were transferred to an RRC, 82 were granted compassionate release, 124 were released, and 153 were transferred. | **NOT DISPUTED.** |
| 76. The BOP has increased the home confinement population by approximately 200% from March 2020 through December 2020 and has transferred over 22,800 inmates to home confinement. | **NOT DISPUTED.** |

3723164.1

24

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| 77. The BOP set temporary population targets for low and minimum-security institutions with open bay housing. As of May 24, 2021, at FCC Lompoc, the COVID-19 population target for the Camp is 309 inmates (even though there are 412 beds), for the North Camp is 120 inmates (though there are 160 beds), and the FCI is 824 (though there are 1,522 beds). | **NOT DISPUTED.** |
| 78. FCC Lompoc's current population of 1,891 is a 29% population reduction from the 2,680 population alleged in the Complaint and well below the number of beds in the facility. | **NOT DISPUTED.** |
| 79. The Court appointed Dr. Homer Venters pursuant to Federal Rule of Evidence 706 to conduct a site visit of FCC Lompoc and prepare a report. | **NOT DISPUTED.** |
| 80. Dr. Venters first visited FCC Lompoc on September 1-2, 2020. | **NOT DISPUTED.** |
| 81. Dr. Venters' first report was filed with the Court on September 25, 2020. | **NOT DISPUTED.** |
| 82. Dr. Venters' first report made recommendations about FCC Lompoc. | **NOT DISPUTED.** |
| 83. Dr. Venters conducted a second visit of FCC Lompoc on April 20-21, | **NOT DISPUTED.** |

3723164.1

25

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| 2021. | |
| 84. Dr. Venters' second report was filed with the Court at Dkt. 239-1. | **NOT DISPUTED.** |
| 85. Dr. Venters' second report makes recommendations about FCC Lompoc. | **NOT DISPUTED.** |
| 86. Dr. Jeffrey Beard believes that to the extent Dr. Venters' recommendations were not already being implemented by FCC Lompoc, those recommendations were either inconsistent with CDC guidance; or based on claims made by unidentified inmates about problems they were allegedly experiencing. | **DISPUTED.** Respondents have proposed an opinion, not a fact. Additionally, Dr. Beard is not qualified to opine on this subject. Dr. Beard has no formal medical training, no epidemiology training, is not licensed to provide clinical care, and has not provided any sort of clinical care in over 40 years. Beard Dep. at 27:11-29:15. He acknowledges that he is not an expert in medical care delivery in prisons, *id.* at 29:22-24, or in infection control in prisons, *id.* at 30:10-12. Finally, Petitioners dispute the facts upon which Dr. Beard's opinion is based. First, Petitioners dispute Dr. Beard's assessment that Lompoc was already carrying out recommendations made by the Court Expert. *Compare* Declaration of Jeffery Beard ("Beard Decl.") ¶ 101 (Dkt. No. 251-4) (asserting that Lompoc "does have a system in place" to deal with assessment for ongoing COVID-19 symptoms among those who have survived the infection), *with* Court Expert Supp. Report at 24 (Dkt. No. 239-1) (criticizing "[t]he lack of |

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| | standardized tracking and attention to the severity and improvement in the[] health issues" of individuals who have survived COVID-19). Second, the Court Expert's recommendations were consistent with CDC guidance. *See, e.g.*, Court Expert Supp. Report ¶ 28(a) (Dkt. No. 239-1) (faulting Lompoc for "fail[ing] to engage with patients" around vaccine education, in contravention of specific CDC guidance). Each of the Court Expert's recommendations were consistent with both CDC and BOP guidance and designed to "prevent morbidity and mortality." Venters Dep. at 279:17-19, 290:19-291:1. Third, the Court Expert's recommendations were based on interviews with staff and incarcerated people, review of BOP's COVID-19 Pandemic Response Plan, review of CDC Guidelines, review of documentation during the Court Expert's on-site tours of Lompoc, and the Court Expert's two on-site tours of the facility. *See* Court Expert's Supp. Report at 2-16 (Dkt. No. 239-1). |
| 87. Dr. Jeffrey Beard visited FCI Terminal Island on September 8, 2020 and April 20-21, 2021. | **NOT DISPUTED,** to the extent Respondents' Proposed Fact No. 87 intended to identify Lompoc, not FCI Terminal Island, as the site of Dr. Beard's initial and supplemental visits. |
| 88. Dr. Beard has reviewed Plaintiff's complaint, the actions taken by the | **NOT DISPUTED.** |

3723164.1

27

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| BOP and FCC Lompoc in response to COVID-19, and has reviewed Dr. Venters' two reports regarding FCC Lompoc. | |
| 89. Dr. Beard determined and opined that FCC Lompoc is currently managed by a knowledgeable, effective Warden and management team, and the facility is clean and well maintained. | **DISPUTED.** Respondents have proposed an opinion, not a fact. Petitioners dispute the facts upon which Dr. Beard's opinion is based. First, Petitioners dispute that the management team at Lompoc is "effective." To the contrary, the Court Expert concluded in his supplemental report that there is "clear evidence of the need for external oversight of this health system" at Lompoc. Court Expert Supp. Report ¶ 30 (Dkt. No. 239-1). Second, Petitioners dispute that the facility is "well maintained." According to the Court Expert, "[t]hroughout the facilities I inspected, it was clear that some people either had no access to soap or paper towels or that access had been provided in the days before my inspection." *Id.* ¶ 28(c). |
| 90. Dr. Beard determined and opined that at the time of his visit, the management team was complying with both BOP direction and CDC guidance relative to managing COVID-19 in a correctional facility. | **DISPUTED.** Respondents have proposed an opinion, not a fact. Additionally, Dr. Beard is not qualified to opine on this subject. DF 86. Petitioners dispute the facts upon which Dr. Beard's opinion is based. *See* DF 1. |
| 91. FCC Lompoc released 25% of its | **DISPUTED.** Respondents have |

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| inmate population from the time of Attorney General Barr's memo on March 26, 2020 to September 4, 2020. Dr. Beard believes that this was a larger proportion than many other state and federal facilities around the country. | proposed an opinion, not a fact. Petitioners also dispute the facts upon which Dr. Beard's opinion is based. To the extent that Respondents propose that Lompoc's incarceration population was reduced by 25% between March 26, 2020 to September 4, 2020, this is incorrect. New admissions to Lompoc continued throughout the pandemic. *See* Figlenski Decl. ¶ 12 (Dkt. No. 251-2) (discussing intake procedures for new admissions of incarcerated people to Lompoc). Accordingly, the total population at Lompoc was not reduced by 25%. |
| 92. Dr. Beard determined and opined that the vaccination program at FCC Lompoc is going very well. | **DISPUTED.** Respondents have proposed an opinion, not a fact. Additionally, Dr. Beard is not qualified to opine on this subject. *See* DF 86. Petitioners also dispute the facts upon which Dr. Beard's opinion is based. *See* AUF 38-47, 49-54 (undisputed facts regarding inadequacy of vaccination program at Lompoc). |
| 93. Dr. Beard determined and opined that Dr. Venters relies on unidentified inmates in reaching his conclusions and often makes recommendations not grounded in CDC guidance. He also does not offer scientific standards upon which the recommendations are based. | **DISPUTED.** Respondents have proposed an opinion, not a fact. Additionally, Dr. Beard is not qualified to opine on this subject. DF 86. Petitioners also dispute the facts upon which Dr. Beard's opinion is based. *Id.* |
| 94. Dr. Beard determined and opined that Dr. Venters' methodology for | **DISPUTED.** Respondents have proposed an opinion, not a fact. |

