1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

10

| | |
|---|---|
| YONNEDIL CARROR TORRES, et al., | CASE NO. 2:20-cv-04450-CBM-PVCx |
| Plaintiff-Petitioners, | **DECLARATION OF COURT EXPERT DR. HOMER VENTERS** |
| vs. | Honorable Consuelo B. Marshall |
| LOUIS MILUSNIC, in his capacity as Warden of Lompoc, et al., | |
| Defendant-Respondents. | |

11
12
13
14
15
16
17

I, Homer Venters, declare as follows:

18

1.      I was appointed Court Expert in this matter.

19

2.      I make this declaration based on my personal knowledge. Attached as

20

Appendix 3 of my report is a true and correct copy of my report to the Court in this

21

matter.

22

3.      I declare under penalty of perjury under the laws of the United States of

23

America that the contents of my report are true and correct to the best of my

24

knowledge, and that I executed this declaration on March 3, 2022, at Port

25

Washington, NY

26
27
28

1

2

3

4

5

6

7                                                  _/s/ Homer Venters_
                                                   Homer Venters, M.D.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

DECLARATION OF DR. HOMER VENTERS

# EXHIBIT "A"

Third COVID-19 inspection of BOP Lompoc by Dr. Homer Venters

**A.  Table of Contents**

Introduction                                   Page 1
Methodology                                    Page 3
Inspection                                     Page 4
Reports from Incarcerated People               Page 9
Record Reviews                                 Page 12
Findings                                       Page 15
Summary                                        Page 23
Appendices                                     Page 25

**B.  Introduction**

1.  This report is submitted to The Honorable Consuelo B. Marshall, United States District Court Judge, Central District of California in response to an order to perform a third COVID-19 inspection of the Federal Bureau of Prisons (BOP) facility Lompoc. This order relates to case CV 20-4450-CBM-(PVCx) *Torres et al. v. Milusnic et al.*

2.  This facility inspection was ordered by The Court on January 18, 2022 and conducted on February 8 and 9 2022.

3.  In the time since my second inspection in April 2021, have continued to conduct COVID-19 inspections as well as work as a Court-appointed monitor of general health services in detention settings. A list of recent COVID-19 related work is presented in Appendix 2.

Venters-third BOP Lompoc

4. The most recent wave of COVID-19 has proved extremely challenging for jails, prisons and immigration detention settings because of the speed of transmission and the overwhelming number of individual detained people and housing areas where active COVID-19 cases were occurring. The overall mortality rate of the Omicron variant appears to have been significantly lower than the prior Delta variant, and the cohort of people who are high-risk for hospitalization and death during this surge appears to include people who are unvaccinated and people with multiple health problems previously identified by the CDC.[1] This wave of COVID-19 has also been characterized by very rapid transmission among staff members, resulting in significant operational challenges for detention settings in both their COVID-19 responses and basic operations. For facilities with electronic medical records, an important part of outbreak management has been to identify high-risk patients and ensure they are checked on during quarantine periods, even if sufficient staff are not available to check on everyone daily.

5. The CDC guidelines for detention settings, as well as the Bureau of Prisons Policies regarding COVID-19 management continued to recommend several key interventions for COVID-19 including[2];

   a. Testing of all potentially exposed people in quarantine settings multiple times during their quarantine.

   b. Transfer of people newly identified as COVID-19 positive into medical isolation settings.

   c.  Daily symptom checks for people in quarantine.

---

[1] https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e4.htm
[2] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html and https://www.bop.gov/coronavirus/

2

Venters-third BOP Lompoc

6. At the time of this report, the Bureau of Prisons reported that 55,200 cases of COVID-19 had occurred, with 287 deaths among incarcerated people and 7 deaths among staff.[3] No data concerning long-COVID-19 or post-COVID-19 illness are reported publicly by the BOP despite the identification of this as a potential disability by the U.S. Department of Health and Human Services and the designation of a ICD-10 code (U09.9) for this diagnosis.[4]

**C. Methodology**

7. The goal of my third inspection of BOP Lompoc was to assess the adequacy of the facility response to COVID-19 since my last inspection. I focused my inspection on several areas specifically identified by the Court, including;

   a. Protective measures at Lompoc to reduce transmission of COVID-19 (e.g., soap and cleaning supplies made available to inmates; type of masks provided to inmates, number/frequency of masks provided, wearing of masks; social distancing; testing; isolating and quarantining procedures; screening; tracking of inmates with COVID-19 symptoms).

   b. COVID-19 vaccination efforts (e.g., type of vaccine offered; when vaccines offered; boosters; the percentage of inmates who have received one, two, or three doses of the vaccine, respectively; information and education provided to inmates regarding the vaccines).