3723164.1

29

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE
DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| surveying inmates is not a credible or sound source of unbiased or reliable information. A random sample of inmates would have been a better source of information. | Additionally, Dr. Beard is not qualified to opine on this subject. DF 86. Petitioners also dispute the facts upon which Dr. Beard's belief is based. First, Dr. Beard acknowledged at his deposition that he was unable to identify specific information reported by incarcerated people to the Court Expert that, in his view, was either reliable or unreliable. Beard Dep. at 175:12-20. When asked if he had "any specific support, meaning academic studies, scholarship, reports, articles, support for the theory that identifying oneself as a doctor or a Court expert will solicit unreliable information," Dr. Beard confirmed that he did not. *Id.* at 173:13-17; 174:1. Second, both of the Court Expert's reports do contain information from a random sample of incarcerated people and there is no evidence that the Court Expert manipulated the sample of incarcerated people with whom he spoke; the reports' plain language indicates that the did not preselect incarcerated people who would offer only criticism of FCC Lompoc. *See, e.g.*, Court Expert Supp. Report ¶ 19(g) (Dkt. No. 239-1) ("Nine people reported concerns about delays in chronic care and sick call responses, while four reported that access to care had improved since my last inspection."). |
| 95. Dr. Beard determined and opined that the BOP continues to update its | **DISPUTED.** Respondents have proposed an opinion, not a fact. |

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| COVID-19 policies and procedures to follow CDC guidelines. | Additionally, Dr. Beard is not qualified to opine on this subject. DF 86. Petitioners also dispute the facts upon which Dr. Beard's belief is based. Dr. Beard was unable to explain why Lompoc, a BOP institution, failed to update its COVID-19 policies and procedures regarding solid-door quarantine in accordance with established CDC guidelines prior to Lompoc's December 2020 COVID-19 outbreak in intake quarantine. Beard Dep. at 108:21-24; 109:3-11. *See also* DF 1. |
| 96. Respondents retained epidemiologist Asma Tekbali to opine as an expert on FCC Lompoc's infection control and testing procedures. | **DISPUTED.** Respondents have proposed an opinion, not a fact. Moreover, Petitioners dispute the facts upon which Ms. Tekbali's belief is based and dispute that Ms. Tekbali is qualified to opine as an expert on Lompoc's infection control practices. *See* DF 6. |
| 97. Ms. Tekbali bore the lead responsibility as an Infection Preventionist at Lenox Hill Hospital-Northwell Health | **NOT DISPUTED.** |
| 98. Her hospital was at the center of dealing with New York's COVID-19 crisis and is believed to have admitted and cared for the most COVID-19 patients in the world. | **NOT DISPUTED.** |

3723164.1

31

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| 99. To prepare her opinion on FCC Lompoc, Ms. Tekbali reviewed the inspection reports by Dr. Venters and Dr. Beard, as well as underlying documentation. She spoke with FCC Lompoc prison governance and infection control officers. | **DISPUTED.** Respondents have proposed an opinion, not a fact. Moreover, Petitioners dispute the facts upon which Ms. Tekbali's belief is based and dispute that Ms. Tekbali is qualified to opine as an expert on Lompoc's infection control practices. *See* DF 6. |
| 100. Ms. Tekbali explains that the efficacy rate of the Pfizer and Moderna vaccines is 94- 95%. The Pfizer vaccine was also shown in clinical trials to be 100% effective at preventing severe disease. Data from Israel show that the Pfizer and Moderna vaccines are highly effective across all age groups at preventing symptomatic and asymptomatic COVID-19 infections, hospitalizations, severe disease and death, including the B.1.1.7 variant. | **NOT DISPUTED.** |
| 101. Ms. Tekbali opines that "FCC Lompoc has effectively responded to a significant COVID-19 outbreak by collaborating with local health departments, adapting to and implementing pandemic response guidance from the CDC and BOP, constructing a COVID-19 hospital unit, providing masks and materials for hand hygiene to inmates, and offering vaccination to essentially all of the inmates and staff." | **DISPUTED.** Respondents have proposed an opinion, not a fact. Moreover, Petitioners dispute the facts upon which Ms. Tekbali's belief is based and dispute that Ms. Tekbali is qualified to opine as an expert on Lompoc's infection control practices. *See* DF 6. |

3723164.1

32

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| DEFENDANT-RESPONDENTS' PROPOSED FACT: | PLAINTIFFS'-PETITIONERS' RESPONSES |
|---|---|
| 102. Ms. Tekbali opines that "In their complaint, petitioners request adequate testing and isolation, PPE, and proper treatment and monitoring of inmates ill with the virus. Based on the materials I have been provided, I have determined that FCC Lompoc has met these requests …" | **DISPUTED.** Respondents have proposed an opinion, not a fact. Moreover, Petitioners dispute the facts upon which Ms. Tekbali's belief is based and dispute that Ms. Tekbali is qualified to opine as an expert on Lompoc's infection control practices. *See* DF 6. |
| 103. Ms. Tekbali observes that "Another indication of the facility's successful effort to stop transmission of the virus is the fact that there are no positive inmates at FCC Lompoc, in contrast to the COVID-19 rates prevailing in California. While positive tests have occurred, they have not led to large new outbreaks at the facility, which provides further proof that the infection control measures have been effective and proper." | **DISPUTED.** Respondents have proposed an opinion, not a fact. Moreover, Petitioners dispute the facts upon which Ms. Tekbali's belief is based and dispute that Ms. Tekbali is qualified to opine as an expert on Lompoc's infection control practices. *See* DF 6. |
| 104. Ms. Tekbali concludes that "The steps the BOP took to respond to and control FCC Lompoc's outbreak went beyond CDC and BOP guidance, and the effectiveness of these actions are reflected today in the lack of any major outbreaks at the facility. Particularly given the recent vaccination efforts, I believe it is unlikely the facility will see a repeat of the spring 2020 outbreak." | **DISPUTED.** Respondents have proposed an opinion, not a fact. Moreover, Petitioners dispute the facts upon which Ms. Tekbali's belief is based and dispute that Ms. Tekbali is qualified to opine as an expert on Lompoc's infection control practices. *See* DF 6. |

3723164.1

33

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

## II.

## PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE

**A.      Office of the Inspector General (OIG) Review**

| PETITIONERS' ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE ("AUF") | SUPPORTING EVIDENCE |
|---|---|
| 1.  In July 2020, the Office of the Inspector General published a report with its findings from a remote inspection that had been undertaken between April 23 and May 1, 2020, "to understand how the COVID-19 pandemic affected the [Lompoc] and to assess the steps Lompoc officials took to prepare for, prevent, and manage COVID-19 transmission within its facilities." | Norman Decl. ¶ 15 & Ex. 14 (OIG Report at i) (parenthetical omitted); *see* DF 15. |
| 2.  According to the July 2020 OIG Report, "The OIG's BOP-wide survey in late April 2020 reflected that Lompoc staff identified as immediate needs at that time more personal protective equipment for staff and hygiene supplies for inmates, additional staff to cover posts, and more space to quarantine inmates." | Norman Decl. ¶ 15 & Ex. 14 (OIG Report at ii). *See also id*. (OIG Report at 11) ("However, 55 percent (60 of 109) of Lompoc staff who responded to our survey reported that more hygiene supplies for staff was an immediate need . . . ."). |
| 3.  The OIG found "[a] preexisting shortage of medical staff," "[a]n insufficient number of correctional staff members," and "lack of a permanent leadership team" as contributing factors to Respondents' failure to mitigate COVID-19 transmission.  In particular, the OIG found that staffing shortages negatively impacted the facility's ability to screen people for symptoms of COVID-19 and implement staff movement restrictions. | Norman Decl. ¶ 15 & Ex. 14 (OIG Report at ii). |

3723164.1

| PETITIONERS' ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE ("AUF") | SUPPORTING EVIDENCE |
|---|---|
| | |