---

[3] https://www.bop.gov/coronavirus/
[4] https://www.hhs.gov/civil-rights/for-providers/civil-rights-covid19/guidance-long-covid-disability/index.html#:~:text=10%20A%20person%20with%20long,or%20more%20major%20life%20activities. And https://www.aafp.org/journals/fpm/blogs/gettingpaid/entry/new_diagnosis_codes.html

3

Venters-third BOP Lompoc

    c.   The number of inmates at Lompoc (including FCI Lompoc, USP Lompoc, and
Lompoc camps).

    d.   The number of positive COVID-19 cases of Lompoc inmates.

These areas of assessment framed questions to both staff and detained people in my
interviews, as well as the areas of the facilities that I inspected.

8.   Communication regarding the information I required to conduct this inspection, as well
as the timing and logistics of the inspection included attorneys from both BOP and
plaintiffs. Several types of information were requested and are described below and in
Appendix 1.

9.   As with the two prior inspections, BOP Lompoc staff did not block or impede my access
to any part of the facility and were extremely helpful in orienting me to the overall layout
and operations of the facility, the various measures taken in response to COVID-19 and
the current status of COVID-19 mitigation efforts.

**D.  Inspection**

10. The path of the inspection roughly followed the path of the prior inspections, with the
Low being inspected on the first day and the North and South camps and Medium being
inspected on the second day. During this time, I spoke with 44 detained people and
approximately 14 staff members. Staff were very helpful in identifying a spot in each
housing area where I could have brief confidential conversations with people. The
Warden and senior staff were present throughout the inspection, and in each facility. I
also met separately with one of the health services leadership and with the Warden. I
have noted areas of the physical inspection that differed from my initial inspection or

Venters-third BOP Lompoc

appeared relevant to the COVID-19 response but have not repeated the basic description
of each unit.

11. Before starting the physical inspection of the facilities, I met with the Warden and BOP
Lompoc leadership team to ask general questions about the COVID-19 responses since
my last inspection. The BOP Lompoc team indicated that the most recent COVID-19
wave of cases had posed significant challenges in identification of new COVID-19 cases
and movement of people to medical isolation. They also reported that the senior security
and health team had only been assembled in the past month, with the Warden having
been deployed elsewhere shortly after my last inspection and recently returned in a
permanent role. They reported that vaccination efforts had progressed significantly since
my last inspection with over 70% of detained people and staff being vaccinated.

12. The leadership team stated that the influx of over 1,000 transfers from other facilities in
the past several months had created serious challenges in responding to COVID-19. One
issue these transfers created was that people coming from private facilities may come
without any or updated vaccination information, with some having vaccination noted in
their medical records and others having vaccine cards but no documentation in their
transfer records. As a result, determining who needed vaccination and booster shots
became a complicated process that still had not been fully addressed. In addition, the
team reported that efforts they initiated shortly before my last visit to spread out the
bunks in some tightly packed dorm housing areas had been reversed by BOP
headquarters. The leadership team reported access to sufficient PPE and vaccine stock.

13. The team also indicated that during the recent wave of cases, an emphasis had been
placed on identification of COVID-19 among unvaccinated people, meaning that when a

new index case became apparent, testing was conducted for exposed people who were unvaccinated, but not necessarily those who had been vaccinated. They also reported that the daily screening of work crew members had faltered since the last inspection and that they had taken steps to finally implement this in the past several weeks.

14. The team reported that multiple areas had been utilized for medical isolation during the recent surge of COVID-19 cases, including the solitary confinement unit (SHU or Special Housing Unit) of the USP. Current designated areas for medical isolation were the gymnasium for the Low, Unit B at the USP and the Visit Room of the Camp areas. With the exception of two patients in the Visit Room of the Camps, none of those locations had anyone housed in them and there were no other active COVID-19 cases at the time of my inspection.