## B. Screening and Testing

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| 4. In May 2020, more than 1,000 of the 2,680 people incarcerated at Lompoc tested positive for COVID-19. | Plaintiff-Petitioners' Complaint ¶ 2 (Dkt. No. 1); Respondents Answer to Corrected Complaint ¶ 1 (Dkt. No. 102). |
| 5. By June 1, 2020, at least four incarcerated people at Lompoc had died of COVID-19. | *See* COVID-19 Data on each BOP facility, maintained by the OIG, available at: https://experience.arcgis.com/experience/ab22fb4c564e4f4b986e257c685190e8/page/page_2/ |
| 6. Respondents never conducted mass testing at the United States Penitentiary (USP) at Lompoc. | Defendant-Respondents' Motion for Summary Judgment at 12-13 (Dkt. No. 251); Respondents' PMK Dep. at 216:16-20. |
| 7. Respondents do not require staff to undergo regular COVID-19 screening testing. | *See* Respondents' PMK Dep. at 70:9-20; Figlenski Decl. ¶ 5 & Ex. 1 (Dkt. No. 251-2 at 19-20). |
| 8. Symptom screenings may not detect staff with asymptomatic infections. | Respondents' PMK Dep. at 67:4-68:13; Norman Decl. ¶ 21 & Ex. 20 (CDC, *Interim Guidance for SARS-CoV-2 Testing in Correctional and Detention Facilities*) ("Symptom screenings cannot identify persons with COVID-19 who may be asymptomatic or pre-symptomatic, and therefore will not prevent all persons with COVID-19 from entering the |

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| | facility."). |
| 9. Respondents do not require new staff to undergo testing for COVID-19. | Figlenski Decl. ¶ 5 & Ex. 1 (Dkt. No. 251-2 at 13-25). |
| 10. Respondents do not require staff identified as close contacts of people infected with COVID-19 to undergo COVID-19 testing. | Respondents' PMK Dep. at 110:20-111:6 (Respondents do not "specifically require them to be tested," but merely "make those COVID tests available to staff . . . [s]hould they wish to have a COVID test"); Figlenski Decl. ¶ 5 & Ex. 1 (Dkt. No. 251-2 at 16) (stating under "Guidance for Staff with Potential Exposure to COVID-19" that "[a] negative COVID-19 test is not required for staff to return to work"). |
| 11. As of April 26, 2021, Respondents did not have any current problems with testing supplies. | Respondents' PMK Dep. at 58:8-11. |
| 12. During the Court Expert's first inspection, he found that Respondents' screening deficiencies increase the risk "that patients will become seriously ill or die from COVID- 19 and also increase the potential spread of the virus." | Court Expert Init. Report ¶ 37 (a) (Dkt. No. 101-1). |
| 13. Although prison leadership repeatedly told the Court Expert "that every detained person who works outside their housing area" was screened for COVID-19 symptoms on a daily basis before they start work, none of the incarcerated people he spoke with who work outside their housing area reported ever having been screened as a part of their work detail, the correctional officers he spoke with did not | Court Expert Init. Report ¶ 37(a)(ii) (Dkt. No. 101-1). |

3723164.1

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| appear familiar with the process, and the screenings were not documented anywhere. | |
| 14. During the Court Expert's April 2021 inspection, despite assurances from leadership that COVID-19 symptom screenings were occurring, incarcerated people assigned to work outside of their housing unit were not in fact being screened for COVID-19. | Court Expert Supp. Report ¶ 28(b) (Dkt. No. 239-1) ("I am dismayed that despite multiple assurances on my first inspection that this process [of screening incarcerated workers for COVID-19] was in place, and clear evidence that it was not, I returned six months later to be told once again that this was process was occurring and find the same complete lack of screening of workers."). |

## C.    Healthcare and Mortality Reviews

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| 15. In his initial report, the Court Expert found that Lompoc had a "grossly inadequate system of health care." | Court Expert Init. Report ¶ 39 (Dkt. No. 101-1). |
| 16. Delays in chronic care can significantly increase the risk of serious illness or death from COVID-19 since poorly controlled health problems are associated with worse COVID-19 outcomes. | Court Expert Init. Report ¶ 37(b)(ii) (Dkt. No. 101-1). |
| 17. In his initial report, the Court Expert concluded that medical staff at Lompoc often fail to address requests for medical care in a timely manner, requiring people to wait a week or longer for a response to | Court Expert Init. Report ¶7 (b)(i) (Dkt. No. 101-1). |

3723164.1

37

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE
DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| their healthcare requests. | |
| 18. The Court Expert opined that the provision of timely carsick call and chronic care encounters is "central to the facility['s] COVID-19 response." | Court Expert Init. Report ¶ 37(b) (Dkt. No. 101-1). |
| 19. The Court Expert discovered that although multiple people at Lompoc who died of COVID-19 had not received daily COVID assessments after testing positive, and others had delayed chronic care appointments, Respondents' mortality reviews did not identify a single deficiency in care. | Court Expert Init. Report ¶ 34(a)-(c) (Dkt. No. 101-1). |
| 20. At the conclusion of his first report, the Court Expert made a series of recommendations to rectify the various problems he identified.  One of his recommendations was that Respondents "utilize basic quality assurance tools to measure and report in their quality meeting the percentage of sick call requests that are seen in a timely manner, as well as the percentage of chronic care encounters that occur in a timely manner." | Court Expert Init. Report ¶ 38 (Recommendation 4) (Dkt. No. 101-1). |
| 21. In April 2021, Respondents were unable to identify any steps that they had taken in response to the Court Expert's first report. | *See* Respondents' PMK Dep. at 94:24-95:3 (unaware of any changes made to implement COVID-19 screening of incarcerated workers), *id*. at 179:19-21 (same with respect to the mortality review process), *id*. at 130:15-22 (same with respect to post-isolation healthcare practices for COVID patients), *id*. at 155:13-16, 156:11-16 |

3723164.1

38

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE
DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| | (same with respect to the implementation of social distancing, institutional cleaning, disinfecting, or mask changes). |
| 22. During the Court Expert's April 2021 inspection, nine people he interviewed about sick call response times and chronic care appointments still reported delays. | Court Expert Supp. Report ¶ 19(g) (Dkt. No. 239-1). |
| 23. The Court Expert identified a number of problems with Respondents' mortality reviews when he returned in April 2021. The Court Expert has led or conducted "well over 100 mortality reviews," and indicated in his report that "it is rare for there to be no areas of deficiency or improvement in a single case," and proceeded to identify numerous "clear deficiencies" with Respondents' care. | Court Expert Supp. Report ¶¶ 28(e), 29 (Recommendation 8) (Dkt. No. 239-1). |
| 24. During the Court Expert's April 2021 inspection, he highlighted Respondents' failure to identify and track chronic or long-term COVID-19 symptoms, leaving him "concerned that the burden of mortality, and certainly morbidity from ongoing or 'long' COVID-19 is unappreciated by the BOP." | Court Expert Supp. Report ¶¶ 11, 29 (Dkt. No. 239-1). |

## D.    Infection Control and Prevention

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| 25. Lompoc staff have internally complained that the prison has failed to respond | Norman Decl. ¶ 12 & Ex. 11 (LOX 3862) (custody officer |