15. During the inspection I was able to speak with one of the senior health services administrators who provided valuable information about the medical management of the most recent outbreaks. He reported that the approach to limiting testing to only unvaccinated people was developed after consultation with regional and national BOP officials. He reported that his team has conducted several town hall style talks in housing areas to encourage reporting of symptoms and that in a small number of housing areas, daily symptom checks had been conducted once an index case was detected. He also reported that their testing and symptom surveillance of recent COVID-19 cases did identify several patients who met criteria for antibody infusion treatment and that these patients were effectively treated on site.

16. The first area of inspection was the COVID-19 staff screening unit. The staff screening process was unchanged from my prior inspections and continues to be robust, with a

Venters-third BOP Lompoc

three-step process and ample room in the training center for all staff to enter, be asked questions, have their temperature taken and obtain a wrist band. I observed ten staff members pass through screening and the process appeared consistent.

17. The next area of inspection was identified as the logistical unit. Here, I observed approximately 30 pallets of supplies and equipment designated as COVID-19 specific for BOP Lompoc that included surgical gowns, surgical and N95 masks, hand sanitizer and mattresses. This area also included boxes of hand dryers that I was told were being installed in housing areas throughout the Lompoc dorm housing areas.

18. The first facility with detained people that I inspected was FCI Lompoc also referred to as 'the Low'. In this facility I started with an inspection of the Unicor area. This was presented as unused factory space, and potential medical isolation or quarantine area. The space was a large warehouse style building with a bathrooms and four shower stalls. The next area I visited was the gymnasium, which had recently been used for medical isolation. The same setup of shower and bathrooms was still in place from my prior visits and staff mentioned that space heaters had been utilized in the most recent wave of cases because of reports of cold temperatures. Staff showed me an area at the edge of the unit where medical and nursing staff saw patients and conducted pill lines when in use for medical isolation.

19. I next inspected two housing areas in the Low, B and J dorms. Staff reported that the spacing of bunks that I had observed on my prior inspection had been reversed, and pointed out how each side of the housing area now held approximately 20 more people in more tightly packed configuration. The bathrooms of both dorm areas had functioning hand dryers and/or paper towels as well as soap in the dispensers. I next inspected the

chow hall and programs areas, both of which were empty at the time of my inspection.
These areas were clean, and staff reported that the programs area would be utilized again
once the security lockdown was lifted.

20. The next areas I inspected were the North and South Camp areas. Here, the bathrooms of
the three dorms I inspected all had working hand dryers and/or paper towels and soap
was present in the dispensers.

21. In the South Camp, I also went to the Visit Room, a small structure separated from the
dorms which is usually utilized for visitation but was in use as medical isolation for two
people who recently arrived and tested positive. This area has two outside showers and a
bathroom inside. Staff reported that this area was only initiated for medical isolation in
the past 2-3 weeks and that previously, people who were housed in the Camp areas and
tested positive for COVID-19 were transferred to the SHU. The North Camp dining hall
was also inspected, and the missing seats I noted in my prior inspection appeared to have
been re-attached with tape marking present for social distancing.

22. The next area of my BOP Lompoc inspection was the USP (United States Penitentiary)
also known as 'the Medium'. As with my last inspection, I inspected J unit, the three-tier
general population unit. I observed cleaning supplies, as well as soap and paper towels
out in the common spaces, and staff indicated that these supplies were for use by people
in their cells.

23. The next area I inspected was B unit, similar in layout to J unit but which had recently
been utilized for medical isolation. Leadership reported this as a markedly preferable
setting from the standpoint of staff as well as detained people, because people who were
all COVID-19 positive could come in and out of their cells, unlike in the SHU. They also

8

Venters-third BOP Lompoc

reported that people were also able to bring some of their personal property to the unit

from their nearby hosing areas. In addition, the team pointed out spaces on the unit for

sick call encounters and they reported that phones were accessible to people on the unit,

unlike the SHU.

**E. Reports from Incarcerated People**

24. I spoke with 44 detained people during my inspection, 18 at the Low, 19 at North and

South Camps and 7 at USP/The Medium. The following are COVID-19 concerns or

observations that were relayed by at least two of the people I spoke with.

  a. Vaccination. Among the 44 people I spoke with, 33 reported being partially or

    fully vaccinated, which represents a significant increase since my last inspection,

    (75% vs. 46% on prior inspection). Among the 33 people who reported being

    vaccinated, 18 reported being fully vaccinated with a booster shot. In my last

    inspection, I reported on the issue of high-risk people not being vaccinated

    because of a lack of engagement about their health concerns and questions.