3723164.1

39

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| adequately to the COVID-19 pandemic. | correspondence to "command center," stating that "I have been through various scenarios through the years but by far this is the most anemic & pathetic response I have ever seen" and enumerating specific failures of Lompoc leadership in its pandemic response). |
| 26. Respondents' policy allows Lompoc medical staff up to three days to respond to reports of COVID-related symptoms, such as coughs and sore throats. | Norman Decl. ¶ 14 & Ex. 13 (FCC Lompoc's Local Procedure for Inmate Sick Call During COVID-19). |
| 27. In his initial report, the Court Expert found that multiple housing units did not have paper towels for people to dry their hands after washing them, and other units had only broken, automated hand dryers, one of which had been inoperable for over a year. Spaces that previously housed suspected or confirmed COVID-19 cases were either not sanitized at all or were cleaned by incarcerated people who were often not wearing masks. | Court Expert Init. Report ¶ 37(c) (Dkt. No. 101-1). |
| 28. In his initial report, the Court Expert found that Respondents lack "basic quality assurance in the approach that leadership takes, not only for staffing, but in access to sick call, chronic care and cleaning/disinfecting." | Court Expert Init. Report ¶ 38 (Dkt. No. 101-1). |
| 29. During the Court Expert's April 2021 inspection, he found that incarcerated workers were forced to sit two to a seat when being transported around the facility on a bus, doubling its capacity from his last | Court Expert Supp. Report ¶¶ 19(d), 20(c), 30 (Dkt. No. 239-1). |

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
| --- | --- |
| visit and preventing any social distancing. He also found that several housing units remained without soap or paper towels or were stocked with those supplies as a staging effort only shortly before his visit to present the illusion of compliance. He described in his report "[t]he performative nature of how" certain areas at Lompoc "were 'prepared' for [his] inspection." | |
| 30. During his April 2021 inspection, the lack of access to basic hygiene supplies at Lompoc left the Court Expert with "a pessimistic assessment about how seriously the facility and the BOP take their own policies, the guidelines of the CDC and basic infection control." | Court Expert Supp. Report ¶ 30 (Dkt. No. 239-1). |
| 31. In March 2021, Lompoc conducted an internal audit of their COVID-19 policies and practices. The audit determined that social distancing guidelines are not properly enforced at the institution. | Norman Decl. ¶ 6 & Ex. 5 (LOX 145-147). |

E.    **Quarantine and Isolation**

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
| --- | --- |
| 32. FCC Lompoc required a cessation of all intake on December 31, 2020, because Respondents were unable to control an outbreak of COVID-19: according to the warden at the time, "our efforts [to contain the spread] have been unsuccessful" because "USP Lompoc has open bar cell | Norman Decl. ¶ 7 & Ex. 6 (LOX 732). |

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| doors in its housing units." | |
| 33. Respondents do not place all staff identified as close contacts of COVID-19 infected individuals on a 14-day quarantine. | Figlenski Decl. ¶ 5 & Ex. 1 (Dkt. No. 251-2 at 16); Respondents' PMK Dep. at 107:9-15, 108:2-4, 215:13-216:14. |
| 34. Respondents do not modify the job duties of staff identified as close contacts, do not require them to monitor their temperature while working, and do not require them to prescreen for temperature and symptoms at home before reporting to work. | Respondents' PMK Dep. at 109:9-25. |
| 35. During the Court Expert's first inspection of Lompoc in September 2020, he found that people in quarantine and isolation units lacked access to basic privileges.  He advised that "housing of people for 22-24 hours per day in cells, without access to basic privileges including phone and out of cell time is not appropriate and runs counter to CDC guidelines . . . ." He recommended that Respondents "provide basic services and freedoms to people in quarantine and medical isolation." | Court Expert Init. Report ¶¶ 37(d), 38 (Dkt. No. 101-1). |
| 36. When the Court Expert returned for his second inspection of Lompoc in April 2021, he again found that Lompoc had an inappropriately punitive approach to quarantine. He emphasized that "there is no excuse for denial of basic services and rights to people under the guise of infection control." | Court Expert Supp. Report ¶¶ 28(d), 29 (Dkt. No. 239-1). |
| 37. The CDC Guidance for correctional facilities states that facilities should "[e]nsure that medical isolation for | Norman Decl. ¶ 20 & Ex. 19 (CDC, *Interim Guidance on Management of Coronavirus* |

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| COVID-19 is distinct from punitive solitary confinement of incarcerated/detained individuals, both in name and in practice." | *Disease 2019 (COVID-19) in Correctional and Detention Facilities).* |

**F.    Vaccination Program**

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| 38. Before the vaccines arrived at Lompoc, Respondents posted an alert to TRULINCS, stating only that "[i]t's very important that all inmates interested in receiving the vaccine are present during these times." | Norman Decl. ¶ 8 & Ex. 7 (LOX 1071) (December 2020 TRULINCS alert) |
| 39. A one-page flyer posted in the housing units before the vaccines arrived included no information regarding the safety of the COVID-19 vaccine for individuals with underlying health conditions. | Norman Decl. ¶ 13 & Ex. 12 (LOX 5476) (February 2021 email instructing staff to post flyer); *id.* (LOX 5477) (one-page flyer about COVID-19 vaccines). |
| 40. Apart from signs posted in certain parts of Lompoc, and vaccine alerts circulated via TRULINCS, Lompoc made no effort to educate incarcerated people about the vaccine prior to its arrival to Lompoc. | Torres Decl. ¶ 5; Mitchell Decl. ¶ 2; Beard Dep. at 138:13-18. |
| 41. Lompoc has provided no town hall-style information sessions to educate incarcerated people about the COVID-19 vaccine. | Mitchell Decl. ¶ 5; Tekbali Dep. at 130:23-25, 131:1-6; Beard Dep. at 133:24-25, 134:1-6. |
| 42. Lompoc offered the vaccine to incarcerated people in large settings, either in their housing area, a dining hall, | Court Expert Supp. Report ¶¶ 19(a), 28(a) (Dkt. No. 239-1); Mitchell Decl. ¶ 3. |

3723164.1

43

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| or other setting. Health staff made a general announcement about vaccination and then called each person one at a time to either take the vaccine or sign a refusal. | |
| 43. Incarcerated individuals with heart disease, diabetes, cancer, asthma, inflammatory bowel disease, kidney disease, emphysema, immune disease, seizure disorder, hypertension (included poorly controlled hypertension), Hepatitis C, and prior medication allergies had health-related questions before deciding whether to accept the vaccine that were unanswered and no subsequent discussion occurred with these individuals about their questions. | Court Expert Supp. Report at 9 (Table 1) (Dkt. No. 239-1); Mitchell Decl. ¶ 2. |
| 44. There was not—nor has there been since this first offering—an opportunity for incarcerated people to ask questions about the safety of the vaccine. | Court Exp. Supp. Report ¶¶ 19(a), 28(a) (Dkt. No. 239-1); Torres Decl. ¶¶ 2-4; Mitchell Decl. ¶¶ 4-5. |
| 45. None of the individuals spoken to by the Court Expert who refused the vaccine reported being subsequently contacted by health staff to discuss their reasons for refusal. | Court Expert Supp. Report ¶ 19(a) (Dkt. No. 239-1). *See also* Mitchell Decl. ¶ 4. |
| 46. None of the individuals spoken to by the Court Expert who refused the vaccine reported that their refusal or vaccine questions had been addressed in their subsequent health encounters. | Court Expert Supp. Report ¶ 19(a) (Dkt. No. 239-1). |
| 47. Lompoc's approach to vaccination has the effect of creating a pool of extremely | Court Expert Supp. Report ¶ 28(a) (Dkt. No. 239-1). |