    During this inspection, all the people who reported health issues that would make

    them high risk were either vaccinated or reported being individually counseled by

    health staff about the importance of COVID-19 vaccination.

  b. Testing and quarantine. Among the 44 people I spoke with, 26 reported having

    symptoms of COVID-19 in recent weeks but not being tested. Among these

    people, 20 reported that others in their housing area had tested positive for

    COVID-19 around the time of their own symptoms but that there was no effort to

    test everyone in their housing area. The other six people reported that despite two

Venters-third BOP Lompoc

to three weeks of widespread symptoms, nobody in their entire housing area report their symptoms fear of being sent to the SHU, so no positive tests were recorded. Those in unites where COVID-19 was identified reported a consistent practice that health staff made at least one announcement about the importance of reporting symptoms. When asked about reluctance to report their symptoms, the three most common responses people gave were fear of going to the SHU, fear of causing problems in their housing area via extending quarantine and lack of concern about getting seriously ill. Five people reported they sought testing by reporting COVID-19 symptoms at sick call or other times to health staff but were told to return later, with two people reporting multiple unsuccessful efforts to report symptoms and get tested.

c.   Symptom checks during quarantine. Among people in housing areas where COVID-19 was detected, only people in dorm B of the Low reported being checked for COVID-19 symptoms on a daily basis for at least some of their quarantine. This practice was not reported from people in any other housing area during the recent COVID-19 cases and quarantines. In addition, at least five of the 26 people who reported symptoms and no testing were high risk based on age and/or pre-existing health problems and at least two of them reported being ill enough that they had trouble breathing or could not get out of bed or eat for one or more days.

d.   Experience in medical isolation. I spoke with six people who tested positive and were transferred to the SHU for medical isolation. They reported concerns with being cold and unable to get blankets from staff, their cells being dirty and

10

Venters-third BOP Lompoc

uncleaned from prior occupants, and feeling isolated and punished by being locked in a cell 22 or 23 hours per day without property or contact with their families. Two of them also reported a delay of more than 48 hours in getting their previously prescribed medications once in the SHU.

e.  Screening of workers. I spoke with 17 people who reported a work assignment, 14 of whom reported never being screened by staff for symptoms of COVID-19 or having their temperatures checked as part of their daily work. Three of the 17 people reported that they had been checked for elevated temperatures in their work sites in the past month. Work assignments for the people I spoke with included working in medical clinic, education, food service, the shop area, administration, as a clerk and as a porter or orderly.

f.  Access to soap, paper towels and masks. Among the people 44 people I spoke with, only three reported any concerns with soap or paper towel/hand drying access, as compared to 50% of the people I spoke with on my last inspection. One common concern was that during the wave of COVID-19 cases in the Camp areas, toilet paper was not available. Only four people reported any concerns with gaining access to masks.

g.  As with prior inspections, several people reported that their COVID-19 symptoms have endured well beyond the period of acute infection, and that they were neither asked about these symptoms or treated for post-COVID-19 illness.

h.  As with prior inspections, several people reported problems with the sick call system, either that sick call requests went completely unanswered or that the response and time to care took more than one week. One person who is a care

11

level 4, the highest in the BOP classification system, reported ongoing delays in
his access to specialty care.

**F. Record Reviews**

25. The BOP provided several types of information based on my requests, listed in Appendix
1.

26. I requested seven sets of medical records regarding care received during the pandemic
from people I spoke with during my inspection. Most of the records I requested and
reviewed related to care in the preceding two months (December 2021 and January
2022).

27. Among the seven sets of medical records I requested, two were from people who told me
during the inspection their symptoms were checked daily during their quarantine and five
from people who reported their symptoms had not been checked during quarantine. This
was consistent with the reports of staff who indicated that only a small number of
housing areas had been identified for daily symptoms checks when on quarantine as well
as the reports of the wider group of detained people I spoke with. All seven reported they
were vaccinated and that they were not tested for COVID-19 while on quarantine which
was also consistent with staff reports that only unvaccinated people were tested when
COVID-19 cases developed in a housing area during the most recent wave of cases. The
medical records of these people were also consistent with their reports, that in one
quarantine housing area, there was a process to conduct and document COVID-19
symptom checks but in others, there was not. Among the five people reporting no
symptom check during their housing area's recent outbreak, diagnoses included the
following.