3723164.1

44

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| high-risk unvaccinated patients. | |
| 48. Respondents' Expert Asma Tekbali stated that vaccine education is "a cornerstone in vaccine uptake." She also stated: "I think any reasonable individual is going to ask questions when something's being put into their body that they are unfamiliar with." | Tekbali Dep. at 88:1-5. *See also id.* at 89:5-7. |
| 49. Respondents have taken a passive approach to vaccinating staff and incarcerated people at Lompoc. | Court Exp. Supp. Rep. ¶ 30 (Dkt. No. 239-1). |
| 50. The Court Expert recommended that "[t]he vaccination program at Lompoc BOP should be substantially expanded to increase the rates of vaccination of staff and ensure that high-risk people have their questions and concerns about vaccination addressed." | Court Expert Supp. Report ¶ 29 (Dkt. No. 239-1). |
| 51. Respondents have made no effort to survey staff about their attitudes toward the COVID-19 vaccines, about who had been vaccinated outside the BOP, or about what incentives would increase vaccine uptake. | Court Expert Supp. Report ¶ 28(a) (Dkt. No. 239-1). |
| 52. The only vaccine education identified by Respondents' PMK deponent that took place before the arrival of vaccines was education of executive staff. | Respondents' PMK Dep. at 32:22-25, 33:1-6. |
| 53. Before the vaccines arrived, Lompoc's education for staff about the vaccine consisted of "fliers," emails about "where they can do research on their own independently," and "information | Respondents' PMK Dep. at 53:19-25, 54:1-2. |

3723164.1

45

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| disseminated on conference calls and shift calls to staff." | |
| 54. Lompoc has not undertaken any of the various "strategies for building vaccine confidence" among staff promoted by the CDC, such as providing incentives to get vaccinated or encouraging staff who have been vaccinated to share their reasons for doing so at staff meetings. | *Compare* AUF 85 *with* Court Expert Supp. Report ¶ 29(a) (Dkt. No. 239-1). |
| 55. Dr. Anthony Fauci, director of the U.S. National Institute of Allergy and Infectious Diseases, opined: "If you have 75%–80% of the people get vaccinated, you create an umbrella of herd immunity." | Norman Decl. ¶ 19 & Ex. 18 (O'Reilly, *The hurdles we face before reaching herd immunity*) |

## G.   Immunity and Risk

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| 56. The California Department of Corrections and Rehabilitation (CDCR) reports 60% of those incarcerated at California State Prison, Solano are fully vaccinated, as are 50% of staff. Yet the prison is in the midst of a significant outbreak: as of June 8, 2021, 83 patients had tested positive for the virus in a recent 14-day period. | *See* Cal. Dep't of Corr. & Rehab., *Population COVID Tracking*, https://www.cdcr.ca.gov/ covid19/population-status-tracking/ (last accessed June 8, 2021). |
| 57. Public health experts do not know how long natural immunity from COVID-19 infection lasts. | *See* Norman Decl. ¶ 34 & Ex. 33 (CDC, *Answering Patients' Questions About COVID-19 Vaccine and Vaccination*); |

3723164.1

46

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| | Norman Decl. ¶ 18 & Ex. 17 (Naushin et al., *Insights from a Pan India Sero-Epidemiological survey*) (finding "about 20% of seropositive individuals lack meaningful neutralization activity after 5–6 months" and concluding "the duration of such immunity may not be sufficient to prevent future outbreaks, even in highly affected regions"). |
| 58. Public health experts do not know what degree of protection, if any, natural immunity from COVID-19 infection provides against new variants of the coronavirus. | *See* Norman Decl. ¶ 16 & Ex. 15 (Andreano & Rappuoli, *SARS-CoV-2 escaped natural immunity, raising questions about vaccines and therapies*); *id.* ¶ 17 & Ex. 16 (Karim & de Oliveira, *New SARS-CoV-2 Variants — Clinical, Public Health, and Vaccine Implications*). |
| 59. As of June 8, 2021, the CDC has identified five "variants of concern"—defined as "variant[s] for which there is evidence of an increase in transmissibility, more severe disease (e.g., increased hospitalizations or deaths), significant reduction in neutralization by antibodies generated during previous infection or vaccination, ***reduced effectiveness of treatments or vaccines***, or diagnostic detection failures"—that are currently circulating in the United States. | Norman Decl. ¶ 39 & Ex. 38 (CDC, *SARS-CoV-2 Variant Classifications and Definitions*) (emphasis added). |
| 60. The CDC's guidance on new variants states that "we do not know . . . how the new COVID-19 variants will affect how COVID-19 vaccines work in real-world | Norman Decl. ¶ 35 & Ex. 34 (CDC, *COVID-19 Vaccines and New Variants of the Virus*). |

3723164.1

47

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| conditions." | |
| 61. Two "variants of concern" were first identified in California. | *See* Norman Decl. ¶ 36 & Ex. 35 (CDC, *About Variants of the Virus that Causes COVID-19*) |

## H.   Centers for Disease Control and Prevention ("CDC") Guidelines

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| 62. The CDC advises that "[l]iving in prisons and jails puts you at higher risk for getting COVID-19." | Norman Decl. ¶ 33 & Ex. 32 (CDC, *COVID-19: For People Living in Prisons and Jails*). |
| 63. The CDC advises that "the risk of severe illness and death from COVID-19 far outweighs any benefits of natural immunity." | Norman Decl. ¶ 34 & Ex. 33 (CDC, *Answering Patients' Questions About COVID-19 Vaccine and Vaccination*). |
| 64. The CDC Guidance states that "[f]requent testing for Severe Acute Respiratory Coronavirus-2 (SARS-CoV-2) is an important prevention measure in correctional and detention facilities." | Norman Decl. ¶ 21 & Ex. 20 (CDC, *Interim Guidance for SARS-CoV-2 Testing in Correctional and Detention Facilities*). |
| 65. The CDC has advised that screening testing of staff "is a key component of a layered approach to prevent SARS-CoV-2 transmission" and "should be considered in all facilities." | Norman Decl. ¶ 21 & Ex. 20 (CDC, *Interim Guidance for SARS-CoV-2 Testing in Correctional and Detention Facilities*). |
| 66. The CDC recommends "[t]esting of all staff before entering the facility every 3–7 days," as well as "[t]argeted testing of new staff, those returning from a prolonged absence, travel, or other concerns related to exposure." | Norman Decl. ¶ 21 & Ex. 20 (CDC, *Interim Guidance for SARS-CoV-2 Testing in Correctional and Detention Facilities*). |

3723164.1

48

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| 67. The CDC advises that, in correctional facilities, "[b]ecause of the potential for asymptomatic and pre-symptomatic transmission unvaccinated close contacts . . . should quarantine and be tested." | Norman Decl. ¶ 21 & Ex. 20 (CDC, *Interim Guidance for SARS-CoV-2 Testing in Correctional and Detention Facilities*). |
| 68. Regarding testing close contacts, the CDC states: "Testing is recommended for all close contacts of persons with SARS-CoV-2 infection, regardless of whether the close contacts have symptoms." | Norman Decl. ¶ 20 & Ex. 19 (CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*). |
| 69. Regarding quarantine of staff exposed to COVID-19, the CDC recommends staff "self-quarantine at home for 14 days, unless a shortage of critical staff precludes quarantine." | Norman Decl. ¶ 20 & Ex. 19 (CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*). |
| 70. The CDC Guidance states that unvaccinated close contacts "may be permitted to work only as a last resort." | Norman Decl. ¶ 21 & Ex. 20 (CDC, *Interim Guidance for SARS-CoV-2 Testing in Correctional and Detention Facilities*). |
| 71. The CDC Guidance states that unvaccinated close contacts should be placed on a "modified quarantine" at work, limiting their contact with other staff and incarcerated people. | Norman Decl. ¶ 21 & Ex. 20 (CDC, *Interim Guidance for SARS-CoV-2 Testing in Correctional and Detention Facilities*). |
| 72. The CDC recommends that prison officials "[c]onsider serial screening testing for people who are assigned to critical work duties within the facility (e.g., food service or laundry) that require them to leave their housing unit." | Norman Decl. ¶ 21 & Ex. 20 (CDC, *Interim Guidance for SARS-CoV-2 Testing in Correctional and Detention Facilities*). |
| 73. The CDC recommends that correctional | Norman Decl. ¶ 20 & Ex. 19 |