12

- A person with ischemic heart disease, chronic kidney disease, hypertension, anxiety disorder and hyperlipidemia, 10 active medications.
- A person with diabetes, hyperlipidemia, 10 active medications.
- A person with Diabetes, Hypertension, Increased Body Mass Index, 11 active medications.
- A person with depression, hypertension, 11 active medications.
- A person with hypertension, ulcerative colitis, 5 active medications.

28. The medical records I reviewed were not sufficient to make an assessment about the overall functioning of the sick call system. The medical records for the one care level four patient did indicate that the facility had identified at least once that his health needs exceed what was available at Lompoc, but the reason for his delay in transfer to a higher level of care was not apparent.

29. I requested two sets of information regarding recent COVID-19 testing at Lompoc. The first was for "Any guidance, directives or policies sent to the Lompoc leadership from regional or national BOP from November 1, 2021 to Feb 1, 2022 regarding the availability of COVID-19 testing supplies and use of these tests, especially with regard to which close contacts should be tested in response to newly detected cases." In response, I was provided with a January 14th memo regarding testing guidance from BOP to facilities. The BOP also reported that "We note however, that while this memorandum was issued to all clinical directors and health services administrators across the BOP, that FCC Lompoc did not experience testing kit shortages and completed at least 1,428 inmate COVID-19 tests from December 1, 2021-February 1, 2022." The memo itself provides guidance on when and how use of tests may be limited during times of short supply but importantly, has no guidance about how to maintain clinical surveillance of untested people in quarantine and how to otherwise detect and treat new cases of COVID-19 that occur.

13

Venters-third BOP Lompoc

30. The second request was for actual testing data that would provide clarity about the
number of people who were tested in individual housing areas once an index case
occurred, and whether or how many people went untested as transmission progressed;
The table below was provided as an example of the format for requested data.

| Unit name/location | Total Census (1/1/22) | Number Tested (12/1/21-2/1/22) | Number Positive (12/1/21-2/1/22) |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| **Total** | | | |

The BOP replied, "Please note that FCC Lompoc does not maintain its testing data
organized by housing unit." Instead, the BOP provided a report of COVID-19 tests for all
FCI and USP over this date range that listed the day, the number of tests and the number
of positive tests per day. This report indicated a total of 1,428 tests during this time
period, 254 of which were positive. Interpreting these test results without housing area-
specific data provides challenges, but staff reported during the inspection that only a
handful of housing units across the entire Lompoc BOP complex had remained free of
new cases during this time. With approximately 2,800 people detained in the USP and
FCI complex, even if only 75% lived in a housing area with a new case of COVID-19
during this period (2,100 people), the CDC and BOP guidelines for testing the entire
exposed housing area for COVID-19 at least twice during the quarantine period should
have resulted in approximately 3,850 tests (4,200 subtracting positive cases which would
reflect people being transferred to medical isolation, and not remaining in quarantine for
a second test).

14

Venters-third BOP Lompoc

31. I requested data on vaccination rates among staff and detained people and was provided information that 79% of staff and 70% of detained people were partially or fully vaccinated.

32. I requested data on hospitalizations and deaths among people with COVID-19 since my last inspection and BOP replied that no hospitalizations or deaths due to COVID-19 occurred during this time. I was informed of one case of trauma in which a person tested positive for COVID-19 in the hospital.

33. I requested data on the number of transfers into the facility with the following categories "Number of transfers into Lompoc from July 1, 2021-Feb 1, 2022 from other BOP facilities and separately, from private BOP contracted facilities." BOP replied that the total number of admissions during this time was 1,663 but that "FCC Lompoc's record-keeping procedures do not sort new intakes by the categories listed in the request.." and that there was not an ability to break out the subtypes of facilities requested.

**G. Findings**

34. As with the last report, my findings are divided into strengths deficiencies and recommendations. My framework for evaluation is based on the areas of update requested by the Court;

- Protective measures at Lompoc to reduce transmission of COVID-19
- COVID-19 vaccination efforts
- The number of inmates at Lompoc (including FCI Lompoc, USP Lompoc, and Lompoc camps)
- The number of positive COVID-19 cases of Lompoc inmates.