3723164.1

49

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| facilities "[i]mplement social distancing strategies to increase the physical space between incarcerated/detained persons" | (CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*). |
| 74. The CDC Guidance for Correctional Facilities that "[c]orrectional facility administrators should establish daily symptom and/or temperature screening to identify staff, visitors, and incarcerated/detained persons with signs or symptoms consistent with COVID-19." | Norman Decl. ¶ 21 & Ex. 20 (CDC, *Interim Guidance for SARS-CoV-2 Testing in Correctional and Detention Facilities*). |
| 75. The CDC's Guidance for Correctional Facilities recommends "[p]rovid[ing] incarcerated/detained persons and staff no-cost access" to "soap," "running water," and "hand drying machines or disposable paper towels for hand washing." | Norman Decl. ¶ 20 & Ex. 19 (CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*). |
| 76. Since March 2020, the CDC has strongly urged that incarcerated people on quarantine be placed in cells with solid doors and solid walls. | Norman Decl. ¶ 37 & Ex. 36 (March 2020 CDC Guidance on COVID-19 in Correctional and Detention Facilities) ("Ideally, each quarantined individual would be quarantined in a single cell with solid walls and a solid door that closes."); *id.* ¶ 20 & Ex. 19 (CDC, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*). |
| 77. The CDC's "Toolkit for Correctional and Detention Facilities" includes, under "Featured Resources," a "Toolkit [for] COVID-19 Vaccines at Long-term Care." | Norman Decl. ¶ 27 & Ex. 26 (CDC, *Toolkit for Correctional and Detention Facilities*); Norman Decl. ¶ 26 & Ex. 25 (CDC, *Long-Term Care* |

3723164.1

50

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| | *Facility Toolkit*). |
| 78. The Long-Term Care toolkit includes a set of resources entitled, "Preparing Residents for COVID-19 Vaccination." | Norman Decl. ¶ 26 & Ex. 25 (CDC, *Long-Term Care Facility Toolkit*); *id.* ¶ 28 & Ex. 27 (CDC, *Preparing Residents for COVID-19 Vaccination*). |
| 79. The CDC's "Preparing Residents for COVID-19 Vaccination" toolkit is geared toward individuals with "increased risk of infection and severe illness from COVID-19." | Norman Decl. ¶ 28 & Ex. 27 (CDC, *Preparing Residents for COVID-19 Vaccination*). |
| 80. The CDC's guidelines recommend that facilities "talk with residents . . . about COVID-19 vaccination in your facility, even before vaccines arrive." | Norman Decl. ¶ 28 & Ex. 7 (CDC, *Preparing Residents for COVID-19 Vaccination*). |
| 81. The CDC, via its toolkit for correctional facilities, encourages facilities to "[s]eek to understand your residents' concerns and provide information they need in a way they can understand." | Norman Decl. ¶ 28 & Ex. 7 (CDC, *Preparing Residents for COVID-19 Vaccination*). |
| 82. The CDC, via its toolkit for correctional facilities, encourages facilities to "[h]ost virtual town hall meetings for residents and families where they can ask questions, and you can address their concerns." | Norman Decl. ¶ 28 & Ex. 7 (CDC, *Preparing Residents for COVID-19 Vaccination*). |
| 83. The CDC, via its toolkit for correctional facilities, encourages facilities to directly address patients' concerns with how the COVID-19 vaccine will affect their underlying health conditions. | Norman Decl. ¶ 29 & Ex. 28 (CDC, *How to talk to your patients about COVID-19 vaccination*). |
| 84. The CDC recommends that "[s]taff at correctional and detention facilities" should be "encouraged to get a COVID-19 | Norman Decl. ¶ 30 & Ex. 29 (CDC, *COVID-19 Vaccine FAQs in Correctional and* |

3723164.1

51

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

| PETITIONERS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS AND SUPPORTING EVIDENCE | SUPPORTING EVIDENCE |
|---|---|
| vaccination." | *Detention Centers*) |
| 85. The CDC has promoted various "strategies for building vaccine confidence," such as providing incentives to get vaccinated or encouraging staff who have been vaccinated to share their reasons for doing so at staff meetings. | Norman Decl. ¶ 38 & Ex. 37 (CDC, *Preparing Staff for COVID-19 Vaccination*). |
| 86. While the CDC has recommended eliminating some COVID-19 related restrictions for fully vaccinated people in the general public, it has explicitly stated that these protections—including testing, mask wearing, and quarantining after exposure—should continue in congregate settings such as prisons and homeless shelters. | Norman Decl. ¶ 31 & Ex. 30 (CDC, *Interim Public Health Recommendations for Fully Vaccinated People*); *id.* ¶ 32 & Ex. 31 (CDC, *Recommendations for Quarantine Duration in Correctional and Detention Facilities*); *id.* ¶ 21 & Ex. 20 (CDC, *Interim Guidance for SARS-CoV-2 Testing in Correctional and Detention Facilities*). |

## III.

## PETITIONERS' RESPONSE TO RESPONDENTS' CONCLUSIONS OF LAW

1.      Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A plaintiff must adduce evidence "sufficient to support a verdict in [his] favor on every element of [his] claim for which [he] will carry the burden of proof." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989).

**CONTESTED.**

Summary judgment is appropriate only when there is "no genuine dispute as

3723164.1

52

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Any fact that "might affect the outcome of the suit under the governing law" is material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party on summary judgment bears the initial burden of "identifying those portions of the pleadings and discovery responses which demonstrate the absence of a genuine issue of material fact." *Cunningham v. City of Los Angeles*, 2004 WL 502309, at *2 (C.D. Cal. Feb. 18, 2004) (citing *Celotex Corp v. Catrett,* 477 U.S. 317, 323 (1986)) (Marshall, J.). In order to defeat a motion for summary judgment, the non-moving party need only demonstrate that there is any specific fact that presents "a genuine issue for trial." *Anderson*, 477 U.S. at 250.  In weighing the facts propounded by the respective parties, "the Court does not make credibility determinations or weigh conflicting evidence and ***draws all inferences in the light most favorable to the nonmoving party***." *Cunningham*, 2004 WL 502309, at *2 (citing *T.W. Elec. Svc., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987)) (emphasis added) (Marshall, J.).

2.     Reasonable efforts taken to reduce COVID-19 risk cannot rise to an Eighth Amendment violation even where those efforts were imperfect and the harm imposed by COVID-19 was "ultimately not averted." *Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (quoting *Farmer*, 511 U.S. at 844); *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020); *Swain v. Junior*, 961 F.3d 1276, 1286 (11th Cir. 2020); *Cameron v. Bouchard*, 815 Fed. Appx. 978, 986 (6th Cir. 2020) (rejecting plaintiffs' attempts to distinguish Williams because their "argument at most shows that defendants' response was imperfect").

**CONTESTED.**

In *Valentine v. Collier*, 993 F.3d 270 (5th Cir. 2021), the Fifth Circuit declined to find prison officials deliberately indifferent because the court's orders had "motivat[ed] the prison officials into action" and they had corrected the prison's

violations by the time of trial. *Id.* at 289 (footnote omitted). In *Wilson v. Williams*, 961 F.3d 829 (6th Cir. 2020), the Sixth Circuit determined that the BOP responded reasonably to the outbreak at one prison through measures such as testing "in accordance with CDC guidance" and "continuous access to sinks, water, and soap." *Id.* at 840-41. In *Swain v. Junior*, 961 F.3d 1276 (11th Cir. 2020), the district court order under review "relied overwhelmingly—if not exclusively" on two factors: the ongoing spread of COVID-19 and the impossibility of physical distancing at the jail. *Id.* at 1286.  The Court of Appeals reversed because (1) the spread of COVID alone does not show a culpable state of mind, and (2) jail officials cannot be deliberately indifferent for failing to do the impossible.  *Id.* at 1287. Each of these cases is distinguishable given the factual situation at Lompoc.