35. Strengths of the BOP/Lompoc COVID-19 response.

15

a. Vaccination. BOP Lompoc has achieved considerable success in their efforts to promote widespread COVID-19 vaccination among staff and detained people alike. Since my last inspection, they have moved from approximately 50% vaccination to 70%, both among people I spoke with and in facility-wide statistics. Importantly, they appear to have effectively engaged with high-risk patients and the few high-risk patients I encountered who remained unvaccinated all reported multiple efforts of engagement on this issue by health staff.

b. Access to hygiene items/equipment. All the housing areas I inspected had ample supply of soap and had either hand dryers or paper towels. People I spoke with also reflected that this part of the COVID-19 response had consistently improved, with the one exception of recent access to toilet paper in the Camps. Concerns regarding mask availability were also minimal.

c. Staff screening. The staff intake screening process continues to operate in a manner that effectively checks each staff member for elevated temperature and COVID-19 symptoms before they start their shift. This process shows that BOP has remained committed to detecting new cases of COVID-19 among staff, even as vaccination efforts continue, consistent with CDC guidance.

d. Medical isolation. While medical isolation is presented as a deficiency below, the most recent efforts of the new leadership team to change the environment and approach to medical isolation is very important. People cannot be expected to report symptoms of any disease if reporting results in them being punished. One of the very critical elements of the B unit in USP is that the doors do not remain constantly locked on individual cells, meaning that people can move in and out of

16

those cells as they wish. This one facet of medical isolation, whether a person is constantly locked behind a cell door, is crucial to whether the other parts of medical isolation are experienced as punishment or care. Similarly, access to phones, routine medical care, recreation and reading material were discussed by the team as important to maintain during medical isolation. The Lompoc team recognized these aspects of improving their approach to medical isolation and their approach should be replicated elsewhere as standard.

e.  Cleanliness. As with prior inspections, the housing areas were generally clean and free of debris during my inspection, in both living quarters and bathrooms. Cleaning solution for personal spaces also appeared abundant during the time of my inspection.

f.  PPE. The Lompoc BOP facilities displayed ample PPE and the staff were knowledgeable about how to don and doff their protective equipment.

36. Deficiencies in the BOP/Lompoc COVID-19 response.

a.  Testing. Available data indicated that many of the people who were recently infected with COVID-19 in Lompoc BOP were never tested, thus creating a significant undercount of cases. The BOP team acknowledged this reality throughout my inspection and offered several rationales for the failure to test entire housing areas when new cases were detected, including prioritizing scant testing supplies for unvaccinated people, limiting the disruption of movement to medical isolation and imposition of new quarantines. The official BOP response I received after inspection states that there was never a shortage of testing supplies, and the team made clear that these decisions about testing were made in

17

Venters-third BOP Lompoc

consultation with BOP leadership. Ultimately, the motives for this approach remain unclear to me but it is uncontested that the guidance from the BOP and the CDC in response to new index cases of COVID-19 in detention was and remains to initiate serial testing of close contacts especially when testing kits are available. For example, CDC guidelines include the following;

> "Serial re-testing of a quarantined cohort: If quarantine cohorts are used (i.e., people who are exposed are quarantined together rather than individually due to space constraints or mental health concerns), facilities should conduct serial re-testing of the entire quarantined cohort, *regardless of their vaccination and booster status.* [emphasis CDC] Facilities should re-test people quarantined as a cohort every 3–7 days until testing identifies no new cases in the cohort for 10 days since the most recent positive result. The testing interval should be based on the stage of an ongoing outbreak (i.e., testing every 3 days can allow for faster outbreak control in the context of an escalating outbreak; testing every 5–7 days is sufficient when transmission has slowed)."[5]

The need for testing all people after potential exposure is also clear in the most recent BOP COVID-19 guidelines:

---

[5] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html#TestingConsiderations

18

Venters-third BOP Lompoc

> "All incarcerated/detained persons should be tested for SARS-CoV-2
>
> following exposure to suspected or confirmed COVID-19 or if they
>
> develop any symptoms of COVID-19."[6]