3.      Broad latitude must be given to the local officials entrusted with protecting the health and safety of its citizens. *Calvary Chapel Dayton Valley v. Sisolak*, No. 19A1070, 2020 WL 4251360 (U.S. July 24, 2020); *South Bay United Pentecostal Church v. Newsom*, 140 S.Ct. 1613-1614 (May 29, 2020) (officials' decisions "should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health and is not accountable to the people.")

**CONTESTED.**

The Eighth Amendment protects those in detention against conditions of confinement that are "very likely to cause serious illness and needless suffering." *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life threatening condition in their prison on the ground that nothing yet had happened to them."). When prison authorities "strip [prisoners] of virtually every means of self-protection and foreclose[] their access to outside aid, [they] are not free to let the state of nature take its course." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994).

1

2    4.    In a conditions-of-confinement case, a prison official violates the

3    prohibition against "cruel and unusual punishments," U.S. Const. Amend. VIII,

4    "only when two requirements"—one objective, the other subjective—"are met."

5    *Farmer v. Brennan*, 511 U.S. 825, 834, 846 (1994).

6    **NOT CONTESTED.**

7

8    5.    To satisfy the Eighth Amendment standards, prison officials must

9    ensure that inmates receive adequate food, clothing, shelter, and medical care, and

10   must "take reasonable measures to guarantee the safety of the inmates." *Id*. at 832.

11   **NOT CONTESTED.**

12

13   6.    Inmates alleging Eighth Amendment violations based on unsafe prison

14   conditions must demonstrate that prison officials were deliberately indifferent to

15   their health or safety by subjecting them to a substantial risk of harm. *Id*. at 834.

16   **NOT CONTESTED.**

17

18   7.    Prison officials display a deliberate indifference to an inmate's well-

19   being when they consciously disregard an excessive risk of harm to the inmate's

20   health or safety. *Id*. at 838-40.

21   **NOT CONTESTED.**

22

23   8.    It is "only 'the unnecessary and wanton infliction of pain' … [which]

24   constitutes cruel and unusual punishment forbidden by the Eighth Amendment.

25   *Whitley v. Albers*, 475 U.S. 612, 619 (1986) (quoting *Ingraham v. Wright*, 430 U.S.

26   651, 670 28 (1977)).

27   **NOT CONTESTED.**

28

3723164.1

55

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

9.      To obtain injunctive relief, Petitioners must demonstrate that "prison authorities' current attitudes and conduct" meet the "high legal standard" of deliberate indifference, and will continue to do so in the future. *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004) (emphasis added); *Farmer*, 511 U.S. at 845.

**NOT CONTESTED.**

10.     The "objective prong" of the Eighth Amendment requires a showing that an inmate has been deprived "of the minimal civilized measure of life's necessities.'" *Farmer*, 511 U.S. at 834.

**NOT CONTESTED.**

11.     Petitioners cannot show that the BOP is depriving them of the "minimal civilized measure of life's necessities" or "violating contemporary standards of decency" in addressing the risk of harm to inmates that COVID-19 presents.

**CONTESTED.**

This is not a statement of law, but is instead a conclusory assertion about the facts of this action that remains in dispute. Petitioners' opposition to Respondents' motion sets out the reasons why this statement is false.

12.     "A prison official's duty under the Eighth Amendment is to ensure reasonable safety." *Farmer*, 511 U.S. at 844.

**NOT CONTESTED**.

13.     Petitioners cannot meet the objective prong of the deliberate indifference standard because FCC Lompoc's response is aligned with official guidance from leading world health authorities for mitigating the risks associated with the pandemic. FCC Lompoc has vastly decreased any risk of outbreak by

1  adhering to the CDC guidelines. Measures including staff screening, mask wearing,

2  and testing and quarantine procedures for newly arriving inmates have kept new

3  COVID-19 cases at bay.

4          **CONTESTED**.

5          This is not a statement of law, but is instead a conclusory assertion about the

6  facts of this action that remains in dispute. Petitioners' opposition to Respondents'

7  motion sets out the reasons why this statement is false.

8

9          14.      FCC Lompoc's COVID-19 practices are the same measures that society

10  deems capable of reducing the risk of COVID-19 transmission, and thus reflect the

11  manner in which "today's society chooses to tolerate" that risk. Helling, 509 U.S. at

12  36; *Grinis*, 2020 WL 2300313, at *3 ("These affirmative steps may or may not be

13  the best possible response to the threat of COVID-19 within the institution, but they

14  undermine an argument that the respondents have been actionably deliberately

15  indifferent to the health risks of inmates."); *Nellson*, 2020 WL 3000961, at *8

16  (finding no likelihood of success on merits of Eighth Amendment conditions-of-

17  confinement claim due to COVID-19 and noting that "[c]ompliance with CDC

18  protocols does not demonstrate that defendants are disregarding a substantial risk to

19  inmate health or failing to respond reasonably to the risks of COVID-19").

20          **CONTESTED**.

21          This is not a statement of law, but is instead a conclusory assertion about the

22  facts of this action that remains in dispute. Petitioners' opposition to Respondents'

23  motion sets out the reasons why this statement is false.

24

25          15.      "[A] mere difference of medical opinion is insufficient, as a matter of

26  law, to establish deliberate indifference." *Toguchi v. Chung*, 391 F.3d 1051, 1058

27  (9th Cir. 2004) (internal quotations marks and citation omitted)).

28          **NOT CONTESTED**.

3723164.1

57

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW

1

2       16.    An inmate who the BOP offers "the ability and opportunity to take

3   measures to markedly reduce [their] risk of severe illness or death from COVID-19

4   while incarcerated," but who rejects such measures, cannot reasonably continue to

5   accuse the BOP of being indifferent to their COVID-19 risk, to the point of violating

6   the Eighth Amendment by inflicting cruel and unusual punishment on them.

7       **CONTESTED.**

8       This is not a statement of law, but is instead a conclusory assertion about the

9   facts of this action that remains in dispute. Petitioners' opposition to Respondents'

10  motion sets out the reasons why this statement is false.

11

12      17.    Petitioners also fail to satisfy the subjective prong of their Eighth

13  Amendment claim, which requires them to show that Respondents "kn[ew] of and

14  disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837.

15      **CONTESTED.**

16      This is not a statement of law, but is instead a conclusory assertion about the

17  facts of this action that remains in dispute. Petitioners' opposition to Respondents'

18  motion sets out the reasons why this statement is false.

19

20      18.    The subjective prong requires that "the official must both be aware of

21  facts from which the inference could be drawn that a substantial risk of serious harm

22  exists, and he must also draw the inference." *Id*.

23      **NOT CONTESTED**.

24

25      19.    The Eighth Amendment does not require perfect results. *See id*. at 844

26  ("prison officials who actually knew of a substantial risk to inmate health or safety

27  may be found free from liability if they responded reasonably to the risk, even if the

28  harm ultimately was not averted").

1    **NOT CONTESTED**.

2

3    20.    Petitioners cannot demonstrate that BOP officials currently are acting

4    with deliberate indifference and cannot show that today, Respondents are recklessly

5    disregarding an excessive risk to Petitioners' safety, and that they will continue to

6    do so "into the future." *Id. at* 845.

7    **CONTESTED**.

8    This is not a statement of law, but is instead a conclusory assertion about the

9    facts of this action that remains in dispute. Petitioners' opposition to Respondents'

10   motion sets out the reasons why this statement is false.