This issue was also exacerbated by the profound reluctance of people to report
their symptoms for fear of being placed into the punitive environment of the SHU.
The team at Lompoc BOP has undertaken important efforts to change how they
implement medical isolation, which is clear from unit B of the USP and the Visit
Room of the Camps, but there is still a need to quickly implement testing of all
close contacts when new index cases of COVID-19 occur. This need flows from
the requirement for managers of any outbreak to understand and act on the true
incidence of disease, but it also flows from the right of people who are
incarcerated to know if/whether they have contracted an infection and receive
both a correct diagnosis and care. Based on the testing data I was provided, along
with the reports of the BOP Lompoc team that virtually every housing area had
cases of COVID-19 in this recent wave, and the stated practice of only testing the
unvaccinated (who were fortunately a small share of the total prison population), I
would estimate that at least half of the people who contracted COVID-19 in
December 2021 and January 2022 were not tested.

b.  Lack of symptom checks during quarantine. As new index cases of COVID-19
    occurred in the most recent wave of infections, it is clear from staff, detained
    people and medical records that only a small portion of people who were close

---

[6] Federal Bureau of Prisons (BOP) COVID-19 Pandemic Response Plan, COVID-19 Modified Operations Matrix,
February 4, 2022.

contacts were checked on a daily basis for new symptoms of COVID-19. This

approach has been a mainstay of CDC guidelines since the outset of the pandemic

and many of the deaths I have investigated involved people quietly deteriorating

in a quarantine unit.

c.  Lack of vaccine documentation. Multiple people reported that their documents

regarding vaccination while in private BOP contracted facilities were incomplete,

either in their personal medical records or in their access to vaccination cards.

BOP Lompoc staff confirmed this problem.

d.  Worker screening. It is apparent that BOP Lompoc has still failed to implement

screening of inmate workers since this issue was raised in my prior inspection

reports. The current leadership have undertaken efforts to implement this

approach and state that they view this as an important part of limiting the spread

of COVID-19.

e.  Punitive approach to quarantine. The SHU is clearly the primary reason people

report for not reporting COVID-19 symptoms. Since 2020, the CDC has made

clear the need for non-punitive approaches to medical isolation in responding to

COVID-19. But the way this unit is administered, both as a high

security/punishment unit, and simultaneously as a medical isolation, creates a

harsh and punitive environment that effectively deters reporting of symptoms.

Many people who contracted COVID-19 in December 2021 and January 2022

were sent to this unit and the more humane and clinically appropriate approaches

of the B unit in MSP should set the standard for future responses. The SHU

should not be utilized for both high security/punishment reasons at the same time it is utilized for medical isolation.

f.  Lack of population health approach. Some of the very basic elements in managing an outbreak appear difficult or impossible because of the BOP's approach to information management. For example, a core part of COVID-19 has been to identify and track each housing area under quarantine and then do daily checks of the people inside for symptoms and conduct periodic or serial testing. Whenever a new case is detected, the 'clock' for quarantine should re-start. This information is not only needed to manage the daily tasks inside a housing area, but to track resource needs for tests, staffing for the symptom checks and manage access to meals, recreation, and other medical and mental health services. I am very concerned that the BOP has not developed the capacity to examine and review housing areas for the number of people who were tested (or missed for testing) in a given time period, one of the most basic and common tasks during this pandemic. Similarly, the inability of the BOP to identify the subset of people newly transferred from the private facilities is concerning because they themselves have identified issues with vaccination documentation in these settings and have a clear interest in determining the true vaccination status of each of these individuals.

37. Recommendations to mitigate morbidity and mortality from COVID-19 at BOP Lompoc.

Recommendation 1. The BOP should ensure that all people in quarantine units at Lompoc BOP are tested for COVID-19 a minimum of two times during their quarantine period.

Venters-third BOP Lompoc

For fully vaccinated people, there is still a need for testing after exposure, as the CDC has made clear. The BOP should also undertake a review of how many of their facilities were advised to take the approach of Lompoc during the Omicron wave of cases and provide an estimate of the number of COVID-19 cases that occurred in the absence of testing. This process should occur in collaboration with the CDC and should include the following estimates;

- How many cases of COVID-19 occurred without being tested/detected?

- What is the prevalence of long-COVID-19/post-COVID-19 symptoms among both tested and untested cases?

- How many hospitalizations and deaths occurred among people who were infected with COVID-19 but not initially tested?

Recommendation 2. BOP Lompoc should implement basic daily COVID-19 screenings for elevated temperature and symptoms of all people who are in a quarantine unit and those who work outside their housing areas.