11

12   21.    Where a prisoner "seeks injunctive relief to prevent a substantial risk of

13   serious injury from ripening into actual harm, the subjective factor . . . should be

14   determined in light of the prison authorities' current attitudes and conduct[.]" *Id. at*

15   845 (internal quotation marks omitted).

16   **NOT CONTESTED**.

17

18   21.[1]    BOP officials have not acted with deliberate indifference to the risk that

19   COVID-19 poses to inmate populations; rather, they have taken aggressive and

20   appropriate measures to abate that risk at FCC Lompoc.

21   **CONTESTED**.

22   This is not a statement of law, but is instead a conclusory assertion about the

23   facts of this action that remains in dispute. Petitioners' opposition to Respondents'

24   motion sets out the reasons why this statement is false.

25

26

27   ───────────────
     [1]   Respondents' Proposed Conclusions Of Law contained two entries numbered 21.
28   *See* Dkt. No. 251-1 at 26-27.

22.     Although Petitioners and Respondents have minor fact disputes over the implementation about these measures, even if Petitioners' allegations are true, it does not rise to the level of deliberate indifference. *See Wragg*, 2020 WL 2745247, at *21 (no Eighth Amendment violation because there is "no evidence of Respondents' liable state of mind" and noting "physical distancing is not possible in a prison setting, as Petitioners urge, does not an Eighth Amendment claim make and, as such, Petitioners are not likely to succeed on the merits"); *Money v. Pritzker*, 453 F.Supp.3d at 1131 (prisoner petitioners have "no chance of success" as to deliberate indifference because of the measures taken by the Illinois Department of Corrections).

**CONTESTED**.

This is not a statement of law, but is instead a conclusory assertion about the facts of this action that remains in dispute. Petitioners' opposition to Respondents' motion sets out the reasons why this statement is false.

23.     Petitioners cannot succeed on their Eighth Amendment claim given the actions taken by the BOP at FCC Lompoc. *See Farmer*, 511 U.S. at 845 ("[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause."). There is no dispute of material fact that Respondents acted with a high degree of care, and were not acting with deliberate indifference that would transform conditions at FCC Lompoc into an Eighth Amendment "punishment."

**CONTESTED**.

This is not a statement of law, but is instead a conclusory assertion about the facts of this action that remains in dispute. Petitioners' opposition to Respondents' motion sets out the reasons why this statement is false.

24.     The evidence demonstrates that Respondents acted with an extremely

high degree of care, and certainly were not acting with deliberate indifference that would transform conditions at FCC Lompoc into an Eighth Amendment "punishment." *See Wilson v. Seiter*, 501 U.S. 294, 298, 300 (1991).

**CONTESTED**.

This is not a statement of law, but is instead a conclusory assertion about the facts of this action that remains in dispute. Petitioners' opposition to Respondents' motion sets out the reasons why this statement is false.

25.     No further relief is available as Respondents have already complied with the Preliminary Injunction in this case. Any further relief ordering inmates to be transferred to home confinement constitutes a prison release order under the PLRA which may not be enacted by a single district judge, violates 18 U.S.C. § 3621.

**CONTESTED.**

This contains multiple statements.  As to the first sentence, that is not a statement of law, but is instead a conclusory assertion about the facts of this action that remains in dispute. Petitioners' opposition to Respondents' motion sets out the reasons why this statement is false.

As to the second sentence, that is irrelevant for the purposes of this motion.

26.     A district court does not have jurisdiction to challenge the BOP's decisions about places of imprisonment. *See Reeb v. Thomas*, 636 F.3d 1124, 1126-28 (9th Cir.2011) (courts lack jurisdiction to review BOP placement decisions under 18 U.S.C. 2  §§ 3621-25).

**IRRELEVANT.**

27.     Petitioners never moved for class certification beyond certifying the provisional class for purposes of the preliminary injunction and no class is

1  certifiable at this juncture in light of individual inmates electing to refuse offered
2  vaccinations.

3      **CONTESTED.**

4      The Federal Rules of Civil Procedure adopt a flexible approach to class
5  certification, requiring only that the Court certify a class at a "practicable time after
6  a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c)(1)(A); *see*
7  *ABS Entertainment, Inc. v. CBS Corp.*, 908 F.3d 405, 427 (9th Cir. 2018) (striking
8  down as incompatible with the Federal Rules a Central District of California Local
9  Rule which required that Plaintiffs move for class certification within ninety days
10  after service of the complaint.); *City of Inglewood v. City of Los Angeles*, 451 F.2d
11  948, 951 (9th Cir. 1971) (Section (c)(1) of Rule 23 "leaves much room for
12  discretion" for Court to decide timing of class certification).

13

14      28.    The Court's Preliminary Injunction has expired under 18 U.S.C. §
15  2626(a)(2).

16      **CONTESTED.**

17      18 U.S.C. § 2626 is not a statute.

18

19      29.    Petitioners have failed to exhaust administrative remedies and may not
20  bring suit for further injunctive relief regarding FCC Lompoc's response to COVID-
21  19 until they have fulfilled the PLRA's exhaustion requirements. *Maronyan v.*
22  *Toyota Motor Sales, USA, Inc.*, 658 F.3d 1038, 1041-42 (9th Cir. 2011).

23      **CONTESTED.**

24      As has been extensively briefed on multiple occasions, exhaustion of
25  administrative remedies is not required here under either 18 USC § 2241 or the
26  PLRA for three reasons: (1) there is no administrative procedure to be considered
27  for home confinement under the CARES Act; (2) exhaustion would be futile due to
28  the urgency of the COVID-19 pandemic; and (3) administrative remedies are

"effectively unavailable" at this time. (*See, e.g.*, Dkt. No. 18 at 54:16-59:5). When granting the Preliminary Injunction, the Court found that "Petitioners [met] their burden of showing exhaustion is excused because administrative remedies are not available." (Dkt. No. 45 at 43:10-11) (citations omitted). There is no basis for overturning that decision now, and Respondents have not attempted to provide one.

30.     Respondents are entitled to summary judgment as to all of Petitioners' claims.

**CONTESTED.**

This is not a statement of law, but is instead a conclusory assertion about the facts of this action that remains in dispute. Petitioners' opposition to Respondents' motion sets out the reasons why this statement is false.

31.     Any Undisputed Fact which is deemed a Conclusion of Law shall be considered a Conclusion of Law.

**TAUTALOGICAL AND IRRELEVANT.**

1    DATED:  June 8, 2021                Respectfully submitted,

2
                                         Terry W. Bird
3                                        Dorothy Wolpert
                                         Shoshana E. Bannett
4                                        Kate S. Shin
5                                        Oliver Rocos
                                         Christopher J. Lee
6                                        Bird, Marella, Boxer, Wolpert, Nessim,
7                                        Drooks, Lincenberg & Rhow, P.C.

8                                        By:      /s/ Oliver Rocos
9                                                    Oliver Rocos
                                            Attorneys for Plaintiff-Petitioners
10

11

12   DATED:  June 8, 2021                Donald Specter
                                         Sara Norman
13                                       Sophie Hart
14                                       Patrick Booth
                                         Prison Law Office
15

16                                       By:      /s/ Sara Norman
17                                                   Sara Norman
                                            Attorneys for Plaintiff-Petitioners
18

19
     DATED:  June 8, 2021                Naeun Rim
20                                       Manatt, Phelps & Phillips, LLP

21                                       By:      /s/ Naeun Rim
22                                                   Naeun Rim
                                            Attorneys for Plaintiff-Petitioners
23

24

25

26

27

28

3723164.1

64

PLAINTIFFS-PETITIONERS RESPONSES TO DEFENDANTS-RESPONDENTS' STATEMENT OF GENUINE
DISPUTES OF MATERIAL FACTS AND CONCLUSIONS OF LAW