Recommendation 3. BOP Lompoc should take steps to further enable social distancing by restoring and maintain the preliminary bunk modifications that increase space between bunks throughout the facility.

Recommendation 4. BOP Lompoc should review the transfer records for all people moving from private facilities to assess the lack of COVID-19 documentation regarding illness, vaccination and treatment.

Recommendation 5. BOP Lompoc should establish a standardized chronic care clinic for long COVID-19 or post-COVID-19 illness to find and treat people with ongoing symptoms. Approximately 10% of the people I have interviewed at Lompoc report

COVID-19 symptoms more than a month past their acute phase of illness. This rate is

lower than many community estimates, but the sample of people I have spoken with is

relatively small. [7]  Nonetheless, the facility reports only being aware of four people with

this issue and a structured approach to finding, diagnosing and treating these patients is

required.

Recommendation 6. The BOP should ensure that all facilities can track both quarantine

and medical isolation settings to ensure that people are not missed for testing, diagnosis

and treatment. This approach requires use of housing area as a variable of analysis.


**H.  Summary**

Since my initial last inspection, the Omicron wave of COVID-19 has overwhelmed Lompoc

BOP. There were fortunately no deaths or even serious illness reported during this time. Both

the efforts of the facility regarding vaccination and the lower case mortality of this variant

likely contributed to this positive outcome. The leadership of BOP Lompoc have made

impressive gains in vaccination of staff and detained people alike, efforts which have likely

saved lives. The facility team has also taken late, but much-needed efforts to stop using the

SHU for medical isolation and instead rely on more humane and clinically appropriate

settings. But the BOP committed a serious error and departed from basic COVID-19

response principles when they decided to limit testing during the recent outbreak. This error

was compounded by the lack of symptom checks in housing areas full of people who were

---

[7] https://www.cdc.gov/mmwr/volumes/70/wr/mm7036a1.htm and https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/post-covid-conditions.html and https://www.psu.edu/news/research/story/how-many-people-get-long-covid-more-half-researchers-find/ and https://www.medpagetoday.com/infectiousdisease/covid19/94524

Venters-third BOP Lompoc

clearly close contacts of cases, some of whom were high-risk patients and who reported being bedbound for days with COVID-19 symptoms. I have no doubt that some of these patients would have met clinical criteria for monoclonal antibody treatment, which the facility was clearly adept at providing. These errors reflect a lack of evidence-based guidance from BOP headquarters and combined with the undoing of bed spacing and problems with vaccine documentation among newly transferred patients, raise serious concerns about the centralized management of COVID-19 responses in the BOP. If a future outbreak of COVID-19 occurs in the BOP Lompoc facilities I believe that addressing these deficiencies, and maintaining these strengths, will be critical to limiting morbidity and mortality.

Executed this 3rd day of March, 2022 in Port Washington, NY

Signed,

Homer Venters MD, MS

Venters-third BOP Lompoc

**Appendix 1. Materials reviewed for third Lompoc inspection report**

- Guidance on testing limitation from BOP to facilities
- Facility testing data
- Data on vaccinations, COVID-19 cases and hospitalizations
- Medical records of seven inmates
- BOP COVID-19 policies and procedures

Venters-third BOP Lompoc

**Appendix 2. New COVID-19 engagements since second report**

- Northeast Florida State Hospital, FL (for oversight organization)
- Florida State Hospital, FL (for oversight organization)
- Western Regional Jail, WV (for plaintiffs)
- Northern Regional Jail, WV (for plaintiffs)
- Tygart Regional Jail, WV (for plaintiffs)
- Women's Community Correctional Center, HI (for state monitoring panel)
- Halawa Correctional Facility, HI (for state monitoring panel)
- Oahu Community Correctional Center, HI (for state monitoring panel)
- Maui Community Correctional Center, HI (for state monitoring panel)
- Kauai Community Correctional Center, HI (for state monitoring panel)
- Clayton County Jail, GA (for plaintiffs)
- Cummings Unit Prison, AK (for plaintiffs)
- Varner Unit Prison, AK (for plaintiffs)
- Ouachita Unit Prison, AK (for plaintiffs)
- East Arkansas Regional Unit, AK (for plaintiffs)

Venters-third BOP Lompoc

**Appendix 3. Declaration, see attached**